QUINN EMANUEL URQUHART & SULLIVAN, LLP
Yury Kapgan (Bar No. 218366)
  yurykapgan@quinnemanuel.com
Patrick Schmidt (Bar No. 274777)
  patrickschmidt@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

Michael F. LaFond (Bar No. 303131)
  michaellafond@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

Attorneys for Plaintiff Wisk Aero LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WISK AERO LLC, | CASE NO. 5:21-cv-02450-WHO |
| Plaintiff, | **PLAINTIFF WISK AERO LLC'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY** |
| vs. | |
| ARCHER AVIATION INC., | |
| Defendant. | **Hearing:** <br> **Date: July 7, 2021** <br> **Time: 2:00 PM** <br> **Judge: The Honorable William H. Orrick** |

TO DEFENDANT ARCHER AVIATION INC. AND ITS COUNSEL OF RECORD:

PLEASE TAKE NOTICE that on **July 7, 2021** at **2:00 P.M.**, or as soon thereafter as the matter may be heard, in the courtroom of the Honorable William H. Orrick at the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, Plaintiff Wisk Aero LLC ("Wisk") shall and hereby does move the Court for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65.

Wisk's motion seeks the following forms of injunctive relief, as set forth more fully in the Proposed Order submitted with this Motion, as required by Local Rules 65-2 and 7-2:

- An order prohibiting Defendant Archer Aviation Inc. ("Archer") from using or disclosing Wisk's trade secrets, as identified in Wisk's Disclosure of Asserted Trade Secrets, which is Exhibit 1 to the Declaration of Yury Kapgan;

- An order prohibiting Archer, and all of Archer's employees and agents, from destroying, deleting, or concealing evidence;

- An order directing Archer to identify all persons or entities to whom Archer has disclosed one or more of Wisk's trade secrets, or whom Archer knows to be in possession of one or more of Wisk's trade secrets;

- An order directing Archer to permit Wisk's counsel to inspect and image any computers, USB flash drives, or other electronic storage devices in Archer's possession, custody or control that contain, or previously contained, one or more of Wisk's trade secrets; and

- An order directing Archer to permit Wisk's counsel to inspect and copy (or image) any documents or other materials that are within Archer's possession, custody, and control, and that contain information consisting of, or derived from, Wisk's trade secrets.

In addition to the foregoing injunctive relief, Wisk further requests an order permitting expedited discovery from Archer pursuant to Federal Rule of Civil Procedure 26(d)(1), so that Wisk may take discovery to aid in the enforcement of a preliminary injunction, or, in the alternative, take discovery in support of further requests for preliminary relief.

Wisk's motion is based on this notice of motion and supporting memorandum of points and authorities, the supporting declarations of Dr. Randy Collins, Dr. Farhan Gandhi, Michael Kunkel, Geoff Long, Caryn Nightengale, Carlie Russell, and Yury Kapgan, the accompanying exhibits to those declarations, Wisk's forthcoming reply briefing in further support of this motion and supporting declarations and accompanying exhibits, Wisk's proposed order, as well as other written or oral argument that Wisk may present to the Court. Additionally, should expedited discovery provide good cause, Wisk respectfully reserves the right to expand the scope of its preliminary injunction request.

DATED: May 19, 2021

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  /s/ Yury Kapgan
     Yury Kapgan
     Patrick Schmidt
     Michael LaFond

Attorneys for Plaintiff Wisk Aero LLC

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ..................................................................................................1

II.   STATEMENT OF FACTS ....................................................................................3

      A.    The Emerging eVTOL Market ...................................................................3

      B.    Wisk And Its Competitors Invest A Decade Developing New Types of
            Aircraft And Their Fundamental Enabling Technologies ...........................4

      C.    Wisk's Trade Secret Technology ...............................................................5

      D.    Archer's Late Entry To The eVTOL Market .............................................7

      E.    Archer's Theft of Wisk's Intellectual Property ........................................8

      F.    Wisk Contacts the Authorities; Archer Copies Wisk's Design ..................8

III.  LEGAL STANDARD ..........................................................................................11

IV.   ARGUMENT .......................................................................................................11

      A.    Wisk Is Likely To Succeed On Its Trade Secret Claims ..........................11

            1.    Wisk Possesses Valuable Trade Secrets ........................................12

            2.    Archer Misappropriated Wisk's Trade Secrets .............................14

            3.    Archer's Design Directly Reflects Use Of Certain Trade Secrets ...............17

      B.    Wisk Has Suffered And Will Continue To Suffer Irreparable Harm Without
            An Injunction ...........................................................................................21

      C.    The Balance Of Hardships Strongly Favors An Injunction ......................22

      D.    The Public Interest Supports An Injunction .............................................23

      E.    The Court Should Not Set a Bond .............................................................24

V.    WISK SHOULD BE GRANTED LEAVE TO TAKE EXPEDITED DISCOVERY .........24

VI.   CONCLUSION ....................................................................................................25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*2Die4Kourt v. Hillair Capital Mgmt., LLC*,
    2016 WL 4487895 (C.D. Cal. Aug. 23, 2016) ............................................................... 23

*Advanced Modular Sputtering, Inc. v. Superior Ct.*,
    132 Cal. App. 4th 826 (2005) .......................................................................................... 12

*Ajaxo Inc. v. E\*Trade Grp. Inc.*,
    135 Cal. App. 4th 21 (2005) ............................................................................................ 16

*Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*,
    2018 WL 4697255 (C.D. Cal. Aug. 3, 2018) ................................................................. 17

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*,
    331 F. Supp. 3d 977 (N.D. Cal. 2018) ........................................................................... 14

*C2 Educ. Sys., Inc. v. Lee*,
    2018 WL 3328143 (N.D. Cal. July 6, 2018) .................................................................. 24

*Comet Techs. United States of Am. Inc. v. Beuerman*,
    2018 WL 1990226 (N.D. Cal. Mar. 15, 2018) ...................................................... 13, 24, 25

*Dish Network L.L.C. v. Ramirez*,
    2016 WL 3092184 (N.D. Cal. June 2, 2016) ................................................................. 22

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
    869 F.3d 848 (9th Cir. 2017) ........................................................................................... 11

*Droeger v. Welsh Sporting Goods Corp.*,
    541 F.2d 790 (9th Cir. 1976) ........................................................................................... 17

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*,
    730 F.2d 61 (2d Cir. 1984) ............................................................................................... 22

*Genentech, Inc. v. JHL Biotech, Inc.*,
    2019 WL 1045911 (N.D. Cal. Mar. 5, 2019) ................................................................. 16

*GTAT Corp. v. Fero*,
    2017 WL 7035655 (D. Mont. May 3, 2017) .................................................................. 16

*Henry Schein, Inc. v. Cook*,
    191 F. Supp3d 1072 (N.D. Cal. 2016) ..................................................................... 11, 22

*Heritage Cablevision of California, Inc. v. J.F. Shea Co., Inc.*,
    1990 WL 1241400 (N.D. Cal. June 4, 1990) ................................................................. 22

*Hilderman v. Enea TekSci, Inc.*,
    551 F. Supp. 2d 1183 (S.D. Cal. 2008) .......................................................................... 13

*I-Flow Corp. v. Apex Med. Techs., Inc.*,
    2008 WL 2233962 (S.D. Cal. May 23, 2008) ............................................................... 12

*Johnson v. Couturier*,
    572 F.3d 1067 (9th Cir. 2009) ......................................................................................... 24

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
    941 F.2d 970 (9th Cir. 1991) ........................................................................................... 22

*Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*,
   944 F. Supp. 2d 775 (N.D. Cal. 2013) .................................................................. 15

*Memry Corp. v. Kentucky Oil Tech., N.V.*,
   2007 WL 2746737 (N.D. Cal. Sept. 20, 2007).................................................... 17

*Netlist Inc v. Diablo Techs. Inc.*,
   2015 WL 153724 (N.D. Cal. Jan. 12, 2015) ...................................................... 22

*Phoenix Techs., Ltd. v. DeviceVM, Inc.*,
   2010 WL 8590525 (N.D. Cal. Mar. 17, 2010) .................................................. 12

*Pyro Spectaculars N., Inc. v. Souza*,
   861 F. Supp. 2d 1079 (E.D. Cal. 2012) ............................................................ 13

*Q-Co. Indus., Inc. v. Hoffman*,
   625 F. Supp. 608 (S.D.N.Y. 1985) ................................................................... 14

*Twitch Interactive, Inc. v. Johnston*,
   2017 WL 1133520 (N.D. Cal. Mar. 27, 2017) .................................................. 24

*Vacco Indus., Inc. v. Van Den Berg*,
   5 Cal App. 4th 34 (1992) ................................................................................... 15

*Vinyl Interactive, LLC v. Guarino*,
   2009 WL 1228695 (N.D. Cal. May 1, 2009) .................................................... 23

*Washington v. Lumber Liquidators, Inc.*,
   2015 WL 2089992 at *2 (N.D. Cal. May 5, 2015) ........................................... 25

*Waymo LLC v. Uber Techs., Inc.*,
   2017 WL 2123560 (N.D. Cal. May 15, 2017) ............................... 12, 17, 22, 23

*WeRide Corp. v. Kun Huang*,
   2019 WL 5722620 (N.D. Cal. Nov. 5, 2019) ................................................... 15

*WeRide Corp. v. Kun Huang*,
   379 F. Supp. 3d 834 (N.D. Cal. 2019) ............................. 11, 12, 13, 16, 17, 22, 23

**Statutory Authorities**

18 U.S.C. § 1836 ........................................................................................................ 11

18 U.S.C. § 1836(b)(3)(A) .......................................................................................... 11

18 U.S.C. § 1839 .................................................................................................. 14, 15

18 U.S.C.A. § 1839(6) ......................................................................................... 12, 13

Cal. Civ. Code § 3426.1 ........................................................... 11, 12, 13, 14, 15

Cal. Civ. Code § 3426.2 .............................................................................................. 11

Cal. Civ. Proc. Code § 2019.210 ............................................................................... 12

**Rules and Regulations**

Fed. R. Civ. P. 26 ....................................................................................................... 24

## I.  **INTRODUCTION**

Plaintiff Wisk Aero LLC ("Wisk") files this Motion for Preliminary Injunction to stop the brazen theft of Wisk's trade secrets by Defendant Archer Aviation, Inc. ("Archer").[1]  Wisk has spent over a decade, and hundreds of millions of dollars, working with hundreds of engineers, to develop a unique, cutting-edge electric vertical takeoff and landing ("eVTOL") aircraft that Archer appears to have ripped off wholesale.  Archer accomplished this theft by hiring a cadre of Wisk employees, at least one of whom downloaded ***thousands*** of confidential files before departing to Archer.  With Wisk's trade secrets in hand, and after hardly a year in existence with only a small number of employees, Archer has publicly disclosed that it is developing and will soon be flying a virtual copy of a confidential sixth-generation aircraft design Wisk submitted to the U.S. Patent & Trademark Office over a year ago.  This design was never publicly disclosed until it appeared in Archer's February 2021 marketing materials.  This lawsuit ensued shortly thereafter.  Upon learning of the lawsuit, Archer revealed to the New York Times that it was the subject of a criminal government investigation, which relates to the conduct alleged here.

The similarities between the two companies' designs could not have been a coincidence or the result of independent development by Archer.  It does not take a PhD in aerospace engineering to recognize the similarities:

| Wisk (January 2020 Patent Application) | Archer Investor Deck 2021 |
|---|---|
|  |  |
|  |  |

---

[1]  Wisk's Complaint also alleges infringement of four Wisk patents.  The present Motion, however, focuses only on the irreparable injury threatened by the trade secret theft.

As Wisk describes in its detailed Disclosure of Asserted Trade Secrets accompanying this motion, *see* Declaration of Yury Kapgan ("Kapgan Decl.") Ex. 1, the trade secrets contained in the files downloaded by Archer employees span the gamut of systems used within the aircraft, such as propulsion, electrical, power distribution and management, avionics, and flight control, as well as information that could be used to manufacture the aircraft. These highly valuable files include detailed information about the history of Wisk's eVTOL aircraft development, the reasons for making certain design choices over others, the various tradeoffs involved, and tangible solutions to difficult engineering challenges arising in the design of eVTOL aircraft. They collectively represent years and countless hours of research, development and testing by hundreds of Wisk engineers.

Given the innumerable design choices that can be made for various aspects of an eVTOL aircraft, it is inconceivable that a competitor could have independently developed the exact same configuration as Wisk, let alone done so in a fraction of the time, and with a fraction of the employees as Wisk and other similarly situated competitors. As the expert declarations accompanying this Motion confirm, to know that a particular eVTOL aircraft configuration is viable—let alone ready to be flown within months—requires an immense amount of time, research, and resources, that simply could not have been achieved independently and legitimately in the short time Archer has been in existence and with the limited engineering resources available to it.

Other serious competitors who have announced plans to commercialize eVTOL aircraft anticipate spending seven or eight years to move from building a prototype to certification by the Federal Aviation Administration ("FAA"). Yet Archer has inexplicably claimed it can accomplish the same feat in just three years. Given the downloads of files by Archer employees containing Wisk's confidential information and trade secrets, Archer's announcement of an improbably short development timeline is not a coincidence. Rather than start from scratch (or from information that is publicly available), Archer simply shortcut the development process and decided to rely on the trade secrets and confidential information already built by Wisk—shaving years off Archer's timeline.

In fact, Archer's improper shortcut is corroborated by the candid statements of its own co-founders about how they achieved their purported progress. Acknowledging that "a lot of the folks from Archer came from Wisk," whom they called an "incredible group with incredible technology,"

Archer's co-founders freely admitted "our team here at Archer has been working on this for 10 years"—despite Archer having no meaningful operations prior to 2020. They admitted that the Archer design "is the *sixth* aircraft they're building," which seems to be another fitting "coincidence" given that Wisk's submission to the U.S. Patent & Trademark Office contained a design for Wisk's *sixth*-generation aircraft. Indeed, Archer's founders asserted that "we're not waiting on any technology breakthroughs"—which is only possible because Wisk already spent tremendous resources to develop the technologies Archer is now illicitly exploiting.

There is only one conclusion to be drawn from the theft of Wisk's files, Archer's too-short-to-be-true development timeline, and its copy of Wisk's unreleased aircraft design: Archer's business is built on Wisk's intellectual property. Wisk respectfully requests the Court to issue a preliminary injunction to stop Archer's egregious misappropriation and preserve the status quo pending trial.

## II.    STATEMENT OF FACTS

### A.    The Emerging eVTOL Market

Recent advances in electric propulsion and battery technology have created the opportunity for a new class of light, electrically-powered aircraft that take off and land vertically, hover in place, and fly at a constant altitude. The availability of eVTOL aircraft is widely expected to revolutionize urban mobility, with the prospect of bringing clean, on-demand, and cost-efficient transportation to the masses. Even conservative estimates suggest that the market for urban air mobility could exceed $1 trillion by 2040. *See* Kapgan Decl. Ex. 2. Other estimates predict the market could exceed $15 billion by as early as 2030. *Id*. Ex. 3.

While the promise of eVTOL aircraft has recently become clear, a host of technical challenges remained before such vehicles could meet all of the reliability, safety, scalability, and regulatory requirements necessary to for long-term commercial viability. A number of early entrants to the eVTOL market—including Wisk—have grappled with these challenges over the past decade, investing hundreds of millions of dollars in research and development to create a highly diverse set of

novel aircraft designs.  Some examples include the designs depicted below.[2]



**B.    Wisk And Its Competitors Invest A Decade Developing New Types of Aircraft And Their Fundamental Enabling Technologies**

Wisk was originally founded in 2010 as a startup focused on the development and manufacture of piloted and autonomous eVTOL aircraft.[3]  Declaration of Geoff Long ("Long Decl.")  ¶¶ 2, 5-6. Between 2011 and 2014, Wisk pursued research related to next-generation electric aircraft and, in particular, the battery and power system technology and form factors capable of providing the energy-to-weight ratios necessary for such aircraft.  *Id.* ¶¶ 5-6.  By 2015, Wisk had developed a promising aircraft design designated "Grits," which, in contrast to designs put forward by other eVTOL companies, relied on a fixed wing mounted on the aircraft's fuselage, with 12 separate rotors, two of which could tilt from a vertical to a horizontal position, and a V-shaped tail.  *Id*. ¶ 7.  By 2018 Wisk had further developed this unique design into its fifth-generation and current flagship aircraft, Cora (pictured below).  *Id*. ¶ 9.  In June 2019, Wisk began operating as a joint venture with Boeing to

---

[2] These images depict aircraft designs from several competitors in the eVTOL industry, as identified by Archer in a February 10, 2021, investor presentation.  *See* Collins Decl. Ex. 2 at 27 (identifying Joby Aviation, Lilium, Volocopter, EHang, and Wisk as competitors of Archer); *see also* Declaration of Farhan Gandhi (hereafter "Gandhi Decl.") ¶¶ 15-19 (authenticating aircraft images).

[3] The company now known as Wisk was originally founded as Levt, Inc. and later known as Zee.Aero Inc.  In 2016, Zee.Aero merged with sister company Kitty Hawk Corporation and took on the Kitty Hawk name.  In 2019, Kitty Hawk and The Boeing Corporation ("Boeing") formed a joint venture and spun off the Zee.Aero business unit, renaming it Cora Aero LLC, which was later renamed Wisk Aero LLC.  *See* Long Decl. ¶¶ 3-4.

further develop eVTOL aircraft, focusing on the Cora design as a potential air taxi. Long Decl. ¶ 4.



Wisk's multi-year journey from concept to commercialization in the form of the Cora aircraft is consistent with Wisk's competitors in the eVTOL industry and reflects the inherent challenges of developing a new class of aircraft from the ground up. Gandhi Decl. ¶¶ 14-22. Wisk's competitors, including Joby Aviation, Lilium, Volocopter, and Ehang, all required (or estimate that they will require) at least seven or eight years to move from a prototype to a final, FAA certified aircraft. *Id.* Moreover, based on their ground-up development processes, each of these major industry players field designs that look nothing like each other. *Id.* ¶ 22.

Today, Wisk continues to push the boundaries of eVTOL research and design and is currently in the process of developing its sixth-generation aircraft. Long Decl. ¶ 10. One potential design for such aircraft can be found in the figures of a confidential patent application Wisk submitted in January 2020, excerpted below, which illustrates an evolution in the fixed-wing, lift-fan, and tail designs of Wisk's previous generation aircraft. *See* Long Decl. Ex. A (January 2020 Patent Application).

**Wisk's Confidential January 2020 Patent Application**



### C. Wisk's Trade Secret Technology

As a result of Wisk's decade-long investment in research and development, it has developed a huge body of intellectual property directed to various aspects of eVTOL aircraft and, in particular, its specific fixed-wing, lift-fan based designs. *See, e.g.*, Declaration of Randy Collins ("Collins Decl.")

¶ 28; Gandhi Decl. ¶¶ 65-73. Wisk has maintained confidentiality over a significant amount of its intellectual property, which constitute its trade secrets. *See* Declaration of Caryn Nightengale ("Nightengale Decl.") ¶¶ 3-9, 10-18, 19-25; Kapgan Decl. Ex. 1.

For example, a number of Wisk's trade secrets relate to its ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Gandhi Decl. ¶¶ 37, 45, 50, 57, 67. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████. *Id.* ¶¶ 38-39, 46-47, 51-53, 58.

Another example of Wisk's trade secrets relates to its ████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████ Collins Decl. ¶ 28 (first bullet). ███████████████████████████████████████████ ████████████████████████████████████████████████. *Id.* (third and fourth bullets). ███████████████████████████████████████████████████████ ████████████████████████████████████████. *Id.* ¶¶ 35-42, 43-47, 48-53.

Wisk's trade secrets also include secrets that relate to ████████████ ████████████████████████████████████████████████████████████████ ██████████. *Id.* ¶¶ 28 (fifth bullet). Again, Wisk's trade secrets in this field of technology ████ ████████████████████████████████████████████████████████████████ ████████████████████████. *Id.* ¶¶ 54-58.

Yet another category of category of Wisk's trade secrets relate to ████████ ████████████████████████████████. *Id.* ¶ 28 (ninth bullet). ████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████

1 ████████████████████████████████████████████████████████████. *Id.*

2 ¶¶ 28 (ninth bullet), 59-63.

3      These categories are just a sampling of Wisk's trade secrets, which are more fully articulated

4 in its Disclosure of Asserted Trade Secrets. *See* Kapgan Decl. Ex. 1. Wisk takes extensive measures

5 to protect this trade secret information, using physical security measures, document marking,

6 electronic security measures, and legal security measures. Nightengale Decl. ¶¶ 3-9, 10-18, 19-25.

7      **D.**     **Archer's Late Entry To The eVTOL Market**

8      In contrast to Wisk, Joby, Volocopter, and other serious competitors in the eVTOL field,

9 Archer does not appear to have begun serious work on any aircraft until last year. On paper, Archer

10 was incorporated by Brett Adcock and Ryan Goldstein in 2018, using a post office box in New York,

11 and listing an "official address" as the University of Florida. *See* Kapgan Decl. Ex. 4. Neither

12 Adcock nor Goldstein has a background in aircraft design (*id*. Exs. 5 & 6), and by December 2019,

13 Archer still lacked a serious workforce and an actual office.

14      In November 2019, Archer hired away Wisk's Vice President of Engineering, Thomas Muniz.

15 Declaration of Carlie Russell ("Russell Decl.") ¶ 3. On or around December 9, 2019, at Muniz's

16 insistence, Geoff Long, Wisk's Head of Hardware Engineering, agreed to meet with Adcock and

17 Goldstein and hear their recruitment pitch. Long Decl. ¶¶ 11-12. During the meeting Adcock and

18 Goldstein repeatedly mentioned the names of people employed in the eVTOL field, but were coy

19 about stating whether any of them actually worked for Archer. *Id*. ¶ 14(b). In fact, the only hire that

20 Adcock and Goldstein would confirm was Muniz himself, though they also insisted they had hired a

21 "head of engineering" but would not reveal that person's name. *Id*. ¶ 14(a). They were equally vague

22 about whether Archer had engaged in fundraising at that point. *Id*. ¶ 14(d). In fact, Adcock and

23 Goldstein could not state where Archer's offices were located. *Id*. ¶ 14(c). This was because, as

24 indicated by Archer's filings with the California Secretary of State, Archer was being run out of a

25 private residence in Los Altos as late as June 2020. *See* Kapgan Ex. 7. It was only later that Archer

26 finally acquired commercial space in Palo Alto. *Id*. Ex. 8.

27      Despite this late entry, Archer issued press statements in May 2020 claiming it was developing

28 an eVTOL aircraft, but provided little to no technical detail. Gandhi Decl. ¶ 74-75. It was not until

February 2021 that Archer revealed detailed renderings of its aircraft—a copy of Wisk's confidential design. *See* Long Decl. Ex. A. That was when Wisk knew Archer was using its stolen technology.

**E.      Archer's Theft of Wisk's Intellectual Property**

Archer's misappropriation began with a raid of Wisk's workforce. After Archer hired Muniz away from Wisk in November 2019, *ten* additional Wisk employees followed Muniz to Archer in the six days between January 8 and January 14, 2020. Russell Decl. ¶¶ 3-4. One of the departing employees, Jing Xue, resigned suddenly from Wisk on January 10, 2020, with no prior notice. *Id.* ¶ 6. Concerned, Wisk sent Xue's work laptops to an outside vendor, Setec Investigations, to be analyzed for evidence of intellectual property theft. Declaration of Michael Kunkel ("Kunkel Decl.") ¶ 6. Wisk also examined the download logs for its corporate document repository on Google Drive. *Id.* ¶ 10.

The findings were remarkable: between approximately 3:30 P.M., Pacific Time, on December 25, 2019, and 11:00 P.M. on December 26, 2019, Xue downloaded over 4,970 files from Wisk's repository on Google Drive. *Id.* ¶ 10 & Ex. B. Xue had also inserted a USB device into one of his Wisk-issued laptops on December 25, 2019, which USB drive he did not return to Wisk. *Id.* ¶ 8. Moreover, the computers and USB drives that Xue did return to Wisk did not contain the downloaded files, and the forensic records on Xue's Wisk-issued computers contained no evidence of the downloads. *Id.* ¶¶ 12-13. Moreover, of the nearly 5,000 files Xue downloaded, over 3,000 were downloaded between 10:57 P.M. and midnight, on Christmas of 2019, using IP addresses associated with Comcast—an internet service provider Wisk does *not* use. *Id.* ¶ 13. The record of the download, combined with the use of a Comcast-associated IP address with no evidence that the download took place using Xue's Wisk-issued computers, all support the conclusion that Xue downloaded thousands of Wisk files over a private network (possibly his home network) and using a personal device that may still be in his possession, along with the stolen files.

**F.      Wisk Contacts the Authorities; Archer Copies Wisk's Design**

Wisk first suspected Xue's theft just after February 2020 (*see* Kunkel Decl. ¶ 6), and soon after on April 3, 2020, Wisk contacted Xue and asked him to return any and all files he had taken. Russell Decl. ¶ 8 & Ex. C. More than two weeks later, Xue had not responded, so Wisk reached out again, but still received no response. *Id.* ¶ 9. Wisk did not hear from Xue until May 21, 2020, at which point he

denied taking files, but failed to explain the evidence in Wisk's possession. *Id*. ¶ 10 & Ex. C. When asked about the missing USB drive, Xue said he "looked and … found" two USB devices that were the same exact brand, but claimed that neither contained Wisk's files, and even if they did, Xue had "reformatted" them. *Id.* ¶ 10 & Ex. C. Given the potential spoliation of evidence suggested by Xue, Wisk elected to report the theft to the authorities.

On June 19, 2020, Wisk reported Xue's theft to the District Attorney for Santa Clara County for investigation as a criminal matter. Nightengale Decl. ¶ 18. The Santa Clara DA then referred the matter to the Federal Bureau of Investigation ("FBI"), and the Department of Justice ("DOJ") became involved as well. On September 14, 2020, the DOJ issued a grand jury subpoena to Wisk. Kapgan Decl. Ex. 9. In response to the subpoena, Wisk produced documents on October 8, November 18, and December 9, 2020. *Id*. Exs. 10, 11 & 12. In the absence of additional evidence that Archer was using the stolen files, Wisk believed its best option was to defer to the authorities to handle the investigation.

But that all changed in February 2021. At that time, Archer announced that it would become a public company through a merger with a Special Purpose Acquisition Company ("SPAC"). Kapgan Ex. 13. This was surprising because, at the time, Archer had not announced any meaningful aircraft developments. Nonetheless, on February 10, 2021, an Archer investor presentation was publicly released (Collins Ex. 2) that, for the first time, revealed the details of a fully developed aircraft—a spitting image of a figure from Wisk's confidential patent application, filed more than a year earlier:



| Wisk (January 2020 Patent Application) | Archer Investor Deck 2021 |

*Compare* Long Ex. A (patent application), *with* Collins Decl. Ex. 2 (Archer Investor Presentation).

Concurrent with this announcement, Archer's founders, Adcock and Goldstein, gave a series of press interviews during which Archer appeared to take credit for an entire decade's worth of Wisk's development efforts. In a February 2021 interview, Goldstein attributed Archer's newfound "success" to "[a] group that started the [eVTOL] industry about 10 years ago" when "[Wisk-backer] Larry Page basically invents the industry 10 years ago with a company … you might know it now called Wisk." Kapgan Decl. Ex. 14. Goldstein continued: "Larry Page spent, I don't know, it's not publicly disclosed, I'm guessing, maybe something like a billion dollars of capital over 10 years building five full-scale aircraft and dozens of those aircraft. … Incredible group with incredible technology." *Id.* Of course, Archer had not been working on *anything* for "the last 10 years," because Archer didn't even have facilities until 2020. Adcock was referring to work actually performed by Wisk. In the same interview, Adcock added "this is the sixth aircraft that [Geoff Bauer and Tom Muniz] are building, sixth full scale aircraft. So it's not a question to us whether the technology work, you can literally just go to a Wisk website or go on YouTube and … you can see these vehicles work." *Id.* Not coincidentally, the "sixth" aircraft he referred to was actually a copy of a potential design for Wisk's sixth-generation aircraft, submitted confidentially to the USPTO.

Later statements by Adcock and Goldstein were just as troubling. In another interview, Goldstein claimed that Archer's aircraft was possible because "this is technology that's been worked on for over a decade now" and "there's actually no new technology that needs to be invented." Kapgan Decl. Ex. 15. But there *had* been new technology invented, it was just invented by Wisk. Worse, Adcock and Goldstein would later tell the Silicon Valley Business Journal that Archer's "success" was due to the sophistication of Wisk's pioneering fixed-wing eVTOL design, which they described as the configuration that would ultimately "win the market." Kapgan Decl. Ex. 16. Thus, Archer's public statements point in the same direction as its aircraft design: directly to the misappropriation of Wisk's intellectual property.

Immediately after Wisk filed its Complaint in this case, Archer revealed to the New York Times that it had placed an employee accused in the Complaint on paid leave "in connection with a

government investigation and a search warrant issued to the employee."[4]  Archer also disclosed that it had been subpoenaed in the criminal investigation, along with three other employees.

### III.     LEGAL STANDARD

"A party can obtain a preliminary injunction by showing that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest."  *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (internal quotation and markup omitted); *see also Henry Schein, Inc. v. Cook*, 191 F. Supp3d 1072, 1076 (N.D. Cal. 2016) (granting injunctive relief on claims of, *inter alia*, trade secret misappropriation); Cal. Civ. Code § 3426.2 (court may issue injunctive relief to prevent actual or threatened misappropriation); 18 U.S.C. § 1836(b)(3)(A) (same).

Alternatively, even if all four factors are not demonstrated, "[a] preliminary injunction may also be appropriate if a movant raises serious questions going to the merits and the balance of hardships tips sharply towards it, as long as the second and third [] factors are satisfied."  *Disney Enterprises*, 869 F.3d at 856.  Thus, a court may issue a preliminary injunction where the plaintiff raises "serious questions going to the merits and the balance of hardships tilts sharply" in the plaintiff's favor, assuming the other two elements have been met.  *Id*. at 856.

### IV.     ARGUMENT

#### A.     Wisk Is Likely To Succeed On Its Trade Secret Claims

Archer misappropriated Wisk's trade secrets by first stealing them (at least through Archer's agent, Xue) and then illicitly using those trade secrets to build a copycat eVTOL aircraft, that it is now public touting in an effort to secure funding and pursue customer relationships.  Accordingly, Wisk is likely to succeed on the merits of its trade secret misappropriation claims.  Wisk's trade secret claims are asserted under the federal Defend Trade Secrets Act (18 U.S.C. § 1836) and the California Uniform Trade Secrets Act (Cal. Civ. Code § 3426.1).  "Both laws require a plaintiff to show that it [1] possessed a trade secret, that [2] the defendant misappropriated the trade secret, and [3] that the defendant's conduct damaged the plaintiff."  *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845

---

[4]  *See* https://www.nytimes.com/2021/04/06/business/wisk-archer-lawsuit.html.

(N.D. Cal. 2019) (granting preliminary injunction); *see also Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017) (granting preliminary injunction). Wisk can easily demonstrate all three elements.

### 1.     <u>Wisk Possesses Valuable Trade Secrets</u>

The declarations of Wisk's expert witnesses demonstrate the first element of trade secret misappropriation: the nearly 5,000 files stolen by Xue contain a multitude of readily identifiable trade secrets. *See* Collins Decl. ¶¶ 26-29; Gandhi Decl. ¶¶ 65-73. Both the DTSA and CUTSA define a "trade secret" as information that (1) derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and (2) is the subject of reasonable efforts to maintain secrecy. Cal. Civ. Code § 3426.1(d); 18 U.S.C.A. § 1839(6). "[T]o obtain a preliminary injunction, a plaintiff must first identify its alleged trade secrets with 'reasonable particularity.'" *WeRide*, 379 F. Supp. 3d at 845 (citing Cal. Civ. Proc. Code § 2019.210).

A trade secret is defined with "reasonable particularity" where it has been distinguished from "matters of general knowledge in the trade or of special knowledge of those persons skilled in the trade." *Advanced Modular Sputtering, Inc. v. Superior Ct.*, 132 Cal. App. 4th 826, 835 (2005); *WeRide*, 379 F. Supp. 3d at 846 (same). Relevant here, that standard is met where "credible experts declare that they are capable of understanding the designation and of distinguishing the alleged trade secrets from information already known to persons in the field." *Advanced Modular Sputtering*, 132 Cal. App. 4th at 836; *see also Phoenix Techs., Ltd. v. DeviceVM, Inc.*, 2010 WL 8590525, at *4-5 (N.D. Cal. Mar. 17, 2010) (same); *I-Flow Corp. v. Apex Med. Techs.*, Inc., 2008 WL 2233962, at *5 (S.D. Cal. May 23, 2008).

Wisk has identified 52 trade secrets, which are meticulously defined (including by reference to specific documents stolen by Xue), across a 74-page 2019.210 statement filed concurrently with this Motion. *See* Kapgan Decl. Ex. 1. Wisk's 2019.210 statement has been reviewed by two credible experts, Dr. Collins and Dr. Gandhi, who both declare that they are capable of understanding the identified trade secrets, and differentiating the trade secret information from general matters in the eVTOL field, as well as specialized knowledge of those skilled in the field. *See* Collins Decl. ¶¶ 26-

27; Gandhi Decl. ¶¶ 65-73.  As explained by Dr. Collins and Dr. Gandhi, Wisk's trade secrets represent confidential, non-public knowledge accumulated by Wisk which would be very valuable to a competitor—like Archer—who wished to gain a "head start" in its eVTOL development.  Collins Decl. ¶¶ 27, 30-31; Gandhi Decl. ¶¶ 23-32.  Accordingly, Wisk's trade secrets are both defined with particularity, and derive independent economic value because they are not known to the public.  *See* Cal. Civ. Code § 3426.1(d); 18 U.S.C.A. § 1839(6).

Wisk's trade secrets also meet the second prong of the test, because Wisk has taken reasonable efforts to maintain the confidentiality of the trade secrets.  Wisk employs three distinct layers of confidentiality protections for its trade secrets.  *See* Nightengale Decl. ¶¶ 3-9, 10-18, 19-25.  First, Wisk employs physical security measures at its offices, including requiring employees to wear badges and to tap their badges against card readers in order to access sensitive areas, employing closed circuit video cameras, and requiring visitors to sign-in before entering Wisk's facilities and to be escorted when moving through the facility.  *Id.* ¶¶ 3-9.  Second, Wisk employs legal protections by requiring employees and visitors to sign confidentiality agreements, running background checks on new hires, implementing non-disclosure policies, instituting an employee "code of conduct" that reinforces the requirement that employees maintain the confidentiality of Wisk information, and requiring former employees to affirm their return of all company property when they resign.  *Id.* ¶¶ 10-18.  Third, Wisk employs electronic information security measures, including passwords with minimum strength requirements, a virtual private network ("VPN"), firewalls, encryption on laptops with removable hard drives, and file backups.  *Id.* ¶¶ 19-25.  Courts routinely find significantly less intensive measures to maintain secrecy to be reasonable.  *See, e.g.*, *Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *3 (N.D. Cal. Mar. 15, 2018) (reasonable efforts included confidentiality agreements, use of passwords, and limits to access based on need); *Pyro Spectaculars N., Inc. v. Souza*, 861 F. Supp. 2d 1079, 1091 (E.D. Cal. 2012) (same); *Hilderman v. Enea TekSci, Inc.*, 551 F. Supp. 2d 1183, 1201 (S.D. Cal. 2008) (verbally telling employees of secrecy was sufficient).

Wisk's trade secrets are identified with particularity, valuable because they are unknown to competitors, and subject to reasonable methods to maintain secrecy.  Wisk meets the first element of its trade secret misappropriation claim.  *WeRide*, 379 F. Supp. 3d at 846.

## 2. Archer Misappropriated Wisk's Trade Secrets

The combination of Xue's theft, Archer's creation of a copycat aircraft in "too short a time" for independent development, and the candid statements of Archer's founders regarding the source of its eVTOL aircraft design, all combine to easily demonstrate the second element of Wisk's trade secret claim: misappropriation. Under both the DTSA and CUTSA, "[m]isappropriation means: (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (2) Disclosure or use of a trade secret of another without express or implied consent by a person who: … (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was: (i) Derived from or through a person who had utilized improper means to acquire it." Cal. Civ. Code § 3426.1; 18 U.S.C. § 1839. Importantly, as courts in this District have previously recognized:

> Misappropriation and misuse can rarely be proved by convincing direct evidence. In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construction of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything.

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977, 984 (N.D. Cal. 2018) (quoting *Q-Co. Indus., Inc. v. Hoffman*, 625 F.Supp. 608, 618 (S.D.N.Y. 1985)). Here, misappropriation may be inferred from four critical facts.

*First*, Archer's agent Xue stole nearly 5,000 files from Wisk, just two weeks before leaving to join Archer. *See* Kunkel Decl. ¶ 10 & Ex. B. The forensic evidence from Xue's Wisk-issued computers, USB drives, and Google Drive logs, all indicate that Xue downloaded thousands of files on December 25 and 26, 2019, and those files are not accounted for in any device returned to Wisk. *Id.* ¶¶ 11-12. Of those stolen files, Xue downloaded 3,000 files between 10:57 PM and midnight, on Christmas, over a Comcast IP address. *Id.* Wisk does not use Comcast as its internet service provider (*id.*), which is consistent with Xue downloading the files on a private network, using a personal device. *Id.* ¶ 13. Moreover, Xue was subject to legal obligations to maintain the secrecy of those documents, and to return them to Wisk upon his resignation, as required by his non-disclosure agreement, the Wisk employee handbook, and Wisk's code of conduct. Nightengale Decl. ¶¶ 12-14 &

Exs. A, B, C. Xue even signed paperwork falsely representing that he *had* returned all of the documents—even though the stolen files remain unaccounted for. Russell Decl. ¶ 7 & Ex. B; Nightengale Decl. ¶ 15 & Ex. D . In short, Xue acquired Wisk's trade secrets using improper means: subterfuge that breached his legal obligations to Wisk.

Xue's improper acquisition immediately prior to departing for Archer is enough, standing alone, to conclude that Archer is likely liable for the misappropriation. *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal App. 4th 34, 50 (1992), *modified* (Apr. 14, 1992) (Defendants "obtained these secrets improperly" because their acts "resulted from a breach of confidence by [former employee] in copying or stealing plans, designs, and other documents related to [Plaintiff's] products which defendants themselves wanted to produce in competition with [Plaintiff]."). Moreover, it is clear that Archer, at a minimum, "knew or had reason to know" that any secret information brought to Archer by its newly hired employees had been "[d]erived from or through a person who had utilized improper means to acquire [them]." (Cal. Civ. Code § 3426.1; 18 U.S.C. § 1839). Archer has engaged in a calculated strategy of hiring away Wisk employees, and therefore understands that a large fraction of its newly hired work force is well aware of Wisk's proprietary technology. Archer should have been able to recognize the obvious leakage of information that originated with Wisk. It is not an exaggeration to say that Archer's workforce is replete with former Wisk employees: roughly half of the workers identified in Archer's February 10, 2021 investor presentation used to work for Wisk. Collins Decl. Ex. 2 at 18. Accordingly, Archer cannot claim "ignorance" regarding the source of Xue's stolen files or ill-gotten know-how. *See, e.g.*, *WeRide Corp. v. Kun Huang*, 2019 WL 5722620, at *3 (N.D. Cal. Nov. 5, 2019) (where two workers switched companies, one "had reason to know" that his coworker misappropriated trade secrets by virtue of their work together).[5]

*Second*, following Xue's transition, Archer inexplicably "developed" an eVTOL aircraft in just one year—even though it had taken Archer's competitors many years to do so. Gandhi Decl. ¶¶ 26-

---

[5] It is also possible that one or more former Wisk employees are actively participating in Xue's theft by augmenting his stolen files with their own personal knowledge of Wisk's trade secrets. *See, e.g.*, *Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*, 944 F. Supp. 2d 775, 782 n.3 (N.D. Cal. 2013) ("courts have found liability under trade secret law even if the information is contained solely within an employee's memory").

30. Moreover, Archer claims that it will have a fully certified eVTOL aircraft by 2024; but that would be impossible if Archer's aircraft were truly independently developed, because it takes far more than three years to transition from prototype to certification. *Id.* ¶ 31; *see also* Collins Decl. ¶¶ 30-31. Trade secret misappropriation may be inferred where a competitor "develop[s] the same technology in too short a time for independent development." *Ajaxo Inc. v. E\*Trade Grp. Inc.*, 135 Cal. App. 4th 21, 54 (2005); *see also WeRide*, 379 F. Supp. 3d at 849 ("implausibly fast development . . . can contribute to finding misappropriation") (granting preliminary injunction); *GTAT Corp. v. Fero*, 2017 WL 7035655, at \*1-3 (D. Mont. May 3, 2017) (similar, granting preliminary injunction).

*Third*, Archer's aircraft is inexplicably a copy of a design Wisk submitted confidentially in a January 2020 patent application—more than a year before Archer's copycat design was revealed. Gandhi Decl. ¶¶ 32. A review of other eVTOL companies identified by Archer as its competitors demonstrates that no two companies have built "look alike" aircraft—*except* for Archer and Wisk. *Id*. It is not a coincidence that Archer "just happens" to be the first company to design an aircraft strikingly similar to Wisk's design *after* Archer's agent Xue stole thousands of Wisk's files.

*Fourth*, Archer's founders, Adcock and Goldstein, have repeatedly claimed that Archer is building off "10 years" of development history, to build a "sixth aircraft" and that there is "no new technology to invent" in order to build this aircraft. Kapgan Decl. Exs. 14, 15 & 16. These statements could not possibly describe the legitimate, independent development of an eVTOL aircraft by Archer, because Archer did not have an office or any meaningful number of employees or operations before 2020. Long Decl. ¶ 14(a), (b), (c); Kapgan Decl. Ex. 17. Instead, the statements are an outright admission that Archer hired away Wisk's workforce so that it could gain access to their knowledge and build a "sixth generation" Wisk aircraft without Wisk's permission or consent. That is trade secret misappropriation. *See Genentech, Inc. v. JHL Biotech, Inc.*, 2019 WL 1045911, at \*10 (N.D. Cal. Mar. 5, 2019) ("Genentech's allegations support a reasonable inference that Jordanov and Lin recruited Xanthe to misappropriate Genentech's trade secrets").

The combination of these facts—(i) forensic evidence of stolen files; (ii) an improbably fast development timeline; (iii) Archer's inexplicable copy of Wisk's confidential aircraft design; and (iv) the public admissions of Archer's founders—is more than sufficient to demonstrate misappropriation

by Archer.  Under long-standing Ninth Circuit law, "disclosure of the secret to the defendant, followed by manufacture of a closely similar device by the defendant, shifts to the defendant the burden of going forward with evidence to prove, if it can, that it arrived at the process by independent invention." *Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790, 793 (9th Cir. 1976); *see also Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*, 2018 WL 4697255, at *7 (C.D. Cal. Aug. 3, 2018) (quoting and following *Droeger*); *Memry Corp. v. Kentucky Oil Tech., N.V.*, 2007 WL 2746737, at *8 (N.D. Cal. Sept. 20, 2007) (quoting and following *Droeger*).  Thus, the foregoing evidence is already sufficient for Wisk to succeed on its trade secret claims *unless* Archer can prove independent development.  But Wisk has even more evidence of Archer's theft.

### 3.  Archer's Design Directly Reflects Use Of Certain Trade Secrets

While the aforementioned evidence is sufficient to establish a "reasonable likelihood of success" on Wisk's trade secret claims, *see WeRide*, 379 F. Supp. 3d at 849-850; *Waymo*, 2017 WL 2123560, at *7-9, there is also extensive *direct* evidence that Archer has leveraged certain of Wisk's trade secrets.  This additional evidence serves to reinforce the likelihood of success, making the entry of a preliminary injunction all the more appropriate.

As previously mentioned, the eVTOL aircraft revealed by Archer in 2021 reflects is a virtual copy of a figure from a confidential patent application that Wisk filed more than a year earlier, in January 2020:

| Wisk (January 2020 Patent Application) | Archer Investor Deck 2021 |
|---|---|
|  |  |

Long Decl. Ex. A.  This outward similarity, as well as other key disclosures in Archer's investor materials and on its website, reflect the use of specific trade secrets.

*Trade Secret Nos. 1*—In designing and validating its specific, twelve rotor, six-boom aircraft design, █████████████████████████████████████████████████████████

1 ████████████████████████ Gandhi Decl. ¶ 37. █████████████████████████

2 ████████████████████████████████████████████████████████████████████████

3 ████████████████████████████████████████████████████████████████████████

4 ████████████████████████████████████████████████████████████████████████

5 ██████████████████████ *Id.* ¶ 38. ████████████████████████████████████████

6 ████████████████████████████████████████████████████████████████████████

7 ███████████████████████████████████████████ *See id.* ¶ 39. ████████████████

8 The evidence demonstrates that Archer has misappropriated Wisk's ██████████████

9 insights related to this trade secret. The unrealistically short timeline in which Archer unveiled its

10 overall aircraft design is an indicator ██████████████████████████████████████

11 ██████████████████████████ *See id..* ¶ 39. ████████████████████████████████

12 ████████████████████████████████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████████████████████████████

15 ████████████████████████████████████████████████████████████████████████

16 ████████████████████████████████████████████████████████████████████████

17 ████████████████████████████████████████████████████████████████████████

18 ████████████████████ *Id.* ¶ 40. ████████████████████████████████████████████

19 ████████████████████████████████████████████████████████████████████████

20 ████████████████████████████████████████████████████████ Thus, it is reasonably

21 likely that Archer has misappropriated Trade Secret No. 1. *Id.* ¶ 44.

22 ***Trade Secret No. 2—*** ████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████████████████

24 ██████████████████████████████████████████████████████████████████ *Id.* ¶

25 45. ██████████████████████████████████████████████████████████████████████

26 ████████████████████████████████████████████████████████████████████████

27 ████████████████████████████████████████ *Id.* ¶ 46. ██████████████████████

28 ████████████████████████████████████████████████████████████████████████



■ *Id.* ¶ 47. Once more, this indicates that it is reasonably likely that Archer has misappropriated Trade Secret No. 2. *Id.* ¶¶ 48-49.

**Trade Secret No. 3**—■ *Id.* ¶ 50.

*Id.* ¶ 50, 53-54.

*Id.* ¶¶ 51-52.

*see id.* ¶ 56.

**Trade Secret No. 4**—■

*Id.* ¶ 57.

■ *Id.* ¶¶ 58-59. Thus, Dr. Gandhi opines, it is reasonably likely that Archer has used Trade Secret No. 4 ■. *Id.* ¶¶ 60-61.

**Trade Secret Nos. 9, 12, 14, and 15**—■



1  Collins Decl. ¶ 35.

2

3

4

5

6

7

8

9

10  *Id.* ¶¶ 38-39.

11

12  *Id.* ¶ 41.

13  Thus, as Dr. Collins opines, Archer is likely using Trade Secret Nos. 9, 12, 14, and 15.  *Id.* ¶ 42.

14  ***Trade Secret Nos. 16, 20, 21—***

15

16

17

18  *Id.* ¶¶ 43-44.

19

20

21  *Id.* ¶¶ 45-46.  Thus, as Dr. Collins opines, it is reasonably

22  likely that Trade Secret Nos. 16, 20, and 21 have been misappropriated by Archer.  *Id.* ¶ 47.

23  ***Trade Secret Nos. 17 and 18—***

24

25

26

27

28  *Id.* ¶¶ 48-50.

█████████████████████████████████████████████████████████████████

███████████████████████, making it reasonably, or even highly likely that Trade Secret Nos. 17 and

18 have been misappropriated.  *Id.* ¶¶ 51-53.

   ***Trade Secret Nos. 29-32—***████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████  *Id.* ¶¶ 54-55.  ████████████████

████████████████████████████████████████████████████████████████

██████████████████████  *Id.* ¶ 56.  Thus, as Dr. Collins opines, it is reasonably likely that

Archer is implementing Wisk's trade secrets ██████████████████████████████

(including Nos. 29, 30, 31, and 32).  *Id.* ¶¶ 57-58.

   ***Trade Secrets Nos. 44 and 46—***██████████████████████████████

████████████████████████████████████████████████████████████████

████  *Id.* ¶¶ 59-60.  ██████████████████████████████████████████████

████████████  to conclude that it is reasonably likely that Archer has misappropriated Wisk Trade

Secret Nos. 44 and 46.  ¶¶ 61-63.

                                     *     *     *

   To be sure, the foregoing evidence concerns only those trade secrets for which the evidence of

trade secret misappropriation is most direct; however, as discussed above in § IV.A.2, based on the

unlawfully downloaded files, Archer's implausibly short developmental timeframe, Archer's copycat

design, and the public statements of Archer's founders, Wisk believes that discovery will reveal even

further evidence of rampant trade secret misappropriation.

   **B.       Wisk Has Suffered And Will Continue To Suffer Irreparable Harm Without**
   **          An Injunction**

   Archer's misappropriation has caused, or is likely to cause, two distinct forms of irreparable

harm to Wisk.  *First*, as averred by Drs. Collins and Gandhi, Archer's use of Wisk's trade secrets is

permitting Archer to shave *years* off the standard "independent development" timeline for eVTOL

vehicles, netting Archer an unjust "head start."  Collins Decl. ¶¶ 30-31; Gandhi Decl. ¶ 23-32.  As

both this District and the Ninth Circuit have repeatedly recognized, an unjust "head start" is a form of

irreparable harm that cannot be remedied with money damages.  *See, e.g.*, *Netlist Inc v. Diablo Techs. Inc.*, 2015 WL 153724, at *8 (N.D. Cal. Jan. 12, 2015) ("The Court finds that the showing of a head-start advantage to Diablo, based upon an improper use of Netlist's technology, is sufficient to establish that any harm to Netlist would not be remedied by money damages alone."); *see also Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (head start constituted irreparable harm); *Heritage Cablevision of California, Inc. v. J.F. Shea Co., Inc.*, 1990 WL 1241400, at *3 (N.D. Cal. June 4, 1990) (same).

*Second*, Wisk's trade secrets are at risk of *total destruction* as a result of Archer's ongoing use and disclosure of the trade secrets.  As reported by LinkedIn, Archer's workforce has grown by over 160% during the past year, and 89% during the past six months alone.  Kapgan Decl. Ex. 17.  Archer's website further reveals that it is still hiring for myriad positions.[6]  All of those hires (and potential hires) represent more and more employees who stand to gain illicit access to Wisk's trade secrets. Moreover, Archer is currently attempting to consummate a merger with a SPAC in order to go public (*id.* Ex. 13), meaning that an entirely new company (the SPAC vehicle) will soon gain access to Wisk's trade secrets as well.  As this District has previously recognized, the risk of such widespread dissemination of trade secrets constitutes irreparable harm because "[w]ithout an injunction, [Wisk's] trade secrets could be widely disclosed [and a] trade secret once lost is, of course, lost forever." *WeRide*, 379 F. Supp. 3d at 853 (quoting *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984)).  If revealed, all protection for Wisk's valuable trade secrets is lost.  That too constitutes irreparable harm.  *Id.*; *see also Waymo*, 2017 WL 2123560, at *11.

**C.      The Balance Of Hardships Strongly Favors An Injunction**

The balance of equities favors issuing a preliminary injunction because Wisk's proposed injunction "would do no more than require Defendant to comply with federal and state laws."  *Henry Schein*, 191 F. Supp. 3d at 1077 (quoting *Dish Network L.L.C. v. Ramirez*, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016)).  There is no legitimate hardship Archer would suffer by being ordered to do what it should have already done: return Wisk's trade secret information, confirm that it has been

---

[6]  *See* https://archer.com/careers.

deleted from Archer's repositories, and provide Wisk the means to verify the same.

Moreover, Wisk has acted expeditiously to protect its rights. Wisk first suspected Xue's theft just after February 2020 and sent Xue's devices to an expert for analysis. Kunkel Decl. ¶ 6. After Wisk's expert discovered evidence of theft, Wisk contacted Xue in an attempt to resolve the situation. Russell Decl. ¶¶ 8-10 & Ex. C. But Xue did not respond until over six weeks later, in May 2020 (*id.* ¶ 10 & Ex. C), and his response contained an apparent admission of spoliation (*id.* Ex. C). That communication prompted Wisk to contact the authorities in June 2020 and cooperate with them through the end of the year, including by producing documents in response to a grand jury subpoena in October, November, and December 2020. Kapgan Decl. Exs. 9, 10, 11 & 12.

It was only after the release of Archer's February 10, 2021 investor presentation, and its founders' subsequent public statements, that Wisk learned Archer was using its trade secrets. *See* Gandhi Decl. ¶¶ 74-75. Archer's disclosures prior to that time were scant. *Id.* Wisk is now moving for a preliminary injunction just three months after learning of Archer's misappropriation. There is no undue delay here, and the balance of hardships therefore tips in Wisk's favor. *See, e.g.*, *Waymo*, 2017 WL 2123560, at *11 (granting preliminary injunction over a year after misappropriation); *2Die4Kourt v. Hillair Capital Mgmt., LLC*, 2016 WL 4487895, at *7 (C.D. Cal. Aug. 23, 2016) (granting preliminary injunction after five-month delay in seeking relief).

**D. The Public Interest Supports An Injunction**

The public interest also weighs in favor of granting a preliminary injunction. The public is served by "vindicating intellectual property rights, and in prohibiting unfair competition." *Waymo*, 2017 WL 2123560, at *11. The public also has a strong interest in vindicating trade secret rights—an interest that far outweighs any public interest in allowing products that infringe those rights. *See Vinyl Interactive, LLC v. Guarino*, 2009 WL 1228695, at *8 (N.D. Cal. May 1, 2009) (granting preliminary injunction to enjoin use of trade secret information based on the public's interest "in prohibiting unfair competition" and noting that defendant "has no right to use the information in the first place"). Additionally, and as noted above, the eVTOL market is an emerging market, and this District has previously recognized that issuing preliminary injunctions to "promote fair and lawful competition in an emerging market," serves the public's interest. *WeRide*, 379 F. Supp. 3d at 854.

**E. The Court Should Not Set a Bond**

Even though Rule 65 permits the Court to set a bond requirement before a preliminary injunction goes into effect, a bond would not be appropriate in this case. Both this District and the Ninth Circuit have recognized that no bond is necessary to "simply enjoin [the] Defendant from doing something Defendant never had a right to do in the first place." *Comet Techs. United States of Am. Inc. v. Beuerman*, 2018 WL 1990226, at *6 (N.D. Cal. Mar. 15, 2018); *see also Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) ("The district court may dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining his or her conduct."). Here, Archer never had any right to use, access, transmit, or exploit Wisk's trade secrets, but it has done so in order to benefit itself. Gandhi Decl. ¶¶ 23-32; Collins Decl. ¶¶ 27, 30-31. Wisk should not be required to pay a fee to stop Archer from continuing its wrongdoing; no bond is needed here. *Comet Techs.*, 2018 WL 1990226, at *6; *Johnson*, 572 F.3d at 1086.

**V. <u>WISK SHOULD BE GRANTED LEAVE TO TAKE EXPEDITED DISCOVERY</u>**

In addition to seeking a preliminary injunction—and regardless how the court rules on Wisk's request for preliminary relief—the Court should grant Wisk leave to take expedited discovery. Federal Rule of Civil Procedure 26 authorizes the Court to grant expedited discovery upon a showing of "good cause." *Comet Techs.*, 2018 WL 1990226, at *7. "Good cause for expedited discovery is frequently found in cases involving claims of infringement and unfair competition or in cases where the plaintiff seeks a preliminary injunction." *Twitch Interactive, Inc. v. Johnston*, 2017 WL 1133520, at *2 (N.D. Cal. Mar. 27, 2017). Here, Wisk is both alleging infringement of its trade secrets (and unfair competition via trade secret theft) as well as seeking preliminary relief, and expedited discovery is especially appropriate. *Comet Techs.*, 2018 WL 1990226, at *7; *see also C2 Educ. Sys., Inc. v. Lee*, 2018 WL 3328143, at *6 (N.D. Cal. July 6, 2018).

Moreover, expedited discovery is appropriate no matter the Court's ruling on Wisk's request for injunctive relief. If the Court grants Wisk's request, then expedited discovery is appropriate to ensure Archer's compliance with the injunction; "[i]t will help to minimize harm to [Wisk's] competitive position and to protect [Wisk's] trade secrets from disclosure." *WeRide*, 379 F. Supp. 3d at 854 (N.D. Cal. 2019); *see also Comet Techs.*, 2018 WL 1990226, at *7 ("Quickly determining what

information Defendant removed from Plaintiff, and whether and how Plaintiff's information is being used by Plaintiff's competitors is essential in order to minimize any harm to Plaintiff's competitive position.").  By contrast, even if the Court does not grant Wisk's request for a preliminary injunction, expedited discovery is still appropriate so that Wisk may further develop the factual record in order to support a subsequent motion for preliminary relief with a greater evidentiary showing.  *See, e.g.*, *Washington v. Lumber Liquidators, Inc*., 2015 WL 2089992 at *2 (N.D. Cal. May 5, 2015) ("Because Plaintiffs seek development of the factual record in support of their preliminary injunction … the purpose for which discovery is sought weighs in favor of expedited discovery.").

Here, Wisk needs to understand, at a minimum: (1) how much of the information contained in the files stolen by Xue has been disseminated through Archer's organization, and who has access to that information; (2) whether Archer is working with vendors or other third parties that may have also gained access to Wisk's trade secrets; and (3) what steps Archer is taking (if any) to prevent further distribution of Wisk's trade secrets to new hires, or employees of the SPAC entity Archer intends to merge with.  This information is critically important to protecting Wisk's trade secrets, regardless whether a preliminary injunction issues, and expedited discovery should be granted in any event.

## VI.  **CONCLUSION**

For the foregoing reasons, Wisk respectfully requests that the Court grant Wisk's Motion for Preliminary Injunction, and further grant Wisk leave to take expedited discovery.

DATED:  May 19, 2021                  Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP


By   */s/ Yury Kapgan*
    Yury Kapgan
    Patrick Schmidt
    Michael LaFond

Attorneys for Plaintiff Wisk Aero LLC