JOSH A. KREVITT, SBN 208552
jkrevitt@gibsondunn.com
JOSHUA H. LERNER, SBN 220755
jlerner@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone:     650.849.5300
Facsimile:     650.849.5333

ORIN SNYDER, *admitted pro hac vice*
osnyder@gibsondunn.com
DANIEL J. THOMASCH, *admitted pro hac vice*
dthomasch@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY  10166-0193
Telephone:     212.351.4000
Facsimile:     212.351.4035

WAYNE BARSKY, SBN 116731
wbarsky@gibsondunn.com
DIANA M. FEINSTEIN, *admitted pro hac vice*
dfeinstein@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2029 Century Park East, Suite 4000
Los Angeles, CA  90067-3026
Telephone:     310.552.8500
Facsimile:     310.551.8741

Attorneys for Defendant
ARCHER AVIATION INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| WISK AERO LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>ARCHER AVIATION INC.,<br><br>                    Defendant. | Case No.    5:21-cv-02450-WHO<br><br>**DEFENDANT ARCHER AVIATION INC.'S FIRST AMENDED COUNTERCLAIMS AGAINST WISK AERO LLC**<br><br>**DEMAND FOR JURY TRIAL** |

## ARCHER'S FIRST AMENDED COUNTERCLAIMS

Counterclaimant Archer Aviation Inc. ("Archer"), by its undersigned counsel, brings these first amended counterclaims against Plaintiff and Counterdefendant Wisk Aero LLC ("Wisk") and alleges as follows[1]:

### Introduction

1.       Wisk initiated this baseless lawsuit with the clear intended purpose to disrupt Archer's business and impede Archer's growth as a competitor in the field of electrical vertical takeoff and landing ("eVTOL") vehicles.  Following Archer's announcement in February 2021 of two significant business deals—a billion-dollar merger into a special purpose acquisition company and a deal with United Airlines, Inc. pursuant to which United has ordered $1 billion worth of aircraft—Wisk filed its inflammatory complaint accusing Archer of conspiring with former Wisk employees to misappropriate Wisk's trade secrets and "copy" Wisk's own aircraft design.  A month later, Wisk moved for a preliminary injunction of such breadth that could, if granted in the form proposed by Wisk, effectively expel Archer from the industry during the pendency of this litigation.

2.       But Wisk's efforts to impugn Archer's reputation extend beyond this litigation. Wisk has made public misrepresentations about purported "evidence" in its possession showing misappropriation by Archer, and stated publicly that Archer is currently being investigated by federal authorities for misappropriation of trade secrets.  These statements were false and were issued with the clear intent to tarnish the reputation of Archer and interfere with its business contracts.

3.       Among the misrepresentations Wisk has publicly made about Archer are its claims that the FBI and Department of Justice are conducting a "criminal investigation into Archer relating to the theft and use of Wisk's intellectual property," that Archer "is seeking to gain a foothold in this industry without respecting the rules of fair competition," and that Archer's

---

[1]  Because Archer has moved to dismiss Wisk's first amended complaint, *see* Dkt. 48, it is not required to file an answer to the first amended complaint at this time.  Archer is filing these first amended counterclaims, however, as a matter of right pursuant to Federal Rule of Civil Procedure 15(a)(1)(B).

*Maker* aircraft is a "copy" of a design Wisk submitted in a confidential patent application in January 2020.  All of these statements are false.

4.  Moreover, Wisk *knows* these statements are false.  Archer's founders *told* Wisk's lead engineer in December 2019 that they were working with third-party consultants to design an aircraft with tiltable rotors.  The chief engineer promptly reported that conversation to the CEO of Wisk.  Just a month later, in January 2020, Wisk filed the patent application that it places at the center of its media campaign.  That application included *several* potential aircraft designs with tiltable rotors.

5.  It is clear now that the patent application Wisk relies on so much for its case is nothing more than a litigation prop, hastily pulled together upon learning of Archer's designs to try and interfere with Archer's business.

6.  This gambit fails for all the reasons explained in Archer's motion to dismiss and opposition to Wisk's motion for a preliminary injunction, but Wisk's conduct outside the courtroom is independently actionable.  Wisk's defamatory statements were issued with reckless disregard for the truth and with the intent to interfere with Archer's business relationships.  These statements were not issued in the course of a judicial proceeding, but rather separately made in blog posts released on Wisk's website for the purpose of spreading falsehoods about Archer. Wisk should be held to account for its false representations regarding Archer.

**Parties**

7.  Archer is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 1880 Embarcadero Road, Palo Alto, California 94303.

8.  On information and belief, Wisk is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located at 2700 Broderick Way, Mountain View, California 94043.

**Jurisdiction and Venue**

9.  This Court has subject-matter jurisdiction under 28 U.S.C. § 1338(a).  The Court also has supplemental subject-matter jurisdiction pursuant to 28 U.S.C. § 1367(a).

10.  Venue is proper in this District under the provisions of 28 U.S.C. § 1391(b),

because a substantial portion of the events or omissions giving rise to the claims occurred in this judicial district, the intellectual property that is the subject of this suit is situated in this judicial district, and Wisk resides in this District for the purposes of 28 U.S.C. § 1391.  Venue is also proper in this District under the provisions of 28 U.S.C. § 1400(b), because this is the judicial district where Wisk "resides" and/or where Wisk has committed acts of tortious interference and unfair competition and "has a regular and established place of business."

11.     This Court has personal jurisdiction over Wisk because Wisk has continuous and systematic contacts with the State of California, including because its principal place of business is located within this judicial District.  Additionally, and on information and belief, Wisk intentionally targeted its improper behavior at Archer in this District.

**Factual Background**

***Archer Leverages Its World Class Talent And Third-Party Partners To Design An Industry-Leading eVTOL Aircraft***

12.     Archer was founded by Brett Adcock and Adam Goldstein in October 2018 with the goal of developing a commercially viable, piloted eVTOL vehicle.

13.     After founding and selling a successful start-up, Adcock and Goldstein negotiated an agreement with their alma mater, the University of Florida, to fund research through what later became known as the Archer Aviation eVTOL Lab (the "Lab").  The Lab produced several potential eVTOL aircraft designs for Archer, and by June 2019, Archer had an eVTOL aircraft design that it believed could be successful.

14.     Following their work at the Lab, Adcock and Goldstein began recruiting and partnering with leading experts in the eVTOL field.

15.     In September 2019, Archer engaged FlightHouse Engineering, LLC—an industry leader that worked with Airbus and others to develop an eVTOL aircraft—to help design an eVTOL aircraft that would meet Archer's needs.

16.     FlightHouse advised Archer that the design produced in consultation with the Lab was not optimal to achieve Archer's objectives, and thereafter spent several months working to develop different potential aircraft configurations for Archer.

17.     No later than November 22, 2019, FlightHouse suggested to Archer the idea of using tiltable rotors on its eVTOL aircraft.

18.     On December 6, 2019, FlightHouse provided Archer with a presentation deck that include a "12-tilt-6" design—an aircraft with twelve rotors, six of which tilt:



## Round 2 Config Sizing

1. 8 rotors, front four tilt
2. 8 coax rotors, separate push system
3. 12 rotors, front six tilt

Common Assumptions (used for Round 1)

- Cruise CL = 1.1 @ 120 mph
  - wing area 186 ft²
  - Span = 45 ft
  - 6500 lbs MTOW
- $MF_{struct}$ = 22%
- FOM
  - 0.7 un-stacked
  - 0.75 coax

FlightHouse Engineering LLC - Proprietary                    157

19.     At the same time it was working with FlightHouse to identify a potential aircraft configuration, Archer also began to recruit what it believed to be the most talented engineers in the eVTOL industry from a wide variety of private and governmental entities, including Airbus, Harris Corporation, Joby, Piper, the Army, and Wisk.

20.     Archer first hired Tom Muniz from Wisk to be its Vice President of Engineering.

21.     On January 6, 2020, Geoff Bower joined Archer from Airbus as Archer's Chief Engineer.

22.     Over the next two months, Bower evaluated the various configurations that FlightHouse had proposed—all of which used tiltable rotors—and concluded that the 12-tilt-6 design was the best design for Archer's needs.

23.     The 12-tilt-6 design that Bower adopted ultimately became the design used in Archer's *Maker* aircraft.

24.     Archer relied on several other third parties to help complete the design of the *Maker*.

25.     Industrial designer Frank Stephenson—who has worked with Ferrari, BMW and eVTOL company Lilium Aviation—designed the *Maker*'s sleek shape, five-blade front propellers, and V-tail.

26.     Archer sourced the motors for the *Maker* from MAGicALL, Inc., an independent third-party vendor that keeps the core structure of its motors confidential (even from its customers).

27.     Archer sourced the battery systems for the *Maker* from Electric Power Systems, Inc., another independent third-party vendor that keeps the core structure of its batteries confidential (even from its customers).

### *Archer Discloses Its Design To Wisk In Advance Of The 2020 Patent Application*

28.     On December 9, 2019—three days after the meeting with FlightHouse that included a deck containing the 12-tilt-6 design—Adcock and Goldstein met with Geoff Long, a senior engineer at Wisk, in Palo Alto to potentially recruit Long to join Archer.  At that time, Archer had not yet determined whether it would adopt the 12-tilt-6 design or some other design.

29.     Adcock and Goldstein told Long they were working with Calder Hughes (of FlightHouse) to design an eVTOL aircraft, and that they planned to use a fixed-wing aircraft with a 12-rotor tiling design.

30.     Adcock and Goldstein also told Long they were considering a design that would have six rotors along the front of a fixed wing, with up to all six front rotors capable of tilting, and six stationary lift fans arranged aft of the wing (i.e., 12-tilt designs).

31.     Adcock and Goldstein believed that the information they shared with Long would be kept confidential.

32.     A few days later, Long told Wisk's CEO, Gary Gysin, and Wisk's Chief Technology Officer, Jim Tighe, about Archer's plans for a 12-rotor tilting design.

Gibson, Dunn &
Crutcher LLP

33.     Long also told Gysin and Tighe that Archer was working with a third-party consultant to design its eVTOL aircraft.

34.     On January 31, 2020, Wisk filed a provisional patent application containing, among several other designs, the 12-tilt-6 design that Wisk repeatedly reproduces in its pleadings and media campaign.

*Archer Attracts Major Investors*

35.     From the start, Archer's goal has been to obtain FAA certification and bring a commercially viable eVTOL vehicle to market as soon as possible.

36.     Archer currently projects that it will be able to obtain FAA certification in 2024.

37.     In January 2021, Archer announced an agreement with Fiat-Chrysler (FCA/Stellantis) that will allow Archer to access the resources and expertise of an established and recognized global manufacturer.

38.     On February 10, 2021, Archer publicly announced it entered into a definitive agreement for a business combination with the special purpose acquisition company Atlas Crest Investment Corp ("ACIC") and its intent to raise $1.1 billion from investors to fund Archer's operations.  If the agreement is approved by ACIC stockholders and other closing conditions are satisfied, Archer would become a public company listed on the New York Stock Exchange.  As part of the $1.1 billion in anticipated funding, certain investors have entered into subscription agreements to purchase an aggregate of 60 million shares for $10 per share.

39.     Also on February 10, 2021, Archer publicly announced an aircraft purchase agreement and collaboration agreement with United Airlines, Inc. that included an order for $1 billion of Archer's future aircraft, with an option for an additional $500 million of aircraft.

40.     As part of these announcements, Archer released a conceptual mock-up of the aircraft design it had been working on.  The design included twelve rotors, six of which tilt.

*Archer Initiates Its Campaign Against Archer*

41.     On April 6, 2021, Wisk filed a lawsuit recklessly accusing Archer of stealing trade secrets and infringing Wisk's patents.  (Dkt. 45.)  Wisk's lawsuit referenced Wisk's knowledge of Archer's contractual relationships with ACIC and United Airlines.  (Dkt. 45 ¶¶ 4, 118, 119,

119 n.2.)

42.     The crux of Wisk's lawsuit is its claim that some Wisk employees departed Wisk to work for Archer, and that two of those employees may have taken some confidential Wisk files with them, shared those files with Archer, and then used those files to design Archer's aircraft. Throughout its pleadings, Wisk includes a side-by-side image of one of the several designs contained in its January 2020 patent application next to the design Archer released in February 2021.

43.     There are no plausible allegations in Wisk's pleadings of any trade secret misappropriation, and certainly no plausible allegations that *Archer* misappropriated any trade secrets.  Instead, Wisk's allegations are premised entirely on speculation and innuendo, accusing Archer of stealing its trade secrets based solely on the fact that two Wisk employees downloaded certain files to their personal devices *while they were still at Wisk*.  There are no plausible allegations that those employees retained those files, that those employees brought those files with them to Archer, that those employees used those files in connection with their work at Archer, or that Archer had any knowledge of such retention or use.

44.     Notwithstanding the absence of any good-faith basis for its allegations, Wisk has taken steps beyond the mere filing of this lawsuit to inflict maximum damage on Archer's reputation.

45.     To ensure that Wisk's allegations received wide exposure and enhanced their chances of (a) disrupting Archer's publicly announced contracts; (b) discouraging highly qualified talent from joining Archer; and (c) discouraging existing and potential investors from investing in Archer, Wisk posted a lengthy blog post on its website[2] and issued a press release that linked to the blog post[3] falsely and recklessly accusing Archer of unlawful conduct.  Wisk

---

[2]  A copy of which is attached as **Exhibit 1** and is also available at https://wisk.aero/news/blog/040621-blog-post/.

[3]  A copy of which is attached as **Exhibit 2** and is also available at https://www.prnewswire.com/news-releases/wisk-aero-sues-archer-aviation-for-theft-of-trade-secrets-and-patent-infringement-301263146.html.

*(Cont'd on next page)*

Gibson, Dunn & Crutcher LLP

timed its public mudslinging campaign, coinciding with the filing of its reckless lawsuit, to maximize harm to Archer after learning of Archer's impending financial success.

46.     Wisk then published a second blog post on the "News & Insights" tab of its website on May 19, 2021, continuing its false, reckless, and unfounded statements of purported fact in an effort to interfere with Archer's success.[4]

47.     Wisk's blog posts were not made in furtherance of the litigation, and instead were made to defame Archer, tortiously interfere with Archer's current and prospective contractual and economic relationships, and stifle fair competition.

48.     In its blog posts and press release, Wisk made numerous unsupported and false assertions that expose its true intentions to derail a more successful competitor by interfering with Archer's contracts, existing and prospective business relationships, and recruiting efforts.

49.     On April 6, 2021, Wisk published a statement that Archer is using "stolen Wisk technology" and "infringing our patents," despite knowing or recklessly disregarding that Archer does not have an infringing device.

50.     Wisk's blog post claimed that Archer's computer-generated image somehow "indicates Archer's use of more detailed design features, including features related to aircraft propulsion, power management, avionics, flight control, and manufacturing methodology."  This claim is false:  A single, shadowed, computer-generated image of Archer's aircraft design cannot indicate underlying propulsion, power management, or other technical methodology.

51.     Wisk also baselessly stated in its blog post that the similarity between the aircraft design in Wisk's patent application and the aircraft design in Archer's investor materials "could not have been a coincidence."  This assertion—which effectively calls Archer a thief of trade secrets and patented technology based on the similarity of two computer-generated pictures— ignores the fact that Wisk *knew* Archer was contemplating design of a 12-tilt-6 aircraft in December 2019, over a month before Wisk filed its patent application

52.     In fact, the evidence suggests that Wisk strategically filed its patent application for

---

[4]  The second blog post is available at the link referenced in footnote 2, *supra*, and the corresponding exhibit.  *See* Ex. 1.

the purpose of creating a litigation prop in its effort to tarnish the reputation of Archer.  Tellingly, Wisk does not even claim in this lawsuit that its aircraft design *is* a secret at all.

53.     Wisk also tried to obscure details about aircraft design and the industry, catering its blog post to industry outsiders like Archer's business partners and investors.  For example, Wisk stated:  "The design of the aircraft submitted in Wisk's patent application is not a result of common knowledge among the industry or basic eVTOL aircraft design."  This is deceptive and objectively untrue.  Relevant aspects of Wisk's aircraft design have been publicly available and are common knowledge among the industry, representing basic eVTOL aircraft design.

54.     Wisk also falsely, or in reckless disregard of the truth, asserted that it is "virtually impossible" for Archer to have made the progress it has in its aircraft design in the amount of time in which it has achieved that progress.

55.     Wisk knew in December 2019 that Archer was working with FlightHouse to design its aircraft configuration and had recruited some of the best engineers in the industry to develop its aircraft.  Long's notes to himself written the morning after his December 9 recruiting meeting with Adcock and Goldstein reflect that knowledge.

56.     Wisk was, or should have been, well aware that it is common within the industry to utilize the services of consultants to assist in various parts of aircraft design, underscoring the falsity and recklessness of its statements.

57.     Wisk's second blog post falsely claimed that the FBI and U.S. Department of Justice are conducting a "criminal investigation into Archer relating to the theft and use of Wisk's intellectual property."  *See* Ex. 1.

58.     That is a false statement that Wisk knew or should have known was untrue when Wisk posted it and that remains untrue today.

59.     Archer is not currently and has never been the target of a criminal investigation.

60.     Wisk made this false statement to intentionally or recklessly further interfere with Archer's contracts and deter would-be employees from joining Archer, to scare off potential Archer investors and customers, and to cause further reputational and economic harm to Archer.

61.     On information and belief, Wisk pushed its salacious blog post to media outlets,

which picked up the false and damaging claim that Archer was the subject of a criminal investigation, harming Archer's reputation and goodwill, as Wisk intended.  Archer was forced to expend significant time and resources to correct the misstatements in an effort to prevent further harm.  But the corrections by certain media outlets to their stories could not undo the damage Wisk's tortious statement already caused to Archer, damage that continues with Wisk's active blog post.

62.     As intended, Wisk's anticompetitive and tortious conduct has already harmed Archer and will continue to do so.  Wisk's public statements on its website have disrupted Archer's current contractual relationships, making them more burdensome and expensive, as well as prospective opportunities for investment and financial success, and have harmed Archer's valuable goodwill and reputation at a critical time for Archer's funding and success.

63.     Wisk's tortious and anticompetitive conduct has also directly impacted Archer's recruiting efforts.  For example, several recruitment prospects were no longer interested in joining Archer after Wisk's misrepresentations were published, including at least one prospective employee who had signed an employment contract to join Archer but then backed out, citing Wisk's false blog post as the impetus for his withdrawal.  As a result of Wisk's conduct, Archer has already lost, and will continue to lose, talent as well as the funds, time, and effort expended to recruit these individuals.

64.     Wisk's tortious and unlawful actions have caused and continue to cause significant financial damages and harm to Archer going forward, which actual and final amounts will be proven at trial.

## First Counterclaim

(INTERFERENCE WITH CONTRACTUAL RELATIONS)

65.     Archer incorporates Paragraphs 1–64 of the Counterclaims as though fully set forth herein.

66.     Archer entered into a contract with ACIC, and many investors purchased stock in ACIC.  Archer had also reached agreement with at least one prospective employee who had agreed to join Archer before Wisk published its blog posts.

Gibson, Dunn & Crutcher LLP

67.     Wisk knew of these contracts, or in the case of the employee, knew on information and belief that Archer was hiring and therefore likely had pending employee contracts.  Wisk's misleading and false blog posts disrupted these contractual relationships, causing the employee to withdraw the acceptance of a job offer from Archer, and making performance of the contracts more expensive, difficult, and burdensome.

68.     By accusing Archer of misconduct and making misleading and false claims in the blog posts and press release intended to obscure the issues for industry outsiders, Wisk intended to disrupt (or, at the very least, failed to act with reasonable care to prevent the disruption of), and did disrupt, these contracts.  Wisk also knew that (or, at the very least, recklessly disregarded whether) disruption of performance was certain or substantially certain to occur.  Wisk has engaged and continues to engage in tortious acts against Archer through which Wisk has intentionally interfered and continues to intentionally interfere with the contractual relations between Archer and its existing investors and recruits.  Wisk intends that such interference would induce breaches or disruption of Archer's contractual relationships.

69.     Wisk knew or should have known that Archer has not misappropriated Wisk's trade secrets, has not infringed any Wisk patents, and is not under criminal investigation.  Wisk had no reasonable basis for stating otherwise.  Nonetheless, Wisk falsely represented to the marketplace—indeed to the world—through its blog posts and press release that Archer stole trade secrets, is infringing Wisk's patents, and is under criminal investigation for the anticompetitive purpose of causing harm to Archer's business by, among other things, interfering with Archer's contracts.

70.     Wisk's tortious conduct has caused Archer considerable damage, including but not limited to loss of an employment contract and additional costs and burdens associated with enjoyment of the ACIC contract.

71.     In addition to the damages already suffered, Wisk's ongoing tortious conduct continues to cause Archer harm in an amount to be proven at trial.

### Second Counterclaim

(INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE)

72.     Archer incorporates Paragraphs 1–71 of the Counterclaims as though fully set forth herein.

73.     Archer was in economic relationships with potential investors, lenders, and employees that would have resulted in economic benefits to Archer.

74.     Wisk knew of these economic relationships, or in the case of potential employee hires, knew on information and belief that Archer was hiring and therefore likely would have pending or prospective employee contracts.  Nonetheless, Wisk falsely represented to the marketplace—indeed to the world—through its blog posts and press release that Archer stole intellectual property, is infringing Wisk's patents, and is under criminal investigation for the anticompetitive purpose of causing harm to Archer's reputation and business by, among other things, interfering with Archer's prospective economic benefits.

75.     By falsely and unfairly accusing Archer of misconduct and making misleading and false claims intended to obscure the issues for industry outsiders, Wisk intended to disrupt (or, at the very least, failed to act with reasonable care in whether it would disrupt) the economic relationships with potential investors, lenders, and employees.  Wisk also knew that (or, at the very least, recklessly disregarded whether) disruption of these relationships was certain or substantially certain to occur.  The relationships, as a result, were disrupted.

76.     Wisk knew or should have known that Archer has not misappropriated Wisk's trade secrets, not infringed any Wisk patents, and is not under criminal investigation, and had no reasonable basis for stating otherwise.  Wisk's false and reckless representations in its blog posts and press release that Wisk knew or should have known were false or misleading were made for the purpose of causing harm to Archer's business.

77.     Wisk's tortious conduct and unfair business practices have caused considerable damage to Archer by interfering with potential investors, potential lenders, and potential employee relationships, including but not limited to lost actual and potential investors, loans, and lost recruits, in addition to the damage caused to Wisk's reputation and goodwill.

78.     In addition to the damages already suffered, Wisk's ongoing tortious conduct continues to cause Archer harm in an amount to be proven at trial.

### Third Counterclaim

(DEFAMATION)

79.     Archer incorporates Paragraphs 1–78 of the Counterclaims as though fully set forth herein.

80.     On April 6, 2021, Wisk published a statement on its website that Archer is using "stolen Wisk technology" and "infringing our patents."

81.     That statement is false and defamatory, and Wisk knew or recklessly disregarded the truth in issuing it.

82.     On April 6, 2021, Wisk published a statement on its website that Archer's computer-generated image somehow "indicates Archer's use of more detailed design features, including features related to aircraft propulsion, power management, avionics, flight control, and manufacturing methodology."

83.     That statement is false and defamatory, and Wisk knew or recklessly disregarded the truth in issuing it.

84.     On April 6, 2021, Wisk published a statement on its website that the similarity between the aircraft design in Wisk's patent application and the aircraft design in Archer's investor materials "could not have been a coincidence."

85.     That statement is false and defamatory, and Wisk knew or recklessly disregarded the truth in issuing it.

86.     On April 6, 2021, Wisk published a statement on its website that it is "virtually impossible" for Archer to have made the progress it has in its aircraft design in the amount of time in which it has achieved that progress.

87.     That statement is false and defamatory, and Wisk knew or recklessly disregarded the truth in issuing it.

88.     On May 19, 2021, Wisk published a statement on its website that the FBI and U.S. Department of Justice are conducting a "criminal investigation into Archer relating to the theft

and use of Wisk's intellectual property."

89.     That statement is false and defamatory, and Wisk knew or recklessly disregarded the truth in issuing it.

90.     The above statements are defamatory on their face because they tend to suggest—or outright claim—that Archer engaged in unlawful conduct and/or is the subject of a criminal investigation.

91.     Individually and collectively, the above statements have injured Archer's reputation.  In particular, Archer's has been impaired in its ability to recruit new engineers to join the company and also will be impaired in its ability to raise additional funding for the company.

**Fourth Counterclaim**

(UNFAIR COMPETITION—CALIF. BUSINESS & PROFESSIONS CODE § 17200)

92.     Archer incorporates Paragraphs 1–91 of the Counterclaims as though fully set forth herein.

93.     The acts and conduct of Wisk as alleged above constitute methods of unlawful or unfair business practices as defined by California Business & Professions Code Section 17200.

94.     Wisk's acts or practices are unlawful in violation of Section 17200, as described in Counterclaims 1 and 2, above.

95.     Wisk's acts or practices are unfair in violation of Section 17200 because they are unlawful, unfair, and/or fraudulent as alleged here, and significantly threaten and harm competition at least in the following aspects:  Archer has lost employees and has been forced to divert substantial resources to fight the false statements Wisk has made in its blog posts and press release regarding Archer's use of Wisk's trade secrets and patents, and Archer's contractual relationships have been disrupted and made more burdensome.  The severity of harm to Archer resulting from Wisk's unfair conduct outweighs any public utility or Wisk's justification for engaging in those acts or practices.

96.     Wisk knew or should have known that Archer has not misappropriated Wisk's trade secrets, not infringed any Wisk patents, and is not under criminal investigation.  Wisk has no reasonable basis for stating otherwise.  Wisk's false and reckless representations in its blog

posts and press release that it knew or should have known were false and misleading were for the purpose of causing harm to Archer's business.

97.     Wisk's tortious behavior has caused Archer considerable damage, including lost employees, potential investors, potential lending relationships, and lost recruits.

98.     Archer has been harmed and is continuing to be harmed as a result of Wisk's unlawful or unfair acts.

**Fifth Counterclaim**

(DECLARATORY JUDGMENT OF NONINFRINGEMENT AND INVALIDITY OF THE '036 PATENT)

99.     Archer incorporates Paragraphs 1–98 of the Counterclaims as though fully set forth herein.

100.     A definite and concrete, real and substantial, justiciable, and continuing case or controversy exists between Archer and Wisk regarding, inter alia, the noninfringement of any valid and enforceable claim of the U.S. Patent No. 10,364,036, or '036 Patent with respect to the manufacture, use, sale, offer for sale, or importation of the aircraft that Archer is developing. This controversy is sufficiently immediate and real to warrant the issuance of Declaratory Judgment.

101.     Archer denies infringement of any valid and enforceable claim of the '036 Patent and alleges that the manufacture, use, sale, offer for sale, or importation of the aircraft that Archer is developing has not infringed, does not infringe, and would not, if manufactured, used, sold, offered for sale, or imported, infringe, either directly, indirectly, or contributorily, and would not induce infringement of, any valid and enforceable claim of the '036 Patent.

102.     Each asserted claim of the '036 Patent is invalid for failure to comply with one or more of the statutory requirements of or conditions for patentability specified by Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, 116, and/or 132.

103.     A judicial declaration is necessary and appropriate so that Archer may ascertain its rights regarding the '036 Patent.

104.    Archer is entitled to a judicial declaration that the manufacture, use, sale, offer for sale, or importation of the aircraft that Archer is developing has not infringed, does not infringe, and would not, if manufactured, used, sold, offered for sale, or imported, infringe, either directly, indirectly, or contributorily, and would not induce infringement of, any valid and enforceable claim of the '036 Patent.

105.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Archer requests the Court's declaration that the claims of the '036 Patent are invalid.

106.    Accordingly, Archer seeks a judgment declaring that it does not infringe, and has not infringed, directly or indirectly, contributorily or by inducement, any valid claim of the '036 Patent.

<u>**Sixth Counterclaim**</u>

(DECLARATORY JUDGMENT OF NONINFRINGEMENT AND INVALIDITY OF THE '833 PATENT)

107.    Archer incorporates Paragraphs 1–106 of the Counterclaims as though fully set forth herein.

108.    A definite and concrete, real and substantial, justiciable, and continuing case or controversy exists between Archer and Wisk regarding, inter alia, the noninfringement of any valid and enforceable claim of the U.S. Patent No. 9,764,833 or '833 Patent with respect to the manufacture, use, sale, offer for sale, or importation of the aircraft that Archer is developing. This controversy is sufficiently immediate and real to warrant the issuance of Declaratory Judgment.

109.    Archer denies infringement of any valid and enforceable claim of the '833 Patent and alleges that the manufacture, use, sale, offer for sale, or importation of the aircraft that Archer is developing has not infringed, does not infringe, and would not, if manufactured, used, sold, offered for sale, or imported, infringe, either directly, indirectly, or contributorily, and would not induce infringement of, any valid and enforceable claim of the '833 Patent.

110.    Each asserted claim of the '833 Patent is invalid for failure to comply with one or more of the statutory requirements of or conditions for patentability specified by Title 35 of the

United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, 116, and/or 132.

111. A judicial declaration is necessary and appropriate so that Archer may ascertain its rights regarding the '833 Patent.

112. Archer is entitled to a judicial declaration that the manufacture, use, sale, offer for sale, or importation of the aircraft that Archer is developing has not infringed, does not infringe, and would not, if manufactured, used, sold, offered for sale, or imported, infringe, either directly, indirectly, or contributorily, and would not induce infringement of, any valid and enforceable claim of the '833 Patent.

113. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Archer requests the Court's declaration that the claims of the '833 Patent are invalid.

114. Accordingly, Archer seeks a judgment declaring that it does not infringe, and has not infringed, directly or indirectly, contributorily or by inducement, any valid claim of the '833 Patent.

### Seventh Counterclaim

(DECLARATORY JUDGMENT OF NONINFRINGEMENT AND INVALIDITY OF THE '033 PATENT)

115. Archer incorporates Paragraphs 1–114 of the Counterclaims as though fully set forth herein.

116. A definite and concrete, real and substantial, justiciable, and continuing case or controversy exists between Archer and Wisk regarding, inter alia, the noninfringement of any valid and enforceable claim of the U.S. Patent No. 10,110,033 or '033 Patent with respect to the manufacture, use, sale, offer for sale, or importation of the aircraft that Archer is developing. This controversy is sufficiently immediate and real to warrant the issuance of Declaratory Judgment.

117. Archer denies infringement of any valid and enforceable claim of the '033 Patent and alleges that the manufacture, use, sale, offer for sale, or importation of the aircraft that Archer is developing has not infringed, does not infringe, and would not, if manufactured, used, sold,

offered for sale, or imported, infringe, either directly, indirectly, or contributorily, and would not induce infringement of, any valid and enforceable claim of the '033 Patent.

118.    Each asserted claim of the '033 Patent is invalid for failure to comply with one or more of the statutory requirements of or conditions for patentability specified by Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, 116, and/or 132.

119.    A judicial declaration is necessary and appropriate so that Archer may ascertain its rights regarding the '033 Patent.

120.    Archer is entitled to a judicial declaration that the manufacture, use, sale, offer for sale, or importation of the aircraft that Archer is developing has not infringed, does not infringe, and would not, if manufactured, used, sold, offered for sale, or imported, infringe, either directly, indirectly, or contributorily, and would not induce infringement of, any valid and enforceable claim of the '033 Patent.

121.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Archer requests the Court's declaration that the claims of the '033 Patent are invalid.

122.    Accordingly, Archer seeks a judgment declaring that it does not infringe, and has not infringed, directly or indirectly, contributorily or by inducement, any valid claim of the '033 Patent.

## **Eighth Counterclaim**

**(DECLARATORY JUDGMENT OF NONINFRINGEMENT AND INVALIDITY OF THE '328 PATENT)**

123.    Archer incorporates Paragraphs 1–122 of the Counterclaims as though fully set forth herein.

124.    A definite and concrete, real and substantial, justiciable, and continuing case or controversy exists between Archer and Wisk regarding, inter alia, the noninfringement of any valid and enforceable claim of the U.S. Patent No. 10, 333,328 or the '328 Patent with respect to the manufacture, use, sale, offer for sale, or importation of the aircraft that Archer is developing. This controversy is sufficiently immediate and real to warrant the issuance of Declaratory

Case 3:21-cv-02450-WHO   Document 90   Filed 07/13/21   Page 20 of 21


Judgment.

125.     Archer denies infringement of any valid and enforceable claim of the '328 Patent and alleges that the manufacture, use, sale, offer for sale, or importation of the aircraft that Archer is developing has not infringed, does not infringe, and would not, if manufactured, used, sold, offered for sale, or imported, infringe, either directly, indirectly, or contributorily, and would not induce infringement of, any valid and enforceable claim of the '328 Patent.

126.     Each asserted claim of the '328 Patent is invalid for failure to comply with one or more of the statutory requirements of or conditions for patentability specified by Title 35 of the United States Code, including but not limited to 35 U.S.C. §§ 101, 102, 103, 112, 116, and/or 132.

127.     A judicial declaration is necessary and appropriate so that Archer may ascertain its rights regarding the '328 Patent.

128.     Archer is entitled to a judicial declaration that the manufacture, use, sale, offer for sale, or importation of the aircraft that Archer is developing has not infringed, does not infringe, and would not, if manufactured, used, sold, offered for sale, or imported, infringe, either directly, indirectly, or contributorily, and would not induce infringement of, any valid and enforceable claim of the '328 Patent.

129.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Archer requests the Court's declaration that the claims of the '328 Patent are invalid.

130.     Accordingly, Archer seeks a judgment declaring that it does not infringe, and has not infringed, directly or indirectly, contributorily or by inducement, any valid claim of the '328 Patent.

## **DEMAND FOR JURY TRIAL**

131.     Archer demands a jury trial.

## **PRAYER FOR RELIEF**

a)      An award of damages to Archer;

b)      Injunctive relief to enjoin Wisk from continuing to interfere with contractual relations and prospective economic advantage;

1  c)  Restitution under Section 17200 and an injunction to enjoin Wisk from continuing its

2      unlawful and unfair practices;

3  d)  An order awarding Archer compensation for any and all damages, injury, or harm;

4  e)  An order directing Wisk to pay full restitution and/or disgorgement of all profits and

5      benefits that may have been obtained as a result of its wrongful conduct;

6  f)  An order awarding Archer treble and/or increased damages resulting from Wisk's

7      willful and intentional conduct;

8  g)  An order awarding Archer its costs pursuant to Rule 54(d) of the Federal Rules of

9      Civil Procedure;

10  h)  Finding this case to be exceptional under 35 U.S.C. § 285 and awarding Archer its

11      costs and reasonable attorney fees; and

12  i)  An order awarding Archer such further relief as the Court may deem appropriate under

13      the circumstances.

14

15 DATED:  JULY 13, 2021    GIBSON DUNN & CRUTCHER, LLP

16

17            BY:  */s/ Josh A. Krevitt*

                Josh A. Krevitt

18

19             Attorney for Defendant
             and Counterclaimant
             ARCHER AVIATION INC.

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP