**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Yury Kapgan (Bar No. 218366)
  yurykapgan@quinnemanuel.com
Robert M. Schwartz (Bar No. 117166)
  robertschwartz@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
  michaelzeller@quinnemanuel.com
Diane Cafferata (Bar No. 190081)
  dianecafferata@quinnemanuel.com
Patrick Schmidt (Bar No. 274777)
  patrickschmidt@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

Michael F. LaFond (Bar No. 303131)
  michaellafond@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

Attorneys for Plaintiff Wisk Aero LLC

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| WISK AERO LLC, | CASE NO. 3:21-cv-02450-WHO |
| Plaintiff, | **WISK AERO LLC'S REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY** |
| vs. | |
| ARCHER AVIATION INC., | Hearing:<br>Date: July 21, 2021<br>Time: 2:00 PM<br>Judge: The Honorable William H. Orrick |
| Defendant. | |

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

<u>**TABLE OF CONTENTS**</u>

<u>Page</u>

I.     INTRODUCTION ......................................................................................1

II.    UPDATED STATEMENT OF FACTS ....................................................3

     A.    Archer's Initial Efforts In eVTOL Design Failed .............................3

     B.    Archer "Starts Over" By Targeting Wisk And Former Wisk Employees..................3

     C.    Archer Steals Wisk's Sixth Generation Aircraft Design............................4

     D.    Former Wisk Engineer Geoff Bower Selects "Cora + Tilt" For Archer ...................5

     E.    Archer Develops The Full Conceptual Design For "Cora + Tilt" In 7 Weeks ..........5

     F.    Archer Continues to Misappropriate Wisk's Trade Secrets......................6

III.   THE COURT SHOULD ENJOIN ARCHER .........................................6

     A.    Archer Misappropriated Wisk's Trade Secrets ........................................6

         1.    Wisk's Detailed Trade Secrets Related to Subsystem Design ......................7

         2.    Wisk's Trade Secrets Related to Aircraft Configuration ............................11

         3.    Archer's Other Misappropriation Arguments Lack Merit ..........................13

     B.    Archer's Insinuation That *Wisk* Copied *Archer* Is False.........................14

     C.    Archer Did Not Seriously Investigate Its Misappropriation ..................15

         1.    Archer Investigated the Wrong Universe of Devices................................15

         2.    Archer Did Not Look for Misappropriation in *Archer's* Documents...........16

     D.    Wisk Has More Than Adequately Identified Its Trade Secrets ..............17

     E.    The Court Should Strike Jing Xue's Declaration...................................17

     F.    Wisk Has Demonstrated Irreparable Harm ...........................................18

     G.    The Balance Of Hardships And Public Interest Favor An Injunction.....................20

     H.    A Bond Is Neither Necessary Nor Appropriate......................................20

IV.   CONCLUSION .......................................................................................20

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

## TABLE OF AUTHORITIES

**Page**

### Cases

*Bambu Franchising, LLC v. Nguyen*,
  No. 5:21-CV-00512-EJD, 2021 WL 1839664 (N.D. Cal. May 7, 2021) ................................... 14

*BladeRoom Grp. Ltd. v. Facebook, Inc.*,
  2018 WL 452111 (N.D. Cal. Jan. 17, 2018) ......................................................................... 17

*Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*,
  2021 WL 1186335 (N.D. Cal. Mar. 1, 2021) ........................................................................ 14

*Cisco Sys., Inc. v. Sheikh*,
  2020 WL 5877573 (N.D. Cal. Oct. 2, 2020) ......................................................................... 18

*Extreme Reach, Inc. v. Spotgenie Partners, LLC*,
  2013 WL 12081182 (C.D. Cal. Nov. 22, 2013) ..................................................................... 15

*GlaxoSmithKline LLC v. Boehringer Ingelheim Pharms., Inc.*,
  484 F. Supp. 3d 207 (E.D. Pa. 2020) ................................................................................... 20

*InfoSpan, Inc. v. Emirates NBD Bank PJSC*,
  2015 WL 13357646 (C.D. Cal. May 6, 2015).......................................................................... 9

*Kewanee Oil Co. v. Bicron Corp.*,
  416 U.S. 470 (1974) .............................................................................................................. 17

*MAI Sys. Corp. v. Peak Computer, Inc.*,
  991 F.2d 511 (9th Cir. 1993).................................................................................................. 17

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
  399 F. Supp. 2d 1064 (N.D. Cal. 2005) .................................................................................. 9

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Reg'l Plan. Agency*,
  766 F.2d 1319 (9th Cir.), *amended*, 775 F.2d 998 (9th Cir. 1985) ........................................ 21

*PMC, Inc. v. Kadisha*,
  78 Cal. App. 4th 1368 (2000) ................................................................................................. 9

*SkinMedica, Inc. v. Histogen Inc.*,
  869 F. Supp. 2d 1176 (S.D. Cal. 2012) ................................................................................... 9

*SolarCity Corp. v. Pure Solar Co.*,
  2016 WL 11019989 (C.D. Cal. Dec. 27, 2016) ...................................................................... 16

*Speech Tech. Assocs. v. Adaptive Commc'n Sys., Inc.*,
  1994 WL 449032 (N.D. Cal. Aug. 16, 1994)............................................................................ 9

*United States v. $133,420.00 in U.S. Currency*,
  672 F.3d 629 (9th Cir. 2012)................................................................................................. 19

*Waymo LLC v. Uber Techs., Inc.*,
  2017 WL 2123560 (N.D. Cal. May 15, 2017) .............................................................. 16, 19, 20

*WeRide Corp. v. Kun Huang*,
  379 F. Supp. 3d 834 (N.D. Cal. 2019) ..................................................................... 16, 17, 20

*Zeetogroup, LLC v. Fiorentino*,
  2019 WL 2090007 (S.D. Cal. May 13, 2019) ........................................................................ 19

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## I. INTRODUCTION

The limited discovery Wisk has obtained from an unwilling Archer confirms that it is misappropriating Wisk's valuable trade secrets on a massive scale, and that a preliminary injunction is needed to protect Wisk's decade-long investment in eVTOL technology. Even the initial record justified this relief. Wisk filed its Complaint and sought the injunction shortly after Archer exited its "stealth mode" and released the first high-level renderings of its aircraft. That publicly disclosed information, coupled with a former Wisk employee's suspicious downloads of thousands of files just before he joined Archer, plus Archer's implausible timelines for certification, would have justified the injunction. As explained below, however, the scope of Archer's theft has turned out to be far worse.

Archer's claim to have "independently developed" its aircraft is a fairy tale. Archer concluded in 2019 that its efforts to date were not viable and that it would have to "start over." So, in December 2019 and January 2020, Archer recruited close to a dozen Wisk employees, promising ███████████████████████ ████████████████████████. In just seven weeks, Archer assembled ████████████████ that not only settled on a final aircraft configuration but also laid out full conceptual designs of all supporting subsystems. That would have been unprecedented for an established eVTOL company. Archer, however, claims to have accomplished this feat starting with just two former Wisk engineers, a few crude sketches from a consultancy (also comprised of former Wisk engineers), and with another dozen or so Wisk engineers picked up along the way. The design was called "*cora + tilt*"—"Cora" being a reference to *Wisk's* well publicized, fifth-generation aircraft.

The Archer engineering documentation is stunning in its reliance on Wisk's trade secrets. Ex-Wisk engineers put Wisk's valuable trade secrets on the table during this critical seven-week period. Archer used Wisk's trade secrets for the architecture and requirements for its motor, battery, high voltage, and avionics subsystems. Many trade secrets are currently being built into Archer's aircraft, while others are at risk for the "in-house," future development Archer intends to undertake.

Discovery has also shown that Archer contacted Wisk engineers weeks and months before they left, allowing them to harvest as much confidential information as possible. The poster child for the covert theft of Wisk's trade secrets is former Wisk engineer Jing Xue, whose Christmas Day download of thousands of Wisk confidential files from an outside IP address occurred one week after

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   Archer contacted him.  Archer made Xue's written denials under oath the centerpiece of its defense.
2   But when Wisk sought to depose Xue about these improbable assertions, contradicted by Archer's
3   documents, he invoked his Fifth Amendment right because of a pending federal criminal investigation.
4   Having denied Wisk the right to question him, however, the Court should strike his testimony.

5         Archer also spoke to three other Wisk engineers weeks before their departure, and all three
6   improperly retained confidential Wisk documents.  In fact, one took a document expressly cited in
7   Wisk's trade secret disclosure.  All three have since been subpoenaed by a federal grand jury.

8         Archer says it used "ironclad" measures to avoid Wisk confidential information and then
9   conducted a "sweeping" investigation.  That is another Archer fairy tale.  Archer designed its
10  investigation to sweep evidence of misappropriation under the rug.  It failed to search its employees'
11  personal devices and refused to run searches aimed at locating Wisk's disclosed trade secrets.  Most
12  egregiously, Archer allowed its technical expert to render her opinions without bothering to analyze
13  *any* of Archer's engineering milestone documents for evidence of Wisk's trade secrets.

14        Archer's most outlandish fabrication is also the most damning.  Having been caught red-
15  handed, Archer falsely claims that Wisk copied ***Archer's*** aircraft design after Archer "disclosed" it on
16  December 9 to a Wisk engineer it was seeking to recruit.  In actuality, the design was created by ***Wisk***
17  years earlier, as the inventors attest with corroborating documentation.  This design—a closely-
18  guarded secret within Wisk—suddenly and mysteriously ████████████████████████████████

19  ████████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████ As for the December 9 disclosure
21  to a Wisk engineer, Archer omits that the engineer's contemporaneous notes of that conversation (the
22  only in existence) make clear that he instantly recognized the design Archer was describing as one that
23  Wisk had secretly worked on years earlier.  In fact, the notes expressly state that the design Archer
24  was proposing sounded "remarkably similar to some configuration[s] for cora x."  Alarmed by what
25  he heard, the engineer reported it to Wisk.  Thus, the notion that Wisk used anything of Archer's is
26  sophistry.  The undeniable fact is that Archer stole what became the "cora + tilt" design from Wisk.

27        The Court must stop Archer from using any of Wisk's valuable intellectual property before it
28  is too late.  Extraordinary misconduct warrants an extraordinary remedy.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

## II.     UPDATED STATEMENT OF FACTS

### A.     Archer's Initial Efforts In eVTOL Design Failed

Archer began development of an eVTOL aircraft in Fall 2018, when it sponsored a research grant at the University of Florida.  Adcock Decl. ¶ 16.  By June 2019, Archer selected an eVTOL design with twelve enclosed rotors incorporated within two wings that ran parallel to the aircraft.  *Id.* ¶ 19.  By September 2019, Archer suspected the design would not be viable.  *Id.* ¶¶ 19-23.  It was "not a good idea" and was "quickly set aside," Ex. 2 (Bower Tr.) at 48:18-49:12, so that Archer could "start over," *id.* at 33:6-9.  *See also* Ex. 3 (Hughes Tr.) at 58:7-60:19; Ex. 1 (Adcock Tr.) at 40:2-12.[1]

### B.     Archer "Starts Over" By Targeting Wisk And Former Wisk Employees

In September 2019 Archer hired FlightHouse, an aircraft design consulting firm run by two ex-Wisk engineers.  Adcock Decl. ¶ 23; Ex. 3 (Hughes Tr.) at 55:15-55:21, 79:25-82:11.[2]  One of these engineers, Zach Hazen, had worked on Wisk's Configuration Exploration Vehicle and a design codenamed "Grits," with ten wing-mounted lift rotors and two inboard rotors capable of tilting horizontally and vertically.  Ex. 2 (Bower Tr.) at 13:18-14:15; Tighe Decl. ¶ 4.  Hazen was also involved in Wisk's fifth-generation "Cora" aircraft.  Ex. 2 (Bower Tr.) at 13:18-14:15.

████████████████████████████████████ Hughes Decl. ¶ 7; Ex. 3 (Hughes Tr.) at 62:6-14. So Archer began systematically recruiting current and former Wisk employees.  On October 7, 2019, Archer contacted Geoff Bower, who also worked on Grits while at Wisk.  Ex. 47; Ex. 2 (Bower Tr.) at 12:23-13:2, 16:3-17:18.  On October 17, Archer contacted Wisk's VP of Engineering Tom Muniz, Ex. 49, convincing him to resign in November.  Ex. 5 (Muniz Tr.) at 45:12-19, 90:12-14.  Archer also contacted Wisk Director of Hardware Engineering, Johnny Melack on November 11 (Ex. 50), a Wisk engineer responsible for its electric motor design, Diedrick Marius, on December 5 (Ex. 52)), and Wisk power electronics engineer, Jing Xue, on December 18 (Ex. 48).

Eleven Wisk engineers departed for Archer between December 2019 and January 2020.  Many did so while retaining Wisk confidential information.  *See* Ex. 7 (Marius Tr.) at 83:19-99:5, 100:6-

---

[1]  "Ex." refers to exhibits to the July 14, 2020 Declaration of Yury Kapgan.

[2]  This brief uses "Wisk" to refer to Plaintiff Wisk Aero LLC as well as its predecessors, Kitty Hawk Corporation, Zee.Aero Inc., and Levt Inc.  Wisk was called Zee.Aero when Calder Hughes and Zack Hazen worked there.  *See* Ex. 3 (Hughes Tr.) at 55:15-55:21, 79:25-82:11.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   106:10, 106:11-110:21, 115:22-117:18, 117:20-127:8, 127:23-134:2; Ex. 4 (Melack Tr.) at 266:9-

2   272:7, 273:2-274:19, 278:12-279:4, 279:5-285:8; Ex. 5 (Muniz Tr.) at 252:12-262:13.  Archer lured

3   these Wisk employees with ███████████████████████████████████████████████████████████████.

4   *See* Ex. 8 (Xue Tr.) at 17:9-10; Ex. 7 (Marius Tr.) at 21:21-25:24; Ex. 4 (Melack (7/1) Tr.) at 82:10-

5   86:4; Ex. 5 (Muniz (6/25) Tr.) at 85:12-86:25.

6         **C.    Archer Steals Wisk's Sixth Generation Aircraft Design**

7         Wisk had long considered a tilting rotor design as a promising configuration.  Tighe Decl.

8   ¶¶ 5-9; Tzarnotzky ¶¶ 4-7.  Wisk's VP of Engineering Tom Muniz knew about Wisk's confidential

9   aircraft development plans at this time, particularly Wisk's designs for a sixth-generation "Cora X"

10  aircraft, which included configurations similar to the Grits configuration and that would involve tilting

11  the front row of six lift fans during flight.  Tighe Decl. ¶ 8; Ex. 9 (Tighe Tr.) at 19:14-20:6, 40:5-

12  42:25; Long Supp. Decl. ¶ 10; Ex. 53 (Long Tr.) at 30:7-31:7.

13        Archer was initially focused on very different eVTOL designs. On November 22, ███████████

14  █████████████████████████████████████████████████████████████████████████████████████████

15  ██████████████████ Ex. 46 at 2309-10. ███████████████████████████████████████████████████

16  █████████████████████████████████████████████████████████████████████████████████ Gandhi

17  Supp. Decl. ¶ 37.  That suddenly changed on December 3, ████████████████████████████████████

18  ████████████████████████████████████████████████████████ Ex. 27 & 28. ████████████████████

19  █████████████████████████████████████████████████████████ Ex. 3 (Hughes Tr.) at

20  121:6-125:25;  *see also*  Ex. 54.  ██████████████████████████████████████████████████████████

21  ███████████████████████████████ Hughes Decl. ¶ 5; Ex. 40 at 2229. ██████████████████████████

22  ████████████████████████████████████████████. Ex. 30 at 2391 & 5 (Muniz Tr.)

23  at 125:7-126:4. The design was aptly referred to as the "**cora + tilt**" configuration.  Ex. 30 at 2404.

24        On December 9, as they continued to recruit Wisk engineers, Adcock and Goldstein met with

25  Wisk's Head of Hardware Engineering, Geoff Long.  *See* Long Supp. Decl. ¶ 5; Ex. 53 (Long Tr.) at

26  10:14-23.  Archer claims it disclosed its plans for aircraft configuration to Long.  Opp. 5.  But, Archer

27  fails to mention that Long immediately recognized the design they were describing as ***Wisk's*** Grits

28  design that Long had worked on at Wisk with FlightHouse's Zach Hazen while Hazen was with Wisk.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1 Long Supp. Decl. ¶ 6.  Long was concerned, and he told Adcock and Goldstein that they were

2 describing a Wisk design.  *Id.* ¶ 7.  The next day, Long created the only contemporaneous notes of

3 what was said.  Ex. 41.  These notes leave no doubt that Long recognized Archer's configuration as

4 "bacon/cev with two tilting propulsion systems."[3]  *Id.*  In fact, he wrote that the design "sounds

5 remarkably similar to some configuration being considered for cora x."  *Id.*; *see also* Long Supp. Decl.

6 ¶¶ 9-11.  Justifiably alarmed, Long conveyed what he learned to his superiors.  Long Supp. Decl. ¶ 12;

7 Ex. 53 (Long Tr.) at 40:20-42:6, 43:17-44:16.

8     **D.**    **Former Wisk Engineer Geoff Bower Selects "Cora + Tilt" For Archer**

9        When ex-Wisk engineer Geoff Bower joined Archer on January 6, Bower Decl. ¶ 2, with

10 Muniz he became the company's second of just *two* engineers.  Ex. 2 (Bower Tr.) at 115:13-17.  His

11 initial task was to select from among the six FlightHouse configurations.  Bower Decl. ¶ 11.  Bower

12 had "complete discretion," Ex. 2 (Bower Tr.) at 49:18-21, and was unaware of any preference by

13 anyone else.  *Id.* at 56:6-15.  In selecting a design, Bower did not consult the FlightHouse analyses, *id.*

14 at 50:4-23, which he considered "low fidelity," *id.* at 54:7-13. In fact, Bower "threw into the mix" four

15 additional designs, Bower Decl. ¶ 19, including a configuration Bower admits was "somewhat

16 related" to the confidential Grits aircraft he had worked on at Wisk.  Ex. 2 (Bower Tr.) at 69:17-72:22.

17 Bower did not select the Grits design, but the fact that he "threw into the mix" this confidential Wisk

18 design is deeply troubling, and contradicts Archer's "independent development" narrative.

19     **E.**    **Archer Develops The Full Conceptual Design For "Cora + Tilt" In 7 Weeks**

20        Bower selected the "cora + tilt" configuration (12 rotors, with 6 tilting rotors in front), with the

21 benefit of input from Muniz.  Ex. 2 (Bower Tr.) at 56:16-57:22.  ████████████████████████

22 ████████████████████████████████████████████████████████████████████

23 ████████████████████████████████████████████████████████████████████

24 ███████████████████████████████████████████████████████████████  Gandhi

25 Supp. Decl. ¶¶ 50-56.  This is particularly evident when ███████████████████████  is

26 contrasted with Wisk's extensive efforts for its validating its own next-generation design: roughly 120

27

---

28 [3] Although Long's notes reference "bacon," he realizes that the two-rotor tilt design described to him
was, in fact, the "Grits" design.  Long Supp. Decl. ¶ 8.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Wisk engineers working full time for months, supported by additional personnel, all involved in testing, simulating, and designing aircraft.  Ex. 53 (Long Tr.) at 57:16-63:3.  This evidence makes clear that Archer's configuration was not selected on the basis of any rigorous analysis by Bower, but instead on the understanding of former Wisk engineers that the design ("cora + tilt") would perform and operate analogously to the Wisk designs with which they were quite familiar.

More startling is Archer's claim to have **simultaneously** developed the conceptual design for all of its subsystems—an effort which typically follows the selection of aircraft configuration, Collins Supp. Decl. ¶¶ 13-14, as Archer's own employees acknowledge, Ex. 2 (Bower Tr.) at 47:10-48:5; Ex. 4 (Melack Tr.) at 212:21-213:4.  Somehow, starting with just two former Wisk engineers on January 6, with its aircraft configuration in flux, ███████████████████████████████████████ ████████████ Ex. 12, specifying the high-level architecture and requirements for its motor, battery, high voltage, and avionics subsystems.  This was supported by recently-departed Wisk engineers, including ████████████████████████████████████████ ████████████ *See* Ex. 2 (Bower Tr.) at 121:13-122:15, 140:3-15, 118:13-119:6, 168:25-169:7. Wisk's second independent expert, Dr. Collins, concluded that Archer lacked sufficient time and resources to develop its level of subsystem sophistication.[4]  Collins Supp. Decl. ¶ 13-15.

### F.       Archer Continues to Misappropriate Wisk's Trade Secrets

Wisk's uncontested expert testimony proves Wisk's trade secrets pervade Archer's aircraft development.  Archer provides no contrary testimony because its own expert never examined Archer's internal engineering milestone documents. Ex. 6 (Smith Tr.) at 42:1-46:16, 132:1-17.  As to those Wisk trade secrets that have not already been built into Archer's aircraft, Archer is transitioning away from sourcing third-party components and is gearing up for an "in-house" development program for the "production" version of its aircraft.  Collins Supp. Decl. ¶¶ 142-173; Gandhi Supp. Decl. ¶ 22.

## III.    THE COURT SHOULD ENJOIN ARCHER

### A.       Archer Misappropriated Wisk's Trade Secrets

---

[4]  Nor can Archer's unbelievable development speed be explained by a rushed FAA certification process, despite Archer's claims.  *See* Opp. 17; Wright Decl. ¶¶ 3-5.  As Wisk and other competitors in the field have experienced, a realistic certification timeline is typically more than **five years**.  Dalton Decl. ¶¶ 7-22.  Archer's argument that the FAA moves faster for Archer than anyone else is a fantasy.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1.      1.      <u>Wisk's Detailed Trade Secrets Related to Subsystem Design</u>

2.      Archer's implausible seven-week timeline to develop the subsystems for its selected "cora +

3. tilt" aircraft itself raises serious concerns. Those concerns are confirmed by a technical analysis of

4. Archer's engineering documents, which proves that Archer stole Wisk's trade secrets for electrical,

5. propulsion, and avionics subsystems at a *granular* level.[5]

6. ████████████████████████: Trade Secret No. 33 relates to █████████████

7. ████████████████████████████████████████████████████████████████

8. ████████████████████████ Dkt. 16-8 at 45-46. ███████████████████

9. ████████████████████████████████████████████████████████████████

10. ████████████████████████████████████████████. *Id.* ██████████████

11. ████████████████████████████████████████████████████████████████

12. █████████████████████████████████████████████████████████

13.      Archer's documents confirm that it has misappropriated Trade Secret No. 33. Collins Supp.

14. Decl. ¶¶ 84-90. ████████████████████████████████████████████████

15. ████████████████████████████████████████████████████████████████

16. ████████████████████████████████████████████████████████████████

17. ████████████████████████ *E.g., id.* ¶¶ 59, 86; Ex. 5 (Muniz Tr.) at 137:7-9, 139:2-4

18. ("Demonstrator" refers to Archer's Maker aircraft). This presentation ███████████████

19. ████████████████████████████████████████████████████████████████

20. ████████████████████████████████████████████████████████████████

21. ████████████████████████████████████████████████████████████████

22. ████████████████████████████████████████████████████████████████

23. ████████████████████████████████████████████████████████████████

24. ████████████████████████████████████████████████████████████████

25. ████████████████████████████████████████████████████

26. ████████████████████████: Trade Secret No. 38 concerns Wisk's analyses of ████████

27. _____

28. [5]  Archer's misappropriation is detailed in the supplemental declarations of Dr. Collins and Dr. Gandhi. Given the volume, Wisk provides only a summary of exemplary evidence herein.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1   ██████████. Dkt. 16-8 at 51-52. ████████████████████████████████

2   ███████████████████████ Collins Supp. Decl. ¶ 92. █████████████████

3   ████████████████████████████████████████████████. *Id.*

4   ████████████████████████████████████████████████████████

5   ██████████████████████████████

6   Archer's documents show that Jing Xue used this trade secret ██████████

7   ████████████████████████████████████████████████████████

8   ██████████████████████ *Id.* ¶¶ 94-95; Xue Decl. ¶ 6. ████████

9   ████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████

11  █████████████████████████████████ *Id.* ¶ 95. ██████████

12  ████████████████████. In fact, the idea behind using █████████

13  ██████████████████████ can be traced directly back to a document Xue downloaded

14  before he left Wisk and which Wisk cited in support of Trade Secret No. 38. *Id.* ¶¶ 96-97; Ex. 37.

15  ████████████████████: Wisk's Trade Secret No. 29 concerns ██████████

16  █████████████. Dkt. 16-8 at 38-40. █████████████████████

17  ████████████████████████████████████████████████████████

18  ██████████████████████████ *Id.*; Collins Supp. Decl. ¶ 57. ████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████ *Id.* ████

21  ████████████████████████████████████████████████████

22  ██████████████████████████. *Id.* ███████████████████

23  Discovery has confirmed that Archer misappropriated Wisk's Trade Secret No. 29. ██

24  ████████████████████████████████████████████████████████

25  ████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████

27  ██████████████████████████ Collins Supp. Decl. ¶¶ 59-65. ████

28  ████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1     ████████████████████████████████████████████████ *Id*. ¶ 69.[6]

2     Archer attempts to distinguish a single feature of the trade secret, arguing that rather than using

3 ████████████████ found in Trade Secret No. 29, Archer is using ████████████ Smith

4 Decl. ¶ 110. However, the concept of trade secret "use" includes situations where the trade secret is

5 "unlawfully acquired and then built upon or modified before being disclosed or benefit derived."

6 *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1197 (S.D. Cal. 2012) (citing *Speech Tech.*

7 *Assocs. v. Adaptive Commc'n Sys., Inc.*, 1994 WL 449032, at *10 (N.D. Cal. Aug. 16, 1994)). That is

8 the case here, where Archer's documents show that it derived its bus design against ████████████

9 ████████████ claimed by the trade secret. Collins Supp. Decl. ¶¶ 66-67.[7]

10     Regardless, the active consideration of ████████████ is also "use" of the trade secret,

11 because misappropriation includes use of trade secrets for "internal experimentation" or "research and

12 development," even if such material was not ultimately incorporated in the final product. *InfoSpan,*

13 *Inc. v. Emirates NBD Bank PJSC*, 2015 WL 13357646, at *5 (C.D. Cal. May 6, 2015) (citing *PMC,*

14 *Inc. v. Kadisha*, 78 Cal. App. 4th 1368, 1383 (2000)); *O2 Micro Int'l Ltd. v. Monolithic Power Sys.,*

15 *Inc.*, 399 F. Supp. 2d 1064, 1072 (N.D. Cal. 2005). Moreover, the ████████████ architecture

16 remains under active consideration at Archer, as ████████████████████████████ *Id*. ¶ 66;

17 Ex. 2 (Bower Tr.) at 139:19-140:5, 163:20-164:3. ████████████

18 ████████████████████ Ex. 36 at -459.

19     ████████████████████████████████: Wisk's Trade Secret No. 12 concerns the

20 development of ████████████████████████████████████████

21 ████. Collins Supp. Decl. ¶ 17. ████████████████████████████████████

22 ████████████████████████████████████████████████████████

23 ████████████████. *Id*. ████████████████████████████████

24 ████████████████████████

25     Archer misappropriated Wisk's Trade Secret No. 12 with ████████████████

26 ─────────────────────

27 [6] ████████████████████████████████████ Collins Supp. Decl. ¶ 69.

28 [7] An ████████████████████████████████████████████ Collins
Supp. Decl. ¶ 66. ████████████████████████████████. *Id*. ¶ 66.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**



1      *Id.* ¶¶ 18-22.            *Id* at ¶¶ 19-
2 20.
3      Collins Supp. Decl. ¶ 19.
4
5
6
7 (Ex. 21)                 Collins Suppl. Decl. ¶ 21.[8]
8      Archer's opposition does not address its use of           , and instead
9 contends that it cannot have used          because it
10      Opp. 20. That makes no difference. Archer *uses*
11                . Collins Supp.
12 Decl. ¶¶ 23-25. And Archer
13
14                 *See* Ex. 12 at Archer-NDCA-00001183; Ex.
15 24 (Podcast Tr.) at 00:54:58.
16                 : Wisk's Trade Secret No. 17
17
18
19
20
21      Archer misappropriated         . Collins Supp. Decl. ¶¶ 46-52.
22
23                 Ex. 12 at Archer-NDCA-
24 00001179.
25           Opp. 21.
26
27 [8]
28                 Dkt. 45 ¶ 62.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1

2        Ex. 2 (Bower Tr.) at

3 134:10-135:12.

4      Collins Supp. Decl. ¶¶ 49-52.

5            2.    <u>Wisk's Trade Secrets Related to Aircraft Configuration</u>

6        Archer's miraculously short timeline for developing conceptual designs of its subsystems

7 between just                is particularly startling when considering that its choice

8 for overall aircraft configuration remained in flux during this period. As Bower admitted, the aircraft

9 configuration "drives" the design of the subsystems. Ex. 2 (Bower Tr.) at 47:10-48:5. Yet Archer

10 lacked a firm decision regarding aircraft configuration until sometime after January 6, 2020. Thus,

11 Archer asks the Court to believe that the incoming Wisk engineers somehow started and finished a

12 rapid subsystem design process without any clear indication of what that configuration would be, or

13 even what engineering requirements would flow from that configuration decision.

14        In addition, Archer's adoption of the copycat "cora + tilt" aircraft configuration, with only the

15 thinnest technical justification, is evidence of *further* misappropriation, because it strains credibility

16 that Archer would adopt this design without a keen understanding of its aerodynamic feasibility,

17 performance, and stability. Gandhi Decl. ¶¶ 50-61. These understandings are covered by Wisk Trade

18 Secrets Nos. 1 through 4, which Archer has misappropriated.

19        Archer argues that its selection of aircraft configurations is supported by "extensive design and

20 analysis work" by FlightHouse. Opp. 16. That is not true. Archer's Chief Engineer, Geoff Bower

21 (another former Wisk engineer), testified that he had "complete discretion" to select the aircraft design

22 beginning on January 6, and he did so without access to any of FlightHouse's underlying technical

23 analyses. Ex. 2 (Bower Tr.) at 49:18-21, 50:12-23.

24        Bower claims that, in consultation with former Wisk engineers (including Muniz), he based his

25 selection regarding aircraft configuration primarily on        . Ex. 2 (Bower Tr.) at

26 81:13-82:25. But as Wisk's expert has explained,         ,

27 inconsistent with the design studies that would be expected from an eVTOL company in selecting an

28 aircraft design, and contains

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1   ████████████████████████████████. Gandhi Decl. ¶¶ 50-61. Bower's claimed approach is

2   particularly suspect when contrasted with the extensive, months-long, ongoing effort by over 120

3   Wisk employees and additional personnel for its current design. Ex. 53 (Long Tr.) at 57:16-63:3.

4        **Trade Secret No. 1**: This concerns Wisk's ████████████████████████

5   ████████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████

8   ███████████████████████████ Dkt. 16-6; Gandhi Supp. Decl. ¶ 77. Such studies

9   are highly valuable to an eVTOL company seeking to adopt such a configuration.

10        Archer has misappropriated Trade Secret No. 1. As discussed above, Archer adopted its 12-

11   rotor, six-boom aircraft design with minimal supporting technical analysis, and no detailed

12   aerodynamic simulation studies. *Id.* ¶¶ 77-79. In doing so, ████████████████████

13   ████████████████████████████████████████████████████████████

14   ████████████████████████████████████. *Id.* ¶ 76. ██████████

15   ████████████████████████████████████████████████████████████

16   ██████████████████████████████████████ Gandhi Supp. Decl.

17   ¶¶ 76-77. Archer either went "all in" on an aircraft configuration with no aerodynamic data

18   confirming its feasibility, or its personnel misused their knowledge of Wisk's detailed simulations.

19        **Trade Secret No. 2**: This concerns ██████████████████████████

20   ████████████████████████████████████████████████████████████

21   ████████████████████████████████████████████████████████████

22   ███████████████████████████. Gandhi Supp. Decl. ¶ 80. Again, Archer's rapid

23   adoption of its aircraft configuration with little or no analysis regarding ████████████ indicates

24   preexisting knowledge of Trade Secret No. 2. *Id.* Expedited discovery indicates that, ██████,

25   Archer made decisions about its ████████████, Ex. 44 at Archer-NDCA-00000275, which

26   would not have been possible without use of Trade Secret No. 2. Gandhi Supp. Decl. ¶ 80.

27        **Trade Secret No. 3**: This concerns ██████████████████████████

28   ████████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    ████████████████████████████████. Gandhi Supp. Decl. ¶ 81. ████████

2    ████████████████████████████████████████, which is a study that

3    enables this feature. *Id.* Archer's ████████████████████████████

4    ████████████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████

6    ████████████. *Id.* This indicates misappropriation of Trade Secret No. 3.[9]

7    **Trade Secret No. 4**: This trade secret concerns ██████████████████

8    ████████████████████████████████████████████████████████████████

9    ████████████████████████████████████████████

10   ████████████ Specifically, Archer claims ████████████████████

11   ████████████████. Bower Decl. ¶ 14, Ex. 2 (Bower Tr.) at 78:12-81:18. But Archer's claim is not

12   backed up by its documents; and Archer's documents simply assume those capabilities without

13   independent analysis or simulation. Gandhi Supp. Decl. ¶ 82. Indeed, ██████████████

14   ████████████████████████████████████████████████████████████

15   ████████████████████. *Id.* The only way Archer could have known ██████████████

16   ████████████████████████████ is if Archer had received contrary information from another

17   source: here, information that was misappropriated from Wisk.

          3.     <u>Archer's Other Misappropriation Arguments Lack Merit</u>

19          Archer's remaining arguments misstate and misread Wisk's misappropriation theories, as well

20   as the governing law. It is not true, as Archer claims, that "Wisk's entire case is premised on Xue's

21   download of files." Opp. 12. Although Xue's Christmas Day download firestorm is an important

22   fact, Wisk has not limited its misappropriation theories to Xue. Nor has it limited its forensic analysis

23   to the "USB drive" Archer fixates upon: Xue also stole Wisk files by using a personal device

24   connected to a private Comcast network (Mot. 14); Archer ignores that theft. Indeed, Archer's focus

25   on Xue's unreturned USB drive is troubling, given that when Archer filed its brief it knew—but had

26   not yet disclosed to Wisk—that at least three other employees were sitting on improperly retained

---

27

28   [9] This trade secret is related to separately claimed Trade Secret No. 17, ████████████████
     ████████████████████████████████████████████████████████

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

Wisk documents, including one identified in Wisk's trade secret disclosure.

Equally wrong is Archer's argument that Wisk must have "direct" evidence of theft. *See Bambu Franchising, LLC v. Nguyen*, 2021 WL 1839664, at *5 (N.D. Cal. May 7, 2021) ("[D]irect evidence of misappropriation is rare and at the preliminary injunction stage, Plaintiff need only show a likelihood of success on its claim, not unassailable proof."); *Carl Zeiss Meditec, Inc. v. Topcon Med. Sys., Inc.*, 2021 WL 1186335, at *6 (N.D. Cal. Mar. 1, 2021). In any case, expedited discovery has turned up ample *direct* evidence of Archer's misappropriation. As seen above, Archer's engineering documents, testimony, and recently disclosed subsystem development timeline make the misappropriation plain. And this is not a case involving "mere possession" by former employees. After Archer's first effort at eVTOL design failed, Archer systematically targeted Wisk employees, at dates much earlier than previously believed, and before the suspicious activity on the employees' Wisk devices and accounts. Archer incentivized these Wisk employees to press an outrageously aggressive schedule with ██████████████████, and then (at best) willfully blinded itself to the likely source of ideas that flooded through the door from these former Wisk employees. Archer certainly knew, or had to know, that the former Wisk employees were using Wisk trade secrets in executing on the "cora + tilt" design, especially when pressed to do so quickly.

**B.    Archer's Insinuation That *Wisk* Copied *Archer* Is False**

Because Archer cannot deny the striking similarity between its "cora + tilt" aircraft design and Wisk's 2020 patent application, or that such similarity is non-coincidental, Archer does the only thing it can: it claims to have shared this design with Wisk, who copied it. *See* Opp. 5. This is false.

First, Archer co-founders Adcock and Goldstein cannot even agree on what they said at the relevant meeting. Adcock Decl. ¶ 33 ("… a design that would have six rotors along the front of a fixed wing, with ***up to all six front rotors capable of tilting*** …."); Goldstein Decl. ¶ 19 ("… an aircraft with twelve fans, with six of them along the front of a fixed wing***, at least two of which*** capable of tilting ….") (emphases added). But Wisk's Long testified and wrote corroborating notes that the configuration described to him was the Wisk Grits design with two of the front rotors capable of tilting. Long Supp. Decl. ¶ 7; *see also* Ex. 53 (Long Tr.) at 23:3-24:5; Ex. 41. What they described to him was a ***different*** configuration than the "cora + tilt" design.

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

Second, Archer had not even selected the "cora + tilt" design at the time the December 9 meeting took place. As Bower testified, he did not join Archer until January 6, and he was the sole individual responsible for selecting the "cora + tilt" design. Bower Decl. ¶ 2; Ex. 2 (Bower Tr.) at 49:18-21, 56:6-15, 115:13-17. Adcock and Goldstein could not have "revealed" the "cora + tilt" design to Long fully a month before Bower even selected it. In fact, Wisk's 2020 patent application reflects designs Wisk created before Archer existed. Both of the inventors attest that the design dates back years, and this is corroborated by documentary evidence. Tighe Decl. ¶¶ 5-9; Tzarnotzky ¶¶ 4-7. Moreover, as Mr. Long's notes show, the designs Archer described sounded "remarkably similar to some configuration[s] for cora x." Ex. 41. Long Supp. Decl. ¶¶ 9-10, 12; Tighe Decl. ¶¶ 7-8. Archer cannot claim that it "invented" a previously developed Wisk design.

**C.      Archer Did Not Seriously Investigate Its Misappropriation**

Archer further attempts to dodge responsibility by pointing to its supposedly "sweeping internal investigation" into Wisk's claims. Opp. 8, 14. In fact, Archer made no serious attempt to investigate Wisk's allegations: Archer's technical and forensic experts ***never*** searched for either: (1) Archer documents containing Wisk's trade secrets, or (2) Wisk documents on personal devices used by Archer employees in the course of their employment. These and other holes in Archer's investigation failed to catch the Wisk trade secrets that, as shown above, were found in Archer's files.

Archer's inadequate investigation is also reason to find that Wisk is likely to succeed on the merits. Archer "may be liable for [its employees'] misappropriation of trade secrets under the doctrine of respondent superior," *Extreme Reach, Inc. v. Spotgenie Partners, LLC*, 2013 WL 12081182, at *7 (C.D. Cal. Nov. 22, 2013) (granting preliminary injunction), provided that Archer "knew, or had reason to know," about the misappropriation. *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 850 (N.D. Cal. 2019) (granting preliminary injunction); *see also SolarCity Corp. v. Pure Solar Co*., 2016 WL 11019989, at *5 (C.D. Cal. Dec. 27, 2016).

1.      Archer Investigated the Wrong Universe of Devices

Archer's investigation was designed to fail. Archer never searched the correct devices. ***First***, Archer limits Xue's theft to a single USB drive he failed to return, Opp. 12, while ignoring the *device* (*e.g.,* computer, tablet, or similar device) Xue used to steal Wisk's files over a private network. *See*

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  Mot. 14 ("Xue download[ed] the files on a private network, using a personal device.").  Xue returned

2  two computers to Wisk, but neither computer contained the 4,977 downloaded files nor a record of the

3  download (Mot. 14), which means Xue used some other device to steal the files.  *See* Kunkel Supp.

4  Decl. ¶7.  Archer never comments on—nor even looked for—that device, because it limited its search

5  to Archer-owned devices and ignored Xue's personal devices.  *See* Harrison Decl. ¶ 11; Ex. 10

6  (Harrison Tr.) at 50:5-52:12.[10]  Unable (or unwilling) to search the device Xue used to accomplish the

7  theft, Archer argues that Xue "returned" the stolen files.  Opp. 12-13.  Not true.  Xue stole 4,977 files,

8  but returned just 800, and the returned files do not match the stolen files.  Kunkel Supp. Decl. ¶¶ 4-6.

9  The undisputed facts are that, in addition to the stolen USB, Xue *also* used a personal device,

10  connected to a Comcast IP address, to steal thousands of files from Wisk, the files have not been

11  returned, and Archer never searched the device Xue used to steal them.

12       **Second**, Archer instructs its employees to use personal devices—e.g., cell phones—for their

13  work.  *See, e.g.*, Ex. 51.  But Archer did not search the personal devices of former Wisk employees.

14  Archer limited its search to devices it owned.  *See* Ex. 10 (Harrison Tr.) at 46:23-48:12. Courts in this

15  District have held such artificial limits to be improper.  *See Waymo LLC v. Uber Techs., Inc.*, 2017

16  WL 2123560, at *5 (N.D. Cal. May 15, 2017) (granting preliminary injunction where "Uber

17  knowingly left Levandowski free to keep that treasure trove of files as handy as he wished (so long as

18  he kept it on his own personal devices)").  Archer's fake investigation failed to discover Wisk's trade

19  secrets only because Archer was determined to search the wrong devices.

20                2.    <u>Archer Did Not Look for Misappropriation in *Archer's* Documents</u>

21       Archer submitted declarations from experts who had not examined Archer's documents for use

22  of Wisk's trade secrets.  Even though Archer's expert examined FlightHouse documents and

23  declarations filed in this case, she admitted she did not review Archer's detailed, internal engineering

24  milestone documents. Ex. 6 (Smith Tr.) at 40:1-43:2, 142:11-146:11.  Archer cannot escape liability

25  by letting its expert cover her eyes.  *E.g.*, *WeRide Corp. v. Kun Huang*, 2019 WL 5722620, at *6

26  (N.D. Cal. Nov. 5, 2019) (rejecting testimony where expert did not examine the relevant source code).

27       Archer's forensic expert, Mr. Harrison, fares no better.  When shown an Archer document that

---

28  [10]  The FBI may have the device Xue used to steal Wisk's files.  *See* Xue Decl. ¶ 8.

1   contained ███████████, Harrison admitted that it would not have been "flagged" by

2   Archer's search unless it hit on one of Archer's search terms.  Ex. 10 (Harrison Tr.) at 155:3-157:22.

3   However, Archer picked those search terms *before* receiving Wisk's trade secret disclosure, and never

4   created *new* search terms based on Wisk's trade secrets.  *Id*. at 151:15-152:1.  Nor could Harrison's

5   other efforts close that gap.  He acknowledged that his forensic tools cannot find images or

6   schematics.  Ex. 10 (Harrison Tr.) at 165:11-19.  Worse, he also admitted that even if a Wisk

7   document was copied verbatim into an Archer document, his search methods would *not* detect it, even

8   though the information matched word-for-word.  *See Id*. at 147:14-149:14.

9       **D.**    **Wisk Has More Than Adequately Identified Its Trade Secrets**

10         Archer argues that Wisk has "not established" what its trade secrets are.  Opp. 9-12.  Archer is

11   wrong.  Relying on Dr. Smith, Archer first argues that Wisk did not describe its trade secrets with

12   "reasonable particularity."  Opp. 11-12.  But she admitted that she applied a "novelty" standard, Ex. 6

13   (Smith Tr.) at 124:8-125:10, even though "[n]ovelty, in the patent law sense, is not required for a trade

14   secret."  *Kewanee Oil Co. v. Bicron Corp*., 416 U.S. 470, 476 (1974); *BladeRoom Grp. Ltd. v.

15   Facebook, Inc.*, 2018 WL 452111, at *2 (N.D. Cal. Jan. 17, 2018) (same).  Wisk need identify only

16   "the boundaries within which the secret lies," *WeRide*, 379 F. Supp. 3d at 846, and Wisk has done

17   that.  See Mot. 12-13.  Archer also argues that Wisk has not established the precise economic value of

18   its trade secret.  Opp. 9-10.  But precision is not required; it is enough that economic value can be

19   inferred from a competitor's potential use of a trade secret, *see MAI Sys. Corp. v. Peak Computer,

20   Inc.*, 991 F.2d 511, 521 (9th Cir. 1993), and Wisk's experts testified as to the value of the trade secrets

21   to a competitor.  Collins Decl. ¶¶ 27, 30-31; Gandhi Decl. ¶¶ 23-32.  Archer presented no contrary

22   evidence.  Archer argues last that Wisk's predecessor entities did not adequately protect Wisk's trade

23   secrets.  Opp. 10-11.  That is false.  *See* Supp. Long Decl. ¶¶ 2-4.  Archer's own witness admitted that

24   Wisk's operations did not change with its name.  Ex. 5 (Muniz Tr.) at 16:7-18:4.

25       **E.**    **The Court Should Strike Jing Xue's Declaration**

26         Archer relies on the declaration of its central witness, Jing Xue, and his claim that he did not

27   transfer Wisk's secrets to Archer, including any in the 5,000 files he remotely downloaded just before

28   leaving Wisk.  Opp. 1.  Xue's declaration, however, should be stricken, along with Archer's reliance

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

on it.  At his deposition, Xue blocked Wisk from exploring the substance of his declaration by refusing to answer basic questions on Fifth Amendment grounds.  In his declaration Xue claims not to have "transfer[ed]" any Wisk "confidential proprietary documents" (Xue ¶ 7), but he invoked the Fifth Amendment to avoid answering *how* he determined which documents were "confidential" or "proprietary."  Ex. 8 (Xue Tr.) at 78:1-17.  That was but one of many subjects Xue refused to address.  *E.g.*, *id*. at 63:21-6:14 (invoking Fifth Amendment as to conversations with Wisk's human resource person, despite representations related to them in paragraph 5 of his declaration), 65:6-16 (invoking Fifth Amendment as to whether he retained Wisk devices or files after joining Archer), 78:680:2-6 & 73:19-23 (invoking Fifth Amendment as to whether he reviewed any Wisk-related information after his resignation), 92:2-7 (invoking Fifth Amendment as to whether he accessed Wisk confidential documents after deciding to join Archer but before resigning), 104:12-105:25 (invoking Fifth Amendment as to all questions about whether and which documents he took with him), 106:1-14 (invoking Fifth Amendment as the identity of his Internet service provider, and whether he has home Internet service), 132:25-133:4 (invoking Fifth Amendment as to which "personal devices" he was describing in his declaration), 138:7-12 (invoking Fifth Amendment as to whether he still "ha[s] access to any devices or cloud drives that contain Wisk confidential information").

The Court should strike Xue's declaration and the portions of Archer's opposition that rely on it.  *See Cisco Sys., Inc. v. Sheikh*, 2020 WL 5877573, at *4 (N.D. Cal. Oct. 2, 2020) (defendant "cannot conceal materials unfavorable to its position under the Fifth Amendment while selectively releasing droplets of materials that support its position."); *United States v. $133,420.00 in U.S. Currency*, 672 F.3d 629, 642 (9th Cir. 2012) (affirming decision to strike declaration where a "claim of privilege here raises the core concern that [the] testimony may furnish one side with what may be false evidence and deprive the other of any means of detecting the imposition.").

**F.     Wisk Has Demonstrated Irreparable Harm**

Archer does not dispute the source of Wisk's irreparable harm or its sufficiency to justify a preliminary injunction: its ill-gotten head start and the threat of destruction of plaintiff's invaluable trade secrets.  Instead, Archer argues mainly that Wisk should have recognized that Archer had access to its stolen trade secrets long ago, and that Wisk waited too long to seek injunctive relief.

**HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY**

1    These arguments do not withstand scrutiny.  First, Archer's argument that Wisk should have

2  sought injunctive relief upon first uncovering Xue's theft is contrary to Archer's argument that the

3  preliminary injunction should be denied because Wisk lacks "evidence" of misappropriation.  This

4  District has previously rejected attempts by trade secret defendants to "have their cake and eat it too"

5  by simultaneously claiming that there is no evidence of misappropriation, while also claiming the

6  lawsuit was untimely.  *Waymo LLC v. Uber Techs., Inc.*, 2017 WL 2123560, at *11 (N.D. Cal. May

7  15, 2017) ("defendants contend that [plaintiff] lacks sufficient evidence of use but simultaneously

8  criticize [plaintiff] for not suing before it had any evidence of use.  This argument impeaches itself.").

9  As Dr. Gandhi explained, before February 2021, there was no public information to establish that

10  Archer's design had copied major elements of Wisk's design.  *See* Gandhi Decl. ¶¶ 74-75.  Archer

11  provides no contrary evidence; and Wisk promptly sought this injunction after February 2021.

12    Archer's attempt to distinguish cases granting preliminary injunctions in these circumstances is

13  unavailing.  For example, Archer argues that *Lamb-Weston* and *Netlist* are distinguishable because

14  they relied on "actual evidence" of misappropriation and the "head starts" examined in those decisions

15  diverted business "at the time the motion was brought."  Opp. 23.  Neither case so holds.  Nor would it

16  matter because, as shown above, there is overwhelming "actual evidence" that Archer relied on

17  Wisk's trade secrets.  *See, supra* § III.A.  Moreover, Archer recently signed a billion-dollar deal to sell

18  that copycat aircraft to United Airlines—a clear "diversion" of future potential business away from

19  Wisk that constitutes irreparable harm.  *See, e.g.*, *Zeetogroup, LLC v. Fiorentino*, 2019 WL 2090007,

20  at *6 (S.D. Cal. May 13, 2019) (granting preliminary injunction where trade secret misappropriation

21  threatened plaintiff's "future business relationships, which can qualify as irreparable harm").

22    Finally, Archer argues that Wisk does not face the total destruction of its trade secrets because

23  Xue is on leave and—according to Archer—"none of the trade secret documents Xue allegedly

24  downloaded are in Archer's systems."  Opp. 23.  This ignores other sources of vast misappropriation

25  uncovered thus far and assumes that Wisk's trade secrets are only those reflected on the face of

26  Wisk's stolen documents.  Wisk brings this motion because the trade secrets reflected in those

27  documents have spread beyond the files themselves and are present throughout Archer's aircraft

28  program.  Indeed, while Archer attempts to distinguish *Waymo* on that basis, that court noted the risk

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

1  here—that trade secrets could be taken from stolen documents and incorporated into defendant's

2  development program and that "[s]uch misuse of [plaintiff's] trade secrets might be virtually

3  untraceable." *Waymo*, 2017 WL 2123560, at *10.

4  **G.      The Balance Of Hardships And Public Interest Favor An Injunction**

5         Archer does not address the merits, instead claiming an injunction cannot be entered based on

6  Wisk's trade secret descriptions and because it would restrain "competition in the marketplace." *See*

7  Opp. 24-25.  Neither of these affects the balance of hardships and public interest analysis here.

8         As described above in Section III.D, Wisk has properly identified its trade secrets in pain-

9  staking detail.  *See* Dkt. 16-8.  Its description provides ample guidance to shape an injunction that

10  enjoins Archer's misappropriation without affecting legitimate independent development.

11         As to the public interest, Archer merely accuses Wisk of anticompetitive motives and argues

12  that promoting competition always weighs against an injunction.  Opp. 25.  Not only are Archer's

13  accusations baseless rhetoric, but Archer is mistaken on the law.  *See WeRide Corp. v. Kun Huang*,

14  379 F. Supp. 3d 834, 854 (N.D. Cal. 2019) (finding public's interest in "***fair and lawful*** competition

15  in an emerging market" supported issuance of a preliminary injunction) (emphasis added).

16  **H.      A Bond Is Neither Necessary Nor Appropriate**

17         Finally, the Court should deny Archer's request for a bond—████████████████.  *See*

18  *GlaxoSmithKline LLC v. Boehringer Ingelheim Pharms., Inc.*, 484 F. Supp. 3d 207, 229 (E.D. Pa.

19  2020) (setting $5,000,000 bond despite defendant's claim it would lose parts of the "billion-dollar

20  COPD market" if its marketing campaign were enjoined); *People of State of Cal. ex rel. Van De Kamp*

21  *v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir.), *amended*, 775 F.2d 998 (9th Cir. 1985)

22  (noting that requiring an impracticably high bond "would effectively deny access to judicial review.").

23  **IV.    <u>CONCLUSION</u>**

24         Wisk respectfully requests that the Court grant Wisk's Motion for Preliminary Injunction.

25  DATED:  July 14, 2021                    Respectfully submitted,

26                                          QUINN EMANUEL URQUHART
                                            & SULLIVAN LLP

27

28                                          By  */s/ Yury Kapgan*
                                                Yury Kapgan
                                            Attorneys for Plaintiff Wisk Aero LLC