United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

WISK AERO LLC,
Plaintiff,

v.

ARCHER AVIATION INC.,
Defendant.

Case No. 3:21-cv-02450-WHO

**ORDER IN SUPPORT OF DENIAL OF MOTION FOR PRELIMINARY INJUNCTION AND DENYING MOTIONS TO DISMISS AND STRIKE**

Re: Dkt. Nos. 29, 48, 50, 54

**INTRODUCTION**

Plaintiff Wisk Aero LLC ("Wisk") and defendant Archer Aviation Inc. ("Archer") are competitors in the budding electronic vertical takeoff and landing ("eVTOL") aircraft industry—products sometimes called "air taxis." In this suit, Wisk (the established player) alleges that Archer (the relative newcomer) misappropriated many of its trade secrets when developing its own eVTOL aircraft. This Order addresses three motions: Wisk's motion for a preliminary injunction to prohibit the alleged misappropriation, which I denied after the hearing on July 21, 2021, and Archer's motions to dismiss the operative complaint and strike Wisk's trade secret disclosure, for which I heard argument on August 11, 2021.

This Opinion provides the full explanation for the denial of Wisk's motion for a preliminary injunction. As a matter of evidence—not mere allegations with the benefit of all reasonable inferences drawn in its favor and the low bar of plausible pleading—Wisk has not shown a likelihood of success on the merits of misappropriation. Although there are some arguable indications of misappropriation, Wisk's evidence is, at best for it, equivocal. Even assuming that Wisk has raised "serious questions going to the merits," its evidence is too uncertain to support findings of a likelihood of irreparable injury or that the balance of hardships sharply

United States District Court
Northern District of California

favors it. But it may find that evidence in discovery. Archer's motions to dismiss and strike are denied because Wisk's disclosure and identification of its trade secrets are sufficient and it has plausibly alleged that Archer misappropriated at least some of them. This case, then, will be determined on the merits.

**BACKGROUND**

**I. FACTUAL BACKGROUND**

A motion to dismiss and a motion for a preliminary injunction are decided based on two different types of support; the former based on the plaintiff's allegations, the latter on an evidentiary record. Because the parties engaged in early discovery, the evidence is significantly more developed than the allegations. Accordingly, I lay out that full record below and note in the discussion on the motion to dismiss when the First Amended Complaint ("FAC") [Dkt. No. 45] makes a related allegation. Both parties have submitted numerous sworn declarations and authenticated exhibits in support of their positions. Neither side has filed evidentiary objections, except for one from Wisk discussed below. The putative trade secrets at issue are discussed as they become relevant to the analysis.

**A. eVTOL Aircraft**

eVTOL aircraft are a still-developing technology that, in short, take off and land like helicopters and fly like planes; they are often colloquially discussed as "flying cars" or "air taxis."[1] Although the industry is still in its relative youth, at least some analysts believe that "urban air mobility"—getting people around in cities with air taxis—will be worth billions of dollars in the next decade and a trillion dollars in two. *See* Dkt. Nos. 16-9 (Morgan Stanley analysis), 16-10 (Emergen Research analysis). The record indicates that the first eVTOL companies opened their

---

[1] *See, e.g.*, Andrew J. Hawkins, *GM surprises with autonomous Cadillac and flying car concepts*, The Verge, Jan. 12, 2021, https://www.theverge.com/2021/1/12/22226778/gm-flying-car-cadillac-halo-av-evtol-concept-autonomous-ces-2021; Antuan Goodwin, *Archer reveals first photos of its Maker eVTOL air taxi*, CNET, June 10, 2021, https://www.cnet.com/roadshow/ pictures/archer-maker-evtol-air-taxi-revealed/; Loz Blain, *Stunning video shows just how quiet Joby's eVTOL air taxi will be*, New Atlas, Feb. 24, 2021, https://newatlas.com/aircraft/joby-aviation-evtol-video/. I take judicial notice of these public websites for general context and do not use them to determine any adjudicative fact. *See* Fed. R. Evid. 201.

doors from 2009 onward and that most started during the 2010s. *See, e.g.*, Declaration of Dr. Farhan Gandhi ("Gandhi Decl.") [Dkt. No. 16-4] ¶¶ 14–22 (expert summarizing development timelines of major competitors).

Understanding several basic terms is useful to making sense of this case. "Rotors" or "rotor systems" are the groups of blades that spin to produce thrust; they are similar to helicopter blades and resemble large fans. *See, e.g.*, Declaration of E. Randolph Collins, Jr. ("Collins Decl.") [Dkt. No. 17-1] ¶ 20. An eVTOL aircraft, as its name implies, is supposed to take off vertically like a helicopter, so it uses several rotors. *Id.* Traditional rotors (again, think helicopter) stay in a single orientation; some rotors, however, "tilt" (for instance, 90 degrees), so that they can propel the aircraft horizontally as well as vertically. *See, e.g.*, *id.* ¶ 37. Sometimes, Archer internally used the formulation of "X-tilt-Y" in which X is the total number of rotors and Y is the number that tilt. *See* Dkt. No. 57-26 at 4 n.1.[2] I sometimes use that formulation too. So, an eVTOL aircraft with 12 rotors, six of which tilt, would be referred to as "12-tilt-6." eVTOL aircraft also have various "subsystems" that comprise the different functional components of the aircraft—an electric subsystem, an avionics subsystem (i.e., the systems that help it fly, such as sensing, communication, and navigation), and so forth. *See, e.g.*, Dkt. No. 57-26 ¶¶ 30–39.

**B. Wisk**

Wisk or its predecessors have been in the electric aircraft business since 2010. *See* Declaration of Geoff Long ("Long Decl.") [Dkt. No. 16-27] ¶¶ 2–5.[3] Wisk previously built five generations of aircraft and began work on a sixth generation in 2019. *See id.* ¶¶ 6–10. Among others, it has been backed by Google co-founder Larry Page. *See, e.g.*, Dkt. No. 16 at 10. The previous generation (the fifth) was the "Cora":

[2] References to briefs are to their original page numbers; references to exhibits are to their ECF-generated page numbers.

[3] Levt Inc. was founded in 2010 and renamed Zee.Aero Inc. in 2011. Long Decl. ¶¶ 2–3. In 2016, it merged with Kitty Hawk Corporation and was called Kitty Hawk. *Id.* ¶ 3. In 2019, Kitty Hawk and The Boeing Company formed a joint venture called Cora Aero LLC. *Id.* ¶ 4. Cora Aero was renamed Wisk Aero LLC later that year. *Id.*



*Id.* ¶ 9.

Wisk's upcoming aircraft, the sixth generation, is called the "Cora X." Reply ISO PI Mot. ("PI Reply") [Dkt. No. 92] 4. According to Wisk, it will employ a front row of six tilting rotors. *Id.* (collecting citations).

**C. Archer and Its Recruiting**

Archer was founded by Brett Adcock and Adam Goldstein in 2018, formally incorporated in October of that year. *See* Declaration of Brett Adcock ("Adcock Decl.") [Dkt. No. 58-13] ¶¶ 16–17. It was initially sponsored by a research grant at the University of Florida. *Id.* ¶ 16.

For many of the events in this case, it appears that Adcock and Goldstein were the only employees at Archer. *See, e.g.*, Deposition of Geoffrey Bower ("Bower Depo.") [Dkt. No. 92-16] at 85:14–17. Both parties agree that Archer hired a number of employees from Wisk (and other eVTOL competitors). For instance, Archer reached out to Tom Muniz, Wisk's vice president of engineering, on October 17, 2019; they spoke the next day; Adcock, Goldstein, and Muniz met for coffee on October 24; they met for lunch on November 1 to offer him the job; Muniz accepted on November 19; and he started on December 6. Adcock Decl. ¶¶ 47–48. Archer also reached out to Airbus Vanhana's chief engineer Geoff Bower on October 7, 2019, who had previously worked at Wisk's predecessor. *Id.* ¶ 50. They made him an offer on November 2; he accepted on December 3; and he started at Archer on January 6, 2020. *Id.* ¶ 51. Following that, ten other Wisk employees left for Archer in the six days between January 8 and January 14. *See* Motion for Preliminary Injunction and Expedited Discovery ("PI Mot.") [Dkt. No. 16] 8[4]; Opposition to the Mot ("PI Oppo.") [Dkt. No. 58] 15 (discussing its hiring of former Wisk employees); *see also*

[4] The sealed, unredacted version of the motion was not filed with the other sealed documents related to it at Dkt. No. 17. It appears at Dkt. No. 87-4.



United States District Court
Northern District of California

United States District Court
Northern District of California

Adcock Decl. ¶ 51 ("We ultimately extended offers to more than twenty engineers from a variety of employers, including Airbus, Wisk, and Harris Corporation.").

**D. Development of the Maker**

How Archer's aircraft, "the Maker," was developed is at the heart of this dispute. Before the Maker was conceived, Archer was working on a different eVTOL aircraft. *See, e.g.*, Adcock Decl. ¶ 18. By June 2019, it had a prototype:



*Id.* ¶ 19. But it "developed doubts" about that design and, in September 2019, hired FlightHouse Engineering ("FlightHouse"), a company that works on eVTOL designs.[5] *Id.* ¶¶ 19–23. First in an October 18 call then in an October 25 meeting, FlightHouse informed Archer that its aircraft was not capable of meeting "mission objectives." *See generally* Declaration of Calder Hughes ("Hughes Decl.") [Dkt. No. 85-25]; Adcock Decl. ¶ 25.

According to Archer and FlightHouse, the first time a 12-rotor aircraft was discussed was at that October 25 meeting. *See* Hughes Decl. ¶¶ 9–11. A photo from that meeting shows that one hand-drawn sketch does include half of a 12-rotor aircraft. *Id.* Archer then hired FlightHouse to come up with a new aircraft design. *Id.* ¶¶ 12–13.

FlightHouse presented its ideas to Archer at a meeting on November 22. *See* Hughes Decl. ¶ 17; Dkt. No. 93-63 (presentation from the meeting). Those ideas included 12-rotor layouts. *See, e.g.*, Dkt. No. 93-63 at 169. It also included tilting rotors (though the 12-rotor layout had four tilting ones, not six). *Id.* Wisk classifies the designs presented as "radically different" than the

[5] FlightHouse's leadership is made up of former Wisk employees as well. PI Mot. 3 (collecting citations). But Wisk never argues—despite its implication—that they misappropriated trade secrets.

Maker because the Maker "has 12 rotors mounted on the front and rear ends of underwing booms and distributed across a single fixed wing lifting surface, with the front row of six rotors capable of tilting forward." Supplemental Declaration of Farhan Gandhi ("Supp. Gandhi Decl.") [Dkt. No. 93-7] ¶ 37. A 12-tilt-6 configuration (which the Maker has) was first presented by FlightHouse on December 6, 2019. Hughes Decl. ¶ 22. FlightHouse represents that it ran simulations on that design using its own analysis tool on December 4. *Id.* ¶ 21. It says that those results were "strong and consistent with Archer's mission objectives." *Id.* On December 11, FlightHouse met with Adcock, Goldstein, and Muniz to present six configurations that it had narrowed down to. *Id.* ¶ 24. The 12-tilt-6 design that FlightHouse presented on was labelled "cora + tilt." Dkt. No. 92-44 at 34. (Cora, to remind, is the name of Wisk's fifth-generation eVTOL aircraft.) Archer and FlightHouse narrowed the six options down to four. Hughes Decl. ¶ 26.

Bower started work at Archer on January 6, 2020, as its chief engineer. *See* Declaration of Geoffrey Bower ("Bower Decl.") [Dkt. No. 57-26] ¶ 2. He had previously worked at several other eVTOL companies, including Wisk's predecessor for five years. *Id.* When he was hired, Archer only had three employees: Adcock, Goldstein, and Muniz. Bower Depo. at 85:14–17. His task was to choose from among the designs presented by FlightHouse. Bower Decl. ¶ 11. He agreed in his deposition that he had "full discretion to select any design that [he] thought was best for Archer." Bower Depo. at 43:13–21. He stated that the only information he was given by FlightHouse that underlay that decision was the slide deck with the modeling results from the different configurations. *Id.* at 44:4–23. According to him it "wasn't important . . . to analyze the underlying data" because he "knew [he] would be doing – conducting my own analysis." *Id.* at 44:18–23. As a result, he did not see (or does not recall seeing) FlightHouse's underlying "detailed analyses." *Id.* at 44:4–23. Bower added four designs to the six under consideration. Bower Decl. ¶ 19. Wisk argues that one of the configurations was similar to its "Grits" model—another previous generation of eVTOL aircraft—and Bower agreed that they are "somewhat related" but have differences. *See id.* at 57:17–58:4.

Bower ultimately selected the 12-tilt-6 design. He testified that he did not notice it was labelled "cora + tilt." Bower Depo. at 49:18–50:13. According to Bower, he made his decision on

the basis of a model that "allowed me to evaluate and predict the range, size and weight, performance, and approximate cost of" the configurations. Bower Decl. ¶ 15. He states that he used "other analytical tools." *Id.* He also compared the concepts to those already on the market. *Id.* ¶ 16. According to Wisk's expert, Bower's analysis is actually "rudimentary" (he compares it to undergraduate level) and based on parameters that came from Wisk information. *See* Supp. Gandhi Decl. ¶¶ 50–51.

Bower presented his recommendation in a "Conceptual Design Review" meeting on February 27, 2020. Bower Decl. ¶ 18. That Conceptual Design Review included a 260-slide presentation that discussed everything from motors to batteries to avionics to the results of flight testing. *See* Dkt. No. 93-32.

Archer held an investor presentation on February 10, 2021. Dkt. No. 16-4 ¶ 13. In that presentation (which occurred several weeks before the Conceptual Design Review), it presented the Maker. *See* Dkt. No. 16-3 (investor slides). The Maker was depicted with 12 "motors and propellers." *Id.* at 33. It looked as follows:





*Id.*

**E. Wisk's Patent and Archer's Alleged Disclosure of Its Design**

On January 31, 2020, Wisk submitted a provisional patent application. The aircraft is depicted in the patent (in photos chosen by Wisk to align with the ones of the Maker above) as:





PI Mot. 9; Dkt. No. 17-19. According to Wisk, that it filed a provisional patent application for this design is indicative of Archer's misappropriation of trade secrets. According to Archer, Wisk

filed the provisional because *Archer* disclosed the Maker's design to a Wisk employee, who promptly alerted the company. The facts underlying that dispute follow.

One of Wisk's employees that Archer tried to recruit was Geoff Long, one of the first five employees hired at Wisk and now its chief engineer. *See* Adcock Decl. ¶ 33; Long Decl. ¶¶ 1–2. A meeting to recruit Long occurred on December 9, 2019, between Adcock, Goldstein, and Long. Adcock Decl. ¶ 33; Long Decl. ¶¶ 11–12. Archer says that Adcock "shared with Long that Archer was working with FlightHouse and seriously considering a design that would have six rotors along the front of a fixed wing, with up to all six front rotors capable of tilting, and six stationary lift fans arranged aft of the wing (i.e., 12-tilt designs)." Adcock Decl. ¶ 33. Goldstein remembers it much the same way: "I recall our discussion with him regarding Archer's then-current leading design option[, which was] an aircraft with twelve fans, with six of them along the front of a fixed wing, at least two of which capable of tilting, and the other six stationary lift fans positioned behind the wing." Declaration of Adam Goldstein ("Goldstein Decl.") [Dkt. No. 58-18] ¶ 19.[6]

Wisk's FAC pleads that, in that meeting, "Archer's co-founders did reveal the design they were considering for their aircraft: it would have six fans along the front wing, with the inner two fans capable of tilting, and six stationary lift fans in the back." FAC ¶ 57. According to Long, "Mr. Adcock and Mr. Goldstein did not describe to me any configuration with more than two tilting fans." Supplemental Declaration of Geoff Long ("Supp. Long Decl.") [Dkt. No 93-9] ¶ 5. He says that he "immediately" recognized the configuration they were talking about as "a configuration that had been developed years before at [Wisk predecessor] Zee.Aero." *Id.* ¶ 6. That configuration was called "Grits." *Id.* He claims that he "told Mr. Adcock and Mr. Goldstein that the configuration they were describing was a Zee.Aero configuration." *Id.* ¶ 7. He sent an email to himself to "memorialize[]" the conversation, which says that he recognized the aircraft as "Bacon"; he represents that he misremembered which past (breakfast food-based) designation actually applied, and it was "Grits." *Id.* ¶ 8. He also claims that the idea for tilting fans was in

[6] Wisk argues that Adcock and Goldstein do not agree on what occurred, but the arguable discrepancy in their statements is that Adcock says that "up to six" rotors would tilt while Goldstein says that "at least two" could tilt. Those statements are not contradictory.

"active consideration" for the next generation of Wisk eVTOL aircraft and his email said the ideas seemed "remarkably similar." *See id.* ¶¶ 9–11. He informed his superior at Wisk about the meeting. *Id.* ¶ 12.

**F. Jing Xue's Downloads**

One of the hires that Archer made from Wisk was an engineer named Jing Xue. Xue says that he interviewed with Archer in December 2019; was given his written offer on December 31, 2019; and accepted on January 2, 2020. *See* Declaration of Jing Xue ("Xue Decl.") [Dkt. No. 58-26] ¶ 4. He gave notice that he was leaving Wisk on January 10. *Id.* ¶ 5. Wisk moves to strike Xue's Declaration because he asserted his Fifth Amendment privilege against self-incrimination for some questions in his deposition. PI Reply 17–18. I agree that, under the circumstances, striking the declaration would likely be appropriate. *See Cisco Sys., Inc. v. Sheikh*, No. 4:18-CV-07602-YGR, 2020 WL 5877573, at *4 (N.D. Cal. Oct. 2, 2020). But there is no need because nothing in it alters any conclusion here and, as explained below, I draw an adverse inference from it in *Wisk's* favor.

In February 2020, Wisk gave two laptops that Xue used to Setec Security Technologies, Inc. ("Setec"), an electronic forensics firm. *See* Declaration of Michael Kunkel ("Kunkel Decl.") [Dkt. No. 16-24] ¶ 6. Setec found that a USB storage device was inserted into one of the laptops on December 25, 2019. *Id.* ¶ 8. The original declaration on this topic said that "files were written" to the USB device, but the investigator corrected that in his deposition, saying that he was referring to the last written date of the "registry key" and could not say whether or what files were written to the USB. Dkt. No. 57-17 at 40:18–41:20. In any event, what is clear is that Xue downloaded 4,977 files from Wisk's Google Drive from December 25 through December 27, 2019. Kunkel Decl. ¶ 13. Those files, however, were not on the any devices Xue turned in. *Id.* ¶ 12. Approximately 3,000 files were downloaded using a computer connected through Comcast, which is not Wisk's internet service provider. *Id.* ¶ 13. Xue's declaration does not address this at all. *See generally* Xue Decl. He does say, though, that he "did not transfer to Archer at any time any Wisk trade secret or confidential proprietary documents" and "did not share or provide any Wisk documents or confidential information to anyone employed at Archer." *Id.* ¶ 7.



United States District Court
Northern District of California

United States District Court
Northern District of California

Wisk turned over this information to local prosecutors, raising the issue of trade secret theft, who turned it over to the federal government. *See* PI Mot. 8–9 (collecting citations). The Federal Bureau of Investigation executed a search warrant at Xue's home in late March 2021 and seized his personal devices and laptop. Xue Decl. ¶ 8. In response to Wisk's allegations, Archer confirmed to the *New York Times* that it had been subpoenaed too. *See* Lauren Hirsch and Niraj Chokshi, *Electric Aircraft Start-Up Accused Rival of Stealing Its Secrets*, N.Y. Times, Apr. 6, 2021.[7]

**G. Wisk Employees' Retention of Documents**

Wisk asserts that discovery has shown that "many" departing Wisk engineers "retain[ed] Wisk confidential information" when they left for Archer. PI Reply 3–4. With one exception discussed below, it indicates virtually nothing else about them. In particular, it cites depositions of three employees—Muniz, Diederik Marius, and Johnny Melack (Wisk's director of engineering)—who forwarded themselves Wisk documents before leaving. *Id.* (collecting citations).

**H. Adcock and Goldstein's Statements**

As explained below, Wisk relies on several public statements made by Adcock and Goldstein to support its misappropriation claim. I reproduce the quotes in context and italicize the portions that Wisk focuses on.

In an interview with Benzinga, Goldstein said,

> *There was a group that started the industry about 10 years ago. So Larry Page basically invents the industry 10 years ago with a company that was originally called Zee Aero, you might know it now called Wisk . . . .*
>
> *So Larry Page spent, I don't know, it's not publicly disclosed, I'm guessing, maybe something like a billion dollars of capital over 10 years building five full-scale aircraft and dozens of those aircraft.* The latest one is called Cora. That's the one you can see on the wisk.aero website. *Incredible group with incredible technology.* A lot of the folks from Archer came from Wisk. So Tom Muniz, our head of engineering, ran engineering at Wisk. Jeff Bauer was an early employee at Wisk as well, but he left around five years ago or so to go run Airbus's program called Airbus Vahana. And so he was the chief engineer there. So

[7] I take judicial notice of Archer's public representation made in a readily accessible publication (and to which Archer did not object when it appeared in Wisk's Motion). *See* Fed. R. Evid. 201.

> Jeff and Tom came back together. And then when those guys came together, it was this huge moment in eVTOL industry. The two leaders of two of the biggest projects out there, Wisk and Airbus got together to come. And a lot of engineers followed them. A lot of engineers wanted to come over and work with them again.
>
> These are two of the most technically competent people, the longest standing people that have been working on this industry. And so this is the sixth aircraft that they're building, sixth full scale aircraft. So it's not a question to us whether the technology work, you can literally just go to a Wisk website or go on YouTube and type in Airbus Vahana or same thing with Joe, but you can see these vehicles work. And so now you're at the point where you need to get through [Federal Aviation Administration ("FAA")] certification.

Dkt. No. 16-21 (emphasis added). In an interview with Fox News, Goldstein said,

> *So this is technology that has been worked on for over a decade now*. This is not new technology. And in fact, we are moving out of really that R&D phase and moving more into the really commercialization phase. So, you know if you think about Tesla, you're really going from T0 and the AC propulsion days to Tesla phase where they really took a technology that had been worked on for over a decade and really commercialized it. You're seeing a lot of the same thing happen here. In order for Archer to get to market, *there's actually no new technology that needs to be invented*.

Dkt. No. 16-22 (emphasis added).[8]

### I. Archer's Merger and New Business

On February 10, 2021, Archer announced a merger with a special purpose acquisition company, Atlas Crest Investment Corp., to provide approximately $1.1 billion in funding and result in Archer going public. *See* Adcock Decl. ¶ 71. It also announced a $1 billion order and $500 million purchase option from United Airlines that day. *Id.* ¶ 72. Archer argues that this lawsuit, and an apparent accompanying "media blitz," are intended to "derail" the merger and new business. *See* PI Oppo. 24.

## II. PROCEDURAL BACKGROUND

Wisk filed suit on April 6, 2021, alleging trade secret misappropriation and patent infringement.[9] Dkt. No. 1. On May 19, it moved for a preliminary injunction and expedited discovery. I ordered the parties to meet-and-confer about the (unspecified) requests for early discovery that they believed necessary to litigate the preliminary injunction. Dkt. No. 28. They

---

[8] Wisk relies on one other quote but the exhibit it cites does not contain that quote. *Compare* PI Mot. 10 (quote about Wisk's design "win[ning] the market"), *with* Dkt. No. 16-23 (exhibit cited).

[9] None of the current motions concern the alleged patent infringement.

narrowed down their disputes and brought a few remaining ones to me. Dkt. No. 37. I ordered that a neutral third-party be permitted to forensically examine Xue's work laptop according to terms the parties agreed to, ordered Wisk to produce documents from certain high-level custodians, denied Archer's request to produce other documents, and permitted Wisk to depose Xue (noting that whether he chose to assert his Fifth Amendment right was up to him and counsel). *Id.*; *see also* Dkt. No. 88 (expanding scope of permissible investigation). Later, I denied Xue's request that Wisk produce the confidential documents to him that it produced to Archer. Dkt. No. 70.

Archer filed its Opposition on June 23. On July 5, Wisk filed an emergency motion to extend the time to reply. Dkt. No. 72. I granted the motion, extended its deadline to July 14, and accordingly reset the hearing for August 11. Dkt. No. 74. Archer (improperly) emailed the court to object to that order; I stated it should file its objection properly by the next day and set a status conference on the timing issue for the day after that. Dkt. No. 76. Archer hoped to have the matter decided expeditiously, so I reset the motion to be heard on an expedited timeline. Wisk filed its reply brief on July 14. Because it included significant new evidence and arguments, I permitted Archer to file a sur-reply by July 19. Dkt. No. 95. I held a hearing on the motion on July 21. Dkt. No. 109. I denied the motion the next day and explained that "[a] full written opinion will follow in due course." Dkt. No. 110.

In the meantime, Archer moved to dismiss the trade secret claims. Dkt. No. 29. On the day its opposition was due, Wisk filed the FAC. Archer again moved to dismiss the trade secret claims and moved to strike Wisk's trade secret disclosure required by California Code of Civil Procedure § 2019.210. Dkt. Nos. 48, 50. I held a hearing on those motions on August 11, 2021.

## LEGAL STANDARDS

### I. MOTION TO STRIKE

Federal Rule of Civil Procedure ("FRCP") 12(f) allows the Court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." "The function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial." *Whittlestone,*

*Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010) (citation and alteration omitted). Motions to strike "are generally disfavored [by courts] because the motions may be used as delaying tactics and because of the strong policy favoring resolution on the merits." *Barnes v. AT&T Pension Ben. Plan-Nonbargained Program*, 718 F. Supp. 2d 1167, 1170 (N.D. Cal. 2010) (citation omitted). Such motions should only be granted if "the matter has no logical connection to the controversy at issue *and* may prejudice one or more of the parties to the suit." *New York City Employees' Ret. Sys. v. Berry*, 667 F. Supp. 2d 1121, 1128 (N.D. Cal. 2009). "Where the moving party cannot adequately demonstrate such prejudice, courts frequently deny motions to strike even though the offending matter literally was within one or more of the categories set forth in Rule 12(f)." *Id.* (citation and quotation marks omitted).

In resolving a motion to strike, the pleadings must be viewed in the light most favorable to the nonmoving party. *Platte Anchor Bolt, Inc. v. IHI, Inc.*, 352 F. Supp. 2d 1048, 1057 (N.D. Cal. 2004). "Ultimately, whether to grant a motion to strike lies within the sound discretion of the district court." *Cruz v. Bank of New York Mellon*, No. 12-CV-00846-LHK, 2012 WL 2838957, at *2 (N.D. Cal. July 10, 2012) (citing *Whittlestone*, 618 F.3d at 973).

## II. MOTION TO DISMISS

Under FRCP 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Id*. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level." *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff. *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987). However, the court



United States District Court
Northern District of California

is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir. 1989).

**III. MOTION FOR A PRELIMINARY INJUNCTION**

FRCP 65 governs preliminary injunctions. A preliminary injunction may be issued if a plaintiff establishes: (1) likelihood of success on the merits; (2) likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The Ninth Circuit has held that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).

**DISCUSSION**

Although the parties' motions require different types of showings, the same substantive legal framework governs them all. I first lay out the fundamentals of trade-secret law before applying the law to each motion.

**I. LEGAL FRAMEWORK**

Wisk brings its claims under the federal Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1836 *et seq.*, and the California Uniform Trade Secrets Act ("CUTSA"), CAL. CIV. CODE § 3426 *et seq*. For present purposes, the elements of both statutes are materially identical; courts frequently

analyze them together (as do the parties here). *See Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017); *Alta Devices, Inc. v. LG Elecs., Inc.*, 343 F. Supp. 3d 868, 877 (N.D. Cal. 2018). A trade-secret plaintiff must show that (1) the plaintiff owned a trade secret, (2) the defendant misappropriated a trade secret, and (3) the defendant's misappropriation damaged the plaintiff. *See* 18 U.S.C. §§ 1836, 1839; CAL. CIV. CODE §§ 3426.1–3426.3; *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 845 (N.D. Cal. 2019), *modified in part*, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019).

**A. Identification With Reasonable Particularity**

California Code of Civil Procedure § 2019.210 requires that "before commencing discovery relating to the trade secret, the party alleging the misappropriation shall identify the trade secret with reasonable particularity." Though the statute is a requirement of California law, "courts in this district have routinely applied" that standard for federal claims as part of the plaintiff's identification of its trade secrets. *Openwave Messaging, Inc. v. Open-Xchange, Inc.*, No. 16-CV-00253-WHO, 2018 WL 2117424, at *4 (N.D. Cal. May 8, 2018).

"[A] plaintiff who seeks relief for misappropriation of trade secrets must identify the trade secrets and carry the burden of showing that they exist." *MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 522 (9th Cir. 1993); *see also Diodes, Inc. v. Franzen*, 260 Cal. App. 2d 244, 250 (1968). The plaintiff must "describe the subject matter of the trade secret with sufficient particularity to separate it from matters of general knowledge in the trade or of special knowledge of those persons who are skilled in the trade, and to permit defendant to ascertain at least the boundaries within which the secret lies." *Openwave*, 2018 WL 2117424, at *4 (quoting CAL. CODE CIV. P. § 2019.210). But the plaintiff "need not spell out the details of the trade secret." *Autodesk, Inc. v. ZWCAD Software Co.*, No. 5:14-CV-01409-EJD, 2015 WL 2265479, at *5 (N.D. Cal. May 13, 2015) (internal quotation marks and citations omitted). Though the rule is similar to a pleading standard, it also serves two practical purposes: (1) "provid[ing] reasonable guidance in ascertaining the scope of appropriate discovery," *id.* (internal quotation marks and citations omitted), and (2) preventing plaintiffs from engaging in a "shifting sands" tactic in which they allege secrets vaguely, discover what is in the defendant's possession, and claim it was a trade

secret all along, *Quintara Biosciences, Inc. v. Ruifeng Biztech Inc.*, No. C 20-04808 WHA, 2021 WL 965349, at *1–*2 (N.D. Cal. Mar. 13, 2021).

**B. Protectability as a Trade Secret**

Under DTSA and CUTSA, a trade secret is defined, essentially, as various types of information that are (1) sufficiently secret and (2) derive economic value from their secrecy. *See* 18 U.S.C. § 1839(3); CAL. CIV. CODE § 3426.1(d); *Alta Devices*, 343 F. Supp. 3d at 877. More specifically, the first element requires that its owner have "taken reasonable measures to keep such information secret," 18 U.S.C. § 1839(3)(A), or that the secret "[i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy," CAL. CIV. CODE § 3426.1(d)(2). The second element requires that the trade secret "derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3)(B); *accord* CAL. CIV. CODE § 3426.1(d)(2). Put another way, the secret must have some economic value *just* from the fact that it is secret. *See WeRide*, 379 F. Supp. 3d at 847.

**C. Misappropriation**

Under the trade secret laws, "misappropriation" can take two broad forms. First, it is "acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means." 18 U.S.C. § 1839(5)(A); *accord* CAL. CIV. CODE § 3426.1(b)(1). Second, it is,

> disclosure or use of a trade secret of another without express or implied consent by a person who—
>
> (i) used improper means to acquire knowledge of the trade secret;
>
> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>
> (I) derived from or through a person who had used improper means to acquire the trade secret;
>
> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or
>
> (iii) before a material change of the position of the person, knew or had reason to know that—
>
> (I) the trade secret was a trade secret; and



United States District Court
Northern District of California

(II) knowledge of the trade secret had been acquired by accident or mistake.

18 U.S.C. § 1839(5)(B); *accord* CAL. CIV. CODE § 3426.1(b)(2). And "improper means" is defined to include "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means" and excludes "reverse engineering, independent derivation, or any other lawful means of acquisition." 18 U.S.C. § 1839(6); *accord* CAL. CIV. CODE § 3426.1(a).

Courts have often differentiated between direct and indirect misappropriation. Direct misappropriation occurs when "a defendant obtained the trade secrets directly from the plaintiff." *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 78 (N.D. Cal. 2020); *see Heller v. Cepia, L.L.C.*, No. C 11-01146 JSW, 2012 WL 13572, at *6 (N.D. Cal. Jan. 4, 2012), *aff'd in part*, 560 F. App'x 678 (9th Cir. 2014). Indirect misappropriation, on the other hand, occurs when a defendant obtains a trade secret "from someone other than plaintiff." *Navigation*, 445 F. Supp. 3d at 78 (internal quotation marks and citation omitted); *Heller*, 2012 WL 13572, at *6. Indirect appropriation requires that the defendant,

> (a) knew or had reason to know before the use or disclosure that the information was a trade secret and knew or had reason to know that the disclosing party had acquired it through improper means or was breaching a duty of confidentiality by disclosing it; or (b) knew or had reason to know it was a trade secret and that the disclosure was a mistake.

*Navigation*, 445 F. Supp. 3d at 79 (quoting *Cal. Police Activities League v. Cal. Police Youth Charities, Inc.*, No. C 08-1991 PJH, 2009 WL 537091, at *3 (N.D. Cal. Mar. 3, 2009)).

**D. Pleading and Proving Misappropriation**

When it comes to proving a case, the general rule in federal court is that direct and circumstantial evidence are treated alike; circumstantial evidence is not, by its nature, any weaker than direct evidence.[10] *See, e.g.*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003). Reliance on circumstantial evidence can be especially warranted in showing trade secret misappropriation:

> misappropriation and misuse can rarely be proved by convincing direct evidence. In most

[10] "Direct evidence is evidence which, if believed, proves the fact without inference or presumption . . . . Circumstantial evidence, in contrast, is evidence that requires an additional inferential step to demonstrate [the fact]." *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1095 (9th Cir. 2005) (internal quotation marks, citations, and alteration omitted).



United States District Court
Northern District of California

> cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take place. Against this often delicate construction of circumstantial evidence there frequently must be balanced defendants and defendants' witnesses who directly deny everything.

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*, 331 F. Supp. 3d 977, 984 (N.D. Cal. 2018) (alteration and citation omitted); *see also UniRAM Tech., Inc. v. Taiwan Semiconductor Mfg. Co.*, 617 F. Supp. 2d 938, 944 (N.D. Cal. 2007) ("Circumstantial evidence is particularly appropriate in trade secret cases.").

In analyzing misappropriation, the inquiry focuses on all of the threads of its allegations woven together—the "whole gestalt," *Quigley v. United Airlines, Inc.*, No. 3:21-CV-00538-WHO, 2021 WL 2590147, at *5 (N.D. Cal. June 24, 2021), of the complaint or evidence—not each in isolation. *See Masimo Corp. v. Apple Inc.*, No. SACV2048JVSJDEX, 2021 WL 925885, at *7 (C.D. Cal. Jan. 6, 2021) (explaining that, in a trade secret case, "the Court must consider the entire sequence of events in context, and not the individual allegations in isolation"). But the weaker those individual strands, the weaker the overall case.

## II. MOTION TO STRIKE

Archer moves to strike the disclosure statement that Wisk made under Section 2019.210. It argues that the 2019.210 Disclosure is deficient in two ways: (1) it fails to identify the trade secrets with reasonable particularity and (2) it does not illustrate the definitional elements of being a trade secret—namely that the secrets were the subject of reasonable efforts to maintain their secrecy and derive economic value from that secrecy. *See* Motion to Strike Plaintiff's Section 2019.210 Statement ("Strike Mot.") [Dkt. No. 50]. For the reasons that follow, its motion is DENIED.

### A. Identification With Reasonable Particularity

As explained above, the 2019.210 Disclosure must identify Wisk's asserted trade secrets with reasonable particularity. *See supra* Section I.A. Archer argues that Wisk has failed to do so.

Wisk's 2019.210 Disclosure, though not ideal, is sufficient at this early stage. The trade secrets identified are not "vague hand waiving" or unbounded abstractions unseparated from matters of general knowledge in the field, as Archer argues in its preliminary injunction briefing.

PI Mot. 11. Instead, they are more or less concrete descriptions of Wisk's tools, knowledge, and inventions. To take one (relatively typical) example of a knowledge-based secret, the 2019.210 Disclosure includes Wisk's modeling of how various aircraft perform under different conditions and the aerodynamic data derived from it. *See* 2019.210 Disclosure at 5. Or, to take an example of a device, Wisk discloses its Energy Storage System Architecture; in doing so, it includes a description of how the batteries are set up, what they are connected to, the voltage specifications, and some explanation of why certain choices were made. *See id.* at 38–39. Archer is, from these and other disclosures, sufficiently on notice of the contours of the secrets to be able to engage in meaningful discovery.

On top of this, Wisk submitted declarations from its experts that delve into detail about each individual trade secret, including to explain why they are reasonably identified. *See* Dkt. Nos. 16-1, 16-4. "Where, as here, credible experts declare that they are capable of understanding the [2019.210] designation and of distinguishing the alleged trade secrets from information already known to persons in the field, the designation should, as a general rule, be considered adequate to permit discovery to commence." *Advanced Modular Sputtering, Inc. v. Superior Ct.*, 132 Cal. App. 4th 826, 836 (2005). Archer critiques those experts and has submitted a countervailing declaration, *see, e.g.*, Reply ISO Strike Mot. ("Strike Reply") [Dkt. No. 79] 9, but weighing that evidence would be premature at this procedural posture. *See Perlan Therapeutics, Inc. v. Superior Ct.*, 178 Cal. App. 4th 1333, 1351 (2009) ("[I]f a plaintiff makes a sufficient showing under section 2019.210 (through an expert or otherwise), the fact that defendant (or an expert) submits contrary evidence is inconsequential.").

Archer's first set of counterarguments is that all of Wisk's trade secrets have "common" flaws. *See* Strike Mot. 7–9. It argues that Wisk has only described "general categories" of information. *Id.* 7–8. As illustrated above, that is not accurate. Further, the only examples it cites are Wisk's first few trade secrets, which relate to the process and results of aerodynamic modeling. *See* 2019.210 Disclosure at 5–7. It argues that "any airplane" would have modeling and studies like that. While that alone seems true enough, it is irrelevant: Wisk here claims the modeling and studies that *it* performed on *its* aircraft. It is not trying to claim all such studies

United States District Court
Northern District of California

performed by anyone, nor are its alleged studies the same as others'.

The next purported flaw is Wisk's use of "non-exhaustive" example documents that allegedly reflect the trade secrets. Strike Mot. 8–9. But the documents are examples of embodiments of the trade secret; they are always preceded by the substantive description of each trade secret. The cases that Archer cites, in contrast, are concerned with the situation in which vague references to lengthy documents are what the plaintiff uses to identify the trade secret. *See, e.g.*, *M/A-COM Tech. Sols., Inc. v. Litrinium, Inc.*, 2019 WL 8108729, at *4 (C.D. Cal. Sept. 3, 2019).

The last "common" alleged flaw is that Wisk's use of "catchall" phrases like "including" dooms the Disclosure. Strike Mot. 9–10. But the examples it gives—and the overwhelming use of the word in the document—are again simply that the *example documents* are non-exhaustive lists. And again, the concern of the cases that Archer cites is when the description of the trade secret injects catchall phrases to expand their scope indefinitely. *See, e.g.*, *Albert's Organics, Inc. v. Holzman*, No. 19-CV-07477-PJH, 2020 WL 4368205, at *4 (N.D. Cal. July 30, 2020).

Next, Archer contends that individual asserted trade secrets have particularized flaws. Many of its arguments, though, repeat the assertions just rejected, rephrased to apply only to particular trade secrets. *See, e.g.*, Strike Mot. 14 (arguing the example documents are overbroad). To that extent, they are likewise rejected. Archer also raises several issues that are not repetitive about the trade secrets asserted in the preliminary injunction motion. I describe those trade secrets in detail below in the analysis of that dispute. *See infra* Section IV.A.i. That discussion shows that the trade secrets are adequately identified at this stage. Among other things, they are defined with such specificity that Archer is able to put forward capable, highly technical defenses to its alleged misappropriation of each one. *Cf. Genentech, Inc. v. JHL Biotech, Inc.*, No. C 18-06582 WHA, 2019 WL 1045911, at *18 (N.D. Cal. Mar. 5, 2019) ("In fact, as [the plaintiff] points out, [the defendant] in its opposition has already defended against numerous documents [the plaintiff] claims as its trade secrets, arguing that it is not 'currently using' [the plaintiff's] trade secrets."). In other words, Archer has at least enough knowledge of the technical boundaries of the trade

secrets to confidently assert (and have its expert assert) that its technology lies beyond them.[11]

**B. Reasonable Efforts to Maintain Secrecy and Economic Value**

Archer argues that the 2019.210 Disclosure was required to, but did not, illustrate the measures taken to maintain the trade secrets' secrecy and how they derive independent economic value from that secrecy. *See supra* Section I.B.

I conclude that Section 2019.210 does not require a plaintiff to do so. The statute itself contains no language requiring it, it only requires identification of the trade secrets. When California courts have discussed the requirement, they have not (as far as I have found) indicated that the statute requires it. Indeed, there is language that tends to indicate it is not required. *See Perlan*, 178 Cal. App. 4th at 1351 ("[The plaintiff] is not required to convince defendants or the court in its section 2019.210 statement that its alleged trade secrets are not generally known to the public."). And the purposes of the statute are not undermined by failing to explain these elements, because the plaintiff must still describe the trade secrets with reasonable particularity, enabling discovery and preventing shifting sands. As one court has explained, "[f]or purposes of complying with section 2019.210 or FRCP 26, a plaintiff need not prove at the [pre-]discovery stage that each trade secret identified qualifies for trade secret protection. Rather, if the defendant contends that the plaintiff has identified a trade secret which the undisputed facts show is not secret, then the defendant should file a motion for summary judgment." *Bal Seal Eng'g, Inc. v. Nelson Prod., Inc.*, No. 813CV01880, 2017 WL 10543565, at *6 (C.D. Cal. Mar. 13, 2017) (citation omitted). Sections 2019.210 does not afford a license to conduct a mini-trial of the evidence. *See Advanced Modular*, 132 Cal. App. at 835.

Archer's argument to the contrary depends largely on an opinion that I authored. There, I wrote that these two elements needed to be included "[t]o satisfy the Section 2019.210 disclosure requirement." *See Openwave*, 2018 WL 2117424, at *4. For that statement, I cited *Jobscience, Inc. v. CVPartners, Inc.*, No. C 13-04519 WHA, 2014 WL 852477 (N.D. Cal. Feb. 28, 2014). I

---

[11] Archer raised a new particularized challenge to Trade Secret No. 52, which Wisk did not assert in either brief, for the first time at the hearing. I decline to address it because it was not raised in the briefs.

then noted in a single sentence that the requirement was met here and moved on to the parties' actual disputes: whether the plaintiff had *proved* protectability and misappropriation. *See Openwave*, 2018 WL 2117424, at *4–*5.

Archer's reliance on my decision is understandable, but I erred in *Openwave* when I suggested that Section 2019.210 itself (as opposed to the court as an exercise of discretion in case management) requires that these elements be explained in the disclosure. That part of my opinion was dicta and I failed to read *Jobscience* closely enough. *Jobscience* did not hold that Section 2019.210 imposed the requirement; instead, it required the plaintiff to lay out its contentions about these two elements as a matter of case management. *See Jobscience*, 2014 WL 852477, at *4–*5; *see also Quintara*, 2021 WL 965349, at *1 (the same judge explaining that the requirement was a matter of his orders).

In short, Section 2019.210 itself does not require an explanation of how the trade secrets meet the definitional elements. At this stage, I see no reason it would be necessary as a matter of case management. Notably, Archer's motion to dismiss does not challenge Wisk's putative trade secrets' protectability on these grounds as a matter of pleading, so it at least has fair notice of Wisk's allegations on this front. Archer will have the opportunity to take discovery on this issue.

## III. MOTION TO DISMISS

Archer mounts two broad challenges to the FAC: that Wisk has not adequately (1) identified protectible trade secrets and (2) alleged misappropriation. *See* Motion to Dismiss ("MTD") [Dkt. No. 48]. For the reasons that follow, its motion is DENIED.

### A. Identification With Reasonable Particularity

Archer argues that, even if the 2019.210 Disclosure adequately identifies Wisk's asserted trade secrets, the FAC itself does not. MTD 8–10. Wisk maintains that the FAC is sufficient but that, even if it is not, it has incorporated its 2019.210 Disclosure into the FAC. *See* Opposition to the MTD ("MTD Oppo.") [Dkt. No. 63] 6–9; *see also* FAC ¶ 71 ("The stolen Wisk trade secrets are described in Exhibit E [the Disclosure] hereto."). Archer counters that Wisk cannot meet its burden by incorporating the Disclosure. *See* MTD 8–10.

I agree that, if a trade-secret plaintiff incorporates the 2019.210 Disclosure in a pleaded

allegation and alleges that its asserted trade secrets are the ones described within, it can rely on the Disclosure to meet the pleading standard. When a plaintiff incorporates the 2019.210 Disclosure into the complaint, it becomes part of the complaint just like any other allegation. If courts did not permit this, plaintiffs could, for example, simply copy the 2019.210 Disclosure and paste it into the complaint to achieve the same end. Holding that a plaintiff could not rely on it would be a meaningless elevation of form over substance.

Archer makes two counterarguments. First, it contends that the Disclosure, unlike a complaint, is not subject to FRCP 11, so plaintiffs will get around that Rule's strictures. *See, e.g.*, MTD 8. Archer is incorrect: Wisk has pleaded that the misappropriated trade secrets are the ones in the Disclosure, a factual and legal assertion; like any factual or legal assertion in a pleading, it is subject to FRCP 11. Second, it says that two cases from this District, one that relied entirely on the other, rejected this incorporation theory. *See* MTD 8–9. Despite the parties' confident readings of those cases, however, it is not clear whether the cases held that the use of 2019.210 disclosures to meet the pleading standard was improper or whether they found that the disclosures *in those cases* were insufficient. *See Palantir Techs., Inc. v. Abramowitz*, No. 19-CV-06879-BLF, 2020 WL 9553151, at *18 (N.D. Cal. July 13, 2020); S*pace Data Corp. v. X*, No. 16-CV-03260-BLF, 2017 WL 5013363, at *2 (N.D. Cal. Feb. 16, 2017). But if those cases did intend to adopt the categorical rule that Archer urges—something they would have done with no explanation—I disagree with that approach for the reasons explained above.[12]

For the reasons explained above, the 2019.210 Disclosure adequately identifies the putative trade secrets. *See supra* Section II.A. Because the FAC alleges that the misappropriated trade secrets are the ones identified in the Disclosure, it does too. To avoid doubt, the trade secrets in the Disclosure in its current form are the only ones that Wisk has alleged; if it wishes to add more, it will have to seek leave to amend the complaint, as any party would.

---

[12] The FAC only listed five broad categories of putative trade secrets. *See* FAC ¶¶ 72–77. The parties' dispute over whether that type of pleading is permitted, *compare* MTD 6, *with* MTD Oppo. 6, is beside the point because the 2019.210 Disclosure individuates the trade secrets.

**B. Misappropriation**

Archer's second ground for dismissal is that the FAC fails to plausibly allege misappropriation of the putative trade secrets. Again, I disagree.

Wisk states that several former employees retained trade secrets when they left Wisk to join Archer. FAC ¶¶ 61–70. Xue, in particular, allegedly downloaded roughly 5,000 files from Wisk's systems at highly unusual times through non-Wisk networks and there is no evidence of them on his returned work devices. *Id.* ¶¶ 63–67. Based on that sequence of events, the "reasonable inference" (that I must draw at this stage in favor of Wisk) is that he indeed retained them. *See Usher*, 828 F.2d at 561. According to the incorporated disclosure, many files embodying trade secrets at issue were among that cache. *See generally* 2019.210 Disclosure. Archer then swiftly hired away a series of Wisk (and other competitors') employees. FAC ¶¶ 56–60. After doing so, Archer was able to put together a relatively comprehensive presentation (comprising hundreds of slides) that set out virtually all important concepts underlying the Maker aircraft in what is allegedly a suspiciously short timeframe. *Id.* ¶¶ 80–87 & n.1. According to Wisk, the timeframe is significantly shorter than it and other competitors have managed. *Id.* ¶¶ 85–87.

These allegations in concert are sufficient to meet the pleading standard. Taken together, the allegations reasonably imply misappropriation by Archer. *See BladeRoom*, 331 F. Supp. 3d at 984 (N.D. Cal. 2018) (holding that reliance on circumstantial evidence is particularly appropriate in trade secret cases). *Cf. WeRide*, 379 F. Supp. 3d at 849 (finding that an implausibly fast timeline can be indicative of misappropriation); *Ajaxo Inc. v. E*Trade Grp. Inc.*, 135 Cal. App. 4th 21, 53 (2005) (same); *Waymo*, 2017 WL 2123560, at *7 (finding that suspicious large file downloads can be indicative of misappropriation). At the very least, the allegedly implausible development timeline concurrent with the influx of former Wisk employees reasonably implies that Archer "had reason to know" that the Maker was improperly derived in part from Wisk's trade secrets. *See* 18 U.S.C. § 1839(5)(A); CAL. CIV. CODE § 3426.1(b)(1); *Navigation*, 445 F. Supp. 3d at 79.

Archer does not cite a case that dismissed a trade-secret claim at the pleadings based on a

combination of allegations materially similar to those here. To the extent it cites cases, they tend to be cherry-picked snippets, not meaningful comparisons. In any event, its two leading cases do not compel dismissal. There are many relevant differences to the allegations here, but one overarching difference suffices. In both cases the misappropriation was allegedly just of customer lists, so there was no allegation (as there is here) of implausibly fast development that supports misappropriation in a technical case. *See CleanFish, LLC v. Sims*, No. 19-CV-03663-HSG, 2020 WL 4732192, at *6 (N.D. Cal. Aug. 14, 2020); *Veronica Foods Co. v. Ecklin*, No. 16-CV-07223-JCS, 2017 WL 2806706, at *14 (N.D. Cal. June 29, 2017).

Archer's other counterarguments are not persuasive. Boiled down, its primary argument, repeated in different permutations across its briefs, is that there is no adequate allegation that *it* had knowledge of any alleged misappropriation (even if, for example, Xue retained trade secrets). *See, e.g.*, MTD 10, 12. As explained above, the allegations together, with all reasonable inferences drawn in Wisk's favor, plausibly imply that it did. Although Archer does not admit this, its argument would essentially require an allegation of direct evidence of Archer's knowledge based on more than information and belief. But, as noted, few trade-secret plaintiffs will ever have anything but circumstantial evidence when pleading a complaint, before any discovery has occurred. *See BladeRoom*, 331 F. Supp. 3d at 984; *UniRAM*, 617 F. Supp. 2d at 944. The competitor's knowledge will often have to be inferred from that evidence at the pleading stage.

Archer also repeatedly contends that Wisk's allegations must "affirmatively exclude an innocent explanation" and, here, the innocent explanation is simply that Archer developed the Maker without trade secrets. It relies on *Veronica Foods* for that statement, but all that case did was apply the usual *Twombly-Iqbal* standard, filtered through several Ninth Circuit cases, to say that a complaint must contain allegations that "tend[]" to exclude an innocent explanation. *See* 2017 WL 2806706, at *12. To say that another way, the allegations must show that the claim is *plausible*, not just theoretically *possible*. *See Twombly*, 550 U.S. at 555. Or a third way, the complaint must not be *merely consistent* with the unlawful explanation. *See Iqbal*, 556 U.S. at 678. Wisk does not have to foreclose all other explanations at the pleading stage. It just needs to plausibly plead misappropriation. If taken as true with all reasonable inferences in its favor, its

allegations tend to exclude an innocent explanation.

Archer's last tactic is to break up the allegations and argue that each is insufficient. But to the extent its cases support that view, they only held that each type of allegation would be insufficient *standing alone*, not in concert with others as here. *See, e.g.*, *Hooked Media Grp., Inc. v. Apple Inc.*, 55 Cal. App. 5th 323, 332–33 (2020) (holding that hiring competitors' employees is not sufficient on its own); *Integral Dev. Corp. v. Tolat*, No. 12-CV-6575 JSW, 2015 WL 674425, at *5 (N.D. Cal. Feb. 12, 2015) (finding that getting a product to market quickly is not sufficient on its own). Archer's reply is that "zero plus zero still equals zero" and, so, allegations that are individually insufficient cannot be enough together. MTD Reply 11. But just because one piece of circumstantial evidence would be insufficient if it were *all* the plaintiff alleged does not mean that that piece of evidence remains worthless once refracted through the lens of other circumstantial evidence. *Cf. Masimo*, 2021 WL 925885, at *7.

As explained below in the discussion on the preliminary injunction, Wisk's theory has something of a disjointed quality. Among other things, even the pleadings do not tie the visual similarity of the Maker and its patent application to any of the purported trade secrets by, for example, alleging that something about the visual design *requires* the use of the one of the actual trade secrets. Further, its briefs muddy the waters by relying on cases advancing a *respondeat superior* theory of liability. *See* MTD Oppo. 14. But it never pleaded *respondeat superior* and it blends together what is required for its general misappropriation theory and a *respondeat superior* theory. The whole of the FAC, however, is still sufficient to plead a misappropriation claim for the reasons explained, regardless of these weaknesses.

## IV. MOTION FOR A PRELIMINARY INJUNCTION

I now analyze Wisk's motion for a preliminary injunction and consider not whether its allegations are plausible but whether there is evidence to support them. For the reasons that follow, its motion is DENIED.

### A. Likelihood of Success on the Merits

To show a likelihood of success on the merits, Wisk would have to prevail on all of the elements discussed above. *See supra* Section I. It has not shown a likelihood of success that its

putative trade secrets were misappropriated—the heart of the parties' dispute. Accordingly, there is no need to address whether it has shown that the putative trade secrets are protectible.

As a preliminary matter—and as explained below—Wisk's evidence (and many arguments) in its Reply changed dramatically from its Motion. Ordinarily, that is improper. *See, e.g.*, *Roe v. Doe*, No. C 09-0682 PJH, 2009 WL 1883752, at *5 (N.D. Cal. June 30, 2009). But because this issue is here on an expedited preliminary injunction based on fast-moving discovery, it makes sense that new arguments would emerge with new evidence. Striking a reply under those circumstances would just kick the can down the road and ignore potential harms identified in discovery. I therefore gave Archer an opportunity to submit a sur-reply to obviate any prejudice to it. *See Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996) ("Where new evidence is presented in a reply . . . the district court should not consider the new evidence without giving the non-movant an opportunity to respond." (internal quotation marks, citations, and alterations omitted)).

**i. Evidence of Misappropriation of Particular Trade Secrets**

Wisk's Motion originally focused on a web of alleged circumstantial evidence to support its view. Its Reply, which was filed after expedited discovery, included more direct evidence. As the record stands now, Wisk's position boils down to two types of evidence: (1) alleged evidence from the Maker and its development process that particular trade secrets were used and (2) various forms of circumstantial evidence. I explain below, however, that the second category of evidence (because of what it is specifically, not because it is circumstantial) is either unhelpful to Wisk or would only help Wisk if it could make some independent showing that an actual trade secret was misappropriated. Accordingly, I begin with Wisk's arguments that particular trade secrets were used to develop the Maker.

1. Trade Secret No. 33

Trade Secret No. 33 is labelled "Battery Management System Architecture" and covers the battery management system ("BMS") for each battery. 2019.210 Disclosure at 45. As described in Wisk's Disclosure, each BMS is [redacted] *Id.* Each can [redacted]

United States District Court
Northern District of California

[redacted]. *Id.* Wisk's BMS uses [redacted] *Id.*

This trade secret was not asserted in Wisk's Motion. Wisk argues in reply that Archer's "engineering documents" show that this trade secret has been misappropriated. *See* PI Reply 7. According to Wisk, supported by its expert, there is "no evidence" that Archer developed its own battery technology before hiring Melack (Wisk's former engineering director). *Id.* But, "just six days" after he joined Archer, he created a presentation about energy storage for the Maker. *Id.* The BMS in that presentation monitors batteries (just like Wisk's), has the "same architecture" as Wisk's, and uses the same [redacted]. *Id.*; *see also* Supp. Collins Decl. ¶¶ 84–90 (expert analyzing this trade secret).

The evidence, however, is that Archer purchased its batteries from third-party vendor Electric Power Systems, Inc. ("EP-S"), which provides that technology to many companies. *See generally* Declaration of Nathan Millecam ("Millecam Decl.") [Dkt. No. 57-39] (EP-S CEO averring that EP-S designed and sold the batteries). EP-S's CEO—who presumably has no reason to lie under oath about interactions with a random customer, every reason to tell the truth, and no reason to take credit for technology that is accused of being pilfered—states under oath that:

> Archer never suggested to us how to design or construct the battery management units, battery modules, battery cells, or cables they sought to purchase from us. Instead, Archer told us what they needed out of their batteries in terms of performance, size, and price, and we recommended particular configurations that we thought would meet their high-level requirements and that we believed were achievable based on our product offerings.

*Id.* ¶ 6. The BMSs were "designed by EP-S." *Id.* ¶ 8. And indeed, it appears that EP-S holds the "core structure" of the batteries as a trade secret, or at least as confidential. *Id.* ¶ 13. This evidence was available to Wisk *before* it submitted its Reply, because it was attached to Archer's Opposition. Yet neither Wisk's brief nor the cited portion of its expert report reference this at all or make any attempt to rebut it.

Wisk's primary argument for believing that there was any use of its secret is also questionable. As noted, its main argument for misappropriation is that Archer's BMS and its

BMS use the same [REDACTED] approach. (It also tosses around the phrase "same architecture" but this is the *only* aspect of it that it discusses with specificity.) It points out that [REDACTED] as in its. Yet its expert actually just says that Archer "could" have chosen different ones; he indicates no reason that it is in any way odd or unusual or questionable to do so, or even how common these selections are in the industry. *See* Supp. Collins Decl. ¶ 85. And Archer has submitted evidence that [REDACTED] is not only "standard and common" but that "every" [REDACTED], "every" [REDACTED], and "every" [REDACTED]. Declaration of John Melack ("Melack Decl.") [Dkt. No. 100-27] ¶ 15. Though Melack has not been tendered as an expert, he does have experience in the field and, more importantly, Wisk has not identified evidence from its expert that contradicts him.[13] Consequently, the evidence at this point favors the view that merely selecting these options does not indicate derivation from Wisk's trade secret.

At the hearing, Wisk repeatedly argued that "it's the law in this district that verbal testimony of an interested witness cannot counter circumstantial evidence of trade secret misappropriation." Transcript of July 21, 2021, Hearing ("Hear. Tr.") [Dkt. No. 121] at 16:2–7. Its argument is off-base in several ways. First, Wisk edits the statement from the case it cites to read in a way it does not; the full statement was, "[t]he court agrees that the verbal testimony of interested witnesses cannot entirely counter *the circumstantial evidence of trade secret misappropriation presented by KOT*." *Memry Corp. v. Kentucky Oil Tech., N.V.*, No. C-04-03843 RMW, 2007 WL 2746737, at *8 n.7 (N.D. Cal. Sept. 20, 2007) (emphasis added). Second, that court cited *Droeger v. Welsh Sporting Goods Corp.*, 541 F.2d 790 (9th Cir. 1976), but all that the

[13] Melack is a former Wisk employee who, as discussed above, is accused of retaining Wisk documents. Consequently, if there were countervailing evidence, his credibility might be questioned. This statement, moreover, appears gerrymandered to give the impression that these are perhaps more common than they are (note the change in categories). But, as explained, Wisk has presented no countervailing evidence. Wisk's papers also do not draw any connection between the documents he allegedly kept and this trade secret.



United States District Court
Northern District of California

relevant part of that case did was endorse a burden-shifting approach under which "disclosure of the secret to the defendant, followed by manufacture of a closely similar device by the defendant, shifts to the defendant the burden of going forward with evidence to prove, if it can, that it arrived at the process by independent invention." *Id.* at 793. And as part of *that* showing, it said that "[t]here is substantial authority for the proposition that the defendant in such a case ought to offer more than the verbal testimony of interested witnesses." *Id.* Here, Wisk is trying to show disclosure and misuse in one fell swoop; it has not established disclosure or similarity. Third, the Federal Circuit has instructed that, even if *Droeger* is good law, it is about burdens at trial, not preliminary injunctions. *Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 959 (Fed. Cir. 1984). Fourth, the California Court of Appeal has explicitly rejected the *Droeger* approach as a matter of California trade secret law. *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1669, 3 Cal. Rptr. 3d 279, 286 (2003).

2. Trade Secret No. 38

Trade Secret No. 38 is labelled "High Voltage Architecture Analysis" and covers Wisk's analysis of various configurations and trade-offs in the architecture related to its high voltage systems. 2019.210 Disclosure at 51–52. *Id.* Such tradeoffs include [redacted] *Id.* Its configurations include [redacted] *Id.* at 52. The analysis includes [redacted] and summarizing them. *Id.*

Once again, Wisk did not assert this trade secret in its Motion.[14] And once again, it argues that Archer's "engineering documents" show misappropriation. *See* PI Reply 7–8. Its argument for misappropriation, relying on its expert, is that one of its configurations discussed [redacted]

[14] I note that this is the *only* trade secret that it has identified in the Maker that Wisk claims can be traced to a document that Xue downloaded. (The downloads are discussed on their own below.)



United States District Court
Northern District of California

[REDACTED]. *Id.* 8; Supp. Collins Decl. ¶ 92. In Archer's Conceptual Design Review, one of the options for [REDACTED] [REDACTED] These [REDACTED] says Wisk, are the same as [REDACTED]; Archer's design would add them to [REDACTED] [REDACTED]. PI Reply 8. Further, the Design Review identified the idea as being from Xue (and another engineer) and Wisk's expert opines that using [REDACTED] to provide this function "can be traced directly back to a document Xue downloaded." *Id.*

As an initial matter, the characteristic of the trade secret that allegedly shows it was misappropriated (the [REDACTED]) does not appear in Wisk's disclosure as part of the secret. It makes its way into Wisk's argument via the supplemental report of Wisk's expert, which cites a single page of a single document in which it is mentioned. *See* Supp. Collins Decl. ¶ 93 (citing Dkt. No. 93-54 at 8). And the parties' experts disagree about whether the [REDACTED] [REDACTED] are the [REDACTED]. *Compare id.* ¶ 97, *with* Supplemental Declaration of Marilyn J. Smith ("Supp. Smith Decl.") [Dkt. No. 100-29] ¶ 29.

Setting that aside, Wisk has not shown that the trade secret as misappropriated. The claimed secret is the analysis and its results, not the physical component. *See* Hear. Tr. at 16:16–18 (Wisk's counsel arguing that, "one of the issues Your Honor had with this [trade secret (in the tentative ruling)] is that you believed the trade secret was directed to an architecture, rather than individual components. I just wanted to point out to Your Honor, this trade secret is actually directed to an architecture *analysis*." (emphasis added)). So Wisk's argument must be that the knowledge gleaned from the analysis was used to make the choice to attach this [REDACTED] for the chosen function. Yet Wisk elides this distinction, arguing that "[REDACTED] [REDACTED] [REDACTED] This is a clear copy of features from Wisk's Trade Secret No. 38. In fact, the idea behind using [REDACTED] can be traced directly back to a document Xue downloaded before he left Wisk and which Wisk cited in support of Trade Secret No. 38." PI Reply 8. But again, Wisk did not claim [REDACTED]

[REDACTED]; it claimed the knowledge of the relative merits of that and other configurations. The mere fact that this component showed up in a design review (it was not used in the Maker) is not sufficient to indicate that the knowledge of various tradeoffs and configurations—including, crediting Wisk's position, one involving this—was misappropriated. Wisk's expert has not, for instance, indicated that the use of the [REDACTED] in this way is unusual, would require specialized testing, or could only be put up as a conceptual proposal (because, again, it was not used) with studies like Wisk's. Xue, moreover, testified (in response to Wisk's questioning) that a [REDACTED] is a "very standard solution to a standard electrical question." Dkt. No. 100-7 at 8:3–7. In the absence of expert testimony from either side's expert on that matter, I cannot find otherwise.[15]

3. Trade Secret No. 29

Trade Secret No. 29 is labelled "Energy Storage System [("ESS")] Architecture" and covers the batteries and electrical systems [REDACTED] 2019.210 Disclosure at 38–39. Wisk uses [REDACTED]. *Id.* The batteries have a number of other specifications. *See id.*

Wisk argues that a presentation created by a former Wisk engineer four days after he joined Archer shows that Archer [REDACTED] PI Reply 8–9. Archer's defense was initially that it purchased the batteries straight from a vendor, so it cannot have made use of the trade secret. *See* PI Oppo. 21. In its Sur-Reply, it added the argument that its ESS lacks a [REDACTED], which is integral to the trade secret. PI Sur-Reply 6–7. Wisk admits that Archer's ESS does not use a [REDACTED], instead

---

[15] Once again, if there were conflicting evidence, Xue's evidence might fall to a credibility critique. But Wisk has not offered any. At the hearing, Wisk attempted to rebut Xue's testimony with his other testimony that he would not disclose a diagram and its notations describing one of these circuit outside of Archer. Hear. Tr. at 17:17–23. But that he would not share a notated schematic of the entire circuit does not rebut—and no expert has claimed that it rebuts—the contention that using this particular component is common.



United States District Court
Northern District of California

using [redacted]. PI Reply 9. But that is immaterial, it says, because research, development, and experimentation from the trade secret qualify as "use" too. *Id.* (collecting cases). Archer's ESS, it argues, is derived from Wisk's, with just this feature altered. *Id.*

There is no dispute between the parties that Wisk's trade secret requires a [redacted] and Archer has not made use of it. The question then becomes whether Wisk has adequately demonstrated derivation, research, or experimentation, the other form of use it puts forward. It has not. First, Wisk's argument for derivation depends, as it must, on its expert. *See* PI Reply 9 (citing Supp. Collins Decl. ¶¶ 66–67). Some of that expert's opinion is just conclusory, with no explanation of how he arrived at his conclusion. *See* Supp. Collins Decl. ¶ 69 ("Archer's use of an [redacted] is simply a derivation of the [redacted] that is used in Wisk's Trade Secret No. 29."). The less conclusory part of his opinion simply parrots what some Archer employees have said, that a [redacted] was considered and may be used in the future. *See* Supp. Collins Decl. ¶¶ 66–68. Because Archer's only proffered distinguishing characteristic is that it lacks this feature, consideration of the feature does raise red flags. But, ultimately, Wisk has not shown that the selection of a several features of the ESS whose secrecy, commonality, and relative importance are unclear—like the use of [redacted], for instance, which is presumably not protectible on its own, yet is one of Archer's highlighted similarities—plus some internal discussion of the [redacted] is not enough to show that Archer has ripped off Wisk's trade secret. Further, the parties' experts again disagree over whether Archer's system *is* derivative, so it appears there is a genuine dispute of material fact. *Compare* Supp. Collins Decl. ¶¶ 66–68, *with* Supp. Smith Decl. ¶¶ 47–49. For clarity, I do not determine that Archer's ESS has *not* been misappropriated; Wisk's showing is simply too uncertain at present.

Wisk also maintains that because the feature is under consideration, it may show up in a future product. Wisk will get discovery on Archer's products and the feature; based on Archer's arguments here, if there is evidence in the future that it has used an ESS reminiscent of Wisk's with a [redacted], a different result may obtain. At present, however, an injunction cannot issue based on this type of speculation.

4. Trade Secret No. 12

Trade Secret No. 12 is labelled "Motor Optimization Model" and covers a simulation tool for evaluating its motors. 2019.210 Disclosure at 12–13. This too was one of the trade secrets asserted in Wisk's Motion. The tool considers various motor "properties and parameters" and evaluates them under different considerations. *Id.*

Unlike the trade secrets just discussed, Wisk's argument does not really depend on a technical comparison between any Archer documents or testimony and its tool. Instead, Wisk's argument is based on a person: former Wisk engineer Diederik Marius. *See* PI Reply 10. Wisk argues that when Marius joined Archer, it "asked him to recreate the same models and tools" he had worked on at Wisk, which include this. *Id.* And it says that one of the documents he allegedly retained "include[s] designs for motor models he developed at Wisk." *Id.*

The first assertion—that Archer specifically asked Marius to "recreate" the same model—would be quite extraordinary. But to make it, Wisk mischaracterizes—really, invents—the evidence. Wisk's citations for its statement is from its expert's supplemental declaration; the paragraph that Wisk cites, however, simply says that Marius was asked to develop *a* model for motors. Supp. Collins Decl. ¶ 19. And that makes sense because Marius testified that he was assigned to develop that. *See id.* (collecting citations). But that is a far cry from "recreat[ing]" Wisk's model—especially in a case that is all about whether trade secrets were recreated. Still more, Wisk deposed Marius and never asked him about this. Wisk's contortion of the record is not well taken.

The issue with the second assertion, and the theory overall, is that there appears to be no dispute between the parties that *some* form of motor simulation would be at least useful to Archer to make an aircraft (and it seems likely necessary). *See* Declaration of Diederik Marius ("Marius Decl.") [Dkt. No. 100-25] ¶ 4 ("Motor simulation and sizing tools are necessary elements of any eVTOL project and are widely used throughout the industry."). *Cf.* Supp. Colins Decl. ¶ 17 (Wisk's expert discussing the "large number of variables" in eVTOL motor design and analysis generally). Wisk has no evidence that the tool used is *its* tool or its output, and Archer employees have said the contrary. Nor does any Wisk expert offer any concrete reason to think so.

United States District Court
Northern District of California

5. Trade Secret No. 17

Trade Secret No. 17 is labelled "Motor Control Algorithms and Architecture" and covers [redacted] 2019.210 Disclosure at 18–19. Wisk alleges that Archer misappropriated its control algorithms. PI Reply 10–11. It bases this on the Conceptual Design Review's statement that [redacted]. *Id.*

Wisk has not made a sufficient showing of misappropriation. It has not shown that the algorithms allegedly used by Archer are those it used. It has not shown that the Maker's [redacted] was built off of its own. It has not shown that the mere idea of [redacted] is a trade secret. And it has not shown that there was research and development, or similar consideration, of its algorithm that could qualify as use of a trade secret. It seems that any design in which [redacted], so it is more than plausible that Archer would create one. Said another way, Wisk's trade secret is its particular algorithms and systems; other algorithms performing the same basic function are not covered. Wisk has not presented any evidence linking its algorithm to the Maker.[16]

Further, the evidence is that Archer purchased its motors from a third-party vendor, MAGicALL, Inc. *See* Declaration of Joel Wacknov ("Wacknov Decl.") [Dkt. No. 58-35]. The CEO of MAGicALL—who, just as with that of EP-S, appears to have every incentive to tell the truth and is not an interested witness—stated that MAGicALL provided motors to Archer, that the configuration "was not requested or specified by Archer," the design of the motors is proprietary and confidential, and that this includes a proprietary stow and lock technology. *Id.* ¶¶ 3–10.

In response to both of these problems, Wisk falls back to contending that the algorithms are the same because Wisk's algorithm uses "certain control loops" and "you need certain direct transitions from one control loop to another control loop." Hear. Tr. At 19:10–11. As the

[16] As far as the record reveals, Wisk has never even disclosed its own algorithm; if so, that would seem to deprive Archer of a fair shot at defending itself. *See* PI Sur-Reply 8 (describing it as "undisclosed").

United States District Court
Northern District of California

confidential slides it submitted and its expert reports show, Wisk is talking about a control performed for moving to a control loop in which the blades are [REDACTED]. *See, e.g.*, Supp. Collins Decl. ¶ 50. And, says Wisk, Archer had its stowing capabilities do the same. The problem, however, is that the MAGicALL CEO has declared that its control mechanism provided to Archer does this—and is "[their] own and proprietary." Wacknov Decl. ¶ 11. Wisk counters that Archer provided the specifications—functionally laundered the trade secrets—but the evidence it cites just shows that Archer asked for the *capability*, not that it provided the algorithm. *See* Supp. Collins Decl. ¶ 49 ("Archer required MAGicALL to modify *its* [REDACTED]." (emphasis added)); Bower Depo. at 134:10–135:1 (discussing wanting Archer's motors to [REDACTED]).

6. Trade Secret Nos. 1–4

Trade Secret No. 1 is labelled "Aerodynamic Models Based On High Quality Simulation Data" and covers a database of aerodynamic simulation results tested in various conditions for different aircraft configurations. 2019.210 Disclosure at 5. In the Motion, Wisk claimed that this putative trade secret has been used in the Maker due to its short timeframe for development. PI Mot. 18. Supported by one of its experts, Wisk contends that designs like the Maker generally require intensive simulations like those embodied in this putative trade secret to be aerodynamically viable. *Id.* But Archer jumped straight to its current design, which means engineers must have known it was aerodynamically viable. *Id.* Particular to the Maker, Wisk's expert opines that "[REDACTED]" Gandhi Decl. ¶ 40. And the Maker, Wisk points out, immediately went for this type of design and "[REDACTED]" that "[REDACTED]" PI Mot. 18. In other words, Wisk says that Archer likely would not have known the Maker would be viable without its trade secret and that its [REDACTED] is derived from Wisk's modeling. In

the Reply, Wisk adds that it is not credible for Archer to have adopted its 12-tilt-6 configuration so quickly "without a keen understanding" of aerodynamic feasibility. PI Reply 12. It also points to the spreadsheet Bower says he used to make his decision about which configuration to pursue. *Id.* Wisk asserts that the spreadsheet contains "unexplained assumptions" about how the [REDACTED]. *Id.*

Trade Secret No. 2 is labelled "Aerodynamic Studies Regarding Aircraft Stability And Control" and also covers data derived from the aerodynamic testing just described. 2019.210 Disclosure at 5–6. Unlike Trade Secret No. 1, this [REDACTED] *Id.* Wisk argues that [REDACTED]" PI Mot. 18–19. Consequently, its argument for misappropriation is along much the same lines as in Trade Secret No. 1, though this time without the evidence like the [REDACTED]. In its Reply, Wisk adds that Archer's quick decision-making on its "[REDACTED]" is also indicative of its use. PI Reply 12.

Trade Secret No. 3 is labelled "Aerodynamic Studies Regarding Lift Fan Locking And Stowing" and again covers data derived from aerodynamic modeling. 2019.210 Disclosure at 6. This time, the modeling "[REDACTED]" *Id.* Those [REDACTED]. *Id.* Wisk alleges that it "[REDACTED]" *Id.* Those analyses can show "[REDACTED]" and "[REDACTED]" *Id.* Wisk says that Archer "copied" its "[REDACTED]

[REDACTED]" PI Mot. 19. As a result, it argues that Archer likely could not have understand the value of this, or how to actually do it, without its trade secret. Wisk's Reply contends that the Conceptual Design Review assumed without analysis that [REDACTED], indicating misappropriation. PI Reply 13.

Trade Secret No. 4 is labelled "Aerodynamic Studies Regarding Flight Performance" and again covers data derived from the modeling. 2019.10 Disclosure at 6. Wisk alleges that its modeling provides predictions for things like velocity in "various flight regimes" and how it would perform in other ways at various speeds. Wisk's argument for why the trade secret is reflected in the Maker differs from the previous secrets in that it does not depend just on the short timeline. Wisk claims that (1) the similarity of Archer's design and (2) its understanding of how that design "[REDACTED]" PI Mot. 19.

The problem, however, is that there is no evidence that these models were used to simulate an aircraft with the material elements of the Maker. Wisk's argument that the model was used depends on its expert's declaration. But that expert admitted in his deposition that changes in the number of rotors or if they tilted would have to be "tested or analyzed. Simulated." Dkt. No. 100-9 at 3:14–25. He admitted that the model embodied in one of the documents was not of those configurations. *Id.* He admitted that the dimensions of the aircraft—like the shape and size of the wings, tail, fuselage, etc.—would also affect the modeling. *Id.* at 4:1–10. All of that would affect [REDACTED] that Wisk points to.[17] Even though Archer's Opposition made this point, *see* PI Oppo. 20, Wisk's Reply does not address it at all. The expert's supplemental declaration *does* purport to respond to this criticism, but Wisk chose not to rely on it. Even if I were to examine it, it does not change the outcome. The expert just says ambiguously that the

[17] Though not its primary evidence, Archer misstates the record at one point. It argues that Gandhi (Wisk's expert) admitted that the modeling "would not have been useful for any other configuration." PI Sur-Reply 9. But its citation, and that quotation, are from its own expert's deposition. *See* Dkt. No. 100-15 at 7. That does not change that Gandhi did admit much the same thing, however.



United States District Court
Northern District of California

United States District Court
Northern District of California

different types of aircraft would "bear many similarities that are relevant." Supp. Gandhi Decl. ¶ 76. That is far from an assurance that the data would translate and it does not address what he himself admitted in his deposition.

7. Remaining Trade Secrets Referenced in Motion

As noted, the Motion asserted 19 trade secrets, but the Reply only discussed five of them and added four new ones. Archer's Opposition responded to all of them, but Wisk's Reply said not one word in defense of any but the five. Moreover, Wisk now has access to a trove of Archer's technical documents and was able to depose numerous witnesses. The arguments on particular misappropriation in its Motion were simply based on public information. Wisk presented nothing from the discovery in its briefing that, now that substantiated the claims in its Motion.[18]

**ii. Other Evidence of Misappropriation**

Aside from its direct evidence that trade secrets were used in the Maker or its development, Wisk has relied on several pieces of circumstantial evidence: (1) the "implausible" speed at which Archer developed the Maker; (2) Xue's download of files; (3) retention of Wisk files by other employees that moved to Archer; (4) Archer's hiring of Wisk employees; (5) the name "cora + tilt"; (6) the contention that the Maker is a "copy" of Archer 12-rotor design in its patent application; and (7) statements by Adcock and Goldstein in public.

1. Length of Timeline

There appears to be no dispute between the parties that Archer developed the ideas behind the Maker on something of a *fast* timeline. Development of a product on an "*implausibly* fast" timeline can be solid evidence that it was borne of misappropriation. *See WeRide*, 379 F. Supp. 3d

[18] At the hearing, Wisk argued that it was not its "intent" to forfeit reliance on the trade secrets and that "Footnote 5 of our reply brief points out that given, you know, what we perceive to be the scale and the scope of the misappropriation in this case, we had to focus on what we thought were some of the best examples, but our expert declaration set forth the full evidence of what we believe is the misappropriation." Hear. Tr. at 7:18–24. That footnote refers with no specificity to Wisk's expert reports. *See* PI Reply 7 n.5. If Wisk seeks relief based on a trade secret, it must affirmatively assert that trade secret with supporting argument. It is entirely insufficient to say that there are nebulous other examples sprinkled in expert reports. *See Munaf v. Geren*, 553 U.S. 674, 690 (2008) ("[A] party seeking a preliminary injunction must *demonstrate* . . . a likelihood of success on the merits." (emphasis added, internal quotation marks omitted)).

United States District Court
Northern District of California

at 849 (emphasis added); *Ajaxo*, 135 Cal. App. 4th at 53. But just because development is fast does not mean it is implausibly so; a quick timeline can have explanations other than trade secret theft. A company could simply make developments at a quick pace, whether by innovation or resource investment or other means. And even an "implausibly" fast timeline may not be the result of trade secret theft: it could be that the company moved quickly because it used others' intellectual property that is not protectible as a trade secret or used trade secrets other than the plaintiff's secrets. The record here, moreover, shows that Wisk and Archer are far from the only competitors actively developing eVTOL aircraft; this is not a situation in which the technology could only have come from the plaintiff.

On these facts, the fast timeline standing alone cannot support misappropriation unless there is some independent evidence of it. The reason is straightforward: the timeline is explicable by any number of things (as discussed above) that are not trade secret theft from Wisk. Because Wisk has not sufficiently shown that any particular trade secret was used or acquired by Archer, that things took place on a quick timeline does not help it. That timeline, additionally, was only to get *concepts* done; the entire process of building, manufacture, testing, and certification is still expected to take until 2024. And it is undisputed that Archer bought at least a number of components straight from other vendors, as described above.

2. Xue's Downloads

The centerpiece of Wisk's Motion was Xue's download of Wisk's files. *See, e.g.*, PI Mot. 1 (third sentence of brief highlighting it), 13 (beginning of first sentence of misappropriation argument). Not only did it argue that "Xue's improper acquisition immediately prior to departing for Archer is enough, *standing alone*, to conclude that Archer is likely liable for the misappropriation," *id.* 15 (emphasis added), it also tied other evidence to it—such as whether the timing of events occurred before or after, *id.* 15–16. For the reasons that follow, however, that event does not offer Wisk much help showing misappropriation.

As an initial matter, contrary to Archer's argument, the evidence adequately supports a finding that Xue downloaded the 5,000 files at issue and retained them. The forensic evidence shows that the download occurred. *See supra* Background, Section I.F. That evidence does not

prove that Xue then transferred the files to a USB device, but it does not disprove it either. The USB device was inserted into the computer at roughly the same (odd) time as the download occurred, so the natural inference is that some transfer of the files took place. Further, Xue's declaration filed in this case explicitly denies that he transferred any trade secrets or confidential information to Archer, but it conspicuously does not deny that he retained those files after he left Wisk. *See generally* Xue Decl. In his deposition, he asserted his Fifth Amendment privilege against self-incrimination to avoid saying one way or the other. In light of his introduction of self-serving testimony and then shielding himself from pertinent questioning with the Fifth Amendment, an adverse inference based on his silence is warranted. *See Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911 (9th Cir. 2008). All of this together shows that it is likely—though not certain—that Xue retained the files when he left Wisk.

As I explained earlier, this evidence combined with other allegations and drawing all reasonable inferences in Wisk's favor gives rise to a *plausible* implication of Archer's misappropriation. *See supra* Section III.B. But that does not necessarily mean, absent those inferences and relying on evidence and not allegations, that Archer misappropriated trade secrets or that any trade secrets used in the files made their way into the Maker. Wisk's Motion was entirely silent on the specific contents of those files, despite receiving a marquee slot. It never connected those files to any of the trade secrets asserted in the Motion. Archer's Opposition pointed this out and could only find links (based just on file names) between four of the asserted trade secrets and the files Xue downloaded. *See* PI Oppo. 24. Despite this, Wisk's Reply still did not address this issue, except to say that one asserted trade secret (of 52) "can be traced to" one file (of the 5,000) that Xue downloaded. (That trade secret is addressed above.) Its reliance on Xue's downloads is somewhat puzzling now that actual evidence must be assessed.

Even assuming that Xue misappropriated trade secrets when he downloaded those files, that would not mean that they either were used in the Maker or that Archer had any role in that misuse. If Xue plundered Wisk for every last piece of confidential information it had, that would not, standing alone, show that Archer committed misappropriation. *See, e.g.*, *CleanFish, LLC v. Sims*, No. 19-CV-03663-HSG, 2020 WL 4732192, at *6 (N.D. Cal. Aug. 14, 2020); *Heller*, 2012

WL 13572, at *6. Wisk's silence about any connection between the files, a trade secret, and use of that trade secret in the Maker (aside from the one file, discussed already) is telling. Presumably, if Wisk had other evidence that anything from those files made its way into the Maker, it would trumpet it.

3. Other Employees' Retention of Documents

Most of the same analysis just conducted about Xue's downloads applies to other former Wisk employees' retention of Wisk documents when they joined Archer. As explained, Wisk alleges that three employees retained files after they left for Archer (though their intent and knowledge in doing so is disputed). These other employees were never referenced in Wisk's Motion (despite one being referenced in its FAC). And while the factual background section of Wisk's Reply does discuss this retention, it never again references those documents except to say that one reflected Trade Secret No. 12 (discussed above). *See* PI Reply 10. Consequently, the connection between this alleged retention and misappropriation is just as attenuated than when it came to Xue's downloads. To repeat the conclusion that follows: Wisk needs some evidence connecting its actual trade secrets to misappropriation; this evidence alone does not do so, though if Wisk were to make a valid misappropriation showing, it could be useful supporting evidence.

4. Hiring of Wisk Employees

Merely hiring a competitor's former employees—even when they possess the former employer's trade secrets—cannot demonstrate misappropriation on its own. *See Hooked Media*, 55 Cal. App. 5th at 332. Especially in a no-non-compete state like California, employees and employers will frequently have to navigate the often-choppy waters of intellectual property. *Cf. Rita Med. Sys., Inc. v. Resect Med., Inc.*, No. C 05-03291 WHA, 2007 WL 161049, at *1 (N.D. Cal. Jan. 17, 2007) (noting that accusations of departing employees stealing trade secrets are a "familiar fact pattern"). On the other hand, trade secrets can exist in employees' memories; a trade-secret plaintiff does not need to show that an actual document was taken. *Language Line Servs., Inc. v. Language Servs. Assocs., Inc.*, 944 F. Supp. 2d 775, 782 n.3 (N.D. Cal. 2013). Wisk's reliance on Archer's hiring of its employees, like all of the evidence just discussed, is not enough on its own; it might be useful supporting circumstantial evidence, but Wisk still needs to

show some misuse of its trade secrets.

5. The Name "Cora + Tilt"

In the course of early discovery, Wisk learned that the sketch for the design that ultimately became the Maker was labelled "cora + tilt." "Cora," again, is *Wisk's* previous generation of aircraft. "Tilt" refers to the rotors being able to tilt, as six of the Maker's rotors can. Wisk's Reply brief is peppered with references to this terminology. It never, however, tries to fit it into its theory of misappropriation. And for good reason: The Cora was publicly released at the time, and adding tilting rotors is not, in itself, a trade secret. Even if Archer could offer no explanation for the name, it seems self-evident that it is so named because the Maker would use the same basic rotor configuration as the Cora, with tilt added. Archer's Sur-Reply says that explicitly. PI Sur-Reply 12–13. In the hindsight that comes with litigating this issue, Archer's use of one of Wisk's product's names is unfortunate, but it is not necessarily indicative of misappropriation. If anything, the use of features in a publicly known aircraft may *lessen* the implication that the Maker ripped off Wisk's *confidential* designs.

6. Similarity Between Patent Application and the Maker

Wisk's Motion relied heavily on the apparent visual similarity between the aircraft in Wisk's January 2020 Patent Application and the Maker. *See, e.g.*, PI Mot. 1 (table displaying photos side-by-side on first page of motion), 16–17. This argument is entirely absent from Wisk's Reply. Despite Wisk's heavy reliance, *id.* 14 (naming the similarity one of Wisk's "four critical facts"), Wisk never explained how anything about the similarity actually related to any asserted trade secret. If there were, for instance, something about the basic visual design that *inherently required* the use of a trade secret, using that design would be indicative of misappropriation. But Wisk would need to draw some nexus between the visual similarity and a trade secret. There is no evidence that using twelve rotors in that configuration is a secret—to the contrary, the publicly revealed Cora did so—or that the feature of tilting a rotor is a secret.

As alluded to above, *see supra* Background, Section I.E., the parties dispute who first invented the design. Because it does not affect the analysis one way or the other for the reasons explained, there is no need to wade into it. The evidence appears to be highly contextual and

based on credibility, so it is better left to a factfinder. *Cf. Gold Club-SF, LLC v. Platinum SJ Enter.*, No. 13-CV-03797-WHO, 2013 WL 5273070, at *6 (N.D. Cal. Sept. 18, 2013) (finding that, in context of motion for a preliminary injunction, "[o]n the state of this record, it is impossible to determine whether [certain evidence] is credible.").

7. Comments by Adcock and Goldstein

Wisk's Motion (again, not its Reply) also relied heavily on the public comments discussed above by Adcock and Goldstein. *See supra* Background, Section I.H. I do not find these to be at all persuasive evidence in support of Wisk's case. All of Adcock and Goldstein's comments, in context, simply describe that they hired people with long experience in the industry (including at Wisk) and that other companies had developed much of the foundational technology. Wisk's attempt to spin them into admissions that Archer was making use of those other companies' *confidential* information is unconvincing.

**iii. Totality of the Evidence of Misappropriation**

As explained, the proper inquiry focuses on all of the evidence of misappropriation together. *See supra* Section I.D. I now make that assessment.

Wisk's theory—while plausibly pleaded—does not fully add up. Its Motion tried to position this case as a prototypical trade secret theft, with a single departing employee (Xue) stealing thousands of documents and the competitor he went to miraculously developing a copycat product. Even this theory (leaving aside the flaws in particular pieces of evidence) was disjointed. Wisk never drew a connection between its other alleged "critical facts" that showed misappropriation and Xue's downloads. As discussed above, those "critical facts" did not hang together: there was no indication of how the visual similarity of the patent application and the Maker was indicative of trade secret misappropriation. And Adcock and Goldstein's statements do not assist Wisk at all. That left the "implausible timeline"; but without other connected evidence, there was no reason to think that the timeline was fast due to anything to do with Wisk. The keystone of what Wisk needed to prove—discussion of its actual trade secrets—was relegated to a few paragraphs. After it got some discovery, Wisk's focus changed to a different (though overlapping) group of trade secrets with new evidence and with much of the old arguments

United States District Court
Northern District of California

forgotten. Its briefs were sprinkled with hints and implications of misappropriation that Wisk never full-throatedly stood behind, like the use of "cora + tilt." And to get over the reality that the actual alleged "theft" of documents was not done by Archer, Wisk sometimes cited cases imposing vicarious liability via *respondeat superior*, which is quite a different mechanism than the direct liability it had elsewhere seemed to be pursuing. *See* PI Reply 15.

Wisk's evidence is not sufficient to show a likelihood of success. Despite getting robust early discovery, including access to engineering documents, Wisk was not able to demonstrate that any of its particular asserted trade secrets was misappropriated. *See supra* Section IV.A.i. Its circumstantial evidence—much of which was simply not mentioned in its reply or oral argument—could not fill in what it lacked in direct evidence. Some of that evidence (e.g., Adcock and Goldstein's comments) is entirely unhelpful to Wisk. Other evidence *could* be helpful, but it is not enough on its own or in concert with Wisk's other particular circumstantial evidence. *See supra* Section IV.A.ii.

Contrast this with Wisk's leading case that granted an injunction. Wisk often treated *Waymo* as its best case; at the hearing, it insisted "there was less evidence [in *Waymo*] than we have here." Hear. Tr. at 27:13–15. There, Waymo's "star engineer" downloaded 14,000 confidential files immediately before joining its competitor Uber. *See Waymo*, 2017 WL 2123560, at *1–*2. Based on Uber's and the engineer's dealings, the court found that Uber had reason to know of this. *Id.*, at *7. And there, unlike here, the court was able to trace two particular trade secrets from those files straight into Uber's technology. *See id.*, at *8. First, Uber's technology included one asserted trade secret and Uber neither "den[ied] it" nor gave "credible explanation" for it. *Id.* Second, Uber's technology used another asserted trade secret and, though Uber claimed that it was obvious or public, it cited no technical evidence disclosing it and the court, looking at the technology, found that it "copie[d] . . . specific [technical] specifications." *Id.*, at *9. If there truly were "less evidence" there, it should be a simple matter to trace a trade secret from Wisk to Archer. Indeed, on the initial theory Wisk was advancing, it should have been possible to trace it from Wisk to Xue to Archer. Yet no trade secret but one has ultimately even been alleged to have gone through that path.

Finally, Wisk leaned heavily at the hearing on the argument that Archer is now moving some design in-house—as opposed to buying from vendors—and will develop more technology in the future. Counsel argued that "Ninth Circuit law is very clear that a preliminary injunction should issue in California to restrain a threatened future misappropriation just like it should restrain the recurrence of a past misappropriation." Hear. Tr. at 22:11–14. But Wisk has not shown *any* future misappropriation with specificity. *That* argument could not depend on the heart of its post-discovery argument (the particular asserted trade secrets *of the Maker*). Instead, Wisk would have to turn back to the chimera-like argument of its motion. As explained, that is insufficient.

Wisk has not shown that it is likely that Archer misappropriated its trade secrets.

**B. Irreparable Injury**

Wisk must also show a likelihood of irreparable injury. *Wild Rockies*, 632 F.3d at 1135. Wisk puts forward two purported irreparable injuries: (1) Archer getting a "head start" premised on Wisk's trade secrets and (2) revelation of Wisk's trade secrets to more Archer employees and, eventually, regulators and the public.

Both of these injuries, if real, can theoretically qualify as irreparable. Once a trade secret is no longer secret, its value is lost. *UniRAM*, 2008 WL 11515597, at *6. Consequently, the broader the disclosure—especially to a competitor or the public—the less likely to remain confidential the information is, rendering the injury irreparable. *WeRide*, 379 F. Supp. 3d at 853 (collecting authorities). Courts have also found that unfair head starts based on a competitor's trade secrets to be irreparable because they cannot be recompensed through simple money damages. *See Netlist Inc v. Diablo Techs. Inc*, No. 13-CV-05962-YGR, 2015 WL 153724, at *8 (N.D. Cal. Jan. 12, 2015); *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991).

But both types of injury depend on the merits. A "head start" is only unfair if it derived from trade secrets. Disclosure is only harmful if it is of a trade secret. Because the merits are so uncertain, it prevents a finding in Wisk's favor, let alone the strong one it would need. I agree with Archer, moreover, that Wisk's delay in bringing suit undermines the urgency of its request

United States District Court
Northern District of California

now. According to Wisk, it first became suspicious in November 2019 due to the meeting with Long. Yet it only filed suit and sought an injunction a year-and-a-half later. Its excuse is that the February 2021 investor presentation tipped it off, but the allegedly suspicious information that presentation—a 12-tilt-6 rotor aircraft—was precisely what it now claims was so suspicious about the November 2019 meeting. It cannot have it both ways.

**C. Balance of Hardships and Public Interest**

Wisk must also show that the balance of hardships tips in its favor and the public interest favors an injunction *Wild Rockies*, 632 F.3d at 1137–38. Because it has not shown a likelihood of success on the merits, its only avenue is "serious questions going to the merits" plus a finding that the balance of hardships "sharply" favors it. *Id.* Even assuming that Wisk has raised serious questions, on these facts, both equitable considerations essentially track the merits analysis. If there were a finding of misappropriation, the equities would usually favor the trade-secret owner. *See, e.g.*, *Dish Network L.L.C. v. Ramirez*, No. 15-CV-04712-BLF, 2016 WL 3092184, at *7 (N.D. Cal. June 2, 2016). The public interest likely would too. *See, e.g.*, *Waymo*, 2017 WL 2123560, at *11. But, because Wisk has not shown a likelihood of success on the merits, neither the balance of hardships nor the public interest offers it much help.

In particular, even though there are some *arguable* indications of misappropriation, the balance of hardships is not "sharply" in Wisk's favor. Because of the breadth of the allege trade secrets, an injunction would cut to the heart of Archer's business. At the hearing, Wisk attempted to dispute the evidence of the hardship on Archer. *See* Hear. Tr. at 26:2–27:11. Whatever the *precise* ramifications for Archer's business, it is absurd to think that Wisk's proposed injunction would not significantly hamstring it. Wisk's entire argument is that the Maker, Archer's only unveiled product, is predominately built on Wisk's trade secrets. *See, e.g.*, *id.* at 23:8–11 (Wisk's counsel describing the misappropriation as encompassing "all of the essential systems of the aircraft"). Wisk's injunction would, therefore, essentially stop work on Archer's core product, a significant harm.[19]

[19] Wisk's argument that an injunction would only require Archer to adhere to the law, PI Mot. 22, misses the point. When there is a finding of misappropriation, that is true, and that harm is not

On the other hand, the harm to Wisk is that it will have to wait for later stages in these proceedings to receive a determination on misappropriation. If it ultimately fails to show misappropriation, the lack of an injunction will not have hurt it in the slightest. If it does prove misappropriation, it will receive relief, taking into account that it may have lost some ground due to the lack of an injunction. *See, e.g.*, *02 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064, 1069 (N.D. Cal. 2005), a*mended sub nom. O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070 (N.D. Cal. 2006) (discussing availability of injunctions to eliminate unjust commercial advantage); *Mattel, Inc. v. MGA Ent., Inc.*, 801 F. Supp. 2d 950, 952 (C.D. Cal. 2011) (discussing availability damages and unjust enrichment). To be sure, if it ultimately proves misappropriation and did not receive an injunction, it may mean that precise damages of Archer's head start may be hard to calculate, Wisk may have lost some comparative advantage in the marketplace, and its trade secrets may be revealed to competitor employees. *See, e.g.*, *Netlist*, 2015 WL 153724, at *8; *Waymo*, 2017 WL 2123560, at *11. But, because it has not adequately demonstrated misappropriation, those harms are too uncertain and speculative at present.

Accordingly, even assuming that the analysis above shows that there are "serious questions" going to the merits, Wisk has not shown that the other elements tilt far enough in its favor under the sliding-scale approach to warrant the "extraordinary and drastic remedy," *Munaf v. Geren*, 553 U.S. 674, 689 (2008) (internal quotation marks omitted), it seeks.

**CONCLUSION**

The motions to dismiss and strike are DENIED. As previously ordered, the motion for a preliminary injunction is DENIED. The numerous pending motions to seal will be ruled on in a forthcoming order; the redactions in this Order are provisional.[20]

meaningful because compliance with the law is the baseline. *See Dish Network*, 2016 WL 3092184, at *7. Here, there has been no such finding, so the injunction would require Archer to stop use of information that Wisk *asserts* to be misappropriated, not information *established* to be.

[20] Archer's partial motion to dismiss the original complaint (Dkt. No. 29) and Wisk's motion to strike and dismiss Archer's original counterclaims and affirmative defenses (Dkt. No. 54) are TERMINATED AS MOOT in light of the subsequent amendment of pleadings.

United States District Court
Northern District of California

**IT IS SO ORDERED.**

Dated: August 24, 2021



William H. Orrick
United States District Judge