UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WISK AERO LLC,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>ARCHER AVIATION INC.,<br><br>　　　　　Defendant. | Case No.  3:21-cv-02450-WHO<br><br>**ORDER DENYING MOTION TO STRIKE AND DISMISS**<br><br>Re: Dkt. No. 118 |

## INTRODUCTION

Plaintiff Wisk Aero LLC ("Wisk") alleges that defendant Archer Aviation Inc. ("Archer") misappropriated its trade secrets and infringed its patents when developing an all-electric vertical takeoff and landing ("eVTOL") aircraft.  Archer countersued, claiming that Wisk's publicity campaign associated with the suit constitutes tortious interference with contractual and economic relations, defamation, and an unfair business practice.  The heart of its claims is that Wisk wrote several blog posts and a press release that accused Archer of theft of trade secrets and, in one case, stated that the federal government was conducting a criminal investigation "into" Archer.  According to Archer, the trade-secret allegations are false.  It is not disputed that Archer was not under criminal investigation—it had been subpoenaed in one related to an investigation into an employee.

Wisk now moves to strike those claims under California's anti-SLAAP law or dismiss them in the alternative.  Its motion is denied.  Though the challenged statements were about a matter of public interest, Wisk has not shown that they are privileged or otherwise immune from creating liability.  Archer has adequately pleaded them.  And whether the statements are indeed true or can create tort liability is a matter for the merits.

United States District Court<br>Northern District of California

# BACKGROUND

The allegations in the complaint in this case were discussed in detail in a recent denying Archer's partial motion to dismiss.  *See* Dkt. No. 133.  In brief, Wisk alleges that Archer misappropriated a large group of its trade secrets related to Wisk's eVTOL aircraft when developing its own.  *See id.* at 22–26.

On April 6, 2021, when Wisk filed this suit, it published a post on its own online blog.  *See* Dkt. No. 90-1 ("Blog Post").  On May 19, 2021, it updated it.  *Id.*  The original post was entitled "Why We're Taking Legal Action Against Archer Aviation."  *Id.* at 2.[1]  It first laid out Wisk's history and a summary of eVTOL aircraft.  *Id.* at 3–4.  Because it is the centerpiece of the current motion, I reproduce the part discussing Archer in full:

> Unfortunately, and as discussed in the Complaint we filed earlier today, it appears that Archer Aviation, a new entrant in the eVTOL market, is seeking to gain a foothold in this industry without respecting the rules of fair competition. As detailed in the Complaint, we have discovered significant and troubling evidence indicating that Archer has been using Wisk's proprietary intellectual property without our permission. Among other things, we discovered the misappropriation of thousands of highly confidential files containing very valuable trade secrets, as well as the use of significant innovations Wisk has patented. Wisk's confidential, proprietary trade secrets and patented innovations represent the hard work and dedication of hundreds of Wisk's engineers over multiple years. Today we took legal action to ask a federal court to stop Archer from using that stolen Wisk technology and from infringing our patents. This isn't a step we wanted to take, but we must protect our IP and the decade's worth of work and innovation we've put into Wisk. Here's some more context.
>
> **Archer's Actions**
>
> Archer has made a series of recent pronouncements about its technology and business that surprised the industry, including that it would soon release its own eVTOL aircraft. Just a year ago, Archer appeared to have little or no meaningful operations, let alone the years of research, development, and testing required to fly even a prototype of an eVTOL aircraft.
>
> Archer's stated timeline for releasing an aircraft was a fraction of the time taken by its serious competitors, using a fraction of the number of employees of those competitors. The development of an entirely new kind of passenger aircraft requires years of engineering and significant expertise to get right, as demonstrated by Wisk and the other leading players in this space. For example, after 10 years of hard engineering and testing, Wisk is currently developing its sixth-generation aircraft, which it plans to certify with the U.S. Federal Aviation Administration (FAA). We believe it is virtually impossible for Archer to have produced an originally-designed aircraft in this timeframe that has gone through the

---

[1] References to exhibits are to their ECF-generated page numbers.

necessary testing and is ready for certification with the FAA.

The design that Archer released for its eVTOL aircraft was particularly surprising. As detailed in our Complaint, it appears to copy the same design that Wisk developed and submitted in a confidential patent application to the U.S. Patent and Trademark Office in January 2020. The copied design includes six front rotors that each consist of five blades and can tilt to be positioned either horizontally or vertically, as well as six rear rotors that each consist of two blades and remain fixed in a vertical position. The design also includes an unconventional "V" tail. A comparison of Wisk and Archer's designs is shown below: As detailed in our Complaint, the striking similarity in these designs could not have been a



coincidence. The same month that Wisk submitted its patent application, Archer hired ten of Wisk's engineers. Concerned about this targeted recruiting, Wisk hired a third party to conduct a forensic investigation. That investigation yielded troubling information. We discovered that one of those engineers downloaded thousands of Wisk files near midnight, shortly before he announced his resignation and immediately departed to Archer. Those files contain our valuable trade secrets and confidential information about Wisk's aircraft development spanning the history of the company, accumulated over countless hours of incremental progress by scores of engineers. Another engineer downloaded numerous files containing test data just before departing for Archer. Yet another wiped any trace of his computer activities shortly before leaving for Archer.

The stolen files include a multitude of Wisk trade secrets for aircraft designs, component designs, system designs, manufacturing, and test data. They include voluminous confidential presentations reporting on the development, simulation and testing of Wisk aircraft, as well as highly technical confidential documents focused on research, design, development, testing and fabrication of specific systems, which compile years of effort by engineers to develop Wisk's proprietary technology. As our Complaint explains, the design Archer disclosed above reflects its insider knowledge of Wisk's extensive aerodynamic test and evaluation data based on years of experimentation and modeling. The similarity in overall aircraft design further indicates Archer's use of more detailed design features, including features related to aircraft propulsion, power management, avionics, flight control, and manufacturing methodology.

The design of the aircraft submitted in Wisk's patent application is not a result of common knowledge among the industry or basic eVTOL aircraft design. This is a completely new type of aircraft and other companies in the space have come up with their own distinct designs based on their own unique innovation process, as shown below:

[White space appears in exhibit.]

All of this taken together – from the massive downloads and other suspicious activity that

3

occurred just before employee transitions to Archer, the copycat aircraft design, and Archer's startlingly short operational history – have led us to conclude Archer is improperly using Wisk's intellectual property, as further detailed in the Complaint.

*Id.* at 3–8. It ended the post by saying, "[y]ou can learn more about why we're asking the Court for an injunction to stop Archer from using our IP, among other remedies, in our Complaint and related press release." *Id.* at 8. The words "Complaint" and "related press release" were hyperlinks to those documents. *See id.*

The May 19 update said the following:

After Wisk filed its Complaint on April 6, Archer publicly disclosed a criminal investigation relating to some of the claims Wisk brought, and Archer's [special purposes acquisition company] sponsor Atlas Crest Investment Corp [("Atlas")] filed an 8-K noting that it was reviewing these matters. Wisk is fully cooperating with the FBI and Department of Justice in their criminal investigation into Archer relating to the theft and use of Wisk's intellectual property.

*Id.* at 2–3. Archer's public disclosure, however, was that it had been subpoenaed in a criminal investigation into a former Wisk employee that joined Archer. *See* Lauren Hirsch and Niraj Chokshi, Electric Aircraft Start-Up Accuses Rival of Stealing Its Secrets, *New York Times*, April 6, 2021, https://www.nytimes.com/2021/04/06/business/wisk-archer-lawsuit.html ("Archer also said it had placed an employee accused in the suit on paid leave 'in connection with a government investigation and a search warrant issued to the employee, which we believe are focused on conduct prior to the employee joining the company.' Archer said it and three employees who had worked with the individual had been subpoenaed in that investigation and were cooperating with the authorities."). Atlas's SEC disclosure stated much the same. *See* Dkt. No. 115-8. There is no evidence on this record that Archer is the target of a criminal investigation.

Wisk also released that press release on April 6. *See* Dkt. No. 90-2 ("Press Release"). It was entitled "Wisk Aero Sues Archer Aviation for Theft of Trade Secrets and Patent Infringement." Two bullet points beneath the title stated, "[l]awsuit follows discovery of suspicious file downloads and Archer's recent public disclosures," and "[s]eeks injunction halting use of Wisk's IP and other remedies against Archer." *Id.* at 2. The press release stated, "[t]he lawsuit alleges that Archer's business is 'built on intellectual property that is not its own' and brings claims for trade secret misappropriation and patent infringement." *Id.* It gave several

4

descriptions of the allegations in the suit preceded by "[a]s detailed in the filing in federal court in the Northern District of California, this lawsuit follows:" and then said,

- Wisk's discovery of suspicious file downloads by certain former employees who left Wisk to work for Archer, including thousands of files related to Wisk's confidential aircraft designs, component designs, system designs, manufacturing, and test data.
- Archer's recent disclosure of an aircraft design appears to be a copy of a design Wisk developed and submitted in a confidential patent application to the U.S. Patent and Trademark Office back in January 2020. Archer's aircraft disclosure was made in connection with its plan to merge with Atlas Crest Corporation.

As stated in the Case complaint, "Wisk brings this lawsuit to stop a brazen theft of its intellectual property and confidential information, and protect the substantial investment of resources and years of hard work and effort of its employees and their vision of the future in urban air transportation." Wisk Aero LLC vs. Archer Aviation Inc. (Case No. 5:21-cv-02450).

Additional context for Wisk's legal action can be found in a recent blog post. *Id.* at 2–3.

After Wisk filed its First Amended Complaint, Archer filed its First Amended Counterclaims ("CC") [Dkt. No. 90]. As relevant here, the first counterclaim alleges interference with contractual relations, the second alleges interference with prospective economic advantage, and the third alleges defamation, and the fourth alleges violations of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200.[2] Wisk now moves to strike or dismiss those claims. *See* Motion to Strike or Dismiss ("Mot.") [Dkt. No. 113].

## LEGAL STANDARD

California Code of Civil Procedure § 425.16 "was enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001). These lawsuits are also known as "Strategic Lawsuits Against Public Participation," or "SLAPPs." *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 261 (9th Cir. 2013). Under Section 425.16, a party may file an "anti-SLAPP motion" to strike "a cause of action based on an act in furtherance of [the] right to

---

[2] Since briefing closed on this motion, Archer filed its operative Answer and incorporated its counterclaims "so as to avoid any suggestion of waiver." *See* Dkt. No. 142 51 n.2. Because they are unchanged, that filing did not moot the motion and no party has suggested otherwise.

United States District Court
Northern District of California

petition or free speech." *Metabolife*, 264 F.3d at 840 (internal quotations omitted).

In ruling on an anti-SLAPP motion, a court engages in a two-step process. *Equilon Enterprises v. Consumer Cause, Inc.*, 29 Cal.4th 53, 67 (2002). At step one, the court assesses whether the moving party has made "a prima facie showing that the lawsuit arises from an act in furtherance of its First Amendment right to free speech." *Nat'l Abortion Federation v. Center for Medical Progress*, Case No. 15-cv-03522-WHO, 2015 WL 5071977, at *3 (N.D. Cal. Aug. 27, 2015).

> At the first step, the moving defendant bears the burden of identifying all allegations of protected activity, and the claims for relief supported by them. When relief is sought based on allegations of both protected and unprotected activity, the unprotected activity is disregarded at this stage. If the court determines that relief is sought based on allegations arising from activity protected by the statute, the second step is reached.

*Baral v. Schnitt*, 1 Cal. 5th 376, 398 (2016).

If the moving party can establish step one, the burden shifts to the non-moving party which must then show a reasonable probability that it will prevail on its claim. *Makaeff*, 715 F.3d at 261. "For a plaintiff to establish a probability of prevailing on a claim, he must satisfy a standard comparable to that used on a motion for judgment as a matter of law." *Price v. Stossel, 620 F.3d 992*, 1000 (9th Cir. 2010). This standard requires that a claim be dismissed if the plaintiff presents an insufficient legal basis, or if no reasonable jury would find in its favor. *Metabolife*, 264 F.3d at 840; *see also Price*, 620 F.3d at 1000 (an anti-SLAPP motion will be granted if the plaintiff "presents an insufficient legal basis for the claims or when no evidence of sufficient substantiality exists to support a judgment for the plaintiff") (internal quotations omitted). But when the step-two analysis depends on the defendant's assertion that a privilege applies, the defendant bears the burden of establishing it. *See Mandel v. Hafermann*, 503 F. Supp. 3d 946, 963–64 (N.D. Cal. 2020) (collecting authorities).

## DISCUSSION

### I. ANTI-SLAPP STEP ONE

A defendant satisfies the first step of the analysis by demonstrating that the "conduct by which plaintiff claims to have been injured falls within one of the four categories described in

subdivision (e) [of Section 425.16] . . . and that the plaintiff's claims in fact arise from that conduct." *Rand Res., LLC v. City of Carson*, 6 Cal.5th 610, 620 (2019) (internal quotation marks and citations omitted). The four categories in subdivision (e) describe conduct "in furtherance of a person's right of petition or free speech under the United States or California Constitution in connection with a public issue." Cal. Civ. Proc. Code § 425.16(e).

Wisk argues that several of these categories apply. I agree with it that the challenged statements at least qualify as "conduct in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." Cal. Civ. Proc. Code § 425.16(e).

There is no bright-line rule to evaluate whether speech or conduct falls within this "catch-all" category. *Healthsmart Pac., Inc. v. Kabateck*, 7 Cal. App. 5th 416, 427 & n.7 (2016), *as modified* (Jan. 10, 2017). The California Court of Appeal has, several times, synthesized large groups of authorities and "developed multiple tests to determine whether a defendant's activity is in connection with a public issue." *Hilton v. Hallmark Cards*, 599 F.3d 894, 906 (9th Cir. 2010). A "commonly cited test," *id.*, looks to whether the statements (1) "concerned a person or entity in the public eye," (2) "could directly affect a large number of people beyond the direct participants," or (3) concerned "a topic of widespread, public interest." *Rivero v. Am. Fed'n of State, Cty., & Mun. Emps.*, AFL-CIO, 105 Cal. App. 4th 913, 924 (2003). The Court of Appeal has elsewhere provided "guiding principles" on the question:

> First, "public interest" does not equate with mere curiosity. Second, a matter of public interest should be something of concern to a substantial number of people. Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. Third, there should be some degree of closeness between the challenged statements and the asserted public interest; the assertion of a broad and amorphous public interest is not sufficient. Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort to gather ammunition for another round of private controversy. Finally, those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure. A person cannot turn otherwise private information into a matter of public interest simply by communicating it to a large number of people.

*Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1132–33 (2003) (internal quotation marks, citations, and alteration omitted).

United States District Court
Northern District of California

1    The blog post and press release qualify under this section.  As evidenced by the existence

2  of many news articles in well-trafficked publications, Wisk and Archer are in an industry that is a

3  "topic of widespread, public interest" to a "substantial number of people"—including coverage

4  specifically of them.[3]  In fact, Wisk and Archer's lawsuit alone has attracted significant press

5  coverage.[4]  *Cf. Henley v. Jacobs*, No. C 18-2244 SBA, 2019 WL 8333524, at *9 (N.D. Cal. Aug.

6  2, 2019) (finding a "well-known" company sufficiently "in the public eye").  The content of the

7  posts related to allegations that Archer—a company that was about to go public, inviting investors

8  on the open market—built its business on misappropriated trade secrets.  *Cf. id.* ("Given Uber's

9  prominence, statements about the company's illegal and unethical practices, which include

10  accusations of stealing trade secrets and conducting surveillance on competitors and politicians,

11  unquestionably concern an 'entity in the public eye' on a matter of 'widespread, public interest.'");

12  *Piping Rock Partners, Inc. v. David Lerner Assocs., Inc.*, 946 F. Supp. 2d 957, 969 (N.D. Cal.

13  2013), *aff'd*, 609 F. App'x 497 (9th Cir. 2015) (finding allegations of unethical business practices

14  by one company against another to qualify because they amounted to a "warning to consumers not

15  to do business with plaintiffs because of their allegedly faulty business practices").  And the blog

16  post (to which the press release linked) alleged that there was a criminal investigation "relating to

17

18  [3] *See, e.g.*, Andrew J. Hawkins, GM surprises with autonomous Cadillac and flying car concepts,

19  *The Verge*, Jan. 12, 2021, https://www.theverge.com/2021/1/12/22226778/gm-flying-car-
   cadillachalo-av-evtol-concept-autonomous-ces-2021; Antuan Goodwin, Archer reveals first

20  photos of its Maker eVTOL air taxi, *CNET*, June 10, 2021, https://www.cnet.com/roadshow/
   pictures/archermaker-evtol-air-taxi-revealed/; Loz Blain, Stunning video shows just how quiet

21  Joby's eVTOL air taxi will be, *New Atlas*, Feb. 24, 2021, https://newatlas.com/aircraft/joby-
   aviation-evtol-video/.

22  [4] *See, e.g.*, Andrew J. Hawkins, Judge rejects Wisk Aero's effort to block rival air taxi startup

23  Archer from using 'stolen' patents, *The Verge*, July 23, 2021,
   https://www.theverge.com/2021/7/23/22590204/wisk-archer-air-taxi-lawsuit-injunction-denied;

24  Phil LeBeau, Futuristic aircraft maker Archer seeks to dismiss competitor's lawsuit claiming theft
   of trade secrets, *CNBC*, June 1, 2021, https://www.cnbc.com/2021/06/01/evtol-start-up-archer-

25  seeks-to-dismiss-trade-secret-lawsuit.html; Lauren Hirsch and Niraj Chokshi, Electric Aircraft
   Start-Up Accuses Rival of Stealing Its Secrets, *New York Times*, April 6, 2021,

26  https://www.nytimes.com/2021/04/06/business/wisk-archer-lawsuit.html; Tracy Rucinski, Air taxi
   maker Archer seeks $1 billion in damages from Boeing-backed rival, *Reuters*, August 11, 2021,

27  https://www.reuters.com/legal/litigation/air-taxi-maker-archer-seeks-1-billion-damages-boeing-
   backed-rival-2021-08-11/.  I take judicial notice of the of these articles' existence (not of the truth

28  of anything within) because they are publicly available on the publications' websites.  *See* Fed. R.
   Evid. 201.

some of the claims Wisk brought" and that the FBI and Department of Justice—public agencies

charged with protecting the public and enforcing the law in its name—had a "criminal

investigation into Archer relating to the theft and use of Wisk's intellectual property."  Blog Post

at 2–3.  *Cf. Healthsmart*, 7 Cal. App. 5th at 430 (finding allegations of bribery of a state senator to

relate to the public interest).  All of this together removes this case from the ambit of a run-of-the-

mill private dispute and makes it an issue of public interest.

## II.   ANTI-SLAPP STEP TWO

Once a defendant has demonstrated that the claims against them arise out of protected

activity, the burden shifts to the plaintiff to demonstrate that each challenged claim based on

protected activity is legally sufficient and factually substantiated.  *Baral*, 1 Cal.5th at 384.  The

inquiry "is limited to whether the plaintiff has stated a legally sufficient claim and made a prima

facie factual showing sufficient to sustain a favorable judgment."  *Id.* at 384–85.  As noted, Wisk

bears the burden of establishing that a privilege applies.  *See Mandel*, 503 F. Supp. 3d at 963–64.

Wisk argues that it is immune from liability for several reasons and that, in any event, Archer has

failed to state any of its claims.

### A.  *Noerr-Pennington* Doctrine

Wisk first contends that its statements are immunized from liability by the *Noerr-*

*Pennington* doctrine.  They are not.

"The essence of the *Noerr-Pennington* doctrine is that those who petition any department

of the government for redress are immune from statutory liability for their petitioning conduct."

*Theme Promotions, Inc. v. News Am. Mktg. FSI*, 546 F.3d 991, 1006 (9th Cir. 2008).  The doctrine

stems from the First Amendment's Petition Clause, which protects the right to "petition the

Government for a redress of grievances."  Petitioning a court via lawsuit is no less protected than

any other form of governmental petition.  *Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir.

2006).  To analyze whether the doctrine protects Wisk from liability, the court first asks whether

the conduct is protected.  Though the core of the doctrine is statements made in litigation, it also

protects certain "[c]onduct incidental to a lawsuit."  *Theme Promotions*, 546 F.3d at 1007.  If the

conduct is protected, the court then asks whether the lawsuit falls into the "sham litigation"

9

1    exception.  *Id.*

2          Wisk argues that its blog posts and press release are "conduct incidental to a lawsuit."

3    Mot. 7–9.  Although district courts have divided on this issue, most courts within this Circuit to

4    have addressed the question have concluded that a communication like this that simply describes

5    the lawsuit is not protected by the doctrine.  I agree.

6          Conduct "incidental" to a lawsuit does not mean conduct "in any way related" to a lawsuit.

7    As one court has put it, Wisk's reading of Ninth Circuit precedent is "overly broad."  *Arista*

8    *Networks, Inc. v. Cisco Sys. Inc.*, No. 16-CV-00923-BLF, 2018 WL 11230167, at *11 (N.D. Cal.

9    May 21, 2018).  The doctrine was given its most substantial treatment by the Ninth Circuit in

10   *Sosa*.  There, the court, relying on past cases, described the test as whether conduct was

11   "incidental to the *prosecution* of the suit."  *Sosa*, 437 F.3d at 929 (emphasis added).  In that case,

12   the court held that pre-suit demand letters could fall within the reach of the doctrine.  *Id.* at 936.

13   As it explained, "preceding the formal filing of litigation with an invitation to engage in

14   negotiations to settle legal claims is a common, if not universal, feature of modern litigation" and

15   "[r]estricting such prelitigation conduct when the same demands asserted in a petition to the court

16   is protected would render the entire litigation process more onerous, imposing a substantial burden

17   on a party's ability to seek redress from the courts."  *Id.*  Significant, too, is that these

18   communications were often privileged under state law.  *Id.*  And demand letters also served the

19   same interest as litigation because they can help resolve disputes outside of formal litigation.  *Id.*

20   at 936–37.

21         The cases that *Sosa* relied on in formulating the "incidental to the prosecution of the suit"

22   standard similarly concern extra-judicial communications with a tight connection to furthering the

23   litigation and the values underlying the doctrine.  One of those cases held that communications

24   accepting or rejecting settlement offers were "conduct incidental to the prosecution of the suit."

25   *Columbia Pictures Indus., Inc. v. Pro. Real Est. Invs., Inc.*, 944 F.2d 1525, 1528 (9th Cir. 1991),

26   *aff'd*, 508 U.S. 49 (1993).[5]  Another held that communications in discovery are likewise incidental

27

28   _____

     [5] *Columbia Pictures* passingly cited one district court case that cuts against my holding here; that
     issue is addressed below.

to the prosecution of the suit. *Freeman v. Lasky, Haas & Cohler*, 410 F.3d 1180, 1184 (9th Cir. 2005). The "incidental" language came from *Noerr* itself. That case, and the Supreme Court's cases expanding on the doctrine, also show its limited scope. There, railroads carried out a campaign to achieve legislative reform related to truckers; the Court held that the publicity campaign had the "incidental" effect of harming the truckers' perception, which was protected from antitrust liability. *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 142 (1961). The Court later explained that holding: "A publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity even when the campaign employs unethical and deceptive methods. *Noerr*, *supra*, 365 U.S., at 140–141. But in less political arenas, unethical and deceptive practices can constitute abuses of administrative or judicial processes that may result in antitrust violations." *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499–500, 108 S. Ct. 1931, 1936–37 (1988). And, as the Ninth Circuit characterized a set of Supreme Court decisions employing the principle: "the Court held that laws restricting the ability of unincorporated associations to employ attorneys for their members, or to advise their members to seek legal advice and to recommend specific lawyers, violated the members' rights of association and petition, notwithstanding that such laws did not directly restrict the members' access to the courts or ability to obtain counsel independently." *Sosa*, 437 F.3d at 935 (citations omitted).

Wisk's blog posts and press release were not "incidental to the prosecution of the lawsuit." The blog posts and press release communicated with the public *about* the lawsuit. But they did not, in any manner, affect it or advance Wisk's interests in it. Not giving them *Noerr-Pennington* immunity also does not threaten the values underlying the doctrine: If Wisk were subject to liability for the blog post and press release, it would not hamper its ability to prosecute this case at all. It is not like pre-suit demand letters, discovery communications, or other conduct that is useful or necessary to successfully petition a court for redress, to give Wisk adequate "breathing space" to petition the court, or to achieve the materially same end as litigation.

Other cases have so held. As one judge in this District explained *when examining blog posts about a lawsuit*, the defendant's "communications are in one sense related to the CLI

litigation because they discuss the parties' copyright dispute.  However, those communications have no relation to the prosecution of the CLI lawsuit as they are merely statements about the status of the parties' litigation and Cisco's intellectual property rights." *Arista*, 2018 WL 11230167, at *11.  Another judge in this District has found that a commercial publication that compared companies' products and described one of their litigating positions against the other was not protected.  *Riverbed Tech., Inc. v. Silver Peak Sys., Inc.*, No. C 13-02980 JSW, 2015 WL 12941890, at *3 (N.D. Cal. Apr. 7, 2015).  It was, the court explained, not incidental to the prosecution of the suit even though it was "about" it.  *Id.*

Wisk unpersuasively attempts to distinguish these cases.  Wisk tries to distinguish *Arista* on the ground that it "examined the 'issue of how to evaluate a constitutionally protected lawsuit as part of a larger anticompetitive scheme,' and found that 'conduct incidental to [the] litigation [is] not protected by the *Noerr-Pennington* doctrine [where] Cisco used such [anticompetitive] conduct as tools to further the . . . scheme.'" Reply ISO Mot. ("Reply") [Dkt. No. 131] 7 (alterations in Wisk's Reply).  It is true that the case *involved* an anti-competitive scheme, but that does not and did not alter the *Noerr-Pennington* analysis.  The question there, as in any such analysis, was still whether the statements were protected.  Not only is this plain from *Arista*'s reasoning, *Arista* also rejected Wisk's primary cases as inconsistent with *Sosa*.  *Arista*, 2018 WL 11230167, at *11.  (*Noerr-Pennington* was originally built for antitrust law, so that it cropped up in that context is no surprise and further shows Wisk's attempted distinction is mistaken.)  And though it is true that *Riverbed* addressed a commercial comparison document (which is not the situation here), its *reasoning* was still that *Noerr-Pennington* does not extend protection to statements merely describing litigation.  *See Riverbed*, 2015 WL 12941890, at *3.

Wisk also relies on a group of cases that, as noted above, disagreed with this approach and found that various descriptions of litigation or publicity related to litigation are protected by the doctrine.  Mot. 8; Reply 7.  I do not find them persuasive.  The only case in the Ninth Circuit that Wisk points to largely addressed cease and desist letters, a type of communication not at issue here.  *See ABC Int'l Traders v. Yamaha Corp. of Am.*, NO. CV-86-7892-RSWL, 1993 U.S. Dist.

LEXIS 20947, at *11 (C.D. Cal. Jan. 27, 1993).[6]  Then, in one sentence it held that "[w]hen publicity is incident to a lawsuit that is not a sham, that publicity is also protected by the Noerr-Pennington doctrine." *Id.*, at *10.  It offered no further explanation for that holding.  In support, it cited two cases.  The first, from the Fifth Circuit, held nothing of the sort: the cited portion held that threats of litigation were protected.  *Coastal States Mktg., Inc. v. Hunt*, 694 F.2d 1358, 1367 (5th Cir. 1983).  It only mentioned "publicity" to stay that "*the* publicity" connected to the threats of litigation was protected.  *Id.* (emphasis added).

        The other case is a decision from the District of Kansas that, as noted below, appears to be the wellspring for all of these cases.  That case *did* hold that publicity attendant to a lawsuit was protected by the doctrine.  *See Aircapital Cablevision, Inc. v. Starlink Commc'ns Grp., Inc.*, 634 F. Supp. 316, 326 (D. Kan. 1986).  To start, that court's analysis elided the distinction between general publicity and threats about litigation, and the cases it cited were all about the protection of litigation threats.  *See id.*  This aside, *Aircapital* did not engage with the values animating the *Noerr-Pennington* doctrine on this issue; it did not explain how mere description of the suit publicly affected the suit itself, let alone was incidental to its prosecution or necessary to safeguard the right to petition; and it long predated *Sosa*.  It is true that the Ninth Circuit cited *Aircapital* in passing in *Columbia Pictures* and its parenthetical characterization was "where underlying litigation is not a sham, attendant publicity is protected by *Noerr-Pennington* doctrine."  *Columbia Pictures*, 944 F.2d at 1529.  But Wisk overreads the Ninth Circuit's stray citation as approval.  The citation came in the substantive discussion of antitrust law, not in the court's discussion of the doctrine.  It was cited for the point that the antitrust claim rose or fell with the copyright action (so it is somewhat puzzling that the court chose that citation).  *See id.*  And the only *Noerr-Pennington* issue the court examined was the sham exception.  In short, one buried and oblique reference with no supporting rationale about an issue not in the case does not transform one decision from the

---

[6] Wisk's other case from this Circuit concerned a letter sent to customers of the other party announcing the litigation and putting them on notice that they may be sued for purchasing infringing products, which is a far cry from the situation here.  *See AirHawk Int'l, LLC v. TheRealCraigJ, LLC*, No. SACV1600624JVSKESX, 2017 WL 3891214, at *3 (C.D. Cal. Jan. 19, 2017).

District of Kansas into Ninth Circuit law.

Wisk's next case only relied on cases finding things like warning or threat letters protected, except for *Aircapital*, and did not provide substantive discussion for why mere descriptions of the suit should be protected. *See Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*, 384 F. Supp. 2d 1334 (S.D. Iowa 2005), *aff'd*, 464 F.3d 1339 (Fed. Cir. 2006). And its last case (marked not for citation) did the same thing, citing only *Kemin*, *Aircapital*, and *ABC International*. *See Cap. Health Sys., Inc. v. Veznedaroglu*, No. 15-8288, 2017 WL 751855, at *13 (D.N.J. Feb. 27, 2017).

Finally, Wisk and the cases it relies on often cited cases in which a public relations campaign incident to a *legislative* petition was found protected. *See, e.g.*, Reply 7. If anything, that highlights how inappropriate applying the doctrine here would be. Litigation, unlike legislation, is not influenced by public pressure campaigns, so the idea that publicity is incident to prosecuting a lawsuit makes still less sense.

Accordingly, Wisk's blog posts and press release are not "incidental to the prosecution" of this litigation because they merely described it to the public.[7] They are not entitled to protection under the *Noerr-Pennington* doctrine.

## B.  Litigation Privilege

Next, Wisk argues that California's statutory litigation privilege shields its statements. Again, it does not.

California Civil Code § 47(b) renders privileged a "publication or broadcast" made, among other things "[i]n any . . . judicial proceeding." When it applies, the privilege is absolute and, so, prevents a claimant from showing it can prevail on the merits. *Argentieri v. Zuckerberg*, 8 Cal. App. 5th 768, 780 (2017). "The usual formulation is that the privilege applies to any communication (1) made in judicial or quasi-judicial proceedings; (2) by litigants or other participants authorized by law; (3) to achieve the objects of the litigation; and (4) that have some

---

[7] The situation described in this Order is materially different from one in which the blog post or press release served some purpose in the litigation. If, for instance, the post were part of a class action notice plan, a search for class members, a search for witnesses, or something similar, the reasoning here would plainly not apply.

United States District Court
Northern District of California

connection or logical relation to the action." *Silberg v. Anderson*, 50 Cal. 3d 205, 212 (1990), *as modified* (Mar. 12, 1990). The privilege exists "to afford litigants and witnesses the utmost freedom of access to the courts without fear of being harassed subsequently by derivative tort actions." *GetFugu, Inc. v. Patton Boggs LLP*, 220 Cal. App. 4th 141, 152 (2013) (internal quotation marks, alteration, and citations omitted). California law is clear, however, that "republications to nonparticipants in the action are generally not privileged under the litigation privilege, and are thus actionable unless privileged on some other basis." *Id.* (internal quotation marks and emphasis omitted); *accord Silberg*, 50 Cal. 3d at 219*; Susan A. v. Cty. of Sonoma*, 2 Cal. App. 4th 88, 93 (1991).

Wisk's blog posts and press release are not shielded by the privilege. First, one requirement is that the publication be "to achieve the objects of the litigation." *Silberg*, 50 Cal. 3d at 212. The Court of Appeal has explained that this means that the "communicative act" must be "a necessary or useful step in the litigation process and must serve its purposes." *Rothman v. Jackson*, 49 Cal. App. 4th 1134, 1146 (1996). In other words, it is not sufficient that the "communication's *content* need only be related in some way to the subject matter of the litigation." *Id.* (emphasis in original). As explained above in the discussion on the *Noerr-Pennington* doctrine, the press release and blog posts were not a useful or necessary step in the litigation and were not for purposes of achieving its objects. The only connection to the litigation is that the communications discussed it: their "content [was] related in some way to the subject matter of the litigation." *Id.* As a judge in this District has explained, a "public post on the internet"—essentially on all fours with Wisk's blog posts—cannot be found to further the objects of the litigation. *Canaday v. Peoples-Perry*, No. 17-CV-05602-JSC, 2017 WL 6405618, at *6 (N.D. Cal. Dec. 15, 2017).

Even setting this aside, Wisk's blog posts and press release were republished to non-participants in the action, so they are not covered by the litigation privilege. *GetFugu*, 220 Cal. App. 4th at 152. The blog post was republished for anyone, not just those in the litigation, to read. The press release was affirmatively sent out to the world at large. That is why, even in one of *Wisk's* leading cases, an emailed statement to the press that "summariz[ed] a pleading on the day it

United States District Court
Northern District of California

1   was filed"—essentially on all fours Wisk's press release—was found to not be privileged.

2   *Argentieri*, 8 Cal. App. 5th at 784.

3       Wisk's counterarguments do not change this reality.  In its Motion, Wisk countered that *its*

4   *complaint and allegations* were made in a judicial proceeding.  Mot. 10.  That is true and

5   irrelevant, the counterclaims are about the blog posts and press release.  In the Reply, Wisk argues

6   that they are "related to this lawsuit."  Reply 9.  Again, that is true; but that is not the test, as

7   described above.

8       Wisk invokes an exception for when the republication is to nonparties "with a substantial

9   interest in the proceeding."  *GetFugu*, 220 Cal. App. 4th at 152; Mot. 10.  That exception does not

10  apply here.  Again, Wisk did not send either the blog post or the press release to someone with a

11  substantial interest in the proceeding, it posted the blog entry online and sent the press release out

12  to whomever would read them.  Neither of Wisk's cases on this issue are like the facts here.  In

13  one, the party *did* post a statement on a website.  *FIVE Hotel FZCO v. Viceroy Hotels, LLC*, No.

14  B288793, 2019 WL 91567, at *7 (Cal. Ct. App. Jan. 3, 2019) (unpublished).  But, in holding that

15  the webpage was aimed at those with a substantial interest in the litigation, the court found that

16  "[t]he Web site statement was not made to an 'unlimited worldwide audience.'  Rather, it was

17  placed on the [defendant]-owned webpage that had previously offered reservations to the hotel and

18  now informed travelers why reservations were no longer offered on that page."  *Id.*, at *8.  That

19  was significant in part because a court threatened to impose liability on "any other person who

20  knows of this order and does anything which helps or permits the defendant to breach the terms of

21  this order."  *Id.*, at *7 (internal quotation marks omitted).  Because liability would extend to those

22  who did business on that website, they had a "substantial interest" in the proceedings.  *Id.*  Wisk's

23  other case found that a press release sent to buyers or prospective buyers of the company's goods

24  was transmitted to people with a substantial interest in the litigation.  *Weiland Sliding Doors &*

25  *Windows, Inc. v. Panda Windows & Doors, LLC*, 814 F. Supp. 2d 1033, 1041 (S.D. Cal. 2011).

26  Neither of Wisk's communications was only transmitted to those it or Archer did business with

27  who may have an interest in this litigation.  Wisk's Reply attempts to reframe the question as

28  whether it was transmitted to "interested parties who visit the site," but that is quite different than

16

parties with a *substantial* interest *in the litigation*.

### C.  Fair Reporting Privilege

Wisk's Motion initially argued that "[b]ecause Archer's tortious interference and unfair competition claims are based on the transmittal of Wisk's blog posts and press release to news outlets, they are barred by the California fair and true reporting privilege."  Mot. 11.  Its Reply narrows that argument to the press release, and only to the extent that it was transmitted via a wire service (not, apparently, posted it on its website).  Based on Wisk's Reply, I address only this updated argument.

California Civil Code § 47(d) renders privileged a "publication or broadcast" made, with several exceptions not relevant here, "[b]y a fair and true report in, or a communication to, a public journal, of . . . a judicial . . . proceeding, or . . . of anything said in the course thereof."  When it applies, the privilege is absolute.  *Healthsmart*, 7 Cal. App. 5th at 431.  And "[a]lthough the fair report privilege is typically invoked by news media defendants, it also protects those who communicate information to the media."  *Id.*

There appears, however, to be no real dispute between the parties.  The press release apparently was put out both in Wisk's website and via a wire service.  Wisk does not defend the post on its website on the basis of this privilege (nor, presumably, could it).  Archer's Opposition admits that it only challenges the statement to the extent it was published on its website.  *See* Opposition to the Mot. ("Oppo.") [Dkt. No. 123] 18.  Both parties will be bound by those representations going forward: Archer cannot impose liability for transmitting the press release to a wire service or the damages that resulted from that transmission; Wisk cannot argue that the posts on its own website are shielded by the fair reporting privilege.

### D.  Failure to State a Claim

Wisk next argues that Archer cannot make the showing that it will prevail on the merits because it has failed to state a claim on three of the four challenged counts.[8]

---

[8] The motion to dismiss is derivative of the arguments made in this part of the motion to strike.

United States District Court
Northern District of California

### i.   Interference with Contractual Relations

Archer's first counterclaim alleges interference with contractual relations. "The elements which a plaintiff must plead to state the cause of action for intentional interference with contractual relations are (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990). Archer argues that two such contractual relationships were disrupted: (1) the merger with Atlas, through which Archer will go public and raise $1.1 billion, *see* CC ¶ 38, and (2) causing an employee to withdraw acceptance of a job offer. *Id.* ¶¶ 65–71.

Wisk's Motion argued that Archer had not pleaded that the Atlas contract was actually breached (as opposed to a mere disruption), Mot. 12, but that is unnecessary because "I follow the line of cases that requires actual breach *or disruption* of the contractual relationship because that is how the California Supreme Court has stated the element." *Park Miller, LLC v. Durham Grp., Ltd.*, No. 19-CV-04185-WHO, 2020 WL 1955652, at *10 (N.D. Cal. Apr. 23, 2020) (emphasis added, internal quotation marks and citation omitted).

Wisk also contends that Archer does not allege that Wisk knew about the potential employee or had knowledge of the contract with them. Mot. 13. Archer's Opposition cites a case in which the court held that "in order to satisfy the second element of this tort under California law, the Plaintiff does not have to identify the specific contractual relations which have allegedly been disrupted . . . . If a potential defendant was completely unaware of contractual relations with a third party, then it would be impossible to infer any intent to interfere on the defendant's part. However, such intent can certainly be inferred if the defendant knows that contractual relations with a third party exist, but does not know the specific identity of the contractual party." *Sebastian Int'l, Inc. v. Russolillo*, 162 F. Supp. 2d 1198, 1203–04 (C.D. Cal. 2001). Wisk cited no contrary authority and did not respond to the argument in its Reply. It appears plausible that Wisk had reason to know that Archer was hiring employees at pace—it was a centerpiece of its complaint. *See* Dkt. No. 133 at 24 (summarizing allegations). Wisk's only response is that this

18

1     argument would impose tort liability whenever a company is hiring, but that is incorrect because a

2     plaintiff will ultimately have to prove the defendant's intent to interfere.

3                    ii.        **Interference with Prospective Economic Advantage**

4          Archer's second counterclaim alleges interference with prospective economic advantage.

5     The elements of the intentional version of the tort are "(1) an economic relationship between the

6     plaintiff and some third party, with the probability of future economic benefit to the plaintiff; (2)

7     the defendant's knowledge of the relationship; (3) intentional acts on the part of the defendant

8     designed to disrupt the relationship; (4) actual disruption of the relationship; and (5) economic

9     harm to the plaintiff proximately caused by the acts of the defendant." *Pac. Gas*, 50 Cal. 3d at

10    1126 & n.2.  The difference between the intentional and negligent torts is that "the defendant knew

11    of the existence of the relationship and was aware or should have been aware that if it did not act

12    with due care its actions would interfere with this relationship and cause plaintiff to lose in whole

13    or in part the probable future economic benefit or advantage of the relationship." *N. Am. Chem.*

14    *Co. v. Superior Ct.*, 59 Cal. App. 4th 764, 786 (1997).  Archer alleges that it had economic

15    relationships with "potential investors, lenders, and employees" that were disrupted.  CC ¶ 73.

16         First, Wisk contends that Archer has failed to identify a specific relationship.  Archer

17    argues that the same relationships are at issue as with the interference with contract claim.  *See*

18    Oppo. 21.  The economic advantage claim does incorporate the contractual relations allegations.

19    CC ¶ 72.  On the understanding that Archer is limited to Atlas (and its individual investors) and

20    the single withdrawn employee, the claim may proceed.  Otherwise, I would agree with Wisk that

21    Archer's pleading is too vague to plausibly state a claim against others.  *See, e.g.*, *Buxton v. Eagle*

22    *Test Sys., Inc.*, No. C-08-04404 RMW, 2010 WL 1240749, at *1 (N.D. Cal. Mar. 26, 2010).  The

23    case will proceed on those allegations alone.

24         Next, Wisk alleges that Archer has not pleaded any wrongful conduct.  California law

25    requires that "the defendant's conduct be wrongful by some legal measure other than the fact of

26    interference itself."  *Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*, 795 F.3d

27    1124, 1133 (9th Cir. 2015) (internal quotation marks and citation omitted).  Archer, however, has

28    alleged that Wisk made false representations publicly, which appears to be an independent

United States District Court
Northern District of California

19

1   wrongful act sufficient to support liability.  *Rausch v. Blair*, No. CV154212DSFAGRX, 2015 WL

2   13283839, at *2 (C.D. Cal. Oct. 1, 2015).  Wisk mustered no authority to the contrary and did not

3   address the argument in reply.

4        Finally, Wisk argues that Archer has not adequately pleaded proximate cause.[9]  Yet Archer

5   has pleaded that the blog post and press release directly led to these contractual and economic

6   problems—a fact that would be within its knowledge.  *See* CC ¶¶ 70, 77.  The loss of an

7   employment contract as a direct result of blog posts and a press release is sufficient to plausibly

8   trace the causal chain to the posts.  I agree that those allegations are not as specific as they could

9   possibly be, but they are sufficient to create a reasonable inference of liability, especially as

10   proximate causation is a quintessential jury matter.  *Pac. Shores Properties, LLC v. City of*

11   *Newport Beach*, 730 F.3d 1142, 1168 (9th Cir. 2013).

12        **iii.**    **UCL**

13        The UCL provides a cause of action against business practices that are (1) unlawful, (2)

14   unfair, or (3) fraudulent.  *See* Cal. Bus. & Prof. Code §17200.

15        Wisk first argues that Archer has failed to allege "unlawful" conduct under the UCL.

16   Generally, "[b]y proscribing 'any unlawful' business practice, section 17200 'borrows' violations

17   of other laws and treats them as unlawful practices that the unfair competition law makes

18   independently actionable."  *Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th

19   163, 180 (1999) (some internal quotation marks omitted).  Wisk argues that Archer only alleges

20   common-law violations, which it claims are not actionable.  It misunderstands the law.  Its pull-

21   quote comes from the broader holding that "a common law violation *such as breach of contract* is

22   insufficient" to make out a UCL claim.  *Shroyer v. New Cingular Wireless Servs., Inc.*, 622 F.3d

23   1035, 1044 (9th Cir. 2010) (emphasis added).  But the law is clear that "[t]he 'unlawful' practices

24   prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal,

25   state, or municipal, statutory, regulatory, or court-made."  *Saunders v. Superior Ct.*, 27 Cal. App.

26   4th 832, 838–39 (1994).  The Ninth Circuit has held that international interference with

27

28   [9] Its Reply attempted to expand this argument to the contractual relations claim as well, but I decline to address that improper argument.

United States District Court
Northern District of California

1    contractual relations can be actionable under the UCL.  *CRST Van Expedited, Inc. v. Werner*

2    *Enterprises, Inc.*, 479 F.3d 1099, 1107 (9th Cir. 2007).  Wisk has presented no principled basis to

3    treat interference with economic advantage any differently—and it too is a "a tortious violation of

4    duties imposed by law," the key reason the Ninth Circuit imposed liability.  *Id.*

5         Wisk asserts that Archer has failed to allege "unfair" conduct under the UCL.  It appears,

6    however, that alleged misrepresentations to third parties about legal issues can constitute an

7    "unfair" violation.  *See Luxul Tech. Inc. v. Nectarlux, LLC*, 78 F. Supp. 3d 1156, 1174 (N.D. Cal.

8    2015). Without any contrary authority from Wisk (it again does not address the issue in reply), the

9    claim will not be dismissed at this early stage on this basis.

10        **E.   Truth Defense**

11        Wisk briefly argues that its statements were substantially true, which is a defense to some

12   types of liability.  *See Savage v. Pac. Gas & Elec. Co.*, 21 Cal. App. 4th 434, 449 (1993).  Its

13   argument is close to undeveloped but is, in any event, rejected.

14        Wisk's statements are not mere opinions or puffery; they are capable of being proven true

15   or false.  Archer has adequately pleaded that they are false, so to the extent Wisk's attack is facial,

16   it fails.  Most of the statements concern whether, as a factual matter, Archer misappropriated

17   Wisk's trade secrets, which Archer alleges to be false.  The remaining statement is that there was a

18   federal criminal investigation "into" Archer, which no one disputes is not true, so the question will

19   be whether Wisk has an adequate defense to that.  Nor is it enough at this stage that Wisk

20   sometimes described its *complaint* as making these allegations, because a reasonable layperson

21   might well understand Wisk to be asserting that Archer in fact did so (and some of the statements

22   were not couched in that way, so it would not wholly doom the claims).  To the extent Wisk's

23   attack is factual, Archer has presented sufficient evidence that it has a reasonable prospect of

24   succeeding on the merits.  Among other things, I previously found that Wisk, in an evidentiary

25   showing, had not demonstrated misappropriation of trade secrets, which may mean that its

26   statements were not true.  *See* Dkt. No. 133 at 26–46.  And again, the claim about the criminal

27   investigation is not accurate in any event, because Archer only admitted it was subpoenaed in the

28   course of the investigation into Xue, not that it itself was under investigation.

United States District Court
Northern District of California

1

2                                    **CONCLUSION**

3          The motion to strike and dismiss is DENIED.

4          **IT IS SO ORDERED.**

5    Dated: September 14, 2021

6

7                                                          

8                                                          William H. Orrick
                                                           United States District Judge
9

10

11

12

United States District Court
Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28