Hon. Donna M. Ryu, Magistrate Judge (N.D. Cal.)

Re:     *Wisk Aero LLC v. Archer Aviation Inc.*, Case No. 3:21-cv-02450-WHO (DMR)

Dear Judge Ryu:

Wisk Aero LLC ("Wisk") and Archer Aviation Inc. ("Archer") submit this joint letter brief per the Court's Standing Order. The parties dispute whether certain Archer devices should be subject to forensic inspection. The Parties have conferred regarding this issue, most recently on 12/23/21.

Relevant case deadlines are: claim construction briefs on 1/6/22, 1/20/22, and 2/3/22; claim construction hearing on 2/22/22; fact discovery closes 6/24/22; expert discovery closes 9/2/22; dispositive motion hearing on 10/26/22; pretrial conference on 12/19/22; and trial on 1/30/23,

**Wisk's Statement.** Wisk respectfully requests that the Court order a neutral forensic examiner to inspect the Archer work computers and devices used by certain Archer employees who are known to have improperly retained Wisk documents after their employment with Wisk ended.

This dispute is related to the dispute at Dkt. 191 ("Third Party Dispute") between Wisk and Third Parties Thomas Muniz, Johnny Melack, Diedrick Marius, and Scott Furman. The Third Parties are all former Wisk employees, now at Archer, who retained Wisk confidential information on their personal devices after joining Archer. In the Third Party Dispute, Wisk seeks forensic inspections, pursuant to Rule 45 subpoenas, of the identified *personal* devices used by the Third Parties to retain Wisk information. This dispute seeks a forensic inspection, pursuant to Rule 34 requests, of *Archer-issued work* devices used (currently or previously) by the Third Parties. *See* Ex. A.[1] Wisk requires relief on both disputes in order to obtain a full forensic picture of the extent to which its confidential information has been used or transferred elsewhere for the benefit of Archer. Wisk has repeatedly sought to negotiate with counsel for Archer and the Third Parties regarding a "global" protocol to address both personal and work devices, without success. Archer attempted to draw distinctions between personal and work devices, requiring two separate motions.

It is undisputed that the Third Parties improperly retained Wisk confidential information on personal devices, while also working on Archer's aircraft development. Accordingly, Wisk seeks a forensic inspection of the Archer work computers and devices used by these Third Parties. Judge Orrick previously ordered a Red Flag Report ("RFR") inspection with respect to the Archer work laptop belonging to former Wisk employee Jing Xue. Dkt. No. 37. After Wisk identified evidence that Xue downloaded thousands of Wisk's confidential files to an unknown device immediately prior to departing Wisk for Archer, Judge Orrick ordered that a third-party neutral examine Xue's work laptop to create RFRs, and share the raw forensic information used to create them, ruling that such inquiries "appear at least potentially relevant and would be discoverable in the ordinary course."[2] Dkt. 88. Similarly here, it is known that the Third Parties stored Wisk confidential information on their personal devices after resigning from Wisk, and Wisk should be entitled to discover to what extent this information might have been transferred to Archer computers or devices. If anything, the evidence regarding the Third Parties more strongly supports a forensic inspection than the evidence against Xue, because all that was known about Xue was that he had downloaded files prior to his departure, whereas here it is undisputed that the Third Parties retained Wisk information after they began working for Archer.

---

[1] RFI Nos. 2, 4, and 6 seek forensic images of the Muniz, Melack, and Marius work devices.

[2] Archer argues that the inspection of Xue's devices identified "nothing of concern." This contention is unsupported and may be the subject of expert testimony at a later time.

Attempting to distinguish this situation from what was previously ordered with respect to Xue, Archer contends that Xue is the "focus" of this suit.[3] That is simply not true. Wisk's originally filed complaint included allegations concerning suspicious forensic activity regarding a number of different employees (Dkt. 1 ¶¶ 61-63), aside from other types of evidence of theft. Then, in the midst of briefing on the PI motion, and only in response to subpoenas, three of the four Third Parties finally produced the evidence *confirming* that each of them had, in fact, improperly retained Wisk information while working on Archer technology. This new and troubling evidence itself justifies the further forensic inspections requested here. Although the Third Parties claim their retention of information was inadvertent, Wisk should be entitled to forensic evidence to fully test that claim. In any event, Archer cannot be heard to assert inadvertence considering it has eschewed responsibility for these Third Party devices.

Archer also claims that such an inspection is unwarranted because its expert, Brett Harrison, already searched these devices and concluded that they do not contain Wisk's information. Dkt. 58-24 ¶¶ 11, 44. However, Harrison's search was limited in scope and did not capture the forensic information Wisk seeks here. He admitted at deposition that, for example, if "an Archer-owned laptop had a non-Archer USB inserted into it, [he] would not have analyzed or examined that non-Archer USB." Harrison Tr. at 58:4-14. He also did not know if the Third Parties "use USB flash drives … during the course of their regular work at Archer." *Id.* at 59:21-60:5. Moreover, while Harrison says he searched "deleted" files, Dkt. 58-24 ¶ 13, his analysis was, at best, directed to capturing deleted files that remain easily recoverable. Harrison Tr. at 125:24-126:12. Harrison did not perform a comprehensive search for deleted or transferred files.

Wisk is entitled to a forensic inspection that fills the gaps in Harrison's analysis.[4] RFR inspections fill those gaps, by looking to whether an employee transferred files from or to an external drive, or whether an employee deleted files even if the files themselves are no longer recoverable. While Archer dismisses it as "quibbles," evidence of file deletions or transfers from the defendant's computers is often the most critical evidence in a trade secret case. Wisk is not trying to "doublecheck Archer's work." Wisk seeks evidence that Archer has not looked for (or at least has not disclosed to Wisk) and is available only through forensic inspection. That distinguishes this case from *Stonebridge*, 2013 WL 3889209, where the requesting party failed to show that the information sought was "not reasonably accessible through other sources."

Archer contends that forensic inspections are reserved for "extreme situation[s]," but Archer's cited case confirms that such inspections are proper "where computers have a special connection to the lawsuit." *Memry*, 2007 WL 832937, at *3. That is this case here, where the forensic evidence has the potential to show evidence that is simply not available through any other alternative means. That is exactly why these sorts of inspections are commonly permitted in trade secret cases. *See, e.g.*, *Brocade Commc'ns Sys., Inc. v. A10 Networks, Inc.*, No. 10-CV-03428-LHK, 2012 WL 70428 (N.D. Cal. Jan. 9, 2012) (trade secret case); *Waymo v. Uber* (discussed at Dkt. 191). Archer claims there is no evidence that Wisk's information made it onto Archer's systems. Wisk is entitled to

---

[3] Archer's apparent insinuation that allegations against Xue are based on his Chinese nationality is offensive and not well taken. These allegations are based on Xue's downloads of thousands of Wisk files while being recruited by Archer, corroborated by Xue's selective assertion of the Fifth Amendment at deposition. As Judge Orrick recognized in drawing an adverse inference, Xue "conspicuously does not deny that he retained [5,000] files after he left Wisk." Dkt. 133 at 41.

[4] Archer's citation to its "discovery responses" is misleading. Archer's production of documents and responses to interrogatories are inherently based on the information in existence at Archer today, and will therefore not uncover forensic evidence of files being transferred to Archer's computers, used for Archer's benefit, and then deleted prior to Mr. Harrison's litigation-driven inspection. That is why Wisk also served Requests for Inspection, which Archer outright refused.

test Archer's claim with the inspection of forensic evidence, particularly given the other circumstantial indicators of trade secret misappropriation that the Court has already found to have been plausibly alleged. (*See* Dkt. 34 at 24-26.) If Archer truly has nothing to hide, it should welcome a forensic inspection rather than impose roadblocks at every turn.

RFR inspections impose minimal burden on Archer. *See* Fed. R. Civ. P. 26(b)(2)(B). Creating a forensic image is a straightforward and non-intrusive exercise. Indeed, the Third Parties previously provided their work devices so that they could be imaged and examined by Harrison. Dkt. 58-24 ¶ 11; *see In re Apple Inc. Device Performance Litig.*, No. 5:18-MD-02827-EJD, 2019 WL 3973752, at *3 (N.D. Cal. Aug. 22, 2019) (ordering forensic inspection and referencing a separate case finding a "nexus" between trade secret claims and the "need for images of the defendants' computers").[5] Any privacy concerns are also minimal because the requested examination is targeted at forensic evidence and does not request production of substantive documents, and because the target devices are work devices unlikely to include private information. Archer's argument that "Wisk seeks unfettered access to virtually the entirety of Archer's systems with the ability to demand production of any file it wants…" is plainly wrong. Wisk seeks only RFR inspections of those work devices used by Third Parties known to have possessed Wisk's confidential information while working on Archer's aircraft.

Finally, Archer put this forensic evidence at issue by using Harrison's opinions to argue that no Wisk confidential information existed on Archer's systems. Dkt. 57-5 at 8 (Opp. to P.I.). Archer should not be permitted to selectively provide forensic images to its paid consultant, then *refuse* to provide those same images to a neutral examiner on a claim of undue burden.

In short, Wisk seeks the same RFR forensic inspection that Judge Orrick already ordered with respect to the work devices of one employee (Jing Xue). This inspection clearly is relevant to Wisk's claims of trade secret misappropriation and is proportional to the needs of this case.

**Archer's Statement.** A forensic inspection of devices in the possession, custody, or control of an opposing party—including a device used for work purposes—is the exception, not the rule, reserved only for "extreme situation[s]." *Memry Corp. v. Ky. Oil Tech., N.V.*, 2007 WL 832937, at *3 (N.D. Cal. Mar. 19, 2007). Wisk does not come even close to establishing such "extreme" circumstances here: Unlike the personal devices of these employees, there is no evidence— *none*—that any confidential Wisk documents made their way onto Archer's systems, including the Archer devices of which Wisk seeks forensic examination. This is a fishing expedition, plain and simple, not supported by any cognizable need for discovery and in contravention of settled precedent.[6]

The circumstances here bear no resemblance to those that gave rise to the forensic inspection of Dr. Xue's Archer devices. From the start, Wisk made Dr. Xue the focus of its attention. In its pre-litigation criminal referral to the Santa Clara County District Attorney's Office, Wisk described a forensic analysis it had conducted on devices used by ten employees who left Wisk for Archer, including Messrs. Muniz, Melack, and Marius. *See* Dkt. 178-10. But in setting forth the results of that analysis, Wisk focused only on Dr. Xue, attempting to manufacture a threat of espionage because Dr. Xue is a "Chinese national" and his "immediate family lived in China." *Id.* at 4. Similarly, Wisk detailed its allegations against Dr. Xue in both its first Complaint, *see*

---

[5] As an even less burdensome alternative, Wisk may be amenable to running the RFR examinations on the same forensic images that Mr. Harrison previously created, rather than creating new images, provided Wisk can confirm that Mr. Harrison created sound copies.

[6] Archer supports the position taken by these individual employees in response to Wisk's demand for forensic inspection of their personal devices.

3

Dkt. 1 ¶¶ 63–70, and in its motion for a preliminary injunction, Dkt. 16 at 8. In ordering the preparation of a "Red Flag Report" of Dr. Xue's Archer devices, Judge Orrick expressly noted that "[t]he centerpiece of Wisk's Motion was Xue's download of Wisk's files." Dkt. 133 at 40. In contrast to Dr. Xue, the employees Wisk targets here are not alleged to have engaged in any widespread downloading of documents outside of their work activities, and there is no evidence that any of the employees had intentionally retained the Wisk documents located on their personal devices or that they used any such documents while at Archer. Wisk did allege that Mr. Marius retained a Wisk document showing motor models that Archer asked him to recreate, but Judge Orrick found that in so arguing, Wisk had "mischaracterize[d]—really invent[ed]—the evidence." *Id.* at 34. All Wisk now alleges is that a small number of former Wisk employees unknowingly retained certain documents on their *personal* devices after their departure from Wisk. That is unsurprising—Wisk expressly permits its employees to use their personal devices for work purposes, *see* Dkt. 16-31 at 11, and did not offer any resources to departing employees to help them sift through data on their personal devices to find any remaining Wisk documents, *see* Dkt. 58-22 ¶ 5. The presence of these documents on the employees' *personal* devices is woefully insufficient to warrant a full-scale forensic investigation of their *Archer work* devices.

In any event, Wisk conspicuously omits the *results* of the forensic examination of Dr. Xue's Archer devices. The third-party forensic inspector generated a "Red Flags Report" for two of Dr. Xue's devices, identifying nothing of concern—the inspector assigned a rating between one and ten (ten being the most suspicious) for ten analyses conducted on each of the devices—the *highest* rating given to any analysis for either device was a *four*; the most common rating (a majority) was *one*. Since the reports were generated in early August 2021, Wisk has requested no additional analyses for these devices. Moreover, Judge Orrick held in denying Wisk's motion for a preliminary injunction that Wisk never connected the files that Dr. Xue allegedly downloaded to the trade secrets Wisk asserted in its motion. *See* Dkt. 133 at 41. With its principal theory of misappropriation debunked, Wisk is now grasping for *anything* it can to justify this lawsuit. That is no basis for the relief Wisk seeks here as to other former Wisk employees.

Moreover, Archer has already conducted a thorough investigation to determine if there is any evidence of any Wisk documents—including those specific documents inadvertently retained on these employees' personal devices—on Archer's systems. The result, time after time, has been the same: There is *no* such evidence. Wisk takes issue with the forensic inspection undertaken by Mr. Harrison, but Wisk's quibbles with Mr. Harrison's methodologies are mere distraction: The proper avenue for challenging the quality of Mr. Harrison's inspection is to challenge Archer's document productions or interrogatory responses, or to proceed with ordinary expert discovery. But Wisk has not raised any issue as to the completeness of Archer's discovery responses regarding Wisk documents, instead making an end-run around such a showing by insisting that it is entitled to conduct its own search of Archer's systems. That is not how document production works.

In any event, Wisk's objections are without merit. Wisk states that Mr. Harrison did not "analyze[]" or "examine[]" non-Archer USB devices connected to the Archer system, but that is because those USB devices are not *Archer* devices, and Archer would have no ability to collect or inspect those devices (although Archer has identified all such devices in its response to Interrogatory No. 17). That would remain true even if Wisk obtained the relief it seeks here. As for the rigor of Mr. Harrison's search for deleted files, Wisk has identified no precedent or forensic standard that requires usage of the particular "file carving" technique it references, and the forensic inspection protocol Wisk proposed to Archer does not even call for the attempted recovery of deleted files (whether by "file carving" or any other methodology).

Archer also has provided forensic information in response to two interrogatories served by Wisk. Wisk's Interrogatory No. 11 sought information regarding the forensic images of the Archer devices of former Wisk employees; Archer provided a complete response to that Interrogatory. Wisk's Interrogatory No. 17 sought all devices used by any former Wisk employee to connect to

4

Archer's network; again, Archer provided a complete response. Contrary to Wisk's claim, those responses provide the same information—devices used by former Wisk employees to connect to Archer's systems *at any time*—Wisk seeks now. Wisk does not point to any information in those responses that supports its demand for forensic inspection. Wisk's desire to conduct its own investigation to doublecheck Archer's work does not justify a forensic inspection.[7]

Another court in this District has come to this same conclusion. In *Lee v. Stonebridge Life Insurance Co.*, Magistrate Judge Corley rejected a defendant's request for forensic inspection of the plaintiff's personal computer, observing that the plaintiff had already provided the defendant "with considerable data" from the device. 2013 WL 3889209, at *2 (N.D. Cal. July 30, 2013). Rejecting the defendant's argument that it "cannot tell what, if anything, is missing without first looking at the computer," the court characterized the defendant's demand as a "fishing expedition," noting that negotiating search terms and producing responsive information "is how discovery of electronically stored information is routinely performed." *Id.* The same reasoning applies here.

Wisk's cited authority is not to the contrary. In *Brocade*, the undisputed evidence showed that 196 source code files of the plaintiff were found on the individual defendant's hard drive, that the defendant imaged his hard drive and then "recycled" it, and that the defendant transferred the source code files from the imaged hard drive to his work device. 2012 WL 70428, at *2. Forensic inspection was thus necessary to "test[] the veracity of [the defendant's] claims as to whether any of [the plaintiff's] source code files on [the individual defendant's] hard drives were accessed" during the time period in question. Here, not only did Wisk's policies expressly permit its employees to use their personal devices for work purposes, *see supra*, but there also is no evidence that any confidential Wisk files were subsequently transferred to those employees' *work* devices. Nor is there any evidence of the destruction or concealment of relevant materials.

Finally, Wisk's contention that forensic inspection would impose no burden is misguided. First, as set forth above, where inspection of devices is sought, it is the receiving party's burden to show that such inspection is warranted by "extreme" circumstances, not the producing party's burden to establish hardship. *See Stonebridge*, 2013 WL 3889209, at *2; *Memry Corp.*, 2007 WL 832937, at *3. Second, the burden on Archer is not the physical production of the devices, but rather the Pandora's Box Wisk seeks to open. The forensic protocol Wisk previously offered for discussion would have permitted Wisk to obtain a "file list" for any device *connected* to the inspected devices (which presumably would include a host of Archer devices), and then demand production of any file from that list that Wisk believed to be *related* to a confidential Wisk document, as well as demand a complete forensic inspection of *that* device as well. Wisk thus seeks unfettered access to virtually the entirety of Archer's systems with the ability to demand production of any file and forensic inspection of any device, all without even a shred of evidence that *any* confidential Wisk document exists or has ever existed on Archer's systems.

Wisk approaches this issue as though it were a routine discovery request subject to the ordinary standards for relevance and burden. It is not. Forensic inspection is a rarely used procedure appropriate only where there is evidence that a party has breached its discovery obligations or that a particular device was used in the commission of the alleged offense in such a way that requires forensic inspection to determine how the device was used or manipulated. There is no such evidence here with respect to any devices in Archer's possession, custody, or control, and Wisk's overreaching demand should therefore be denied.

---

[7] Wisk disclaims that it is attempting to "doublecheck" Archer's work, but its letter speaks for itself: "Archer claims there is no evidence that Wisk's information made it onto Archer's systems. Wisk is entitled to test Archer's claim with the inspection of forensic evidence."

DATED: December 23, 2021          QUINN EMANUEL URQUHART & SULLIVAN, LLP

By */s/ Patrick Schmidt*
Yury Kapgan
Robert M. Schwartz
Michael T. Zeller
Diane Cafferata
Patrick Schmidt
Michael LaFond
*Attorneys for Plaintiff Wisk Aero LLC*

GIBSON, DUNN & CRUTCHER LLP

By */s/ Josh A. Krevitt*
Josh A. Krevitt
Daniel J. Thomasch
Wayne Barsky
Joshua H. Lerner
Michael H. Dore
Diana M. Feinstein
*Attorneys for Defendant Archer Aviation Inc.*

In accordance with Civil Local Rule 5-1(h)(3), I attest that concurrence in the filing of this document has been obtained from the other signatories to this document.

*/s/ Patrick Schmidt*

Patrick Schmidt