GIBSON, DUNN & CRUTCHER LLP
Josh A. Krevitt, SBN 208552
  jkrevitt@gibsondunn.com
Joshua H. Lerner, SBN 220755
  jlerner@gibsondunn.com
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: 650.849.5300
Facsimile: 650.849.5333

Orin Snyder, *admitted pro hac vice*
  osnyder@gibsondunn.com
Daniel J. Thomasch, *admitted pro hac vice*
  dthomasch@gibsondunn.com
200 Park Avenue
New York, NY  10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Wayne Barsky, SBN 116731
  wbarsky@gibsondunn.com
Diana M. Feinstein, *admitted pro hac vice*
  dfeinstein@gibsondunn.com
2029 Century Park East, Suite 4000
Los Angeles, CA  90067-3026
Telephone: 310.552.8500
Facsimile: 310.551.8741

Attorneys for Defendant
Archer Aviation Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WISK AERO LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>ARCHER AVIATION INC.,<br><br>                    Defendant. | CASE NO. 3:21-cv-02450-WHO<br><br>**DEFENDANT ARCHER AVIATION INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS UNDER RULE 12(c) REGARDING THE '099 AND '441 PATENTS**<br><br>**Hearing:**<br>**Date: February 23, 2022**<br>**Time: 2:00 p.m.**<br>**Courtroom: The Honorable William H. Orrick** |

Gibson, Dunn &
Crutcher LLP

1  TO PLAINTIFF WISK AERO LLC AND ITS COUNSEL OF RECORD:

2           PLEASE TAKE NOTICE that on February 23, 2022 at 2:00 PM, or as soon thereafter as the

3  matter may be heard, in the courtroom of the Honorable William H. Orrick at the United States District

4  Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California,

5  Defendant Archer Aviation Inc. ("Archer") will and hereby does move the Court for judgment on the

6  pleadings pursuant to Federal Rule of Civil Procedure 12(c) regarding the Seventh and Eighth Causes

7  of Action in Wisk's Second Amended Complaint, which allege infringement of U.S. Patent No.

8  10,370,099 ("the '099 Patent") and U.S. Patent No. 11,034,441 ("the '441 Patent").  Archer's motion

9  seeks the following relief, as set forth in the Proposed Order submitted with this Motion:  An order

10  dismissing the Seventh and Eighth Causes of Action of Wisk's Second Amended Complaint with

11  prejudice, on the ground that the claims of the '099 Patent and '441 Patent are patent-ineligible under

12  35 U.S.C. § 101.

13           Archer's motion is based upon this motion, the below supporting memorandum of points and

14  authorities, the operative pleadings in this case and the documents attached thereto, Archer's

15  forthcoming reply brief in support of this motion, and any other written or oral argument or submission

16  that Archer may submit to the Court.

17  Dated:  January 19, 2022           GIBSON, DUNN & CRUTCHER LLP

18

19                                  By:  _____*/s/ Stuart M. Rosenberg*_____

20                                    Stuart M. Rosenberg

21                           *Attorneys for Defendant Archer Aviation Inc.*

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I. INTRODUCTION ........................................................................................................... 1

II. BACKGROUND ............................................................................................................ 2

    A.    The Patents Concern A Mathematical Computation In The Field Of Flight Control ................................................................................................................. 2

    B.    The Asserted Patent Claims Are Directed To A Mathematical Computation ............. 5

        1.    The '099 Claims Are Directed To Computation Of An "Optimal" Set Of Outputs ................................................................................................ 5

        2.    The '441 Claims Are Directed To Computation On Conventional Equipment ................................................................................................ 6

III. LEGAL STANDARD ................................................................................................... 9

IV. ARGUMENT ............................................................................................................... 10

    A.    The Claims Of The '099 Patent Are Ineligible Under Section 101 ........................... 10

        1.    *Alice* Step One:  The '099 Patent Claims Are Directed To An Abstract Idea ...................................................................................................... 10

        2.    *Alice* Step Two:  The '099 Patent Claims Lack Any Inventive Concept ........ 16

        3.    Wisk's Pleading Does Not Save The '099 Claims From Ineligibility ........... 18

    B.    The Claims Of The '441 Patent Are Likewise Ineligible Under Section 101 ........... 19

        1.    *Alice* Step One:  The '441 Patent Claims Are Directed To An Abstract Idea ...................................................................................................... 20

        2.    *Alice* Step Two:  The '441 Patent Claims Lack Any Inventive Concept ........ 22

        3.    Wisk's Pleading Does Not Save The '441 Claims From Ineligibility ........... 24

    C.    The '099 And '441 Claims Are Ineligible Under Either Party's Proposed Construction ................................................................................................ 25

V. CONCLUSION ............................................................................................................. 25

Gibson, Dunn & Crutcher LLP

1

## TABLE OF AUTHORITIES

2

**CASES**

3

*Accenture Global Servs., GmbH v. Guidewire Software, Inc.,*
4
    728 F.3d 1336 (Fed. Cir. 2013)................................................................20

5
*Affinity Labs of Texas, LLC v. DirecTV, LLC,*
    838 F.3d 1253 (Fed. Cir. 2016)...........................................................10, 21
6

7
*Alice Corp. v. CLS Bank Int'l,*
    134 S. Ct. 2347 (2014) ................................................1, 10, 14, 15, 16, 17, 20, 21, 22

8
*Am. Axle & Mfg., Inc. v. Neapco Holdings LLC,*
9
    967 F.3d 1285 (Fed. Cir. 2020)..........................................................16, 17

10
*Ariosa Diagnostics, Inc. v. Sequenom, Inc.,*
    788 F.3d 1371 (Fed. Cir. 2015)................................................................16
11

12
*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ..................................................................................9

13
*Bilski v. Kappos,*
14
    561 U.S. 593 (2010) ..................................................................................1

15
*In re Bilski,*
    545 F.3d 943 (2008), *aff'd sub nom. Bilski v. Kappos,* 561 U.S. 593 (2010)................................10
16

17
*In re Board of Trustees of Leland Stanford Junior Univ.,*
    989 F.3d 1367 (Fed. Cir. 2021)..........................................................11, 12

18
*In re Board of Trustees of Leland Stanford Junior Univ.,*
19
    991 F.3d 1245 (Fed. Cir. 2021).............................1, 11, 13, 15, 17, 18, 19, 24

20
*Boom! Payments, Inc. v. Stripe, Inc.,*
    839 F. App'x 528 (Fed. Cir. 2021) ..........................................................10
21

22
*Bot M8 LLC v. Sony Corp. of Am.,*
    4 F.4th 1342 (Fed. Cir. 2021)...................................................................20

23
*Brightedge Techs., Inc. v. Searchmetrics, GmbH,*
    304 F. Supp. 3d 859 (N.D. Cal. 2018) .......................................................9
24

25
*Cafasso v. Gen. Dynamics C4 Sys., Inc.,*
    637 F.3d 1047 (9th Cir. 2011)....................................................................9

26
*Chamberlain Grp., Inc. v. Techtronic Indus. Co.,*
27
    935 F.3d 1341 (Fed. Cir. 2019)................................................................20

28
*ChargePoint, Inc. v. SemaConnect, Inc.,*
    920 F.3d 759 (Fed. Cir. 2019)........................................................9, 15, 20

*Cisco Sys., Inc. v. Uniloc 2017 LLC,*
    813 F. App'x 495 (Fed. Cir. 2020) .......................................................................9, 19, 24

*Cleveland Clinic Found. v. True Health Diagnostics LLC,*
    859 F.3d 1352 (Fed. Cir. 2017).........................................................................................9

*Coffelt v. NVIDIA Corp.,*
    No. 16-00457-SJO, 2016 WL 7507763 (C.D. Cal. June 21, 2016), *aff'd,* 680 F. App'x 1010 (Fed.
    Cir. 2017) .........................................................................................................................12

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,*
    776 F.3d 1343 (Fed. Cir. 2014)...................................................................................9, 25

*CyberSource Corp. v. Retail Decisions, Inc.,*
    654 F.3d 1366 (Fed. Cir. 2011).............................................................................12, 15, 21

*Diamond v. Diehr,*
    450 U.S. 175 (1981).....................................................................................................15, 16

*Digitech Image Techs. v. Elecs. for Imaging,*
    758 F.3d 1344 (Fed. Cir. 2014).......................................................................................12

*Dropbox, Inc. v. Synchronoss Techs., Inc.,*
    815 F. App'x 529 (Fed. Cir. 2020) ..............................................................................9, 24

*Elec. Power Grp. v. Alstom S.A.,*
    830 F.3d 1350 (Fed. Cir. 2016)............................................................................12, 14, 17

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.,*
    955 F.3d 1317 (Fed. Cir. 2020)........................................................................................21

*In re Gilead Scis. Sec. Litig.,*
    536 F.3d 1049 (9th Cir. 2008)....................................................................................10, 19

*In re Gopalan,*
    809 F. App'x 942 (Fed. Cir. 2020) .................................................................................12

*Gottschalk v. Benson,*
    409 U.S. 63 (1972)..............................................................................................................1

*Health Discovery Corp. v. Intel Corp.,*
    No. 6:20-cv-666-ADA, 2021 WL 6116891 (W.D. Tex. Dec. 27, 2021) .........................12

*iLife Techs., Inc. v. Nintendo of Am., Inc.,*
    839 F. App'x 534 (Fed. Cir. 2021) .................................................................................20

*Interval Licensing LLC v. AOL, Inc.,*
    896 F.3d 1335 (Fed. Cir. 2018)..................................................................................17, 22

*Kumar v. Ovonic Battery Co.*,
  351 F.3d 1364 (Fed. Cir. 2003) ................................................................................................9

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
  132 S. Ct. 1289 (2012) ............................................................................................................20

*Parker v. Flook*,
  437 U.S. 584 (1978) .........................................................................................1, 12, 13, 14, 15

*PUREPREDICTIVE, Inc. v. H20.AI, Inc.*,
  No. 17-cv-03049-WHO, 2017 WL 3721480 (N.D. Cal. Aug. 29, 2017), *aff'd*, 741 F. App'x 802
  (Fed. Cir. 2018) ......................................................................................12, 13, 14, 15, 19, 21

*RecogniCorp, LLC v. Nintendo Co.*,
  855 F.3d 1322 (Fed. Cir. 2017) ..............................................................................................15

*In re Rosenberg*,
  813 F. App'x 594 (Fed. Cir. 2020) .........................................................................................12

*Rothschild Digital Confirmation, LLC v. Skedulo Holdings Inc.*,
  No. 3:19-cv-02659, 2020 WL 1307016 (N.D. Cal. Mar. 19, 2020) .........................................10

*SAP Am., Inc. v. InvestPic, LLC*,
  898 F.3d 1161 (Fed. Cir. 2018) ........................................................................9, 13, 15, 18, 20

*Secured Mail Sols. LLC v. Universal Wilde*,
  873 F.3d 905 (Fed. Cir. 2017) ...............................................................................2, 9, 10, 19

*Sensormatic Elecs., LLC v. Wyze Labs, Inc.*,
  No. 20-2320, 2021 WL 2944838 (Fed. Cir. July 14, 2021) ......................................................20

*Simio, LLC v. FlexSim Software Prods., Inc.*,
  983 F.3d 1353 (Fed. Cir. 2020) ..............................................................................................16

*Software Rights Archive, LLC v. Facebook*,
  485 F. Supp. 3d 1096 (N.D. Cal. 2020) ...................................................................................9

*Synopsys, Inc. v. Avatar Integrated Systems, Inc.*,
  No. 20-cv-04151-WHO, 2020 WL 6684853 (N.D. Cal. Dec. 22, 2020) .....................14, 15, 18, 21

*Synopsys, Inc. v. Mentor Graphics Corp.*,
  839 F.3d 1138 (Fed. Cir. 2016) ......................................................................................16, 19, 24

*TDE Petroleum Data Solutions, Inc. v. AKM Enter., Inc.*,
  657 F. App'x 991 (Fed. Cir. 2016) .........................................................................................12

*TPP Tech LLC v. Zebra Techs. Corp.*,
  403 F. Supp. 3d 382 (D. Del. 2019) ........................................................................................12

*Trading Techs. Int'l, Inc. v. IBG LLC*,
    921 F.3d 1084 (Fed. Cir. 2019)....................................................................................18

*Two-Way Media Ltd. v. Comcast Cable Commc'ns*,
    874 F.3d 1329 (Fed. Cir. 2017)................................................................................1, 21

*V-Formation, Inc. v. Benetton Grp. SpA*,
    401 F.3d 1307 (Fed. Cir. 2005)................................................................................9, 23

*Voter Verified, Inc. v. Election Sys. & Software LLC*,
    887 F.3d 1376 (Fed. Cir. 2018)....................................................................................21

*WhitServe LLC v. Donuts Inc.*,
    809 F. App'x 929 (Fed. Cir. 2020) ..............................................................................21

*Yu v. Apple Inc.*,
    1 F.4th 1040 (Fed. Cir. 2021)......................................................................10, 11, 20

# I.  INTRODUCTION

After the Court denied Wisk's motion for a preliminary injunction, Wisk filed a Second Amended Complaint adding two patents (and 34 asserted claims) to this lawsuit.  Archer now moves to dismiss those two patents under Rule 12(c) and 35 U.S.C. § 101 because the asserted claims are ineligible for patenting.

The Supreme Court and Federal Circuit have held repeatedly that patent claims directed to mathematical computations are ineligible under Section 101, regardless of whether the math is allegedly an improvement over prior art, and regardless of whether the claims are limited to use in a particular industry or field.  *See, e.g.*, *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355–57 (2014); *In re Board of Trustees of Leland Stanford Junior Univ.*, 991 F.3d 1245, 1250 (Fed. Cir. 2021).  Further, claims are ineligible when they are directed to abstract ideas implemented using conventional equipment.  *See Alice*, 134 S. Ct. at 2355; *Two-Way Media Ltd. v. Comcast Cable Commc'ns*, 874 F.3d 1329, 1337 (Fed. Cir. 2017).  Indeed, the modern Supreme Court has weighed in at least four times to confirm that mathematical calculations and related abstract ideas are not patentable.  *See Gottschalk v. Benson*, 409 U.S. 63 (1972) (programmed conversion of numerical information); *Parker v. Flook*, 437 U.S. 584 (1978) (computing updated alarm limit); *Bilski v. Kappos*, 561 U.S. 593 (2010) (method and mathematical formula for hedging risk); *Alice*, 134 S. Ct. at 2355 (concept of intermediated settlement).

Here, the two patents that Wisk added in the Second Amended Complaint are not patent-eligible for exactly these reasons, and should be dismissed on the pleadings under Rule 12(c).  The '099 Patent claims methods and computer code for "computing" an allegedly optimal set of outputs based on inputs relating to aircraft flight control.  These claims fail step one of the *Alice* test for patent-eligible subject matter because they are directed to mathematical computation.  And they fail step two of the *Alice* test because there is no inventive concept in the claims beyond the allegedly improved mathematical computation, which is itself ineligible.  *See Alice*, 134 S. Ct. at 2357.  The '441 Patent, which is related to the '099 Patent and was also added in the Second Amended Complaint, is likewise directed to math and abstract "determinat[ions]," performed using conventional aircraft equipment without any inventive concept.  The '441 claims therefore fail both steps of the *Alice* test and are ineligible.  *Id.*

The Court should dismiss both patents under Rule 12 because the ineligibility of their claims is apparent from the pleadings, which include the patents.  The specification shared by the '099 and '441 Patents establishes that the alleged invention is a purportedly improved *mathematical* computation, and that the aircraft equipment discussed in the specification, and referred to in some of the claims, is nothing more than conventional equipment used for its known purposes.  Further, the claim language itself demonstrates that the claims are directed to mathematical computations and abstract ideas, without even reciting precisely *how* to perform the required calculations.  For example, the '099 Patent claims merely recite "computing" an "optimal" result, while the '441 Patent claims recite "determin[ing]" a solution "within the solution space," all using conventional equipment.  Further, Wisk's complaint does not identify any allegedly inventive concept in the claims.  Instead, Wisk makes wholly conclusory and unexplained allegations that contradict the specification and, as a matter of law, should not be accepted as true under Rule 12.  *Secured Mail Sols. LLC v. Universal Wilde*, 873 F.3d 905, 912 (Fed. Cir. 2017).  Finally, the claims of the two patents are ineligible under either party's proposed constructions (or any other possible construction).  Thus, the Court should grant this motion and should dismiss Wisk's claims regarding the '099 and '441 Patents with prejudice.

## II.  BACKGROUND

### A.    The Patents Concern A Mathematical Computation In The Field Of Flight Control

The '099 and '441 Patents relate to the field of flight control, and more specifically to mathematical computations that can be used for flight control.  The two patents are related, and claim priority to an application filed in October 2016. Ex. A ('441 Patent), 1:7–10.  As the patents themselves show, it was already conventional to use computers in flight control by receiving inputs from sensors or pilot equipment and using those inputs to compute commands that could be provided to flight control effectors, such as rotors.  For example, the '099 and '441 Patents cite on their face to prior-art U.S. Patent No. 7,255,306 to Jones, which is entitled "Method and computer program product for controlling the control effectors of an aerodynamic vehicle."  The Jones patent was filed in 2002, approximately fourteen years before the earliest filing date for the '099 and '441 Patents, and discloses that even before that time, "flight control effectors have been driven by a flight control computer which, in turn, receives inputs from the various input devices operated by the pilot."  Ex. C (Jones), 1:43–45.

Gibson, Dunn &
Crutcher LLP

One example context in which flight controllers were already known and used in the prior art to perform such mathematical computations was when a flight control effector on an aircraft failed or became inoperable, and it was necessary to redistribute power to the remaining effectors in order to compensate for the failure and to move the aircraft the way the pilot wanted.  As the prior-art Jones patent explained, flight control systems were already known in the art "to detect the failure of one or more flight control effectors and to alter the control logic associated with one or more of the flight control effectors that remain operable in an attempt to produce the desired change in the time rate of change of the current system state vector of an aerodynamic vehicle requested by the pilot."  *Id.* at 1:49–63.  The concept of using a flight control system to account for the failure of an effector—e.g., a rudder, engine or flap—during flight has been known and practiced for decades.  For example, the '441 Patent cites on its face to U.S. Patent No. 4,469,294 to Clifton, which was filed forty years ago in 1982 and describes a system for redistributing power to "maintain balance and operational control" in "the event of an engine failure."  Ex. D (Clifton), Abstract.

Against this background, the '099 and '441 Patents do not purport to have invented flight controllers or flight control systems, and instead treat this technology as conventional.  For example, the specification discusses flight controllers in a section titled "Background of the Invention."  Ex. B ('099 Patent), 1:13–2:2.  This section discusses "prior systems" (*id.* at 1:63), and explains that it was already known that "[f]light control systems (sometimes referred to as 'flight controllers') translate inputs received from manually operated pilot controls . . . referred to collectively herein as 'inceptors,' and/or inputs from one or more sensors (e.g., air speed) into commands to the flight control assets of the aircraft," which are also called "actuators."  *Id.* at 1:6–30.

While flight controllers were already known, the specification states that there was a problem with the *mathematical computations* performed by flight controllers—for any given set of inputs, the existing computations performed by flight controllers might yield *more than one* corresponding set of outputs, and some sets could be better than others in some ways.  In the specification's own words, "[f]or a given set of one or more pilot commands under given circumstances, some combinations of actuators capable of acting on the aircraft to achieve the result indicated by the pilot command(s) may be more effective and/or efficient than others."  *Id.* at 1:40–45.  For example, "some may consume

Gibson, Dunn &
Crutcher LLP

1   more or less power and/or fuel than others, provide a more smooth transition from a current state than

2   others, etc." *Id.* at 1:45–47. Thus, according to the specification, there was a need for an improved

3   mathematical computation that includes parameters relating to power consumption, smoothness of

4   motion, or other "system constraints." *Id.* at 1:51.

5       The specification states that some mathematical approaches to this problem were already

6   proposed in the prior art, but the specification states that those prior approaches were deficient because

7   they did not compute the *best* mathematical set of outputs for any given set of inputs. For example, the

8   specification states that "[i]n prior systems, attempts have been made to pre-compute, offline [i.e.,

9   before flight], combinations of actuators and associated parameters (e.g., position, speed, other

10  parameters) to respond to different combinations of inceptor input using heuristics and/or engineering

11  judgment." *Id.* at 1:52–56. The specification states, however, that the "offline" approaches were

12  deficient because they did not cover all possible sets of inputs in the real world, and thus could not

13  compute the *best* mathematical solution for any given set of inputs. *Id.* at 1:56–59. The specification

14  states that "typically it [wa]s not possible to determine in advance every combination of actuators and

15  associated parameters that may be required under all possible conditions and circumstances." *Id.* Thus,

16  the specification states, these "offline" approaches "typically did not find a *true optimal solution*

17  (minimum cost) in any given real world set of inputs and conditions." *Id.* at 8:58–61.[1]

18      The specification also states that "online" mathematical approaches were already proposed in

19  the prior art, for computing a solution during flight instead of before flight. But the specification states

20  that those particular "online" approaches were likewise deficient, because they allegedly did not result

21  in the *best* mathematical solution for a given set of inputs. The specification states that "[o]nline

22  approximate optimization approaches [we]re believed to have been attempted using other objective

23  functions and other techniques, such as [a] pseudo-inverse or cascaded pseudo-inverse approach." *Id.*

24  at 8:61–65. But according to the specification, the prior-art "pseudo-inverse" approach did not provide

25  the *best* solution because it "d[id] not handle the case in which one or more actuators (e.g., lift fans)

26  reach an upper limit of their capacity/effectiveness." *Id.* at 8:66–9:3. And even though the prior-art

27

28

---

[1] All emphasis in quotations is added except where noted.

"cascaded pseudo-inverse" approach "attempt[ed] to mitigate that problem," the specification states that it still "d[id] not provide an actual *optimal* solution" and thus was deficient.  *Id.* at 9:3–5.

In contrast to these prior-art approaches, the specification of the '099 and '441 Patents purports to describe *an improved mathematical approach* that provides an "optimal" solution not provided by the prior art.  The specification states that "[i]n contrast to prior approaches, the quadratic program/least squares approach disclosed herein, in which different weights are applied to give priority to certain axes when one or more actuators are saturated, and which allows constraints to be defined and enforced, *enables a workable optimal solution to be computed* online within the required cycle time even under saturation or actuator failure conditions."  *Id.* at 9:5–12.

Despite tying this alleged improvement to the "quadratic program/least squares" technique, the specification goes on to state that "other optimization techniques may be used" instead, as long as they "find an optimal solution."  *Id.* at 11:1–5.  And despite touting the benefits of the alleged invention for "online" computations, the specification states that embodiments of the alleged invention can include "offline processing" as well, to "precompute optimal solutions" before flight and store them "in a lookup table or other data structure."  *Id.* at 11:21–34.

**B.     The Asserted Patent Claims Are Directed To A Mathematical Computation**

Like their common specification, the asserted claims of the '099 and '441 Patents are directed to a mathematical computation that can be used on an aircraft.  The claim language itself focuses on computation, reciting steps like "computing" or "determin[ing]" a "solution" based on "inputs."  And the claims do not recite anything of substance beyond the performance of those steps, using conventional equipment such as a "processor" or a "flight controller" on a conventional aircraft.

**1.     The '099 Claims Are Directed To Computation Of An "Optimal" Set Of Outputs**

Claim 1 of the '099 Patent recites a method with only two steps:  (1) "receiving" a set of inputs, and (2) "computing" an optimal set of outputs and parameters:

1. A method of controlling flight of an aircraft, comprising:

receiving a set of inputs associated with a requested set of forces and moments to be applied to the aircraft; and

computing an optimal mix of actuators and associated actuator parameters to achieve to an extent practical the requested forces and moments, including by minimizing a weighted set of costs that includes costs associated with one or

Gibson, Dunn & Crutcher LLP

> more errors each corresponding to a difference between a requested force or moment and a corresponding force or moment achieved by the computed solution.

'099 Patent at 11:62–12:6.  The claim, however, does not specify precisely who or what performs these basic functions of "receiving" and "computing."  Indeed, the claim recites no particular requirements for performing these functions differently from how they would be performed in the human mind.

Wisk additionally asserts independent claim 26 of the '099 Patent, which recites the same exact "receiving" and "computing" limitations as claim 1, but in the form of a "computer program product" comprising "computer instructions for receiving . . . and; computing. . . ."  *Id.* at 14:9–23.  Thus, the only limitations in the asserted independent claims of the '099 Patent are limitations reciting "receiving" certain inputs and "computing" a particular output.

Wisk also asserts dependent claims 2–4, 6, 8–10, 13–17, 19, and 21–22 of the '099 Patent, which are likewise directed to a mathematical computation.  For example, claims 2–4 do not add any steps beyond the "receiving" and "computing" steps of claim 1, and instead merely specify the "set of inputs" that is received in the "receiving" step.  *See, e.g.*, *id.* at 12:7–8 (claim 2) ("The method of claim 1, wherein the set of inputs is associated with a set of inceptor output values").

Similarly, claims 6, 8–10, 13–17, and 19 do not add any steps beyond the "receiving" and "computing" steps of claim 1, and instead merely add limitations regarding performance of the "computing" step.  *See, e.g.*, *id.* at 12:27–29 (claim 8) ("The method of claim 1, wherein the optimal mix is computed based at least in part on a vehicle model that is linear").

Finally, claims 21–22 additionally recite outputting the computed solution by "providing" control signals reflecting the computation.  *See, e.g.*, *id.* at 13:6–9 (claim 21) ("The method of claim 1, further comprising providing to each actuator included in the optimal mix a respective control signal reflecting a corresponding actuator parameter determined for the actuator.").  The claims, however, say nothing about *how* to carry out this step of "providing" a control signal, and the specification does not purport to describe any technology for this step either.

### 2.    The '441 Claims Are Directed To Computation On Conventional Equipment

The '441 Patent claims are likewise directed to a mathematical computation in the context of air travel.  But instead of claiming a computation in the form of a method or computer instructions like

Gibson, Dunn & Crutcher LLP

the '099 Patent, the '441 Patent claims are written in the form of operations performed by a "flight controller" in an "aircraft."  As noted above, the specification states in the "Background of the Invention" section that "flight controllers" were already known in the art for this purpose (and no new or specialized flight controllers are disclosed in the patent).  *See* Ex. B ('099 Patent), 1:6–30.  And the '441 Patent recognizes that one context in which flight controllers were conventionally used for this purpose was when an actuator, such as a lift fan, was failing, making it necessary to compute a solution that excluded the failing actuator—as discussed, for example, in the Clifton and Jones prior art patents cited on the face of the '441 Patent.  *See* Ex. D (Clifton), Abstract; Ex. C (Jones), 1:49–63.

Claim 1 of the '441 Patent, the only independent claim, recites an "aircraft" with components which, as further discussed below (*infra* Section IV(B)(2)), are all conventional.  These off-the-shelf components, including "actuators," "sensors," and a "flight controller," are used to receive inputs and to perform a computation to account for the failure of an actuator:

1. An aircraft comprising:

an airframe;

actuators coupled with the airframe, wherein the actuators comprise lift fans;

sensors via which sensor data is generated, wherein the sensor data is indicative of whether each of a plurality of the lift fans has a failure induced reduced capacity;

a flight controller configured to:

receive flight control inputs corresponding to a set of forces and moments to be applied to the aircraft via operation of the actuators;

monitor the sensor data to detect whether any one of a plurality of lift fans has a failure induced reduced capacity to generate lift;

determine, for an instance in which at least one of the lift fans has a failure induced reduced capacity to generate lift, a solution space based on current capabilities of the actuators; and

determine, within the solution space, a combination of the actuators and associated actuator parameters to apply the set of forces and moments to the aircraft to an extent practicable with the failure induced reduced capacity of the at least one of the lift fans.

Ex. A ('441 Patent), 12:6–28.

Notably, while the claims in the '099 Patent require computation of an "optimal" solution—which is touted repeatedly in the specification as the alleged improvement of these patents over the

prior art—the claims in the '441 Patent do not include this requirement, let alone recite any specific methodology for performing the recited computation.  Rather, the computation claimed in the '441 Patent needs only to determine "a solution space based on current capabilities of the actuators" and then determine a solution "within the solution space" that is "practicable."[2]  In addition, although the claims recite a flight controller "configured to" perform the recited operations, neither the specification nor the claims identify precisely *how* to "configure" the flight controller to perform those operations.  Instead, the claims only broadly recite that the flight controller performs the basic functions of "receiv[ing]" inputs, "monitor[ing]" data, and "determin[ing]" a "solution space" and outputs, which are all steps that a human could mentally perform.

Wisk also asserts dependent claims 2–7, 12–13, and 15–19 of the '441 Patent.  These claims are likewise directed to computation, as the added limitations relate only to the inputs for, or outputs of, the claimed mathematical calculation—such as what the inputs are, from where they derive, what outputs are computed, or when the outputs are computed.  The claims do not require that the system components be improved in any particular manner to perform the computation, they merely relate to aspects of the computation itself.  *See, e.g.*, Ex. A ('441 Patent), 12:29–31 (claim 2) ("The aircraft of claim 1, wherein the failure induced reduced capacity is measured, detected and/or inferred from indirect indications."), 12:44–46 (claim 7) ("The aircraft of claim 1, wherein the combination of the actuators and associated actuator parameters are determined so as to minimize combined thrust of the lift fans."), 13:13–14 (claim 12) ("The aircraft of claim 1, wherein the flight control inputs are associated with a set of inceptor outputs."), 14:1–3 (claim 15) ("The aircraft of claim 1, wherein flight controller determines the combination of the actuators and associated actuator parameters in real time.").  Wisk also asserts dependent claims 9–11 and 14, which relate only to a description of the system in which the mathematical calculation is performed.  *See, e.g.*, *id.* at 12:52–53 (claim 9) ("The aircraft of claim 1, wherein the actuators comprise seven or more independent actuators.").

---

[2] As explained in Archer's forthcoming claim construction briefing, the limitation "to an extent practicable" in the '441 Patent, and the corresponding limitation "to an extent practical" in the '099 Patent, are each indefinite and thus render the claims invalid under Section 112.

### III.  LEGAL STANDARD

__Judgment on the Pleadings.__  "'Rule 12(c) is functionally identical to Rule 12(b)(6),'" and "'the same standard of review applies to motions brought under either rule.'"  *Software Rights Archive, LLC v. Facebook*, 485 F. Supp. 3d 1096, 1102 (N.D. Cal. 2020) (quoting *Cafasso v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 n.4 (9th Cir. 2011)).[3]  Under this standard, a plaintiff must allege facts adequate to "raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  Judgment on the pleadings should be granted where "'there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.'"  *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765 (Fed. Cir. 2019) (citation omitted); *Brightedge Techs., Inc. v. Searchmetrics, GmbH*, 304 F. Supp. 3d 859, 863 (N.D. Cal. 2018).

The Federal Circuit has recognized that patent eligibility "may be, and frequently has been, resolved on a Rule 12(b)(6) or (c) motion," "before claim construction or significant discovery has commenced" and "based on intrinsic evidence from the specification without need for 'extraneous fact finding outside the record.'"  *See SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1166 (Fed. Cir. 2018); *Cleveland Clinic Found. v. True Health Diagnostics LLC*, 859 F.3d 1352, 1360 (Fed. Cir. 2017); *Secured Mail Sols. LLC v. Universal Wilde*, 873 F.3d 905, 912 (Fed. Cir. 2017); *see also Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1349 (Fed. Cir. 2014) ("[C]laim construction is not an inviolable prerequisite to a validity determination under § 101.").  In addition, the court has "established that 'prior art cited in a patent or cited in the prosecution history of the patent constitutes intrinsic evidence.'"  *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1311 (Fed. Cir. 2005) (quoting *Kumar v. Ovonic Battery Co.*, 351 F.3d 1364, 1368 (Fed. Cir. 2003)).

Finally, the Federal Circuit has made clear that "conclusory statements regarding eligibility" need not be accepted as true and "d[o] not preclude dismissal."  *Cisco Sys., Inc. v. Uniloc 2017 LLC*, 813 F. App'x 495, 498–99 (Fed. Cir. 2020); *see also Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 538 (Fed. Cir. 2020) ("These sorts of conclusory pleadings are insufficient to survive a

---

[3] Rule 12(c) applies here because the pleadings are closed on Section 101 eligibility.  *See* Dkt. 148 (Wisk Second Amended Complaint ("SAC")) ¶¶ 230, 241; Dkt. 154 (Archer Answer and Counterclaims) ¶¶ 131–46, 264–65; Dkt. 163 (Wisk Answer to Archer Counterclaims) ¶¶ 131–46.

1  motion to dismiss."); *Boom! Payments, Inc. v. Stripe, Inc.*, 839 F. App'x 528, 533–34 (Fed. Cir. 2021)

2  ("Because Boom's amended complaint includes only conclusory allegations, the district court did not

3  err in granting Stripe's motion to dismiss."); *see also In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055

4  (9th Cir. 2008).  The appeals court likewise has made clear that "a court need not accept as true

5  allegations that contradict matters properly subject to judicial notice or by exhibit, such as the claims

6  and the patent specification."  *Secured Mail*, 873 F.3d at 905, 913; *see also Rothschild Digital*

7  *Confirmation, LLC v. Skedulo Holdings Inc.*, No. 3:19-cv-02659, 2020 WL 1307016, at *4 (N.D. Cal.

8  Mar. 19, 2020).

9         **Patent Eligibility.**   The legal question of patent eligibility under Section 101 involves a two-

10  step "threshold inquiry."  *In re Bilski*, 545 F.3d 943, 950 (2008), *aff'd sub nom. Bilski v. Kappos*, 561

11  U.S. 593 (2010).  Step One asks whether the claims are directed to an ineligible "concept[]," such as

12  an "abstract idea."  *Alice Corp. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014).  If so, Step Two asks

13  whether the claims involve a specific "inventive concept" that "amounts to significantly more than a

14  patent upon the [abstract idea] itself."  *Id.*  Each step is addressed in detail below for each patent.

## IV.  ARGUMENT

### A.    The Claims Of The '099 Patent Are Ineligible Under Section 101

17         The focus of the '099 Patent claims is a purportedly improved mathematical calculation.

18  Because the claims recite no specific improvement to the existing technology, they lack any inventive

19  concept and thus are not patent-eligible.

#### 1.    *Alice* Step One:  The '099 Patent Claims Are Directed To An Abstract Idea

21         Applying Federal Circuit precedent, it is abundantly clear that the claims of the '099 Patent are

22  directed to an abstract idea—the idea of using a mathematical calculation to compute an "optimal" set

23  of outputs for a given set of inputs in a flight control system.  As the Federal Circuit has explained, the

24  Step One "directed to" inquiry "ask[s] what the patent asserts to be the *focus* of the claimed advance

25  over the prior art," and whether that focus is on ineligible subject matter, such as an abstract idea.  *Yu*

26  *v. Apple Inc.*, 1 F.4th 1040, 1043 (Fed. Cir. 2021); *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838

27  F.3d 1253, 1257 (Fed. Cir. 2016) (holding that Step One "look[s] at the 'focus of the claimed advance

28  over the prior art' to determine if the claim's 'character as a whole' is directed to excluded subject

matter"). This inquiry "must focus on the language of the [a]sserted [c]laims themselves, considered in light of the specification." *Yu*, 1 F.4th at 1043 (citation omitted).

Here, the claims themselves make clear that their focus is a mathematical calculation. As shown above, the only steps in the independent claims are "receiving" inputs and "computing" an output, and the dependent claims do not change this focus. Further, the specification confirms that the "focus of the claimed advance" is a mathematical calculation; namely, one that computes an "optimal" set of outputs for a given set of flight command inputs. Ex. B ('099 Patent), 9:5–12. The specification concedes the existence of prior art mathematical approaches with the same optimization goal, including those that made "offline" calculations before flight and others that made "online" calculations during flight. *Id.* at 1:52–56, 8:61–65. But the specification contends that the claimed mathematical approach is better because the prior art "offline" calculations could not "determine in advance every [possible] combination" of outputs, and the prior art "online" calculations did not provide "optimal" solutions. *Id.* at 1:56–59, 8:66–9:3. The patent states that "[i]n contrast to [these] prior art approaches," the claimed approach "enables a workable optimal solution" that is "computed online . . . even under saturation or actuator failure conditions." *Id.* at 9:5–12.

Regardless of whether the claims actually provide an *improved* mathematical calculation, however,[4] the intrinsic record is clear that the claims' focus is an abstract idea—mathematically calculating an optimal set of outputs based on flight command inputs. It is well settled that claims like these, directed to "mathematical algorithms for performing calculations, without more, are patent ineligible under § 101." *In re Board of Trustees of Leland Stanford Junior Univ.*, 991 F.3d 1245, 1250 (Fed. Cir. 2021) ("*Stanford II*"); *see also In re Board of Trustees of Leland Stanford Junior Univ.*, 989 F.3d 1367, 1372 (Fed. Cir. 2021) ("*Stanford I*"). Indeed, the Federal Circuit has held that even "[t]he different use of a mathematical calculation, even one that yields different or better results, does not render patent eligible subject matter." *Stanford II*, 991 F.3d at 1251. Accordingly, in addition to the

---

[4]  Other portions of the specification concede that the allegedly improved mathematics were in fact known in the art. *See, e.g.*, Ex. B ('099 Patent), 9:26–31 (discussing P.B. Stark and R.L. Parker, "Bounded-Variable Least-Squares: an Algorithm and Applications," Computational Statistics 10:129–41 (1995)). The specification also states that "[m]any other optimization algorithms can be used," and "any optimization technique suitable to solve an optimization problem subject to one or more constraints may be used." *Id.* at 9:38–40, 11:9–12.

1    cases discussed in detail below, courts repeatedly have held ineligible claims whose claimed advance

2    focused merely on an abstract mathematical calculation, even if it was "groundbreaking, innovative, or

3    even brilliant." *See, e.g.*, *In re Gopalan*, 809 F. App'x 942, 943–44, 946 (Fed. Cir. 2020) (claims to a

4    "measurement strategy" that provided "an optimal combination of true positives and false positives"

5    and "optimal number of measurements"); *Stanford I*, 989 F.3d at 1373 (claims to the "abstract idea of

6    mathematically calculating alleles' haplotype phase").[5]   Furthermore, the Federal Circuit and other

7    courts, including this Court, have made clear that "'mathematical algorithms . . . are mental processes

8    within the abstract-idea category.'" *In re Rosenberg*, 813 F. App'x 594, 596 (Fed. Cir. 2020) (quoting

9    *Elec. Power Grp. v. Alstom S.A.*, 830 F.3d 1350, 1353 (Fed. Cir. 2016)); *PUREPREDICTIVE, Inc. v.*

10   *H20.AI, Inc.*, No. 17-cv-03049-WHO, 2017 WL 3721480, at *1 (N.D. Cal. Aug. 29, 2017), *aff'd*, 741

11   F. App'x 802 (Fed. Cir. 2018) (holding ineligible claims "directed to a mental process and the abstract

12   concept of using mathematical algorithms to perform predictive analytics").   This is consistent with the

13   long-held principle that "a method that can be performed by human thought alone is merely an abstract

14   idea and is not patent-eligible under § 101." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d

15   1366, 1373 (Fed. Cir. 2011).   Thus, even if the '099 Patent is assumed to disclose and claim an

16   improvement, it is not the kind that is eligible for patenting.

17             **a.      Controlling Authority Establishes That The '099 Claims Are Abstract**

18             Decades of controlling authority demonstrate that claims like those of the '099 Patent are

19   abstract.   Indeed, in *Parker v. Flook*, 437 U.S. 584, 585 (1978), the Supreme Court held that because

20   the "only novel feature" of the claims at issue was "a mathematical formula," the claims were not

21   patent-eligible.   The claims recited calculating "updated alarm limit[s]" by using a formula that

---

[5] *See also, e.g.*, *TDE Petroleum Data Solutions, Inc. v. AKM Enter., Inc.*, 657 F. App'x 991, 992 (Fed. Cir. 2016) (claims "to the abstract idea of 'storing data, receiving data, and using mathematics or a computer to organize that data and generate additional information'"); *Digitech Image Techs. v. Elecs. for Imaging*, 758 F.3d 1344, 1350 (Fed. Cir. 2014) (claims to the "process of organizing information through mathematical calculations"); *Coffelt v. NVIDIA Corp.*, No. 16-00457-SJO, 2016 WL 7507763, at *7 (C.D. Cal. June 21, 2016), *aff'd*, 680 F. App'x 1010 (Fed. Cir. 2017) (claims to "an abstract, mathematical algorithm" used to "deriv[e] a pixel color"); *TPP Tech LLC v. Zebra Techs. Corp.*, 403 F. Supp. 3d 382, 387 (D. Del. 2019) (claims to "the abstract idea of collecting information and analyzing that information using mathematical formulas"); *Health Discovery Corp. v. Intel Corp.*, No. 6:20-cv-666-ADA, 2021 WL 6116891, at *10 (W.D. Tex. Dec. 27, 2021) (claims to "improving a mathematical analysis" for pattern recognition).

Gibson, Dunn & Crutcher LLP

DEFENDANT'S RULE 12(c) MOTION REGARDING '099 AND '441 PATENTS
CASE NO. 3:21-CV-02450-WHO

required various inputs, such as an "original alarm base" and "appropriate margin of safety." *Id.* at 586. The Court held that, at most, the claims "simply provide[] a new and presumably better method for calculating alarm limit values," and that they otherwise "contain no patentable invention." *Id.* at 594. The Court further explained that "even if the [mathematical] solution is for a specific purpose, the claimed method is nonstatutory" and not patent-eligible. *Id.* at 595. Here, likewise, the '099 Patent merely claims a method and computer instructions for "computing" an allegedly improved solution, and thus contain no patentable invention.

Similarly, the Federal Circuit's holding in *SAP* is exactly on point. 898 F.3d at 1164–65. The court affirmed a grant of judgment on the pleadings on the basis of ineligibility, holding that the "focus of the claims" was "on selecting certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis." *Id.* at 1167. The court explained that this focus of the claims was "not any improved computer or network, but the improved" abstract "mathematical analysis" recited in the claims. *Id.* at 1168. Here, an improved mathematical analysis is exactly what the '099 Patent purports to claim, and it is ineligible.

Likewise, in *Stanford II*, the Federal Circuit held ineligible claims relating to the mathematical calculation of haplotype phase, which indicates "the parent from whom a gene has been inherited." 991 F.3d at 1247. The court held that the claims were "directed to the use of mathematical calculations and statistical modeling." *Id.* at 1250. The court rejected the patentee's argument that the "claim steps result in more accurate haplotype prediction." *Id.* at 1251. The court reasoned that even such an "improvement in computational accuracy" was "merely an enhancement to the mathematical calculation of haplotype phase itself," which is an ineligible abstract concept. *Id.* at 1250–51. Here, the '099 Patent does not claim anything more than an alleged enhancement to a calculation that yields an "optimal" solution allegedly not provided by prior art calculations. That is ineligible.

**b.   This Court's Decisions Confirm That Claims Like These Are Abstract**

The ineligibility of the '099 Patent claims is further confirmed by this Court's decisions applying Section 101. For example, in *PUREPREDICTIVE*, the Court granted dismissal on the basis that the asserted claims to a "predictive analysis factory" were ineligible. 2017 WL 3721480, at *1. The Court determined that the claims were directed to "the abstract concept of using mathematical

algorithms to perform predictive analytics." *Id.* at *5. The Court explained that the claims merely involved "generating learned functions or regressions from data" and then "tak[ing] the learned functions, evaluat[ing] their effectiveness, and select[ing] those most effective to create a rule set." *Id.* The Court held that "[t]hese are mathematical processes that not only could be performed by humans but also go to the general abstract concept of predictive analytics." *Id.*

Furthermore, in *Synopsys, Inc. v. Avatar Integrated Systems, Inc.*, this Court held ineligible claims to "statistical static timing analysis." No. 20-cv-04151-WHO, 2020 WL 6684853, at *8 (N.D. Cal. Dec. 22, 2020). The Court echoed the settled principle that "[m]athematical algorithms and methods of calculation are abstract concepts and are not patent eligible," and determined that the claims were directed to "a patent ineligible mathematical algorithm and/or improved method of calculation, namely a 'statistical analysis of information describing a circuit.'" *Id.* The Court rejected the patentee's assertion that the claims offered an "improved method." *Id.* at *9. The Court stated that, "as the Supreme Court made clear in *Flook*, 'a claim for an improved method of calculation, even when tied to a specific end use, is'" not patent-eligible. *Id.* (citing *Flook*, 437 U.S. at 595 n.18).

Here, like the ineligible claims in *Flook*, *SAP*, *Stanford II*, *PUREPREDICTIVE*, *Synopsys*, and similar cases, the '099 Patent claims at most "provide a new and presumably better method for calculating" an optimal set of outputs for a given set of flight command inputs.[6] *Flook*, 437 U.S. at 594–95. The claims also fail to specify how precisely to perform that calculation to obtain those outputs. The claims instead employ broad, functional language to merely "comput[e]" those outputs "to an extent practical" by "minimizing a weighted set of costs," for instance, without any other detail. *See Elec. Power*, 830 F.3d at 1350, 1356 (recognizing that "essentially result-focused, functional character of claim language has been a frequent feature of claims held ineligible under § 101"). In

---

[6] During prosecution of the '099 Patent application, even the U.S. Patent Office examiner recognized at Step One that at the core of these claims is an abstract concept, noting that they could "be said to fall within the group of abstract ideas of mathematical concepts." Ex. F (3/28/19 Notice of Allowability) at 3. The examiner, however, concluded—in a *single* sentence—that the claims nevertheless were patent-eligible because they applied the abstract mathematical concept "to control an aircraft." *Id.* This conclusion contravened the long-held principle that "limiting the use of an abstract idea to a particular technological environment"—here, aircraft control—is "not enough for patent eligibility." *Alice*, 134 S. Ct. at 2358 (citation and internal quotation marks omitted). Notably, the examiner also failed to make the central Step Two determination of whether the claims "amount[] to significantly more than a patent upon the [ineligible concept] itself," and what precisely that "significantly more" is. *Id.* at 2355.

Gibson, Dunn & Crutcher LLP

1    addition, the claims do not even specify who or what carries out these steps of "receiving" inputs and

2    "computing" outputs, which are undoubtedly basic functions that can be performed in the human mind.

3    *See CyberSource Corp.*, 654 F.3d at 1373 ("[A] method that can be performed by human thought alone

4    is merely an abstract idea and is not patent-eligible under § 101.").  The claims themselves recite no

5    particular requirements for performing these functions any differently from how a person could

6    perform the functions in their mind.  Thus, the claims are directed to a patent-ineligible abstraction.  *Id.*

7         Even assuming the claims adequately detail how to perform the abstract calculation, the

8    Supreme Court, Federal Circuit, and this Court have held that even "[t]he different use of a

9    mathematical calculation, even one that yields different or better results, does not render patent eligible

10   subject matter."  *Stanford II*, 991 F.3d at 1251 (improved method of calculating haplotype phase);

11   *Flook*, 437 U.S. at 594–95 (improved method for calculating updated alarm limits); *SAP*, 898 F.3d at

12   1167–68 (improved method of mathematically analyzing investment data); *PUREPREDICTIVE*, 2017

13   WL 3721480, at *5 (improved mathematical algorithms for performing predictive analysis); *Synopsys*,

14   2020 WL 6684853, at *7–8 (improved mathematical algorithm for performing statistical analysis of

15   information about a circuit).  That is because even improvements to abstract mathematical calculations

16   are themselves abstract, as they are merely an "enhancement" to an ineligible concept.  *Stanford II*, 991

17   F.3d at 1251–52.  The Federal Circuit has reiterated in numerous instances that simply "'[a]dding one

18   abstract idea . . . to another abstract idea . . . does not render the claim non-abstract.'"  *ChargePoint*,

19   920 F.3d at 771 (quoting *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017)).

20         **c.     Nothing In The '099 Claims Can Rescue Them Under Step One**

21         Furthermore, even if the claimed mathematical calculation may be for the "specific purpose"

22   or "tied to [the] specific end use" of flight control, it still does not cure the problem that the

23   mathematical calculation is wholly abstract.  *Flook*, 437 U.S. at 594–95; *Synopsys*, 2020 WL 6684853,

24   at *9.  It is well settled that limiting an abstract idea "to a particular technological environment," such

25   as flight control, "is not enough for patent eligibility."  *Alice*, 134 S. Ct. at 2358.

26         To be sure, Archer does not contend that all claims involving mathematical calculations are *per*

27   *se* ineligible.  In *Diamond v. Diehr*, 450 U.S. 175, 177, 185 (1981), for example, the Supreme Court

28   held that claims to a "process for molding raw, uncured synthetic rubber into cured precision products"

were patent-eligible even though "in several steps of the process a mathematical equation and a programmed digital computer [we]re used."  But the focus of the claims in *Diehr* was more than just a mathematical equation.  *See id.* at 184.  The Court distinguished those claims from the ineligible claims in cases like *Flook*, reasoning that the claims at issue used the mathematical equation to specifically "transform[] . . . an article, in this case raw, uncured synthetic rubber, into a different state or thing." *Id.*  The Court held that "[i]ndustrial processes such as this are the types which have historically been eligible to receive the protection of our patent laws."  *Id.*  Here, in contrast to the *Diehr* claims, the '099 Patent claims do not transform any article "into a different state or thing."  Instead, as their language makes clear, the claims merely involve "receiving a set of inputs" and "computing" an "optimal" set of outputs (and at most, "providing" information accordingly).  The claims end there. They require no specific technological improvements.

Accordingly, at the heart of the '099 Patent claims is no more than a purportedly improved mathematical calculation used to compute an "optimal" set of outputs for a given set of flight command inputs.  The claims therefore are directed to an ineligible abstract idea.

## 2.    *Alice* Step Two:  The '099 Patent Claims Lack Any Inventive Concept

Where a claim is directed to an abstract idea, it must recite an "inventive concept" that "amounts to *significantly more* than a patent upon the [abstract idea] itself."  *Alice*, 134 S. Ct. at 2355.  This inquiry ultimately is a "question of law."  *Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1363 (Fed. Cir. 2020).  "[C]onventional, routine and well understood applications in the art" are insufficient to confer an inventive concept. *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed. Cir. 2015).  In addition, as with Step One, Step Two "must focus on the language of the Asserted Claims themselves." *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1149 (Fed. Cir. 2016).  Thus, any features not recited in the claims "are irrelevant" to the "*Mayo/Alice* analysis." *Am. Axle & Mfg., Inc. v. Neapco Holdings LLC*, 967 F.3d 1285, 1293 (Fed. Cir. 2020).

Here, the claims of the '099 Patent recite no inventive concept beyond the abstract mathematical calculation discussed above, let alone anything that could constitute "significantly more" than that abstract concept.  The language of the claims confirms that they merely require "receiving a set of inputs" and "computing an optimal" set of outputs using that mathematical calculation.  The claims do

not require any specific improvements to the existing technology to "receive" the inputs, or to the technology used to calculate the "optimal" set of outputs.  Rather, the claims simply recite a generic "processor," which the specification refers to as "one or more" basic "devices, circuits, and/or processing cores configured to process data, such as computer program instructions."  Ex. B ('099 Patent), 2:42–44.  Thus, the broadly recited steps of "receiving" and "computing" "amount to" nothing more than "well-known, routine, and conventional steps taken when executing a mathematical algorithm" using "regular" and known technology.  *Stanford II*, 991 F.3d at 1251.

Furthermore, although dependent claims 21 and 22 recite "providing to each actuator . . . a respective control signal reflecting a corresponding actuator parameter determined for the actuator," the claims recite no specific technological improvement to "provide" that signal either.  Indeed, these claims require no specific manner by which to provide that signal.  They simply say "provide" it, with no guidance on how to do so.  That does not suffice for eligibility.  *See Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335, 1343 (Fed. Cir. 2018) (citation omitted) (holding that the ineligible claims "fail[] to recite a practical way of applying an underlying idea . . . [and] instead [a]re drafted in such a result-oriented way that they amount[] to encompassing 'the principle in the abstract' no matter how implemented"); *Elec. Power*, 830 F.3d at 1356; *see also Alice*, 134 S. Ct. at 2357 ("[T]ransformation into a patent-eligible application requires more than simply stat[ing] the [abstract idea] while adding the words 'apply it.'") (citation and internal quotation marks omitted).  This added step therefore "amount[s] to no more than conventional . . . post-solution activity" that is insufficient to provide an inventive concept.  *Am. Axle*, 967 F.3d at 1299.

Thus, the only potential advance that might be found within the language of the claims is the abstract mathematical calculation itself.  As explained above, there is not even any true improvement there, as the specification states that the least-squares approach it touts as a supposed improvement was in fact known in the art, and further states that the alleged invention is not even limited to that approach, but rather "any optimization technique suitable to solve an optimization problem subject to one or more constraints may be used."  Ex. B ('099 Patent), 9:26–31, 9:38–40, 11:9–12.  Regardless, even an improved mathematical calculation cannot save the claims from ineligibility because "[t]he abstract

idea itself"—here, the claimed mathematical calculation—"cannot supply the inventive concept." *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019).

Accordingly, the '099 Patent claims are no different from the ineligible claims in the cases discussed above. For instance, in *SAP*, the ineligible claims recited "various databases and processors," but it was "clear . . . from the claims themselves and the specification . . . that these limitations require[d] no improved computer resources." 898 F.3d at 1169. Similarly here, the specification confirms that the handful of generic components recited in the '099 Patent claims, such as a basic "processor," require no particular technological improvement. Because the '099 Patent claims do not "require or result in a specialized computer or a computer with a specialized . . . processor," it is—as the Federal Circuit noted in *Stanford II*—"hard to imagine a patent claim that recites hardware limitations in more generic terms than the terms employed by the claims." 991 F.3d at 1252. Furthermore, in *Synopsys*, the patentee argued at Step Two that the claims recited a "non-conventional and non-generic" "series of common mathematical operations," but this Court rejected that argument on the basis that "[t]he unique arrangement of mathematical operations" was not "significantly more" than the "abstract statistic analysis method . . . it *is* the method." *Synopsys*, 2020 WL 6684853, at *9. Here, Wisk similarly cannot argue that the '099 Patent claims derive an inventive concept from the claimed mathematical calculation because that calculation is the abstract idea itself, and therefore it cannot provide the requisite inventive concept. *Id.*; *see also Trading Techs.*, 921 F.3d at 1093.

### 3.    Wisk's Pleading Does Not Save The '099 Claims From Ineligibility

Wisk offers a handful of conclusory allegations in the Complaint, but they do not (indeed, cannot) save the claims from ineligibility. In any event, Wisk's allegations fail to tie the purported inventive concept to any aspect of the claims other than the abstract calculation itself.

For instance, Wisk alleges that the '099 Patent "introduced a flight control system capable of *optimizing* the flight control responses to achieve a desired result based on current conditions," and that this "online optimization approach introduces *greater efficiency* and allows for consistent control even under dynamic conditions." SAC ¶ 125. But Wisk identifies no improved technology found within the language of the claims to support this argument; indeed, Wisk identifies no particular technology at all. The precedent is clear, however, that the inquiry "must focus on the language of the Asserted

Claims themselves." *Synopsys*, 839 F.3d at 1149.  Focusing on that claim language, only the use of the mathematical calculation at the core of the '099 Patent claims—carried out using generic technology (i.e., a "processor") in its conventional manner—could possibly be credited with this purported "optimization" and "greater efficiency."  But as discussed above, use of a mathematical calculation is alone insufficient for eligibility even if that calculation is itself improved.  *Stanford II*, 991 F.3d at 1251; *PUREPREDICTIVE*, 2017 WL 3721480, at *5.

Wisk also concludes that "the '099 Patent cannot be considered to have been conventional, well-understood, or routine," and that a "person of ordinary skill in the art would have recognized that the invention of the '099 Patent includes a substantially inventive feature that advances the state of the art for flight control systems."  SAC ¶ 126.  Yet Wisk offers no support for this contention, in the intrinsic record or otherwise.  It is entirely conclusory.  The Federal Circuit has made clear that such "conclusory statements regarding eligibility" "d[o] not preclude dismissal."  *Cisco*, 813 F. App'x at 498–99; *see also In re Gilead*, 536 F.3d at 1055 (Ninth Circuit holding that "merely conclusory" allegations need not be accepted at pleading stage).  Nor does Wisk even attempt to substantiate this naked conclusion.  Indeed, Wisk's assertion directly *contradicts* the '099 Patent specification, which confirms that the "substantially inventive feature" of the claims is the purportedly improved mathematical calculation that computes an "optimal" set of outputs based on flight command inputs. Ex. B ('099 Patent), 9:5–12.  Thus, Wisk's baseless allegation cannot be credited as fact for purposes of this motion.  *Secured Mail*, 873 F.3d at 913 (holding that "a court need not accept as true allegations that contradict matters properly subject to judicial notice or by exhibit, such as the claims and the patent specification").  In any event, as discussed above, use of an abstract mathematical calculation alone is insufficient for eligibility.  *Stanford II*, 991 F.3d at 1251.

**B.    The Claims Of The '441 Patent Are Likewise Ineligible Under Section 101**

As with the '099 Patent claims, the focus of the '441 Patent claims is an abstract mathematical calculation.  Because the '441 Patent claims also require no specific technological improvement, they are not patent-eligible.

1.  *Alice* **Step One:  The '441 Patent Claims Are Directed To An Abstract Idea**

The '441 Patent claims are directed to the abstract idea of using a mathematical calculation to compute a set of outputs for a given set of inputs in a flight control system.  The claims thus fail Step One for at least the same reasons discussed with respect to the '099 Patent claims.  *Supra* Section IV(A)(1).

That the '441 Patent claims are written in the format of operations performed by a "flight controller" in an "aircraft" rather than a method (as in most of the asserted '099 Patent claims) does not change this conclusion.  It is well established that the form in which claims are drafted is not relevant to the patent-eligibility inquiry.  The Supreme Court explained in *Alice* that it "has long warn[ed] . . . against interpreting § 101 in ways that make patent eligibility depend simply on the draftsman's art."  *Alice*, 134 S. Ct. at 2360 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 132 S. Ct. 1289, 1303 (2012)); *see also Accenture Global Servs., GmbH v. Guidewire Software, Inc.*, 728 F.3d 1336, 1342 (Fed. Cir. 2013) (holding ineligible system claims that were not "meaningfully different" from ineligible method claims).

Adhering to this established principle, the Federal Circuit repeatedly has held ineligible not only method claims but also claims to physical systems, apparatuses, and devices.  *See, e.g.*, *SAP*, 898 F.3d at 1165 (claims to a "system for providing statistical analysis of investment information over an information network"); *ChargePoint*, 920 F.3d at 764, 763 (claims to "charging stations for electric vehicles"); *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d 1341, 1345 (Fed. Cir. 2019) (claims to a "movable barrier operator"); *iLife Techs., Inc. v. Nintendo of Am., Inc.*, 839 F. App'x 534, 535–36 (Fed. Cir. 2021) (claims to a "system within a communications device capable of evaluating movement of a body relative to an environment"); *Yu*, 1 F.4th at 1042 (claims to an "improved digital camera"); *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1358 (Fed. Cir. 2021) (claims to a "first gaming machine for transmitting/receiving data to/from a server"); *Sensormatic Elecs., LLC v. Wyze Labs, Inc.*, No. 20-2320, 2021 WL 2944838, at *1 (Fed. Cir. July 14, 2021) (claims to a "surveillance

1    system for wireless communication"); *PUREPREDICTIVE*, 2017 WL 3721480, at *2 (claims to "[a]n

2    apparatus for a predictive analytics factory").[7]

3         Here, although the words of the '441 Patent claims take the form of a system claim (an

4    "aircraft"), the subject matter to which the claims are directed is ineligible for the same reason as the

5    '099 Patent claims, because the claimed "aircraft" merely implements a mathematical calculation used

6    to compute a set of outputs for a given set of flight command inputs.  As with the '099 Patent claims,

7    the '441 Patent claims involve no more than "receiv[ing] flight control inputs" and "determin[ing]" a

8    "combination," or set, of outputs based on those inputs—without reciting any specific requirements

9    about how to obtain those "functional results."  *Compare* Ex. A ('441 Patent), 12:14–28, *with* Ex. B

10   ('099 Patent), 11:64–12:6; *Two-Way Media Ltd. v. Comcast Cable Commc'ns*, 874 F.3d 1329, 1337

11   (Fed. Cir. 2017) (holding ineligible claims that "require[d] the functional results of 'converting,'

12   'routing,' 'controlling,' and 'accumulating records,' but d[id] not sufficiently describe how to achieve

13   these results in a non-abstract way").  Furthermore, although the claims may recite a flight controller

14   "configured to" perform the recited steps, the claims offer no detail about precisely *how* to "configure"

15   the controller to perform those steps.  Instead, the claims merely recite "receiv[ing]" inputs,

16   "monitor[ing]" data, and "determin[ing]" a "solution space" and outputs.  And without reciting any

17   particular limitations for performing these basic functions, the claims require nothing more than

18   processes that a person could carry out in their mind.  *See CyberSource Corp.*, 654 F.3d at 1373 ("[A]

19   method that can be performed by human thought alone is merely an abstract idea and is not patent-

20   eligible under § 101").  In other words, the claims simply take these basic functions and say "apply it"

21   using a flight controller, which is wholly inadequate for patent eligibility.  *Alice*, 134 S. Ct. at 2357.

22        That the '441 Patent claims recite this concept in the context of an "aircraft" amounts to no

23   more than limiting the concept to a "particular technological environment," which is inadequate for

24   eligibility.  *Id.* at 2358; *Synopsys*, 2020 WL 6684853, at *9.  The claims do not purport to have invented

---

[7] *See also WhitServe LLC v. Donuts Inc.*, 809 F. App'x 929, 931 (Fed. Cir. 2020) (claims to a "device for automatically delivering professional services"); *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1325 (Fed. Cir. 2020) (claims to a "system for controlling access to a platform"); *Voter Verified, Inc. v. Election Sys. & Software LLC*, 887 F.3d 1376, 1385 (Fed. Cir. 2018) (claims to a "self-verifying voting system"); *Affinity Labs of Texas, LLC*, 838 F.3d at 1253, 1255, 1265 (claims to a "broadcast system").

a new aircraft or its components, or specifically improved those components in any way.  Finally, the claims add that this computation is made when a "lift fan" "has a failure."  Ex. A ('441 Patent), 12:20–21.  But again, that simply limits the concept to the technological environment where there is a lift fan failure, which is insufficient for eligibility.  *Alice*, 134 S. Ct. at 2358.  The claims recite no specific technological improvement required to compute a set of outputs in that particular context.

Finally, to the extent Wisk argues that the '441 Patent claims provide an improved "aircraft" as a result of performing this abstract calculation, the claims are still patent-ineligible because they do not even attempt to specify precisely *how* to make that calculation.  Instead, the claims simply state "determine" those outputs "within the solution space," without any other detail or particular requirements about how to achieve that result.  The Federal Circuit repeatedly has explained that claims "drafted in such a result-oriented way" are not patent-eligible because they merely "amount[] to encompassing 'the principle in the abstract' no matter how implemented."  *Interval Licensing*, 896 F.3d at 1343.  Here, because the '441 Patent claims merely recite "determine[] within the solution space" to describe the performance of the mathematical calculation, the claims "amount[] to encompassing" that abstract concept "no matter how implemented."  Accordingly, as with the claims of the '099 Patent, the claims of the '441 Patent are directed to an ineligible abstract idea.

### 2.  *Alice* Step Two:  The '441 Patent Claims Lack Any Inventive Concept

The claims of the '441 Patent lack any inventive concept for at least the same reasons discussed with respect to the '099 Patent claims.  *Supra* Section IV(A)(2).  The intrinsic record confirms that all of the components recited in the '441 Patent claims were well known and conventional.  The specification states that "material that is known in the technical fields related to the invention has not been described in detail so that the invention is not necessarily obscured."  Ex. A ('441 Patent), 3:1–3.  Notably, the specification does not describe in detail any of the components recited in the claims.  For instance, the specification broadly states that "actuators" can be preexisting "lift fans" or any "other structures capable of affecting aircraft altitude, motion, and/or orientation."  *Id.* at 1:37–40.  Similarly, the specification at most generically describes "sensors" as detecting and transmitting sensor data.  *See, e.g.*, *id.* at 1:19–21, 5:32–33.  In addition, the specification simply states that a "flight controller" is any

1  existing "flight control computer."  *Id.* at 7:39–41.  The claims themselves recite no specific

2  technological improvement to these preexisting components.

3         The intrinsic record also demonstrates conclusively that the claims of the '441 Patent involve

4  only well-known and conventional technology used in their routine manner.  *V-Formation*, 401 F.3d at

5  1311 ("[P]rior art cited in a patent . . . constitutes intrinsic evidence") (citation and quotation marks

6  omitted).  For instance, the '441 Patent cites U.S. Patent No. 4,469,294 ("Clifton"), which issued in

7  1984—decades before the effective filing date of the '441 Patent—and describes aircraft with wings

8  "equipped with identical lift fans" that "achieve vertical lift velocity."  Ex. D (Clifton), Abstract, 9:11–

9  14.  Clifton itself cites U.S. Patent No. 3,335,976, which issued in 1967—fifty years before the effective

10  filing date of the '441 Patent—and "shows an aircraft . . . incorporating lift fans."  *Id.* at 2:5–11.

11         The intrinsic record also makes clear that sensors have long been used for the function of

12  detection, including detecting actuator failure, and that flight controllers have long been used for the

13  same purpose as the '441 Patent—i.e., to account for an actuator failure.  For example, the '441 Patent

14  cites U.S. Patent No. 8,532,102 ("Shue"), whose PCT application was filed in 2010, over five years

15  before the effective filing date of the '441 Patent.  Shue describes sensors used to detect the functioning

16  of an actuator, including whether an actuator "remained at its failed position."  Ex. E (Shue), 9:19–22;

17  *see also id.* at Figure 4 (depicting "Aircraft Sensors" feeding into "Fault Detection and Diagnosis,"

18  which is part of the "Reconfiguration Control").  The '441 Patent also cites U.S. Patent No. 7,255,306

19  ("Jones"), which issued in 2007 and describes in detail known systems for "failure detection and flight

20  control reconfiguration systems."  Ex. C (Jones), 1:52–65, 13:29–33.  Clifton likewise discloses the

21  use of flight control to account for an actuator failure as far back as 1984.  The intrinsic record therefore

22  is replete with confirmation that using lift fans as "actuators," using sensors to detect lift fan failure,

23  and using a flight controller to compute actuator commands in the event of a lift fan failure, were all

24  well-known and conventional.

25         Thus, the only possible advance described in the specification is that the claimed mathematical

26  calculation "enables a workable *optimal solution* to be computed online within the required cycle time

27  even under saturation or actuator failure conditions."  Ex. A ('441 Patent), 9:21–23.  But, again, the

28  inquiry "must focus on the language of the Asserted Claims themselves," and the '441 Patent claims

1   do not even recite using the mathematical algorithm to obtain an *optimal* set of outputs.  *Synopsys*, 839

2   F.3d at 1149.  Indeed, the '441 Patent claims do not use the word "optimal" at all.  Even if they did, an

3   improved mathematical calculation is still not patent-eligible because it is abstract.  *See, e.g.*, *Stanford*

4   *II*, 991 F.3d at 1251 ("The different use of a mathematical calculation, even one that yields different or

5   better results, does not render patent eligible subject matter").

6       Accordingly, because the '441 Patent claims lack any inventive concept, they are not patent-

7   eligible and judgment on the pleadings should be granted on that basis.

8       **3.      Wisk's Pleading Does Not Save The '441 Claims From Ineligibility**

9       Wisk's conclusory allegations in the Complaint regarding the patent eligibility of the '441

10  Patent claims do not preclude judgment on the pleadings.  *Cisco*, 813 F. App'x at 498–99; *Dropbox*,

11  815 F. App'x at 538.  Wisk makes the unsupported assertion that the claims "provide an unconventional

12  solution."  SAC ¶ 129.  Wisk's only attempt at an explanation, however, is that, "[f]or example, claim

13  1 of the '441 Patent recites an aircraft with *actuators* in the form of lift fans, *sensors* capable of

14  detecting a failure in a lift fan, and a *flight controller* configured to *optimize* flight controls based on

15  whether a lift fan has experienced a failure-induced reduction in its capacity to generate lift."  *Id.*

16      All of these conclusory assertions should be rejected.  There is no evidence, in the intrinsic

17  record or otherwise, that the '441 Patent claims have invented lift fans or the use of them as actuators

18  for an aircraft, sensors to detect lift fan failure, or a flight controller to optimize flight controls in the

19  event of a lift fan failure.  Instead, as discussed above, the intrinsic record confirms that lift fans have

20  been used as actuators on aircraft for decades, and that sensors have long been known to perform the

21  function of detection, including detecting actuator failures.  *Supra* Section IV(B)(2).  Finally, Wisk's

22  assertion that the "flight controller" is configured to "optimize" flight controls is wholly divorced from

23  the language of the claims, which do not recite an "optimal" solution but rather just one that is

24  "practicable."  Thus, the Court should not credit Wisk's allegations.  *See, e.g.*, *Synopsys*, 839 F.3d at

25  1149 (holding that the patent-eligibility inquiry "must focus on the language of the Asserted Claims

26  themselves").  And, in any event, Wisk offers no support for its allegations.  Again, the only possible

27  advance mentioned in the specification is the purportedly improved mathematical calculation, which

28  is itself abstract and thus cannot confer eligibility.  *Supra* Section IV(A)(1).

1   **C.     The '099 And '441 Claims Are Ineligible Under Either Party's Proposed Construction**

2          Finally, while the parties dispute the construction of four claim terms in these two patents, the

3   outcome of those disputes has no bearing on the patent-eligibility inquiry here, and thus there is no

4   need to defer this motion until after claim construction. *See Content Extraction*, 776 F.3d at 1349

5   ("[C]laim construction is not an inviolable prerequisite to a validity determination under § 101"). For

6   instance, Archer contends that certain claim terms using the words "practical" and "practicable" are

7   indefinite under Section 112, but their indefiniteness does not impart eligibility under Section 101, and

8   instead is a separate and additional reason why the claims are invalid. Nor can Wisk argue that this

9   motion should be deferred pending claim construction, given that Wisk's position is that these terms

10  (and the disputed term "optimal mix") do not require construction at all. *See* Dkt. 196 at 17–25. The

11  only remaining claim term in dispute from these patents is the term "lift fans" recited in claim 1 of the

12  '441 Patent. While Wisk proposes that they should be construed as being "configured to provide lift,"

13  Archer proposes that they should be construed as being "installed only for vertical thrust." *Id.* at 7:8–

14  11. The Court's adoption of either party's proposed construction (or the Court's own construction)

15  will not impact the patent-eligibility analysis here because lift fans were, as discussed above, decidedly

16  well known in the art and conventional. *Supra* Section IV(B)(2)–(3).

17                                    **V.  CONCLUSION**

18         For the foregoing reasons, Archer respectfully asks the Court to hold that the claims of the '099

19  Patent and '441 Patent are ineligible under 35 U.S.C. § 101, and therefore grant judgment on the

20  pleadings to Archer under Federal Rule of Civil Procedure 12(c) with respect to Counts VII and VIII

21  of Wisk's Second Amended Complaint by dismissing those counts with prejudice.

22  DATED:  January 19, 2022              GIBSON, DUNN & CRUTCHER LLP
23
24                                       By:     */s/ Stuart M. Rosenberg*
25                                               Stuart M. Rosenberg

26                                       *Attorneys for Defendant Archer Aviation Inc.*
27
28

Gibson, Dunn & Crutcher LLP