GIBSON, DUNN & CRUTCHER LLP
Josh A. Krevitt, SBN 208552
  jkrevitt@gibsondunn.com
Joshua H. Lerner, SBN 220755
  jlerner@gibsondunn.com
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: 650.849.5300
Facsimile: 650.849.5333

Orin Snyder, *admitted pro hac vice*
  osnyder@gibsondunn.com
Daniel J. Thomasch, *admitted pro hac vice*
  dthomasch@gibsondunn.com
200 Park Avenue
New York, NY  10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Wayne Barsky, SBN 116731
  wbarsky@gibsondunn.com
Michael H. Dore, SBN 227442
  mdore@gibsondunn.com
Diana M. Feinstein, *admitted pro hac vice*
  dfeinstein@gibsondunn.com
2029 Century Park East, Suite 4000
Los Angeles, CA  90067-3026
Telephone: 310.552.8500
Facsimile: 310.551.8741

Attorneys for Defendant and Counterclaimant
Archer Aviation Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| WISK AERO LLC, | CASE NO. 3:21-cv-02450-WHO |
| Plaintiff, | **DEFENDANT ARCHER AVIATION INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |
| v. | |
| ARCHER AVIATION INC., | |
| Defendant. | **Hearing:**<br>**Date: March 4, 2022**<br>**Time: 2:00 PM**<br>**Judge: The Honorable William H. Orrick** |

Gibson, Dunn &
Crutcher LLP

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................................................................... 1

II. BACKGROUND ..................................................................................................................... 2

    A.    The '036 Patent ............................................................................................... 2

    B.    The '033 And '328 Patents ............................................................................. 3

    C.    The '099 And '441 Patents ............................................................................. 4

III. LEGAL STANDARD ............................................................................................................ 7

IV. ARGUMENT REGARDING DISPUTED CLAIM TERMS ................................................ 7

    A.    "lift fans" / "lift rotors" ('036 Patent Claim 1; '441 Patent Claim 1) ........... 7

    B.    "battery sub-module" ('033 Patent Claims 1, 10, 19; '328 Patent Claims 1, 6, 11) ................................................................................................................. 11

    C.    "discharge-related fault" ('328 Patent Claims 1, 6, 11) ............................... 15

    D.    "computing an optimal mix of actuators and actuator parameters to achieve to an extent practical the requested forces and moments, including by minimizing a weighted set of costs…" ('099 Claims 1, 26) ......................................... 17

    E.    "computing an optimal mix of actuators and actuator parameters to achieve to an extent practical the requested forces and moments, including by minimizing a weighted set of costs…" ('099 Claims 1, 26) ......................................... 21

    F.    "determine, within the solution space, a combination of the actuators and associated actuator parameters to apply the set of forces and moments to the aircraft to an extent practicable with the failure induced reduced capacity of the at least one of the lift fans" ('441 Claim 1) ................................................. 24

V. CONCLUSION ...................................................................................................................... 25

ARCHER'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. 3:21-CV-02450-WHO

Gibson, Dunn &
Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

## CASES

*BASF Corp. v. Johnson Matthey Inc.*,
  875 F.3d 1360 (Fed. Cir. 2017).................................................................................24

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed. Cir. 2018).................................................................................22

*Bicon, Inc. v. Straumann Co.*,
  441 F.3d 945 (Fed. Cir. 2006)...................................................................................11

*Datamize, LLC v. Plumtree Software, Inc.*,
  417 F.3d 1342 (Fed. Cir. 2005).................................................................................23

*Halliburton Energy Servs., Inc. v. MI LLC*,
  514 F.3d 1244 (Fed. Cir. 2008).................................................................................20

*Intel Corp. v. Tela Innovations, Inc.*,
  No. 3:18-CV-02848-WHO, 2019 WL 5697922 (N.D. Cal. Nov. 4, 2019)...................23

*Intell. Ventures I LLC v. T-Mobile USA, Inc.*,
  902 F.3d 1372 (Fed. Cir. 2018).................................................................................23

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014).................................................................2, 21, 22, 25

*K-2 Corp. v. Salomon S.A.*,
  191 F.3d 1356 (Fed. Cir. 1999).................................................................................10

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)...................................................................................................23

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005).........................................................1, 7, 14, 18, 19

*In re Power Integrations, Inc.*,
  884 F.3d 1370 (Fed. Cir. 2018).................................................................................11

*Renishaw PLC v. Marposs Societa' per Azioni*,
  158 F.3d 1243 (Fed. Cir. 1998).................................................................................19

*Shire Dev., LLC v. Watson Pharm., Inc.*,
  787 F.3d 1359 (Fed. Cir. 2015).................................................................................16

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
  511 F.3d 1132 (Fed. Cir. 2007).................................................................................18

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Starhome GmbH v. AT&T Mobility LLC*,
   743 F.3d 849 (Fed. Cir. 2016)..........................................................................................8

*SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*,
   336 F.3d 1298 (Fed. Cir. 2003)......................................................................................14

*Symantec Corp. v. Comput. Assocs. Int'l, Inc.*,
   522 F.3d 1279 (Fed. Cir. 2008)......................................................................................18

*Taurus IP, LLC v. DaimlerChrysler Corp.*,
   726 F.3d 1306 (Fed. Cir. 2013)..............................................................................10, 19

### REGULATIONS

14 C.F.R. 36.1(i) ................................................................................................................9

Gibson, Dunn &
Crutcher LLP

# I.  INTRODUCTION

Archer respectfully submits this brief in response to Wisk's opening brief on claim construction. Dkt. 196.  There are six terms in dispute.  Four of the terms have objective, specific meanings in the art and are used in the patents according to those specific meanings.  Archer proposes to construe the terms accordingly, and Archer's constructions are supported by both the intrinsic record and the relevant extrinsic evidence.  Wisk, by contrast, is seeking to broaden each of these four terms far beyond their plain and ordinary meanings, and beyond their use in the intrinsic record, to cover subject matter that is not only outside the scope of the claims but also not described or enabled in the relevant specifications.

For example, the '036 Patent requires a specific kind of rotor called a "lift rotor" to be mounted on the forward end of a boom.  Wisk knows that Archer does not have a "lift rotor" mounted on the forward end of a boom.  So Wisk is trying to broaden the term "lift rotor" beyond its ordinary meaning to cover an entirely different kind of rotor used by Archer—a "tilt rotor"—contrary to the evidence showing a clear distinction between those two terms.  Similarly, the '099 Patent claims an "optimal" solution to a math problem, yet Wisk seeks to construe "optimal" so broadly that it would cover, in the words of Wisk's opening brief, "something other than a 'true' optimal solution."  Dkt. 196 at 18.  Wisk takes the same improper approach to the '033 and '328 Patents, which require testing a "battery sub-module" for a "discharge-related fault."  Both of these terms have specific meanings in the art and are used in the patents accordingly.  But Wisk knows that Archer does not test "battery sub-modules" for "discharge-related faults," so Wisk is trying to broaden each of these terms far beyond the scope of its plain meaning in the patents, in an attempt to cover totally different aspects of battery technology that are not actually claimed.  In all of these instances, Wisk's positions violate the core principles for claim construction set forth in *Phillips*, and should be rejected.  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1312–15 (Fed. Cir. 2005) (en banc).

The final two terms in dispute, by contrast, do not have objective and clear meanings in the art or in the intrinsic record, and instead are indefinite under Section 112.  In the '099 Patent, the claims recite mathematical solutions that can be used in flight control to achieve a requested outcome "to an extent *practical*."  The '441 Patent similarly claims solutions that can be used to achieve an outcome

"to an extent *practicable*."  But whether a flight control solution is "practical" (or "practicable") is a highly subjective inquiry, and the evidence shows that different people in the art will have different views about what is "practical" or "practicable" in any given circumstance.  The '099 and '441 Patents never provide an *objective* standard for making that determination, and Wisk's own arguments confirm that there is none.  Therefore the boundaries of the claims are fatally unclear, and the Court should find that the asserted claims of the '099 and '441 Patents are indefinite.  *See, e.g.*, *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014) ("[T]here is an indefiniteness problem if the claim language 'might mean several different things and no informed and confident choice is available among the contending definitions[.]'" (cleaned up)).

## II.  BACKGROUND

### A.     The '036 Patent

U.S. Patent No. 10,364,036 ("the '036 Patent") is entitled "Multicopter with Boom-Mounted Rotors."  Ex. A.[1]  In the "Background of the Invention" section of the specification, the '036 Patent explains that "[m]ulticopter aircraft typically include a plurality of *horizontally oriented rotors, sometimes referred to as 'lift fans,'* to provide lift, stability, and control."  *Id.* at 1:6–8.  The specification explains that in addition to "lift fans," an aircraft can also have other, different kinds of actuators including "propellers, control surfaces, such as ailerons, etc."  *Id.* at 1:14–15.  For example,



FIG. 2A

in Figure 2A of the patent, the "propeller" of the aircraft, which is numbered 210 in the Figure as highlighted in blue here, is an actuator that is "configured to push the aircraft through the air in the *forward* (e.g., x axis) direction."  *Id.* at 4:23–25.  By contrast, the "lift fans," which are numbered 208 in the Figure as highlighted in orange, are the actuators that "produce[] *vertical* thrust."  *Id.* at 4:13–15.

The '036 Patent identifies a concern with multicopter aircraft, which is that "[r]otors may spin at a high rate and could pose a risk to an occupant of a manned multicopter and/or to equipment housed

---

[1]  Lettered Exhibits A–O were submitted by Wisk with its opening brief at Dkt. 196.  Numbered exhibits are being submitted by Archer with this response brief.  All emphasis herein is added except where otherwise noted.

in a fuselage or other structure comprising the multicopter." *Id.* at 1:41–44.  For example, with a "lift fan," which is "horizontally oriented" as the patent states above, there is a risk that "debris thrown centrifugally from the rotor"—*i.e.*, thrown horizontally away from the center of the lift fan—"would hit the fuselage or other structure." *Id.* at 6:10–14.  To address this concern, the specification proposes mounting the "lift fans" on booms angled at a "non-zero angle off of a horizontal plane," with the angle being selected "at least in part to ensure that a plane in which in which the rotor primarily rotates does not intersect the fuselage and/or a human or other occupied portion thereof." *Id.* at 2:47–56.  The specification states that this approach can "increase the likelihood that debris thrown centrifugally from a lift fan, e.g., should the lift fan break apart, would be propelled on a trajectory and/or in a plane that does *not* intersect a human-occupied portion of fuselage." *Id.* at 5:5–11.  The specification also states that mounting lift fans at angles can "provide the ability to use the rotors to control yaw of the aircraft (i.e., rotation around the vertical axis)." *Id.* at 2:56–64.

The claims of the '036 Patent recite an aircraft with "lift rotors" that are mounted on the forward and after ends of booms. *Id.* at 8:16–9:2.  The parties have proposed competing constructions for the claim term "lift rotors," addressed in the argument section below.

**B.     The '033 And '328 Patents**

U.S. Patent Nos. 10,110,033 ("the '033 Patent") and 10,333,328 ("the '328 Patent") are related to each other and are both entitled "Multi-battery charging station which selectively connects battery sub-modules to a common power bus for charging."  The "Background of the Invention" section of the specification explains that new types of aircraft are being developed "that rely solely upon battery power," and asserts that new systems suitable for all-electric aircraft are needed because existing systems "designed for other products" are inadequate. Ex. B ('033 Patent) at 1:8–13.  The patents then propose allegedly novel ways of charging "battery sub-modules."

For example, the specification discusses charging battery sub-modules based on metrics such as voltage, current, temperature, and the state of charge (*i.e.*, a percentage associated with the degree of charge). *Id*. at 5:7–6:35.  The metrics "are used to select which battery sub-modules" to charge. *Id.* at 5:9–13.  Some of the metrics (current, temperature, and state of charge) relate to conditions at the *sub-module level*, but the voltage metric relates to conditions at the *cell level*, which is more granular.

Gibson, Dunn &
Crutcher LLP

ARCHER'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. 3:21-CV-02450-WHO

*Id.* at 6:4–9 ("The metrics in column 316 are the minimum cell voltages for each of the battery sub-modules … these voltages are at the cell level and represent the minimum voltage of a cell within a particular battery sub-module").  The claims of the '033 Patent relate to this disclosure, and recite systems and methods where metrics are collected from each "battery sub-module" and are used to determine certain aspects of the charging process, such as the charging current.  *Id.* at 14:47–22:47.

The specification also discusses performing safety checks on the battery sub-modules and selectively disconnecting a particular battery sub-module from a common power bus if metrics indicate the battery sub-module is in a "fault condition."  *Id.* at 6:40–7:47.  "Generally speaking, a fault condition is a safety check to ensure none of the battery sub-modules will be damaged and/or cause damage if charged."  *Id.* at 6:52–54.  The specification identifies several different kinds of fault conditions, including fault conditions related to voltage, temperature, and state of charge (*id.* at 6:40–7:47), as well as a fault condition that can arise when a battery sub-module is "completely discharged" for a relatively long period of time.  This "completely discharged" fault condition may exist "even though temperature and/or voltage checks may be satisfied."  *Id.* at 6:54–62.  In other words, the specification makes clear that a battery sub-module can have a discharge-related fault even if there is no temperature or voltage fault.  *Id.*  The claims of the '328 Patent relates to this disclosure, and recite systems and methods for determining whether a particular battery sub-module has a "discharge-related fault"; if so, the sub-module with the discharge-related fault is selectively disconnected from the common power bus so that it is not charged, while the non-faulty sub-modules remain connected and are charged.  Ex. C ('328 Patent) at 14:58–18:26.

The parties have proposed competing constructions for the terms "battery sub-module" and "discharge-related fault," addressed in the argument section below.

## C.    The '099 And '441 Patents

U.S. Patent No. 10,370,099 ("the '099 Patent) and 11,034,441 ("the '441 Patent) are related to each other and are both entitled "Online optimization-based flight control system."  These patents relate to the field of flight control, and more specifically to mathematical computations that can be used for flight control.  As reviewed in Archer's motion for judgment on the pleadings regarding Section 101, the claims of these two patents are directed to math and abstract ideas performed on conventional

Gibson, Dunn &
Crutcher LLP

equipment such as processors and flight controllers. *See* Dkt. 201. The specification acknowledges in its "Background of the Invention" that flight controllers were known in the art for receiving inputs from pilot controls and sensors, and for using those inputs to compute outputs for controlling the rotors and other actuators of an aircraft: "Flight control systems (sometimes referred to as 'flight controllers') translate inputs received from manually operated pilot controls . . . referred to collectively herein as 'inceptors', and/or inputs from one or more sensors (e.g., air speed) into commands to the flight control assets of the aircraft." Ex. D ('099 Patent) at 1:6–30.

While flight controllers were already known, the specification states that there was a problem with the *math* used by flight controllers—it was not refined enough to compute the *best* output for a given set of inputs. In the specification's own words, "[f]or a given set of one or more pilot commands under given circumstances, some combinations of actuators capable of acting on the aircraft to achieve the result indicated by the pilot command(s) may be more effective and/or efficient than others." *Id.* at 1:40–45. Thus, as Wisk admits in its opening brief, the goal of these patents is "to *calculate* an *optimal* mix of aircraft actuators that most efficiently and effectively control flight of an aircraft." Dkt. 196 at 5. The specification discusses various mathematical approaches to this problem, including calculating sets of efficient solutions "offline" (before flight), and alternatively calculating solutions "online" (during flight) by using various algorithms. Ex. D. at 2:61–11:54.

Contrary to Wisk's characterization, however, the patents do not purport to have invented "online" (*i.e.*, real-time) calculation as an improvement over "offline" (*i.e.*, stored) calculation. Rather, the specification states that *both* "offline" and "online" calculations were already known in the art, but criticizes all of the known mathematical approaches on the ground that supposedly they did not provide the truly "optimal" solution. For example, the specification states that "offline" calculations "typically did not find a *true optimal solution (minimum cost)* in any given real world set of inputs and conditions." *Id.* at 8:58–61. The specification does *not* say that "online" approaches necessarily solve this problem. Rather, the specification acknowledges that certain "online" calculations were already known in the art as well, but criticizes the *math* used for those calculations because it did not provide an "optimal" solution either. In the specification's own words, "[o]nline approximate optimization approaches are believed to have been attempted using other objective functions and other techniques,

such as pseudo-inverse or cascaded pseudo-inverse approach." *Id.* at 8:61–65.  But according to the specification, the prior-art "pseudo-inverse" approach did not provide the best solution because it "d[id] not handle the case in which one or more actuators (e.g., lift fans) reach an upper limit of their capacity/effectiveness." *Id.* at 8:66–9:3.  And even though the prior-art "cascaded pseudo-inverse" approach "attempt[ed] to mitigate that problem," the specification states that it still "d[id] not provide an actual *optimal* solution" and thus was allegedly deficient. *Id.* at 9:3–5.

In contrast to these prior-art approaches, the specification of the '099 and '441 Patents purports to describe an improved mathematical approach that provides an "optimal" solution not provided by the prior art.  The specification states that "[i]n contrast to prior approaches, the quadratic program/least squares approach disclosed herein, in which different weights are applied to give priority to certain axes when one or more actuators are saturated, and which allows constraints to be defined and enforced, *enables a workable optimal solution to be computed* online within the required cycle time even under saturation or actuator failure conditions." *Id.* at 9:5–12.

Despite tying this alleged improvement to the "quadratic program/least squares" technique, however, the specification goes on to state that "other optimization techniques may be used" instead, as long as they "find an *optimal* solution." *Id.* at 11:1–5.  And despite touting the benefits of the alleged invention for "online" computations, the specification states that embodiments of the alleged invention can include "offline processing" as well, as long as they are used to "precompute *optimal* solutions" before flight and store them "in a lookup table or other data structure." *Id.* at 11:21–34.

The claims of the '099 Patent recite "computing an optimal mix of actuators and associated actuator parameters," and doing so by "minimizing a weighted set of costs." *Id.* at 11:62-:14:24.  The parties have proposed competing constructions for this claim language, and for the term "lift fans." The claims of the '099 Patent also recite that even though the claimed mix must be "optimal," it must only be "optimal" to achieve a result "to an extent *practical*."  The parties dispute whether this limitation, and a similar limitation in the '441 claims (achieving a result "to an extent *practicable*") are indefinite under Section 112.  These disputes are addressed in the argument section below.

### III.  LEGAL STANDARD

Claim terms are "generally given their ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (citation and quotation marks omitted).  To ascertain that meaning, the Court should look to the claims themselves, the specification, prosecution history, and extrinsic evidence to the extent it does not contradict the intrinsic record.  *Id.*  Archer understands that the Court is familiar with this process, and Archer addresses specific principles where relevant below.

### IV.  ARGUMENT REGARDING DISPUTED CLAIM TERMS

**A.**    **"lift fans" / "lift rotors" ('036 Patent Claim 1; '441 Patent Claim 1)**

| WISK'S CONSTRUCTION | ARCHER'S CONSTRUCTION |
|---|---|
| "fans configured to provide lift" / "rotors configured to provide lift" | "a fan installed only for vertical thrust" / "rotor installed only for vertical thrust" |

The dispute between the parties is whether "lift fans" / "lift rotors" should be construed to refer to the actual class of structures identified in the patents and known in the art by that name—*i.e.*, fans installed only for vertical thrust, not forward thrust, which is exactly how "lift fan" is used in the specification and defined in the relevant technical dictionary—or whether Wisk should be permitted to expand the claims beyond their plain meaning by reading this term onto any fan or rotor whenever it is configured to provide lift.  Under *Phillips*, the answer is clear.  Archer's construction is correct because it aligns with the intrinsic record and the plain meaning in the art, while Wisk's construction does not.

First, the specifications of both the '036 and the '441 Patents—which date back to the same filing date in 2016 and contain much overlapping disclosure—make clear that "lift fans" and "lift rotors" refer to a known class of structures in the art, defined by the fact that they are "horizontally oriented" when in use and thus are installed specifically to provide vertical thrust (*i.e.*, lift), as opposed to forward thrust.  In the "Background of the Invention" section, the '036 Patent states this point unambiguously:  "Multicopter aircraft typically include a plurality of *horizontally oriented rotors, sometimes referred to as 'lift fans,'* to provide lift, stability, and control."  Ex. A at 1:6–8.  Likewise, the "Background of the Invention" section of the '441 Patent distinguishes explicitly between "sources of *forward thrust*, such as propellers or jet engines" on the one hand, and "powered sources of *lift* such as rotors or lift fans" on the other hand.  Ex. E at 1:22–30.  Both of the specifications also illustrate this

distinction using a figure, shown above in the background section regarding the '036 Patent, with the accompanying disclosure that the "propeller" of the aircraft is an actuator that is "configured to push the aircraft through the air in the *forward* (e.g., x axis) direction," while the "lift fans" are the actuators that "produce[] *vertical* thrust." Ex. A at Figure 2A and 4:13-25; Ex. E at Figure 2A and 6:8–16; *see also* Ex. E at 1:24–40 (listing different classes of actuators, including "propellers," "lift fans," and "aerodynamic control surfaces").

Second, the extrinsic evidence confirms that the term "lift fan" was known in the art to refer to a specific class of structures installed specifically for vertical thrust, not forward thrust, and that therefore the '036 and '441 Patents use this term consistent with its ordinary meaning, which is exactly how Archer proposes to construe it. The Cambridge Aerospace Dictionary contains two definitions of "lift fan," both of which state explicitly that a "lift fan" is a structure "installed *only for lift*." *See* Ex. 1 (Second Edition, 2009), at 381 ("lift fan") (definition one: "Turbofan of HBPR [high bypass ratio] *installed only for lift thrust*"; definition two: "Free-running fan driven by tip turbine from external gas supply *installed only for lift*").

Wisk does not mention these definitions anywhere in its opening brief, let alone attempt to distinguish them, even though they are squarely on point and were provided to Wisk during the meet-and-confer process leading up to the filing of Wisk's brief. In fact, they are the most recent technical definitions in the record for this term before the filing dates of these two patents, and thus are the most relevant to establish the ordinary meaning of "lift fan" to a person of skill in the art at the relevant time. *See, e.g.*, *Starhome GmbH v. AT&T Mobility LLC*, 743 F.3d 849, 856 (Fed. Cir. 2014) (looking to technical dictionaries to determine whether a claim term "had a well-understood meaning in the art *at the time the patentees filed the application*"). By contrast, Wisk cites two different dictionaries from other time periods, neither of which is as relevant as the definitions above. Dkt. 196 at 9–10. But Wisk's definitions do not contradict Archer's construction in any event, as they do not state that a "lift fan" includes structures installed for forward thrust. Instead, they merely state that a "lift fan" can be "swiveled" or "pivoted" up and down (*id.*), which may refer to moving a lift fan out of the way when

it is *not in use*.[2]  The '036 Patent discloses a similar concept, which is that a lift fan may be positioned to reduce the amount of drag it creates when it is *not being used*, *i.e.* during forward flight.  *See, e.g.*, Ex. A at 7:27–32 (discussing positioning lift fans "to minimize drag, turbulence, or other undesirable aerodynamic effects of the lift fans when the aircraft 200 is in forward flight, e.g. being propelled by push propeller 200").

Thus, all of the extrinsic and intrinsic evidence is consistent in demonstrating that "lift fans" / "lift rotors" are a defined class of structures dedicated to vertical thrust, as opposed to forward thrust.  Wisk's proposed construction is wrong because it would *expand* these terms beyond their ordinary meaning in this context, and would incorrectly read them on any rotor that is configured to provide vertical thrust, including rotors that the evidence shows are *not* "lift rotors."  For example, the Cambridge Aerospace Dictionary explains that there is a *different* class of rotors that are installed for both lift and forward thrust—they are called "tilt rotors," not "lift rotors" or "lift fans."  Ex. 1 at 701 (defining "tilt rotor" as "[a] rotor arranged to operate with axis vertical or horizontal").  By definition, these are two distinct and mutually exclusive categories.  A "tilt rotor" cannot be a "lift fan," because a "tilt rotor" is not "installed only for lift" as required by the definition of "lift fan."  Rather, by definition a "tilt rotor" is installed for both lift and forward thrust, *i.e.* for operation "with axis vertical or horizontal."  *Id.*  Wisk's construction would conflate these two mutually exclusive categories, and would incorrectly read the term "lift fan" on a whole class of structures that the term does not cover.

Indeed, this distinction is even codified in the Code of Federal Regulations for the aviation industry, which defines "Tiltrotor" aircraft and explains that they have rotors which "vary in pitch from near vertical to near horizontal configuration relative to the wing and fuselage."  14 C.F.R. 36.1(i).  That is fundamentally different from a "lift rotor," which the patents themselves confirm is "horizontally oriented" and does not operate in a vertical configuration (*i.e.*, does not provide forward thrust).  Wisk should not be permitted to expand the scope of the terms "lift fans" / "lift rotors" beyond their ordinary meaning to cover an entirely different category of rotors that Wisk did not recite in its

---

[2]  *See, e.g.*, Ex. 2 (Christopher Silva & Wayne Johnson, VTOL Urban Air Mobility Concept Vehicles for Technology Development) at 7 ("the rotors for lift are separate from those used for propulsion, and *the lift rotors are not used* (stopped and aligned with flow) during cruising flight.").

ARCHER'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. 3:21-CV-02450-WHO

Gibson, Dunn &
Crutcher LLP

claims.  Rather, as the Federal Circuit has held repeatedly, the Court must "give effect to the terms chosen by the patentee" and cannot "rewrite claims" as the patentee wishes they were written.  *Taurus IP, LLC v. DaimlerChrysler Corp.*, 726 F.3d 1306, 1321 (Fed. Cir. 2013) (quoting *K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999)).

Finally, Wisk's arguments against Archer's construction are unpersuasive.  Wisk argues that Archer is "narrowing the scope" of these terms by adding a "negative limitation."  Dkt. 196 at 7–8.  But to the contrary, Archer is construing these terms according to their full ordinary meaning in the context of the patents, as demonstrated above, and is not narrowing them or adding any limitations to them.  The phrase "installed only for vertical thrust" in Archer's construction comes directly from the plain and ordinary meaning of "lift fan," as reflected in the relevant technical dictionary, and is fully consistent with the usage of "lift fans" / "lift rotors" in the intrinsic record.  It is not a negative limitation in the legal sense, but rather is the meaning of the term itself.  By analogy, the term "prime number" has an ordinary meaning of "number divisible *only* by itself and one"; the word "only" is not a negative limitation but rather is a part of the ordinary meaning.  Thus, Wisk's cases are simply inapposite.

Likewise, Wisk argues that Archer's construction is inconsistent with the alleged "angling" invention disclosed in the patents (but claimed only in the '036 Patent).  *Id.* at 8–9.  But Wisk gets this exactly backwards.  The patents describe this alleged invention as taking structures that by definition are dedicated to vertical thrust ("horizontally oriented rotors"), and mounting them at an allegedly novel set of angles to achieve an allegedly improved result.  *See* Ex. A at 1:6–8; 2:47–64.  That disclosure merely confirms the importance of construing "lift fans" / "lift rotors" according to their ordinary meaning, since that is a foundational aspect of the alleged invention.  By analogy, if an invention involves multiplying prime numbers by one hundred to generate larger numbers, the fact that the larger numbers are divisible by one hundred does not change the meaning of "prime number" to make it broader than it already was, *e.g.* to make it "number divisible by itself and one" rather than "number divisible *only* by itself and one."  Therefore Wisk's arguments are unpersuasive.

## B.   "battery sub-module" ('033 Patent Claims 1, 10, 19; '328 Patent Claims 1, 6, 11)

| WISK'S CONSTRUCTION | ARCHER'S CONSTRUCTION |
|---|---|
| "a component of a battery system, that includes a battery management system and a switch" | "a container of two or more cells that is a sub-part of a module, which in turn may be combined with other modules to make up a battery pack." |

The dispute here is whether "battery sub-module" has its ordinary meaning in the hierarchy of battery terminology, as Archer proposes, or whether Wisk should be permitted to broaden the term beyond its ordinary meaning to cover any "component" at any level of a large system, from a single cell all the way up to an entire multi-module battery or pack.[3]  Archer's construction faithfully reflects how a person of skill would understand the term "battery sub-module," and is supported by the intrinsic record, relevant textbooks, technical publications, industry material from leading manufacturers, and Wisk's own documents.  Wisk's construction contradicts all of these sources.

First, starting with claim term itself, the word "sub-module" conveys that a "battery sub-module" is different from, and *smaller than*, a "battery" or a "battery module."  *See, e.g.*, Ex. 3 (Hofmann Decl.), ¶ 43.  Archer's construction correctly honors that requirement by explaining that a "battery sub-module' is "a sub-part of a module."  *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("claims are interpreted with an eye toward giving effect to all terms in the claim").  Wisk's construction, by contrast, ignores the word "sub-module" and renders it meaningless, which is improper.  *In re Power Integrations, Inc*., 884 F.3d 1370, 1376 (Fed. Cir. 2018) (reversing a claim construction because it "renders claim language meaningless").  Specifically, Wisk proposes that a "battery sub-module" can be any "component in a battery system," even though in Wisk's view that phrase would apply to an *entire battery* in a multi-battery system.  *See* Ex. I, ¶ 24 (Wisk's expert asserting that a "battery system" may include multiple "batteries").  Thus Wisk's construction would remove any distinction between a "battery" and a "battery sub-module," in violation of black-letter law.[4]  *See Bicon*, 441 F.3d at 950 ("Allowing a patentee to argue that physical structures and characteristics specifically described in a claim are merely superfluous would render the scope of the patent ambiguous" and thus is not permitted).

---

[3]  Indeed, Wisk's infringement contentions reveal that Wisk is trying to read the term "battery sub-module" onto *an entire battery pack containing multiple battery "modules,"* which is untenable.

[4]  Moreover, Wisk's phrase "component of a battery system" is so untethered to the actual claim term that it could be read to cover a structure that does not include *any* battery cells at all.

Gibson, Dunn &
Crutcher LLP

Second, the intrinsic and extrinsic evidence demonstrates that there is a generally understood hierarchy in battery terminology, and that the term "battery sub-module" refers to the second-lowest level of the hierarchy, just above the "cell" level, exactly as Archer proposes in its construction. Wisk's own expert explains that "*cells* are the smallest logical unit of the battery" and the "voltage of an individual cell is usually just a few volts." Ex. I (Collins Decl.), ¶ 25. The specification of the patents-in-suit explains that cells can be grouped together to form a *"battery sub-module."* Ex. B ('033 Patent) at 3:30–33 ("each battery sub-module includes multiple cells"); 5:31–34 ("each battery sub-module (e.g., 212a and 212b in FIG. 2) contains multiple cells"); *id.* at 13:22–24 ("As described above, there are a plurality of battery sub-modules and each battery sub-module includes a plurality of cells"). As Wisk's expert states, these groups of cells may then be "connected to each other to increase the voltage," and "by connecting the required number of cells in series and parallel, the desired voltage and energy storage capacity of a *battery* can be achieved." Ex. I, ¶ 25. Finally, multiple batteries can be used together in a larger "*energy storage system*." *Id*., ¶ 24. Thus, in this hierarchy, the term "battery sub-module" is near the bottom, just above the cell level, but decidedly below the level of an individual battery in a battery system. *See also* Ex. 3, ¶¶ 44–45.

Wisk argues that Archer is taking too "rigid" a view by placing "battery sub-module" in a hierarchy at all. Dkt. 196 at 12. But Wisk's argument is not credible, because Wisk has admitted in this litigation that "sub-module" is indeed a hierarchical term in this technical context, and that it fits exactly where Archer's construction says it does. *See* Dkt 16-8 at 39:2–4. Similarly, Wisk's own patent number 10,355,496 ("the '496 Patent"), which shares two of the same named inventors as the '033 and '328 Patents, explains that a high-voltage power source for powering an electric aircraft may include "36 battery sub-modules and 12 *cells per battery sub-module*." Yet another patent application assigned to Wisk, filed the same year as the '033 Patent, discusses "*contents of a battery sub-module, including battery cells*, thermally insulating layers, and thermally conducting layers," and explains that each "battery sub-module" outputs "a voltage on the order of 15V," which are combined together in a frame to form a high voltage supply (*i.e.*, an overall battery) "on the order of 600V." Ex. 18 ('737

Publ.) at [0019], [0028], [0056]; Ex. 3, ¶¶ 54–57.  Thus, Wisk's own statements to the public and the Court support Archer's construction.[5]

Moreover, additional evidence discussed by Archer's expert, Dr. Hofmann, in his declaration confirms that the plain and ordinary meaning of "battery sub-module" in the art is a collection of cells, smaller than a battery or battery module, which in turn are smaller than a battery pack—just as Archer states in its construction.  For example, a glossary of terminology regarding batteries for electric vehicles, contained in a published thesis dated just a few years before the filing date of the '033 Patent, explains that a "*battery sub-module (BSM) is collection of two or more cells* connected in series," a "battery module (BM) is a collection of two or more BSMs connected in series or parallel to get higher energy or power or both," and a "battery pack (BP) is a collection of several BMs connected in series and parallel to meet voltage, energy and power requirements."  Ex. 3, ¶¶ 47–48.  Similarly, a textbook on battery management systems explains that a "cell" is "the most basic element of a battery," and that at a higher level, multiple batteries can be arranged together to form a "pack."  *Id.*, ¶ 49; *see also id.* ¶¶ 50–53, 58 (reviewing additional extrinsic support for Archer's construction).  Thus, Archer's construction properly reflects the plain and ordinary meaning of "battery sub-module" in the art.

Wisk does not identify any alternative glossary or textbook definitions for "battery sub-module," let alone any that contradict Archer's construction.  Instead, the only extrinsic document that Wisk and its expert offer in response is a Dell patent that is directed to battery systems for personal computers, mobile devices, and the like, which operate at far different voltages and under far different conditions than the electric-vehicle batteries contemplated by the '033 and '328 Patents.  Dkt. 196 at 14; Ex. L (U.S. Patent No. 10,027,133) at 4:4–11.  As such, the Dell patent is far less relevant than Wisk's own patents and the other electric-vehicle sources discussed above.  In any event, the Dell patent confirms that a "battery sub-module" is smaller than a "battery pack," as stated in Archer's construction, and thus refutes Wisk's proposal that "battery sub-module" can read on any "component," no matter how large, in "a battery system."  *Id.* at 8:34–36; Ex. 3, ¶ 65.

---

[5]  Wisk argues that "a battery submodule may in some instances be comprised of one, rather than multiple cells" (Dkt. 196 at 13), but that is not consistent with the evidence.  For example, the patents themselves distinguish between measurements at the "sub-module" level and "cell" level. Ex. B at 6:4–9, claims 1, 10.

ARCHER'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. 3:21-CV-02450-WHO

Gibson, Dunn & Crutcher LLP

Finally, Wisk's construction is incorrect for the additional reason that it imports limitations into the term "battery sub-module" from preferred embodiments and dependent claims. Wisk's construction would require each "battery sub-module" to contain "a battery management system and a switch." But a "switch" does not appear anywhere in the claims, and the term "battery management system" appears only in *dependent* claims. Further, the specification only discusses these elements in *example* embodiments. Wisk relies on Figures 2, 7, and 8 of the patents as the support for its construction. Dkt. 196 at 11–12. But the specification states that each of these Figures is merely "a diagram illustrating an embodiment," and that each Figure merely shows an "example." Ex. B. at 1:23–38; 2:1–6; 9:55–59; 10:18–20. Thus, as Wisk itself acknowledges on the first page of its brief, these embodiments are not limiting. Dkt. 196 at 1–2 ("the Court must take care to avoid limiting a claim to the embodiments disclosed in the specification"); *Phillips*, 415 F.3d at 1323.[6]

Further, the claims show that a "battery management system" is not required in every "battery sub-module." Rather, the limitation a "built-in battery management system in [a] given battery sub-module" is recited in certain dependent claims, and is recited as the only limitation added by each of those dependent claims. *See* Ex. C ('328 Patent) at claims 3, 8, 13; *see also, e.g.*, Ex. M at 4:41–5:4 and Fig. 2 (Wisk patent disclosing battery management systems *external* to battery sub-modules). Under the doctrine of claim differentiation, Wisk cannot read a "battery management system" into the term "battery sub-module," because the addition of "battery management system" in dependent claims makes clear that it is not a required part of the term "battery sub-module" in the independent claims. *See, e.g.*, *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003) (claim differentiation is "especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim"). Therefore the Court should reject Wisk's proposed construction, and should adopt Archer's construction for "battery sub-module."

---

[6] Nor can Wisk argue that the plain meaning of "battery sub-module" includes a "battery management system and a switch." Wisk's own '496 Patent discloses "battery sub-modules," each of which is connected to an *external*, not internal, battery management system. Ex. 16. at Fig. 206a-206c. Similarly, the switch in the '496 Patent that Wisk argues supports its construction actually resides in the "path for power" between the BMS and the electronics controller, *not* in the "battery sub-module" itself. Ex. M at 6:47–52.

Gibson, Dunn &
Crutcher LLP

### C. "discharge-related fault" ('328 Patent Claims 1, 6, 11)

| WISK'S CONSTRUCTION | ARCHER'S CONSTRUCTION |
|---|---|
| Plain and ordinary meaning | "a fault related to discharge of the battery sub-module (as opposed to temperature or voltage)" |

The '328 Patent claims require checking individual battery sub-modules to look for a "discharge-related fault." The dispute between the parties is whether a "discharge-related fault" is a fault related specifically to discharge, as Archer proposes (and the specification makes clear), or whether Wisk should be permitted to read the term "discharge-related fault" expansively, so that it covers faults relating to temperature and voltage (both of which are expressly distinguished from discharge faults by the specification).

Starting with the claim language itself, it is clear that a "discharge-related fault" is a fault that is distinct from a general "fault." The words "discharge-related" modify the word "fault," thereby identifying a "discharge-related fault" as a particular *type* of fault. Ex. 3, ¶ 69. Consistent with this plain meaning, the specification uses the word "fault" generally, to describe different kinds of faults, and then distinguishes between discharge-related faults and other kinds of faults. Ex. C ('328 Patent) at 6:60–63 ("Generally speaking, a fault condition is a safety check to ensure none of the battery sub-modules will be damaged and/or cause damage if charged."). The specification identifies a number of fault conditions related to voltage, temperature, and state of charge that may occur during the charging process (*id.* at 6:49–7:58), and it further identifies a different, particular type of fault that relates to discharge. The specification explains that this fault may arise when a battery sub-module is "completely discharged" for a relatively long period of time, and that it may arise "*even though temperature and/or voltage checks may be satisfied*." *Id.* at 6:63–7:1. That this fault condition is a "discharge-related fault" is confirmed by the '328 Patent's claims 2, 7, and 12, each of which recite: "a discharge-fault indication is determined at least in part on … being in a state of discharge for more than a specific period of time." Therefore, Archer's construction is correct in distinguishing a "discharge-related fault" from other faults such as temperature or voltage.

The patent's file history further confirms Archer's proposal. During prosecution, Wisk was asked by the examiner to clarify where in the specification there is support for claims that include the "discharge-related fault" term. Ex. 19 (file history excerpt). In response, Wisk identified the same

1  language Archer calls out above concerning an over-discharged battery condition, and Wisk *did not*

2  *identify any disclosure regarding other faults*. *Id*., Jan. 9, 2019 amendment at 7; Ex. 3, ¶ 74.  Thus, the

3  intrinsic record fully supports Archer's proposal.  *Id.*, ¶¶ 68–74.

4       Archer's proposal is also supported by the extrinsic evidence.  As Archer's expert Dr. Hofmann

5  explains, relevant technical standards address certain faults including "overtemperature, undervoltage,

6  and overvoltage," and then *separately* address faults associated with battery cells "discharged past their

7  specified lower voltage limit," thus demonstrating that discharge-related faults are different from

8  temperature or voltage faults.  *Id*., ¶ 75.

9       While Wisk proposes that "discharge-related fault" should be construed to have its "plain and

10  ordinary meaning," Wisk's argument reveals that Wisk is attempting to broaden this term beyond its

11  plain meaning.  Wisk and its expert suggest that any fault condition that occurs "during discharge" falls

12  within the term's scope. Dkt. 196 at 16:4–5; Ex. B, ¶ 55.  But as explained above, a "discharge-related"

13  fault is a *type* of fault; it is not defined merely by when it occurs.  Indeed, as discussed above, the

14  specification refutes Wisk's argument by explicitly distinguishing between temperature- and voltage-

15  related faults, on the one hand, and discharge-related faults on the other hand.  Ex. B at 6:63–7:1.

16       Wisk also argues that Archer is adding an extraneous negative limitation, but that is not correct.

17  The words "as opposed to temperature or voltage" in Archer's proposal arise directly from the words

18  the specification uses to distinguish discharge-related faults from other faults.  Ex. C at 6:66–67 ("even

19  though temperature and/or voltage checks may be satisfied").  Wisk's argument about disavowal is

20  also misplaced, as Archer is not arguing that Wisk disavowed claim scope, but rather that Archer's

21  construction reflects the plain meaning of "discharge-related fault" in the context of the intrinsic record.

22  Archer is simply using the intrinsic record's disclosure to interpret the claims, as is entirely appropriate.

23  *See, e.g.*, *Shire Dev., LLC v. Watson Pharm., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir. 2015) (prosecution

24  history statements "inform the claim construction" even if they "do not rise to the level of unmistakable

25  disavowal").  Similarly, Archer is not asking the Court to limit "discharge-related fault" to the specific

26  fault disclosed in the specification (*i.e.*, a discharge-related fault in which a battery sub-module is

27  "completely discharged to 0V" and remains discharged for a relatively long period of time).  Rather,

28  Archer simply uses that example—the only relevant example in the specification—to help interpret

Gibson, Dunn &
Crutcher LLP

ARCHER'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. 3:21-CV-02450-WHO

what *type* of fault constitutes a "discharge-related fault."  Therefore, the Court should adopt Archer's proposed construction.

**D.**  **"computing an optimal mix of actuators and actuator parameters to achieve to an extent practical the requested forces and moments, including by minimizing a weighted set of costs…" ('099 Claims 1, 26)**

| WISK'S CONSTRUCTION | ARCHER'S CONSTRUCTION |
|---|---|
| Plain and ordinary meaning | "an optimal mix of actuators and associated actuator parameters" means "the mix that provides the true minimum of the weighted set of costs" |

The asserted claims of the '099 Patent require "computing an *optimal* mix of actuators and actuator parameters," and require that this "optimal" mix be computed "by *minimizing* a weighted set of costs."  Archer's construction is correct and helpful because it explains what the word "optimal" refers to in this context—*i.e.*, when "minimizing a weighted set of costs," the "optimal" outcome is the true minimum of the weighted set of costs.  As discussed below, Archer's construction is based on the plain meaning of "optimal" in this field, and is confirmed by the specification, which distinguishes the alleged invention from prior art on exactly this basis.  Wisk's argument, by contrast, is not supported by the evidence.  On the one hand, Wisk argues that "computing an optimal mix" does not require any construction because it is already clear.  Dkt. 196 at 17.  But on the other hand, Wisk argues that this language is *not* limited to what it clearly says, and instead covers "something *other than* a 'true' optimal solution."  *Id.* at 18.  Wisk is thus seeking to *expand* the scope of the claims under the guise of "plain and ordinary meaning."  The Court should reject that improper effort, and should adopt Archer's construction, which gives effect to the actual plain and ordinary meaning.

First, the claims themselves demonstrate that "optimal" is used here in accordance with its ordinary meaning in the art, to refer to the best outcome of the "minimizing" process—*i.e.*, the true minimum.  As Archer's expert, Dr. Heppe, explains in his declaration, with support from both technical and general purpose dictionaries as well as his experience in the field, the plain and ordinary meaning of "optimal" in this art is consistent with its ordinary meaning in common language, and refers to the *best* outcome.  *See* Ex. 21 (Heppe Decl.) ¶ 24; *Phillips*, 415 F.3d at 1318 (explaining that expert testimony can be useful "to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field").  Wisk's opening brief does not dispute, or even mention, any of the

ARCHER'S RESPONSIVE CLAIM CONSTRUCTION BRIEF
CASE NO. 3:21-CV-02450-WHO

Gibson, Dunn & Crutcher LLP

dictionary definitions identified by Dr. Heppe, nor do Wisk or its expert Dr. Gandhi offer any evidence that the term "optimal" has any other meaning in the art.[7]   And the claims themselves show that "optimal" is used according to the ordinary meaning identified by Dr. Heppe.  More specifically, Dr. Heppe explains that the Authoritative Dictionary of IEEE Standard Terms defines "optimization" as "[t]he procedure used in the design of a system to maximize or minimize some performance index." Ex. 21 ¶ 24.  That is exactly the context in which the claims of the '099 Patent use the word "optimal," as the claims recite "minimizing a weighted set of costs."  In this context, where "optimization" refers to the process of "minimizing" costs, it is clear that the "optimal" outcome of the "minimizing" process is the *actual minimum cost*, just as Archer's construction provides.  *See id.* ¶¶ 25–27.  Wisk effectively admits this in its brief, by agreeing that a person of skill in this art would understand that "the claim language 'minimizing a weighted set of costs' refers to the mathematical process of determining which solution yields *the lowest total costs for the 'weighted set of costs.'*"  Dkt. 196 at 17 (quoting Archer's expert Dr. Heppe with approval).

Second, the specification of the '099 Patent confirms that Archer's construction is correct, as it repeatedly distinguishes the alleged invention from prior art on the ground that the alleged invention provides the "true" or "actual" optimum where the prior art allegedly did not.  For example, the specification criticizes prior-art "offline" calculations because they "typically did not find a *true optimal solution (minimum cost)* in any given real world set of inputs and conditions."  Ex. D at 8:58–61.  And the specification also criticizes prior-art "online" calculations on the same ground, stating that "[o]nline approximate optimization approaches are believed to have been attempted," but that the online "cascaded pseudo-inverse approach" known in the prior art is deficient because it "does not provide an *actual optimal solution*."  *Id.* at 8:61–9:5.  By contrast, the claims of the '099 Patent explicitly require reaching an "optimal" mix, computed by "minimizing" costs, and thus purport to overcome this deficiency in the prior art—*i.e.*, the lack of a true or actual optimal solution (minimum

---

[7]   Instead, Wisk's expert Dr. Gandhi cites only to the specification, and thus his testimony is entitled to little or no weight, unlike Dr. Heppe's declaration.  *See, e.g., Symantec Corp. v. Comput. Assocs. Int'l, Inc.*, 522 F.3d 1279, 1291 (Fed. Cir. 2008) (holding that expert testimony that "simply recites how each expert would construe the term 'computer system' based on his own reading of the specification" is "unhelpful" because it "does not identify the 'accepted meaning in the field' to one skilled in the art"); *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1137 n.3 (Fed. Cir. 2007) (such testimony is "entitled to little or no weight").

cost).  Thus the intrinsic record confirms that Archer's construction is correct.  *See, e.g.*, *Phillips*, 415 F.3d at 1316 ("'The construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'" (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998))).

Wisk raises a smattering of complaints about Archer's construction, but all miss the mark.  First, Wisk argues that Archer is importing the requirement of a "true" optimum from a mere embodiment in the specification, in which the calculation is performed online instead of offline.  Dkt. 196 at 18–19.  But Wisk is wrong.  The specification does not use the concept of a "true" optimum to distinguish between offline and online embodiments of the alleged invention, as Wisk argues, but rather to distinguish between *the prior art* and the alleged invention.  As shown above, the specification states that prior art approaches—including *both offline and online* approaches—failed to provide a "true" or "actual" optimal solution, and states that the alleged invention cures this deficiency.  Ex. D at 8:58–9:13.  Thus Archer is not relying on a mere embodiment.  Nor is Archer relying on the specification to narrow or contradict the plain meaning of the claim language; rather, the specification as a whole *confirms* that the claims use the term "optimal" in accordance with its ordinary meaning as a superlative.  Indeed, if the patentee had not intended to claim the actual minimum cost, then the patentee could have used other words instead of the binary word "optimal."  For example, the patentee could have recited an "effective" mix, or a "reduced-cost" mix.  Having chosen the word "optimal," the patentee must be held to that choice.  *See, e.g.*, *Taurus IP*, 726 F.3d at 1321 ("we give effect to the terms chosen by the patentee.").  Wisk's cases are inapposite, as they concern situations where the plain meaning of a claim term is broader than the specification.  Here, by contrast, the plain meaning of "optimal" is consistent with the specification and supports Archer's construction.  Thus, it is clear that Wisk is attempting to broaden the claims *beyond* their clear plain meaning, by arguing that the claim term "optimal" should be understood to encompass "something other than a 'true' optimal solution."  Dkt. 196 at 18.  But Wisk has no ground to do so.

Next, Wisk complains that Archer's construction would require "computing the one, and only one, perfect solution that results in the absolute or theoretical minimum under all circumstances, assumptions, and optimization techniques."  *Id.* at 19.  But that is a straw man.  Archer's construction

merely requires "the true minimum *of the weighted set of costs*," whatever that "weighted set of costs" is in a given instance.  Archer agrees wholeheartedly with Wisk that "the computed optimal solution will depend on the 'set of costs' a design may seek to minimize," that "costs may be weighted differently based on different aircraft priorities," and that "the 'optimal mix' in any given circumstances may differ based on the various design assumptions and priorities" chosen by a particular person in a particular instance.  *Id.*  But none of that contradicts Archer's construction for "optimal mix," because none of it contradicts the plain meaning of "optimal" as an objective superlative, used in the claims to refer to the *minimum* of the set of weighted costs—whatever that set of costs may be.  Instead, Wisk's argument merely proves Archer's own separate point (addressed below in the next section) that the claims are indefinite because they do not provide any objective methodology for determining *which* "weighted set[s] of costs" are within the scope of the claims and which are not—the claims merely say to choose something "practical," with no objective standard by which to judge what is "practical."  But that is a separate issue from the meaning of "optimal," which refers here to the minimum cost for a given set.

Finally, Wisk argues that that "optimal" cannot mean "true minimum" because "a person of ordinary skill in the art understands that the minimum [of a] weighted set of costs may be identified within some tolerance level, or within some local range of solutions."  *Id.* at 20.  But the patentee did not *claim* a "local range of solutions"; instead the patentee claimed an "optimal" solution for any given weighted set of costs, and should be held to that choice.  Further, Wisk's argument would render the term "optimal mix" indefinite if accepted, because it would turn a clear superlative term ("optimal") into a vague term of degree ("identified within *some* tolerance level"), without any objective boundary between the claimed "optimal mix" and the prior art, even though the specification purports to distinguish the alleged invention from the prior art on the basis of this limitation.  *See, e.g.*, *Halliburton Energy Servs., Inc. v. MI LLC*, 514 F.3d 1244, 1253 (Fed. Cir. 2008) (holding that claim term "fragile gel" was indefinite where patent "distinguished 'fragile gels' of the invention from those of the prior art," but patentee did not identify "*how much* more quickly the gels broke when stress was imposed or *how much* more quickly the gels reformed when stress was removed" as compared to prior-art gels).

Gibson, Dunn &
Crutcher LLP

1

**E.     "computing an optimal mix of actuators and actuator parameters <u>to achieve to an extent practical the requested forces and moments</u>, including by minimizing a weighted set of costs…" ('099 Claims 1, 26)**

| WISK'S CONSTRUCTION | ARCHER'S CONSTRUCTION |
|---|---|
| Plain and ordinary meaning | "achieve to an extent practical the requested forces and moments" is indefinite |

Regardless of how the Court rules on the prior dispute, the Court should find that claims of the '099 Patent are indefinite under Section 112, because the claims lack clear, objective boundaries.  As the Federal Circuit has held repeatedly, claims "must provide objective boundaries for those of skill in the art," or else they are indefinite.  *Interval Licensing*, 766 F.3d at 1371.

The problem here is that regardless of the meaning of "computing an optimal mix of actuators and actuator parameters" and "minimizing a weighted set of costs," the claims also use a *subjective term of degree*—"to an extent practical"—to distinguish between optimizations that satisfy the claims—*i.e.*, optimizations that "achieve to an extent practical the requested forces and moments"—and optimizations that do not.  As Dr. Heppe explains, "the phrase 'to an extent practical' is highly subjective, and does not provide a clear boundary to a person of skill in the art working with actual aircraft optimization problems, so it is not reasonably clear what the claims actually cover and what they do not cover." Ex. 21 ¶ 35.  By analogy, Dr. Heppe explains, this is like "requiring that one must reach an objective target, such as the summit of a mountain ('an optimal mix'), but then stating that it is sufficient to climb only as high as 'practical.'"  *Id.* ¶ 36.  Because people of skill in the art use the word "practical" subjectively and with a range of meanings, this claim term makes it unclear how high up (how close to "achiev[ing] the requested forces and moments") the climber must go.  *Id.*

In other words, a person of ordinary skill would understand that the phrase "to an extent practical" in these claims is a subjective term of degree, and "would understand that different people in the art will have different views about what is and is not practical in a given circumstance, and so would need additional guidance if expected to apply this phrase objectively."  *Id.* ¶¶ 37–38; *see, e.g.*, *Berkheimer v. HP Inc*., 881 F.3d 1360, 1364 (Fed. Cir. 2018) ("Our case law is clear that the objective boundaries requirement applies to terms of degree.").

But there is no such objective guidance anywhere in the intrinsic record of the '099 Patent. Instead the patent leaves the definition of "practical"—and the line between "practical" and

"impractical"—up to the subjective views of the reader.  Ex. 21 ¶ 38.  For example, the word "practical" appears several times in the specification, but always in the same subjective phrase as it appears in claim 1, with no further definition.  *See id.* ¶ 43; Ex. D at Abstract ("to an extent practical"), 6:45–48 (same), 11:14–17 (same).  The word "impractical" appears in the specification only once, in the statement that "offline optimization *may become impractical* at higher dimensionality."  Ex. D at 11:46–47.  As Dr. Heppe explains, this statement does not clarify the meaning of the claims, because "the specification does not identify the boundary between dimensionality that *should* be considered 'practical' for purposes of the patent and dimensionality that should be considered 'impractical.'"  Ex. 21 ¶ 41.  And there is no clarification in the prosecution history either.  *Id.* ¶ 46.  Therefore the claims are indefinite.  *Id.*; *see also Berkheimer*, 881 F.3d at 1364 (claims held indefinite because "[t]he specification contains no point of comparison for skilled artisans to determine an objective boundary" of the limitation at issue).

Wisk argues that the claims are not indefinite because the specification discusses "the type of constraints that *might* make achieving a requested set of forces and moments *impractical*."  Dkt. 196 at 23.  But Wisk inadvertently makes Archer's point.  The patent does not identify an objective boundary between "practical" and "impractical" results, but rather lists a variety of variables that a person of skill "might" decide to consider in making a quintessentially *subjective* determination about what she considers "practical" in a given circumstance.  Indeed, as Dr. Heppe explains, "there are many different metrics and thresholds that *could* apply to determine whether a given solution is 'practical' for controlling an aircraft, and the claims and specification of the '099 patent do not identify an objective methodology for making that determination."  Ex. 21 ¶ 38.  Thus the claims are indefinite. *See Interval Licensing*, 766 F.3d at 1371 ("there is an indefiniteness problem if the claim language 'might mean several different things and no informed and confident choice is available among the contending definitions'") (quoting *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 911 n.8 (2014) (citation omitted)); *Intell. Ventures I LLC v. T-Mobile USA, Inc*., 902 F.3d 1372, 1381 (Fed. Cir. 2018) (holding term "optimize end user application IP QoS requirements" indefinite because the

patent recognized that QoS (quality of service) depends on "what network performance characteristic is most important to a particular user"); .[8]

Wisk also recites a laundry list of different metrics that a person of skill "might" consider from the specification, including "maximum power consumption," "minimum and/or maximum motor speed and/or torque," "control surface minimum and/or maximum deflection," "actuator minimum and/or maximum rate of change, etc." Dkt. 196 at 23. But that list merely demonstrates the indefiniteness problem. As Dr. Heppe explains, there is no shortage of possible metrics, thresholds, and combinations that different people of skill in the art might consider relevant to the word "practical," but different choices would result in drastically different claim scope:

> [A] person of skill might interpret the phrase "to an extent practical" as suggesting that any solution that does not violate overall constraints on maximum power consumption for the entire system satisfies this portion of the claim. Alternatively, a person of skill may interpret this phrase as referring to any mix of parameters that lies within the maximum power consumption or fan speed for individual lift fans. Yet another possible interpretation of this phrase could be that "to an extent practical" refers to the ability to produce necessary software packages within a predefined time period for research and development. Yet another possible interpretation could be that all of these metrics must be considered in the cost function, or some combination of them. Yet another interpretation could be that any solution that results in the aircraft continuing to fly, rather than crashing, is "practical." Yet another interpretation could be that the solution must not cause passengers to experience forces beyond a given threshold which might make the passengers uncomfortable or expose them to potential injury. The claim phrase "computing an optimal mix of actuators and associated actuator parameters to achieve *to an extent practical* the requested forces and moments," does not provide any clarity about which if any of these conflicting interpretations is correct.

Ex. 21 ¶ 39. Wisk and its expert have no response to Dr. Heppe on this point; they never even attempt to identify *which* if any of the interpretations above is correct in their view, thus admitting the patent does not disclose an objective standard for "an extent practical." *See, e.g.*, *Intel Corp. v. Tela Innovations, Inc.*, No. 3:18-CV-02848-WHO, 2019 WL 5697922, at *12 (N.D. Cal. Nov. 4, 2019) (finding indefiniteness where patent "provides no line by which to measure" and "instead explicitly invit[es] these subjective considerations to guide the determination of what that spacing should be").

Finally, Wisk ignores controlling caselaw regarding indefiniteness of subjective phrases like the one at issue here, and instead Wisk relies on the *BASF* case, which is readily distinguishable because

---

[8] *See also Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1352 (Fed. Cir. 2005) (subjective claim term "aesthetically pleasing" was indefinite even though specification provided "examples of aesthetic features of screen displays that can be controlled by the authoring system," because patent did not indicate "what *selection* of these features would be 'aesthetically pleasing'").

Gibson, Dunn &
Crutcher LLP

it concerned an *objective* phrase.  There, the claim phrase at issue was "effective to catalyze," and as the Federal Circuit explained, the experts on both sides "agreed that objective tests to determine the effectiveness of the catalysts in question, e.g., percent conversion, were available and well known at the time."  *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1368 (Fed. Cir. 2017).  Here, by contrast, Dr. Heppe explains that the disputed phrase "to an extent practical" is subjective in the relevant art, and that there is no agreed *objective* test in the art for what is "practical."  Ex. 21 ¶¶ 37–40.  Further, Wisk's expert Dr. Gandhi does not purport to identify any objective test in the art.  Instead, he offers a tautological and unhelpful opinion that "a person of skill in the art would understand that the phrase 'to achieve to an extent practical the requested forces and moments'" means that "the optimization process must determine the solution that achieves those requested forces and moments to an extent practical, as taught by the specification and recited by the claims."  Ex. F (Gandhi Decl.) ¶ 50.  That opinion does not save the claims; it merely confirms that the claims and specification do not identify an objective boundary for "practical," and thus confirms that the claims are indefinite.

**F.   "determine, within the solution space, a combination of the actuators and associated actuator parameters <u>to apply the set of forces and moments to the aircraft to an extent practicable</u> with the failure induced reduced capacity of the at least one of the lift fans" ('441 Claim 1)**

| WISK'S CONSTRUCTION | ARCHER'S CONSTRUCTION |
| --- | --- |
| Plain and ordinary meaning | Indefinite |

Just as the phrase "to an extent practical" in the '099 claims is indefinite for the reasons above, the parallel phrase "to an extent practicable" in the '441 claims is likewise indefinite.  As Dr. Heppe explains, this phrase is likewise a *subjective* term of degree:  "Different people of skill in the art will have different views and understandings of where the boundary is between 'practicable' and impracticable solutions in any given circumstance where a lift fan is failing."  Ex. 21 ¶ 50; *id.* ¶ 51 ("practical or 'practicable' can be developer, user, and scenario dependent").  The claims do not provide any objective boundary for this phrase—they merely state that the "practicable" solution must be chosen from somewhere within a "solution space," not *how* to choose it within that space—and the specification does not help either.  *Id.*  Indeed, the word "practicable" does not even appear at all in the specification; there is literally *no guidance* about that particular word beyond its appearance in the claims themselves.  Therefore, as Wisk does not dispute, a person of skill in the art trying to determine

Gibson, Dunn & Crutcher LLP

the meaning of "to an extent practicable" in the '441 patent would consider how the specification uses the word "practical," as that is the closest analog in the specification. Ex. 21 ¶ 49. But the specification's use of "practical" does not help, as demonstrated above, because the specification merely identifies many different considerations that a person of skill *could* take into account in making the subjective determination about what to deem "practical" or "practicable" in a given instance. *Id.* ¶¶ 50–51. Therefore this limitation is indefinite. *See, e.g.*, *Interval Licensing*, 766 F.3d at 1371.

## V. CONCLUSION

For the foregoing reasons, Archer respectfully asks the Court to adopt Archer's proposed constructions and to hold that the asserted claims of the '099 and '441 Patents are invalid as indefinite.

DATED:  January 20, 2022                      GIBSON, DUNN & CRUTCHER LLP


By:   ____*/s/ Stuart M. Rosenberg*_____
                                              Stuart M. Rosenberg

                                              *Attorneys for Defendant Archer Aviation Inc.*

Gibson, Dunn &
Crutcher LLP