QUINN EMANUEL URQUHART & SULLIVAN, LLP
Yury Kapgan (Bar No. 218366)
  yurykapgan@quinnemanuel.com
Robert M. Schwartz (Bar No. 117166)
  robertschwartz@quinnemanuel.com
Michael T. Zeller (Bar No. 196417)
  michaelzeller@quinnemanuel.com
Diane Cafferata (Bar No. 190081)
  dianecafferata@quinnemanuel.com
Patrick Schmidt (Bar No. 274777)
  patrickschmidt@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

Michael F. LaFond (Bar No. 303131)
  michaellafond@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

Attorneys for Plaintiff Wisk Aero LLC

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WISK AERO LLC, | CASE NO. 3:21-cv-02450-WHO |
| Plaintiff, | **PLAINTIFF WISK AERO LLC'S REPLY CLAIM CONSTRUCTION BRIEF** |
| vs. | |
| ARCHER AVIATION INC., | Hearing Date: March 4, 2022 |
| Defendant. | Hearing Time: 2:00 pm |

# **TABLE OF CONTENTS**

**Page**

WISK'S REPLY TO ARCHER'S RESPONSIVE CLAIM CONSTRUCTION BRIEF .................1

    A.    "lift fans"/ "lift rotors" ('036 Pat. Claim 1; '441 Pat. Claim 1) ................................1

    B.    "battery submodule" ('033 Pat. Claims 1, 10, 19; '328 Pat. Claims 1, 6, 11) ...........3

    C.    "discharge-related fault" ('328 Pat. Claims 1, 6, 11) .................................................7

    D.    "computing an optimal mix of actuators and associated actuator parameters to achieve to an extent practical the requested forces and moments, including by minimizing a weighted set of costs that includes costs associated with one or more errors each corresponding to a difference between a requested force or moment and a corresponding force or moment achieved by the computed solution" ('099 Pat. Claims 1, 26) ..................................9

    E.    "computing an optimal mix of actuators and associated actuator parameters to achieve to an extent practical the requested forces and moments, including by minimizing a weighted set of costs that includes costs associated with one or more errors each corresponding to a difference between a requested force or moment and a corresponding force or moment achieved by the computed solution" ('099 Pat. Claims 1, 26) ................................12

    F.    "determine, within the solution space, a combination of the actuators and associated actuator parameters to apply the set of forces and moments to the aircraft to an extent practicable with the failure induced reduced capacity of the at least one of the lift fans" ('411 Pat. Claim 1) .................................................14

II.    CONCLUSION ........................................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

### Cases

*3M Innovative Props Co. v. Tredegar Corp.*,
 725 F.3d 1315 (Fed. Cir. 2013) .................................................................................................. 8

*BASF Corp. v. Johnson Matthey Inc.*,
 875 F.3d 1360 (Fed. Cir. 2017) ................................................................................................ 14

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
 567 F.3d 1314 (Fed. Cir. 2009) .................................................................................................. 3

*Embrex, Inc. v. Service Eng. Corp.*,
 216 F.3d 1343 (Fed. Cir. 2000) ................................................................................................ 11

*GE Lighting Solutions, LLC v. AgiLight, Inc.*,
 750 F.3d 1304 (Fed. Cir. 2014) .................................................................................................. 1

*Goldenberg v. Cytogen, Inc.*,
 373 F.3d 1158 (Fed. Cir. 2004) .................................................................................................. 6

*Immunex Corp. v. Sanofi-Aventis U.S. LLC*,
 977 F.3d 1212 (Fed. Cir. 2020) .................................................................................................. 4

*Indacon, Inc. v. Facebook, Inc.*,
 824 F.3d 1352 (Fed. Cir. 2016) .................................................................................................. 6

*JVC Kenwood Corp. v. Nero, Inc.*,
 2013 WL 2356149 (C.D. Cal. Jan. 29, 2013) ........................................................................... 12

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
 358 F.3d 898 (2004) ................................................................................................................... 2

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
 474 F.3d 1323 (Fed. Cir. 2007) ................................................................................... 1, 4, 9, 10

*Nevro Corp. v. Boston Sci. Corp.*,
 955 F.3d 35 (Fed. Cir. 2020) .............................................................................................. 13, 14

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005) ...................................................................................... 3, 4, 10

*Realtime Data, LLC v. Packeteer, Inc.*,
 2009 WL 41410318 (E.D. Tex. Nov. 23, 2009) ....................................................................... 12

*Seabed Geosolutions (US) Inc. v. Magseis FF LLC*,
 8 F.4th 1285 (Fed. Cir. 2021) ..................................................................................................... 9

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
 511 F.3d 1132 (Fed. Cir. 2007) ................................................................................................ 10

*Smith & Nephew, Inc. v. Hologic, Inc.*,
 721 F. App'x 943 (Fed. Cir. 2018) ............................................................................................. 3

*Symantec Corp. v. Comput. Assocs. Int'l, Inc.*,
 522 F.3d 1279 (Fed. Cir. 2008) ................................................................................................ 10

*Teleflex, Inc. v. Ficosa N. Am. Corp.*,
 299 F.3d 1313 (Fed. Cir. 2002) .................................................................................................. 7

*Toro Co. v. White Consol. Indus., Inc.*,
 199 F.3d 1295 (Fed. Cir. 1999) .................................................................................................. 9

*U.S. Surgical Corp. v. Ethicon, Inc.*,
    103 F.3d 1554 (Fed. Cir. 1997) .................................................................................... 7, 9

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001) .................................................................................... 8, 10

# WISK'S REPLY TO ARCHER'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

## A. "lift fans"/ "lift rotors" ('036 Pat. Claim 1; '441 Pat. Claim 1)

| WISK'S CONSTRUCTION | ARCHER'S CONSTRUCTION |
|---|---|
| "fans configured to provide lift" / "rotors configured to provide lift" | "a fan installed only for vertical thrust" / "rotor installed only for vertical thrust" |

Both patents emphasize embodiments in which lift fans/rotors are used to deliver forces *other than* vertical thrust. Archer's construction excludes these embodiments, which is improper. Archer also relies primarily on disparate extrinsic evidence which fails to establish that its proposed construction is supported by any generally accepted understanding in the art.

Archer's intrinsic evidence is paltry and actually refutes its construction. First, Archer cites a sentence in the "Background" section of the '036 Patent that "Multicopter aircraft typically include a plurality of horizontally oriented rotors, sometimes referred to as 'lift fans,' to provide lift, stability, and control." Opp. at 7, *citing* Dkt. 196-2 at 1:6-8. This passage does not support Archer's construction. In fact, it does just the opposite: the "stability" and "control" features are enabled by "a horizontal force component" and "a corresponding moment about one or more axes of the aircraft." Dkt. 196-2 ('036 Patent) at 5:51-55. Thus, lift fans/rotors are *not* installed *only* for vertical thrust.[1] *See GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (setting forth "exacting" standards for lexicography and disavowal); *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007) ("A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.").

Similarly, Archer cites another passage from the "Background" section of the '441 Patent that it claims "distinguishes explicitly between 'sources of forward thrust'" and "powered sources of lift." Opp. at 7, *citing* Dkt. 196-6 ('441 Patent) at 1:22-30. But that passage merely provides an overlapping list of possible "flight control assets of the aircraft" (*e.g.*, "control surfaces," "sources of forward thrust," "powered sources of lift," and other "forces capable of being directed or

---

[1] Archer never reconciles its construction, that "lift fans" are installed *only* for vertical thrust, with the Patent's teaching that lift fans are installed for providing additional forces and moments as well. At page 10 of its Opposition, Archer finally acknowledges these teachings, but asserts that they somehow "confirm [] the importance" of adopting its flawed construction. Opp. at 10. Archer's argument and strained analogy to "multiplying prime numbers by one hundred" is a non-sequitur.

otherwise controlled . . .") that may be used to translate inputs into flight control commands. *Id.* at 1:15-30. Indeed, the Patent states that "*[e]ach* of the foregoing [flight control assets] . . . may be used to affect one or more of the speed, direction, and attitude/orientation of the aircraft . . . ." *Id.* at 1:31-36 (emphasis added). Thus, the Patent does not describe mutually exclusive "flight control assets," but rather how the assets ("actuators") can be used *interchangeably* to control the aircraft in different ways.[2] *Id.* at 1:36-40. As with the "Background" passage Archer cited from the '036 Patent, this hardly supports the narrow definition of a lift fan that Archer seeks here. It does not rise to the level of a disclaimer or express lexicography, and Archer does not argue otherwise.

With respect to extrinsic evidence, Archer relies solely on the Cambridge Aerospace Dictionary, on which it apparently places dispositive weight. *See* Opp. at 8. But the two definitions cited by Archer from this dictionary are not helpful to its cause. The definitions do not purport to define "lift fans" for all possible use cases, but rather relate to two specific scenarios: (1) a "[t]urbofan of a HBPR" [high bypass ratio aircraft]; and (2) a fan "driven by tip turbine from external gas supply." *See* Dkt. 202-2. Moreover, both definitions refute Archer's construction because they teach that a "lift fan" "may have exit vanes to give a diagonal lift/thrust component." *See id.* This portion of Archer's definition plainly contradicts its argument that a "lift fan" is precluded from providing horizontal thrust, and it is conspicuously omitted from Archer's brief, *see* Dkt. 202 at 8.

Archer also discounts Wisk's countervailing dictionary definitions from 1980 and 2020, which teach that a "lift fan" may be "pivoted" or "swiveled" to direct its thrust vertically, *see* Dkts. 196-8 & 196-9. Archer speculates that these definitions "may" refer to simply moving a fan out of the way when it is not in use. Opp. at 8. But there is nothing in the definitions themselves to suggest this. Archer's only support for this "meta-interpretation" of Wisk's extrinsic evidence is an entirely *different* extrinsic reference, which discusses specific types of "reference" vehicles.[3] *Phillips v.*

---

[2]  Archer also cites a mere embodiment, *see* Opp. at 7-8, *citing* Figure 2A, which cannot be used to limit the claims. *See Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (2004) (improper to limit patent to even the sole disclosed embodiment).

[3]  Archer cites *Silva and Johnson*, which "us[ed] **specific aircraft conceptual designs**" as mere "**reference vehicles**" "in order to [assess] . . . vehicle requirements, and to quantify the levels of performance." Opp. Ex. 2 (Dkt 202) at 2 (emphasis added). The passage relied upon by Archer describes a "lift fan" in the context of a particular class of reference aircraft ("Lift+Cruise VTOL").

*AWH Corp.*, 415 F.3d 1303, 1321 (Fed. Cir. 2005) ("A claim should not rise or fall based upon the preferences of a particular dictionary editor, or the court's independent decision, uninformed by the specification, to rely on one dictionary rather than another."). In short, without any relevant intrinsic support for its construction, Archer is grasping at straws in cobbling together disparate external references that ultimately do not support the grossly narrow interpretation it seeks.

Archer's construction appears calculated to exclude from the claims its own tiltable rotor system, which includes rotors/fans that provide *both* vertical and horizontal thrust. The fact is that a tiltable rotor is not, as Archer claims, a category of rotors that is "mutually exclusive" from a lift fan/rotor. A fan/rotor configured to provide lift is a "lift fan/rotor." A "lift fan/rotor" configured to also tilt and provide forward thrust can also qualify as a tilt fan/rotor. Notably, the Federal Circuit has rejected arguments that two terms must be "mutually exclusive" where, as here, the "specification taught away" from so limiting the term. *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1327 (Fed. Cir. 2009) (holding that "posterior stabilization" and "micro-motion" were not "mutually exclusive" in light of the specification teaching away from a "rigid screw"); *see also Smith & Nephew, Inc. v. Hologic, Inc.*, 721 F. App'x 943, 946 (Fed. Cir. 2018) (affirming that the terms "translation and reciprocation . . . are not mutually exclusive of one another, and are not redundant to each other"). The Court should adopt Wisk's construction.

B. **"battery submodule" ('033 Pat. Claims 1, 10, 19; '328 Pat. Claims 1, 6, 11)**

| WISK'S CONSTRUCTION | ARCHER'S CONSTRUCTION |
|---|---|
| "a component of a battery system, that includes a battery management system and a switch" | "a container of two or more cells that is a sub-part of a module, which in turn may be combined with other modules to make up a battery pack" |

Archer's construction seeks to read into the claims a rigid, three-tier battery hierarchy without *any* relevant intrinsic support. Indeed, Archer's construction improperly excludes the patent embodiments, which describe a "battery submodule" as a component of the larger battery system. Moreover, Archer fails to establish that its construction is mandated by the extrinsic evidence.

Archer contends that "the word 'sub-module' conveys that a 'battery sub-module' is different from, and *smaller than* a 'battery' or a 'battery module.'" Opp. at 11. But the claim never uses the term "battery" or "battery module," and thus never suggests the specific three-tier hierarchy Archer seeks to import. The only actual term used in the claim is "battery sub-module," which

merely implies an individually controlled component of some larger battery system. Archer's argument that Wisk is seeking to "remove any distinction between a 'battery' and a 'battery sub-module,'" Opp. at 11, is circular because it assumes that the term "battery," in isolation (which is neither recited by the claims nor used anywhere in the specification), must refer to some distinct and readily identifiable level in the system hierarchy. This is not just unsupported; all of the intrinsic evidence suggests otherwise. *E.g.*, Dkt. 196-3 ('033 Patent) at 2:20-22 (describing embodiments involving a "battery **_system_**" with a "plurality of battery **_sub-modules_**" (emphases added)).

That a "battery sub-module" is merely a component of some larger battery system is fully supported by the specification, *see* Br. at 11-12, which is "the single best guide to the meaning of a disputed term" and "[u]sually . . . dispositive." *Phillips*, 415 F.3d at 1315. The specification consistently describes a charger for a "battery system" comprised of "battery sub-modules." *E.g.* Dkt. 196-3 ('033 Patent) at 2:20-22, 2:34-36, 3:4-11, 3:31-33, 4:10-23, 9:59-65, 10:22-24. Also, Figure 2 depicts a *two-tiered* architecture with a "battery system" comprised of multiple "battery sub-modules" and having no intermediate structure. Archer does not dispute that its proposed construction would exclude this embodiment, which is improper, *see MBO Labs.*, 474 F.3d at 1333.

Tellingly, Archer fails to muster any meaningful intrinsic evidence for its proposed construction. Archer cites only a handful of disclosures that state "battery sub-modules" may include multiple cells. Opp. at 12. But the fact that a "battery sub-module" may include multiple cells says nothing about whether that sub-module must be placed within some intermediary module, which in turn is combined with other modules to make up a pack, as Archer would require. In fact, the cited disclosures teach that, contrary to Archer's construction, a battery sub-module need not inherently comprise "a container of two or more cells." Opp. at 12 (citing '033 patent at 3:30-33); Br. at 13 (citing '033 patent at 3:31-48) (battery sub-modules do not inherently have multiple cells). Thus, Archer's construction finds no support in the intrinsic evidence.

Lacking any persuasive intrinsic evidence, Archer relies almost exclusively on extrinsic evidence. But because the meaning of "battery sub-module" is clear from the intrinsic record, Archer's extrinsic evidence is irrelevant. *Immunex Corp. v. Sanofi-Aventis U.S. LLC*, 977 F.3d 1212, 1221-22 (Fed. Cir. 2020) (improper to use extrinsic evidence to "introduce ambiguity in a

way that disregards the language usage in the patent itself") Further, Wisk provides evidence demonstrating that skilled artisans used the term in different ways, such that the "meaning of 'battery sub-module' is dictated by the context in which the term appears."[4] Collins Decl., ¶ 36.

Archer relies primarily upon its expert's interpretation of a 2014 thesis submitted by Faisal Altaf to Chalmers University of Technology in Sweden ("Altaf Thesis"). The Altaf Thesis relates to a "multi-level converter" that "has a special modular structure which distributes a large battery pack into smaller units." Hoffman Decl., ¶ 48, *citing* Altaf Thesis. Contrary to Archer's suggestion, the usage of "battery submodule" by this particular author, in this particular context, falls far short of establishing that the term has an accepted meaning consistent with Archer's construction.

Wisk's expert also presented countervailing evidence that uses "battery sub-module" to refer to a fully-contained battery within the battery system. Collins Decl. ¶¶ 46-47, 50. Archer's only response to this evidence is to argue that it is "directed to battery systems for personal computers, mobile devices, and the like, which operate at far different voltages and under far different conditions than the electric-vehicle batteries." Opp. at 13. But Archer points to nothing in the claims or specification that limits the Charging Patents to any particular voltages or conditions, or shows that the term should be given a different meaning on this basis.

Archer also contends that other patents assigned to Wisk support its construction. Opp. at 12. Not so. Wisk already showed in its opening brief that these patents support Wisk's, not Archer's, construction by teaching that battery sub-modules are components of a battery system. Br. at 12-13. Archer's citations to a few disclosures in these patents, which state a battery sub-module may include multiple cells and that multiple battery sub-modules may form a high-voltage battery system, is entirely consistent with Wisk's construction. Opp. at 12-13. And most

---

[4] That a "battery sub-module" can be a component of some larger battery system is also reflected in U.S. Patent Publication No. 2020/0176737 (cited by Archer) which equates the "battery system" with "module" and the "battery sub-modules" with components of the battery system. Br., Ex. O ¶¶ 45 (describing two levels: "sub-module level" and the "battery system or module level"), 55 ("battery sub-modules are combined together to form a larger, high-voltage battery system"). This is also reflected in Wisk's extrinsic evidence which states that "each battery sub-module 102 may be a fully-contained battery." *E.g.*, Collins Decl. ¶ 36, *citing* U.S. Patent No. 10,027,133.

importantly, Archer is unable to cite to any teaching in these patents that suggests a "battery submodule" must be a "sub-part of a module," which in turn is combined with other modules to make up a "battery pack." In sum, Archer's construction is not justified by the extrinsic evidence.

Finally, Archer's criticisms of Wisk's construction lack merit. Archer argues that Wisk's construction is incorrect because the term "switch" and "battery management system" are not expressly recited in the claim language. But the purpose of the invention is to provide individually controlled "sub-modules" of a larger battery system. *See* Dkt. 196-3 ('033 Patent) at Abstract. A person of skill in the art would understand from this teaching, as well as from the context of the surrounding claim language, that a battery sub-module requires a switch (for connection to and disconnection from the common power bus) and a BMS (for collecting metrics), to fulfill its stated purpose. Collins Decl. ¶¶ 29, 31, 39-40. Archer provides no evidence to dispute this understanding.

Archer also does not dispute that the specification consistently teaches that a battery sub-module includes a "switch" and a "battery management system." Although Archer argues that these are merely preferred embodiments,[5] where, as here, the claim term ("battery sub-module") does not have universal meaning, its meaning should be dictated by the specification. *See Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004) ("Where a claim term has no ordinary and customary meaning, a court must resort to the remaining intrinsic evidence . . . to obtain the meaning of that term."); *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016) (terms with no established meaning "ordinarily cannot be construed broader than the disclosure in the specification"). Here, the purpose of the invention is to collect metrics for the purpose of selectively connecting/disconnecting individually controlled battery sub-modules to a common bus. Every disclosure implements this by equipping a "battery sub-module" with a switch and a battery management system. *See* Collins Decl. ¶¶ 39-40. Thus, Wisk's proposed construction is correct.

---

[5] Archer's claim differentiation argument also misses the mark. Dependent claims of the '328 Patent recite "[t]he system recited in claim 1, wherein the discharge-related fault indication is determined by a built-in battery management system in the given battery sub-module." These dependent claims are consistent with the "battery sub-module" of the independent claim including a battery management system. The dependent claims still narrow scope by adding the requirement that the battery management system determines the "discharge related fault indication."

C.   **"discharge-related fault" ('328 Pat. Claims 1, 6, 11)**

| WISK'S CONSTRUCTION | ARCHER'S CONSTRUCTION |
|---|---|
| Plain and ordinary meaning | "a fault related to discharge of the battery sub-module (as opposed to temperature or voltage)." |

Archer's brief begins by mischaracterizing the dispute as "whether a 'discharge-related fault' is a fault related specifically to discharge, as Archer proposes" or "whether Wisk should be permitted to read the term 'discharge-related fault' expansively, so that it covers faults relating to temperature and voltage." Opp. at 15. But Wisk agrees that a discharge-related fault must relate to "discharge." A discharge is a release of electrical energy from the system, and there is no dispute that such a release inherently involves some change in temperature and voltage conditions. *See* Collins Decl. ¶¶ 55-56. Wisk's position, therefore, is that there is no reason to limit the plain and ordinary meaning of the term "discharge-related fault" to exclude those discharge related faults that happen to be triggered by problematic temperature or voltage conditions. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002) ("[C]laim terms take on their ordinary and accustomed meanings unless the patentee demonstrated an intent to deviate from the ordinary and accustomed meaning of a claim term by redefining the term or by characterizing the invention in the intrinsic record using words or expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope."). Properly framed, the dispute is not whether a "discharge-related fault" relates to "discharge," but rather whether the Court should adopt Archer's negative limitation which carves out of discharge-related faults those faults that are triggered by temperature or voltage.

Archer's negative limitation is unwarranted. Archer does not dispute that a negative limitation must find support either in the words of the claim, or through an express disclaimer or independent lexicography in the written description. And, Archer admits that it is not relying on disclaimer or lexicography here. Opp. at 16 ("Archer is not arguing that Wisk disavowed claim scope"). Instead, Archer claims that its construction somehow does not include a negative limitation. Opp. at 16-17. But by its own terms, Archer's construction excludes "a fault related to . . . temperature and voltage," and therefore clearly qualifies as a "negative limitation" under Federal Circuit law. *See Ethicon*, 847 Fed. Appx. at 907 ("We have identified claim constructions that exclude a particular element as including a 'negative limitation'"). Archer's inability to justify

its proposed negative limitation, alone, warrants rejection of its proposed construction.

Archer also attempts to establish an illusory distinction between what it calls a "general 'fault'" and a "discharge-related fault." Opp. at 15. The passage it cites, however, draws no such distinction. At most, the specification describes one particular, and *exemplary*, type of fault condition: "**For example**, if a battery sub-module was completely discharged to 0V and remained discharged for a relatively long period of time (e.g., a week) . . . ." Dkt. 196-4 ('328 Patent) at 6:63-7:4 (emphasis added).[6] Archer points to nothing to suggest that this example is an express and exclusive definition for a "discharge-related fault." While the specification teaches that this fault may be triggered "even though temperature and/or voltage checks may be satisfied," Archer does *not* claim that this constitutes a clear and unmistakable disavowal of temperature or voltage related faults from the scope of the claims. Opp. at 16. Accordingly, Archer has, at most, identified a single embodiment that happens to not be triggered by a temperature or voltage condition. That does ***not*** mean that discharge related-faults can never involve temperature and voltage.

Archer's citation to the prosecution history is equally unavailing. That Wisk pointed to an *embodiment* for purposes of supporting an amendment does not limit the claim. *See* Opp. Ex. 19 (Dkt. 202-20) at 7. Archer does not, and cannot, claim that identifying exemplary support for a claim amendment creates a "clear and unmistakable" disclaimer. *See 3M Innovative Props Co. v. Tredegar Corp.*, 725 F.3d 1315, 1325-26 (Fed. Cir. 2013) (standard for prosecution disclaimer).

Finally, Archer's extrinsic evidence is unpersuasive. Archer's expert, Dr. Hoffman, relies on a document, RTCA DO-311A at 2.1.6, which he contends has separate sections for "battery fault conditions (including overtemperature, undervoltage, and overvoltage)" and "Overdischarge Protection." Opp. Ex. 3 (Dkt. 202-4) ¶ 75. But Dr. Hoffman never opines that these sections are distinguishing between distinct types of faults. Rather, as he tacitly admits, the section dealing with Overdischarge states that a dangerous discharge condition can occur when cells are "discharged past

---

[6] Importantly, dependent claim 2 is drawn specifically to this exemplary type of "discharge-related fault." Dkt. 196-4 ('328 Patent) at claim 2. This suggests that the term "discharge-related fault" in independent claim 1 is broader. *See Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1234 (Fed. Cir. 2001) (holding that express recitation of a particular embodiment in dependent claim indicates that independent claim should be interpreted more broadly).

their specified lower voltage limit." *Id.* If anything, this supports Wisk's position that temperature and voltage related faults occur during discharge. Thus, Wisk's construction is correct.

   D.   **"computing an optimal mix of actuators and associated actuator parameters to achieve to an extent practical the requested forces and moments, including by minimizing a weighted set of costs that includes costs associated with one or more errors each corresponding to a difference between a requested force or moment and a corresponding force or moment achieved by the computed solution" ('099 Pat. Claims 1, 26)**

| WISK'S CONSTRUCTION | ARCHER'S CONSTRUCTION |
|---|---|
| Plain and ordinary meaning | "an optimal mix of actuators and associated actuator parameters" means "the mix that provides the true minimum of the weighted set of costs" |

The parties agree that "an optimal mix of actuators and associated actuator parameters" is one that that minimizes a "weighted set of costs." Opp. at 17 ("The asserted claims . . . require that this 'optimal' mix be computed 'by *minimizing* a weighted set of costs.'"). That requirement, however, is already included in the claim language, since all asserted claims recite "minimizing a weighted set of costs." *See* claims 1, 26. This leaves no doubt about what is meant by "optimal mix," and there is no need for the Court to provide a further construction. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) (noting that claim construction "is not an obligatory exercise in redundancy"). Further, Archer's proposal, which injects the word "true" from the specification, is unhelpful and confusing at best. It also appears aimed at limiting the invention to an embodiment, which is not proper. *See MBO Labs.*, 474 F.3d at 1333.

   In support of its construction Archer relies first, and primarily, on extrinsic evidence. Opp. at 17-18. But this is backwards—claim construction "begin[s] with the intrinsic evidence" and "[i]f the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence." *See Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021). Moreover, Archer's reliance on Dr. Heppe's testimony, and his interpretation of various extrinsic sources, is unpersuasive because this evidence is largely disconnected from the Patent, the technical field, and the specific flight control optimization problem that the invention seeks to solve. *See* Heppe Decl. ¶ 24 (citing general understanding and IEEE dictionaries); *Toro Co. v. White Consol. Indus., Inc.*, 199 F.3d 1295, 1299 (Fed. Cir. 1999) (discounting dictionary definitions because "[i]n judicial 'claim construction' the court must achieve the same

understanding of the patent, as a document whose meaning and scope have legal consequences, as would a person experienced in the technology of the invention"). Here, where the Patent itself already provides extensive guidance, extrinsic evidence is generally less reliable and useful.[7] *See Phillips*, 415 F.3d at 1324.

Turning to the intrinsic evidence, Archer argues that the specification criticized "prior-art 'offline' calculations because they 'typically did not find a true optimal solution (minimum cost) in any given real world set of inputs and conditions.'" Opp. at 18, *quoting* Dkt. 196-5 ('099 Patent) at 8:58-61. But the specification further explains that while "flight control via online optimization" yields a "true optimal combination," the invention also covers embodiments achieving optimization "at least to a degree via offline processing." *Id.* at 11:21-24. An embodiment involving a "degree" of offline processing involves some approximation in minimizing the weighted set of costs, and achievement of a "true" optimum is therefore unlikely. *See* Gandhi Decl. ¶ 42. The Patent makes clear that these embodiments are nevertheless within the scope of the invention. Thus, Archer's proposed construction is, apparently, a backdoor attempt to limit the claim to a purely "online" optimization technique, *see id.* ¶ 43, and thereby exclude the embodiment teaching a degree of offline processing. This is improper. *See MBO Labs.*, 474 F.3d at 1333 ("A claim interpretation that excludes a preferred embodiment from the scope of the claim is rarely, if ever, correct.").[8]

Archer argues that "[t]he specification does not use the concept of a 'true' optimum to distinguish between offline and online embodiments of the alleged invention . . . but rather to distinguish between *the prior art* and the alleged invention." Opp. at 19. That is wrong. In each of

---

[7] Archer criticizes Dr. Gandhi for reliance on the intrinsic record to opine on how the claim would be understood from the viewpoint of a person of skill in the art. Opp. at 18 n.7. But the cases Archer cites, *Symantec Corp. v. Comput. Assocs. Int'l, Inc.*, 522 F.3d 1279, 1291 (Fed. Cir. 2008), and *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1137 n.3 (Fed. Cir. 2007), are inapt. In these cases, the Court was critical of experts whose testimony recited how that expert would construe the term based on his own reading of the specification rather than the expert's opinion of how one skilled in the art would construe the term in light of the specification.

[8] Claim differentiation also supports rejecting Archer's attempt to limit the claim to a purely "online optimization" technique. Dependent claim 5 is directed to the online approach, reciting "[t]he method of claim 1, wherein said optimal mix is computed **onboard the aircraft in real time**." Dkt. 196-5 ('099 Patent), claim 5 (emphasis added). This suggests that claim 1 is broader, and covers optimization techniques that involve a degree of offline processing. *See Wenger*, 239 F.3d at 1234.

the two instances where the specification uses the word "true," it expressly links the concept to "online" optimization. Dkt. 196-5 ('099 Patent) at 8:58-61, 11:13-17. In column 8, the Patent contrasts a "true" optimum with prior approaches that computed actuation mixes offline. *Id.* at 8:58-59. And column 11 contrasts "various embodiments" involving online optimization to yield a "true" optimum with other, "various embodiments" that achieve optimization "at least to a degree via offline processing." *Compare id.* at 11:13-17, *with id.* at 11:21-33. Archer asserts that the Patent distinguishes prior art online optimization techniques as well. Opp. at 18, *citing* Dkt. 196-5 ('099 Patent) at 8:61-9:5. But this portion of the specification (unlike the portions contrasting online and offline approaches) does not link the described improvement to the concept of a "true" optimum and therefore does not support the requirement that Archer seeks to import. In any event, this passage is irrelevant because it merely criticizes a single online optimization technique—*i.e.*, "cascaded pseudo-inverse"—and only in a specific circumstance—*i.e.*, when "one or more actuators (e.g., lift fans) reach an upper limit of their capacity/effectiveness, a condition sometimes referred to herein as 'saturation.'" Dkt. 196-5 ('099 Patent) at 8:61–9:5. In sum, there is no justification in the intrinsic evidence to import the requirement for a "true" optimum, as Archer would require.

Archer's effort to import the word "true" also risks confusion by suggesting that the claim is limited to the one, and only one, solution that minimizes the weighted set of costs under all assumptions and under all circumstances. Archer "agrees wholeheartedly" that this interpretation would be improper, and does not dispute that the costs to be minimized depends on the design, and may be weighted differently based on different aircraft priorities.[9] Opp. at 20. Yet, injecting the word "true" into the claim would introduce ambiguity, suggesting to the jury that the claim requires what even Archer agrees is too restrictive. The purpose of claim construction is to clarify, not to create additional confusion. *See Embrex, Inc. v. Service Eng. Corp.*, 216 F.3d 1343, 1347 (Fed. Cir. 2000) (holding that claim construction "is simply a way of elaborating the normally terse claim language[ ] in order to understand and explain, but not to change, the scope of the claims").

---

[9] Archer is wrong that the '099 Patent is indefinite for failing to exhaustively specify the types of constraints that a designer may want to enforce and costs that might be included within the weighted set of costs, Opp. at 20. This argument is addressed further below in Section E.

Finally, while somewhat of a sideshow to the primary dispute, Archer disagrees that the optimum mix of actuators may be based on minimizing the weighted set of costs within some tolerance or local range of solutions. Opp. at 20. But the Patent describes exactly this type of optimization technique as within the scope of the invention. For example, in some cases "an optimal control flight solution using BVLS" is found "if residual values are small enough to consider the [Kuhn-Tucker] convergence test to be satisfied." Dkt. 196-5 ('099 Patent) at 10:18-25; *see also id.* at 8:54-58 ("In various embodiments, formulating the optimization as a quadratic program enables *converging to an optimal solution within a flight control cycle time* (e.g., 10 msec in the case the controller framerate is 100 Hz)." (emphasis added)). This makes sense—the Patent is not directed towards computing some theoretical minimum as an exercise in mathematical perfection, but rather concerned with computing the best solution under a given set of operating constraints, given time and processing limitations and operating constraints. *See Realtime Data, LLC v. Packeteer, Inc.*, 2009 WL 41410318, at *6-7 (E.D. Tex. Nov. 23, 2009) (recognizing that the language of the patent was dealing with "real world practical considerations" and rejecting effort to limit claim to a "data storage rate" that would ignore how the device operated in real-world conditions); *see also JVC Kenwood Corp. v. Nero, Inc.*, 2013 WL 2356149, at *3 (C.D. Cal. Jan. 29, 2013) ("Optimization can also involve containing or limiting the value of a parameter within an acceptable range.").

For all of these reasons, the Court should reject Archer's effort to import the unnecessary and confusing word "true" into the claims, and instead adopt plain meaning.

E. **"computing an optimal mix of actuators and associated actuator parameters to <u>achieve to an extent practical the requested forces and moments</u>, including by minimizing a weighted set of costs that includes costs associated with one or more errors each corresponding to a difference between a requested force or moment and a corresponding force or moment achieved by the computed solution" ('099 Pat. Claims 1, 26)**

| WISK'S CONSTRUCTION | ARCHER'S CONSTRUCTION |
|---|---|
| Plain and ordinary meaning | "achieve to an extent practical the requested forces and moments" is indefinite |

Archer fails to demonstrate indefiniteness of this term by clear and convincing evidence. As Wisk explained in its Opening Brief, Archer's indefiniteness theory is premised on a "fundamental misreading" of the claim. Br. at 21. The "to an extent practical" language in the claim is *not*, as

Archer contends, drawing a distinction "between optimizations that satisfy the claims—i.e., optimizations that 'achieve to an extent practical the requested forces and moments' and optimizations that do not." Opp. at 21.  Rather, this language is simply an acknowledgment that the claim applies in a situation where the "requested forces and moments" cannot fully be achieved. Gandhi Decl. ¶ 47; *see also* Dkt. 196-5 ('099 Patent) at 3:48-54.  Archer's brief inexplicably ignores this explanation, and simply doubles down on its fundamental misreading.

When the claim is read correctly, Archer's indefiniteness theory falls apart.  There is no "subjectivity" in what the claim requires.  The claim requires a "mix of actuators and actuator parameters" that "minimiz[e] a weighted set of costs."  But the claim also acknowledges that there may be situations in which the selected solution, while "optimal," will not be capable of fully satisfying the "forces and moments" that were requested.  In *that* situation, the optimal solution will "achieve to an extent practical the requested forces and moments."

The claims also specify exactly how to account for this situation.  Where the "requested forces and moments" cannot fully be achieved, the claims instruct that the "error" (*i.e.*, the difference between what was requested and what can be achieved) be *itself* modeled as a cost within the "weighted set of costs" that are to be minimized.  Gandhi Decl. ¶ 48.  To be clear, the solution will still minimize the weighted set of costs and therefore be the "optimum" solution.  But the optimization technique will account for the fact that the forces and moments achieved by that optimum will not fully satisfy the forces and moments that were required.  The result does *not* depend on any subjective judgment about what is, or is not, practical.  This distinguishes the claims here from Archer's cited cases.  Opp. at 22-23, *citing Interval*, *Intellectual Ventures*, and *Datamize*.

Also, as Wisk noted in the Opening Brief, there is no uncertainty regarding the types of conditions and constraints that may lead to a flight controller being unable to practically achieve the requested forces or moments.  Br. at 23 (describing examples of objective constraints and describing how such constraints are modeled); *Nevro Corp. v. Boston Sci. Corp.*, 955 F.3d 35, 39-40 (Fed. Cir. 2020) (holding that claims were not indefinite where the intrinsic evidence provided "a general guideline and examples" that allow a person of ordinary skill in the art to determine the scope of the claims).  It is unclear, from Archer's briefing, whether it seriously disputes this point.  Archer argues

that "the patent does not identify an objective boundary between 'practical' and 'impractical' results." Opp. at 22. But that is just another variation of Archer's studied misreading of the claims. Again, the claims are not drawing a distinction between optimal results that are practical or impractical; the claim is drawing a readily understandable distinction between an optimal result that satisfies the requested forces/moments and an optimal result that cannot.

Archer complains that the specification identifies multiple constraints that could be modeled, but does not specify exactly which constraints should be modeled. Opp. at 23. This argument demands a level of specificity that is not required in the law. *See BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1366 (Fed. Cir. 2017) ("[A]n inventor need not explain every detail because a patent is read by those of skill in the art."). The Patent provides guidelines and examples regarding the types of constraints that may be imposed on a flight control system, which are more than sufficient to allow a person of ordinary skill in the art to understand the scope of the claims. Gandhi Decl. ¶¶ 27, 35, 47; *see Nevro Corp.*, 955 F.3d at 39-40. The Patent also teaches the situation "in which one or more actuators (e.g. lift fans) reach an upper limit of their capacity/effectiveness, a condition sometimes referred to herein as 'saturation.'" Dkt. 196-5 ('099 Patent) at 8:66-9:3. There is, of course, no one-size-fits all approach to the types of constraints that a designer may wish to enforce, and these constraints may differ based on the particular characteristics of the eVTOL aircraft implemented. However, the Patent provides sufficient detail to understand these choices. *See BASF*, 875 F.3d at 1365-66 (challenger failed to establish indefiniteness merely because patent did not recite the level and measurement necessary to determine whether a composition was "effective to catalyze"). The Court should find that the claim is not indefinite, as a matter of law.

F. **"determine, within the solution space, a combination of the actuators and associated actuator parameters to apply the set of forces and moments to the aircraft to an extent practicable with the failure induced reduced capacity of the at least one of the lift fans" ('411 Pat. Claim 1)**

| WISK'S CONSTRUCTION | ARCHER'S CONSTRUCTION |
|---|---|
| Plain and ordinary meaning | Indefinite |

Just as the "to an extent practical" language in the '099 Patent claims is meant to acknowledge a scenario in which the optimal solution could not fully achieve the requested forces/moments, the "to an extent practicable" language in the '441 Patent claims acknowledges

the limitations of a flight control computer to fully achieve a requested outcome, particularly in the context of one or more lift fan failures. The language does *not* introduce subjectivity.

The '441 Patent teaches the concept of a "solution space," which comprises all possible combinations of actuator commands given their current capabilities and within any constraints to be enforced. *See* '441 patent at 7:58-62 ("[A] solution space that takes into account which actuators are available (e.g., haven't failed, aren't excluded from use due to current air speed, etc.) and for each a minimum and/or maximum command is determined."). The flight controller may encounter a situation in which an otherwise "unconstrained optimum" for all of the free variables "is not entirely within bounds" of the "solution space." In this situation, the Patent teaches techniques for identifying variables at or beyond a bound of the solution space, and constraining those variables to the applicable bound. *See* at 10:61-66 & Figure 9 (teaching, for example, a "convex interpolation of a previously-computed solution with the unconstrained optimum" for moving free variables to the applicable bound and removing them from the free set of variables in the optimization analysis).

As with the '099 Patent claims, there is no subjectivity. The claims merely acknowledge situations in which the requested forces/moments and/or an otherwise "unconstrained optimum" may lie beyond the boundary of what is possible, and teaching a method to account for this situation by selecting a combination within the solution space. The claims are not indefinite.

## II. CONCLUSION

For the foregoing reasons, Wisk requests that the Court adopt its proposed constructions.

DATED: February 3, 2022                     Respectfully submitted,

                                            QUINN EMANUEL URQUHART & SULLIVAN, LLP

                                            By  */s/ Patrick T. Schmidt*
                                                Yury Kapgan
                                                Robert M. Schwartz
                                                Michael T. Zeller
                                                Patrick Schmidt
                                                Michael LaFond

                                            Attorneys for Plaintiff Wisk Aero LLC