1  QUINN EMANUEL URQUHART & SULLIVAN, LLP
   Yury Kapgan (Bar No. 218366)
2    yurykapgan@quinnemanuel.com
   Robert M. Schwartz (Bar No. 117166)
3    robertschwartz@quinnemanuel.com
   Michael T. Zeller (Bar No. 196417)
4    michaelzeller@quinnemanuel.com
   Diane Cafferata (Bar No. 190081)
5    dianecafferata@quinnemanuel.com
   Patrick Schmidt (Bar No. 274777)
6    patrickschmidt@quinnemanuel.com
   865 South Figueroa Street, 10th Floor
7  Los Angeles, California 90017
8  Telephone:    (213) 443-3000
   Facsimile:    (213) 443-3100
9

10 Michael F. LaFond (Bar No. 303131)
11   michaellafond@quinnemanuel.com
   555 Twin Dolphin Drive, 5th Floor
12 Redwood Shores, California 94065
   Telephone:    (650) 801-5000
13 Facsimile:    (650) 801-5100

14
   Attorneys for Plaintiff Wisk Aero LLC
15

16               **UNITED STATES DISTRICT COURT**

17              **NORTHERN DISTRICT OF CALIFORNIA**

18                **SAN FRANCISCO DIVISION**

19

20 WISK AERO LLC,                          CASE NO. 3:21-cv-02450-WHO

21            Plaintiff,                   **PLAINTIFF WISK AERO LLC'S**
                                           **OPPOSITION TO DEFENDANT ARCHER**
22      vs.                                **AVIATION INC.'S MOTION FOR**
                                           **JUDGMENT ON THE PLEADINGS**
23 ARCHER AVIATION INC.,                   **UNDER RULE 12(C) REGARDING THE**
                                           **'099 AND '441 PATENTS**
24            Defendant.
                                           Hearing Date: March 4, 2022
25                                         Hearing Time: 2:00 pm

26

27

28

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INTRODUCTION ................................................................................................................................1

BACKGROUND OF THE CLAIMED INVENTIONS ....................................................................2

LEGAL STANDARD ........................................................................................................................6

ARGUMENT .....................................................................................................................................8

I.  The Claims of the '099 Patent are Patent Eligible Under § 101 ..........................................8

    A.  *Alice* Step One ...........................................................................................................8

        1.  The Relevant Authority Demonstrates the '099 Claims Are Eligible...........9

        2.  This Court's Decisions Confirm That the '099 Claims are Not Abstract .....................................................................................................11

        3.  Archer Mischaracterizes the Invention as an Improved Calculation ..........13

        4.  Archer Relies on Inapt Authority .................................................................16

        5.  Archer Gives Short Shrift to the Dependent Claims ....................................18

    B.  *Alice* Step Two ........................................................................................................18

II.  The Claims of the '441 Patent are Patent Eligible Under § 101 ........................................20

    A.  *Alice* Step One .........................................................................................................20

    B.  *Alice* Step Two ........................................................................................................24

III.  If Necessary, Wisk Requests Leave to Amend its Factual Allegations ..............................25

CONCLUSION ................................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
   882 F.3d 1121 (Fed. Cir. 2018) ............................................................................................. 8

*Alice Corp. Pty. Ltd. v. CLS Bank Intern.*,
   573 U.S. 208 (2014) ................................................................................................... passim

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
   841 F.3d 1288 (Fed. Cir. 2016) ........................................................................................... 19

*Berkheimer v. HP Inc.*,
   881 F.3d 1360 (Fed. Cir. 2018) ..................................................................................... passim

*Bilski v. Kappos*,
   561 U.S. 593 (2010) ............................................................................................... 6, 16, 17

*Cal. Inst. of Tech. v. Broadcom Ltd.*,
   --- F.4th ----, 2022 WL 333669 (Fed. Cir. Feb. 4, 2022) ........................................ 7, 9, 10, 11

*CardioNet, LLC v. InfoBionic, Inc.*,
   955 F.3d 1358 (Fed. Cir. 2020) ..................................................................................... passim

*Cellspin Soft, Inc. v. Fitbit, Inc.*,
   927 F.3d 1306 (Fed. Cir. 2019) ........................................................................................... 19

*Chamberlain Grp., Inc. v. Techtronic Indus. Co.*,
   935 F.3d, 135 (Fed. Cir. 2019) ............................................................................................ 23

*ChargePoint, Inc. v. SemaConnect, Inc.*,
   920 F.3d 759 (Fed. Cir. 2019) ............................................................................................. 23

*CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*,
   15 F.4th 1091 (Fed. Cir. 2021) ................................................................................. 7, 19, 23

*Cronos Techs., LLC v. Expedia Inc.*,
   No. 13-1538, 2015 WL 5234040 (D. Del. Sept. 8, 2015) ..................................................... 18

*CyberSource Corp. v. Retail Decisions, Inc.*,
   654 F.3d 1366 (Fed. Cir. 2011) ..................................................................................... 17, 23

*Enfish, LLC v. Microsoft Corp.*,
   822 F.3d 1327 (Fed. Cir. 2016) ..................................................................................... passim

*Finjan, Inc. v. Blue Coat Sys.*,
   No. 3295, 2016 WL 7212322 (N.D. Cal. Dec. 13, 2016) ........................................................ 8

*Finjan, Inc. v. Sophos, Inc.*,
   244 F. Supp.3d 1016 (N.D. Cal. Mar 14, 2017) ................................................................... 19

*Fortinet, Inc. v. Forescout Techs., Inc.*,
   No. 03343, 2021 WL 5565836 (N.D. Cal. Nov. 29, 2021) ............................................. 24, 25

*Funk Bros. Seed Co. v. Kalo Inoculant Co.*,
   333 U.S. 127 (1948) ............................................................................................................. 6

*Gottschalk v. Benson*,
   409 U.S. 63 (1972) ....................................................................................................... 16, 17

*Gregg v. Haw., Dep't of Pub. Safety*,
   870 F.3d 883 (9th Cir. 2017) ................................................................................................ 6

*Huawei Technologies v. Samsung Electronics*,
No. 02787, 2016 WL 6834614 (N.D. Cal. Nov. 21, 2016) ........................................... 9, 11, 12

*iLife Techs., Inc. v. Nintendo of Am., Inc.*,
839 F. App'x 534 (Fed. Cir. 2021) .................................................................................... 23

*In re Board of Trustees of Leland Stanford Junior University*,
991 F.3d 1245 (Fed. Cir. 2021) ......................................................................................... 16

*In re Rosenberg*,
813 F. App'x 594 (Fed. Cir. 2020) .................................................................................... 17

*Interval Licensing LLC v. AOL, Inc.*,
896 F.3d 1335 (Fed. Cir. 2018) ......................................................................................... 22

*Lopez v. Smith*,
203 F.3d 1122 (9th Cir. 2000) ........................................................................................... 25

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008) ............................................................................................. 6

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
566 U.S. 66 (2012) ............................................................................................................... 7

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) ............................................................................. 7, 8, 9, 17

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
521 F.3d 1097 (9th Cir. 2008) ............................................................................................. 6

*Mod Stack LLC v. Aculab, Inc.*,
No. 332, 2019 WL 3532185 (D. Del. Aug. 2, 2019) .......................................................... 13

*Packet Intelligence LLC v. NetScout Sys., Inc.*,
965 F.3d 1299 (Fed. Cir. 2020) ......................................................................................... 22

*Parker v. Flook*,
437 U.S. 584 (1978) ........................................................................................................ 7, 16

*PUREPREDICTIVE, Inc. v. H20.AI, Inc.*,
No. 03049, 2017 WL 3721480 (N.D. Cal. Aug. 29, 2017) ............................................... 12

*Research Corp. Techs., Inc. v. Microsoft Corp.*,
627 F.3d 859 (Fed. Cir. 2010) ........................................................................................... 15

*SAP America, Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) ............................................................................... 17, 20, 23

*SiRF Tech., Inc. v. Int'l Trade Com'n*,
601 F.3d 1319 (Fed. Cir. 2010) ............................................................................................ 8

*Stormborn Techs., LLC v. Topcon Positioning Sys.*,
No. 07804, 444 F. Supp.3d 1119 (N.D. Cal Mar. 17, 2020) ............................................. 23

*Synopsys, Inc. v. Avatar Integrated Systems, Inc.*,
No. 04151, 2020 WL 6684853 (N.D. Cal. Dec. 22, 2020) ........................................... 12, 13

*TecSec, Inc. v. Adobe Inc.*,
978 F.3d 1278 (Fed. Cir. 2020) ............................................................................... 7, 9, 13, 22

*Thales Visonix Inc. v. United States*,
850 F.3d 1343 (Fed. Cir. 2017) ......................................................................................... 11

*Two-Way Media Ltd. v. Comcast Cable Communications, LLC*,
874 F.3d 1329 (Fed. Cir. 2017) ......................................................................................... 22

*Uniloc USA, Inc. v. LG Elecs. USA, Inc.*,
   957 F.3d 1303 (Fed. Cir. 2020)...................................................................................... 8

*Visual Memory LLC v. NVIDIA Corp.*,
   867 F.3d 1253 (Fed. Cir. 2017).............................................................................. passim

**Statutory Authorities**

35 U.S.C. § 101 ................................................................................ 6, 8, 9, 13, 20

35 U.S.C. § 112 .................................................................................................. 23

**Rules and Regulations**

Fed. R. Civ. P. 15(a).......................................................................................... 25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# INTRODUCTION

Archer's Motion for Judgment on the Pleadings ("Motion" or "Mot.") is founded on a mischaracterization of the inventions claimed in Wisk's '099 and '441 Patents ("Patents") as well as a misapplication of the caselaw.  Arguing that the claimed inventions are mere "mathematical computations," and thus patent ineligible, Archer fails to acknowledge that the claims of the Patents, as made clear in the specification, are in fact directed to specific and novel improvements to existing technology grounded within the field of flight optimization.

In particular, the claims of the '099 Patent set forth a novel flight optimization technique that accounts for situations in which an aircraft cannot fully supply the requested force or moment due to system constraints or "saturation" of an aircraft actuator.  To address this problem, the claims recite modeling a weighted set of costs, and they include within that set of costs a novel consideration of the cost comprising the difference between (i) the force or moment *requested* by a pilot or operator, and (ii) the force or moment that can be practically *achieved*.  *E.g.*, Ex. A ('099 Patent) at claim 1; *see also id.* at 3:48–54, 8:4–18.  The specification expressly describes that this improves upon "prior approaches" by enabling computation of a "workable optimal solution" within a required cycle time.  *Id.* at 8:62–9:13.  Archer's brief ignores this critical aspect of the claims.

Similarly, the '441 Patent is not directed to a mere abstract mathematical calculation but is directed to an aircraft comprising a flight controller configured to solve a specific flight control problem, namely a lift fan failure with an aircraft that can cause an otherwise unconstrained optimum solution to lie entirely outside a calculated "solution space."  Ex. B ('441 Patent) at claim 1; *see also id.* at 7:33–7:64; 8:9–29; 10:43–62.  In these circumstances, the Patent teaches an exemplary technique to "move[]" variables that are at or beyond the bounds of the solution space to the applicable bound of the solution space, and remove those variables from the set of "free variables" in the process.  *Id.* at 10:61–66.  This technique is reflected in the claims, which recite that the flight controller determines "a combination of the actuators and associated actuator parameters to apply the set of forces and moments to the aircraft to an extent practicable" in light of the "failure induced reduced capacity of the at least one of the lift fans."  Again, this novel approach represents an improvement to flight control technology and is therefore a patent-eligible invention.

Setting aside the Motion's failure to show that the Patents are directed to an "abstract idea," the Motion should be denied because it does not and cannot show that the Patents fail step two of the *Alice* test, which in this case raises technical and factual issues that are not amenable to resolution on the pleadings.  *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1369 (Fed. Cir. 2018) ("Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination.").  At this procedural juncture, all inferences must be drawn in Wisk's favor, and Wisk's well-pled allegations support the conclusion that the claims are not "routine, conventional, or well-known."  These highly technical issues of fact will ultimately require expert analysis and are not appropriately resolved in connection with a Rule 12 Motion.

## BACKGROUND OF THE CLAIMED INVENTIONS

### A.   The '099 Patent Claims Recite A Technological Solution

The '099 Patent claims are directed to the technological solution of modeling a weighted set of costs, including costs associated with an "error" term in an aircraft optimization model, in order to optimize flight control, where requested forces and moments cannot fully be supplied (*e.g.*, in cases involving system constraints or actuator "saturation").  While the invention *involves* mathematical computation, the claims are *directed to* a novel way of improving prior art efforts to control flight through a particular cost modeling technique that is expressly recited in the claims and further described within the specification.  This technique offers a technologically improved way to address a specific problem that occurs in flight control optimization processes: namely, accounting for situations in which the requested forces and moments cannot completely be achieved, by factoring that "error" term into the larger optimization analysis.

Claim 1 of the '099 Patent, for example, recites this cost modeling technique:

1. A method of controlling flight of an aircraft, comprising:

receiving a set of inputs associated with a requested set of forces and moments to be applied to the aircraft; and

computing an optimal mix of actuators and associated actuator parameters to achieve to an extent practical the requested forces and moments, **including by minimizing a weighted set of costs that includes costs associated with one or more errors each corresponding to a difference between a requested force or moment and a corresponding force or moment achieved by the computed solution**.

Ex. A ('099 Patent) at claim 1 (emphasis added).  Archer's Motion glosses over the bolded text by

1  characterizing it as merely an improvement to a mathematical algorithm, but it glaringly ignores
2  that it is this language that is critical to improving the prior art methods of flight optimization.

3      The specification underscores the inventive solution recited in the claims.  As described in
4  the specification, the '099 Patent pertains to "techniques to control flight of an aircraft."  Ex. A ('099
5  Patent) at Abstract.   The specification discusses a "flight control system to perform online
6  optimization" that "receives inceptor inputs, sensor inputs, and/or forces and moments[,] and
7  determines an optimal mix of actuators and associated actuator parameters [] to achieve (to an extent
8  feasible) the requested forces and moments."  *Id.* at 2:61–3:3.  "[O]ptimization may be performed
9  at least in part by modeling one or more costs" such as "battery power consumed to drive electric
10 motor-driven lift fans and/or other rotors/propellers, time to move control surfaces, drag associated
11 with control surfaces, etc."  *Id.* at 3:3–8.  That is, the disclosed flight control system receives a set
12 of inputs, *i.e.*, requested forces and moments, that an operator applies to the aircraft.  The flight
13 control system then determines the set of actuators, such as lift fans or control surfaces, that the
14 aircraft will deploy in an effort to satisfy the requested forces and moments, while also minimizing
15 a weighted set of costs incurred by such deployment (*e.g.*, battery power consumed).

16     In performing this optimization analysis, the '099 contemplates the scenario in which a flight
17 control system is unable to produce a mix of actuators to fully achieve the requested forces and
18 moments, for example due to a system-imposed constraint.  *Compare* Ex. A ('099 Patent) at 7:67–
19 8:4 ("In various embodiments, if the requested force and moments ***can be*** satisfied fully without
20 violating any constraint can be found, then such a solution that minimizes a secondary part of the
21 cost function is determined and returned.") (emphasis added), *with id.* at 3:48–49 ("In some
22 embodiments, to the extent requested forces and moments ***cannot fully be*** satisfied") (emphasis
23 added).  The '099 explains that prior art optimization approaches struggled with this problem,
24 teaching for example that the "pseudo-inverse approach does not handle the case in which one or
25 more actuators [] reach an upper limit of their capacity/effectiveness, a condition sometimes referred
26 to herein as 'saturation.'"  *Id.* at 8:62–9:5.  The '099 teaches a need to manage this situation, while
27 still enabling computation of a "workable optimal solution."  *Id.* at 9:5–13.  The '099 is thus directed
28 to solving this technological problem with prior art flight controllers.

Specifically, the claimed flight control technique includes using within "the weighted set of costs" the "one or more errors" that correspond to "a difference between a requested force or moment and a corresponding force or moment achieved by the computed solution."  Ex. A ('099 Patent) at claim 1.  That is, when the requested forces and moments cannot be fully achieved, the claimed flight control takes the disparity, or error, between what was requested and what is achievable and factors *that* into the analysis as a cost to be minimized in the overall optimization. *Id.* at 3:48–54 ("[T]o the extent requested forces and moments cannot fully be satisfied, 'error' terms (i.e., the difference between the requested force and/or moment for a given axis and the corresponding force/moment provide by a given mix of actuators and associated parameters) are modeled as a cost and an optimization is performed to minimize the collective error."); *see also id.* at 8:4–18.   Archer cites nothing in the record to undermine that this novel technique is a technological improvement over prior art flight controllers and is thus patent eligible.

**B.**      **The '441 Patent Claims Recite A Technological Solution**

The '441 Patent claims are directed to an aircraft comprising a flight controller that is configured in a specific and novel way to determine a flight control solution when faced with a specific type of actuator failure, and under the circumstances where an otherwise unconstrained optimum solution (*i.e.*, one that does not account for applicable constraints and limitations) may fall outside a calculated solution space of practically achievable solutions.  As with the '099 Patent, these claims arise particularly within the context of a multi-variable flight optimization problem and are focused on a novel way to solve problems with prior art flight controllers.

For example, claim 1 of the '441 Patent recites:

1. An **aircraft** comprising:

an airframe;

actuators coupled with the airframe, wherein the actuators comprise lift fans;

sensors via which sensor data is generated, wherein the sensor data is indicative of whether each of a plurality of the lift fans has a failure induced reduced capacity;

**a flight controller** configured to:

receive flight control inputs corresponding to a set of forces and moments to be applied to the aircraft via operation of the actuators;

monitor the sensor data to detect whether any one of a plurality of lift fans has a

failure induced reduced capacity to generate lift;

determine, for an instance in which at least one of the lift fans has **a failure induced reduced capacity to generate lift, a solution space** based on current capabilities of the actuators; and

**determine, within the solution space, a combination of the actuators and associated actuator parameters to apply the set of forces and moments to the aircraft to an extent practicable** with the failure induced reduced capacity of the at least one of the lift fans.

Ex. A ('441 Patent) at claim 1 (emphasis added).  As noted, the claims expressly apply where one or more of the plurality of lift fans (*i.e.*, one of the aircraft "actuators") experiences a "failure induced reduced capacity to generate lift."  *Id.*  The specification teaches it is important to detect and account for such an actuator failure because it can impact, in real time, the optimization analysis.  *See id.* at 5:32–46.  Thus, in some embodiments, sensor data is monitored and analyzed for "diminished power/performance, overheating, etc." which "may be taken into consideration, such as by adjusting the actuator effectiveness model and/or the actuator constraints."  *Id.* at 5:51–56.  This provides a "seamless response" to a lift fan experiencing a failure or reduction in capacity.  *Id.* at 5:47–51.

Given the potential for lift fan failure and other constraints on an aircraft's ability to deliver requested forces and moments, the '441 claims recite generating a "solution space."  The "solution space" comprises all possible combinations of actuator commands given their capabilities and within any constraints to be enforced.  *See* Ex. A ('441 Patent) at 7:58–62 ("[A] solution space that takes into account which actuators are available (e.g., haven't failed, aren't excluded from use due to current air speed, etc.) and for each a minimum and/or maximum command is determined.").  As claim 1 recites, the "solution space" is generated based on "current capabilities of the actuators" and thereby accounts for any diminished capability.  The claims then recite how a combination of actuators within the "solution space" is selected to achieve forces/moments to an "extent practicable"—*i.e.*, acknowledging that the forces/moments to be applied may not fully be achieved.

This novel use of a "solution space" in the context of actuator failure is further explained in the supporting specification.  For example, if the flight controller determines that the "unconstrained optimum" for all free variables lies "entirely within bounds of the solution space" then an "exit condition" is satisfied, and the unconstrained optimum solution is simply selected.  Ex. A ('441 Patent) at 10:59–61.  Where, however, "the optimum is not entirely within bounds," the method

involves identifying variables that are at or beyond a bound of the solution space and constraining those variables to the applicable bound.  *See id.* at 10:61–66 & Fig. 9 (teaching, for example, a "convex interpolation of a previously-computed solution with the unconstrained optimum").  Thus, the '441 Patent teaches the use of a "solution space" to account for aircraft failures and constraints, and to select within bounds a solution that approaches the *unconstrained* optimum, all while acknowledging that fully achieving input forces or moments may not be practicable.

In short, the '441 Patent teaches a novel way to configure a flight controller to address a specific problem, namely selecting an appropriate control mix given the potential for lift fan failure in circumstances where an unconstrained optimum cannot be fully achieved.  Again, Archer cites nothing to dispute that this technique is a novel, technological improvement over the state of the art.

## LEGAL STANDARD

A Rule 12(c) motion is "functionally identical to a Rule 12(b)(6) motion."  *Gregg v. Haw., Dep't of Pub. Safety*, 870 F.3d 883, 887 (9th Cir. 2017) (citations omitted).  Dismissal is appropriate "only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory."  *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  The Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party."  *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

Patent protection applies broadly to "any new and useful process, machine, manufacture, or composition of matter."  35 U.S.C. § 101.  This provision, however, carries an "implicit exception" rendering ineligible laws of nature, natural phenomena, and abstract ideas.  *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 573 U.S. 208, 216 (2014).  The exclusionary principle of the § 101 patent-eligibility inquiry is based on the policy against granting a patent monopoly on the building blocks of human ingenuity that are "part of the storehouse of knowledge of all men."  *Bilski v. Kappos*, 561 U.S. 593, 602 (2010), *citing Funk Bros. Seed Co. v. Kalo Inoculant Co.*, 333 U.S. 127, 130 (1948).

Distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications involves a two-step test.  *Alice*, 573 U.S. at 217.  Step one asks, "whether the claims at issue are directed to one of those patent-ineligible concepts."  *Id.*

The "directed to" inquiry asks "what the patent asserts to be the focus of the claimed advance over the prior art." *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (citation omitted). In particular, the step-one inquiry determines whether the claims "focus on a specific means or method *that improves the relevant technology* or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (emphasis added); *see also Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017) (claims directed to a technological improvement to the computer memory system).

If the claim is directed to an ineligible concept, the analysis proceeds to step two, which asks if there is an "inventive concept"—*i.e.*, an element or combination of elements that "amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217–18, *citing Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72–73 (2012).  At step two, "the elements of each claim both individually and 'as an ordered combination'" must be considered "to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* at 217, *citing Mayo*, 566 U.S. at 78.  Step two "must be decided on a case-by-case basis in light of the particular claim limitations, patent specification, and invention at issue." *CosmoKey Sols. GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1099 (Fed. Cir. 2021).

In undertaking the foregoing analysis, it is important to recognize that "[a]t some level, all inventions embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Alice*, 573 U.S. at 217 (cleaned up).  Thus, the Supreme Court has emphasized "tread[ing] carefully in construing this exclusionary principle lest it swallow all of patent law."  *Id.*; *see also Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (generalizing claims, "if carried to its extreme, make[s] all inventions unpatentable").  Moreover, the Supreme Court has stressed that a claim "is not unpatentable simply because it contains a law of nature or a mathematical algorithm." *Parker v. Flook*, 437 U.S. 584, 590 (1978); *see also Cal. Inst. of Tech. v. Broadcom Ltd.*, --- F.4th ----, 2022 WL 333669, at *8 (Fed. Cir. Feb. 4, 2022) (holding a claim involving a formula was patent-eligible because it was directed to "an efficient, improved method of encoding data that relies in part on irregular repetition"). Similarly, the Federal Circuit has repeatedly affirmed that even inventions

wholly implemented in software are patent eligible where they "improv[e] an existing technological process." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016) (quotes omitted); *e.g.*, *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1309 (Fed. Cir. 2020) ("[S]oftware can make patent-eligible improvements to computer technology, and related claims are eligible."); *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020) (holding patent-eligible claims that "'focus on a specific means or method that improves' cardiac monitoring technology"); *McRO*, 837 F.3d at 1314 (rejecting argument that claims were unpatentable because they contain algorithms that "can be performed solely with pencil and paper" and finding claims eligible because they focused "on a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type"); *SiRF Tech., Inc. v. Int'l Trade Com'n*, 601 F.3d 1319, 1333 (Fed. Cir. 2010) (holding as patent-eligible, method claims for computing position of a GPS receiver).

"While the ultimate determination of eligibility under § 101 is a question of law, like many legal questions, there can be subsidiary fact questions which must be resolved en route to the ultimate legal determination." *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018).  Where these fact questions "cannot be answered adversely to the patentee based on the sources properly considered on a motion to dismiss, such as the complaint, the patent, and materials subject to judicial notice," dismissal should be denied.  *Id.*  For example, "[w]hether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination." *Berkheimer*, 881 F.3d at 1369.  Here, at a minimum, there are factual questions as to whether the technique of modeling a weighted set of costs that includes a cost associated with error is not merely the addition of "well-known, routine, and conventional steps." Where factual issues permeate the eligibility analysis, Rule 12 Motions are appropriately denied. *See Aatrix*, 882 F.3d at 1130 (reversing dismissal on § 101 grounds); *Finjan, Inc. v. Blue Coat Sys.*, No. 3295, 2016 WL 7212322, at *12 (N.D. Cal. Dec. 13, 2016) (denying judgment on the pleadings).

## ARGUMENT

## I.      The Claims of the '099 Patent are Patent Eligible Under § 101

### A.      *Alice* Step One

The '099 Patent is focused on a particular technical problem that arises in the field of flight

1   control, namely when a flight control system is unable to fully produce a mix of actuators to achieve

2   a requested force/moment, and its claims recite the novel solution of including error as a weighted

3   cost in a cost function.  Ex. A ('099 Patent) at claim 1.  This is not an abstract idea, but a patent-

4   eligible solution to an existing technological problem.  *See McRO*, 837 F.3d at 1316 (method claim

5   directed to "technological improvement over the existing [technological] techniques" is patent-

6   eligible at step one).  Contrary to Archer's arguments that the invention is directed to no more than

7   a mathematical computation to achieve a mere result, the claims and specification unequivocally

8   demonstrate that the claims in fact recite novel, concrete techniques that improve operation of the

9   flight control system itself.  *See TecSec,* 978 F.3d at 1296 (claims patent-eligible when directed to

10  a method of "employing a secure labelling technique in addition to encryption," which solved a

11  "particular problem" with computer networks); *McRO*, 837 F.3d at 1313 (claims directed to

12  "specific rules" that could be used to produce more "accurate and realistic lip synchronization and

13  facial expressions in animated characters"); *Enfish*, 822 F.3d at 1336 (claim involving "self-

14  referential table" was directed to a "specific improvement" to the way computers operate).

15         The Motion also does not address, and thus fails to show that the '099 raises preemption

16  concerns.  The claims do not cover all approaches to flight control optimization.  Nor do they

17  preempt any mathematical technique.  Instead, the claims only apply specifically in a situation where

18  the optimization problem involves modeling a weighted set of costs that includes costs

19  corresponding to one or more error terms.  This weighs heavily in favor of eligibility.  *See Huawei*

20  *Techs. v. Samsung Elecs.*, No. 02787, 2016 WL 6834614, at *10 (N.D. Cal. Nov. 21, 2016)

21  (describing how concern underlying the exceptions to § 101 is preemption).

22         **1.      The Relevant Authority Demonstrates the '099 Claims Are Eligible**

23         The claims of the '099 Patent are comparable to the patent-eligible claims examined in cases

24  such as *California Institute,* 2022 WL 333669; *CardioNet*, 955 F.3d 1358; *Enfish*, 822 F.3d 1327,

25  and *Visual Memory*, 867 F.3d 1253.  In *California Institute*, the defendant argued precisely what

26  Archer argues here—that a claim involving the creation of codewords was ineligible because it was

27  directed to a mathematical operation.  Rejecting that characterization, the Federal Circuit determined

28  that the claim at issue "claims more than a mathematical formula *because* it is directed to an

efficient, improved method of encoding data that relies in part on irregular repetition."  2022 WL 333669, at *8 (emphasis added).  Similarly, the '099 claims more than a mathematical formula because it recites an improved method of flight control that relies on the modeling of a weighted set of costs, including costs associated with an "error" term, in order to optimize an actuator mix where requested forces and moments cannot fully be supplied.  Ex. A ('099 Patent) at claim 1.

Similarly, in *CardioNet*, the Federal Circuit rejected the assertion that claims were ineligible as abstract where they were directed to determining the relevance of the beat-to-beat timing to atrial fibrillation or atrial flutter, taking into account the variability in the beat-to-beat timing caused by premature ventricular beats identified by the device's ventricular beat detector.  955 F.3d at 1369–70.  The district court had found the claims directed to the abstract idea that "atrial fibrillation and atrial flutter 'can be distinguished by focusing on the variability of the irregular heartbeat.'"  *Id.* at 1366.  But the Federal Circuit reversed, relying largely on the specification's discussion regarding the improvement over prior art heart monitors.  *Id.* at 1368–69.  Specifically, the Court held that because the claims "focus on a specific means or method that improves cardiac monitoring technology," they were not abstract and thus patent eligible.  *Id.* at 1368 (internal citations omitted).

In *Enfish*, the claims recited a "data storage and retrieval system" that used an algorithm to create a "self-referential table."  822 F.3d at 1336–37.  The defendant argued the claims were directed to "the concepts of organizing data into a logical table with identified columns and rows where one or more rows are used to store an index or information defining columns."  *Id.* at 1337.  The Federal Circuit disagreed, determining that the novel aspect of the claims—the self-referential table—focused on an "improvement to computer functionality itself, not on economic or other tasks for which a computer is used in its ordinary capacity."  *Id.* at 1336.  Notwithstanding the lack of any improvement to hardware, the Court found the claims non-abstract because the specification described the self-referential table as an improvement to prior art databases.  *Id.* at 1337–38.

Finally, in *Visual Memory*, the claims recited a computer memory system having "one or more programmable operational characteristics" that were configurable based on the type of processor the memory was connected to.  867 F.3d at 1257.  The district court concluded that these claims were directed to the "abstract idea of categorical data storage," *id.* (quotation omitted), but

the Federal Circuit reversed.  Noting that "[t]he specification explains that multiple benefits flow from the [patent's] improved memory system," the court held that the claims were directed to a "specific asserted improvement in computer capabilities."  *Id.* at 1259 (quotation omitted).  The court distinguished the *Visual Memory* claims from those in prior cases that merely recited the "use of an abstract mathematical formula on any general purpose computer," "a purely conventional computer implementation of a mathematical formula," or "generalized steps to be performed on a computer using conventional computer activity."  *Id.* at 1260 (quotations and citation omitted).

The common lesson from *California Institute*, *CardioNet*, *Enfish*, and *Visual Memory* is that even claims embodied wholly in software, which necessarily involve computational and/or mathematical processes, are eligible where they recite a specific technique, relationship, or approach that improves upon existing technology.  That is precisely what the '099 claims do.  The claims recite a specific technique for modeling a weighted set of costs, including costs relating to any error terms between what the system can achieve and what was requested, in order to improve upon prior art flight controllers in cases of actuator "saturation."  Ex. A ('099 Patent) at 8:62–9:5.

The '099 claims are also comparable to those in *Thales Visonix Inc. v. United States,* 850 F.3d 1343 (Fed. Cir. 2017).  There, the claims involved a method "for tracking the motion of an object."  *Id.* at 1344.  The lower court held the claims were directed to the abstract idea of using "mathematical equations for determining the relative position of a moving object to a moving reference frame."  *Id.* at 1348.  Rejecting this conclusion, the Federal Circuit observed that the claims "specify a particular configuration of inertial sensors and a particular method of using the raw data from the sensors in order to more accurately calculate the position and orientation of an object on a moving platform."  *Id.* at 1349.  Analogizing to *Diehr*, 450 U.S. at 179, and noting that the claimed technique reduced "errors in an inertial system that tracks an object on a moving platform," the court deemed the claims nonabstract.  *Thales*, 850 F.3d at 1348–49.  Similarly, the '099 claims recite a method specific to flight control systems, involving a technique for using flight information to select an actuator mix in a way that overcomes limitations with existing systems.

**2.       This Court's Decisions Confirm That the '099 Claims are Not Abstract**

This Court's reasoning in *Huawei Technologies v. Samsung Electronics* is also directly on

point.  2016 WL 6834614 (N.D. Cal. Nov. 21, 2016).  There, the patent-at-issue recited a "method of facilitating communication in a mobile communication system."  *Id.* at *2.  As Archer does here, the defendant argued the claims were patent ineligible because "(1) they are directed to mathematical equations; and (2) they do not contain any inventive concepts."  *Id.* at *3.  The defendant further argued, as Archer does here, that the "claimed advance is a mathematical equation."  *Id.* at *7.  This Court, however, found the claims patent eligible because they "purport to improve the functioning of the mobile communication system."  *Id.* at *9 (internal quotations omitted).  Addressing the defendant's assertion that the claims were abstract because the claimed advance is merely a mathematical equation, the Court recognized that "[t]he advance is the result of applying a mathematical formula to the specific context of a mobile communication system."  *Id.* at *8.  This is equally true with the '099 claims.  The claims both improve the functioning of flight controllers and they do so by applying a formula to the specific context of flight control.  Ex. A ('099 Patent) at claim 1, 3:48–54, 8:4–18.  Importantly, in finding the *Huawei* claims patent-eligible, this Court recognized that if an "equation has no independent significance outside the technological environment of mobile communication systems, then the claims tying the equation to a mobile device cannot be an attempt to limit something that could be broader, and thus, there is no attempt to 'circumvent' patent law."  *Huawei*, 2016 WL 6834614 at *8.  Similarly, here, the computing step claimed in the '099 Patent has no independent significance outside of the technological environment of flight optimization, and Archer does not argue otherwise.

This Court's decision in *Huawei* is much more on point to this case than the Court's decisions in *Synopsys, Inc. v. Avatar Integrated Systems, Inc.*, No. 04151, 2020 WL 6684853 (N.D. Cal. Dec. 22, 2020), and *PUREPREDICTIVE, Inc. v. H20.AI, Inc.*, No. 03049, 2017 WL 3721480 (N.D. Cal. Aug. 29, 2017), *aff'd*, 741 F. App'x 802 (Fed. Cir. 2018), on which Archer relies.  In *PUREPREDICTIVE*, the claims were directed to a "method for a predictive analysis factory."  2017 WL 3721480, at *1.  This Court agreed with the defendant that the claims were directed to the "abstract concept of testing and refining mathematical algorithms."  *Id.* at *5.  However, key to the Court's decision was the fact that the claims "do not make a specific improvement to existing computer-related technology."  *Id.*  Unlike the *PUREPREDICTIVE* claims, however, the '099

claims are directed to a specific improvement to flight optimization technology.

Likewise, *Synopsys* is inapposite. There, the patent-at-issue described a computer-implemented method of statistical static timing analysis that performed an analysis and stored the result.  2020 WL 6684853, at *2–3.  The "key concept" of the patent was directed to "discarding some irrelevant information and retaining a sub-set of information" and applied "regardless of the type of information at issue or the specific information being discarded and retained."  *Id.* at *6. The claims were held abstract because the claimed method was just another way that "humans regularly sort and analyze information" and the patentee failed to "point to any other focus of the [patent] that is not statistical analysis or mathematical calculations."  *Id.* at *9.  Here, by contrast, the focus of the patent is improved flight control to better account for situations where actuators reach the point of saturation or where system design constraints must be enforced.

### 3.   Archer Mischaracterizes the Invention as an Improved Calculation

Attempting to reduce the claims to just mathematical computations, Archer ignores the very aspects of the claims that render them patent eligible.  *See, e.g.*, *TecSec*, 978 F.3d at 1293 ("[W]e have reiterated the Supreme Court's caution against 'overgeneralizing claims' in the § 101 analysis, explaining that characterizing the claims at 'a high level of abstraction' that is 'untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.'").  According to Archer, the invention is directed to "the idea of using a mathematical calculation to compute an 'optimal' set of outputs for a given set of inputs in a flight control system."  Mot. at 10.  This vast oversimplification ignores key claim limitations and alone is reason enough to deny Archer's motion.  *See Mod Stack LLC v. Aculab, Inc.*, No. 332, 2019 WL 3532185, *3 (D. Del. Aug. 2, 2019) (denying § 101 motion at step one because defendant failed to propose an "abstract idea [that] satisfactorily captures the substance of the claims").

For example, Archer's characterization ignores, and effectively reads out of Claim 1, the claimed advance to which the patent is directed—namely, the element of "minimizing a weighted set of costs associated with one or more errors each corresponding to a difference between a requested force or moment and a corresponding force or moment achieved by the computed solution."  Ex. A ('099 Patent) at claim 1.  Archer's over-abstraction is apparent from its argument

1   that "Claim 1 of the '099 Patent recites a method with only two steps: (1) 'receiving' a set of inputs,

2   and (2) 'computing' an optimal set of outputs and parameters."  Mot. at 5.  Yet this limitation is key

3   to improving prior art flight control methods.  By boiling down the "computing" step in this way,

4   Archer strips out all of the subsequent recited technical details, including the details that lead directly

5   to the claimed technological improvement.

6        Archer also mischaracterizes the specification.  *See* Mot. at 2–5.  Archer asserts that "the

7   specification states that there was a problem with the mathematical computations performed by

8   flight controllers," Mot. at 3, and describes "an improved mathematical approach that provides an

9   'optimal' solution not provided by the prior art."  Mot. at 5.  This is a mischaracterization of how

10  the '099 specification identifies both the problem and the solution.  The passages Archer cites for

11  these assertions merely explain how the invention arises in the context of an aircraft with "more

12  actuators than degrees of freedom" (*i.e.*, an "over-actuated" aircraft"), Ex. A ('099 Patent) at 1:37–

13  45, and express a preference for "online" calculations as opposed to off-line, precomputed solutions,

14  *id.* at 1:51–59 (though, later, the specification makes clear that in some embodiments, the invention

15  includes optimization techniques that rely "at least to a degree via offline processing," *id.* at 11:22–

16  33).  **Nowhere** does the specification ever describe a problem with existing mathematics, or state

17  there was a need in the art for an improved method of computation.

18       In actuality, the specification teaches "formulating the optimization program as a quadratic

19  program."  Ex. A ('099 Patent) at 8:50–54.  By formulating the problem in this way, the objective

20  becomes to minimize "costs," including "a weighted $l^2$-norm of the error between the requested

21  forces and moments vector $F_{cmd}$ and a returned vector $F_{ret}$."  *Id.* at 8:4–18; *see also id.* at 3:3–8

22  (discussing costs that may be modeled); *id.* at 3:12–13 (discussing modeling of costs using "linear

23  terms to form an 'objective' function").  "Examples of costs to be considered include, without

24  limitation, power consumption, errors between commanded and returned forces and moments,

25  actuator change rate, etc."  *Id.* at 9:20–23.  It is this modeling and weighting of "costs," *including*

26  the "errors between commanded and returned forces and moments," which the '099 Patent teaches

27  is necessary to solve the problem identified with prior art flight controllers.  *Id.* at 9:5–11 ("[T]he

28  quadratic program/least squares approach disclosed herein, in which different weights are applied

1   to give priority to certain axes when one or more actuators are saturated, . . . **_enables a workable_**

2   **_optimal solution to be computed online within the required cycle time even under saturation or_**

3   **_actuator failure_**" (emphasis added).); *see also id.* at 3:48–4:3, 8:4–18.  This novel approach does

4   not preempt all flight optimization approaches or even all flight optimization approaches directed to

5   minimizing costs.  Instead, the claim is directed to a specific, improved approach of modeling a

6   weighted set of costs that includes a cost associated with error terms.[1]

7           To be sure, the "least squares" approach to minimizing the cost function is described as one,

8   known technique for applying the claimed invention.  *Id.* at 9:27–32 (teaching "Bounded-Variable

9   Least-Squares" approach).  And the Patent also teaches alternative techniques for minimizing the

10  cost function.   *Id.* at 11:6–9 (teaching "gradient descent," "sequential quadratic programming

11  (SQP)," and "simplex methods").  But the **_claims_** are not directed to these mathematical techniques,

12  but rather to an *application* of these techniques in the context of a novel approach to modeling costs,

13  including the cost of the error term, to improve flight control.  "The Supreme Court has [] made

14  abundantly clear that inventions incorporating and relying upon even 'a well known mathematical

15  equation' do not lose eligibility because 'several steps of the process use that mathematical

16  equation.'"  *Research Corp. Techs., Inc. v. Microsoft Corp.*, 627 F.3d 859, 869 (Fed. Cir. 2010)

17  (cleaned up), *quoting Diehr*, 450 U.S. at 185.  If anything, the '099 Patent's teaching of the known,

18  Bounded-Variable Least-Squares (BVLS) approach *supports* eligibility, because it reinforces the

19  distinction between the novel cost modeling technique claimed by the '099 Patent and the known

20  mathematical techniques (such as BVLS) that can be applied to minimize the modeled cost function.

21          Finally, Archer's argument that the Examiner's Notice of Allowability for the '099 Patent

22  _____

23  [1]   Archer claims the '099 Patent first ties the "alleged improvement to the quadratic program/least
    squares," but then later states that "other optimization techniques may be used" as well.  Mot. at 5,

24  *citing* Ex. A ('099 Patent) at 9:5–12, 11:1–5.  This is an improper effort to conflate different
    teachings in the specification.  The Patent's reference to a "quadratic program" relates to a novel

25  application of a technique for modeling costs as an objective function comprised of linear terms and
    including within that set of costs the costs associated with the error terms.  Ex. A ('099 Patent) at

26  8:50–54, 8:4–18, 3:3–5, 3:12–13.  This is reflected in the claims and is an express requirement of
    the '099 Patent.  The Patent's reference to "least squares," by contrast, is one exemplary technique

27  that may be used to minimize the cost function.  *Id.* at 9:27–32 (discussing how in "some
    embodiments" the minimum of the cost function can be determined applying a "least squares

28  approach").  Other techniques for minimizing the cost function are also discussed.  *Id.* at 11:6-9.

1   somehow supports an ineligibility determination lacks merit.  The Examiner properly found that the

2   '099 Patent "ties the abstract idea in a meaningful way to a practical application."  Dkt 201-7 at 4.

3   Contrary to Archer's assertion, this finding was sound, and it supports eligibility.

### 4.   Archer Relies on Inapt Authority

5       Archer argues that "controlling authority establishes that the claims are abstract."  Mot. at

6   12.  But its cited cases are inapposite.  Archer's foundational case, *Parker v. Flook*, for example,

7   held that claims were ineligible not because they "contain[ed] a mathematical algorithm as one

8   component," but because they covered nothing more than an algorithm.  437 U.S. 584, 594–95

9   (1978).[2]  Indeed, "an inventive application of [a mathematical formula] may be patented."  *Id.* at

10  594.  Unlike in the present case, there was no discussion in *Flook* regarding whether or how the

11  claims provided a technical improvement over the prior art.  Moreover, critical to the Court's

12  decision was something not at issue here, namely that the "claims cover any use of respondent's

13  formula" and thus "the claims cover a broad range of potential uses of the method."  *Id.* at 586.  In

14  contrast, the '099 Patent claims are directed to an improved process of flight control that applies

15  optimization techniques in a novel way in order to solve a technological problem in the art.

16      Archer cites other cases for the proposition that claims directed to even improved

17  mathematical processes are not eligible for patenting, but each of its cited cases is distinguishable.

18  Mot. at 11–12 (collecting cases).  In *In re Board of Trustees of Leland Stanford Junior University*,

19  the Court found that unlike the claims of the '099 Patent, the claims at issue did not involve

20  "practical, technological improvements extending beyond improving the accuracy of a

21  mathematically calculated statistical prediction." 991 F.3d 1245, 1251 (Fed. Cir. 2021).  The '099

22  claims, on the other hand, are directed to a practical technological improvement to flight

23  optimization.  Similarly, in *In re Gopalan*, the claims were rejected as patent ineligible because

---

24

25  [2]  The other three Supreme Court cases on which Archer relies are likewise inapposite, as none
26  involved a specific technical improvement over the prior art, as do the claims of the '099 Patent.
    *See Gottschalk v. Benson*, 409 U.S. 63 (1972) (patent ineligible where "the patent would wholly
    pre-empt the mathematical formula and in practical effect would be a patent on the algorithm
27  itself"); *Bilski v. Kappos*, 561 U.S. 593 (2010) (claims ineligible where they "explain the basic
    concept of hedging and reduce that concept to a mathematical formula"); *Alice*, 573 U.S. at 219
28  (claims ineligible when drawn to the concept of "intermediated settlement" which is "a fundamental
    economic practice long prevalent in our system of commerce").

1    unlike the '099 claims, they did not "embody a concrete solution to a problem." 809 F. App'x 942,

2    946 (Fed. Cir. 2020).

3         Archer's cited case, *SAP America, Inc. v. InvestPic, LLC*, 898 F.3d 1161 (Fed. Cir. 2018), is

4    likewise unhelpful. Mot. at 13. There, the claim preamble specified that the claims were directed

5    to "selecting certain information, analyzing it using mathematical techniques, and reporting or

6    displaying the results of the analysis," which the court noted "is all abstract." *Id.* at 1167. Unlike

7    the claims in *SAP*, the '099 Patent claims do not merely automate the process of gathering and

8    analyzing information, but specifically improve flight control systems.

9         Archer also argues that the mere automation of "mental processes," without any

10   corresponding improvement to the functionality of a computer, is not eligible for patenting. Mot. at

11   12, *citing, e.g.*, *In re Rosenberg*, 813 F. App'x 594, 596 (Fed. Cir. 2020)*, and *CyberSource Corp. v.*

12   *Retail Decisions, Inc.*, 654 F.3d 1366, 1370 (Fed. Cir. 2011). None of these cases, however, involve

13   the improvement of an existing technological process. Again, the invention of the '099 Patent is

14   directed to a specific process for improving a flight control system, removing the claims from the

15   realm of the "mental processes" line of cases.

16        Finally, Archer argues that "limiting an abstract idea 'to a particularly technological

17   environment'" is insufficient to confer eligibility. Mot. at 15. The '099 Patent, however, does not

18   simply apply an otherwise general abstract idea to a flight control setting. Rather, the '099 Patent

19   claims are directed to a problem particular to the field of flight optimization and provide a solution

20   that requires modeling a weighted set of costs that includes costs corresponding to error terms.

21   Moreover, where, as here, a claim recites a technique representing a concrete improvement, the fact

22   that the claim applies in a particular technological environment actually serves to reinforce a finding

23   of eligibility.[3]  *See McRO*, 837 F.3d at 1314 ("The abstract idea exception has been applied to

24   prevent patenting of claims that abstractly cover results where it matters not by what process or

25

---

26   [3]  To the extent Archer suggests that the eligibility of claims involving mathematical equations turns
     on whether they "transform" an article "into a different state or thing," Mot. at 15–16, Archer is
27   wrong. The Supreme Court has made clear that the "machine-or-transformation test" is not the
     exclusive test for determining whether a "process" is patentable, principally because using the
28   "machine-or-transformation" as a litmus test would "create uncertainty as to the patentability of
     software" and  "inventions based on linear programming." *Bilski*, 561 U.S. at 603–05.

machinery the result is accomplished"); *compare Gottschalk v. Benson*, 409 U.S. 63, 64 (1972) (claims ineligible where they "were not limited to any particular art or technology, to any particular apparatus or machinery, or to any particular end use. They purported to cover any use of the claimed method in a general purpose digital computer of any type.").

### 5.    Archer Gives Short Shrift to the Dependent Claims

Finally, Archer glosses over the additional particularity recited in the dependent claims.  A patentee, however, does not waive the right to rely on inventive features in other claims where it never agreed to make a particular independent claim representative, and where it makes meaningful arguments regarding limitations found only in the other claims.  *Berkheimer*, 881 F.3d at 1365–66; *see also Cronos Techs., LLC v. Expedia Inc.*, No. 13-1538, 2015 WL 5234040, *3 (D. Del. Sept. 8, 2015) (denying Rule 12 motion partly because defendants did not articulate why the dependent claims relate to the same abstract idea purportedly embodied in the representative claim).  Here, the asserted dependent claims include additional limitations regarding the types of inputs, costs and constraints, and approximations that may be applied using the overall novel optimization technique.  These dependent claim limitations further ground the invention in the specific technological problem context of flight control.  For example, Claims 2–4 include limitations regarding the type of inputs, including wherein the inputs are provided by an autopilot or other automated flight computer.  Claims 6, 8–10, 13–17 and 19 include limitations regarding the costs and constraints, including a limitation that the errors include one or more different weights determined to achieve in the case of saturation a priority associated with an axis.  Claims 21–22 include limitations providing to each actuator in the optimal mix a respective control signal reflecting a corresponding actuator parameter determined for the actuator.  Each of these claims provide further particularity to the flight control optimization technique required, as well as the overall flight control system that is improved as a result of the claimed inventions.  These claims should be considered on their own merits.

### B.    *Alice* Step Two

Because the '099 Patent claims are not directed to an abstract idea under step one, there is no need to proceed to step two.  Yet, the claims also satisfy step two by supplying an inventive concept.    The '099 Patent's additional limitations and features, even if paired with an

overgeneralized inventive idea of "using a mathematical calculation to compute an 'optimal' set of outputs for a given set of inputs in a flight control system," Mot. at 10, render them "significantly more" than the mere computation of an "optimal" set of outputs.  As discussed, the '099 Patent teaches a novel and inventive solution to a problem arising when "requested forces and moments cannot fully be satisfied." Ex. A ('099 Patent)  at 3:48–49, 8:4–18.  Specifically, the inventive step is taking the disparity, or error, between the requested force or moment and the calculated achievable force or moment and factoring that error into the analysis as a cost to be minimized.

This modeling of the "error" term adds something more to the concept of simply computing an optimum because, without it, an optimization model would fail to account for situations in which the requested forces and moments could not fully be achieved, and therefore potentially lead to different results.  This additional, novel technique also allows a flight optimization model to undertake and remain effective in a broader range of situations, including when faced with an unachievable set of inputs.  As such, the technique of modeling a weighted set of costs to include a cost associated with error is not merely the addition of "well-known, routine, and conventional steps."  Indeed, neither the prior art cited in the Patent, nor the art cherry-picked by Archer, discusses this concept.  Courts have found technical solutions like this to be patent-eligible at step two.  *See, e.g.*, *CosmoKey*, 15 F.4th at 1099 (identifying an inventive step in a method that ensures the authentication function is normally inactive, activates only for a transaction, communicates the activation within a certain time window, and thereafter ensures the function is deactivated); *Finjan, Inc. v. Sophos, Inc.*, 244 F. Supp.3d 1016, 1061 (N.D. Cal. Mar 14, 2017) (Orrick, J.) (identifying as innovative the "method of scanning and extracting particular suspicious elements of a file rather than scanning only entire files"); *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1303 (Fed. Cir. 2016) (finding an inventive concept in the ordered combination of steps).

At a minimum, whether the additional limitations add "significantly more" to what Archer characterizes to be the abstract idea raises questions of fact not amenable to resolution on a motion to dismiss.  Taking the pleadings as true, Wisk's pleadings demonstrate the inventiveness of the novel technique in the '099 Patent and are sufficient to withstand a Rule 12(c) dismissal.  *See Cellspin Soft, Inc. v. Fitbit, Inc.*, 927 F.3d 1306, 1318–19 (Fed. Cir. 2019) (Plaintiff's specific

allegation of inventiveness of its implementation of Bluetooth, using a two-step, two-device structure was sufficient to show an inventive step and enough to withstand a Rule 12 dismissal). The Second Amended Complaint ("SAC") identifies the unconventional features in the claims, Dkt. 148 (SAC) ¶ 124, and further pleads that the features of the '099 Patent "cannot be considered to have been conventional, well-understood, or routine," and that a "person of ordinary skill in the art would have recognized that the invention of the '099 Patent includes a substantially inventive feature that advances the state of the art for flight control systems."

In claiming there is no "inventive concept," Archer repeats its step-one argument that the only "advance" in the claims "is the abstract mathematical calculation itself," going so far as to suggest that "improved computer resources" are required for the '099 Patent to be patent-eligible. Mot. 16–17 ("the claims do not require any specific improvements to the existing technology to 'receive' the inputs, or to the technology used to calculate the 'optimal' set of outputs.").[4]  Yet the Federal Circuit in *Enfish* completely rejected that proposition.  822 F.3d at 1339 ("that the improvement is not defined by reference to 'physical' components does not doom the claims. . . . Much of the advancement made in computer technology consists of improvements to software that, by their very nature, may not be defined by particular physical features but rather by logical structures and processes.").  Here, the inventive concept is not the physical processor; it is the technique of modeling the error term, which provides significantly more to the optimization technique.  *See Amdocs*, 841 F.3d at 1303.  Archer's step-two arguments thus necessarily fail.[5]

## II.   The Claims of the '441 Patent are Patent Eligible Under § 101

### A.   *Alice* Step One

The '441 Patent adds to the patent-eligible invention articulated in the '099 Patent by including additional limitations that further specify novel features of the claimed flight control

---

[4]   To support this argument, Archer again cites to *SAP*.  But in that case, the court refuted the plaintiff's argument that mere off-the-shelf databases/processors rendered the claim patent eligible.

[5]   Archer misleadingly states that the '099 Patent confirms the "substantially inventive feature" is the improved mathematical calculation that computes an "optimal" set of outputs based on flight command inputs.  Mot. at 19. Nowhere does the patent state or suggest that the mere computation of an optimum solution was the "substantially inventive feature."  Nor is there any direct quote setting forth any "substantially inventive feature."  Mot. at 19, *citing* '099 Patent at 9:5–12.

system.  Ex. B ('441 Patent) at 10:43–46.  For example, the system claims apply specifically in a situation where sensor data indicates that a lift fan has experienced a "failure induced reduced capacity to generate lift."  *Id.* at claim 1.  To provide a "seamless response" to such a reduction in capacity, the '441 Patent teaches a flight controller configured to generate a "solution space" comprising all possible combinations of actuator commands given their current capabilities and within any constraints to be enforced.  *Id.* at 7:58–62.  The claims acknowledge that in light of "the failure induced reduced capacity of the at least one of the lift fans," the selection of actuators may not fully achieve the "set of forces and moments" to be applied to the aircraft.  Nevertheless, the Patent teaches a selection "within the solution space" to achieve the "set of forces and moments" to an extent practicable.  *Id.* at claim 1; *see also id.* at 10:61–66 & Figure 9 (teaching, for example, a "convex interpolation of a previously-computed solution with the unconstrained optimum" for moving free variables to the applicable bound and removing them from the free set in the optimization analysis).  Thus, the '441 Patent is directed to a specific solution (*i.e.*, generation of a solution space and selection of a control mix within that solution space) to a problem arising in the field of aircraft flight control (*i.e.*, a failure of a lift fan that reduces the ability of the flight controller to achieve the set of forces and moments input by the operator).

As with the '099 Patent, these claims improve the functioning of an aircraft flight control system by reciting techniques to deal with flight control situations where actuators reach the limits of their capacity and/or effectiveness.  *See* Ex. B ('441 Patent) at 9:5–14.  Whereas the '099 Patent claims minimizing system costs, including the cost of "error" terms, the '441 Patent claims a flight controller that first models a "solution space" to account for actuator limitations, and then selects a solution whose variables are bounded to the limits of the solution space.  Once again, Archer does not (and cannot) demonstrate that these claimed techniques represent anything less than a technological solution for improving the functioning of the flight controller itself.

Archer asserts that the claims of the '441 Patent "fail Step One for at least the same reasons discussed with respect to the '099 Patent claims."  Mot. at 20.  But the claims of the respective patents are not the same, and Archer's attempt to chalk them up to the same "abstract idea" underscores Archer's mischaracterization of the invention.  Archer's assertion that the claims

"merely implement[] a mathematical calculation used to compute a set of outputs for a given set of flight control inputs," Mot. at 21, is a vast overgeneralization that ignores the very limitations that lead to the improvement over prior art technology – a flight controller that is configured to detect a "failure induced reduced capacity to generate lift" and determine a "solution space" to account for this reduced capacity.  Ex. B ('441 Patent) at claim 1; *see TecSec*, 978 F.3d at 1292 (claims eligible where they focus on specific means or method that improves the relevant technology).

Archer's characterization of the claim limitations is likewise misguided.  Archer wrongly contends that the "lift fan failure" limitation "simply limits the concept to the technological environment." Mot. at 22.  But the lift-fan failure limitation is not a limitation included simply to relate an abstract idea to a particular technological environment, as there are no other technological environments applicable to the claimed invention.  Rather, detecting lift-fan failure is integral to the claimed flight control technique because such failure can materially impact, in real-time, the flight control optimization process.  *Id.* at 5:32–56 (teaching that optimizer/mixer may have to "omit[]" the failed fan, or take into consideration "diminished power/performance" by "adjusting the actuator effectiveness model and/or the actuator constraints").

Archer further argues that the claims lack detail about how to implement the "solution space" limitation and are thus drafted in a "result-oriented way." Mot. at 22.  Wrong again.  The claims expressly teach that the "solution space" is "based on current capabilities of the actuators" and recite that this technique addresses the specific problem of lift fan "failure induced reduced capacity to generate lift." Ex. B ('441 Patent) at claim 1.  The specification provides further guidance about how the claim elements work together to achieve the claimed improvement to flight control technology.[6]  *See id.* 10:61–66 & Figure 9; *Packet Intelligence LLC v. NetScout Sys., Inc.*, 965 F.3d

---

[6]  Archer's reliance on *Two-Way Media Ltd. v. Comcast Cable Communications, LLC*, 874 F.3d 1329 (Fed. Cir. 2017), and *Interval Licensing LLC v. AOL, Inc.*, 896 F.3d 1335 (Fed. Cir. 2018) is misplaced.  The *Two-Way Media* patents were ineligible because the claims used only generic functional language and required nothing more than conventional computer and network components.  874 F.3d at 1338–39.  Similarly, the *Interval Licensing* patent claimed only an "attention manager" that was broadly construed as any "system" for producing that result.  896 F.3d at 1338.  As discussed, the '441 patent requires more than a generic, conventional computer – the flight controller is significantly modified through its configuration to implement the claimed advances of addressing failure induced reduced capacity and using a solution space.  *See* Ex. B ('441 Patent) at Fig. 9; 5:32–46; 5:47–51; 5:51–56; 7:58–62; 10:59–60; 10:61–66.

1299, 1310 (Fed. Cir. 2020) ("The specifications likewise explain how the elements recited in the claims refer to specific technological features functioning together to provide that granular, nuanced, and useful [improvement], rather than an abstract result.").  Moreover, Archer's assertion that the claim "does not describe *how* the desired result [] is achieved [] is better suited for a validity challenge based on lack of enablement under 35 U.S.C. § 112."  *Stormborn Techs., LLC v. Topcon Positioning Sys.*, No. 07804, 444 F. Supp. 3d 1119, 1125 (N.D. Cal Mar. 17, 2020); *see also Visual Memory*, 867 F.3d at 1261 ("whether a patent specification teaches an ordinarily skilled artisan how to implement the claimed invention presents an enablement issue under 35 U.S.C. § 112").

To the extent Archer asserts that claim 1 is abstract merely because it does not spell out every minute implementation detail, such argument is contrary to law.  *See, e.g.*, *CardioNet*, 955 F.3d at 1368 (finding claim not directed to mere result even where it recited "relevance determination logic" without additional detail for determining relevance on the basis of variability in beat-to-beat timing); *Visual Memory*, 867 F.3d at 1260 (rejecting argument that claim was ineligible because it did not recite how to implement the "programmable operational characteristic," which provided "a technological improvement: an enhanced computer memory system").

The cases Archer cites for the proposition that an abstract method claim is not rendered eligible simply because it is implemented in a physical system are likewise inapposite.  *See* Mot. at 20-21, *citing, e.g.*, *SAP*, 898 F.3d at 1168; *Chamberlain Grp., Inc. v. Techtronic Indus. Co.*, 935 F.3d, 1341, 1358 (Fed. Cir. 2019), *iLife Techs., Inc. v. Nintendo of Am., Inc.*, 839 F. App'x 534, 535–36 (Fed. Cir. 2021), *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 770 (Fed. Cir. 2019).  It is not Wisk's position that the '441 claims are eligible because of any distinction between system and method claims.  They are patent eligible because they recite a novel, technological improvement to an aircraft flight control system, whether framed as a method *or* a system claim.

Archer's reliance on cases that prohibit the patenting of mere "processes that a person could carry out in their mind" is similarly misguided.  Mot. at 21, *citing CyberSource Corp.*, 654 F.3d at 1373.  Here, as with the '099 Patent, Archer ignores the teachings in the specification that make clear the recited processes concretely improve the functioning of the flight control system itself.  Ex. B ('441 Patent) at 7:63–8:8 (teaching how solution space models system constraints), *id.* at 9:5–11

(invention addresses problem with conventional approaches when actuators reached "an upper limit of their capacity/effectiveness, a condition sometimes referred to herein as 'saturation'").

Lastly, as with the '099 Patent, Archer largely ignores the '441 Patent dependent claims. But the dependent claims add even greater particularity by reciting, for example: specific techniques for determining lift fan failure (claims 2–3), constraints that affect the determination of the solution space (claims 4–6), attributes for the computed solution (claims 7–8 and 18–19), characteristics of the aircraft under control (claims 9–11), mechanisms for receiving input and mapping to output actuators (claims 12–14), and further detail regarding the mathematical techniques to be applied in carrying on the inventive process of the independent claim. At a minimum, these dependent claims preclude a finding that the entire patent is ineligible at this stage. *Berkheimer*, 881 F.3d at 1365.

## B.   *Alice* **Step Two**

Even assuming the claims are directed to the "abstract idea of using a mathematical calculation to compute a set of outputs for a given set of inputs in a flight control system" (which they are not), Mot. at 20, the claims nevertheless contain features that render them significantly more than that abstract idea. As discussed, the '441 patent is directed to an *aircraft* comprising a *flight controller* that has been configured to apply novel techniques for determining an optimal solution when faced with a *specific type of actuator failure* and under the circumstances where the unconstrained optimum solution may *fall entirely outside a calculated solution space* of practically achievable solutions. This adds significantly to the mere concept of computing a set of outputs.

In particular, these elements transform the flight controller into one that allows the handling of situations that were previously impossible with the prior art technologies. Technical solutions like this are inventive steps that render claims eligible at step two. *See, e.g.*, *Fortinet, Inc. v. Forescout Techs., Inc.*, No. 03343, 2021 WL 5565836, at *11 (N.D. Cal. Nov. 29, 2021) (finding an inventive step in a method to combine two datasets that solved the technological problem of conventional classification methodologies relying on media access control addresses and hypertext transfer protocol user-agent strings that were too limited); *see also BASCOM*, 827 F.3d at 1351–52; *Amdocs*, 841 F.3d at 1303. Like the technique in *Fortinet*, the additional elements in the '441 claims expand the capabilities and effectiveness of the claimed flight controller over prior technologies.

1    Archer's arguments regarding step two are also not supported by the intrinsic record.  Citing

2    to the prior art, Archer asserts that the claims involve only "well-known and conventional

3    technology used in their routine manner."  Mot at 23.  Yet Archer fails to demonstrate that any of

4    the cited art disclose the claimed advance.  Archer simply ignores the claim elements that recite

5    determining a "solution space" and accounting for when the unconstrained optimum solution falls

6    outside a calculated "solution space."  These limitations, in ordered combination with the other

7    limitations of the claim, are more than a recitation of a well-known component.  *See BASCOM*, 827

8    F.3d at 1350.  At a minimum, there is a disputed issue of fact about the limitations.

9    Finally, taking the pleadings as true, Wisk's allegations of inventiveness of the novel

10   technique in the '441 Patent are sufficient to withstand a Rule 12(c) dismissal.  Again, the SAC

11   incorporates by reference the allegations related to the '099 Patent, SAC ¶ 128, and identifies the

12   novel features in the claims.  SAC ¶ 129 ("Similar to the '099 Patent, the '441 Patent claims aircraft

13   with flight controllers for online optimization based on flight control inputs and current conditions,

14   particularly including whether a lift fan has experienced a failure, which provide an unconventional

15   solution to the technological problems described in the '099 and '441 Patents.").  Wisk's allegations

16   are not conclusory but are based on the intrinsic evidence.  At this stage, Wisk's allegations and the

17   intrinsic record are enough to support the eligibility of the '441 Patent.  *See Fortinet*, 2021 WL

18   5565836, at *11 ("Inferences must be resolved in [Plaintiff's] favor at the motion to dismiss stage,

19   and there is a plausible argument that the above features constitute an inventive concept.").

20   **III.    If Necessary, Wisk Requests Leave to Amend its Factual Allegations**

21   At a minimum, to the extent the Court believes that further specificity regarding the

22   allegations is necessary at step two, Wisk respectfully seeks leave to amend the complaint.  *See* Fed.

23   R. Civ. P. 15(a); *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (leave is liberally

24   granted).  Such amendment will not be futile, nor will it cause delay or prejudice to Archer.

25                                      **<u>CONCLUSION</u>**

26   For these reasons, Wisk respectfully requests that the Court deny Archer's Motion.

27

28

1    DATED:  February 8, 2022

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN, LLP

By  /s/ Patrick Schmidt
     Yury Kapgan
     Robert M. Schwartz
     Michael T. Zeller
     Diane Cafferata
     Patrick Schmidt
     Michael LaFond

Attorneys for Plaintiff Wisk Aero LLC