ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
SHAELYN K. DAWSON (CA SBN 288278)
ShaelynDawson@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile:  415.268.7522

Attorneys for Third Party Witnesses
DIEDERIK MARIUS, JOHN MELACK, AND THOMAS MUNIZ

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WISK AERO LLC, | Case No. 3:21-cv-02450-WHO |
| Plaintiff, | **DECLARATION OF DIEDERIK MARIUS IN SUPPORT OF OPPOSITION TO PLAINTIFF'S REQUEST FOR FORENSIC INSPECTION OF PERSONAL DEVICES** |
| v. | |
| ARCHER AVIATION INC., | |
| Defendant. | |

I, Diederik Marius, declare as follows:

1.      I am the Electric Propulsion lead at Archer Aviation, Inc.  I earned an M.S. in Engineering Physics/Applied Physics from Ghent University in Ghent, Belgium as well as an M.S. in Electrical Engineering from Stanford University in Palo Alto, California.  I have worked on motors for approximately 15 years, with approximately 12 years of experience working on eVTOL propulsion systems specifically.  I first started working on eVTOL motors at Joby, a well-known eVTOL company, in 2009 and I worked there for 2 years.  I left Joby to join Zee.Aero in July 2011, and I worked there for approximately 8.5 years before I ultimately joined Archer Aviation, where I work today, on January 21, 2020.  I have personal knowledge of the facts stated herein and could testify to them competently if called upon to do so.

2.      I worked at Wisk and its predecessors for approximately 8.5 years. We were allowed to use our personal devices. Indeed, it was understood that we would be using our personal cell phones for work. No one at Wisk ever told me that I could *not* use personal devices for work.

3.      I gave Wisk two weeks' notice on January 7, 2020. The next day, I was told that it would be my last day. I had hoped to have time to review my work devices to remove my personal information, and to remove any Wisk documents from my personal devices. Instead, I had to try to do that on a rush basis. On my last date at Wisk, I asked human resources how I could get my personal information from the work computer. I also advised human resources that I had Wisk documents on my personal devices and requested guidance on what to do. On or around January 15, 2020, I was told that I should upload Wisk documents into Dropbox, and then delete them from my personal devices. I was unable to get the documents to upload to Dropbox, so with Wisk's authorization, instead I copied them onto a hard drive and delivered that hard drive to Wisk on January 16, 2020.  I also sent Wisk an email outlining each of the sources I reviewed to identify any potential Wisk documents or photographs I had collected and/or stored in the course of my work at Wisk for over 8.5 years, as well as confirmation that I had deleted or planned to return any identified Wisk materials. I have attached to this declaration a copy of my email exchanges with Wisk between January 15 and 16, 2020, discussing my review and return of Wisk materials.  (**Marius Exhibit 1**.)

DECLARATION OF DIEDERIK MARIUS IN SUPPORT OF OPPOSITION TO PLAINTIFF'S REQUEST
FOR FORENSIC INSPECTION OF PERSONAL DEVICES
CASE NO. 3:21-CV-02450-WHO
sf-4757396

1

4.      Before joining Archer, I met with an outside employment lawyer named Michael Aparicio of Aparicio Law Firm, in January 2020, who was referred to me by Archer.  I understood that the purpose of the meeting was to ensure I did not inadvertently retain any confidential or proprietary materials from my previous employers, which I understand has been a standard part of Archer's onboarding process for employees starting on or after January 1, 2020.

5.      The hard drive that I provided to Wisk contained hundreds—and perhaps thousands—of documents that I found on my personal devices. I made a good faith effort to return all Wisk documents.  When I returned the hard drive to Wisk on January 16, Carlie Russell, a member of Wisk's human resources department, asked me to wait in the lobby and returned with the device approximately 15 minutes later.  I assumed that someone at Wisk wiped the hard drive before returning it to me, but I never actually looked.  It is my understanding now based on documents my counsel identified and produced in connection with subpoenas served by the government and Plaintiffs, that Wisk apparently did not delete some or possibly all of the Wisk documents I returned to them on that hard drive.

6.      My work at Archer is completely independent of any work I did at Wisk and any Wisk information.  No one at Archer has ever asked me to use any Wisk information for any purpose, and I have never used any Wisk information for any of my work at Archer.

7.      I have provided the following personal devices and electronic sources to my counsel at Morrison & Foerster, which include personal email and personal information, in response to subpoenas from the government and Plaintiff:

- Google Pixel 3
- iPhone
- Gmail
- Google Drive
- Flash Drive (16GB)
- LinkedIn
- iCloud Drive
- MacBook Pro 16
- MacBook Pro 16-iChat Converted

- iCloud Mobile Backup
- Flash Drive (4GB Sandisk)
- Flash Drive (1GB)
- Flash Drive (8GB Sandisk)
- External HD1 (G-Tech)
- External HD2 (2TB WD)
- External HD3 (2TB WD)
- External HD4 (1.5TB Seagate)
- External HDD 2TB

DECLARATION OF DIEDERIK MARIUS IN SUPPORT OF OPPOSITION TO PLAINTIFF'S REQUEST FOR FORENSIC INSPECTION OF PERSONAL DEVICES
CASE NO. 3:21-CV-02450-WHO

sf- 4757396

2

8.      It is my understanding that any non-personal document that originated from Wisk on my personal devices has been produced to Wisk.

9.      I understand that Wisk has asked the Court to order me to produce my personal devices to a third party, and that their expert has identified 13 documents in support of that request.  I have reviewed these documents with my legal counsel and address them below:

a.  I understand DM-000428, DM-000439, and DM-000468 reflect a "last accessed" date of January 15, 2020 and time of 11:00:00 PM, the week before I started at Archer and after I left my employment at Wisk.  As I told Wisk on January 15, 2020 (**Marius Exhibit 1**) and testified at my deposition (**Marius Exhibit. 2** at 178:9-22), I either deleted or transferred all of the Wisk documents that I could find onto a hard drive and then took that hard drive to Wisk before I started at Archer.  I stand by that testimony.  I apparently failed to delete or transfer these three documents among the hundreds (or thousands) of Wisk documents I had identified and transferred to a hard drive to return to Wisk.  I further understand that Wisk has argued in its motion that I relied on DM-000428 to develop the motor performance specifications I provided to Archer's motor vendor MAGicALL on February 7, 2020 (MAGICALL_0000069).  That is not true.  I did not develop the motor performance specifications I sent to MAGicALL.  Those were provided to me by Archer's Chief Engineer Geoff Bower based on the vehicle sizing analysis he conducted.  I understand Dr. Bower described how he developed these specifications using his "basic vehicle sizing" tool in his sworn declaration filed in this action on June 24, 2021 (Dkt. 58-20 at ¶¶ 14-24, 30-32) and at his deposition (Dkt. 92-16 at 120:2–121:25).  Specifically, the motor performance specifications sent to MAGicALL are based on the aircraft configuration, size, weight, and speed and range requirements for Archer's demonstrator aircraft.  In effect, we were asking MAGicALL if they could provide

DECLARATION OF DIEDERIK MARIUS IN SUPPORT OF OPPOSITION TO PLAINTIFF'S REQUEST
FOR FORENSIC INSPECTION OF PERSONAL DEVICES
CASE NO. 3:21-CV-02450-WHO
sf-4757396

1

an electric motor that would enable Archer's demonstrator aircraft to take off vertically, then climb, cruise and ultimately land vertically for specified periods of time.  Archer did not ask MAGicALL to provide any type of particular motor; it asked if MAGicALL could provide a motor—*type not specified*—that could power Archer's aircraft under the conditions proposed.  DM-000428 does not have any motor performance specifications for any aircraft configuration; rather, it only contains information relating to the performance of a particular type of electric motor used in Wisk's proof of concept aircraft.  Even if I had known I was still in possession of DM-000428 at the time I joined Archer, it would have no bearing on the motor performance requirements Dr. Bower developed and I subsequently provided to MAGicALL.

    b.   MARIUS-DOJ-0000288 is an email chain from May 2015 regarding encoder cable.  I forwarded this to myself to prepare for an interview with Amazon.  As I testified in deposition, Amazon had asked me for an example of an engineering problem that I had solved and I intended to use this as an example.  (**Marius Ex. 2** at 101:20–102:14.)  As I testified during my deposition, I did not share this document with anyone.  (**Marius Ex. 2** at 105:9–106:1.)  I did not communicate any proprietary Wisk information to Amazon during the interview.  (*Id*. at 153:15-23.)  I did not use this document while at Archer.  (*Id*. at 156:8–157:5.)  I understand that Wisk's expert says this file was "last modified" on April 14, 2021, and "last accessed" on April 19, 2021, which is when my attorneys at Morrison & Foerster were collecting from my personal email account to respond to a subpoena from the government.  That is why the Bates number refers to "DOJ," or the Department of Justice.

    c.   MARIUS-DOJ-0000728 is another email that the expert says was "last modified" on April 14, 2021, and "last accessed" on April 19, 2021, when my attorneys at Morrison & Foerster were collecting from my personal email account to respond

DECLARATION OF DIEDERIK MARIUS IN SUPPORT OF OPPOSITION TO PLAINTIFF'S REQUEST FOR FORENSIC INSPECTION OF PERSONAL DEVICES
CASE NO. 3:21-CV-02450-WHO

2

sf- 4757396

to a subpoena from the government.  I never accessed this email or the February 2016 presentation attached to the email since I sent it to myself on September 15, 2019.  As I testified at deposition, I did not share this PowerPoint with anyone at Archer nor did I even know I had this email or the attached presentation until after this litigation commenced.  (**Marius Ex. 2** at 154:12–155:6.)

    d.  MARIUS-DOJ-0001468 is a photograph of a screen reflecting a marketing story.  I understand that Wisk's expert says it was copied to a personal device belonging to me on January 15, 2020, and reflects a "last accessed" date of January 15, 2020.  I did not take this photo on January 15, 2020, as I had already departed Wisk.  My best guess is that the metadata was updated when I was transferring files onto a hard drive to return to Wisk, as I previously testified about.  I apparently failed to delete this document.  Since starting at Archer, I had not seen this document before this lawsuit was filed and have not used it at Archer.

    e.  MARIUS-DOJ-0001469 is another photograph of a screen reflecting files names and code compilation notifications.  This is another document that Wisk's expert says was "created" on January 15, 2020.  As noted above, that is when I was looking for documents to return to Wisk after I left Wisk and prior to my Archer start date.  I did not take this photo on January 15, 2020, as I had already departed Wisk.  My best guess is that the metadata was updated when I was transferring files onto a drive to return to Wisk, as I previously testified about.  (**Marius Ex. 2** at 31:14–32:19 )  I must have inadvertently failed to delete it.  Since starting at Archer, I had not seen this document before this lawsuit was filed and have not used it at Archer.

    f.  I understand Wisk's expert also identified six image files that reflect a "last accessed" date of my last day at Wisk, January 8, 2022 after 4:00 PM.  That day I worked alongside Wisk Information Technology personnel, including Kamlesh Rao, to remove personal items from my Wisk laptop and desktop and transfer

DECLARATION OF DIEDERIK MARIUS IN SUPPORT OF OPPOSITION TO PLAINTIFF'S REQUEST FOR FORENSIC INSPECTION OF PERSONAL DEVICES
CASE NO. 3:21-CV-02450-WHO

3

sf- 4757396

Wisk materials to the hard drive that I ultimately returned to Wisk on January 16. These six images were probably linked to those efforts. If they remained on my personal devices, it would have been approved by Wisk personnel, including Kamlesh Rao, or accidentally retained. As I noted above, I transferred hundreds—and perhaps thousands—of Wisk documents from my personal devices back to Wisk. Since starting at Archer, I had not seen these images before this lawsuit was filed and have not used them at Archer.

10.    I did not take any documents from Wisk with the intention of using them at Archer or elsewhere. The documents Wisk raises in this motion were inadvertently retained. At no time have I accessed these documents since joining Archer. Indeed, I did not know that I had these documents until after this lawsuit was filed in connection with adhering to my subpoena obligations. I did not share the content of these (or any) Wisk documents with anyone at Archer, did not use any part of the information in Wisk documents in my work at Archer, and have not looked at Wisk documents since joining Archer, with the exception of discussions with my legal counsel in connection with this motion and at deposition when Wisk's counsel showed me Wisk documents.

11.    I have already been deposed in this case. I was asked detailed questions about my efforts to remove Wisk information from my personal devices, use of Wisk information at Archer, and specifically about two of the emails and two of the photographs Wisk raises in this motion (MARIUS-DOJ-0000288; MARIUS-DOJ-0000728; MARIUS-DOJ-0001468; MARIUS-DOJ-0001469). I have appended to my declaration excerpts of my deposition testimony related to these issues, which are consistent with all of the information I have attested to in this declaration (**Marius Ex. 2**), the prior declaration I have submitted under penalty of perjury previously in this case (ECF 98-17, ¶¶ 8-10), and the emails I sent Wisk on January 15 and 16, 2020, reflecting the extensive review I undertook to return Wisk documents (**Marius Ex. 1**).

12.    I have extensive personal information on my personal devices, including family photos, financial and tax information, personal communications involving family members, and other sensitive data pertaining to my wife and children. I have already provided substantial discovery to

DECLARATION OF DIEDERIK MARIUS IN SUPPORT OF OPPOSITION TO PLAINTIFF'S REQUEST FOR FORENSIC INSPECTION OF PERSONAL DEVICES
CASE NO. 3:21-CV-02450-WHO

4

sf- 4757396

Wisk and devoted a substantial amount of time attempting to remove Wisk documents from my personal devices.  My family and I strongly object to providing images of our personal devices to a third party forensics consultant.

DECLARATION OF DIEDERIK MARIUS IN SUPPORT OF OPPOSITION TO PLAINTIFF'S REQUEST FOR FORENSIC INSPECTION OF PERSONAL DEVICES
CASE NO. 3:21-CV-02450-WHO

sf- 4757396

5

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on May 2, 2022 at Palo Alto, California.

_____

Diederik Marius

DECLARATION OF DIEDERIK MARIUS IN SUPPORT OF OPPOSITION TO PLAINTIFF'S REQUEST FOR FORENSIC INSPECTION OF PERSONAL DEVICES
CASE NO. 3:21-CV-02450-WHO

6

sf- 4757396

# EXHIBIT 1

| Date: | Thursday, January 16 2020 03:42 PM |
|---|---|
| Subject: | Re: Confidentiality agreement |
| From: | Diederik Marius <diederik@gmail.com> |
| To: | Carlie Russell <carlie.russell@wisk.aero>; |

Carlie and Denise,

I returned the various drives, cards and computer this afternoon. I also made a copy of the files I had on other devices and put them on a hard drive (there had been some problems with dropbox, and it was agreed upon to return the files on a physical drive). That hard drive was copied by someone at Wisk and the disk was wiped clean afterwards. The files were deleted from my personal devices. I also returned a few more hardware pieces and a book I still had in my possession.

Thanks and have a great weekend!

Diederik

On Wed, Jan 15, 2020 at 6:49 PM Carlie Russell <carlie.russell@wisk.aero> wrote:
Hi Diederik,
Thank you for your attention to detail regarding company property and confidential information.  As discussed in your exit interview, you have an obligation to Wisk Aero LLC (the "Company") to return all company property in your possession and maintain your relationship of confidence and trust with respect to any information or materials of a confidential or secret nature that may have been discovered or disclosed to you throughout your employment with the Company.

A dropbox folder will be sent to you from our IT team and we ask that any digital proprietary information that has not been returned be uploaded to that folder and then destroyed on any personal devices/accounts.  We ask that the physical proprietary information and property be returned to the company in person (i.e., drives, manuals, books, computers, etc.); please plan to return those to our office at 2700 Broderick Way, Mountain View, CA 94043 by end of day Thursday, January 16, 2020.  Upon arrival you can ask for me or Denise Parsonage at the front desk and one of us will come to collect the items.

In response to the specific items listed in your email, we ask that you comply with the following:

- USB Drive USB20FD: Please return this item to Wisk as instructed above without making copies of the data contained therein.  In addition, destroy any copies of the data contained therein that you may have.
- USB Drive Electrom Instruments:  Please return this item to Wisk as instructed above without making copies of the data contained therein.  In addition, destroy any copies of the data contained therein that you may have.
- 2 USB Drives Kingston:  Please return this item to Wisk as instructed above without making copies of the data contained therein.  In addition, destroy any copies of the data contained therein that you may have.
- USB Drive SanDisk Cruzer 8GB:  Please return this item to Wisk as instructed above without making copies of the data contained therein.  In addition, destroy any copies of the data contained therein that you may have.
- 15" Macbook Pro:  Please return this item to Wisk as instructed above without making copies of the data contained therein.  In addition, destroy any copies of the data contained therein that you may have.
- 2 Compact Flashcards - Transcend, CompactFlash, 133x, 8GB:  Please return this item to Wisk as instructed above without making copies of the data contained therein.  In addition, destroy any copies of the data contained therein that you may have.

MARIUS-DOJ-0000947

- Various work-related files from 2012-2013 time frame; Work-related files from the past few years: Upload these items to the DropBox provided by IT and delete/destroy on any personal devices/accounts.

- Various Photos on my personal devices and cloud storage: Upload these items to the DropBox provided by IT and delete/destroy on any personal devices/accounts.

Please confirm to me in writing by Thursday, January 16, 2020 that all items have been returned to the Company and/or removed from your personal devices and accounts.

Thank you and best of luck with your future career endeavors.
--

Carlie Russell
People Partner
Mobile: 951.533.3529
Wisk | wisk.aero

On Wed, Jan 15, 2020 at 12:42 PM Diederik Marius <diederik@gmail.com> wrote:

Dear Denise and Carlie,


I write in follow up to my exit interview and regarding my obligations under the confidentiality agreement with the company. As you know I gave advanced notice to the company of my resignation and the company accelerated my departure date abruptly. As I prepared for my exit, I was already working to meet my obligations to the company in terms of returning company property and disengaging from all digital files that could arguably constitute the company's confidential information. I take these matters seriously, as does my new employer.


To that end, I have undertaken an extensive review of my data and devices in order to be certain that I return all company property and that I have not inadvertently maintained any company property or confidential information collected and/or stored in the ordinary course of my work performed on behalf of the company. I have discovered a few items that I feel should be returned to the company. I did not find any company property in my search other than as set out below.

| # | Property | Further identification |
|---|----------|------------------------|
| 1 | USB drive -- USB20FD | I believe this belongs to the company. It contains mostly scope plots from 2014/2015 - plots taken from measurements with an oscilloscope. This USB disk was also used by others who put some data files on there. |

| | | **I will deliver the drive to the company.** |
|---|---|---|
| 2 | USB drive -- Electrom Instruments | I believe this belongs to the company.  It contains an Electrom ITIG manual.<br><br>**I will deliver the drive to the company without making copies of the data contained therein.** |
| 3 | 2 USB drives -- Kingston | I believe these belong to the company. One drive contains various work files (matlab files, data files and ansys files).  The other contains a few work pictures from 2012, as well as some "sdv" files that are inaccessible to me.<br><br>**I will deliver the drive to the company without making copies of the data contained therein.** |
| 4 | USB drive -- SanDisk Cruzer 8 GB | I believe this arguably belongs to the company. It belonged to a former Zee employee who left it at the company, and I reused it in the oscilloscope to take scope screen shots.<br><br>**I will deliver the drive to the company without making copies of the data contained therein.** |
| 5 | 15" Macbook Pro | This is a company computer that broke in November 2016 and hasn't been used since.  I have not reviewed the contents of this computer, as it is inoperable.<br><br>**I will deliver the computer to the company.** |
| 6 | 2 Compact Flash Cards -- Transcend, CompactFlash, 133x, 8GB | I believe these belong to the company.   They are most likely for use in a thermal camera; however, I cannot access the contents.<br><br>**I will deliver the devices to the company.** |
| 7 | Various work-related files from 2012-2013 time | These files were located in various external memory devices, and include: |

MARIUS-DOJ-0000949

| | | |
|---|---|---|
| | frame.<br><br>Work-related files from the past few years | • some work files from 2011-2013<br><br>• A few data files from 2013, test data files<br><br>• matlab files<br><br>• Misc data files (████ cmd and data logs, flight data logs)<br><br>• Misc work files from 2012<br><br>. pdfs<br><br>**I will provide a copy of these items if instructed to do so. Otherwise these items will all be deleted**.  If the company would like a copy please provide instructions. |
| 8 | Various Photos on my personal devices and cloud storage | During my employment I took photos in the workplace with my personal cell phone, along with personal photos.  All of these photos were routinely and automatically sync'd to various devices connected the cloud and sometimes manually backed up to a personal computer and/or memory card.  I have gone through all of my storage devices and locations and isolated all photos that pertain to the company or my work for the company.<br><br>**These photos have been isolated and will be deleted**.  If the company would like a copy please provide instructions. |

Items 1-6 are physical devices that will be physically delivered to the company.  Please provide instructions.  If I do not receive any instruction by EOD Thursday January 16, I will simply drop the materials off at the company reception desk, to your attention.

Items 7 and 8 are old data and/or photos, or are duplicate copies of materials already in the company's possession.  Therefore, **I plan to DELETE all of this old data without making more copies for the company** and **will not retain any of these data**.  If the company would like a copy of these items before I delete them, please make arrangements for me to provide a copy.  Otherwise please approve my complete deletion of this data. If I do not receive any instruction by EOD Thursday January 16,  I will proceed to delete everything as delineated above without making copies.

Finally, I need to point something out regarding the letter that was presented to me at my exit interview.  It was presented to me without any opportunity to review and I was told to sign it acknowledging receipt.  Had I read the letter carefully, I would have noted the sentence in section 4 that states that I "have delivered to the Company all documents and data of any nature containing or pertaining to such Proprietary information" and that I "have not retained any such documents or data or any reproduction thereof."  That is incorrect, as I had not at that time yet completed my search or turned over any materials.  I regret signing the document without reading it, as it is not true and accurate; however it will be as soon as the materials are delivered to the company and all copies deleted as discussed above.


I trust the above is sufficient for the company to confirm my compliance with obligations.  I would appreciate your timely attention to these matters, receiving any further guidance from the company on these important points so we can wrap this up during my exit interview, as well as the company's approval of my plan outlined above.


Thank you,

Diederik Marius




--

Carlie Russell
People Partner
Mobile: 951.533.3529
Wisk | wisk.aero

# EXHIBIT 2

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 1

1          UNITED STATES DISTRICT COURT
           NORTHERN DISTRICT OF CALIFORNIA
2
   WISK AERO, LLC,
3

4              Plaintiff,        Case No.
                                 3:21-cv-
5          -against-             02450-WHO

6   ARCHER AVIATION, INC.,

7
               Defendant.
8

9    Highly Confidential - Attorneys' Eyes Only
              Under Protective Order
10

11        VIDEO-RECORDED DEPOSITION OF
               DIEDERIK MARIUS
12        Zoom Recorded Videoconference
                 07/06/2021
13             1:32 p.m. (PDT)

14

15

16

17

18

19

20

21

22

23

24   REPORTED BY:  AMANDA GORRONO, CLR
     CLR NO. 052005-01
25   JOB NO. 196612

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 31

1      A.     That is correct, yes.

2      Q.     Okay.  But you did at least

3   understand at the time that returning

4   confidential information and documents,

5   including electronically stored documents,

6   was something that was going to be

7   important to Wisk, right?

8      A.     Yes, I did.

9      Q.     After you signed this document,

10  what steps did you take to make sure that

11  you had returned confidential documents

12  and electronically stored information to

13  Wisk?

14     A.     Brett and Adam had hired a

15  counsel for us, a lawyer to look into this

16  for a clean exit.  So with him, I went

17  through, like, all the different steps I

18  had to do here, so I went through all of

19  my devices.

20          MS. FEINSTEIN:  I'm going to

21       interject -- hold on, hold on,

22       Diederik.  I want to make sure,

23       because you're going close to the line

24       here.  Please don't disclose any

25       communications you had with the lawyer

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 32

```
 1        that Brett and Adam retained for you,

 2        okay?  You can disclose any of the

 3        acts that you took --

 4             THE WITNESS:  Okay.

 5             MS. FEINSTEIN:  -- in response

 6        to the question, not your

 7        communications with the lawyer.

 8        Sorry, I didn't mean to interrupt.

 9        A.    Yeah, so then I went -- I

10   started looking for all of the devices

11   that I had at home or that were either

12   personal for me or that still belonged to

13   Wisk.  I went through all of those

14   devices, identified all the files that

15   needed to be returned, both on devices and

16   on online accounts, and then contacted

17   Carlie to see what the next steps would be

18   there, like how to return all the

19   information to Wisk.

20   BY MR. SCHMIDT:

21        Q.    And we'll get to those steps in

22   a second, but I want to circle back to the

23   lawyer.  You said that Brett and Adam had

24   hired a counsel for employees that were

25   joining Archer.  Is that your
```

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

1      A.    Not yet.  It looks like it's

2  sent.  I'm trying to connect.  I think I

3  might have trouble with Excel here.

4           MS. FEINSTEIN:  Just press the

5      word "connect."

6           THE WITNESS:  Yeah, I press

7      connect and then it's asking me to add

8      a server.  See if I can work offline.

9      Okay.

10  BY MR. SCHMIDT:

11     Q.    Okay.  Do you recognize

12  Exhibit 3, sir?

13     A.    I do.

14     Q.    What is Exhibit 3?

15     A.    Exhibit 3 is a bunch of their

16  devices I found at home.

17     Q.    So if I understand correctly,

18  when you took this effort to identify all

19  the devices that you had at your house,

20  you made a record of what you found in

21  this spreadsheet which is Exhibit 3,

22  correct?

23     A.    That is correct.

24     Q.    When you created Exhibit 3, were

25  you trying to make it as accurate and

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 42

1    comprehensive as possible?

2        A.    I did.

3        Q.    Sitting here today, are you

4    aware of any inaccuracies in Exhibit 3?

5        A.    Still accurate.

6        Q.    And it looks like to me that the

7    items that you had identified for

8    Ms. Russell are the items that are

9    highlighted in gray; is that correct?

10        A.    That is correct, yes.

11        Q.    And items that are not

12    highlighted in gray were not identified to

13    Ms. Russell or anyone else as Wisk; is

14    that correct?

15            MS. FEINSTEIN:  Objection;

16        misstates the document.  That would be

17        the prior exhibit, not this document,

18        the prior exhibit.

19        A.    Sorry, can you repeat your

20    question there, Patrick?

21    BY MR. SCHMIDT:

22        Q.    Sure.  The items that are not

23    identified in gray, did you ever identify

24    those to Ms. Russell or anybody else at

25    Wisk?

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 65

1    your employment agreement with Archer,

2    correct?

3        A.    I did.

4        Q.    And you agree your Archer

5    employment agreement has a clause in it

6    that states you're not supposed to

7    maintain possession of your prior

8    employer's information when you join

9    Archer, correct?

10       A.    That is correct.

11       Q.    As of the time that you showed

12   up on your first day at Archer,

13   January 21st, did you believe at that time

14   that you lacked possession of any Wisk

15   confidential information?

16       A.    Yes, I did.

17       Q.    In your work at Archer, what

18   physical computer media do you have

19   available to you to store documents on?

20       A.    I have a work desktop and a work

21   laptop.

22       Q.    Have you ever used any external

23   media devices in your work at Archer?

24       A.    I -- I don't think so.

25       Q.    So no USBs or external hard

1   is Exhibit 6, with Exhibit 7 coming in the

2   intervening time at 3:24 p.m.

3          Do you see that?

4      A.   I see that, yes.

5      Q.   Do you recall why you were

6   forwarding these three E-mails to yourself

7   within a five-minute span on November 9th,

8   2019?

9      A.   Yes, I do.

10         MS. FEINSTEIN:  Let the record

11     reflect that he's reviewing the

12     documents.  It's difficult to tell on

13     Zoom.

14         You can take your time.

15         THE WITNESS:  Yes.  It's also a

16     very small screen here.  It's like a

17     little text.  Let's see.

18     A.   Okay.  I quickly glanced over it

19   in there.

20     Q.   So the question, sir, is:  Is

21   there an explanation as to why these three

22   particular E-mails were being forwarded

23   from yourself to yourself within the

24   five-minute span on this date?

25     A.   This also has to do with my

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 102

1    interview at Amazon.  I had talked with my

2    friend there, and they wanted to do like

3    another round with me, and he was asking

4    me for, like, some specific examples of,

5    like, problems and, like, more aircraft

6    level rather than just a motor level that

7    I could provide.  It was a task I would do

8    at Amazon would be more in that line.

9            I send myself these documents

10   here, again, to refresh myself about some

11   of the stuff I've worked upon and see how

12   I could convey some of the things I worked

13   on without giving any confidential

14   information away.

15        Q.    What was it specifically that

16   Amazon was asking you to provide more

17   details on?

18        A.    They just wanted to see, like,

19   what my level was on like not just a motor

20   side but on a whole system level -- system

21   level troubleshooting.

22        Q.    And is it fair to say that these

23   three documents are things that you were

24   doing related to system level

25   troubleshooting from -- throughout the

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 105

```
 1       A.     That is correct.

 2       Q.     And this is just a sampling of

 3   some of the troubleshooting and trial and

 4   error that you and the multiple engineers

 5   on your team undertook relating to

 6   implementing the ███████████████████

 7   at Wisk and its predecessors, correct?

 8       A.     That is correct.

 9       Q.     Are you able to tell me what

10   information, if any, from these documents

11   you shared with the representatives from

12   Amazon during your interview?

13       A.     I don't know off the top of my

14   head which of these specific -- I would

15   not have given any specifics.  It would

16   just be like on the whole.  But I don't

17   know which of these three would have been

18   a basis for that.

19       Q.     You didn't share the documents

20   with the folks at Amazon, did you?

21       A.     I did not share those documents

22   with anyone.

23       Q.     Okay.  You didn't share the

24   previous document we looked at, Exhibit 5,

25   at Amazon, correct?
```

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

1        A.    That is correct.

2        Q.    When you interviewed with

3   Amazon, did you sign an NDA with Amazon?

4        A.    I -- I don't remember.

5        Q.    But if you did sign an NDA, that

6   would have been an NDA to protect Amazon

7   not to protect Wisk, of course, right?

8        A.    I would assume so.

9        Q.    Okay.  Let's go to the next

10  document.

11              MR. SCHMIDT:  I'm going to do

12       the next two together.  For the

13       record, I've marked the next two

14       exhibits in order, Exhibits 9 and 10.

15       Both begin with Bates prefix

16       MARIUS-DOJ.  Exhibit 9 ends in Bates

17       570; Exhibit 10 ends in Bates No. 571.

18       Q.    Let me know when you have those,

19  sir.

20       A.    Yes, I have 9 open and 10 --

21  okay -- it's opening 10 now, yep.

22       Q.    Okay.  Turning to Exhibit 9.

23       A.    Okay.

24       Q.    We see, again, an E-mail from

25  your Gmail account to your Gmail account

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 141

1    Q.    Okay.  And can you just read

2  that paragraph into the record, please?

3    A.    "I returned the various drives,

4  cards, and computer this afternoon.  I

5  also made a copy of the files I had on

6  other devices and put them on a hard

7  drive.  There had been some problems with

8  Dropbox, and it was agreed upon to return

9  the files on a physical drive.  That hard

10  drive was copied by someone at Wisk.  The

11  disk was wiped clean afterwards.  The

12  files were deleted from my personal

13  devices.  I also returned a few more

14  hardware pieces and a book I still had in

15  my possession."

16    Q.    Okay.  And you say there that

17  "the hard drive was copied by someone at

18  Wisk."  Who is "someone at Wisk" who

19  copied the hard drive, to your knowledge?

20    A.    So, I handed it off the hard

21  drive to Carlie Russell, and then she took

22  it upstairs -- because I had to wait in

23  the lobby -- and then someone there copied

24  it or cleaned it and then -- before it was

25  returned to me, but I do not know exactly

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

1    who that was.

2         Q.    And did somebody tell you that

3    the hard drive was cleaned or wiped, as

4    you wrote here in your E-mail in

5    January 16th?

6         A.    I think I assumed that I could

7    just take it home at that point.

8         Q.    Who -- did somebody hand the

9    hard drive back to you?

10        A.    Yes, Carlie gave me the hard

11   drive back.

12        Q.    And did she tell you anything

13   about whether any files had been deleted

14   by Wisk from that device?

15        A.    I don't exactly remember.

16        Q.    She may have told you that or

17   she may not have told you that.  You don't

18   recall?

19        A.    Exactly.

20             MR. SCHMIDT:  Objection; calls

21        for speculation.

22        Q.    Okay.  And you took that hard

23   drive home with you; is that correct?

24        A.    That is correct.

25        Q.    Did Ms. Russell's give it to

 1    you?

 2        A.    Yes.

 3        Q.    And when you took that hard

 4    drive home with you, was that January 16,

 5    2020, did you ever access any files on

 6    that hard drive again between January 16,

 7    2020 and today?

 8        A.    I did not.

 9        Q.    Did you turn that hard drive

10    over to your legal counsel as part of the

11    forensic effort you've been discussing

12    today in response to the Grand Jury

13    subpoena?

14        A.    I did.

15        Q.    MS. FEINSTEIN:  Pass the witness

16    to you, Arturo.

17    EXAMINATION

18    BY MR. GONZÁLEZ:

19        Q.    Just briefly, sir, a few

20    follow-up questions.

21              I'm going to start at the end,

22    it's easier given my notes.

23              Exhibits 14, 15, and 16 are the

24    documents you described as garbled.

25              Do you recall those?

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

1       A.      Yes.

2       Q.      Are those fragments from a much

3   longer document?

4       A.      I am not -- I'm not sure of

5   that.  It could be.

6       Q.      Did you use any information from

7   Exhibits 14, 15, and 16, in any of the

8   work that you've done at Archer?

9               MR. SCHMIDT:  Objection;

10      leading.

11      A.      I did not.

12      Q.      Before this lawsuit was filed,

13  did you even know whether or not

14  Exhibits 14, 15, or 16 were on any of your

15  personal devices since you left Wisk?

16              MR. SCHMIDT:  Objection;

17      leading.

18      A.      I did not.

19      Q.      Have you shared with anyone at

20  Archer any information from Exhibits 14,

21  15, or 16?

22              MR. SCHMIDT:  Objection;

23      leading.

24      A.      I did not.

25      Q.      The motor model that Wisk was

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 147

1       Q.    You were asked a few questions

2    about Exhibits 12 and 13, which are the

3    two screenshots.

4             Do you recall those screenshots?

5       A.    Yes, I do.

6       Q.    Did you know before this lawsuit

7    was filed that either one of those

8    screenshots was on any of your personal

9    devices?

10            MR. SCHMIDT:   Objection;

11    leading.

12       A.    I did not.

13       Q.    Let me ask a better question.

14       A.    Yeah.  Of course.

15       Q.    Let me ask a better question,

16    even though I don't think that was

17    leading.

18            Between the time that you left

19    Wisk and the time that this lawsuit was

20    filed, did you know whether or not the

21    screenshots that have been marked as

22    Exhibit 12 and 13 were on any of your

23    personal devices?

24       A.    I did not.

25       Q.    Have you ever shared with anyone

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 148

1    at Archer any information from either one

2    of those screenshots, Exhibits 12 or 13?

3            MR. SCHMIDT:  Objection;

4        leading.

5        A.    I have not shared it.

6        Q.    Have you used any information

7    from Exhibits 12 or 13, the screenshots,

8    during the time that you've been employed

9    by Archer?

10           MR. SCHMIDT:  Objection;

11       leading.

12       A.    I have not.

13       Q.    I'm not sure if I asked that

14   question about Exhibits 14, 15 and 16.

15           MS. FEINSTEIN:  You did.

16           MR. GONZÁLEZ:  Okay.  All right.

17   By MR. GONZÁLEZ:

18       Q.    You were also shown a

19   presentation that you made to Apple, which

20   is Exhibit 11.

21           Do you recall that?

22       A.    Yes.

23       Q.    It may have been Exhibit 10,

24   actually.  I think Exhibit 10.

25       A.    Yes.

Page 153

1        Q.    And the "him" that he's

2   referring to is the person you were going

3   to speak to from Amazon?

4        A.    It is, I believe that was Sammy.

5        Q.    And again, this is sent to you

6   on November 6th, and then three days later

7   is when you send yourself the three

8   examples that are Exhibits 6, 7, and 8; is

9   that right?

10       A.    That is correct.

11       Q.    Did you intend to refer to those

12  as examples of the kind of things that is

13  referenced by Josh in his E-mail?

14       A.    Yes, I did.

15       Q.    Now, when you spoke to the folks

16  at Amazon -- I think you said you

17  interviewed with them twice -- did you

18  ever disclose to them any information that

19  you thought was confidential Wisk

20  information?

21            MR. SCHMIDT:  Objection; calls

22       for a legal conclusion.

23       A.    I did not.  Okay.  I did not.

24       Q.    And now, sir, calling your

25  attention to Exhibit 5.  That was the

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 154

1    PowerPoint presentation that you were

2    shown earlier.

3              Do you recall that?  Do you have

4    that in front of you?

5         A.    I have that in front of me

6    exactly, yes.

7         Q.    A few questions about this

8    document.  First of all, it's dated

9    February of 2016.

10             Do you see that?

11        A.    Yes, I see that.

12        Q.    With respect to this

13   February 2016 PowerPoint, between the time

14   that you left Wisk and the date that this

15   lawsuit was filed, did you know whether or

16   not you had that document on your personal

17   devices?

18        A.    Not with independent knowledge.

19        Q.    Did you ever at any point share

20   any information from the February 2016

21   PowerPoint, Exhibit 5, with anyone at

22   Archer?

23             MR. SCHMIDT:  Objection;

24        leading.

25        A.    I did not.

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 155

```
1         Q.    Can you tell us whether or not

2    you ever used anything in that document in

3    connection with your work at Archer?

4              MR. SCHMIDT:  Objection;

5         leading.

6         A.    I did not.  I did not.

7         Q.    Sir, before you joined Archer,

8    did anyone tell you to bring Wisk

9    information for you to use at Archer?

10             MR. SCHMIDT:  Objection;

11        leading.

12        A.    No.

13   BY MR. GONZÁLEZ:

14        Q.    When you left Wisk, did you

15   purposely take any information with you

16   that you intended to use at Archer?

17             MR. SCHMIDT:  Objection;

18        leading.

19        A.    I did not.

20        Q.    Since you began working at

21   Archer, have you used any confidential

22   Wisk information at Archer?

23             MR. SCHMIDT:  Objection;

24        leading, calls for a legal conclusion.

25        A.    I have not.
```

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 156

1        Q.    Since you began working at

2   Archer, have you used any information that

3   you believed was Wisk confidential

4   information at Archer?

5             MR. SCHMIDT:   Objection;

6        leading, calls for a legal conclusion.

7        A.    No, I haven't.

8        Q.    Since you began working at

9   Archer, have you shared with anyone at

10  Archer any Wisk information that you

11  believed was confidential to Wisk?

12            MR. SCHMIDT:   Objection;

13       leading.

14       A.    I haven't.

15  BY MR. GONZÁLEZ:

16       Q.    Since you began working at

17  Archer, has anybody from Archer asked you

18  to share with them any information that

19  you thought was confidential Wisk

20  information?

21            MR. SCHMIDT:   Objection;

22       leading.

23       A.    No.

24       Q.    Since you have been working at

25  Archer, have you heard anyone at Archer

1   using information that you believed was

2   confidential to Wisk?

3           MR. SCHMIDT:   Objection;

4       leading.

5       A.    No.

6       Q.    I think this was clear, but

7   there was a lot of objections so I'm going

8   to try a couple of additional questions

9   before we wrap up here.

10          The motor that you are currently

11  working on at Archer, is it or is it not

12  the same type of motor that you worked on

13  at Wisk?

14      A.    This is for which aircraft,

15  sorry?

16      Q.    The one that you are currently

17  working on --

18      A.    Okay.

19  ████████████████████████████████

20  ████████████████████████████████████

21  ███████████████████████████

22  ███████████████████████

23      ██████████████

24      Q.    Can you tell me when you left

25  Wisk, were you working on a radial flux

HIGHLY CONFIDENTIAL - ATTORNEY'S EYES ONLY

Page 178

1    about what you returned and all of that.

2    Do you remember, sitting here today, when

3    you were going through these various

4    devices, do you remember how many Wisk

5    documents you identified?

6        A.    It was a lot.  I don't remember

7    exactly.  It was like hundreds or

8    thousands.

9        Q.    Is it fair to say that when you

10   returned the document to Wisk on the

11   device that you mentioned, that there were

12   hundreds of thousands of documents on it?

13       A.    Yes.

14       Q.    And it turns out, you now know

15   from today's deposition, that you missed a

16   few; is that right?

17       A.    That is correct.

18       Q.    And that was accidental?

19       A.    It was.

20       Q.    Did your best to get them all?

21       A.    I spent many days going through

22   all of my devices.

23       Q.    And a few more, and then I'll be

24   done.

25            Was it common when you were at