ARTURO J. GONZÁLEZ (CA SBN 121490)
AGonzalez@mofo.com
SHAELYN K. DAWSON (CA SBN 288278)
ShaelynDawson@mofo.com
Morrison & Foerster LLP
425 Market Street
San Francisco, California  94105-2482
Telephone: 415.268.7000
Facsimile:  415.268.7522

Attorneys for Third Party Witnesses
DIEDERICK MARIUS, JOHN MELACK, AND
THOMAS MUNIZ

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| WISK AERO LLC, | Case No. 3:21-cv-02450-WHO |
| Plaintiff, | **DECLARATION OF THOMAS MUNIZ IN SUPPORT OF OPPOSITION TO PLAINTIFF'S REQUEST FOR FORENSIC INSPECTION OF PERSONAL DEVICES** |
| v. | |
| ARCHER AVIATION INC., | |
| Defendant. | |

I, Thomas Muniz, declare as follows:

1.      I am the Chief Operating Officer of Archer Aviation Inc.  I started at Archer on December 6, 2019, as Vice President of Engineering.  In this role, I oversaw and helped build Archer's engineering team, its processes and tools, program plans, budgets, and overall program execution.  I held that position until March 2021, when I was promoted to Chief Operating Officer, which is my current position as of the date of this Declaration.  My responsibilities as Chief Operating Officer include strategic planning and oversight of Archer's engineering, certification,

manufacturing, supply chain, quality, and facilities departments.  I have personal knowledge of the facts stated herein and could competently testify to them if called upon to do so.

2.      On November 19, 2019, I accepted Archer's offer to serve as its Vice President of Engineering.  Both before and after joining Archer, my discussions about Wisk were limited to my historical role and responsibilities, and publicly available information about Wisk.  I have never revealed, and would never reveal, any confidential information of any former employer.

3.      I met with an outside employment lawyer named Eugene Illovsky, of Boersch & Illovsky LLP, in mid-March 2020, who was referred to me by Archer.  I understood that the purpose of the meeting was to ensure I did not inadvertently retain any confidential or proprietary materials from my previous employers, which I understand has been a standard part of Archer's onboarding process for employees starting on or after January 1, 2020.

4.      I have provided the following personal devices and electronic sources to my counsel at Morrison & Foerster, which include personal email and personal information, in response to subpoenas from the FBI and Plaintiffs:

- •    iPhone XR
- •    Gmail
- •    Google Drive
- •    LinkedIn
- •    iCloud Drive
- •    iCloud Mobile Backup

5.      It is my understanding that any non-personal document that originated from Wisk on my personal devices has been produced to Wisk.

6.      I understand that Wisk has asked the Court to order me to produce my personal devices to a third party, and that they have identified one email with attachments in support of that request (MUNIZ-DOJ-0000428).  I have reviewed that email with my legal counsel.  While employed at Wisk, I sent this email on August 15, 2019, from my personal email account to Johnny Melack's Wisk email account after the head of facilities at Wisk asked me to assist with clearing out

DECL. OF THOMAS MUNIZ IN SUPPORT OF OPPOSITION TO PLTF'S REQUEST FOR FORENSIC INSPECTION OF PERSONAL DEVICES
Case No. 3:21-cv-02450-WHO
sf- 4757397

2

the storage warehouse for unused items.  The attachments are photographs of items in the Wisk storage warehouse.  I sent these images to inquire whether Johnny Melack wanted us to keep any of them.  If not, they would be discarded.  I never considered (and do not consider) these photographs to contain any proprietary Wisk information.

7.      I did not take any documents from Wisk with the intention of using them at Archer or elsewhere.  As I testified previously, the email Wisk raises in this motion (MUNIZ-DOJ-0000428) was inadvertently retained.  (*See* **Muniz Exhibit 1** at 260:9–261:20.)  At no time have I accessed this email or attachments since joining Archer.  Indeed, I did not know that I had this email (or its attachments) until after this lawsuit was filed in connection with adhering to my subpoena obligations.  (*Id*. at 316:1-16.)  I did not share the content of this email (or any) Wisk document with anyone at Archer, did not use any part of the information in Wisk documents in my work at Archer, and have not looked at Wisk documents since joining Archer, with the exception of discussions with my legal counsel in connection with this motion and at my prior depositions, where Wisk showed me Wisk documents.  (*Id*. at 192:4-21.)  I understand that Wisk's expert says this file was "last modified" on April 15, 2021, and "last accessed" on April 19, 2021.  That is when my attorneys at Morrison & Foerster were collecting from my personal email account to respond to a subpoena from the government.  That is why the Bates number refers to "DOJ," or the Department of Justice.

8.      I have already been deposed twice in this case. I was asked detailed questions about my efforts to remove Wisk information from my personal devices, use of Wisk information at Archer, and specifically about the email Wisk raises in this motion.  I have appended to my declaration excerpts of my deposition testimony related to these issues, which are consistent with all of the information I have attested to in this declaration (**Muniz Ex. 1**), as well as the two prior declarations I have submitted under penalty of perjury previously in this case (ECF 58-22, ¶¶ 5, 15, 16, 17 and ECF 98-19, ¶ 4).

9.      I have extensive personal information on my personal devices, including family photos, financial and tax information, personal communications involving family members, and other sensitive data pertaining to my wife and children.  I have already provided substantial discovery to

DECL. OF THOMAS MUNIZ IN SUPPORT OF OPPOSITION TO PLTF'S REQUEST FOR FORENSIC
INSPECTION OF PERSONAL DEVICES
Case No. 3:21-cv-02450-WHO
sf- 4757397

3

Wisk and devoted a substantial amount of time attempting to remove Wisk documents from my personal devices.  My family and I strongly object to providing images of our personal devices to a third party forensics consultant.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on April __24__, 2022, at Palo Alto, California.

_____

Thomas Muniz

DECL. OF THOMAS MUNIZ IN SUPPORT OF OPPOSITION TO PLTF'S REQUEST FOR FORENSIC
INSPECTION OF PERSONAL DEVICES
Case No. 3:21-cv-02450-WHO
sf- 4757397

4

# EXHIBIT 1

1              UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3

4  WISK AREO, LLC,              )   Case No.

5        Plaintiff,       )   3:21-cv-02450-

6          vs.            )   WHO

7  ARCHER AVIATION, INC.,     )

8        Defendant.       )   Page 1-198

9

10

11      THIS TRANSCRIPT IS CONFIDENTIAL WITH

12     PORTIONS DESIGNATED HIGHLY CONFIDENTIAL -

13          ATTORNEYS' EYES ONLY

14

15   REMOTE VIDEOTAPED DEPOSITION OF THOMAS P. MUNIZ

16               TAKEN ON

17          FRIDAY, JUNE 25, 2021

18

19

20

21

22  JOB NO. 196221

23  Reported by:

24  BRENDA R. COUNTZ, RPR-CRR

25  CSR NO. 12563

Confidential

1   hard copy lab notebooks?

2        A.   2011 to 2015, something like that, if I

3   had to guess.

4        Q.   And do I take it from your prior

5   answers that you don't maintain hard copy

6   notebooks at Archer?

7        A.   Correct.

8        Q.   Is there some substitute that you use

9   in lieu of a hard copy notebook for

10   contemporaneous notes?

11        A.   Just e-mail, e-mail and Google Docs.

12        Q.   After your exit interview on December

13   5th, was it your belief that you no longer had

14   possession of any Wisk material?

15        A.   I'm sorry, can you repeat that one more

16   time?

17        Q.   After your exit interview on December

18   5th, was it your belief that you no longer had

19   possession of any Wisk material?

20        A.   Yes.

21        Q.   At any time after the exit interview up

22   until now did you ever discover that you were

23   still in possession of Wisk material?

24             MR. GONZALEZ:   Okay, hold on a second.

25   I'm going to instruct the witness that you should

Confidential

1    want to ask very briefly.

2

3                   EXAMINATION

4    BY MR. GONZALEZ:

5         Q.   Sir, when you left your prior employer

6    did you intend to take any documents with you

7    that you would use at Archer?

8         A.   No.

9         Q.   And did you take any documents with you

10   with the intention of using them at Archer?

11        A.   No.

12        Q.   Have you used any Wisk documents during

13   your employment at Archer?

14        A.   No.

15        Q.   Have you seen anybody else at Archer

16   using Wisk information at Archer?

17        A.   I have not.

18        Q.   Before you left your prior employer,

19   did anybody at Archer tell you to bring

20   information to Archer from your prior employer?

21        A.   No.

22             MR. GONZALEZ:   That's all I have.

23   Thank you.

24             (The confidential portion of the

25   deposition of Thomas P. Muniz was concluded at

Attorneys Eyes Only - Highly Confidential

1        IN THE UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3                ---oOo---

4    WISK AERO, LLC,                    :
                                        :
5              Plaintiff,               :
                                        :
6         vs.                           : No.
                                        : 3:21-cv-02450-WHO
7    ARCHER AVIATION, INC.,             :
                                        :
8                                       :
              Defendant.                :
9    _____     :

10

11

12

13      ATTORNEYS' EYES ONLY - HIGHLY CONFIDENTIAL

14        REMOTE DEPOSITION OF THOMAS MUÑIZ

15             July 7, 2021

16

17

18

19

20

21

22   Job No. 196615

23   Stenographically reported by:
     LAURA AXELSEN, CSR NO. 6173
24      RMR, CCRR, CRR, CRC

25

Attorneys' Eyes Only - Highly Confidential

Page 242

1   And for the record, I'm showing the witness what was

2   previously marked as Muñiz Exhibit 1, which is his

3   declaration submitted in this action.

4       A.  Yes.

5       Q.  Please let us know when you've had a chance

6   to open it.

7       A.  I have it open now.

8       Q.  Great.  So directing your attention to

9   Exhibit 1, paragraph 5, the last sentence you say,

10  "However, before I left Wisk, I personally spent

11  several days sorting through my personal devices to

12  remove Wisk-related photos and other Wisk

13  information I could locate."

14          Do you see that?

15      A.  I see that, yes.

16      Q.  And that's -- that's a true statement,

17  that's something you did?

18      A.  That's correct.

19      Q.  How many days did you spend doing that?

20      A.  Several days over the last week or so that

21  I was there.

22      Q.  When you say the last week you were there,

23  you mean the last week you were there at Archer --

24  or excuse me -- at Wisk?

25      A.  At Wisk.

Attorneys' Eyes Only - Highly Confidential

Page 243

1    Q.  Before you left for Archer?

2    A.  Yes.

3    Q.  And were those consecutive days, or how did

4    you do that?

5    A.  It was, you know, spend a couple hours at

6    night after work over the course of, you know, about

7    a week, something like that.

8    Q.  So you think something like maybe 14 hours

9    in total?

10    A.  Oh, no, I don't believe it was every day.

11    I probably spent a total of -- if I had to guess --

12    six or eight hours doing this over the course of a

13    week, but not every day.

14    Q.  And you were -- you were searching through

15    these devices, as you say, in order to remove

16    Wisk-related photos and any other Wisk information

17    you could locate, right?

18    A.  Yes.

19    Q.  And did you do that for all of the devices

20    that you had, uhm, at that time in 2020?

21    A.  So I did that for, uhm, my photos, which --

22    which I, you know, basically went through all the

23    photos that I had taken in the last 10 years.  Uhm,

24    and then I went through my e-mails and deleted

25    everything I can find in my e-mail.

1        A.   No.

2        Q.   And I take it when you looked at these --

3    these repositories like Google Photos and Flickr,

4    you did that in that same time period back in 2019

5    approximately the week before you -- before you left

6    Wisk for Archer?

7        A.   Yes, that time, yeah.

8        Q.   And during the course of when you're going

9    through your devices and these repositories in 2019,

10   did you find Wisk-related documents or photos that

11   you deleted?

12       A.   I did, yes.

13       Q.   And what do you recall finding and

14   deleting?

15       A.   I mean, I worked at Wisk for about 10

16   years.  Uhm, so I deleted hundreds, many hundreds of

17   photos of -- of lots of things.

18       Q.   I take it you used your phone at Wisk to

19   take photos that were actually related to your work?

20       A.   I did, yes.

21       Q.   And do you recall deleting anything other

22   than photos?

23       A.   Well, like I said earlier, I -- I went

24   through my personal e-mail and tried to delete

25   everything I could that was associated with Wisk,

Attorneys' Eyes Only - Highly Confidential

Page 248

1   yeah, had any Wisk information.

2        Q.   And you recall finding some e-mails along

3   those lines?

4        A.   Yes, uh-huh.

5        Q.   And do you have an approximate number or

6   way of estimating the number?

7        A.   Number of e-mails that I deleted?

8        Q.   Uh-huh --

9        A.   It was relatively infrequent that I used,

10  uhm, personal e-mail for work, but, uhm, I guess

11  maybe 50 to a hundred, something like that, that

12  kind of ballpark.

13       Q.   Back during this time period when you were

14  at Wisk, in 2019, did you typically use your Gmail

15  address for -- for work-related activities?

16       A.   No.  It was not typical.

17            MS. FEINSTEIN:  Mike, I'm going to -- I'm

18  going to ask you, we -- this deposition is supposed

19  to be intended to cover documents that are newly

20  produced.  And we allowed Patrick yesterday some

21  leeway to lay foundation to get into that, but it

22  seems like you're completing retreading areas and --

23  of things either you previously asked or you could

24  have asked.  So --

25            MR. ZELLER:  Okay.  Again, if you're going

Attorneys' Eyes Only - Highly Confidential

1          when you were at Wisk, in 2019, did you

2          typically use your Gmail address for -- for

3          work-related activities?")

4               MR. ZELLER:   Q.  So with respect to these

5     50 to hundred e-mails that were related to Wisk that

6     you did find, can you please tell me why -- why

7     generally speaking you were communicating by your

8     personal e-mail in those instances?

9          A.  Yeah.  The usual thing would be if for some

10    reason I couldn't use my work e-mail on my phone

11    because of, you know, inability to log in.  You

12    know, we went through various different I.T. systems

13    over the years where they made it, you know, harder

14    to use your phone to access Wisk information.  Uhm,

15    it was -- so it was not not typical because usually

16    I would use my -- my work e-mail for that.  But

17    those are kind of the reasons, if that makes sense.

18         Q.  And were these 50 to hundred e-mails that

19    you deleted from that account, were they

20    approximately from the same time period?  Were they

21    over your entire course of -- I mean, in other

22    words, did you have e-mails going back years?

23         A.  Yes, going back to 2010, that kind of time

24    period.

25         Q.  Uhm, so we talked about you looked at the

Attorneys' Eyes Only - Highly Confidential

1    repositories.  You did delete e-mails.  You deleted

2    photos.  Are there other materials that you can

3    recall deleting as a result of your -- your search

4    back in 2019?

5        A.  I don't specifically recall other

6    materials, no.

7        Q.  And during the course of this search and

8    deletion that you did in 2019, did you do it all by

9    yourself, or did you have any kind of assistance by

10   anybody?

11       A.  By myself.

12              MR. ZELLER:  I'm going to show what we are

13   marking as Muñiz Exhibit 6, which for the record

14   bears Bates numbers Muñiz-DOJ-0000428 and continues

15   through 440.

16              (EXHIBIT 6 WAS MARKED FOR IDENTIFICATION.)

17              MR. ZELLER:   Q.  Mr. Muñiz, please let me

18   know when you've had a chance to open and take a

19   look at Exhibit 6.

20       A.  Yes, I have it open.  I see it.

21       Q.  And do you recognize what this is?

22       A.  Yes.  I've -- I recognize this e-mail.

23       Q.  And what are these?

24       A.  Yeah, this is an e-mail -- looks like I

25   sent from my personal e-mail to Johnny Melack's work

Attorneys' Eyes Only - Highly Confidential

1    e-mail with some images attached of items that were

2    in our storage warehouse that we were working to

3    clean out.  So these are basically me saying -- the

4    context here was went to Johnny and said hey, can we

5    throw this stuff away, or do you want to keep any of

6    it.

7         Q.  And do you have a recollection or

8    understanding as to why this e-mail went to your

9    personal Gmail account?

10        A.  Not a specific recollection.  But my

11   assumption would be it was, you know, same reason as

12   before, either for some reason I was logged out of

13   my work e-mail and this was faster, or, you know --

14   just on your iPhone, when you go to send a -- an

15   image, it defaults to your -- to the one you have

16   set up in your mail app, which is my personal

17   e-mail.  So --

18        Q.  You'll see that Exhibit 6 is dated

19   August 15th, 2019.  Do you see that?

20        A.  I see that, yeah.

21        Q.  Is that consistent with your recollection

22   of when you sent this e-mail to John Melack?

23        A.  Yes.

24        Q.  Were these items in a particular warehouse?

25        A.  Yes, these were in the Bayshore 3

Attorneys' Eyes Only - Highly Confidential

Page 254

1    warehouse.

2         Q.   And why were you sending these images to

3    Mr. Melack in particular?

4         A.   They are images of equipment that he was

5    responsible for.   He was basically the owner of.

6         Q.   What was your relationship to the

7    equipment?

8         A.   Well, I was being asked by our facilities

9    person to help clean out this facility.   So I was

10   there just facilitating, you know, trying to get rid

11   of old stuff.

12        Q.   Did you have more than one communication

13   with Mr. Melack about -- about the equipment in

14   this -- in this Bayshore warehouse?

15        A.   I don't remember the details.   But I assume

16   I took these images, sent -- sent them over to him,

17   and then verbally said hey, do you want to keep any

18   of this otherwise we're going to throw it all away.

19        Q.   So with respect to the images that are here

20   in Exhibit 6, these are photos you actually took?

21        A.   Yeah, exactly.

22        Q.   And did you take more than the photos that

23   are depicted here of the equipment that was in the

24   Bayshore 3 warehouse at the time?

25        A.   You mean when we were cleaning out the

Attorneys' Eyes Only - Highly Confidential

1  warehouse did I take other photos?

2      Q.  Yes.

3      A.  I don't recall.

4      Q.  Is it your expectation you did?

5      A.  It's possible.

6      Q.  Do you know what any of the equipment is

7  that's here depicted in Exhibit 6?

8      A.  Yes.

9      Q.  What is it?

10     A.  Uhm, so let's see.  The --

11     Q.  We can just break it down.  So we'll

12  have --

13     A.  Should we go --

14     Q.  Yeah, we can break it down so we have a

15  clear record.  If you turn to the second page of

16  Exhibit 6, which for the record bears Bates number

17  Muñiz-DOJ-0000429.

18     A.  Yep, so this image to me looks like an old

19  rack with some power supplies in it and a bunch of

20  old wire harnesses.  Looks like a circuit board on

21  top.

22     Q.  Do you know -- do you know any more

23  information about it?

24     A.  I know it was related to the battery --

25  battery system at Wisk is old, you know, power

Attorneys' Eyes Only - Highly Confidential

1  supplies for charging, that kind of stuff.

2      Q.  Can you tell which aircraft it's for?

3      A.  No.

4      Q.  Directing your attention to -- I take it

5  there's nothing else that you know or remember about

6  429?

7      A.  Correct.

8      Q.  Turning to the next one then, the next

9  image, which is in the page ending 0000431.  Do you

10  recognize what this image depicts?

11      A.  Yes.  This is an ultra sonic welder.

12      Q.  And then turning your attention to the next

13  page, which ends in 0000433.

14      A.  Uh-huh --

15      Q.  Do you recognize anything that's depicted

16  in this image?

17      A.  Yes.

18      Q.  And what is this?

19      A.  It's another ultrasonic welder.  That's the

20  thing in the middle, and then the thing on the left

21  is a heat staking machine.

22      Q.  I'm sorry.  When you -- I can tell which

23  one is on the left, but which --

24      A.  It's on -- on the bottom.  I guess it's

25  rotated for me.

1      Q.   Yeah, and what's the one in the middle?

2      A.   That's another ultrasonic welder.

3      Q.   Then directing your attention to the next

4   image, which it ends in 000435.

5      A.   Yes.

6      Q.   Do you see -- do you recognize what's

7   depicted in that image?

8      A.   Yes, the boxes were old battery cells that

9   we didn't use.

10     Q.   And then directing your attention to the

11  next image, which ends in 000437.

12     A.   Uh-huh --

13     Q.   Do you recognize what this depicts?

14     A.   This one I can't really tell what's going

15  on.  I don't recall what I was trying to capture in

16  this one.  It's like these things on the table, but

17  I don't know what they are.

███████████████████████████████████████████

██████████

███████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████

25     Q.   I take it you don't have any additional

Attorneys' Eyes Only - Highly Confidential

1    information about what's on this page?

2        A.  No.

3        Q.  And you don't recall why you took it?

4        A.  Uhm --

5        Q.  Specifically, I understand your general

6    purpose was to go through the -- to go through the

7    warehouse or at least the particular equipment.  But

8    you don't recall why you took this specific image?

9        A.  Uhm, no.

10       Q.  Did you send out similar e-mails to people

11   in connection with this -- when you were going

12   through the Bayshore 3 warehouse facility?

13       A.  I don't recall, but I don't believe so.

14   Most of the other people that had equipment there

15   were able to come in person.  But since Johnny

16   wasn't there, I was keeping an eye out for anything

17   that he might be concerned about.

18       Q.  What was your role in this exactly?  Were

19   you overseeing all of it?  Were you talking to other

20   people on the team or within the company about it?

21   If you could please just tell me generally what your

22   role was in this -- this request by the facilities?

23       A.  Yeah, sure, happy to.  Uhm, so we were

24   trying to clear out, uhm, this space and essentially

25   purge old parts and equipment and things.  So the

Attorneys' Eyes Only - Highly Confidential

1    head of facilities asked several people to go in and

2    help go through what was there because they were

3    going to essentially take anything that was left to

4    the dump, you know, within a week or something like

5    that.  So I went through just to make sure I had a

6    second set of eyes on anything that shouldn't be

7    disposed of.  And so these specifically were things

8    that I identified as hey -- to Johnny specifically,

9    are these things that you want to get rid of or want

10   to preserve.

11       Q.  Was there somebody in charge of the

12   facilities in particular who you interacted or

13   worked with on this?

14       A.  Yes.  His name was Niraj Nath.

15       Q.  And he was the one who made this request?

16       A.  The request for folks to come look at their

17   old stuff, yeah, correct.

18       Q.  Now, with respect to Exhibit 6, uhm, as we

19   talked about, these are obviously Wisk photos.  Do

20   you have any explanation as to why you didn't locate

21   this e-mail and these images in your -- in your

22   search that you did in 2019 of your personal

23   devices?

24       A.  Uhm, I mean it's my understanding that this

25   was in my sent folder and, you know, didn't have a

```
 1    Wisk e-mail associated with it.  So, you know,

 2    whatever search terms I used to purge -- to do my

 3    best to purge the -- all the e-mail folders, this

 4    one I just missed.

 5            MS. FEINSTEIN:  Mike, just -- don't mean to

 6    interrupt your flow, but we've been going a while,

 7    so when you're -- we can take a break soon, that

 8    would be good.

 9            MR. ZELLER:   Q.  Sure.  Sure.  Just a

10    couple follow up, then we can take a break.

11            I take it that when you did your searches

12    of your personal devices to look for and remove

13    Wisk-related materials, you -- you -- you attempted

14    to find the e-mails in your Gmail account by using

15    search terms?

16        A.  Yeah, Wisk, you know, Zee.

17        Q.  Other terms you can remember?

18        A.  Cora, I'm sure.

19        Q.  Other ones you can remember?

20        A.  Kitty Hawk.  We were Kitty Hawk for a

21    while.

22        Q.  Any others you can remember?

23        A.  Uhm, I don't think so.  I mean my -- my

24    attempt was, hey, anything that was, you know, a

25    Zee, Kitty Hawk, Wisk, Cora e-mail, trying to get
```

Attorneys' Eyes Only - Highly Confidential

1    all those out of there.

2        Q.  If you look at Exhibit 6, you'll see that

3    the word Cora is part of Johnny Melack's e-mail at

4    the time.  Do you see that?

5        A.  I see that, yeah.

6        Q.  And I take it Exhibit 6 are Wisk-related

7    materials that -- that were not, in fact, deleted

8    from your personal devices.  You're aware of that?

9        A.  Correct, yep.

10        Q.  And do you have any explanation as to why

11    this document that uses the word Cora in the to line

12    didn't get picked up by your searches?

13        A.  Uhm, yeah, because I must have skipped or

14    inadvertently not searched my sent folder for Cora.

15        Q.  Do you recall back in 2019 searching your

16    sent folder at all?

17        A.  I don't recall the details.  I would have

18    hoped that I would have got it.  But just to be

19    clear, this is the type of e-mail that I did my best

20    to remove.

21        Q.  And certainly you agree, sitting here now

22    and seeing it, it's something that should have been

23    removed?

24        A.  I would have tried to remove this, yes.

25        Q.  Just to finish off with Exhibit 6, and then

1  we can take a quick break.  Do you recall kind of

2  any conversations with Johnny Melack concerning

3  these images?

4          MS. FEINSTEIN:  Objection; vague as to

5  time.

6          MR. ZELLER:  Q.  I'm talking about back

7  then in 2019.

8      A.  I recall sending him these images and then

9  following up with a these are going to go to the

10  dump unless you want to keep them, you know, verbal

11  discussions, something like that.

12      Q.  Do you know what happened to the equipment?

13      A.  I do not.

14          MR. ZELLER:  All right.  Now's a good time

15  to take a break, then.  Thank you.

16          VIDEOGRAPHER:  Off the record.  The time is

17  10:24.

18          (The deposition was in recess from      to

19              .)

20          VIDEOGRAPHER:  Back on the record.  I'm

21  sorry.  Back on the record.  The time is 10:40.

22          MR. ZELLER:  Thank you.  Mr. Muñiz, I'm

23  going to show you what we're marking as Exhibit 7,

24  which is a multi-page document bearing Bates numbers

25  Muñiz-DOJ-0000144 through 147.  And it appears to be

1    Q.  And during that approximately 10-year

2  period, did you consistently use personal devices

3  for your work as Wisk?

4    A.  Periodically I did, yeah.

5    Q.  Did anybody ever tell you that that was not

6  appropriate?

7    A.  No.  It was -- it was expected.

8    Q.  Now, you talked with counsel today about

9  some of your efforts to remove Wisk data from your

10  computers.  Would it be fair to say that before you

11  started at Archer, you made a good faith effort to

12  remove Wisk information from your personal devices?

13        MR. ZELLER:  Leading.

14        MR. GONZALEZ:  Q.   Let me rephrase it.

15  Before you began at Archer, did you or did you not

16  make a good faith effort to remove Wisk documents

17  from your personal devices?

18    A.  Yeah, I tried my best before I left to

19  remove Wisk documents from my personal devices.

20    Q.  And that was so that you wouldn't use them

21  at Archer?

22    A.  It was because it was the right thing to

23  do, and, of course, because I didn't use them at

24  Archer.

25    Q.  Now, counsel showed you a document today

1    Q.  With respect to those photos that are

2  marked as Exhibit 6, between the time that you began

3  at Archer and the time that this lawsuit was filed,

4  had you looked at any of those photos?

5    A.  I had not.

6    Q.  Did you even know whether or not they were

7  on your personal device?

8    A.  No, I didn't have any knowledge that any of

9  those files were there.

10    Q.  At any time during your employment at

11  Archer have you used any of those photos for any

12  purpose at Archer?

13    A.  No.

14    Q.  Have you shared any of those photos or any

15  information from the photos with anyone at Archer?

16    A.  I have not.

17    Q.  You've indicated that many of your devices

18  were imaged.  Did you provide your counsel with all

19  of your personal devices that may have had Wisk

20  information as part of that process?

21    A.  Yes.

22    Q.  And in addition, your Gmail?

23    A.  Yes.

24    Q.  And if counsel can agree on a protocol

25  that's mutually acceptable, would you be willing to