# EXHIBIT 1

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 1

1            UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3              SAN FRANCISCO DIVISION

4
   WISK AERO LLC,
5
                 Plaintiff,
6
        vs.                        No.
7                                  3:21-cv-02450-WHO
   ARCHER AVIATION INC.,
8
                 Defendant.
9   _____

10

11

12

13     HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

14        VIDEO DEPOSITION OF SCOTT FURMAN

15              July 21, 2022

16                9:09 a.m.

17

18            1881 Page Mill Road

19           Palo Alto, California

20

21

22
   Reported by:  QUYEN N. DO, CSR No. 12447
23

24

25  JOB NO. 214469

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 10

1        Counsel, would you please introduce
2  yourselves, starting with the questioning attorney.
3        MR. MACK:  Brian Mack of Quinn Emmanuel,
4  representing Wisk Aero LLC, the Plaintiff.
5        MR. BARSKY:  Wayne Barsky, Gibson Dunn,
6  representing Archer Aviation.
7        MR. SIM:  Charlie Sim from Gibson Dunn,
8  also representing Archer Aviation.
9        MR. GONZALEZ:  Arturo Gonzalez from
10 Morrison Foerster on behalf of the witness,
11 Mr. Furman.
12       THE VIDEOGRAPHER:  Will the court reporter
13 please swear in the witness.
14            --oOo--
15            SCOTT FURMAN,
16   having been first duly sworn, was examined and
17         testified as follows:
18            --oOo--
19       THE VIDEOGRAPHER:  Proceed.
20            EXAMINATION
21 BY MR. MACK:
22    Q    Good morning, Mr. Furman.  Could you
23 please state your name for the record.
24    A    My name is Scott Furman.
25    Q    And what is your address?

Page 11

1    A    123 Hedge Road, Menlo Park, California
2  94025.
3    Q    And have you been deposed before today?
4    A    Never.
5    Q    Okay, since you haven't been deposed
6  before, we'll run through some quick ground rules.
7  Is that okay?
8    A    That's okay.
9    Q    First, your answers are all being
10 transcribed by the court reporter, so please speak
11 slowly and try not to talk over -- we'll try not to
12 talk over one another, okay?
13       Also, if -- I'm going to be asking you a
14 series of questions.  If you -- feel free to answer
15 the question if you understand the question.  If you
16 don't understand the question, please ask for
17 clarification, okay.
18       And I -- can I assume that if you answer a
19 question, you understood the question?
20    A    If I answer a question, I would try not to
21 answer it unless I understood it, yes.
22    Q    Great.  Thank you.  We'll probably take
23 breaks every hour so, but feel free to ask for a
24 break if you need one, whenever you need one.  And
25 I -- I think that's basically it.

Page 12

1        Is there any reason today you cannot give
2  full and accurate testimony?
3    A    There's no reason I'm aware of I cannot
4  give full and accurate testimony.
5    Q    And today you are represented by your
6  personal counsel, correct?
7    A    Correct.
8    Q    And who is that?
9    A    Arturo.
10    Q   Okay.  And Arturo is here in the room with
11 you today, correct?
12    A   Correct.
13    Q   And what other counsel are with you today?
14    A   Wayne Barsky and Charlie Sims.
15    Q   And do you understand that Mr. Sim and
16 Mr. Barsky--?
17    A   Sim.  Sorry.  Sorry, Charlie.
18    Q   Mr. Sim and Mr. Barsky are Archer's
19 counsel, right?
20    A   I understand that.
21    Q   Okay.  And are you representing you today?
22    A   Not me personally, no.
23    Q   Mr. Archer -- Mr. Arturo is representing
24 personally today, right?
25    A   That's correct.

Page 13

1    Q    Okay.  We have some documents that have
2  been premarked in front of you.  The first document
3  is Exhibit No. 1.  I think we'll move through the
4  first few of these documents relatively quickly.  I
5  only brought two copies.  I brought three -- four
6  copies total, including one for myself.
7        You two -- maybe you two could share, if
8  that's okay.
9        MR. BARSKY:  Mr. Sim will, hopefully, let
10 me share with him.
11       MR. MACK:  Sorry about that.
12    Q   (By Mr. Mack)  Mr. Furman, do you recognize
13 what has been marked as Exhibit 1?
14    A   My top exhibit is Exhibit 21.
15    Q   Okay.  They may be in reverse order.  If
16 you -- the court reporter has already stamped them,
17 so you might have to start from the back.
18    A   Okay.  We got it.
19    Q   Do you see Exhibit 1 now?
20    A   Yes, I see Exhibit 1.  It appears to be a
21 snapshot of my LinkedIn profile.
22    Q   Okay, and this is your public LinkedIn
23 page, right?
24    A   I don't know if I ever look at my LinkedIn
25 pages, what it looks like publicly, but -- but, yes,

Page 14

1  I think so.
2      Q      Okay.  And you put this page together,
3  right?
4      A      I did.
5      Q      Your current title, according to your
6  LinkedIn profile, is chief avionics architect at
7  Archer; is that correct?
8      A      Yes, my current title at Archer is chief
9  avionics architect.
10     Q      And this says that you started at Archer
11 in January 2020; is that also correct?
12     A      Yes, that's correct.
13     Q      And you're -- you are still employed by
14 Archer today, right?
15     A      Yes, I'm still employed by Archer with
16 that title today.
17     Q      Okay.  We'll talk briefly about your job
18 responsibilities on the next exhibit.  But at a high
19 level, could you just explain what your role is at
20 archer.  Why don't we start when you -- when you
21 started at Archer in January 2020 and then we'll
22 move on to today, if it's changed?
23     A      Okay.  Excuse me.  So, let's see.
24 Initially, Archer was building a -- prototype
25 vehicle that we refer to as Maker, and Maker is a

Page 15

1  fly-by-wire aircraft, meaning that it -- it has no
2  mechanical linkages to its controls or its motors.
3  It's -- that -- that's all controlled by computers,
4  and so I was one of the people that was charged with
5  designing the -- the -- identifying the set of
6  electronics, boxes, software, and interconnects that
7  collectively allow the aircraft to fly under control
8  of this fly-by-wire system.
9      Q      And is that still your role today at
10 Archer?
11     A      Today I don't have too much to do with the
12 Maker aircraft.  That's -- the design, at least the
13 physical design, is largely complete.  Today I'm
14 working on -- spending more time on M001, which is
15 our next-generation certified aircraft.
16     MR. BARSKY:  I'll take this opportunity,
17 Mr. Mack, to designate the entire transcript as
18 "Highly Confidential -- Attorneys' Eyes Only" under
19 the protective order.
20     MR. MACK:  Understood.
21     Q      (By Mr. Mack)  And is -- M001, is that also
22 known as Midnight?
23     A      Correct.  M001 is Midnight.
24     Q      You mentioned that you were largely
25 working on the Maker prototype until that design was

Page 16

1  complete.  When was the design largely complete, as
2  you mentioned in your last answer, for Maker?
3      A      ████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████
███████████████████████
████████████████████████████████████████████████
13     Q      And today would you say the majority of
14 your work is focused on the M001 aircraft?
15     A      Yeah, I would be accurate to say that I
16 spend the majority of my time working on M001.
17     Q      Okay, and who do you -- who did you report
18 to when you started at Archer in January 2020?
19     A      Damien Bardon.
20     Q      And what is Damien's title?
21     A      I honestly don't recall.
22     Q      And do you still report to Damien today?
23     A      I do.
24     Q      Okay, and who does Damien report to?
25     A      I believe he reports to Sergio, whose last

Page 17

1  name I've apparently forgotten.
2      MR. BARSKY:  I don't think Mr. Mack wants
3  you to speculate.  So, if you know the answer --
4      THE WITNESS:  I don't -- I don't know.
5  BY MR. MACK:
6      Q      Okay, but Damien reports to -- to Sergio,
7  you think?
8      A      Yes.
9      Q      Okay, and Damien's last name, could you
10 just spell it for the record.  I know it's in some
11 of these document, but . . .
12     A      B-a-r-d-o-n.
13     Q      Gotcha.  Okay, and according to your
14 LinkedIn profile, Exhibit 1, immediately prior to
15 your work at Archer, you worked at Wisk, correct?
16     A      It's true.  That was my job immediately --
17 working at Wisk was my job immediately prior to
18 working at Archer.
19     Q      Okay, and your title at Wisk was also
20 chief avionics architect, was it not?
21     A      At the time I left.  That was not my title
22 for the full duration of my work at Wisk.
23     Q      Okay, if we turn to the -- to the back
24 side of Exhibit 1, you also have some positions
25 under Kitty Hawk.  How does Kitty Hawk relate to

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 18

1  Wisk?
2      A    Kitty Hawk was the -- Kitty Hawk was
3  the -- how do I put it? -- the progenitor company of
4  Wisk that --
5          (Reporter clarification)
6          THE WITNESS:  Progenitor.  It was -- it
7  was -- it was -- it spun -- Wisk spun out of Kitty
8  Hawk.
9  BY MR. MACK:
10     Q    And this says that you were employed by --
11 at Kitty Hawk for over -- over seven years; is that
12 right?
13     A    I'm adding up the numbers here.  Yes,
14 that's correct.
15     Q    And prior to your title being the chief
16 avionics architect at Kitty Hawk, it was the manager
17 of software and automation; is that right?
18     A    Yeah, my title was manger software
19 automation for period of slightly over a year.
20     Q    Okay.  Let's go back to Wisk for a second.
21 What were your job responsibilities at Wisk as the
22 chief avionics architect?
23     A    Let's see.  Well, at -- at Wisk, you know,
24 the design was a lot more mature.  I wasn't
25 necessarily spending much of my time making

Page 19

1  architectural decisions there.  So I split my time
2  being an individual contributor, writing software,
3  evaluating -- you know, helping evaluate new sensors
4  and -- I'm trying to -- excuse me a moment.  I'm
5  trying to think about what else.  Debugging problems
6  with the -- the Wisk, you know, air frames, you
7  know, proposing new technologies to investigate.
8      Q    Okay, and since your title at Wisk was
9  chief avionics architect, would it be fair to say
10 that your work at Wisk focused on the avionics
11 system?
12     A    It focused on -- well, avionics is a broad
13 term that includes, you know, basically, all
14 electronics on the aircraft, and the way avionics is
15 used at Wisk is not necessarily the same as it was
16 used at other companies and nor is it the same as
17 the way it's used at Archer.  I would say the
18 avionics that I -- that I focused on was -- primary
19 had to do with the fly-by-wire architecture.
20     Q    And your role as the chief avionics
21 architect at Kitty Hawk, what were your main
22 responsibilities at Kitty Hawk?
23     A    I think they were similar.  My -- my
24 responsibilities at Kitty Hawk were similar to what
25 they were at Wisk.

Page 20

1      Q    Okay.  And you -- you mentioned, on your
2  LinkedIn profile, that you started at Wisk in
3  July 2019.  Is that -- is that accurate?
4      A    Yes.  I believe I started at Wisk in
5  July 2019.
6      Q    Okay.  And you mentioned Kitty Hawk was
7  the -- was the predecessor company to Wisk?
8      A    That's correct.
9      Q    From 2014 to 2015, you were the manager of
10 software and automation according to your LinkedIn
11 profile; is that right?
12     A    Yes.  For a little over a year, I was -- I
13 was the manager.
14     Q    And what were your job responsibilities as
15 manager at Kitty Hawk?
16     A    Let's see.  Well, my manager had just
17 left, and we hadn't backfilled the position, and we
18 needed some way of -- and -- and the -- and -- and
19 there were too many people for another person to
20 manage, so I took on, I think, two direct reports.
21 And back then, I was dealing with, let's see,
22 management -- one -- one individual was working on
23 simulation of the software, and I'm trying to recall
24 what the other one was working on.  I . . .
25 honestly, at this point, I don't -- I don't even

Page 21

1  recall the details of what the other individual was
2  working on.
3      Q    Okay.  And who did you report to while you
4  were a manager at Kitty Hawk?
5      A    At -- sometimes when Brian Viele was an
6  employee at Kitty Hawk, I reported to him.
7          (Reporter clarification)
8          THE WITNESS:  Sorry.  I'm sorry.  Brian
9  Viele, V-i-e-l-e.
10 BY MR. MACK:
11     Q    Did you also report to Brian Viele as the
12 chief avionics architect at Kitty Hawk?
13     A    Yes, I did report to Brian Viele when I
14 had that title.
15     Q    Did you report to anybody else at Kitty
16 Hawk?
17     A    I did.  I'm trying to remember.  I'm
18 sorry, I don't remember the individual's full name,
19 so I guess I better not speculate.
20     Q    And at Wisk, when you moved over to Wisk
21 in January 2019, how did the reporting structure
22 change, if at all?
23     A    To my recollection, the reporting
24 structure didn't change when I moved over to Wisk.
25     Q    Okay, so you were still reporting to Brian

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 22

1 Viele as the chief avionics architect at Wisk,
2 right?
3     A    No.  I don't think Brian Viele was an
4 employee then.
5     Q    Okay, so who did you report to as Wisk as
6 chief avionics architect?
7     A    Again, I'm just saying I can't remember
8 the individual's name.
9     Q    Okay.
10    A    I'm embarrassed, but I just don't
11 remember.
12    Q    Okay.  We'll look at a lot of documents
13 today, and, hopefully, they'll refresh your -- your
14 recollection.
15        You have in front of you what's been
16 marked as Exhibit 2, little more detail.  It's a
17 copy of your -- your résumé.
18        Do you recognize Exhibit No. 2?
19    A    Yes, I recognize Exhibit 2.
20    Q    And is this a résumé that you put
21 together?
22    A    Yeah, I put this résumé together.
23    Q    And I don't see a date on the résumé.  Can
24 you tell, by looking at this résumé, what date you
25 put this together?

Page 23

1     A    Ah, I mean, I would have to speculate, so,
2 no, I don't know what date this résumé was
3 assembled.
4     Q    Just for the record, this document is
5 bearing Bates Archer-NDCA-00138464.
6        Take a quick glance over this résumé.
7 Does -- does it look accurate to you?
8     A    Yeah, I -- I would say this résumé is
9 accurate, as I remember it.
10    Q    And the last date on this résumé is
11 January 2016 through the present time.
12        Can you -- can you tell, by looking at the
13 description of Kitty Hawk, the approximate date that
14 this résumé was created?
15    A    I have to say that, no, I don't -- I don't
16 recall.  There's -- I -- I don't have enough context
17 from what's here to guess what the date of this
18 résumé was.
19    Q    Okay.  But sometime after 2016, correct?
20    A    Yes.
21    Q    Okay.  The Kitty Hawk experience is broken
22 down in a bit more detail.  Do you see it says,
23 "Member of Technical Staff"?  What -- what is --
24 what title is that?
25    A    Sorry, that's not the Kitty Hawk

Page 24

1 experience -- oh.  Oh, sorry.  I was looking at --
2 on -- I apologize.
3        I think that was my -- may have been my
4 initial title at Kitty Hawk.
5     Q    And do you recall who -- who you reported
6 to as member of technical staff?
7     A    That would have been Brian Viele.
8     Q    Okay.  And was your role different as a
9 member of technical staff as when -- than when you
10 switched to the software group manager?
11    A    Yeah.  I mean, my initial -- my initial
12 role at -- at Zee, which was the predecessor of
13 Kitty Hawk was to -- was basically as an individual
14 contributor, writing flight software and test
15 software and things like that.
16    Q    Okay.  And you say Kitty Hawk Zee.Aero
17 division.  Do you sometimes refer to Kitty Hawk to
18 refer to both Kitty Hawk and Zee.Aero          0
19    A    Yes.  And we can agree to do that, I
20 think.
21    Q    Okay.  Is that what you meant here when
22 you wrote Kittyhawk is -- Zee.Aero was a division of
23 Kittyhawk, correct?
24    A    I believe that's true.  It's -- Zee.Aero
25 was a division of Kitty Hawk.

Page 25

1     Q    Okay.  Did you also report to Jim Tighe?
2     A    I did not ever report to Jim Tighe.
3     Q    Okay.  At Wisk, did you interact with Jim
4 Tighe?
5     A    Yes, I interacted with Jim Tighe at Wisk.
6     Q    Okay.  And who was Jim Tighe?
7     A    Jim Tighe was the chief engineer of the
8 Cora project and -- initially, and, eventually, he
9 became the -- I think -- I think his title became --
10 I shouldn't say.  He had a different role after
11 that, but I'm not sure of the title.
12    Q    Your Kitty Hawk experience, it says:
13        "Kitty Hawk is building Cora, a
14        self-piloted, passenger-carrying,
15        electrically propelled man -- "manned
16        aircraft for the civilian aviation
17        market."
18        Do you see that?
19    A    I do see that.
20    Q    Okay.  And Cora was one of the projects
21 that you've worked on at Kitty Hawk, right?
22    A    I worked on Cora, yes.
23    Q    Okay.  Did you work on any predecessor
24 aircraft prior to Cora?
25    A    Yes.  There was several different

Page 26

1  predecessor aircraft that I worked on at -- at Kitty
2  Hawk.
3       Q    Okay, did you work on the -- the MUTT
4  project?
5       A    I did work on MUTT.
6       Q    Did you work on the MULE project?
7       A    I -- I did work on MULE.
8       Q    Okay.  Were there any other projects that
9  you worked on at Kitty Hawk?
10      A    There was Z-P1.
11           (Reporter clarification)
12           THE WITNESS:  Z-P1.  It's the predecessor
13  to MUTT, and also POC, Proof of Concept, vehicle,
14  although I did not -- that vehicle was completed at
15  the time I joined Kitty Hawk.
16  BY MR. MACK:
17      Q    So, when you joined Kitty Hawk in 20- --
18  in January 2016, the proof-of-concept vehicle was
19  already complete?
20      A    So this -- this chronology is little
21  confusing, because it is hard for me to distinguish
22  between Kitty Hawk and Zee.  There were, from my
23  point of view, a continuous employment, a continuous
24  company, but I know there were legal changes in
25  ownership or whatnot, and my employment at -- at --

Page 27

1  at Zee started in March 2012.
2       Q    Okay.  So March 2012 you were employed by
3  Zee, correct?
4       A    Correct.
5       Q    And then do you know approximately what
6  time that became known as Kitty Hawk?
7       A    I actually do not recall when Zee became
8  known as Kitty Hawk.
9       Q    Okay.  You so mentioned the
10  proof-of-concept vehicle and the Z-P1.  What was the
11  Z-P1?
12      A    Z-P1 was the second-generation aircraft
13  that was a larger version of the Proof of Concept.
14      Q    Okay.  And what was your role with -- with
15  respect to the Z-P1?
16      A    I think, at -- at that time, on Z-P1 I was
17  still primarily an individual contributor.  So I was
18  writing flight software.  I was, you know, debugging
19  electronics, that sort of thing.
20      Q    Did you have a -- did you help develop any
21  of the avionics system for Z-P1?
22      A    I was not -- so for Z-P1, I -- I did not
23  have primary responsibility for development the
24  avionics systems; that was Brian Viele.  I -- I
25  certainly participated in the discussions about that

Page 28

1  system, yes.
2       Q    And what was the next generation or the
3  third-generation aircraft after Z-P1 that you worked
4  on?
5       A    I worked on MUTT.
6       Q    And what -- what were your primary
7  responsibilities in connection with MUTT?
8  ███████████████████████████████████████
9  ███████████████████████████████████████████
10 ████████████████████████████████████████████
11 █████████████████
12
13      Q    And what -- what was the vehicle
14  configuration for MUTT, number of booms and rotors?
15      A    MUTT had three booms per wing.  Each boom
16  had a rotor on the front and rotor on the rear, and
17  there were two propulsion motors at the back.
18      Q    And how about MULE; what was the
19  configuration of MULE?
20      A    So I think . . .  So MULE was -- MULE was
21  the same as Cora.  So it had -- had six booms, three
22  on each wing, lift -- lifter rotors at the front and
23  back of each boom and a large -- a large
24  forward-propulsion system at the back, a single
25  large forward propulsion system at the back.

Page 29

1           (Reporter clarification)
2           THE WITNESS:  Oh, I apologize.  A single
3  large forward-propulsion system at the back.
4  BY MR. MACK:
5       Q    Okay, and was MULE the fourth-generation
6  aircraft at Kitty Hawk?
7       A    Gosh, honestly, I -- I don't know how to
8  count generation, because these thing -- because the
9  designs overlapped in some ways.
10          I'm sorry.  You asked about Cora?  You
11  asked about . . . ?
12      Q    So I think we went from Proof of Concept
13  to Z-P1, then to MUTT, then to MULE, correct?
14      A    Right.  And you asked me -- can you please
15  repeat the question?
16      Q    Sure.
17          So was -- was MULE the fourth-generation
18  aircraft that you worked on at Kitty Hawk?
19      A    Yes, I believe MULE was the
20  fourth-generation aircraft I worked at Kitty Hawk.
21      Q    Okay.
22          MR. BARSKY:  Mr. Furman, could you keep
23  your voice up a bit?
24          THE WITNESS:  Sure.  I apologize.
25          MR. BARSKY:  It'll help the reporter and

Page 30

1  those of us down at the far end.
2          THE WITNESS:  Yeah.  I'll -- I'll -- I'll
3  be louder.
4  BY MR. MACK:
5      Q   And was MULE known by any other name?
6      A   I do not recall if MULE was known by any
7  other name.
8      Q   Do you recall working on MZ1 architecture?
9      A   MZ1 -- I -- I don't remember working on
10 the MZ1 architecture.
11     Q   Okay.  Do you remember anything about the
12 MZ1 architecture at Kitty Hawk?
13     A   Honestly, I can't say, because it might be
14 a name for something else that I do know, but I just
15 don't -- I do not recall what the MZ1 name stood
16 for.
17     Q   Okay.  And then Cora would be
18 fifth-generation aircraft that you worked at [sic],
19 at Kitty Hawk, right?
20     A   I have difficulty distinguishing between
21 Cora and MULE.
22     Q   Okay.  But at some point -- at some point
23 in time, you started -- you began work at -- on
24 Cora, right?
25     A   Yes, I did work on Cora.

Page 31

1      Q   And how did the configuration of Cora
2  relate to the vehicle configuration of MULE?
3      A   To my recollection, it was the same.
4      Q   Same number of booms and rotors?
5      A   Yes.
6      Q   In connection with Cora, what were your
7  job responsibilities?
8      A   I think, by the time we got to Cora, I did
9  have the -- the title of chief avionics architect,
10 so I was responsible for the -- the overall design
11 of the fly-by-wire electronics and the software that
12 was in there.  We were still a small group, so, I
13 mean, I still rolled up my sleeve and dug in and
14 wrote code and reviewed code and, you know, look
15 over people's shoulders and things like that.  I was
16 the arbiter of some decisions, when other -- when --
17 when we couldn't come to agreement otherwise.
18     Q   So, as the chief -- chief avionics
19 architect, would it be fair to say that you had the
20 final say on all avionics decisions relating to
21 Cora?
22     A   I think it would be fair to say that I had
23 the final decision for some avionics decisions
24 related to Cora.
25     Q   And I think you mentioned that you worked

Page 32

1  with Jim Tighe.  How were his responsibilities
2  different than your responsibilities in connection
3  with Cora?
4      A   Jim Tighe's responsibilities were
5  completely different from mine.  He dealt with the
6  aircraft as a whole: its aerodynamics, its shape,
7  its configuration, the choice of -- you know, the
8  choice of -- of how it worked at -- at some high
9  level, even what the goals of the program were,
10 mechanical aspects, aerodynamics aspects.  My role
11 was much, much narrower than Jim's.
12     Q   Okay.  But you didn't report directly to
13 Jim, correct?
14     A   I did not report directly to Jim.
15     Q   Okay.  So we talked about your -- who you
16 reported to, did you have any direct reports?
17     A   During the time when I had a manager title
18 for the year of 15 months or whatever it was, I did
19 have direct reports.
20     Q   And who were your direct reports at that
21 time?
22     A   Chris Sloan was one and Allen Ibara was
23 another.
24          (Reporter clarification)
25          THE WITNESS:  Allen Ibara.  I-b-b-a-r- --

Page 33

1  I believe it's double -r-a.
2  BY MR. GONZALEZ:
3      Q   Okay, so, during your tenure at Kitty Hawk
4  or Zee.Aero, you -- it looks like you were promoted
5  at least three times, right?
6      A   I think I was promoted twice.  My first
7  promotion was to being a software group manager and
8  the second to being the chief avionics architect.
9      Q   Okay.  And your final -- and then at Wisk
10 your title remained chief avionics architect the
11 entire time at Wisk, right?
12     A   After I got that title, that title was my
13 time for the remainder of my employment at Wisk,
14 yes.
15     Q   Okay.  In addition to the aircraft that
16 we've talked about (the Cora, the MUTT, the MULE,
17 the Z-P1, and the Proof of Concept), were there any
18 other aircraft that you worked at either Kitty Hawk
19 or Wisk?
20     A   Give me a moment to think.
21          I mean, certainly, in terms of full-scale
22 aircraft, that's all I -- all -- the only aircraft I
23 can recall working on.
24     Q   Okay.  Fair enough.  The second sentence
25 of your résumé, under Kitty Hawk, says:

Page 126

```
 1    A    I don't --
 2         MR. GONZALEZ:  Objection.  Objection.
 3    Asked and answered.  Mischaracterizes prior
 4    testimony.
 5         You can still answer.
 6         THE WITNESS:  Yeah.  As I said earlier, I
 7    don't recall the specifics of what we discussed.
 8    He -- he discussed -- generally, he discussed his
 9    approach to leadership.
10    BY MR. MACK:
11    Q    Okay.  At the time, you had your call with
12    Mr. Bower, you were still a Wisk employee, right?
13    A    Yes.
14    Q    And when was your last day at Wisk?
15    A    June 8 -- I believe it was Wednesday of
16    June 8th -- sorry, January 8th, apologies,
17    January 8th, 2022.
18    Q    Okay.  Did you and Mr. Bower, in this
19    telephone call, discuss 12-tilt-6 configuration for
20    Archer's first vehicle?
21    A    No.  We did not.
22    Q    Do you recall anything specific about the
23    design or architecture about Archer's first vehicle
24    that you discussed with Mr. Bower in this first
25    call?
```

Page 127

```
 1    A    I don't recalling [sic] design -- I -- I
 2    don't recall us discussing anything specific about
 3    any technology.  This was mostly a discussion about
 4    leadership style and things like that.
 5    Q    Okay, but it's clear, from this e-mail,
 6    that Mr. Bower has a vision for how to approach
 7    design and architecture for Archer's first vehicle,
 8    right?
 9    A    It's clear, from this e-mail, that he said
10    he has a vision, yes, I agree that [sic].
11    Q    Okay.  And, when he says for the first --
12    of this first vehicle or for this first vehicle, you
13    understood that to mean Archer's first vehicle,
14    right?
15    A    Yes.
16    Q    Okay.  You have Exhibit 7 in front of you.
17    It's another e-mail correspondence.  This one is
18    bearing Bates Archer-NDCA-150144, and the attachment
19    to that is Exhibit 8.  So why don't we put those two
20    together?
21         Exhibit 8, the attachment to this e-mail,
22    is bearing Bates Archer-NDCA-15014 -- -145.
23         Do you recall, at some point, receiving an
24    offer letter from Archer?
25    A    I do.
```

Page 128

```
 1    Q    And this Archer -- this offer -- this
 2    Archer offer letter was sent on December 19th; is
 3    that -- is that right?
 4    A    I'm sorry, we're looking at Exhibit 8 now?
 5    Q    Exhibit 7 and Exhibit 8, correct.
 6    A    I'm -- I'm willing to assume it was sent
 7    on December 19th.  I can't -- I can't -- I don't
 8    know if this was the particular revision, but yes.
 9    Q    Okay.  Well, I can represent to you that
10    the attachment that's referenced in Exhibit 7 -- do
11    you see the -- the -- the numbers on the bottom
12    right-hand page, the right-hand corner of the page,
13    it goes from -179 to -180, so this was the
14    attachment to the e-mail.
15    A    Okay.
16    Q    So this -- is this -- is this the offer
17    letter that you received via e-mail from Brett
18    Adcock on December 19th?
19    A    Let's take a quick look.
20         Yes, this is -- appears to be on the offer
21    letter I received on that date.
22    Q    Okay, and this offer letter, your position
23    title is chief avionics architect, correct?
24    A    Correct.
25    Q    This --
```

Page 129

```
 1    A    Well, actually, it says, "Principal
 2    Engineer 2, Chief Avionics Architect."
 3    Q    Okay.  And the "Chief Avionics Architect"
 4    part of that title is the same title that you had at
 5    Wisk, correct?
 6    A    Correct.
 7    Q    And that's the same title that you had at
 8    Kitty Hawk as well?
 9    A    Correct.
10    Q    Okay.  And the -- the salary offered was
11    ████████████████████████████
12    A    Yes.
13    Q    Okay.  And that -- that would --
14    A    That's annual, yes.
15    ████████████████████████████████████
16    ████████████████████████████████████████
17    ████████████████████████████████████
18    ████████████████████████████████████
19    ████████████████████████████████████
20    Q    Okay.  And was this salary number, the
21    ████████████████████████████████████████
22    prior calls with Mr. Adcock, or was that the initial
23    salary offer?
24    A    That was the initial salary offer.
25    ████████████████████████████████
```

Page 130

7    Q    And do you have a pretty good
8    understanding of the eVTOL market and what employees
9    are paid at other eVTOL companies?
10    A    I don't necessarily know what other
11   employees are paid at other eVTOL companies, but for
12   the folks in our team, we could work in lots of
13   non- -- nonaviation space and be paid more than we
14   were being paid at Wisk.  We could work at Google,
15   for example.
16    Q    Okay.  But any event, you mentioned that
18   bit of a surprise, right?
19    A    That is correct.
20    Q    Okay.  It also included a one-time
22    A    Yes.
23    Q    And it also included equity in Archer,
24   right?
25    A    Yes.  It included options that vested over

Page 131

1    time.
2    Q    Okay.  Did you consider this -- this offer
3    package, including the salary bonus and equity, to
4    be significantly above market?
5         MR. GONZALEZ:  No foundation.
6         THE WITNESS:  I -- I -- I -- I did not
7    consider it to be significantly above market.  I did
8    consider it to be higher than I expected, however.
9    BY MR. MACK:
10    Q    Okay.  Did you negotiate either the
11   salary, the amount, the initial bonus, or the amount
12   of equity stake with Archer before accepting the
13   letter?
14    A    Let's see, I did negotiate the equity.
15    Q    Let's look at Exhibit 8, which is the next
16   exhibit that's been premarked.
17         MR. GONZALEZ:  Is it 9?
18         MR. MACK:  Oh, sorry.  It's 9; you're
19   correct.
20         Exhibit 9 has been premarked, and this is
21   a revised version of the Archer offer letter bearing
22   Bates SF-95.
23    Q    (By Mr. Mack)  Do you recall this?
24    A    I'm sorry, what's the date associated with
25   this?

Page 132

1    Q    That is a good question.  I don't think --
2    is there a date on the back?  So this is actually
3    the signed version of your offer letter.
4    A    Okay.
5    Q    Do you see that -- do you -- do you see
6    your signature on page SF-101?
7    A    I do.
8    Q    Okay.  So, since this is the version you
9    signed, is it fair to say that this is the final
10   version of the Archer offer letter?
11    A    Yes.
12    Q    Okay.  And you can see here there's a new
13   role description on page 1 of the offer letter.  Do
14   you see that?
15    A    I -- I didn't hear that.  Can -- oh, yes,
16   you say role description.
17    Q    Role description.
18    A    Yeah.  I hear that.  Okay, I'm looking.
19    Q    And that role description, that was
20   something that you had discussed with Mr. Adcock
21   during one of your meetings, right?
22    A    Hold on a second.  I'm still reading this.
23         Yes.  I did discuss this with -- with
24   Brett.
25    Q    Okay.  So this -- this role description is

Page 133

1    new; it wasn't in the prior version of the offer
2    letter, right?
3    A    I'm looking, but, yeah, I agree it was not
4    in the -- in the prior version of the offer letter.
5    Q    Okay, so you -- you asked for this
6    description to be added, correct?
7    A    I specifically asked for the 30 percent of
8    the time to be spent on working on other -- on --
9    working on things that weren't necessarily tied into
10   my primary job responsibilities, yes.
11    Q    Okay, and when you say your -- your
12   primary job responsibilities, you mean your primary
13   job responsibilities at Wisk?
14    A    I'm sorry, aren't we talking at Archer?
15    Q    Well, so you're -- you're advocating for a
16   70/30 percent split, correct?
17    A    That's correct.
18    Q    And 70 percent would be avionics, and
19   30 percent would be propulsion, right?
20    A    Yeah, propulsion or system design work,
21   yes.
22    Q    Okay.  So you were advocating for some
23   different job responsibilities than what you had at
24   Wisk; is that fair?
25    A    I was -- I wanted to learn something, not

Page 170

1 Archer?
2      A    I -- I don't know how -- why you're asking
3 me.  I think you'd have to ask him.
4      Q    Well, did you -- do you know if he was --
5 did he express any discontent with any of Archer's
6 policies or employees?
7           MR. BARSKY:  Calls for speculation.
8           THE WITNESS:  I -- I'm not aware of any.
9 BY MR. MACK:
10      Q    Okay, so before April 2022, when he
11 stepped down, you weren't aware that he -- there was
12 a potential of him leaving the company?
13      A    I was not.
14      Q    After he had stepped down, did you become
15 aware of the reason why he stepped down?
16      A    I did not.  I still do not.

Page 172

1 BY MR. MACK:
2      Q    I want to talk a little bit about your
3 confidentiality obligations at Wisk, and you have in
4 front of you your Wisk termination letter and your
5 Cora employee invention assignment and
6 confidentiality agreement.  It's Exhibit 13 and 14.
7      A    Yes, I do.
8      Q    You understood that any information from
9 your -- any nonpublic information from your work at
10 Wisk was not to be shared outside of Wisk, right?
11      A    Yeah, I understood that -- I understood
12 that.
13      Q    Okay.  But you -- you understood, while
14 you were working at Wisk, that you had a general
15 confidentiality obligation, right?
16      A    I don't know what a general
17 confidentiality obligation means, but I agree with
18 what you said earlier.
19      Q    Okay.  Do you see paragraph 3 of
20 Exhibit 13 -- well, first off, do you recognize
21 Exhibit 13?
22      A    Yes, I recognize Exhibit --
23      Q    What --
24      A    -- 13.
25      Q    -- what is Exhibit 13?

Page 173

1      A    I believe this was the letter I signed
2 when I was talking with HR on -- after giving notice
3 to Wisk.
4      Q    Okay, and this resignation date lists
5 January 8th, 2020; is that correct?
6      A    Yeah.  At the top, it does.
7      Q    Okay, and what was your actual last day at
8 Wisk, right?
9      A    I believe so, yes.
10      Q    Okay.  Paragraph 3 is about return of
11 company property.  Do you see that?
12      A    Yes.
13      Q    And it says, "Upon termination of
14 employment, you are obligated to return to the
15 Company immediately all property or data of the
16 Company of any type whatsoever," and it continues to
17 include "electronically-stored information."  Do you
18 see that?
19      A    I do.
20      Q    Okay.  And you were aware of that policy
21 prior to receiving this letter, right?
22      A    Yes, I was aware of that policy.
23      Q    Paragraph 3 requests that you sign the
24 letter below to confirm that you have, in fact,
25 returned all company data, right?

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 174

1    A    I'm sorry.  I -- I spaced out for a
2  second.  Can you repeat that, please?
3    Q    Sure.  The last sentence of paragraph 3
4  requests that you sign the letter below to confirm
5  that you have returned all company data, right?
6    A    Correct.
7    Q    Can you look at paragraph 4, "Proprietary
8  Information"?
9    A    Yeah.
10    Q    That paragraph references the Employee
11  Invention Assignment and Confidentiality Agreement.
12  Do you see that?
13    A    Mm-hm.
14    Q    And that's the -- is that the document in
15  Exhibit 14 that you signed?
16    A    Oh, yes, I do remember signing that.
17    Q    And what was your understanding of Cora's
18  Employee Invention Assignment and Confidentiality
19  Agreement?
20    A    You know, just a -- just that I would keep
21  Cora -- keep Wisk information that was confidential
22  confidential.
23    Q    You see the paragraph 9 entitled
24  "Confidentiality"?  This is at Archer-NDCA-138443.
25    A    I am sorry, I don't -- what are you

Page 175

1  referring when you say NDCA?  Where do I find that
2  on the page?
3    Q    The bottom right-hand corner.  It's
4  paragraph 9 of the document, though.
5    A    Okay.
6    Q    See paragraph 9 says, "I will keep and
7  hold all Proprietary Information in strict
8  confidence and trust"?  Do you see that?
9    A    Yes, I do.
10    Q    And then the last sentence:
11        "Upon termination of my employment
12        with the Company, I will promptly deliver
13        to the Company all documents and materials
14        of any nature pertaining to my work with
15        the Company, and I will not take with me
16        or retain in any form any documents or
17        materials or copies containing any
18        Proprietary Information."
19        Do you see that?
20    A    I do.
21    Q    And you understood those were the terms
22  that you agreed to during your employment at -- at
23  Wisk, right?
24    A    Yes.
25    Q    I think you mentioned that someone from

Page 176

1  the HR department at Wisk contacted you on your last
2  week of work?
3    A    Yes.  I don't -- I don't remember who it
4  was, but yes.
5    Q    Why don't you take a look at Exhibit 15?
6  Was it Carlie Russell?
7    A    It could have been, yes.
8    Q    Okay, do you recognize this e-mail,
9  Exhibit 15?
10    A    Yes.
11    Q    So this was an e-mail that Ms. Russell
12  sent to you and you responded to in connection with
13  your resignation from Wisk, right?
14    A    Yes.
15    Q    And, if you look . . . you look on the
16  back side of the first page -- for the record, it's
17  NDCA-138552 -- do you see your e-mail on
18  January 8th, 2020, to Carlie?
19    A    Yes.
20    Q    The last sentence -- or the last two
21  sentences of the second paragraph read:
22        "Unfortunately, due to the short
23        transition time, I have not been able to
24        complete this task.  I will, however,
25        continue to review my personal devices and

Page 177

1        accounts even after my departure, as I
2        know it is important."
3        Do you see that?
4    A    I do.
5    Q    And why did you -- why did you write that
6  to Ms. Russell?
7    A    I think that falls under privileged
8  communication.
9    Q    Well, what information -- when you say
10  "complete this task," were you referring to
11  reviewing your -- your devices for any Wisk
12  documents?
13    A    That's correct.
14    Q    And, in fact, when you -- when wrote this
15  e-mail, you had not removed all confidential
16  Wisk materials, right?
17    A    I believe, yeah, that's correct; I did
18  not.  I had not yet removed the materials.
19    Q    And when did you complete the removal of
20  all Wisk-related materials from your devices?
21    A    Oh.  As far as these things that were
22  listed here, I assume -- I assume in the time frame
23  that I said, which is after they were uploaded.
24    Q    And why don't we look at what has been
25  marked as Exhibit 16?

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 178

1        You recall receiving a subpoena in
2  connection with this case, correct?
3        A    Yes.  It was -- I think it was --
4             (Reporter clarification)
5        THE WITNESS:  Yes, it was -- I -- I think
6  my -- it was -- my attorney, but yes.
7             (Reporter clarification)
8        THE WITNESS:  Delivered, delivered to my
9  attorney.  Sorry.  I know I'm a mumbler.
10 BY MR. MACK:
11       Q    When you say your attorney, do you mean --
12 which attorney do you -- are you referring to?
13       A    I don't know.
14       Q    And when did you first receive a copy of
15 this subpoena?
16       A    I think in November of 2021.
17       Q    Okay.  Yeah, the -- the subpoena was -- I
18 believe the date is November 10th, even though date
19 doesn't appear -- the date's in the file name.  It
20 doesn't appear to be on the -- on the first page of
21 the document, at least this version of it.
22            But you were served with a subpoena,
23 correct?
24       A    Yes.
25       Q    And that was in some -- sometime in

Page 179

1  November 2021?
2        A    Yes.
3        Q    And you understand that this subpoena
4  required you to produce all Wisk-related documents
5  that you had in your possession, correct?
6        A    I understand that's what was requested.
7        Q    And you understand that, once served with
8  the subpoena, you were obligated to preserve all
9  those documents?
10       A    That's a legal judgment, and I'm not a
11 lawyer, so no.
12       Q    What was your understanding of the
13 subpoena?
14       A    My understanding is that it was an opening
15 volley and that there would be some kind of
16 negotiation.
17       Q    Okay.  Could you look at page 3 of the
18 subpoena.  Instruction C, you see that?
19       A    Instruction C, "Specifying Conditions as
20 an Alternative"?
21       Q    It's actually on page 3 of the document,
22 so I think you have to keep going.  Page 3 of the
23 text.  Yes.
24       A    Okay.  Sorry.  I was looking at the
25 boilerplate.  Okay.

Page 180

1        Q    Okay.  Do you see the instructions there?
2        A    Yes.  For -- starting line 22, is that
3  you're [sic] referring to?
4        Q    Yes.  Well, did you -- did you happen to
5  read through the subpoena after you were served with
6  it?
7        A    I -- I didn't read the subpoena at all.
8        Q    Okay, and why not?
9        A    I assumed, if there was something to do,
10 my attorneys would have told me about it.
11       Q    Okay.  When you say "my attorneys," who
12 are you referring to?
13       A    I'm referring to my personal attorneys.
14       Q    Okay, and that's Mr. Arturo?
15       A    Includes him, yes.
16       Q    Okay.  What did you do in response to
17 receiving the subpoena?
18       A    I didn't do anything.
19       Q    Okay, did you realize that you had a duty
20 to preserve all documents in connection with the
21 subpoena?
22       A    Again, I didn't -- I didn't read the
23 subpoena.
24       Q    But did you understand that you had a duty
25 to preserve all documents called for by the

Page 181

1  subpoena?
2        A    No.
3        Q    Did you also receive a litigation hold
4  notice in connection with this case?
5        A    I did.
6        Q    And do you recall receiving a litigation
7  hold on February 14th, 2020, and August 20th, 2021?
8        A    The dates may -- don't necessarily sound
9  correct, but I do receive -- do recall receiving a
10 litigation hold notice.
11       Q    Okay, did you -- did you read the
12 litigation hold notice?
13       A    I read part of it, yes.
14       Q    And what did you do in response to
15 receiving the litigation hold notice?
16       A    At that point, I didn't think it applied.
17 I -- I didn't think there was any immediate
18 application, so I didn't do anything.
19       Q    Okay, what did the litigation hold notice
20 say?
21            MR. GONZALEZ:  I want to object and
22 instruct him not to answer on the basis of
23 attorney-client privilege.
24 BY MR. MACK:
25       Q    And did you understand that you were

Page 182

1 supposed to preserve documents in response to the
2 litigation hold notice?
3     A    Yes.
4     Q    And did you preserve documents -- did you
5 preserve any documents in connection with the
6 litigation hold notice?
7     A    I did produce some photos several days
8 after the litigation hold was issued.
9          (Reporter clarification)
10         THE WITNESS:  I did produce some photos
11 several days after the litigation hold notice was
12 issued.
13 BY MR. MACK:
14    Q    Okay.  Did you do anything else in
15 response to the litigation hold notice?
16    A    No.
17    Q    Did you delete any documents that you --
18 were in your possession in response to the
19 litigation hold notice?
20    A    Not in response to the litigation hold
21 notice, no.
22    Q    Okay, but did you actively preserve
23 documents in response to the litigation hold notice?
24    A    I -- other than those four photos at the
25 time I received the hold notice, I was not aware of

Page 183

1 any other documents in my possession.
2     Q    Okay.  And what is the -- does Archer have
3 a e-mail deletion policy?  Do you know if there's a
4 policy in place at Archer where e-mail is
5 automatically deleted after a certain period of
6 time?
7     A    I'm not aware of any such a policy.
8     Q    Okay, can you still access your
9 original -- your -- your original e-mail from 2020,
10 your first week of work at Archer?
11    A    I believe so, yes.
12    Q    Okay.  Have any documents that you've
13 created in connection with your work at Archer been
14 deleted?
15    A    I'm sure that -- as documents become
16 outdated, they are deleted.
17         Well, you're specifically asking me about
18 e-mail, though, not documents, say, on Drive or
19 things like that.
20    Q    Any documents relating to your work at
21 Archer, have you deleted any documents relating to
22 your work at Archer after you received the
23 litigation hold notice?
24    A    I don't remember.
25    Q    Did you delete any documents relating to

Page 184

1 your work Archer after receiving the subpoena?
2     A    I don't remember.
3     Q    But you do remember that you didn't
4 actively preserve documents in response to either
5 the subpoena or the litigation hold notice, right?
6     A    Well, at the time I received either, I
7 didn't think I had any documents that were relevant.
8     Q    Why don't we look at Request for
9 Production No. 2 in the subpoena?  This is on page 5
10 of the subpoena, the very last page.
11        MR. GONZALEZ:  It's in the back.
12 BY MR. MACK:
13    Q    This particular request is for:
14            "All DOCUMENTS and COMMUNICATIONS in
15            YOUR possession, custody, or control
16            including YOUR attorneys or other agents,
17            that originated from WISK, are owned by
18            WISK, or were created by WISK, its
19            employees, agents, or . . . other PERSONS
20            acting on behalf of WISK."
21        Do you see that?
22    A    Yes.
23    Q    So you understand that this subpoena was
24 requesting any Wisk documents that you may have
25 still had in your possession, correct?

Page 185

1     A    I understand that now.  This is the very
2 first time I'm reading it.
3     Q    Okay, but, in fact -- and, in fact, you
4 did have some documents relating to work at Wisk
5 when you received the subpoena, right?
6     A    I did.
7     Q    Okay.
8     A    But I was not aware of them.
9     Q    Let's look at Exhibit 17.  You have that
10 marked in front of you.  This is Mr. Furman's red
11 flag report.
12        Have you seen a copy of this before,
13 Mr. Furman?
14    A    I have not.
15    Q    Okay, this is a -- a Red Flag Report.  Do
16 you see your name is listed as "Custodian" at the
17 top?
18    A    Yes.
19    Q    And, specifically, you go to page 2, back
20 side of the front page, this is a report, a forensic
21 report, on an Apple MacBook Pro 16.  You see that?
22    A    Yes.  Wait, sorry, I don't.  Show me
23 again.
24    Q    The top of the second page.
25    A    Ah.  Apologize.

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 186

1        Okay.
2     Q    And this corresponds to your Apple MacBook
3  Pro, right?
4     A    I'm sorry, I don't know which -- because
5  I -- I've used two MacBook Pro 16s: one for work and
6  one for personal.  I don't -- I don't know which one
7  this is referring to.
8     Q    Okay, the last four digits of the serial
9  number are -MD6T, and this would have been -- did
10  you hand over a MacBook Pro to be forensically
11  examined in connection with this case?
12     A    I -- I'm not sure if that's privileged
13  information or not.  Certainly at least one.
14     Q    Okay, which -- which devices did you hand
15  over to be forensically examined?
16        MR. GONZALEZ:  You can answer that.
17        THE WITNESS:  Okay.  My -- my personal
18  MacBook Pro 16-inch that -- the newer one, the 2012
19  version, and as well as my work MacBook Pro.
20  BY MR. MACK:
21     Q    Okay, so three different MacBook Pros?
22     A    Correct.
23     Q    I want to point out a couple points of
24  this report.
25        So, when you -- when you handed over your

Page 187

1  devices to be forensically examined, when were they
2  given back to you?  How long were they out of your
3  possession?
4     A    Well, none of them are back in my
5  possession at this point.
6     Q    Okay, so you still don't have access to
7  any three of those devices?
8     A    That's correct.
9     Q    Okay.  And let's look at page 3 of this
10  report.  Do you see the three in the bottom
11  right-hand corner?
12     A    Yeah.
13     Q    Okay.  This is a analysis of your search
14  history from your MacBook Pro.
15     A    Mm-hm.
16     Q    See that?
17     Q    Do you see the -- this report indicates
18  that, on December 6, 2021, you performed a search
19  for "remove thunderbird files from mac" and "remove
20  Thunderbirds cache from Mac."  Do you see that?
21     A    I'm sorry, where is that -- what's the
22  date?
23     Q    December 6th.
24     A    Yeah.
25     Q    And those were performed at 9:09 a.m. and

Page 188

1  9:08 a.m.  Do you see that?
2     A    Yeah.
3     Q    Okay.  And Thunderbird is a -- is that
4  referring to the Mozilla Thunderbird application?
5     A    That's correct.
6     Q    And that's an e-mail client, right?
7     A    Yeah.
8     Q    And you searched these keyword terms on
9  the dates listed in Table 1 of Exhibit 17, correct?
10     A    I accept that I did, yeah.
11     Q    Okay, do you recall making these searches?
12     A    I don't know what the stuff about
13  BUILTIN_STL_SUPPORT is.  I don't recall that, or
14  ads-b, but, yeah, it's -- it's -- I -- I -- I
15  probably did make those other searches, yes.
16     Q    Okay.
17     A    I did make those other searches.
18     Q    This would have been, sort of, in a few
19  weeks after you were served with the subpoena that
20  we looked on Exhibit --
21     A    Uh-huh.
22     Q    -- 16, correct?
23        Okay --
24     A    Yeah.
25     Q    -- why -- why did you make these -- why

Page 189

1  did you search these keyword terms?
2     A    I was trying to remove my personal files
3  from my work laptop.
4     Q    So this was in connection with your
5  Archer-issued laptop?
6     A    That's correct.
7     Q    Okay, when you say your work files, are
8  you referring to your -- your Thunderbird--?
9     A    No.  It was a personal --
10     Q    Okay.
11     A    I was trying to remove my personal files
12  from my work laptop.
13     Q    Okay.  And what personal work files were
14  on your work laptop?
15     A    E-mail, whatever Thunderbird preserves,
16  iCloud photos or i- -- sorry.  They call it Apple
17  Photos.  And Apple chat messages.  Sorry.  You know,
18  well, they -- SMSes, SMSes, text, MMS, all that
19  stuff, whatever the -- the Apple chat program
20  preserves.
21     Q    Okay, why were there personal e-mails on
22  your Archer-issued laptop?
23     A    Because I sometimes use my Archer-issued
24  laptop for personal reasons.
25     Q    Okay.  And, at some point, you installed

Page 190

1 the Mozilla Thunderbird client on your Archer-issued
2 laptop, correct?
3     A    Correct.
4     Q    And what date did you install that?
5     A    I don't recall a specific date.
6     Q    Do you recall a month?
7     A    I do not recall a month.
8     Q    Was it towards the beginning of your
9 new -- was it in the first month of employment at
10 Archer?
11     A    I would say that it was in the first month
12 or two of employment, yeah.
13     Q    Okay, so either in January or February of
14 2020 you installed the Mozilla Thunderbird e-mail
15 client on your Archer-issued laptop.
16     A    Yes.
17     Q    Okay.  And what--?
18             (Discussion off the record)
19 BY MR. MACK:
20     Q    And did -- did you also use the Mozilla
21 Thunderbird e-mail client on your personal computer,
22 your personal MacBook?
23     A    Yes.
24     Q    And did you use it on both of your
25 personal MacBooks: your older 2012 plus the newer

Page 191

1 one?
2     A    Am I don't know about the older one or
3 not.  It's . . . I don't know.
4     Q    Okay.
5     A    I don't know.
6     Q    And why Mozilla Thunderbird?  Was that a
7 e-mail client that you've used historically?
8     A    I have a long association with
9 Thunderbird, and I've used it for decades.
10     Q    Okay, what e-mail addresses or what e-mail
11 accounts did you set up using the Mozilla
12 Thunderbird client?
13     A    It would have been my personal address.
14 ███████████████████████████████████████████████████
15     A    That's correct.
16     Q    Were there any other e-mails accounts that
17 you set up using the Mozilla Thunderbird client?
18     A    I'm trying to recall if I -- I don't -- I
19 don't think I set up my Archer one.
20       I don't -- don't recall any others.
21     Q    Okay.  So this -- these keyword search
22 terms about removing Thunderbird files and removing
23 Thunderbird cache, those were because you were
24 trying to delete the Thunderbird e-mail from your
25 Archer-issued laptop?

Page 192

1     A    That's correct.
2     Q    Okay.  And why were you trying to delete
3 those files?
4     A    That's privileged communications.
5     Q    Well, you tried to delete them in -- you
6 tried to delete them after receiving the subpoena,
7 correct?
8     A    Yes.  But that -- not necessarily causal.
9     Q    Okay.
10       MR. MACK:  I believe -- I believe, Arturo,
11 one of the footnotes, on the joint report we
12 submitted to the Court, says that -- why he deleted
13 them, so I'm not sure if that's privileged.  Are
14 you -- are you instructing him not to answer on that
15 question?
16       MR. GONZALEZ:  Well, you have to show me
17 the footnote.  I don't remember what you're
18 referring to.
19       MR. MACK:  I can -- well, let me just ask
20 him again and see if you -- if you want to instruct
21 him not answer, that's fine.
22     Q    (By Mr. Mack)  But why did you delete your
23 Thunderbird e-mail client files on your
24 Archer-issued laptop?
25       THE WITNESS:  Sorry.  Did you -- is it

Page 193

1 okay for me to answer?
2       MR. GONZALEZ:  Well, I'm not sure exactly
3 what your answer is going to be.  You should not
4 disclose privileged communications.  If we need to
5 take a -- we could talk about it at a break if
6 you're concerned about the privilege.  I -- I don't
7 want you to guess on the privilege.  If -- if -- if
8 it may be privileged, we could talk about it at a
9 break.
10       THE WITNESS:  Okay.
11       MR. GONZALEZ:  And the you could show me
12 the footnote that you're referencing, because I
13 don't -- I don't recall it.
14 BY MR. MACK:
15     Q    Well, I think mentioned earlier that you
16 didn't have any communications with your attorneys
17 about the meaning of the subpoena, correct?
18     A    It's not --
19       MR. GONZALEZ:  Yeah, I don't think that's
20 quite what he said.
21 BY MR. MACK:
22     Q    Well, you said -- when you were served
23 with the subpoena, did you have an understanding
24 what the subpoena was requesting?
25     A    Not in detail.  As I said, I didn't read

Page 194

1  it.
2      Q    Okay.  Between when you were served with
3  the subpoena and when you entered these keyword
4  search terms, did communicate with any attorneys?
5      A    Yes.
6           MR. GONZALEZ:  Yes or no.  Yeah.
7  BY MR. MACK:
8      Q    And did you discusses with your
9  attorneys--?
10          MR. GONZALEZ:  I'm going to instruct you
11  not to answer that question regardless of how he
12  finishes it.
13          THE WITNESS:  Okay.
14          MR. GONZALEZ:  So --
15  BY MR. MACK:
16     Q    Which attorneys did you communicate with?
17          MR. GONZALEZ:  That, you could tell him.
18          THE WITNESS:  Okay.
19          With -- with Archer attorneys.
20  BY MR. MACK:
21     Q    Your personal attorneys.
22     A    No, no.  With -- with --
23     Q    Archer attorneys.
24     A    With -- with Eric -- with Eric Lentell.
25     Q    Okay.  So you spoke with Archer's

Page 195

1  attorneys after receiving the subpoena in connection
2  with this case, correct?
3      A    I -- I communicated with them.
4      Q    Okay.  And then, at some time later, you
5  ran these keyword searches?
6      A    Yes.
7      Q    Okay, what was the purpose of running
8  these keyword searched?
9      A    I think I've added -- answered that
10  already.
11          MR. GONZALEZ:  Yeah.  He said removing
12  personal items.
13  BY MR. MACK:
14     Q    So you ran these searches to remove
15  personal items from your Archer-issued laptop,
16  correct?
17     A    That is correct, yes.
18     Q    Okay.  And which personal items were on
19  your Archer-issued laptop specifically?
20     A    Thunderbird and its cache files, Apple
21  Photos, and as I said, the -- you know, Apple -- I
22  don't know how to refer to it -- the Apple chat --
23     Q    Okay.
24     A    -- Application that contains SMS
25  messages -- messages and the like --

Page 196

1           MR. BARSKY:  Counsel, would you give me
2  two minutes with Mr. Gonzalez?
3           MR. MACK:  Sure.
4           MR. BARSKY:  Thank you.
5           MR. GONZALEZ:  Can we go off the record?
6           THE VIDEOGRAPHER:  This is the end of
7  Media 3.  We're off the record at 1:39 p.m.
8           (Break taken from 1:39 p.m. to
9           1:49 p.m.)
10          THE VIDEOGRAPHER:  This is the beginning
11  of Media 4.  We're back on the record at 1:50 p.m.
12          Proceed.
13  BY MR. MACK:
14     Q    All right, Mr. Furman, we were talking
15  about your Thunderbird e-mail data before the break.
16  Do you recall that?
17     A    I do recall that.
18     Q    Had you ever deleted Thunderbird e-mail
19  data prior to this January or February of 2020,
20  prior to this time?
21     A    Thunderbird mail -- Thunderbird e-mail
22  data, I -- I don't recall.  Not recently before
23  that.
24     Q    Okay.  So this was the only instance that
25  you can recall, January or February of 2020, where

Page 197

1  you -- you deleted your Thunderbird cache file?
2      A    I believe this was December.
3      Q    December of?
4      A    2021.
5           MR. GONZALEZ:  I think your dates are off.
6           MR. MACK:  Oh, sorry.  Let me -- did we
7  say--?
8           MR. GONZALEZ:  Because you said
9  January 2020.
10  BY MR. MACK:
11     Q    I thought you testified earlier, though,
12  sometime within your first -- oh, sometime within
13  your first couple months you installed
14  Thunderbird --
15     A    That's correct.
16     Q    -- in January 20- -- January/February
17  2020, and then this deletion here, at least
18  according to the Red Flag Report, occurred at some
19  time between May 9th, and --
20     A    February 26.
21     Q    Right.  But the searches here were -- were
22  performed on December 6.
23          So do you recall the date that you deleted
24  your Thunderbird e-mail box?
25     A    I don't recall the exact date, no.

Page 198

1    Q    But it was sometime around December 6th,
2    correct?
3    A    It was sometime, I would say, within -- it
4    was near that date.
5    Q    So near December 6th, 2021, you removed
6    your Thunderbird e-mail files from the Archer-issued
7    laptop.
8    A    Yes.
9    Q    Okay.  And there's probably going to be
10   some debate about why.  But was -- did you remove
11   those files because you thought you might be accused
12   of holding onto Wisk-related information?
13   A    No.
14   Q    Okay.
15        MR. MACK:  And . . . because that's little
16   bit different than what the footnote in the joint --
17   there was a footnote in the joint statement that you
18   guys issued, footnote 4, that said -- that said
19   exactly that:  Mr. Furman deleted those files
20   because he was afraid he would be accused of
21   misappropriation.  So are you guys--?
22        MR. GONZALEZ:  Wait, can you read the
23   entire footnote, if you're reading something?
24        MR. MACK:  I'd have to find it.  It was
25   footnote 4 in my draft.  It wasn't the actual

Page 199

1    version that was filed, because somebody removed --
2         MR. GONZALEZ:  Because I -- I'm not --
3    trust me, I'm not accusing you of anything
4    intentional, but I think that's a disconnect between
5    what you're saying and what the footnote is, but --
6    but -- but keep going.
7         MR. MACK:  Okay.
8    Q    (By Mr. Mack)  But, Mr. Furman, the reason
9    you deleted your Thunderbird e-mail on your
10   Archer-issued laptop is because you were accused --
11   or you were concerned that you may be accused of
12   improperly retaining Wisk information, right?
13   A    That's false.
14   Q    So, Mr. -- Mr. Furman, why did you delete
15   your Thunderbird files?
16        MR. GONZALEZ:  Well, he -- he's answered
17   that twice already by saying removing personal
18   items.
19   BY MR. MACK:
20   Q    But why did you -- why did you delete your
21   Thunderbird files on December -- in December of
22   2021?
23   A    That's privileged information.
24   Q    Okay.  And did -- did Archer have a policy
25   about the personal use of e-mail on Archer-issued

Page 200

1    laptops?
2         MR. BARSKY:  Time period, Counsel?
3    BY MR. MACK:
4    Q    When you started at Archer, was there a
5    policy in place about use of personal e-mail on
6    Archer-issued laptops?
7    A    Not one that I was aware of.
8    Q    And, at some point in time, did you become
9    aware of a policy at Archer regarding the use of
10   personal e-mail on Archer-issued laptops?
11        MR. BARSKY:  You could answer that
12   question.
13        THE WITNESS:  I can answer that question.
14        Yes, I did become aware of a change in
15   policy.
16   BY MR. MACK:
17   Q    And when did that policy change?
18   A    Near the beginning of December 2021.
19   Q    So, approximately how many e-mail did you
20   delete off of your Archer-issued laptop in -- on or
21   about December 2021?
22   A    Oh.  It was my -- it was my entire -- I
23   don't -- I don't know how much e-mail was stored on
24   the laptop, because the laptop comes out of the
25   cloud, but it was my entire account.

Page 201

1    Q    So thousands of e-mails.
2    A    Tens of thousands.
3    Q    So you deleted tens of thousands of e-mail
4    from your Archer-issued laptop?
5    A    I didn't delete any on that -- on -- in --
6    for this, what we're talking about, I didn't delete
7    any e-mails.  What I deleted was Thunderbird from my
8    computer.  All the e-mails still remained in the
9    cloud.
10   Q    Okay.  But you deleted the actual
11   Thunderbird cache file that was stored locally on
12   your Archer-issued laptop, correct?
13   A    That's correct.
14   Q    Okay.  And that cache file had within it
15   thousands of e-mails.
16   A    I have no idea how many e-mail were in
17   that cache file.
18   Q    Okay, but the cache file typically would
19   have all the e-mail that was accessible by
20   Thunderbird, right?
21   A    I don't -- I don't know that.
22   Q    Okay.  But, in any event, you searched
23   for/removed Thunderbird files from Mac in December
24   2021 so that you could remove your Thunderbird
25   e-mail in your Archer-issued laptop, correct?

Page 202

1   A   Yes.
2   Q   Okay.
3       MR. MACK:  And just for the record, the
4   letter brief, which was --
5       (Reporter clarification)
6       MR. MACK:  -- the joint letter brief,
7   which was Docket 191, footnote 4 reads . . . hold on
8   a second.  It's just opening.
9       MR. BARSKY:  Why don't we just continue
10  with the deposition, Counsel?  If you think there's
11  some contradiction there, you could raise it in the
12  letter, I'm sure.
13  BY MR. MACK:
14  Q   Footnote 4:  Third-party Scott Furman made
15  the mistake of deleting certain Wisk documents from
16  his personal devices after service of Wisk's
17  subpoena out of fear that Wisk would falsely accuse
18  him of committing a crime.  He is remorseful for
19  having done so, and has agreed with Wisk to turn
20  over images of his personal devices to a neutral
21  forensic examiner.
22      Do you recall that Mr. Furman?
23  A   I don't recall that statement, but I do
24  agree with it.
25  Q   So, you told -- Mr. Furman, I just asked

Page 204

1   in this -- in this --
2       MR. BARSKY:  I'm trying --
3       MR. MACK:  -- court.
4       MR. BARSKY:  I'm trying to get us past an
5   unnecessary miss.  You're making a miss, and I'm
6   just trying to suggest to you go on --
7       MR. MACK:  I respect your opinion, sir,
8   but please -- this is my deposition.  Please --
9       MR. BARSKY:  Fine.
10      MR. MACK:  -- do not interrupt me.
11      MR. BARSKY:  That's fine.  Go ahead.
12      MR. MACK:  Mr. Furman --
13      MR. BARSKY:  But don't badger the witness.
14      MR. MACK:  He just agreed.
15  Q   (By Mr. Mack)  Mr. Furman, you agree that
16  third-party, Scott Furman, made the mistake of
17  deleting certain Wisk documents from his personal
18  devices after service of Wisk subpoena out fear that
19  Wisk would falsely accuse him of committing a crime.
20  Do you agree with that statement?
21  A   I agree with that statement.
22  Q   You are remorseful for having done so, and
23  have agreed with Wisk to turn over images of your
24  personal devices to a neutral forensic examiner.  Do
25  you agree to that?

Page 203

1   you why you deleted your Thunderbird e-mail and if
2   it was because you thought you would be accused of
3   misappropriation, and said, no, I don't agree with
4   that.
5       Are -- are you changing your -- your
6   testimony now?
7   A   I'm not --
8       MR. BARSKY:  Objection.  Misstates the
9   witness's testimony, Counsel, and it's unnecessarily
10  misleading.
11  BY MR. MACK:
12  Q   Mr. Furman, you deleted your Thunderbird
13  file from your Archer-issued laptop because you were
14  afraid that Wisk would accuse you of trade secret
15  misappropriation, correct?
16      MR. BARSKY:  Objection.  He's already told
17  you that's false, Counsel.  You are making a
18  mistake, and so you need to --
19      MR. MACK:  Exactly what it says right
20  here.
21      THE WITNESS:  No, it --
22      MR. BARSKY:  You are make -- hang on.
23      MR. MACK:  Counsel, this is a leading
24  objection.  Can you please -- you're -- please do
25  not -- you can't -- you can't do talking objections

Page 205

1   A   I agree that.
2   Q   Okay.  That's all that I wanted.  Thank
3   you.
4       So, Mr. Furman, in addition to deleting
5   your thunder e-mail cache file from your
6   Archer-issued laptop, what else did you delete from
7   your Archer-issued laptop?
8   A   I deleted Apple Photos.
9   Q   And how many Apple Photos did you delete?
10  A   Well, it was all my personal photos, so
11  probably somewhere between 25- and 30,000 photos.
12  Q   And why did you delete your Apple Photos?
13  A   Because of this aforementioned policy
14  change.
15  Q   Did you also delete your Apple Photos
16  because you were afraid you might be accused of
17  trade secret misappropriation?
18  A   That -- not -- no.  This -- again, this
19  was because of the policy change.
20  Q   Did any of the Apple Photos that you
21  deleted relate in any way to your work at Wisk?
22  A   Yes, although I was not aware of it at the
23  time.
24  Q   Okay, which e-mails specifically did you
25  delete?

Page 206

1    A    I'm sorry.  I thought we were talking
2  about photos.
3    Q    Sorry.  Which photos specifically did you
4  delete?
5    A    So, I'm sorry, I don't know how to answer
6  this.  You're talking now about the December time
7  frame?
8    Q    Yes.  Were there other periods of time
9  where you also deleted additional photos?
10   A    Yes.
11   Q    Okay, so why don't we talk about all
12  the -- what were the other time periods when you
13  deleted additional photos?
14   A    I deleted -- so, to be clear, what we're
15  talking -- what we had been talking about is my Wisk
16  laptop, and as I said, those deletions were done in
17  response to a policy change.
18        MR. GONZALEZ:  I'm sorry.  You may have
19  misspoke.  You said my Wisk laptop.
20        THE WITNESS:  Sorry.  You're right.
21        MR. GONZALEZ:  Let's just get --
22        THE WITNESS:  My Archer --
23        MR. GONZALEZ:  -- this straight.
24        THE WITNESS:  -- laptop.  Let's just say
25  we're -- we're -- I think we're about even now in

Page 207

1  these --
2        MR. MACK:  I completely -- completely
3  agree.
4        MR. GONZALEZ:  So let's go back.  You're
5  talking your Archer laptop, and continue, please.
6        THE WITNESS:  Yeah.  And, I'm sorry,
7  please repeat the question.
8  BY MR. MACK:
9    Q    Sure.  We're talking about the other times
10  that you may have deleted iCloud photos from your
11  Archer-issued laptop.
12   A    Oh.  No.  There was no other time that I
13  recall deleting photos from my Archer iCloud.
14   Q    Okay.  But on or around December 2021, you
15  not only deleted your Thunderbird e-mail cache file,
16  you also deleted your Apple Photos and Apple chat
17  messages.
18   A    Correct.
19   Q    Okay.  And did any of those -- let's start
20  with the e-mail.  Did any of the e-mail that ended
21  up being deleted because of removal of Thunderbird
22  relate to your work at Wisk?
23   A    Yes, but I was not aware of it at the time
24  of deletion.
25   Q    And when did you become aware of it?

Page 208

1    A    Sometime in mid-January.
2    Q    And how about the photos that you deleted
3  from your Archer-issued laptop; did those also
4  relate to your work at Wisk?
5    A    Some of them did.
6    Q    And how about the chats that you deleted,
7  the Apple chats; did they also relate to your work
8  at Wisk?
9    A    A handful did, yes.
10   Q    So going back to the Red Flag Report, this
11  is Exhibit 147.  And, again, sitting here today, you
12  can't tell us how many chats you deleted or how many
13  photos you deleted, correct?
14   A    I'm sorry.  We're -- off my work laptop?
15   Q    Yes, your Archer work laptop.
16   A    No.  I mean, it was basically everything
17  that was on -- everything that was part of my
18  personal accounts was deleted.
19   Q    Okay.  And that's also true with the
20  Thunderbird e-mail that you deleted off your
21  Archer-issued laptop; you can't tell us the number
22  of e-mail, correct?
23   A    I don't know the number deleted, but,
24  again, I didn't know the number that was in the
25  cache file to begin with.

Page 209

1    Q    Okay, but could it have been hundreds of
2  e-mails?
3        MR. GONZALEZ:  Well -- well --
4        THE WITNESS:  How -- how --
5        MR. GONZALEZ:  Don't --
6        THE WITNESS:  -- that's a --
7        MR. GONZALEZ:  I'm sorry.  Don't -- don't
8  speculate.  If you know, tell him.
9        THE WITNESS:  I -- I don't know.  I don't
10  know how -- way of finding out either.
11  BY MR. MACK:
12   Q    Okay.  And looking at -- looking again at
13  the middle of page 3 of this forensic report,
14  Exhibit 17, do you see where it says:
15        ". . . while the [May 9th, 2021]
16        forensic image of . . . custodian's macOS
17        device contained email data derived from
18        Thunderbird (email client application),
19        MBOX and database files, the
20        [February 26th, 2022] forensic image of
21        the same device did not include such
22        artifacts."
23        Do you see that?
24   A    Yes, I do.
25   Q    So that's referring to the deletion of the

Page 210

1  Thunderbird client and its database files from your
2  Archer-issued laptop at some time between those two
3  dates, right?
4      A   I'm sorry.  Ask one more time, please.
5      Q   That -- that sentence is referring to the
6  deletion of the Thunderbird client and its database
7  files from your Archer-issued laptop at some point
8  between those two dates, right?
9      A   That's how I would interpret that
10 statement, yes.
11     Q   Okay, but it's your best recollection that
12 you deleted the Thunderbird client and its
13 associated e-mail database file in December of 2021,
14 right?
15     A   Yes.
16     Q   Okay.  It also states that you began the
17 regular use of fastmail.com.  Do you see that?  The
18 last sentence of that paragraph.
19     A   Yes.
20     Q   And why did you -- did you switch from
21 Thunderbird to Fastmail?
22     A   That's -- that's a bit of non sequitur,
23 because Fastmail is an e-mail service.  However,
24 what happened was that, in October of 2021, I
25 changed e-mail service providers because my old

Page 211

1  provider was going out of business, and switched
2  from one called Tuffmail to Fastmail, and sometime
3  later I started using the -- using the Web mail
4  interface to Fastmail instead of using Thunderbird
5  to access it.
6          Did that make sense?
7      Q   Yeah.  Let me just try to break that down
8  a little bit.
9          So you changed e-mail service providers.
10 Who -- you changed from whom to whom?
11     A   From Tuffmail to Fastmail.
12     Q   And the Fastmail, was that also associated
13 ████████████████████████████████████████████
14     A   It was.
15     Q   Were there any other e-mail addresses that
16 used in connection with Thunderbird or with
17 Fastmail?
18     A   No.
19     Q   Let's turn to page 4 of this report.
20     A   Sorry, just to emphasize, there's no other
21 e-mail addresses I use with that instance of
22 Thunderbird on that laptop.
23     Q   Okay.  What other e-mail addresses have
24 you used in any instance of Thunderbird on any
25 laptop?

Page 212

1      A   I mean, back on Wisk days, I -- I was
2  looking at Wisk e-mail on Thunderbird and stuff like
3  that.
4      Q   Okay.  When you install the Thunderbird
5  e-mail application, does it automatically download
6  the database file that's stored on the -- on the
7  server?
8      A   I -- I don't know the answer, without
9  speculating.
10     Q   Which e-mail protocol do you use?  Do you
11 use POP3 or SMNT?
12     A   i- -- i- --
13     Q   SMTP?
14     A   i- -- iMap.
15     Q   You use iMap, okay.
16         So do you know how iMap works when you
17 add a new iMap account to the Thunderbird e-mail
18 client?
19     A   I have a -- I have some idea.
20     Q   And what is your idea of how it works?
21     A   My idea is, it will -- it will download
22 the message headers locally, but not necessarily the
23 message bodies.
24     Q   Okay.  And do you know if that was true in
25 this case?

Page 213

1      A   Sorry, "this case" being the installation
2  of Thunderbird on my -- on my work laptop?
3      Q   On your Archer-issued laptop, yes.
4      A   I -- I don't know.  I don't know that I
5  have a way of knowing.
6      Q   Okay.  But you do know that, in connection
7  with this case, Archer has produced hundreds of your
8  e-mail --
9      A   Okay.
10     Q   -- from your time at Wisk, right?
11     A   Okay.
12     Q   So those -- in those -- the metadata on
13 those e-mails say that they came from Thunderbird.
14 So would that indicate to you that the entire e-mail
15 message was downloaded?
16     A   I -- I can't answer that, without
17 speculating.  I don't -- I don't know the detail,
18 the technical of details, of what it's doing.
19     Q   Okay.  So is it fair to say that all the
20 e-mail that Archer produced in this case relating to
21 your work at Wisk derived from that Thunderbird
22 e-mail box?
23     A   Answer -- sorry, ask it one more time.  I
24 want to make sure I answer it accurately.
25     Q   Sure.  Is it fair to--?

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 214

1       MR. BARSKY:  Can establish foundation,
2  Counsel?
3           (Reporter clarification)
4       MR. BARSKY:  Can you lay a foundation,
5  please, Counsel?
6       MR. MACK:  Sure.
7       Q    (By Mr. Mack)  Mr. Furman, you're -- you're
8  aware that Archer produced a number of your e-mail
9  in connection with this case, correct?
10      A    I am aware of that.
11      Q    Again, we're going to look at some of
12 those today.
13           The only way Archer -- or how would Archer
14 have access to your personal e-mail relating to your
15 work at Wisk?
16      A    So there was -- I had saved a number of --
17 I become aware that I had some number of Wisk
18 e-mails in my e-mail folder, my Fastmail folder, and
19 I had saved them to a zip file on my Archer work
20 laptop.
21      Q    And why did you do that?
22      A    Well, I mean, those -- those e-mails were
23 ones that I -- I deleted, and -- and I deleted them
24 when I was very -- what's the word? -- I -- I was
25 very panicked about deleting them, but I still

Page 215

1  thought maybe this is something that I need to undo,
2  so I saved those e-mails, the e-mails I deleted,
3  into a zip file that I stored on my Archer work
4  laptop.
5       Q    Okay, and then you deleted the zip file?
6       A    I don't recall deleting the zip file no.
7       Q    Okay, did you hand the zip file over to
8  your attorneys?
9       A    That would be privileged.
10      Q    How many -- how many e-mail were in the
11 zip file?
12      A    I don't recall exactly.
13      Q    Okay.  And what did you do with the zip
14 file?
15      A    I -- I didn't -- I personally didn't do
16 anything with the zip file.
17      Q    And I think you mentioned that -- so we're
18 talking about -- are these -- the e-mail that you
19 downloaded from Fastmail, these different Wisk
20 e-mail e-mail than the e-mail that were in your
21 Thunderbird mail box?
22      A    I couldn't speculate as to whether or not
23 they were different.  I mean, they came -- they did
24 come from the same source.
25      Q    Okay.  So you had Wisk -- you had e-mail

Page 216

1  related to your -- your work at Wisk on both
2  Fastmail and on Thunderbird.
3       A    Well, Thunderbird is a mail client reader.
4  It only -- it only displays and downloads e-mail
5  that exist in the cloud, which is the same thing
6  that Fastmail does.  Difference is that one displays
7  it in a Web browser, and one displays it in a
8  dedicated program.
9       Q    Okay.  So you had both Fastmail and
10 Thunderbird on your Archer-issued laptop.
11      A    Yes, though I don't know that they were
12 ever at the same time, but yes.
13      Q    Okay.  And you could access Archer -- you
14 could -- excuse me.
15           On your Archer-issued laptop, you were
16 able to access Wisk e-mail from your time related to
17 your work at Wisk, right?
18      A    Not all Wisk e-mail.  The -- the -- the
19 particular e-mail that were accidentally retained,
20 yes.
21      Q    Okay.  And how many e-mails were
22 accidentally retained?
23      A    As I said, I don't recall.
24      Q    Could it have been thousands?
25      A    It could not have been thousands.

Page 217

1       Q    Could it have been hundreds?
2       A    I don't think so.
3       Q    Okay.  Do you know how many e-mail that
4  Archer produced in this case?
5       A    I do not.
6       Q    Okay.  Do you know the -- what technology
7  areas those e-mail related to?
8       A    I -- I looked at those e-mails only long
9  enough to deduce whether or not they were personal
10 or not.  So, with the exception of a couple of them,
11 no, I really don't know what the contents of the
12 e-mails were.
13      Q    Okay.  And you said you also zipped up
14 some of the e-mail, and I was confused because I
15 thought you said you also -- did you also delete
16 e-mail from Fastmail in addition to the e-mail from
17 Thunderbird?
18      A    So -- okay, I feel like we're confusing
19 multiple events.  So, let's talk about --
20           MR. GONZALEZ:  No, hold on.  Just answer
21 his question.
22           THE WITNESS:  Okay.
23           MR. GONZALEZ:  And -- and then let him
24 proceed.
25 BY MR. MACK:

Page 218

```
 1    Q    So, at some -- at some point in time, on
 2 your Archer-issued laptop, you had two e-mail
 3 clients for use in accessing Wisk e-mail.  You
 4 had --
 5    A    That wasn't the -- you said those e-mail
 6 clients.
 7    Q    Well -- well, that -- two e-mail clients
 8 that were capable of accessing Wisk e-mail, right?
 9    A    Two e-mail clients that were capable of
10 accessing my personal e-mail account that happened
11 to contain Wisk e-mail that I did not know was
12 there.
13    Q    Okay.  Then why are some of the e-mail
14 that have been produced -- they don't say
15 ████████████████████████████████████
16 address at all.  It's just Zero.aero e-mail
17 addresses.  Can you explain that?
18    A    I'm not aware of any such e-mails.  I
19 can't explain that.
20    Q    Okay.  So --
21    A    Maybe they're attachments to other
22 e-mails.  I don't know.
23    Q    Okay.  But, in any event, let's start with
24 the Thunderbird client.  You had the Thunderbird
25 client on your Archer-issued laptop, installed it
```

Page 219

```
 1 sometime between January and February of 2020,
 2 right?
 3    A    Yeah.
 4    Q    You received the subpoena to produce all
 5 Wisk-related material still in your possession in
 6 November of 2020, right?
 7    A    I agree.
 8    Q    Less than a month later you delete your
 9 Thunderbird e-mail box, right?  From the
10 Archer-issued laptop.
11    A    The -- yes, the Thunderbird application
12 and cache directory were deleted from my
13 Archer-issued laptop in December.
14    Q    And, as a result, hundreds of e-mail from
15 your days at Wisk were also deleted.
16    A    I don't know that.
17    Q    But we know that, because many of them
18 were produced in the case, right?
19         MR. GONZALEZ:  That's argumentative and no
20 foundation.
21         THE WITNESS:  I mean, I -- I just don't
22 know that.
23 BY MR. MACK:
24    Q    Okay.  So how does the Fastmail client --
25 and then when did you install Fastmail on your
```

Page 220

```
 1 Archer-issued laptop?
 2    A    Well, Fastmail is a Web address.  You
 3 don't install it.
 4    Q    Okay.  So you just go to fastmail.com and
 5 log in with a user --
 6    A    Right.
 7    Q    -- name and password.
 8    A    It's like Gmail.
 9    Q    Okay.  But when you log in to Fastmail,
10 you have -- you have your iMap account configured
11 ████████████████████████████████
12    A    It's a Web -- it's a Web e-mail client, so
13 there is no iMap or POP or anything like that.
14 You're just -- you're just interacting with your
15 e-mail on a Web browser.
16    Q    Okay.  So, you also accessed Fastmail from
17 your Archer-issued laptop.
18    A    Yes.
19    Q    And when did you access Fastmail?
20    A    This must have been mid-January.
21    Q    So, mid-January of 2020?
22    A    No.  I apologize.  2022.
23    Q    2022, okay.  So why did you access
24 Fastmail?
25    A    I was concerned -- I -- I -- I became
```

Page 221

```
 1 concerned that -- that there might have been e-mails
 2 that were accidentally retained that were Wisk --
 3 Wisk materials.
 4    Q    And, if -- if Fastmail is just a Web
 5 interface, how are those e-mail accidentally
 6 retained?  Are they stored to the server somehow?
 7    A    Well, they were -- they would have been
 8 e-mails that were received from my e-mail client at
 9 some distant time in the past while I was a Wisk
10 employee.
11    Q    Okay.  But they were still accessible
12 through fastmail.com.
13    A    That's right.
14    Q    Okay.  And in January -- or in early 2022,
15 you accessed Fastmail.com from your Archer-issued
16 laptop?
17    A    That's right.
18    Q    And when what did you do?
19    A    I searched for -- I searched for e-mails
20 that were to or from Zee.aero or to Cora.aero or to
21 Wisk.aero, and I found a whole bunch of them that I
22 didn't expect to see, and I -- I -- I separated the
23 out into a -- a zip folder, which I stored on my
24 Archer-issued laptop, and I deleted the other copy
25 of them from the -- from the e-mail -- from -- from
```

Page 222

1  the Fastmail folder.
2      Q     Okay.  And this was all in early 2022,
3  correct?
4      A     I suppose -- January 2022.
5      Q     Okay.  And why did you delete the files
6  from your Fastmail account in January 2022?
7      A     I was -- I was shocked to find Wisk
8  materials in my e-mail.  I didn't expect them to be
9  there.  I freaked out.  I thought -- Wisk has this
10 habit of -- of making outrageous accusations against
11 Archer employees, and I knew they were going claim
12 that I had known the e-mails all along and I
13 retained it and I had used it improperly, and I was
14 afraid.  I was afraid that the same thing would
15 happen to me that happened to -- Jing Xue had FBI
16 agents some through his door at 6 a.m. with guns
17 drawn.  I did not want that scenario at all for me
18 and my family.  I was fucking scared.
19     Q     Okay.  So --
20           MR. GONZALEZ:  This is the footnote.
21           MR. MACK:  Okay.
22           MR. GONZALEZ:  I didn't mean to argue with
23 you earlier.  It's just that the footnote wasn't
24 December.  The footnote was January.
25           MR. MACK:  Okay.  And that zip file has

Page 223

1  been produced to us, correct?
2           MR. GONZALEZ:  I'm not the witness here.
3  You -- you keep going.  I --
4           MR. MACK:  Well, for the record, if it
5  hasn't been produced, we would like that to be
6  produced.  I'm not sure if that zip file that he
7  had -- he --
8      Q     (By Mr. Mack)  Is that zip file still
9  accessible?
10     A     I would not know.
11     Q     Okay, so what did you do with the zip
12 file?
13     A     Archer -- I don't know if this is
14 privileged or not.
15           MR. GONZALEZ:  Well, it -- it may be.
16 If -- if -- if you only know something via
17 communications with counsel, you should not say
18 that.
19 BY MR. MACK:
20     Q     I'm just talking about the actions that
21 you took.  Like --
22           MR. GONZALEZ:  Yeah.
23 BY MR. MACK:
24     Q     -- what did -- what actions did you take
25 with respect to the zip file?

Page 224

1      A     I didn't take any actions with respect to
2  the zip file.
3      Q     So the zip file is still saved on your
4  Archer-issued laptop.
5      A     I have no reason to believe otherwise.
6      Q     Okay.  Okay, well, if that document hasn't
7  been produced, we would like it to be produced.  I'm
8  not sure if has or not, but . . .
9           Okay, so I think that -- I think that --
10 so there were two separate deletion events.  There's
11 the deletion of the Thunderbird e-mail, and then
12 there's a separate deletion of Fastmail a few -- a
13 month or two later, correct?
14     A     Yes.  About a month later.
15     Q     Okay.  And then, in addition to the e-mail
16 deletion, there's also the deletion of iCloud
17 photos, correct, happened in December?
18     A     Yes.
19     Q     There's also the deletion of Apple chat
20 messages, correct?
21     A     Yes.
22     Q     And all of these potentially related to
23 your work at Wisk.
24     A     They all potentially related to it, yes.
25     Q     And not only potentially, you know that

Page 225

1  some of the chat messages did relate to your work at
2  Wisk, correct?
3      A     Yes.
4      Q     And some of the photos did relate to your
5  work at Wisk, correct?
6      A     Yes.
7      Q     And many of the e-mail did relate to your
8  work at Wisk, correct?
9      A     Some of the e-mail, yes.  A handful of the
10 e-mail did relate to my work at Wisk.
11           (Reporter clarification)
12           THE WITNESS:  And a handful of the e-mails
13 did relate to my work at Wisk.
14 BY MR. MACK:
15     Q     Okay, on page 3 of the Red -- or page 4 of
16 the Red Flag Report, it also mentions that the
17 Google -- sorry, the -- it also mentions that the
18 device image collected on May 9th, 2021, contains --
19           MR. BARSKY:  Sorry.  Counsel, I'm sorry to
20 interrupt.  Where are you reading, sir?
21           MR. MACK:  This is page 4 of the report of
22 the --
23           MR. BARSKY:  Okay.
24           MR. MACK:  -- report.
25           MR. BARSKY:  Second paragraph.

1        MR. MACK:  At the top.

2        MR. BARSKY:  Thank you.

3        MR. MACK:  "Cloud Storage Analysis."

4        MR. BARSKY:  Yes.  Thank you.

5   BY MR. MACK:

6        Q    Says that the earlier image contains

7   evidence for locally installed and utilized Google

8   Drive and iCloud applications, while the image

9   connect -- collected later in February contains only

10  evidence for Google Drive.

11       So is that consistent with what you

12  mentioned, that you had deleted the iCloud

13  applications?

14       A    Well, I don't -- don't know if I deleted

15  things applications, but I did log out and delete

16  the data.

17       Q    And this also says that the accounts used

18  to access these cloud storage services are

19  ███████████████████████████████████████████████████

20  see that?

21       A    Yes.

22  ███████████████████████████████████████████████████

23  use for Google Drive?

24       A    Yes.  That's my personal log-in for Google

25  Drive.

1        Q    Okay.  And today what is stored on your

2   Google Drive account?

3        A    Today it's -- well, it's -- it's personal

4   documents, and -- and there's images there as well.

5   I'm not sure what -- what additional information

6   you're looking for.

7        Q    Okay, are there any -- are there any

8   Archer or Wisk documents stored in your Google

9   Drive?

10       A    I -- there are no -- I don't know.  I

11  don't believe so, but I don't -- I don't -- I don't

12  know.

13       Q    If we go to -- still on page 4, "File

14  System Analysis," you were also used a Linux client

15  on your MacBook Pro, correct?

16       A    I -- if you mean a Linux virtual machine,

17  then the answer is yes.

18       Q    Was your MacBook Pro capable of booting

19  into a Linux operating system, using a Parallels

20  app?

21       A    Yeah.  It doesn't exactly mean that it

22  booted into Linux.  It means that -- it mean --

23  meant -- meant that Linux could operate as an

24  application on top of -- while you're still using it

25  as a Mac.

1        Q    Okay.  This indicates that you actively

2   utilized the Parallels application to access Linux

3   between May 9th and February 26th, 2022.  Is that

4   true?  Did you access -- did you use the Parallels

5   application on your MacBook Pro?

6        A    Yes.  All the time.

7        Q    And what do you use the Parallels

8   application for?

9        A    For development of software for Archer

10  systems.

11       Q    Did you also use the Parallels application

12  for development of Wisk software?

13       A    At Wisk, yes.

14       Q    Okay.  Is there any Wisk information on

15  your Linux profile that's referenced here, the Linux

16  18.04?

17       A    No.

18       Q    It says that size of this Linux filesystem

19  increased over 23 gigabytes between May 9th

20  February 26, 2022.  Do you know why it would have

21  increased by so much?

22       A    It was being used for development.  Our

23  system software was being designed over that period

24  of time.  We were adding packages, adding software,

25  adding new dependencies on the build.  Probably had

1   hundreds of old builds sitting around on there.

2   It's use -- it's -- it's use for software

3   development.

4        Q    Did you actively search that -- that Linux

5   filesystem to see if there were any Wisk documents

6   or Wisk material stored there?

7        A    I -- I wouldn't never have put any on

8   there.  I did not search it.

9        Q    So you said . . . you said that you

10  decided -- back to the -- the Fastmail e-mail, you

11  said that you decided to save the e-mail to a zip

12  file before you deleted them.

13       A    That's right.

14       Q    Why would you save files to a zip file--?

15            (Reporter clarification)

16  BY MR. MACK:

17       Q    Why would save the e-mail to a zip file

18  before deleting them?

19       A    I --

20       MR. BARSKY:  Excuse me one second.

21       THE WITNESS:  Sure.

22       MR. BARSKY:  Counsel, could I just suggest

23  we be clear about -- I -- I don't want to say it on

24  the record with the witness saving it here.  Can you

25  just be clear about whether we are talking about

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 230

1  permanent deletions or not?
2          (Reporter clarification)
3          MR. MACK:  Permanent deletions.
4          MR. BARSKY:  Yeah.
5  BY MR. MACK:
6      Q   Okay, well, let's -- let's go back.
7          The Fastmail that you deleted from the
8  Fastmail website --
9      A   Yeah.
10     Q   -- those were permanently deleted,
11 correct?
12     A   Well, there was still the zip file copy
13 that remained.
14     Q   Okay, but they were permanently deleted
15 from Fastmail.
16     A   Yes.
17     Q   Okay.  And it's your testimony that you --
18 before permanently deleting them, you retained a
19 copy in a zip file.
20     A   Yes.
21     Q   Were there any e-mail that you permanently
22 deleted that you did not put in the zip file?
23     A   Not at that time, no.
24     Q   Okay, what do you mean "at that time"?  At
25 any time.

Page 231

1      A   Well, there was, prior to the litigation,
2  sometime in the beginning of 2021 -- no, actually,
3  take it back.  I would -- I would -- I retract that.
4      Q   So the answer is no?
5      A   The answer is no.
6      Q   Okay.  Could you turn to page 6 of the Red
7  Flag Report.
8          Page 6, do you see "File & Folder Activity
9  Analysis"?
10     A   I do see it.
11     Q   Okay.  Actually, I think it's not this
12 page.  Let me see.
13         Yeah, so I think it's actually -- it
14 starts on bottom of page 5.  It's "Deletion Activity
15 Analysis."  Do you see that?  Goes on to the top of
16 page 6.
17         MR. GONZALEZ:  What is the pending
18 question?
19         THE WITNESS:  So I see it.  I --
20 BY MR. MACK:
21     Q   Do you see that section?
22     A   I do see that section.
23     Q   Okay.  This section lists five -- well,
24 the -- the -- on the bottom of page 5, it says the
25 Windows OS Recycle Bin contains five items listed

Page 232

1  below on this table.  Do you see those five items?
2      A   Yeah.
3      Q   And then, at the top of page 6, analysis
4  of the Windows OS filesystem logs, and then it says,
5  "contain information regarding removed items from
6  user accessible locations."
7          And do you see the Table 3 in this report?
8      A   I -- I found Table 3, yeah.
9      Q   Okay.  One of the removed items from user
10 Scott's -- Users/scott/downloads is "ESS LV Power
11 Distribution.jpg."  Do you see that?
12     A   I do see that.
13     Q   And that's the energy storage system, the
14 low-voltage energy storage system power
15 distribution.  Do you see that?
16     A   Yeah.
17     Q   What was that jpg file?
18     A   I . . . part of the Archer design.
19     Q   Okay, do you know why you removed that
20 file from Users/scott/Downloads?
21     A   Well, downloads is generally the place
22 that I put things that I'm not going to retain long
23 term.  I'm going to retain them, I take them out of
24 that directory, so every now and then I'll just, you
25 know, delete files out of there.

Page 233

1      Q   And did the ESS LV Power
2  Distribution.jpg -- was that picture of Wisk's or
3  Archer's implementation?
4          (Reporter clarification)
5          MR. MACK:  Implementation.
6          THE WITNESS:  Ah.  So . . . the truth is,
7  I don't remember, but I certainly would not have had
8  Wisk's fucking -- excuse me, Wisk's picture of
9  Wisk's technology on my computer and been aware
10 that -- so --
11         (Reporter clarification)
12         THE WITNESS:  Sorry.
13         I -- it -- I would not have had a picture
14 of Wisk's technology there.
15 BY MR. MACK:
16     Q   Okay.  Well, we haven't been able to
17 locate what this file name corresponds to, but can
18 you tell us any information about what that file
19 was?
20     A   No, I don't recall.
21     Q   And you never handed that file over to
22 your counsel for production in this case, did you?
23     A   I would have had no idea that was in any
24 way relevant, so no.
25     Q   But from the -- from the file name, it's

Page 234

1  certainly related to the energy storage system
2  low-voltage power distribution system, right?
3      A    Yes, but if it had anything to do with an
4  Archer design, presumably, also existed in the
5  Archer Google Drive.  Not the only copy.
6      Q    Okay.  Is there any way for you -- can you
7  still access -- do you know if you could still
8  access that file?
9      A    I don't know.
10     Q    Okay.  Do you see in "File & Folder
11 Activity Analysis" at the bottom of this page 6?
12     A    Yes, I see that.
13     Q    Do you see, on February 25th, 2022, you
14 accessed a file Maker_LV_Power_Distribution?
15     A    I do.
16     Q    Okay, do you know what that file is?
17     A    I can get -- I -- I can speculate from the
18 name, but, no, I don't remember that specific file.
19     Q    Okay, do you know why you accessed that
20 file on February 25th?
21     A    Probably because I was working.  No.  I
22 don't specifically recall.
23     Q    Okay.  Do you know how that file relates
24 to the deleted jpg from the table above?
25     A    I don't.  I don't recall.

Page 235

1      Q    Let's look at Exhibit 18.  This is an -- a
2  letter from your counsel to us.
3           Do you see this is a May -- a March 30th,
4  2022, letter.  Exhibit 18 says:
5              "We write to advise you that on or
6           around January 13[th], 2022, one of our
7           clients (Scott Furman) deleted certain
8           Wisk-related documents from his personal
9           account/devices."
10          Is that sentence referring to the deletion
11 that we just -- is that refer -- what is that
12 referring to?
13     A    Sorry.  I think it is including deletions
14 that we've just been referring to, yes.
15     Q    Okay, but on January 13th, would that be
16 the date of the Fastmail deletion, or is that the
17 date of Thunderbird deletion or both?
18     A    The -- that would be the date --
19 approximate date of the Fastmail deletion.
20     Q    Okay.  And so this -- this letter is dated
21 March 30th.
22          How long did it take you to inform your
23 attorneys that you had deleted files from Fastmail?
24     A    I think that's privileged communication.
25          MR. GONZALEZ:  Yeah, I'm going to --

Page 236

1           MR. MACK:  I'm just asking for the date.
2           MR. GONZALEZ:  Well --
3           MR. MACK:  Okay.  It would just be -- it
4  would be something that would be on a privilege log.
5  I mean, it's the date that -- if -- if -- even if
6  the communication was privileged, which I'm not sure
7  if deleting files is privileged subject matter,
8  but --
9           MR. GONZALEZ:  If you have a recollection
10 of the date, tell him the date.
11          THE WITNESS:  It was sometime in late
12 February.
13 BY MR. MACK:
14     Q    Okay, why did it take you so long to
15 inform your counsel?
16     A    Because I was fucking scared out of my
17 mind.  I was paralyzed.
18     Q    And this specific letter refers to
19 January 13th.  That wasn't the first time that you
20 deleted information, right?  You also had deleted
21 information in December of 2021, correct?
22     A    At the time, I deleted the information,
23 December 2021, I was not aware there were any Wisk
24 documents in that information.
25     Q    Okay, but you're aware now that there are,

Page 237

1  right?
2      A    I'm aware now.
3      Q    Okay, and you deleted -- you deleted
4  documents even though you had received a litigation
5  hold notice in connection with this case, correct?
6      A    Correct.
7      Q    And you deleted documents even though you
8  had received a subpoena in connection with this
9  case, correct?
10     A    Correct.
11     Q    And are there any other times that you
12 deleted any documents or information other than the
13 times that we've discussed so far?
14     A    Yes.
15     Q    And what is that?
16     A    I also deleted some photos from Apple
17 Photos on approximately the same date.
18     Q    And, when you say "approximately the same
19 date," is that January 13th, 2022?
20     A    That's correct.
21     Q    Why did you delete the Apple Photos?
22     A    This -- well, because the same reason.  I
23 was looking around, thinking I did not have any
24 Wisk-related documents in my -- in my personal
25 things, and I found some.

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 238

1   Q   Okay.

2   A   And it scared the shit out of me.

3   Q   Okay, but didn't Carlie from Wisk's HR

4   specifically ask you to search for all Wisk

5   documents and delete them when you left Wisk?

6   A   Yes.

7   Q   Or were these just documents escaped your

8   review?

9   A   Well, as I said, I had over 25,000 photos

10  to search through, and I was given no guidance on

11  what counted as confidential information.  I used my

12  judgment as to what was confidential information.  I

13  did my -- the best job I knew how to remove

14  confidential Wisk materials from -- from these

15  photos.

16  Q   Okay.  But now you know that at least some

17  confidential Wisk information did make its way on to

18  Archer's laptop, correct?

19      MR. GONZALEZ:  Well, hold on.  I'm going

20  to object.  Confidential.  Mischaracterizes his

21  testimony.

22  BY MR. MACK:

23  Q   You can answer.

24  A   Ah.  I know that some Wisk-related

25  materials made it on to my Archer laptop, but I was

Page 239

1   not aware, at the time, of that.

2   Q   Okay, and you're aware that some of those

3   Wisk-related materials that made their way on to

4   your Archer laptop were confidential Wisk materials,

5   right?

6   A   I don't -- not sure I know how to define

7   confidential.

8   Q   Would you consider any of that material to

9   be proprietary to Wisk?

10  A   Again, I'm not -- I'm not really sure how

11  to answer that.

12  Q   Well, I mean, we went through the

13  definition of proprietary information in your Cora

14  agreement that you had signed, but how would you

15  understand what proprietary information is?  What's

16  your definition?

17  A   Information that could not -- what -- what

18  is not possible to learn through public means.

19  Q   And some of the information from Wisk that

20  you brought over and was stored on your

21  Archer-issued laptop was not possible to be learned

22  through public means, right?

23      MR. GONZALEZ:  Objection.  No foundation.

24  Calls for speculation.

25      THE WITNESS:  Sorry.  Again, I want to

Page 240

1   emphasize that I did not know, at the time, that

2   this material was on my Archer work laptop, that --

3   that there was any Wisk materials there.

4   BY MR. MACK:

5   Q   Okay, but that wasn't the question.

6       The question was, The information that was

7   deleted from your Wisk -- excuse me, the

8   Wisk-related information that was deleted from your

9   Archer-issued laptop, at least some of that

10  information was confidential and proprietary to

11  Wisk, right?

12      MR. GONZALEZ:  Objection.

13      MR. BARSKY:  I'm going to object.  That

14  mischaracterizes the testimony.

15      MR. GONZALEZ:  Yeah, there's no foundation

16  for that.  I think he said earlier he didn't read

17  the stuff.

18      MR. BARSKY:  I assume that was

19  inadvertent.

20      (Reporter clarification)

21  BY MR. MACK:

22  Q   I'll let the question stand.  Could you

23  please answer my question, Mr. Furman.

24      MR. GONZALEZ:  I said it -- it also lacks

25  foundation.

Page 241

1       MR. MACK:  These --

2       MR. GONZALEZ:  Calls for --

3       MR. MACK:  -- speaking objections --

4       MR. GONZALEZ:  -- speculation.

5       MR. MACK:  -- are completely

6   inappropriate.  And any --

7       MR. GONZALEZ:  Lacks foundation --

8       MR. MACK:  -- any --

9       MR. GONZALEZ:  -- and calls for

10  speculation.

11      MR. MACK:  In Texas and in Cal, doesn't

12  matter where you are, your speaking objections are

13  not appropriate.  Please -- please limit your

14  objections just to one word only.

15      MR. BARSKY:  Misleading.

16      MR. MACK:  Thank you.

17      MR. BARSKY:  Assumes facts not in

18  evidence.

19  BY MR. MACK:

20  Q   Mr. Furman, let me reask --

21      MR. BARSKY:  And mischaracterizes --

22  BY THE WITNESS:

23  Q   -- the question.

24      MR. BARSKY:  -- his testimony.

25  BY MR. MACK:

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 242

1    Q    Let me reask the question.  The --
2    A    Go ahead.
3    Q    -- information that you deleted from your
4  Archer-issued laptop, at least some of that
5  information, was confidential and proprietary to
6  Wisk, right?
7         MR. GONZALEZ:  Hold on.  Objection.  That
8  mischaracterizes his prior testimony, that lacks
9  foundation, and it calls for speculation.
10        THE WITNESS:  Ah.  Okay, so my answer is,
11 that information made its way on to my Archer
12 laptop, that I was not aware of at the time, that,
13 by your definition, would count as proprietary Wisk
14 information.
15        MR. MACK:  Thank you.
16        (Discussion off the record)
17 BY MR. MACK:
18    Q    Okay, so other than the deletions we
19 talked about thus far, are there any other instances
20 where you deleted information from your personal
21 devices or from your Archer-issued laptop relating
22 to Wisk?
23    A    So, I -- I've already described deleting
24 Apple Photos, and at the time I had a -- an
25 application installed that would synchronize between

Page 243

1  my Apple Photos and my Google photos account.
2  However, that synchronizing feature had been
3  disabled a couple months earlier.  So, I made an
4  attempt to delete the same photos from my Google
5  photos account.
6     Q    And do you know specifically which photos
7  those were?
8     A    I tried to identify them by searching for
9  keywords like --
10         (Reporter clarification)
11         THE WITNESS:  -- keywords like "airplane,"
12 "helicopter," stuff -- stuff like that.
13 BY MR. MACK:
14    Q    Okay.  There were four photos that were
15 produced in this case of -- of Wisk wiring diagrams.
16 Do -- do you refer -- do you recall those four
17 photos?
18    A    I recall I produced four photos.  I
19 wouldn't characterize them as wiring diagrams.
20    Q    Well, they -- they showed how the -- they
21 were photos of some the wiring, correct?
22    A    They were photos of, yes, Cora's wiring.
23    Q    Okay.  Why did you have photos of Cora's
24 wiring in your possession after you left Wisk?
25    A    It was an accidental retention, and as

Page 244

1  soon as I found out about it, which was only, like,
2  a couple day after the litigation hold, I turned of
3  them over to the attorneys to produce to -- to Wisk.
4     Q    Okay, but you had accessed to those Cora
5  photos while you were employee at Archer, right?
6     A    I had accessed to them, but I wasn't aware
7  of them.  So what does that -- what use is that?
8     Q    Okay, but the -- your Archer laptop was
9  connected to the Archer network, right?
10    A    Yes.
11    Q    So potentially everyone at Archer had
12 access to those, too, right?
13    A    I don't think that's how it works.  No,
14 that's definitely not how it works.
15    Q    Well, we read the -- we read the privacy
16 from policy from Archer, correct?  Archer had --
17    A    Well, you just said everyone at Archer had
18 access to those photos.  Do you really mean
19 everyone, like, all the employees?
20    Q    Well, you're connected to -- you're
21 connected to the Archer network and you --
22         MR. BARSKY:  Assumes facts not in
23 evidence.
24 BY MR. MACK:
25    Q    I mean --

Page 245

1          MR. GONZALEZ:  Hold on, just wait for the
2  question.  What--?
3          THE WITNESS:  Sorry.  Yeah.  I'm --
4          MR. GONZALEZ:  That's okay.
5          THE WITNESS:  -- sorry.  Yeah.
6          MR. GONZALEZ:  It's already -- it's
7  already getting late.  Just --
8          THE WITNESS:  Sorry.  Maybe -- maybe, if
9  it's okay, next time we have an opportunity for a
10 break, I'd like take a break.
11 BY MR. MACK:
12    Q    Okay.  Let's just look at Exhibit 19, and
13 I think we can move on to some other topics.
14         Exhibit 19 is forensic protocol --
15 protocol entered in this case.
16         Mr. Furman, there's a list of devices at
17 the bottom of page 1.  Do you recognize this list?
18    A    Give me a moment to read it.
19         Yeah, I recognize this list.
20    Q    What is this list?
21    A    It's a list of sources provided to a
22 forensic examiner.
23    Q    And did you provide this list to the
24 examiner?
25    A    Not directly.  It wasn't me.

Page 246

1    Q    Okay, I think we talked some of these

3  that was the account we talked about earlier today,
4  correct?
5    A    Well, I don't recall in what context we
6  talked about it, but I -- I believe we talked about
7  it.
8    Q    Okay, does that account have any
9  Wisk-related material on it?
10    A    Not that I'm aware of.
11    Q    Okay, what material are you aware of on
12  that account?
13    A    It's got my personal photos.  It's got
14  financial documents, personal documents, that sort
15  of thing.
16    Q    And did you delete any -- did you delete
17  or remove any material from that account since you
18  started working at Archer?
19    A    Any material at all?
20    Q    Well, how much material is that -- is in
21  that account?  Is it . . . ?
22    A    I mean, I certainly did remove material,
23  and I think we've already discussed that I
24  removed -- that this -- this encompasses my
25  Google -- Google photos account.  So, there were

Page 247

1  photos removed from that account.
2    Q    Okay.  And some of those Google photos
3  were Wisk-related photos?
4    A    That's correct.
5    Q    Okay.  Were there any other Wisk-related

7    A    No.
8    Q    How about the iTunes?  The next one down
9  is an iCloud account; do you see that?
10    A    Yes.
11    Q    Would that also have your iCloud photos on
12  it?
13    A    That's correct.
14    Q    And your backups of your Apple chat?
15    A    Yes.
16    Q    And were those -- and those were the ones
17  that were deleted related to your work at Wisk?
18    A    There were a subset of those, yes, were
19  related to my work at Wisk.
20    Q    Okay.  Were there any -- did you delete
21  any other files or information from that iCloud
22  account that related to your work at Wisk?
23    A    No.
24    Q    Okay, Fastmail, we talked about.
25         Other than the e-mail deletion from

Page 248

1  Fastmail that you saved to a zip file, were there
2  any other files or information that you had deleted
3  from Fastmail that related to your work at Wisk?
4    A    No.
5    Q    Dropbox is the next one.
6    A    Yes.
7    Q    What's currently stored in your Dropbox
8  account?
9    A    Personal, personal documents, financial
10  documents, taxes.
11    Q    Did you delete any information relating to
12  your work at Wisk from your Dropbox account?
13    A    I deleted a single e-mail attachment from
14  that box.
15    Q    And what was the single e-mail attachment?
16    A    It was a -- it was a 2013 critique of the
17  first-generation Zee aircraft that was built in --
18  first built in 2011.
19    Q    And why did you delete that 2013 critique?
20    A    It was around the same time as these other
21  things.  I was panicked and freaking out and scared
22  that Wisk was going to drop a hammer on me with some
23  bullshit story.
24    Q    Okay.  Do we know -- do we have -- is
25  there a way for us to find that 2013 critique to see

Page 249

1  it today?
2    A    I don't know the answer to that.
3    Q    But can you tell us a little bit more
4  about what was in that 2013 critique?
5    A    So, what I'm recalling, I'm recalling from
6  when I first saw it in 2013.  There was some --
7  there was a lot of problems with the
8  first-generation aircraft.  It wasn't transitioning,
9  and it was -- there was some kind of a pitch-up --
10         (Reporter clarification)
11         THE WITNESS:  -- pitch, pitch, like a
12  baseball pitch -- pitch-up behavior in the aircraft
13  during transition, and it was problematic, and this
14  presentation proposed to -- to change the design in
15  some way that I don't recall.
16  BY MR. MACK:
17    Q    And that related to which generation of
18  Zee's aircraft?
19    A    The very first aircraft.
20    Q    Not the Proof of Concept, but the -- the
21  one --
22    A    No.
23    Q    -- after that?
24    A    I think it was the Proof of Concept.
25    Q    It was the Proof of Concept, okay.

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 286

1  patent.  Mark -- mark that.
2              (Exhibit 26 marked)
3         MR. BARSKY:  Thank you.  26?
4         THE REPORTER:  Yes.
5         MR. BARSKY:  Thank you.
6  BY MR. MACK:
7    Q    Do you recognize Exhibit 26, Mr. Furman?
8         MR. GONZALEZ:  '033.
9         THE WITNESS:  Yes, I do.
10  BY MR. MACK:
11   Q    Yeah, this is the '03- -- do you have the
12  '033 patent in front of you, or--?
13   A    I do have the '033 patent in front of me.
14  I do recognize it.
15   Q    If you could turn to Column 1 of this --
16  and let me reask you the question that I asked you
17  before:  What was the problem, in the prior art,
18  that you were trying to solve when you came up with
19  this invention?
20   A    I believe we were trying to avoid the need
21  to have multiple chargers, multiple chargers, you
22  know, one for battery, so this allowed you to have a
23  single charger to --
24              (Reporter clarification)
25         THE WITNESS:  -- allowed you to have a

Page 287

1  single charger that charged multiple -- multiple
2  battery packs.
3  BY MR. MACK:
4    Q    And if you could look in Column 1 of this
5  patents, lines 8 through 14.  Do you see that?
6    A    Column 1 of page 1?
7    Q    Column 1 -- there's column numbers listed
8  on the top, if you flip through a few pages.
9    A    Okay, Column 1.  I'm in Column 1.
10   Q    All right.  Do you see, starting at
11  line 8, through 12?
12   A    The -- starts "New types of aircrafts,"
13  that -- that -- that's the start of the paragraph?
14   Q    Right.  It says, "New types of aircraft
15  are being developed which rely slowly upon battery
16  power."
17   A    Yes.
18   Q         "In some cases, new types of support
19              and/or maintenance systems must also be
20              developed since existing support and/or
21              maintenance systems ([for example],
22              designed for other products) will not work
23              with these new all-electric aircraft."
24              Do you see that?
25   A    I do see that.

Page 288

1    Q    Do you -- do you agree with that
2  statement?
3    A    I -- I say I partially agree with it.
4  Maybe some existing support things.  Like, if we try
5  to adapt something from another industry, wouldn't
6  work, but -- but there are certainly -- it is
7  certainly possible to create systems that -- that
8  create support systems out of existing equipment
9  that could work with all-electric aircraft.
10   Q    Okay, but this patent in particular
11  describes a new multibattery charging station that
12  is designed with an eVTOL aircraft in mind, right?
13   A    I don't see that there's anything eVTOL
14  specific about the -- about the design.
15   Q    Okay.  But when you came up with this
16  design, were you -- you were designing a charging
17  system specifically for eVTOL, right?
18   A    Charging -- as a charging system design
19  for parallel independent batteries, yeah --
20   Q    Okay.
21   A    -- which you might use in eVTOL.
22   Q    All right, can put that away.
23         We'll -- Mr. Furman, when -- on your first
24  week at Archer, you were assigned responsibility for
25  certain engineering tasks within the Jira system,

Page 289

1  correct?
2    A    I don't recall that.
3    Q    Okay.  Do you recall Damien Bardon
4  assigning you to a task for proposing candidate
5  physical architecture for Primary Avionics?
6    A    I do recall that task being assigned to
7  me.  I don't know if it got assigned the first week
8  or not.
9    Q    Okay, and you, in fact, at Archer worked
10  on the candidate physical architectures for Primary
11  Avionics, right?
12   A    Yes.
13   Q    You were also assigned a task select type
14  of redundancy for flight control.  Do you recall
15  that?
16   A    Yes.
17   Q    Okay, and you -- and you worked on that at
18  Archer, right?
19   A    Yes.
20   Q    You were also assigned a task preliminary
21  platform architecture for each subsystem.  Do you
22  recall that?
23   A    I don't, actually.
24   Q    Did you work on the platform architecture
25  for each subsystem at Archer?

HIGHLY CONFIDENTIAL -- ATTORNEYS' EYES ONLY

Page 346

```
 1      A   No.
 2      Q   Bear with me one second, please.
 3          Thank you, Mr. Furman.  I have no more
 4  questions.
 5          MR. MACK:  And nothing from me.  Thank
 6  you.
 7          MR. GONZALEZ:  Okay.  Off the record.
 8          THE VIDEOGRAPHER:  This concludes today's
 9  deposition.  Total number of media used was six.
10  Master media will be held by TSG Reporting.  We are
11  off the record at 5:25 p.m.
12          THE REPORTER:  Mr. Gonzalez, you'd like a
13  transcript?
14          MR. GONZALEZ:  Just a transcript, not the
15  video.  I -- I don't need it need an expedite or
16  nothing like that.
17          (The deposition concluded at 5:25 p.m.)
18                      --oOo--
19
20
21
22
23
24
25
```

Page 347

```
 1              CERTIFICATE OF REPORTER
 2          I, Quyen N. Do, CSR No. 12447, a Certified
 3  Shorthand Reporter, hereby certify that the witness in
 4  the foregoing deposition was, by me, duly sworn to tell
 5  the truth, the whole truth, and nothing but the truth in
 6  the within-entitled cause;
 7          That said deposition was taken down in
 8  shorthand by me, a disinterested person, at the time and
 9  place therein stated, and that the testimony of the said
10  witness was thereafter reduced to typewriting, by
11  computer, under my direction and supervision;
12          That before completion of the deposition,
13  review of the transcript [ ] was [X] was not requested.
14  If requested, any changes made by the deponent (and
15  provided to the agency) during the period allowed are
16  appended hereto.
17          I further certify that I am not of counsel or
18  attorney for either or any of the parties to the said
19  deposition, nor in any way interested in the event of
20  this cause, and that I am not related to any of the
21  parties thereto.
22
23          DATED:  July 26, 2022
24                      Quyen Do
25          Quyen N. Do, CSR No. 12447
```

Page 348

```
 1              J U R A T
 2
 3  I,         , do hereby certify under
 4  penalty of perjury that I have read the foregoing
 5  transcript of my deposition taken on          ;
 6  that I have made such corrections as appear noted
 7  herein in ink, initialed by me; that my testimony as
 8  contained herein, as corrected, is true and correct.
 9
10  DATED this ____ day of _____,2022,
11  at _____,      .
12
13
14
15
16
17  _____
18          SIGNATURE OF WITNESS
19
20
21
22
23
24
25
```

Page 349

```
 1              ERRATA SHEET
 2  Case Name:
 3  Deposition Date:
 4  Deponent:
 5  Pg.  No. Now Reads    Should Read  Reason
 6  ____ ___ _____   _____   _____
 7  ____ ___ _____   _____   _____
 8  ____ ___ _____   _____   _____
 9  ____ ___ _____   _____   _____
10  ____ ___ _____   _____   _____
11  ____ ___ _____   _____   _____
12  ____ ___ _____   _____   _____
13  ____ ___ _____   _____   _____
14  ____ ___ _____   _____   _____
15  ____ ___ _____   _____   _____
16  ____ ___ _____   _____   _____
17  ____ ___ _____   _____   _____
18  ____ ___ _____   _____   _____
19  ____ ___ _____   _____   _____
20                        _____
21                        Signature of Deponent
22  SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2022.
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES:_____
```