# EXHIBIT 9

Confidential - Attorneys' Eyes Only

Page 1

```
 1            UNITED STATES DISTRICT COURT

 2          NORTHERN DISTRICT OF CALIFORNIA

 3               SAN FRANCISCO DIVISION

 4  WISK AERO, LLC,

 5                  Plaintiff,
    vs.                            NO:  3:21-cv-02450-WHO
 6
    ARCHER AVIATION, INC.,
 7
                    Defendant.
 8
    _____/
 9

10

11

12      ** CONFIDENTIAL - ATTORNEYS' EYES ONLY **

13      VIDEOTAPED DEPOSITION OF ADAM GOLDSTEIN

14             Friday, November 18, 2022

15             Volume I - Pages 1 to 312

16

17

18

19

20

21

22

23  Reported By:

24  LINDA VACCAREZZA, RPR, CLR, CRP, CSR. NO. 10201

25  JOB NO. 219800
```

## Page 2

November 18, 2022
9:00 a.m.

Videotaped Deposition of ADAM GOLDSTEIN, held at Gibson, Dunn and Crutcher, 1881 Page Mill Road, Palo Alto, California, pursuant to Notice, before Linda Vaccarezza, a Certified Shorthand Reporter of the State of California.

## Page 3

A P P E A R A N C E S:

    Quinn Emanuel Urquhart & Sullivan
    Attorneys for Plaintiff
        865 S. Figueroa Street
        Los Angeles, CA 90017
    BY: Patrick Schmidt, Esq.
        Yury Kapgan, Esq.
        Rafe Andrews, Esq.
        Jeff Nardinelli, Esq.

    Gibson, Dunn & Crutcher
    Attorney for the Defendant
        200 Park Avenue
        New York, NY 10166
    BY: Daniel Thomasch, Esq.
        Kim Do, Esq.
        Diana Feinstein, Esq.
        Sara Williams, Esq.

Also Present: ANY MISSAN

Videographer: Marcus Majors

## Page 4

THE VIDEOGRAPHER: Good morning. This is the start of Media labeled Number 1 of the video recorded deposition of Adam Goldstein in the matter of Wisk Aero LLC versus Archer Aviation, Inc. in the United States District Court, Northern District of California, San Francisco Division. Case number 3:21-CV-02450-WHO. This deposition is being held at Gibson Dunn, 1881 Page Mill Road, Palo Alto, California on November 18th, 2022 at approximately 9:55 a.m.

My name is Mark Major. I'm the legal videographer from TSG Reporting, Inc. Today's court reporter is Linda Vaccarezza in association with TSG Reporting. Will all counsel present please introduce themselves including those joining Zoom.

MR. KAPGAN: Good morning. Yury Kapgan of Quinn Emanuel on behalf of the plaintiff Wisk Aero. And with me are my colleagues Jeff Nardinelli, Patrick Schmidt and Rafe Andrews.

MR. BARSKY: Good morning. Wayne Barsky of Gibson Dunn on behalf of Archer Aviation. And with me from Gibson Dunn is my colleague Diana Feinstein as well as Andy Missan from Archer and Eric Lentell, also of Archer.

## Page 5

ADAM GOLDSTEIN,
Having been duly sworn by the Certified Shorthand Reporter, was examined and testified as follows:

EXAMINATION

BY MR. KAPGAN:
    Q.    Good morning, Mr. Goldstein.
    A.    Good morning.
    Q.    My name is Yury Kapgan and I'm going to be one of the attorneys asking you questions today. Would you mind stating your full name and address for the record?
    A.    Adam Goldstein. Address where I live, you're asking?
    Q.    Yes, please.
    Q.    And you understand that you're under oath here to tell the truth, the whole truth and nothing but the truth?
    A.    I do.
    Q.    Is there any reason that you can't give full and complete and accurate testimony here today in response to my questions?
    A.    There's no reason.
    Q.    Have you ever been deposed before?

Confidential - Attorneys' Eyes Only

Page 202

1  at Archer been disciplined in any way as a result
2  of having retained Wisk information on any devices?
3       MR. BARSKY:  Objection.  Assumes facts not
4  in evidence.
5       THE WITNESS:  To date, I have not seen any
6  evidence that anyone at Archer has ever used or
7  relied on any Wisk information.  As it relates to
8  Scott Furman, I believe we detailed it out in a
9  letter that was given to the other side.  And Scott
10 Furman did have a penalty assessed to him where he
11 lost his annual bonus.
12 BY MR. SCHMIDT:
13      Q.   Other than the penalty to Mr. Furman, have
14 there been any other disciplinary or remedial
15 actions taken against former Wisk employees as a
16 result of them retaining Wisk information on any
17 devices?
18      MR. BARSKY:  Objection.  Assumes facts not
19 in evidence.  You may answer.
20      THE WITNESS:  There have been no actions
21 taken against other employees for -- there have
22 been no actions taken against any other employees.
23 BY MR. SCHMIDT:
24      Q.   Are you aware that in this case, Wisk
25 requested a forensic examination of certain of the

Page 203

1  employees' personal devices?
2       A.   Yes.  I'm aware that Wisk asked for
3  examination of personal devices.
4       Q.   Did you urge the former Wisk employees now
5  at Archer to provide those devices to Wisk so that
6  it could uncover forensic evidence confirming the
7  non-use of the information?
8       MR. BARSKY:  Objection.  Calls for
9  attorney-client privilege.  If you have any
10 information on that subject that goes beyond
11 communications you've had with company counsel, you
12 can answer the question.
13      THE WITNESS:  Can you repeat the question?
14 BY MR. SCHMIDT:
15      Q.   Did you, Mr. Goldstein, as CEO of Archer,
16 urge those former Wisk employees now at Archer to
17 turn over their devices so that Wisk could discover
18 forensic information that would confirm non-use of
19 the confidential information?
20      MR. BARSKY:  If you have any
21 non-privileged information on that subject, you can
22 respond, Mr. Goldstein.  Otherwise, you should tell
23 Mr. Schmidt that you're unable to answer it.
24      THE WITNESS:  The only communications I've
25 had on that have been with my counsel.

Page 204

1  BY MR. SCHMIDT:
2       Q.   So you've had no communication with former
3  Wisk employees urging them to turn those devices
4  over to Wisk for that forensic examination,
5  correct?
6       MR. BARSKY:  Asked and answered.
7       THE WITNESS:  The only communications I've
8  had have been with my legal counsel.
9       MR. SCHMIDT:  Okay.  Can we take a short
10 break at this time?  I believe that finishes my
11 questions.  So I'm going to turn you over to
12 Mr. Kapgan at this time.  But I just want to
13 confirm.
14      MR. BARSKY:  Okay.
15      THE VIDEOGRAPHER:  This marks the end of
16 Media File labeled Number 6, off the record at
17 3:53 p.m.
18      (Recess taken from 3:53 p.m. to 4:07 p.m.)
19      THE VIDEOGRAPHER:  This marks the
20 beginning of Media File labeled Number 7.  Back on
21 the record at 4:07 p.m.
22           FURTHER EXAMINATION
23 BY MR. KAPGAN:
24      Q.   So I thought I would just follow up on the
25 last topic that Mr. Schmidt discussed with you.

Page 205

1           You understand that you're designated on
2  topics related to Archer's policies and practices
3  regarding violations of its document retention
4  orders.
5           Does that sound familiar?
6       A.   Yes.
7       Q.   Topic 3 in the chart.  Take the chart out.
8  You can take a look.
9       A.   Yes, I see that.
10      Q.   And you're also designated on Topic 10
11 related to the identity of, use and reliance on the
12 documents that were authored or created by Wisk
13 that were found in the possession, custody and
14 control of Archer or any of its current or former
15 employees, right?
16      A.   Yes, I understand that.
17      Q.   And then Topic 13 relates to disciplinary
18 or remedial measures you've taken with respect to
19 any former Wisk employee relating to the issues or
20 allegation in this action, right?
21      A.   Yes, I see that.
22      Q.   And you're also designated on Topic 27
23 that relates to Archer's response to learning that
24 one or more of its employees retained or possessed
25 or failed to delete documents containing

Page 206

1  information that originated from Wisk and any
2  communications between Archer and the employees
3  regarding such documents, right?
4      A.   Yes.  I understand that.
5      Q.   Now, you mentioned that you learned or
6  Archer learned that Mr. Furman had retained certain
7  Wisk documents after leaving Wisk to go work at
8  Archer, correct?
9           MR. BARSKY:  Objection.  That misstates
10 the evidence and it assumes facts not in evidence.
11 You may testify.
12          THE WITNESS:  My understanding is that we
13 provided a letter to the other side that details
14 the entirety of what took place with Mr. Furman.
15 And it's all can be found in there.
16 BY MR. KAPGAN:
17     Q.   Do you have an understanding sitting here
18 today, one way or another, whether Mr. Furman
19 retained confidential Wisk information after he
20 began work at Archer?
21     A.   As I stated, there's a letter that's been
22 sent over that details the entire thing.  And any
23 of the discussions I've had have only been with my
24 counsel.
25     Q.   And I'm not asking you to reveal any

Page 207

1  conversations with your counsel.  All I'm asking
2  here:  You're designated on the topics that we just
3  mentioned as the corporate representative for
4  Archer, correct?
5      A.   Yes.
6      Q.   And I am just asking:  Do you have an
7  understanding one way or another whether
8  Mr. Furman retained confidential Wisk information
9  when he started his employment at Archer?
10          MR. BARSKY:  That's same objections.  And
11 now it's asked and answered, Yury.  Exact question
12 was asked and answered.
13 BY MR. KAPGAN:
14     Q.   Do you have an understanding one way or
15 the other, sir, yes or no?
16          MR. BARSKY:  Asked and answered.
17          THE WITNESS:  I'm not sure what else I can
18 provide there.  I'm saying we provided a letter
19 detailing it.  So you know everything we know.  And
20 anything else besides that, I've only had
21 discussions with my counsel.
22 BY MR. KAPGAN:
23     Q.   Okay.  Can you tell me which employees
24 you're aware of retained Wisk confidential
25 information after leaving Wisk to go work at

Page 208

1  Archer?
2           MR. BARSKY:  Objection.  Assumes facts not
3  in evidence.
4           THE WITNESS:  My understanding that there
5  is an interrogatory that details out information of
6  any documents that were retained or in some way
7  found and that's been shown to the other side and
8  listed.
9           MR. KAPGAN:  Rafe, can you bring out Tab
10 171.  We'll mark the next exhibit.  I'm not sure
11 what exhibit number we are on now.
12          MR. BARSKY:  It's 17, Yury.
13          MR. KAPGAN:  Thank you.
14          (Exhibit 17 was marked for
15 identification.)
16 BY MR. KAPGAN:
17     Q.   This is a document Bates number
18 Archer_NDCA-00895593.
19          And my question, Mr. Goldstein, is just
20 going to be whether you recognize this document,
21 now that you've had a chance to read it?
22          MR. BARSKY:  Take a moment to read it,
23 please, Mr. Goldstein.
24          THE WITNESS:  Okay.  I see the document.
25 BY MR. KAPGAN:

Page 209

1      Q.   Do you see that this is an e-mail chain
2  that begins with an e-mail sent by Arturo Gonzales
3  at Morrison & Foerster on April 6th, 2021?
4      A.   Yes.  I see that.
5      Q.   And in April of 2031, do you have an
6  understanding that Morrison & Foerster was
7  representing Archer?
8      A.   Yes, that's my understanding.
9      Q.   And Mr. Gonzales is sending this e-mail to
10 two attorneys with the Department of Justice,
11 Benjamin Kingsley and Helen Gilbert, correct?
12     A.   Yes, that's my understanding.
13     Q.   Is it your understanding at this time that
14 Mr. Gonzales was communicating with the DOJ on
15 behalf of Archer?
16     A.   My understanding that Arturo Gonzales
17 reached out to the DOJ on behalf of Archer.
18     Q.   And it directs your attention to the last
19 extension of the e-mail.  Mr. Gonzales writes, "As
20 referenced in the release, out of an abundance of
21 caution, we have placed Jing Xue not named in our
22 statement on paid administrative leave and he no
23 longer has access to our facilities or computers."
24          Do you see that?
25     A.   I see that.

Confidential - Attorneys' Eyes Only

Page 218

1 not -- I do not know the details of that one.
2     Q.    But do you know that Archer asked him not
3 to assert his Fifth Amendment right with respect to
4 the recent deposition this week; is that right?
5     A.    It's my understanding that Tasha Perkins
6 sent him an e-mail on behalf of the company asking
7 him to tell the truth.
8     Q.    Do you have an understanding of whether
9 Archer took any disciplinary action against Mr. Xue
10 after he asserted his Fifth Amendment rights in
11 deposition?
12    A.    I have not connected with my counsel about
13 that.  And the plan is to connect with them to
14 understand what even happened at the deposition and
15 then to make a judgment and make an assessment from
16 there.
17    Q.    At this point, there's been no
18 disciplinary action taken with respect to Mr. Xue
19 as a result of his testimony this week; is that
20 right?
21    A.    It is my understanding that nothing has --
22 there has been no additional disciplinary action.
23 But I have not had a chance to review that with any
24 of my counsel, in-house team, outside counsel.  And
25 so I don't have anything else I can add to that.

Page 219

1     Q.    Do you have an understanding of the
2 circumstances or any circumstances under which
3 Archer would take disciplinary action, further
4 disciplinary action against Mr. Xue?
5           MR. BARSKY:  Calls for speculation.
6           THE WITNESS:  I don't know how to
7 speculate.  I would just be speculating.  I would
8 want to fully understand the situation before I
9 made any judgments there.
10          MR. KAPGAN:  Rafe, can we go to Tab 151.
11          (Exhibit 19 was marked for
12 identification.)
13          MR. BARSKY:  Take a moment and read
14 through this, please.
15          THE WITNESS:  Okay.
16 BY MR. KAPGAN:
17    Q.    This is a letter from Gibson Dunn dated
18 March 3rd, 2022 to Judge Ryu, correct?
19    A.    Yes.  This is a letter dated March 3rd
20 2022 to Judge Ryu.
21    Q.    Is this one of the documents you were
22 referring to earlier that talked about Mr. Furman?
23    A.    No.
24    Q.    Have you seen this document before?
25    A.    No.

Page 220

1     Q.    You don't recognize it?
2     A.    I do not.
3     Q.    I'll direct your attention to the second
4 paragraph.  It starts with, "In the joint letter
5 brief of December 23rd, 2021, Archer stated the
6 following:  'Unlike the personal devices of these
7 employees, there is no evidence, none, that any
8 confidential Wisk documents made their way onto
9 Archer's systems including the Archer devices of
10 which Wisk seeks forensic examination.'"
11          Do you see that?
12    A.    I see that.
13    Q.    Do you remember Archer making that
14 statement in a filing with the court?
15    A.    No, I don't recall that.  I do recall the
16 general sense of the belief that there has not been
17 any confidential information of Wisk set on Archer
18 systems.  But I don't recall that exact statement.
19    Q.    You don't have any reason to dispute that
20 Archer made that statement though, right?
21    A.    I do not have any reason to dispute that.
22    Q.    And then it says, "That statement was true
23 at the time as to 'Archer systems' and remains true
24 true as to 'Archer systems.'  But Archer discovered
25 in the past few days that this was an oversight in

Page 221

1 its review of the image taken of a laptop computer
2 that Archer issued to Scott Furman, one of the
3 employees whose Archer-issued devices Wisk is
4 seeking to forensically inspect."
5           Do you see that?
6     A.    I see that.
7     Q.    And it says, "The image indicates that
8 Wisk-related materials are in fact located on that
9 device.  As noted below, those documents have now
10 been produced to Wisk."
11          Do you see that?
12    A.    I see that.
13    Q.    Based on reading this, do you have an
14 understanding that Archer discovered that Scott
15 Furman in fact had Wisk-related materials on an
16 Archer-issued device after he began working at
17 Archer?
18    A.    I believe we detailed that out in a letter
19 that we sent to you.  It was in the May time frame
20 from Gibson Dunn to you guys.  It was all detailed
21 out.  So everything we knew, you would know.  And
22 my understanding is that Scott didn't even know
23 that there was anything on there.  And so we were
24 trying to be open about the whole thing.  That's
25 all written in the letter.

Confidential - Attorneys' Eyes Only

Page 222

1   Q.   Well, putting aside whatever you say is in
2   the May letter and focus on this March letter right
3   now.  Okay.
4   A.   Okay.
5   Q.   So my question is:  Based on reading this
6   letter, do you have an understanding that
7   Mr. Furman in fact retained Wisk-related materials
8   on an Archer-issued device after he began work at
9   Archer?
10       MR. BARSKY:  Objection.  Assumes facts not
11  in evidence.  And it's argumentative in the use of
12  the word "retained."  You can answer the question.
13       THE WITNESS:  Again, I don't know how to
14  say it any differently from the entire Scott
15  Furman situation was reviewed in that letter and
16  that was all -- all that we knew was in there.  And
17  we can refer to that letter to walk through it.
18  I'm not sure what else I can add.  The other
19  conversations I've even had about that about Scott
20  Furman had been with my counsel.
21  BY MR. KAPGAN:
22  Q.   Now, you understand this is a letter from
23  your counsel, correct?
24  A.   Yes.
25  Q.   And one of the sentences that I read here

Page 223

1   says, "The image," referring to the image taken of
2   a laptop computer that Archer issued to Scott
3   Furman.  "The image indicates that Wisk-related
4   materials are in fact located on that device."
5        Do you see that?
6   A.   Which sentence was that?
7        MR. BARSKY:  The last sentence.
8        THE WITNESS:  Okay.  "The image
9   indicates."
10       I see that sentence.
11  BY MR. KAPGAN:
12  Q.   You're not disputing that there was an
13  image taken of a laptop computer that Archer issued
14  to Scott Furman which had Wisk-related materials
15  located on that device, correct?
16  A.   I'm not disputing there was an image that
17  Wisk-related materials are -- that indicates
18  there's Wisk-related material on a device that is
19  stated in this letter.
20  Q.   And that device was a laptop computer that
21  Archer issued to Scott Furman as indicated in this
22  letter, correct?
23  A.   It appears that it's referring to --
24  again, I haven't seen this letter before.  But it
25  appears that it's referring to a computer that was

Page 224

1   issued to Scott Furman.  Archer computer issued to
2   Scott Furman.
3   Q.   Are you aware one way or the other that
4   Mr. Furman testified in his deposition that he
5   saved Wisk e-mails in a ZIP file on his
6   Archer-issued laptop?
7   A.   The only discussions I've had with
8   Mr. Furman beyond what I've told you in that
9   letter, I've only had with my counsel.
10  Q.   So you can't tell me one way or the other
11  whether you have an awareness of whether
12  Mr. Furman testified in deposition that he saved
13  Wisk e-mails in a ZIP file on his Archer-issued
14  laptop, correct?
15       MR. BARSKY:  He's already said, Counsel.
16  He said the only information he has comes from
17  discussions with counsel.
18       MR. KAPGAN:  Wayne, I appreciate.  Let the
19  witness testify, please.
20       MR. BARSKY:  Well, try not misstating what
21  he has already testified.
22       THE WITNESS:  As I previously have stated
23  the only information that I have that goes beyond
24  that letter is just from conversations I've had
25  with my counsel.

Page 225

1   BY MR. KAPGAN:
2   Q.   With respect to the laptop that's being
3   referenced in this March 3rd letter, do you know
4   whether anyone other than Mr. Furman, anyone at
5   Archer accessed that laptop or reviewed it in any
6   way?
7   A.   Again, the only conversations I've ever
8   had about Scott Furman that go beyond that letter
9   have been with counsel.
10       MR. KAPGAN:  All right.  Rafe, let's go to
11  Tab 51.
12       This is going to be an excerpt of
13  interrogatory response.  We'll mark this as Exhibit
14  20.
15       (Exhibit 20 was marked for
16  identification.)
17  BY MR. KAPGAN:
18  Q.   Is this the interrogatory response,
19  Mr. Goldstein, that you were referencing earlier in
20  Interrogatory Number 1?
21       MR. BARSKY:  Take a moment and look
22  through it, Mr. Goldstein.
23       THE WITNESS:  Okay.  I've reviewed the
24  document.
25  BY MR. KAPGAN:

Page 230
1  or control that were created by Wisk, its employees
2  or agents?
3      A.   I have a high level understanding that
4  these -- from what I can read on Page 14 and
5  understanding there are a bunch of appendices with
6  a bunch of numbers next to them and a high level
7  understanding that those are supposed to represent
8  documents.  But this is kind of a complicated
9  technical document.  That's my high level
10 understanding of this.
11     Q.   Do you have any understanding, sitting
12 here today as Archer's representative, to why
13 Archer had in its possession, custody or control
14 all of the documents that are identified in
15 Appendices A through E?
16     A.   It's my understanding that every employee
17 that came over to Archer went through a very
18 extensive process to remove any type of documents,
19 whether confidential or not, from previous
20 employees.  They went through a very thorough
21 process to do that.  We hired counsel to help them
22 do that.
23          And after years of working at companies,
24 it's very hard to get every single document.  And
25 maybe they missed some here or there.  It's my

Page 231
1  understanding, looking at the list of what these
2  things are, I look at some of the examples where
3  they say "draft VISA application" or something that
4  could be found publicly, a leave of absence or --
5  they all look -- none of these look like they have
6  anything to do with any confidential information.
7          So it is not surprising to me that there
8  would be some documents missed over people working
9  very long periods of time at a company; that they
10 tried to get rid of everything they could and there
11 might be some stuff that got missed here or there.
12     Q.   It's not your testimony that all documents
13 that are listed here are not confidential
14 information of Wisk, is it?
15     A.   As you just stated, there's -- I can only
16 see some of the ones that are listed out here.
17 There's other documents that just correspond to
18 numbers which I can't see.  But just looking
19 through this list, I can look at them one at a
20 time.
21          But they do not appear to be anything
22 outside of information related to either
23 immigration or items that could be related to W-2s
24 or items that could be found in the public domain
25 like a LinkedIn post.  Or somebody's personal

Page 232
1  payroll stub.  Or I'm just -- that kind of thing.
2  Stuff that's from a publicly available video.
3      Q.   I apologize.  How about photographs of
4  plane wiring as indicated on Page 12, Line 11?  Do
5  you know whether that was confidential information
6  of Wisk or not?
7      A.   Can you repeat the question?
8      Q.   Do you know whether photographs of plane
9  wiring constitute confidential Wisk information?
10 Do you know one way or the other?
11     A.   Again, my understanding is all of the
12 stuff that relates to Scott Furman was laid out in
13 that letter and that's the only stuff that was my
14 understanding of things that he had of any
15 importance.
16          MR. BARSKY:  I'll just add, there's no
17 foundation for you to ask this witness whether a
18 bullet point item listed in this interrogatory
19 response is confidential to Wisk or not
20 confidential to Wisk.
21 BY MR. KAPGAN:
22     Q.   Do you know what Archer has done with the
23 documents that are listed in Appendices A through E
24 here?
25     A.   Do I know what Archer has done with the

Page 233
1  documents?  It was my understanding that --
2          MR. BARSKY:  Objection.  Document speaks
3  for itself.  You can answer.
4          THE WITNESS:  I mean, I don't know.  The
5  stuff seems like it was all laid out here.  And all
6  the stuff that seems to be produced here seems to
7  be stuff that's related to people's -- I don't know
8  if I would call it personal items, but non-
9  confidential information and things that are
10 publicly available.
11 BY MR. KAPGAN:
12     Q.   Sir, let's be clear here.  Appendices A
13 through E have hundreds of documents of which you
14 do not know the content, correct?
15     A.   Correct.
16     Q.   All right.  So you don't know whether the
17 documents that are identified, Appendices A through
18 E, whether all or none of them are confidential to
19 Wisk, correct?
20          MR. BARSKY:  Objection.  Misstates the
21 witness's testimony.
22          THE WITNESS:  Can you repeat the question?
23 BY MR. KAPGAN:
24     Q.   Let me ask it differently.  Do you --
25 sitting here today, can you tell me whether any of

Page 242

1  letter that you just showed Mr. Goldstein to
2  Ms. Cafferata from my colleague Diana Feinstein.
3         And that is the information that the
4  witness has with respect to Mr. Furman that he
5  referred to earlier. And that what he has said, I
6  think pretty clearly, is that everything else
7  that's not in that correspondence is -- only comes
8  -- only other source of information is
9  communications with counsel.
10 BY MR. KAPGAN:
11    Q.   If you take a look at Exhibit 21 on the
12 second page in the paragraph in the middle, it
13 refers to Mr. Furman's deletion of certain Wisk
14 materials on or about March 1, 2022.
15        Do you see that?
16    A.   I see that.
17    Q.   What's your understanding of who
18 Mr. Furman told about those deletions?
19    A.   Again, anything else that's not mentioned
20 in the letter, the only conversations I've had
21 about this have only been with counsel.
22    Q.   You understand that Mr. Furman was
23 disciplined by making him ineligible for a bonus,
24 correct?
25    A.   That is correct.

Page 243

1     Q.   Was that the only discipline that was
2  imposed upon Mr. Furman for his conduct in
3  retaining and/or deleting Wisk materials?
4     A.   That is my understanding.  My
5  understanding is that he was disciplined by losing
6  his annual bonus.
7     Q.   Given that Mr. Xue was placed on paid
8  administrative leave because of allegations about
9  his use or retention of Wisk confidential
10 information, do you have an understanding as to why
11 Archer did not place Mr. Furman on paid
12 administrative leave when it found that he had
13 retained and/or deleted Wisk confidential
14 materials?
15        MR. BARSKY:  Objection.  It's
16 argumentative and it misstates the witness's
17 testimony.  You can answer.
18        THE WITNESS:  Can you restate the
19 question?
20 BY MR. KAPGAN:
21    Q.   Given that Archer placed Jing Xue on
22 administrative leave after hearing the allegations
23 about his retention or use of Wisk confidential
24 information, do you have an understanding as to why
25 Archer did not place Mr. Furman on administrative

Page 244

1  leave after learning that he retained and/or
2  deleted Wisk materials?
3         MR. BARSKY:  Objection.  It's
4  argumentative and it misstates the evidence.  You
5  may answer.
6         THE WITNESS:  It is my understanding that
7  after the action was taken or after the situation
8  unfolded with Mr. Furman, I met with my legal
9  counsel and we decided that a disciplinary action
10 should take place.  And we thought that removing a
11 person's annual bonus, which was a big part of how
12 people live in Silicon Valley, that was a harsh
13 penalty and we decided to take that action and
14 that's what we did.
15        MR. KAPGAN:  Can we show Tab 173?
16        (Exhibit 22 was marked for
17 identification.)
18        THE WITNESS:  Okay.  I see the document.
19 BY MR. KAPGAN:
20    Q.   This is a letter written by Mr. Furman's
21 attorneys at Morrison Foerster correct?
22    A.   Yes, that's correct.
23    Q.   Have you seen this document before?
24    A.   I have not.
25    Q.   The letter states that on or around

Page 245

1  January 13th, 2022, Mr. Furman deleted certain
2  Wisk-related documents from his personal
3  accounts/devices.
4         Do you see that?
5     A.   I see that.
6     Q.   Is that consistent with your
7  understanding?
8     A.   Again, my understanding is is everything
9  that's been laid out in the letter from May 3rd.  I
10 would have to go back and reread the letter again
11 from May 3rd.  But I don't know the exact date when
12 they -- is when these deleted items happened.  This
13 is the first time I've seen this letter before.
14    Q.   At any time after this lawsuit was filed,
15 did Archer tell its employees not to delete Wisk
16 documents that were saved on their personal devices
17 to your knowledge?
18    A.   After the lawsuit was filed, we put out
19 a -- an e-mail, a notice to the employees that
20 there would be a litigation hold in place and to
21 not destroy any documents or delete any documents.
22    Q.   And not to delete any Wisk documents
23 specifically?
24    A.   I don't recall if it was Wisk=specific.  I
25 thought it was more broad than that.  But I don't

Confidential - Attorneys' Eyes Only

Page 302

1  A.  I don't know who vetted Tom's section.  I
2  know who vetted my section.
3  Q.  Who was that?
4  A.  My legal counsel.
5  Q.  Do you have an understanding that the --
6  that Mr. Muniz in making statements during earnings
7  call made every attempt to be truthful and accurate
8  in his statements?
9  A.  I do believe he did that.
10 Q.  So when I ask you about whether the
11 statements here are accurate, you wouldn't have any
12 reason to doubt the accuracy of those statements,
13 would you?
14 A.  I don't have any reason to believe that
15 any statements that Tom Muniz has given would be
16 inaccurate.  I gave you my opinion of the statement
17 that was given.
18 Q.  Okay.  And then do you see the next
19 paragraph?  It says, if you look at the second
20 --well, we'll start at the first sentence.
21     "As Adam outlined earlier, our strategy
22 from day one has been to take the most capital and
23 time efficient path in developing, certifying and
24 commercializing our eVTOL aircraft."
25     Do you see that?

Page 303

1  A.  I see that.
2  Q.  And then he said, "The key aspect of the
3  strategy has been to focus our internal development
4  efforts on the key technical enablers like the
5  batteries, the motors and flight control software."
6     Do you see that?
7  A.  I see that.
8  Q.  Do you agree with that statement?
9  A.  I think what he's saying is that the stuff
10 that we are building in-house are the battery
11 systems, the motors and the flight control.  I
12 think that's what he's saying.  And then we
13 vertically integrate everything else.
14 Q.  And do you agree with his statement?
15 A.  Let's read it one more time.  I agree with
16 the first sentence.  Yes, I agree with that.  I'm
17 on the second sentence.  When he says like the
18 batteries.  We are not creating the battery cell.
19 I assume he's referring to the battery system.
20     And those are -- I agree that, yes.  It's
21 been key for us to focus on -- our internal
22 developments on just those three things.  So if
23 that's what he means by that, then yes, I agree
24 with that.  And largely, I agree with the
25 statement.

Page 304

1  Q.  In other words, one of Archer's strategies
2  was to focus internal development efforts on key
3  technical enablers like the battery system and the
4  motors and flight control software.  Is that how
5  you read that?
6  A.  I read that, yes.  Archer's strategy has
7  been to focus on internal developments.  Archer's
8  strategy has been to focus our internal
9  developments on those three systems.
10     MR. KAPGAN:  Why don't we break for today.
11 I'll let you go really early and we'll continue
12 this deposition tomorrow.
13     MR. BARSKY:  Yury, I know you need to go
14 back and review your notes.  But just shoot from
15 the hip.  We won't hold you to it.  But guesstimate
16 for tomorrow?
17     MS. FEINSTEIN:  Do you want to be on the
18 record, Wayne?
19     MR. KAPGAN:  Gosh, Wayne.  Can we go off
20 the record?
21     MR. BARSKY:  Sure.
22     THE VIDEOGRAPHER:  This concludes day one
23 of today's deposition of Adam Goldstein on November
24 18th, 2022.  The original media will remain in the
25 custody of TSG Reporting, Inc.  Off the record at

Page 305

1  6:55 p.m.
2     (Time noted:  6:55 p.m.)
3
4
5
6     _____
7        ADAM GOLDSTEIN
8     Subscribed and sworn to before me
9
10    This       day of         2022.
11
12    _____

Page 306

```
 1           C E R T I F I C A T E
 2    STATE OF CALIFORNIA   )
 3    COUNTY OF SAN FRANCISCO )
 4
 5    I, LINDA VACCAREZZA, a Certified Shorthand
 6    Reporter for the State of California, do
 7    hereby certify that ADAM GOLDSTEIN, the
 8    witness whose deposition is hereinbefore set
 9    forth, was duly sworn by me and that such
10    deposition is a true record of the testimony
11    given by such witness.
12    I further certify that I am not related to
13    any of the parties to this action by blood or
14    marriage; and that I am in no way interested
15    in the outcome of this matter.
16
17    IN WITNESS WHEREOF, I have hereunto set my
18    hand this 22nd day of November 2022.
19
20            _____
21             LINDA VACCAREZZA, CSR. NO. 10201
```

Page 307

```
 1    -------------I N D E X---------------
 2    EXAMINATION                          PAGE
 3        BY MR. KAPGAN.........................5
 4        BY MR. NARDINELLI.....................12
 5        BY MR. SCHMIDT........................66
 6    --------------EXHIBITS----------------
 7    Exhibit 1
 8        Plaintiff Wisk Aero LLC's Notice of Rule
 9        30(b)(6) Deposition of Defendant Archer
10        Aviation, Inc..........................6
11    Exhibit 2
12        Summary of Archer's Responses to Wisk's
13        30(b0(6) Notice and Designees..........6
14    Exhibit 3
15        Document: "Midnight Planning, December
16        2020," Bates stamped Archer-NDCA-00117190
17        Through Archer-NDCA-00117227...........20
18    Exhibit 4
19        Archer Demonstrator CONOPS, Bates stamped
20        Archer-NCDA-00609844 through Archer-NCDA-
21        00609854...............................23
22    Exhibit 5
23        Document, Bates stamped Archer-NCDA-
24        00215167 through Archer-NCDA-00215229..29
```

Page 308

```
 1    EXHIBITS (CONT'D)
 2    Exhibit 6
 3        Document, Bates stamped Archer-NDCA-
 4        00009865 (Produced Natively)...........35
 5    Exhibit 7
 6        Archer Purchase Agreement dated January
 7        29, 2021, Bates stamped Archer-NCDA-
 8        00007462 through Archer-NCDA-00007502..52
 9    Exhibit 8
10        Collaboration Agreement, Bates stamped
11        Archer-NDCA-00007503 through Archer-NDCA-
12        00007525...............................52
13    Exhibit 9
14        Document, Bates stamped Archer-NDCA-
15        00014589 (Produced Natively)...........87
16    Exhibit 10
17        Flighthouse Engineering Authorization,
18        Bates stamped FH 000018 through FH
19        000022................................107
20    Exhibit 11
21        Email from Calder Hughes dated October 18,
22        2019, Bates stamped Archer-NDCA-
23        00190011..............................118
```

Page 309

```
 1    EXHIBITS (CONT'D)
 2    Exhibit 12
 3        Email from Geoffrey Bower dated October
 4        10, 2019, Bates stamped GB-000044......122
 5    Exhibit 13
 6        Flighthouse Engineering ARcher Technical
 7        Exchange, Bates stamped FH 008476 through
 8        FH 008819.............................132
 9    Exhibit 14
10        Email from Brett Adcock dated December, 2
11        2019, Bates stamped TM-000008..........149
12    Exhibit 15
13        Email from Brett Adcock dated November 10,
14        2019, Bates stamped Archer-NDCA-
15        00190256..............................179
16    Exhibit 16
17        Document, Bates stamped Archer-NDCA-
18        00072437 (Produced Natively)..........189
19    Exhibit 17
20        Email from Arturo Gonzalez dated April 6
21        2021, Bates stamped Archer-NDCA-
22        00895593..............................208
```