QUINN EMANUEL URQUHART & SULLIVAN, LLP
Yury Kapgan (Bar No. 218366)
  yurykapgan@quinnemanuel.com
Robert M. Schwartz (Bar No. 117166)
  robertschwartz@quinnemanuel.com
Diane Cafferata (Bar No. 190081)
  dianecafferata@quinnemanuel.com
Patrick Schmidt (Bar No. 274777)
  patrickschmidt@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone:     (213) 443-3000
Facsimile:     (213) 443-3100

Michael F. LaFond (Bar No. 303131)
  michaellafond@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone:     (650) 801-5000
Facsimile:     (650) 801-5100

Attorneys for Plaintiff Wisk Aero LLC

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| WISK AERO LLC, | Case No.  3:21-cv-02450-WHO |
|---|---|
| Plaintiff, | **WISK'S NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ON ARCHER'S STATE LAW COUNTERCLAIMS AND WISK'S '036 PATENT CLAIM** |
| vs. | |
| ARCHER AVIATION INC., | Hon. William H. Orrick |
| Defendant. | Hearing Date: May 12, 2023<br>Hearing Time: 3:00 p.m. |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE THAT** that on May 12, 2023 at 3:00 p.m., or as soon thereafter as this matter may be heard before the Honorable William H. Orrick, via videoconference, in Courtroom 2 of the United States District Court for the Northern District of California in the San Francisco Courthouse, 450 Golden Gate Avenue, San Francisco, California, 94102, Plaintiff and Counterclaim Defendant Wisk Aero LLC shall, and hereby does, move this Court, pursuant to Federal Rule of Civil Procedure 56, for an order granting summary judgment in favor of Wisk in the following respects:

*First*, Wisk moves for summary judgment on Counter-Claimant Archer Aviation Inc.'s first through fourth counterclaims (for interference with contractual relations, interference with prospective economic advantage, defamation, and unfair competition under California Business & Professions Code Section 17200). Alternatively, Wisk moves for partial summary judgment in its favor as to any claim for relief, liability issue, or damages issue, including the type and scope of available damages, to which Archer fails to meet its burden of creating a triable issue of fact.

Summary judgment—or, alternatively, partial summary judgment—for Wisk is proper on these state law claims because Archer cannot prove every essential element of them, and each claim fails as a matter of law:

1. As to Archer's defamation and interference claims, Archer cannot establish the elements of causation and damages that are attributable to Wisk's statements or to Wisk's unlawful conduct.

2. Archer's claims fail because it is based on privileged contact with the media.

3. Archer's defamation claim fails for additional, independent grounds:

   a. The allegedly defamatory statements are protected opinion,

   b. The statement concerning a criminal investigation is substantially true, and

   c. Archer cannot establish, let alone by clear and convincing evidence, that Wisk made the allegedly defamatory statements with knowledge that the statements were false or were made with reckless disregard of their truth (*i.e.*, constitutional malice).

1        4.      Because Archer's defamation claim fails, its interference claims, which are

2               based on the same constitutionally-protected speech, also fail.

3        5.    Archer's unfair competition counterclaim fails also because:

4            a.      Having incurred no economic harm, Archer has no standing to pursue an

5               unfair competition claim against its competitor, Wisk; and

6            b.      Archer is unable to prove each of the unlawful, unfair, and fraudulent

7               prongs.

8        ***Second***, Wisk moves for summary judgment that claim 2 of U.S. Patent No. 10,364,036

9    (the "'036 Patent") has been infringed by Archer and that claim 2 is not invalid.

10       1.    Summary judgment for Wisk is proper on infringement because the accused Archer

11              aircraft contained all the limitations of claim 2 of the '036 Patent when they were

12              manufactured and/or used in the United States.

13       2.    Summary judgment for Wisk is proper on validity because Archer's obviousness

14              combinations fail to render obvious all the limitations of claim 2 of the '036 Patent.

15       Wisk's motion is based on this Notice of Motion, the accompanying Memorandum of

16   Points and Authorities, the Declarations of Moon Hee Lee in support and exhibits thereto, all

17   pleadings and papers on file in this action, such other matters of which this Court may take

18   judicial notice, and such other evidence or arguments as may be presented to the Court.

19

20   DATED:  March 19, 2023                    QUINN EMANUEL URQUHART &
                                              SULLIVAN, LLP
21

22

23                                           By_____*/s/ Yury Kapgan*_____
                                              Yury Kapgan
24                                            Attorneys for Plaintiff Wisk Aero LLC

25

26

27

28

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

UNDISPUTED FACTS ....................................................................................................... 2

    A.    Archer's Legal Troubles—Civil and Criminal. .......................................... 2

    B.    Atlas Crest Acquires Archer in September 2021 ....................................... 5

ARGUMENT ....................................................................................................................... 8

I.     ARCHER CANNOT PROVE THE ELEMENTS OF CAUSATION AND
      DAMAGES FOR THE DEFAMATION AND INTERFERENCE CLAIMS ................ 9

    A.    Archer Cannot Establish Causation. ........................................................... 9

    B.    Archer Cannot Establish Damages. ........................................................... 11

II.    ARCHER SEEKS DAMAGES FOR WISK'S PRIVILEGED CONDUCT ...................... 13

III.   THE FIRST AMENDMENT PRECLUDES ARCHER'S INTERFERENCE AND
      DEFAMATION CLAIMS ...................................................................................... 14

    A.    Wisk's Statements Are Protected Opinion. ............................................... 14

    B.    The Criminal Investigation Statement Was True. ...................................... 16

    C.    Archer Cannot Show That Wisk Spoke With Actual Malice. .................... 18

          1.    Archer is a limited purpose public figure. .................................... 18

          2.    Archer cannot show that Wisk made its statements with actual
               malice. ........................................................................................... 19

    D.    The Same First Amendment Principles Also Bar the Interference Claims. ............ 20

IV.   ARCHER'S UCL CLAIM ALSO FAILS ............................................................... 20

V.    WISK IS ENTITLED TO PREVAIL ON ITS '036 PATENT CLAIM .............................. 21

    A.    The Accused Archer Aircraft Infringed Claim 2 of the '036 Patent. ...................... 22

    B.    Claim 2 of the '036 Patent is Not Invalid Over the Alleged Prior Art. .................... 24

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Agard v. Hill*,
 2010 WL 4365543 (E.D. Cal. Oct. 27, 2010) ............................................................................. 13

*Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*,
 2013 WL 3460707 (N.D. Cal. July 9, 2013) ................................................................. 15, 16, 21

*Ampex Corp. v. Cargle*,
 128 Cal. App. 4th 1569 (2005) .................................................................................................. 18

*Annette F. v. Sharon S.*,
 119 Cal. App. 4th 1146 (2004) .................................................................................................. 18

*Argentieri v. Zuckerberg*,
 8 Cal. App. 5th 768 (2017) ....................................................................................................... 14

*Berryman v. Merit Prop. Mgmt.*,
 152 Cal. App. 4th 1544 (2007) .................................................................................................. 21

*Campanelli v. Regents of the Univ. of Cal.*,
 44 Cal. App. 4th 572 (1996) ..................................................................................................... 14

*Celotex Corp. v. Catrett*,
 477 U.S. 317 (1986) ..................................................................................................................... 8

*Cheese Sys., Inc. v. Tetra Pak Cheese and Powder Sys., Inc.*,
 725 F.3d 1341 (Fed. Cir. 2013) ................................................................................................ 25

*City of Vernon v. S. Cal. Edison Co.*,
 955 F.2d 1361 (9th Cir. 1992) .................................................................................................. 14

*Coastal Abstract Serv. Inc. v. First Am. Title Ins. Co.*,
 173 F.3d 725 (9th Cir. 1999) .................................................................................................... 13

*Copp v. Paxton*,
 45 Cal. App. 4th 829 (1996) ..................................................................................................... 20

*Della Penna v. Toyota Motor Sales, U.S.A., Inc.*,
 11 Cal. 4th 376 (1995) .............................................................................................................. 20

*Di Giorgio Corp. v. Valley Labor Citizen*,
 260 Cal. App. 2d 268 (1968) .................................................................................................... 13

*Di Giorgio Fruit Corp. v. AFL-CIO*,
 215 Cal. App. 2d 560 (1963) .................................................................................................... 12

*Drum v. San Fernando Valley Bar Ass'n*,
 182 Cal. App. 4th 247 (2010) ................................................................................................... 21

*Franklin v. Dynamic Details, Inc.*,
 116 Cal. App. 4th 375 (2004) ........................................................................... 9, 11, 16, 21, 24

*Healthsmart Pac., Inc. v. Kabateck*,
    7 Cal. App. 5th 416 (2016) ......................................................................... 14

*Hughes v. Hughes*,
    122 Cal. App. 4th 931 (2004) ..................................................................... 16

*Information Control Corp. v. Genesis One Computer Corp.*,
    611 F.2d 781 (9th Cir. 1980) ...................................................................... 15

*Innovative Business P'ships, Inc. v. Inland Counties Reg'l Ctr, Inc.*,
    194 Cal. App. 4th 623 (2011) ................................................................ 16, 17

*Invitrogen Corp. v. Clontech Lab's, Inc.*,
    429 F.3d 1052 (Fed. Cir. 2005) .................................................................. 24

*Isuzu Motors Ltd. v. Consumers Union, Inc.*,
    12 F. Supp. 2d 1035 (C.D. Cal. 1998) ....................................................... 20

*Jankovic v. Int'l Crisis Grp.*,
    822 F.3d 576 (D.C. Cir. 2016) ................................................................... 19

*Johnstech Int'l Corp. v. JF Microtechnology SDN*,
    2016 WL 4182402 (N.D. Cal. Aug. 8, 2016) ............................................. 21

*Kennedy v. Jackson Nat. Life Ins. Co.*,
    2010 WL 4123994 (N.D. Cal. Oct. 6, 2010) .............................................. 20

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ............................................................................... 9

*Leisek v. Brightwood Corp.*,
    278 F.3d 895 (9th Cir. 2002) ....................................................................... 8

*Makaeff v. Trump Univ., LLC*,
    715 F.3d 254 (9th Cir. 2013) ..................................................................... 18

*Masson v. New Yorker Mag., Inc.*,
    501 U.S. 496 (1991) ................................................................................... 16

*Mattel, Inc. v. MCA Records, Inc.*,
    28 F. Supp. 2d 1120 (C.D. Cal. 1998) .................................................. 15, 18

*McGinley v. Franklin Sports, Inc.*,
    262 F.3d 1339 (Fed. Cir. 2001) .................................................................. 24

*McGlinchy v. Shell Chemical Co.*,
    845 F.2d 802 (9th Cir. 1988) ..................................................................... 10

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
    429 F.3d 1344 (Fed. Cir. 2005) .................................................................. 10

*Murphy v. Teamster Local 542*,
    2013 WL 3149482 (S.D. Cal. June 18, 2013) ............................................ 11

*Oracle Corp. v. SAP AG*,
    734 F. Supp. 2d 956 (N.D. Cal. 2010) ........................................................................ 12

*Partington v. Bugliosi*,
    56 F.3d 1147 (9th Cir. 1995) ..................................................................................... 16

*Prendeville v. Singer*,
    155 F. App'x 303 (9th Cir. 2005) .............................................................................. 13

*Quelimane Co. v. Stewart Title Guar. Co.*,
    19 Cal. 4th 26 (1998) .................................................................................................. 9

*Reader's Digest Assn. v. Superior Court*,
    37 Cal. 3d 244 (1984) ........................................................................................ 18, 19

*Smith v. Maldonado*,
    72 Cal. App. 4th 637 (1999) ..................................................................................... 16

*Toscano v. PGA Tour, Inc.*,
    201 F. Supp. 2d 1106 (E.D. Cal. 2002) .............................................................. 11, 12

*Triton Ins. Underwriters, Inc. v. Comm. on Chiropractic Welfare*,
    232 Cal. App. 2d 829 (1965) .............................................................................. 12, 13

*Underwager v. Channel 9 Australia*,
    69 F.3d 361 (9th Cir. 1995) ................................................................................ 15, 19

*Wyatt Tech. Corp. v. Malvern Instr. Inc.*,
    2010 WL 11505684 (C.D. Cal. Jan. 25, 2010)......................................................... 14

**Statutory Authorities**

35 U.S.C. § 271(a) ........................................................................................................ 23

Cal. Bus. & Prof. Code § 17200 ................................................................................... 5

Cal. Civ. Code § 45a........................................................................................... 9, 12

Cal. Civ. Code § 47(d) .................................................................................................. 14

Cal. Civ. Code § 48a(d) ................................................................................................ 12

**Rules and Regulations**

Fed. R. Civ. P. 56.................................................................................................... 1, 8

1

# <u>INTRODUCTION</u>

2          Wisk is entitled to summary judgment on Archer's four state law counterclaims.  Each is

3    based on Wisk's April 6, 2021 press release and blog post, which summarized Wisk's Complaint

4    against Archer, and a May 19, 2021 update to the blog post, which stated that Wisk was

5    cooperating with the "criminal investigation into Archer relating to the theft and use of Wisk's

6    intellectual property."  Archer claims that these statements defamed Archer, interfered with its

7    contracts, and violated California's unfair competition law.  In December, Archer's counterclaim

8    expert, Professor Todd Milbourn, issued a report purporting to show "economic harms" to Archer

9    arising from its counterclaims, including a $1 billion drop in its "enterprise value" for its de-SPAC

10   merger with Atlas Crest.  But when deposed, Archer's expert destroyed the counterclaims by

11   repeatedly admitting that Archer cannot establish causation or damages from Wisk's statements.

12         The destruction of Archer's counterclaims by its own expert cannot be overstated.  At his

13   deposition, Professor Milbourn: (1) repeatedly conceded that neither he ***nor anyone else*** can

14   conclude that Wisk's statements about Archer were the cause of Archer's claimed "economic

15   harms," (2) made clear that he was neither asked to conduct a damages analysis nor performed

16   one, and (3) admitted that he could not say whether Archer had suffered any damages.  That is

17   primarily because he cannot isolate the effect of Wisk's statements from other contemporaneous

18   events that could have had a negative effect on Archer:

19         Q:  But because there was the litigation [between Wisk and Archer] and because the
           SPAC market deteriorated independently of the litigation and the alleged defamatory
20         statements, you're not in a position to attribute any dollar amount of damages to the
           alleged defamatory statements on their own, correct?
21

22         A: I'm not in a position to be able to separate those, nor do I think anybody could separate
           out those three in an economically sound way.  So with that, ***no, I cannot uniquely***
23         ***identify dollar amounts of damage that [Wisk's statements] caused, because it's***
           ***happening at the same time as these other events***.
24

25   Ex. A (Milbourn Tr.) 114:23-115:13.[1]  Because causation and damages are elements of Archer's

26   counterclaims, these confessions entitle Wisk to summary judgment.

27   _____
     [1]  Citations to "Ex." refer to the exhibits in the concurrently filed declaration of Moon Hee Lee.
28   All emphases are added, unless otherwise indicated.

1   The defamation claim (and the other counterclaims, which are all based on the same facts)

2   also run afoul of established libel law and First Amendment principles.  *First*, Wisk's statements

3   are non-actionable opinions about a litigation opponent for which California courts have

4   repeatedly granted summary judgment.  *Second*, Wisk's statement about the "criminal

5   investigation into Archer" was true.  When Archer claimed otherwise at the pleading stage, it was

6   hiding the fact that the federal grand jury—a criminal investigative body—had subpoenaed Archer

7   to obtain documents and information about *Archer's* possession and use of Wisk's intellectual

8   property and *Archer's* hiring of Wisk employees.  Using the same phrase as Wisk, Archer's

9   merger partner, Atlas Crest, told the SEC that there was a criminal investigation "into Archer's

10  aircraft design and hiring practices."  Ex. B at -952.  *Third*, Archer has no evidence of actual

11  malice—that Wisk knew its statements were false or acted with reckless disregard for the truth.

12  Wisk also moves for summary judgment that claim 2 of the '036 Patent has been infringed

13  and is not invalid.  Although Archer has purported to design around this patent, Wisk intends to

14  seek an injunction based on Archer's past infringement to ensure the continued exclusivity of its

15  intellectual property.  Summary judgment can narrow the issues for trial.

16  **UNDISPUTED FACTS**

17  **A.   Archer's Legal Troubles—Civil and Criminal.**

18  As the Court has recognized, the promise of electric, self-piloting air taxis has captured

19  widespread interest.  Dkt. 146 at 1, 8.  Wisk is the first U.S. company to fly a self-piloted eVTOL

20  aircraft.  By 2018, Wisk had refined its unique design into its fifth-generation flagship aircraft.  In

21  June 2019, Wisk began operating as a joint venture with Boeing to further develop it.

22  Archer is a more recent entrant in this field.  In late 2019 and 2020, after Archer stalled out

23  on its first attempt to design a viable eVTOL, with no employees besides its two founders, it

24  sought to ██████████ with a systematic raid on Wisk's engineering work force to ████ Wisk's

25  entire engineering team.  Ex. C 68:7-70:19; Dkt. 16-34 ¶¶ 3-5; Ex. D.  Archer lured away a dozen

26  Wisk engineers, a number of whom we now know retained key Wisk confidential, proprietary, and

27  trade secret information.  Dkt. 16-34 ¶¶ 3-5; Ex. E-A (Crain Rep.) ¶¶ 16-24, 47-53.

28

In the wake of this mass exodus, Wisk conducted an internal investigation, which revealed suspicious computer and download activity by employees moving to Archer.  When Wisk asked them to clarify and avoid misunderstandings, their cryptic and evasive responses only raised more questions.  *E.g.*, Ex. F.  In June 2020, Wisk contacted the Santa Clara County District Attorney about the potential theft of its IP.  Ex. G.  Deeming the matter sufficiently serious, the DA referred the matter to the FBI and DOJ, who took over the investigation (the "Criminal Investigation") and received Wisk's cooperation, including responses to subpoenas and interviews with Wisk employees.  Ex. H; Ex. I (FBI Special Agent noting the employees provided helpful information).

There are many ways to design an eVTOL aircraft (Dkt. 45 ¶ 23):

  

 

Given this range of designs, Wisk became concerned when, in February 2021, Archer released images of its new and re-designed eVTOL aircraft that appeared disturbingly similar to the design in Wisk's confidential patent application from more than one year earlier (Dkt. 1 ¶ 4):

| Wisk<br>(Confidential 2020 Patent Application) | Archer<br>(2021 Investor Deck) |
| --- | --- |
|  |  |
|  |  |

1       These similarities, along with the evidence Wisk had collected, caused Wisk to conclude

2   that ex-employees had become a conduit for the transfer of Wisk's intellectual property to Archer

3   and that Archer was using Wisk's IP to develop competing aircraft.  Based on the available

4   information, Wisk filed this lawsuit on April 6, 2021.  Wisk alleged claims for patent infringement

5   and trade secret misappropriation.  That day, Wisk posted a statement on its public blog, titled

6   *Why We're Taking Legal Action Against Archer Aviation* (Ex. J at 2) and which provided a link to

7   a press release, which it disseminated to reporters (Ex. K) (the "Lawsuit Statements").

8       Also on April 6, 2021, Archer told the *New York Times* that it had placed an employee

9   (Jing Xue) on paid leave "in connection with a government investigation and search warrant," and

10   that Archer and three employees who worked at Wisk, had received grand jury subpoenas.  Dkt.

11   55-4 at 2; Dkt. 115-6 at 4.  These are tools of criminal investigations.  That day, Archer's merger

12   partner, Atlas Crest, filed an SEC Form 8-K stating that Archer had told it the same things. Ex. L.

13       The grand jury subpoena to Archer required it to produce documents concerning, among

14   other things, ***Archer's*** business practices, including ***Archer's*** records related to "[a]ny Wisk

15   technology, products or business plans, … [including] confidential business information or data

16   belonging to Wisk … or [Archer's] use of any such information."  Ex. M at -738.  It also required

17   Archer to produce its records relating to former Wisk employees and "[a]ny proprietary

18   documents … brought to Archer Aviation by these individuals."  *Id.*

19       On May 19, 2021, Wisk filed a motion to preliminarily enjoin Archer from using Wisk's

20   trade secrets (the "PI Motion").  Wisk's brief noted Archer's admissions to the media about the

21   Criminal Investigation.  Dkt. 16 at 10-11.  Later that day, Wisk updated its April 6 blog post:

22       After Wisk filed its Complaint on April 6, Archer publicly disclosed a criminal
    investigation relating to some of the claims Wisk brought, and Archer's SPAC sponsor

23       Atlas Crest Investment Corp filed an 8-K noting that it was reviewing these matters. Wisk
    is fully cooperating with the FBI and Department of Justice in their criminal investigation

24       into Archer relating to the theft and use of Wisk's intellectual property.

25   Ex. J ("Criminal Investigation Statement"; with the Lawsuit Statements, "Wisk's Statements").

26       Wisk based its May 19 blog post not only on Archer's public disclosures and Atlas Crest's

27   SEC filing, but on information Wisk had received from the FBI and the U.S. Attorney's Office.

28   *See, e.g.*, Ex. N (Bibbes Tr.) 77:22-78:03; 78:14-79:02; 80:14-82:08.  Given that the criminal

subpoena to Archer requested information about Archer's possession and use of ***Wisk's*** technology and confidential information, including Wisk confidential documents brought to Archer by former Wisk employees, Archer can no longer pretend that the FBI and DOJ were not conducting a "criminal investigation into Archer related to the theft and use of Wisk's intellectual property." *See* Ex. O-A (Freeh Rep.) ¶¶ 17, 36-37; Ex. O-B (Freeh Reb. Rep.) ¶¶ 12-13."[2]

Despite these facts, Archer asserts counterclaims over Wisk's Statements: interference with contract; interference with prospective economic advantage; defamation; and unfair competition under Business & Profession Code section 17200 ("UCL" claim). Dkt. 154.

The blog post included a link to the Complaint. Ex. J at 7. In fact, each Lawsuit Statement is found in Wisk's Complaint, as shown by a comparison of Archer's Second Amended Counter-Claims (Dkt. 154 "SACC") to Wisk's Complaint (Dkt. 1):

1. Archer is "using stolen Wisk technology." SACC ¶¶ 1, 49; Compl. ¶¶ 15, 71.

2. Archer is "infringing [Wisk's] patents." SACC ¶ 49; Compl. ¶¶ 5-6.

3. Archer's image "indicates Archer's use of more detailed design features, including features related to aircraft propulsion, power management, avionics, flight control, and manufacturing methodology." SACC ¶ 50; Compl. ¶ 83.

4. The similarity between the aircraft design in Wisk's patent application and the aircraft design in Archer's investor materials "could not have been a coincidence." SACC ¶ 51; Compl. ¶ 6.

5. It is "virtually impossible" for Archer to have made the progress it has in its aircraft design in the amount of time in which it has achieved that progress. SACC ¶ 54; Compl. ¶¶ 80, 87.

As to the Criminal Investigation Statement—the May 19 blog post—Wisk had said earlier that day, in its PI Motion, that "Archer revealed to the New York Times that it was the subject of a criminal government investigation, which relates to the conduct alleged here." Dkt. 16 at 1.

### B.   Atlas Crest Acquires Archer in September 2021.

Archer claims that Wisk's Statements harmed the economics of Archer's 2021 merger with Atlas Crest and imposed additional expenses. *See* Ex. R (Milbourn Rep.) ¶ 16. To track Archer's

---

[2] In opposing Wisk's anti-SLAPP motion, Archer told the Court that the statement was not true. Dkt. 124 at 8, 12, 26. But Archer had withheld the scope of the criminal subpoena served on it, which concerned not just the conduct of Archer's ex-Wisk employees, but ***Archer's*** possession and use of Wisk's IP. Ex. M.

assertions, it is necessary to wade into the Special Purpose Acquisition Company ("SPAC") bubble that arose a few years ago and then burst in 2021.

SPACs were formed by sponsors (*e.g.*, investment firms) and raised capital through an IPO in which investors were told little about how the SPAC would become profitable, other than by buying a private company within two years. *See id.* ¶ 19.  If a SPAC failed to timely find a merger target, it would return the investors' money and shut down.  *Id.*  If the shareholders were not satisfied with the proposed merger, they had the right to redeem their IPO shares (usually priced at $10 per share) for a refund.  *Id.* ¶ 20.  The extent to which SPAC shareholders redeemed their shares for a refund is called the "redemption rate."  *Id.* ¶ 118.

In 2020, Atlas Crest was formed as a SPAC and had its IPO.  In the second half of 2020, after looking at the emerging technology landscape, Atlas Crest identified Archer as a viable target.  In February 2021, Atlas Crest and Archer announced a merger agreement, subject to approval of Atlas Crest's shareholders.  Ex. S at -701.  The parties placed an enterprise value on the combined company of roughly $2.6 billion.  *Id.*  Under the agreement, Archer's shareholders would exchange their shares for shares of the merged entity (not for cash) at a specified exchange ratio.  *Id.*  Atlas Crest planned to seek its shareholders' approval in Q2 2021.  Ex. T at -273.

As was common, after Atlas Crest raised capital from its IPO, it sought a second capital raise from PIPE ("private investment in public equity") investors, which would close with the Archer merger.  Ex. R (Milbourn Rep.) ¶ 22.  Typically, PIPE investors are institutional investors. *See id*.  Atlas Crest obtained $600 million from them.  *Id.* ¶ 28.  Despite Wisk's Statements, none backed out.  Ex. U (Spellacy Tr.) 41:6-9; 196:9-17.

After the February 2021 merger announcement, however, the deal ran into headwinds. ***First***, Atlas Crest and its investors became concerned about the SPAC market.  In early 2021, SPACs were still popular.  *See* Ex. R (Milbourn Rep.) ¶ 109.  But in the weeks that followed the merger announcement, as a new administration assumed power in Washington, the new head of the SEC cautioned investors about SPACs and suggested that the SEC might take action against some of them for misleading investors.  *Id.* ¶¶ 104-05.  This led to a sharp drop in the share prices

1   of SPACs and in the desirability of holding their shares. *Id.* ¶¶ 108-110.  Redemption rates

2   climbed, as investors sought to exit the SPAC market. *Id.* ¶¶ 113, 116-118.

3        ***Second***, Atlas Crest was concerned about the Lawsuit, Wisk's PI Motion, and the Criminal

4   Investigation, as each raised serious questions about whether Archer was using stolen technology.

5   *See* Ex. U (Spellacy Tr.) 68:19-70:03; Ex. V at -613.  As these three matters unfolded, the Atlas

6   Crest Board met eight times to discuss the Archer merger.  *See* Ex. V at -612.  According to Atlas

7   Crest's SEC filing, its Board considered: "the civil investigation"; the "federal government

8   investigation"; "general and industry-specific market conditions and developments" including in

9   eVTOL and SPAC markets; "the interaction of such matters" with "Archer's business plan and

10  financial projections"; "the terms" of Archer and Atlas Crest's merger agreement; and "market,

11  regulatory and other developments." *Id.* at -612-14.  Absent from Atlas Crest's SEC filing—in its

12  disclosure of material risks or anywhere else—is any mention of Wisk's Statements or any harm

13  to Archer from them. *Id.* at -545-82, 612-614.

14       On July 13, 2021, Atlas Crest told Archer that it would need to accept a "strategic reset of

15  transaction terms," which included a "reduction" in Archer's enterprise value. *Id.* at -614.  On

16  July 29, one week after this Court denied Wisk's PI Motion, Atlas Crest and Archer agreed to new

17  terms. *Id.* at -616.  Archer agreed to reduce the enterprise value of the combined company by

18  about $1 billion. *Id.* at -486. ███████████████████████████████████ Ex. U

19  (Spellacy Tr.) 136:24-138:24; Ex. AR (Adcock Tr.) 144:24-145:14; Ex. AS (Goldstein Tr.) 520:8-

20  521:6.  Instead, it meant that Archer's shareholders would receive fewer Atlas Crest shares for

21  their Archer shares, and would end up owning a smaller percentage of the combined company

22  (55%) than they would have originally (67%).  Ex. R (Milbourn Rep.) ¶¶ 128-129.  Atlas Crest

23  shareholders would own a larger percentage. *Id.*

24       Atlas Crest asked a valuation firm, Duff & Phelps, to opine as to whether the lower price

25  was "fair" to Atlas Crest's shareholders.  Duff & Phelps concluded that it was.  In its July 2021

26  fairness opinion, updated from its February 2021 opinion, ██████████████████████████

27  ████████████████████████████████ *Compare* Ex. W (July report) at -244

28  *with* Ex. AW (February report) at -310 (████████████████████████████).

1    Like Atlas Crest's SEC filings, Duff & Phelps' opinion made no mention of Wisk's Statements or

2    any harm they caused Archer.  *See* Ex. W.

3          In September 2021, 96% of Atlas Crest's shareholders approved the merger.  Ex. AQ at -

4    373.  The redemption rate was 48.5%, much lower than the 60% market average.  Ex. A (Milbourn

5    Tr.) 294:1-5, 298:23-299:9.  Thus, despite everything that had occurred—the Lawsuit, the

6    Criminal Investigation, Wisk's Statements, and the SPAC market plummet—far fewer Atlas Crest

7    shareholders demanded their money back than did shareholders of other SPACs.  Archer raised

8    $857.6 million in the transaction.  Ex. R (Milbourn Rep.) ¶ 132; Ex. U (Spellacy Tr.) 175:5-14.

9          Nonetheless, Archer contends that, but for Wisk's Statements, the merger would have

10   proceeded as planned.  Its expert catalogs supposed harms from this delay: additional due

11   diligence, a delay during which the market weakened, the $1 billion lower enterprise value, added

12   borrowing costs, and a higher redemption rate.  Ex. R (Milbourn Rep) ¶¶ 15-16.  But even if one

13   were to accept those as harms, Professor Milbourn's common sense deposition admissions, that it

14   "would be impossible" to isolate the effect of Wisk's Statements, invalidate the claims:

15          The alleged defamatory statements are also happening in this economic laboratory.
16          At the same time, there is litigation.  At the same time, the headwinds at a macro
            level in the SPAC market are changing. So you have, in some sense, three legs of
17          the stool that are all taking place contemporaneously.  An empirical examination
            would be impossible to do. I have no idea how you could separate out each of those
18          separately.

19   Ex. A (Milbourn Tr.) 79:24-80:8.

20                                        **ARGUMENT**

21          Archer has the burden of proof on its counterclaims.  Once Wisk "points out" the absence

22   of evidence to support those claims, Archer must show significant probative evidence to support

23   them. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Otherwise, Wisk is entitled to summary

24   judgment.  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002).  Even "[i]f the court

25   does not grant all the relief requested by the motion," it may grant partial summary judgment or

26   "enter an order stating any material fact—including an item of damages or other relief—that is not

27   genuinely in dispute and treating that fact as established in the case."  Fed. R. Civ. P. 56(g).

28

1   **I.      ARCHER CANNOT PROVE THE ELEMENTS OF CAUSATION AND DAMAGES
        FOR THE DEFAMATION AND INTERFERENCE CLAIMS**
2       **A.      <u>Archer Cannot Establish Causation.</u>**

3        Archer's inability to prove the essential elements that Wisk caused Archer's alleged

4   economic and reputational loss is fatal to the defamation and interference claims.  Cal. Civ. Code

5   § 45a (defamation); *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)

6   (intentional interference with prospective economic advantage); *Quelimane Co. v. Stewart Title*

7   *Guar. Co.*, 19 Cal. 4th 26, 55 (1998) (intentional interference with contractual relations).

8        Archer claims that Wisk is responsible for harms that Archer experienced after Wisk's

9   Statements, in the form of: (1) due diligence costs incurred after Wisk sued Archer and sought a

10  preliminary injunction, and after a criminal subpoena landed on Archer's doorstep, (2) the delay in

11  closing the merger, (3) the $1 billion decrease in Archer's enterprise value, and (4) the cost of a

12  loan to tide Archer over.  Ex. R (Milbourn Rep.) ¶¶ 15-16.  But Archer has no proof.

13       To begin, the fact that these things happened ***after*** Wisk made the Statements does not

14  mean that Wisk's Statements ***caused*** them.  Milbourn has confused correlation with causation.

15  *See Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 393-94 (2004) ("A cause and effect

16  relationship based upon such a temporal sequence is a classic example of [a] logical fallacy ….").

17       And Professor Milbourn has repeatedly admitted that these harms were the result of many

18  factors, including the decline in the SPAC market during Summer 2021, this Lawsuit, the

19  allegations of the Complaint and Preliminary Injunction Motion, and the Criminal Investigation.

20  Ex. A (Milbourn Tr.) 79:21-80:12; 80:25-81:20; 82:23-83:9; 85:4-86:7; 90:4-91:25; 93:20-94:19;

21  113:6-114:6; 114:23-115:13; 118:25-120:3; 122:13-123:13; 129:2-23; 141:2-11; 205:22-206:14;

22  210:10-23; 219:17-221:20; 294:21-295:12; 296:16-297:20.

23       Dispositively, when Professor Milbourn was asked to identify harms caused by ***just*** Wisk's

24  Statements, over and over again he said that it would be empirically impossible to say.  Despite

25  having access to all of the information he needed to conduct a full analysis, *id.* 28:9-29:1, he was

26  adamant that: "***I have no idea*** how you could possibly separate" any harm from the

27  contemporaneous fall in the SPAC market and the litigation from Wisk's statements; such an

28  attempt was "***empirically going to be impossible***"; the multiple causes would be "***empirically***

1   *impossible to disentangle*"; such an effort would be "*hypothetical* based on judgment" because it

2   was "*not possible*"; he did not "*know any way* empirically where you could isolate" the effect of

3   Wisk's statements; and he did not "think *anybody* could separate out those … in an *economically*

4   *sound way*."  *Id*. 82:23-83:6; 80:25-81:20; 90:4-91:5; 93:20-94:19; 113:6-114:6; 114:23-115:13.

5        That failure of proof puts an end to Archer's counterclaims.  In *McGlinchy v. Shell*

6   *Chemical Co.*, 845 F.2d 802, 806-08 (9th Cir. 1988), the Ninth Circuit affirmed summary

7   judgment based on the plaintiff's failure to establish damages because, as here, the plaintiff's

8   damages expert "did not relate the loss to specific acts" taken by the defendant, but rather simply

9   "attributed all of the future lost profits to [the defendant's] acts."  And just as Milbourn admitted

10  that it would be "empirically impossible" for him to attribute the amount of the decline in Archer's

11  value to Wisk's statements, the plaintiff's expert in *McGlinchy* admitted that "the cause of the

12  decline in sales theoretically could have been anything."  *Id*.  Milbourn's admission that it is

13  impossible to assess Archer's damages caused by Wisk's Statements compels summary judgment.

14  *Id.* at 807-09; *see MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1353-54 (Fed. Cir.

15  2005) (affirming exclusion of expert who could not "link any single instance of misconduct to a

16  specific amount of damages," and summary judgment based on resulting lack of evidence).

17       Moreover, the lynchpin of Milbourn's harm analysis is his assumption that Wisk's

18  Statements, and Atlas Crest's and Archer's reaction to them, delayed the merger from Q2 2021

19  until September 2021, by which time the SPAC market had deteriorated.  Ex. R (Milbourn Rep.)

20  ¶¶ 75-78.  That assumption is false.  Archer's sophisticated merger partner and its institutional

21  investors were not simply accepting Wisk's blog post to base their decisions.  Atlas Crest's CEO

22  confirmed that the *only* two causes for the merger's delay were "the filing of the lawsuit, and the

23  filing of the preliminary injunction, and the allegations that were made in both those filings."  Ex.

24  U (Spellacy Tr.) 68:19-70:3; 73:5-16 ("I can't recall single investor[] or the … groups of investors

25  saying 'as a result of this particular blog post, this is my straw that breaks the camel's back'").

26       Atlas Crest's SEC filings further confirm that Professor Milbourn assumed the wrong facts

27  in opining that Wisk's Statements delayed the merger or caused the drop in Archer's enterprise

28  value.  Those filings detail the reasons for the delay and revaluation, but make no mention of

Wisk's Statements as something Atlas Crest considered, even though the filings post-date Archer's counterclaims.  Ex. V at -613; *see Franklin*, 116 Cal. App. 4th at 391-92 (no triable issue on causation and damages on interference claim where alleged harm could be explained by other, more plausible causes); *Murphy v. Teamster Local 542*, 2013 WL 3149482, at *12 (S.D. Cal. June 18, 2013) (defamation claim fails where "remarks caused no actionable injury or damage separate from what Plaintiff had already suffered").  If Wisk's Statements were a cause, Atlas Crest would have disclosed that in its SEC filings.  *See* Ex. U (Spellacy Tr.) 113:20-114:05 ("I don't think we missed anything that is of material significance in that disclosure, the factors are all here.").

**B.   Archer Cannot Establish Damages.**

As noted above, damages is a prima facie element of each of Archer's counterclaims.  Yet Archer's expert: (1) said that, although he has been retained in other cases to perform a damages analysis, he did not conduct one here (Ex. A (Milbourn Tr.) 116:4-23), (2) admitted that his "assignment" was limited instead to evaluating "the economic impact to Archer as a result of what was coined 'alleged defamatory statements,'" *id.* 66:5-13, and (3) further admitted that he "can[not] speak to what a damage assessment would be," *id.* 117:18-118:13.  Given his testimony, a jury might as well throw a dart to arrive at a damages figure: Professor Milbourn went so far as to admit that he does not know whether the "dollar value" of the "damages from the alleged defamatory statements … could be ten dollars, zero dollars, or 100 million dollars."  *Id.* 141:2-11.

Archer has provided no quantification of its alleged damages.  In truth, Archer's expert believes that no damages can be quantified: "In this case I am not able, and I don't think anyone is, to do a damages analysis of just the alleged defamatory statements because they cannot be uniquely identified and separated from changes in the SPAC market and the litigation itself because they're happening contemporaneously."  *Id.* 118:24-120:3.  Professor Milbourn is referring not only to the *fact* of damages; he makes clear that *no* "dollar amounts" can be stated as damages from Wisk's Statements.  *Id.* 114:23-115:13; 91:9-25; 93:20-94:9; 111:17-112:10 (admitting he "cannot point to or isolate a dollar value" to the Criminal Investigation Statement); 210:14-23 (similar).  Given his admissions, Archer cannot establish the damages element of its claims.  *See Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1124 (E.D. Cal. 2002) (summary

1  judgment for defendants is proper if the plaintiff's "lone expert witness did not provide any

2  evidence on damages" and "would require a jury to engage in speculation or guesswork").

3      Archer's expert conceded other fatal defects with its damage case.  Despite Wisk's

4  Statements, the SPAC investors' redemption rate was 20% *lower* than the average redemption

5  rates for other de-SPAC transactions that also closed in September 2021.  Ex. A (Milbourn Tr.)

6  300:15-25.  ██████████████████████████████  Ex. U (Spellacy Tr.) 196:9-17.  And

7  although the $1 billion drop in the combined entity's enterprise value is attention grabbing, it is a

8  red herring.  ██████████████████████████████████████████████████

9  ████████████████████████████████████████████████████  *Id.* 136:24-

10 138:24; Ex. AR (Adcock Tr.) 144:24-145:14; Ex. AS (Goldstein Tr.) 520:8-521:6.  The valuation

11 drop only lowered the rate at which the Archer shareholders would exchange their shares for

12 shares in the new company.  Ex. A (Milbourn Tr.) 196:5-21.  Thus, this supposed $1 billion in

13 "economic harm" was sustained by those shareholders, not by Archer.  Ex. X-A (Klausner Rep.)

14 ¶ 67.  Because *Archer* did not suffer this "harm," it cannot recover for it.  *See Oracle Corp. v. SAP

15 AG*, 734 F. Supp. 2d 956, 968-69 (N.D. Cal. 2010) (entering summary judgment and barring

16 damages based on "the rights of third parties—even affiliated entities").

17     These fundamental gaps in Archer's prima facie case cannot be cured by Archer opting to

18 seek "general" (or "presumed") damages for defamation—assuming Archer is entitled to them.  If

19 Archer were, such general/presumed damages would be for "loss of reputation, shame,

20 mortification, and hurt feelings."  Cal. Civ. Code § 45a, 48a(d).  But Archer cannot recover for

21 any nebulous, intangible harm.  As a corporation, Archer's recovery is limited to its "business

22 reputation" for an injury "only in a business way, resulting in pecuniary loss."  *Di Giorgio Fruit

23 Corp. v. AFL-CIO*, 215 Cal. App. 2d 560, 571-72 (1963) (quotation omitted).

24     Here, Milbourn's testimony severing the connection between Wisk's Statements and the

25 alleged harm precludes an award of such general/presumed damages.  Although having a right to

26 general/presumed damages may excuse proof on the *amount* of those damages, it does not

27 eliminate the obligation to establish "some reasonable basis" for claiming that the statements

28 caused the harms.  *Triton Ins. Underwriters, Inc. v. Comm. on Chiropractic Welfare*, 232 Cal.

1   App. 2d 829, 835 (1965); *see Di Giorgio Corp. v. Valley Labor Citizen*, 260 Cal. App. 2d 268, 277

2   (1968) (general damages compensate "actual detriment incurred").  *Triton* affirmed the trial

3   court's denial of general damages for defamation per se because "there was no reasonable basis

4   upon which general damages could be awarded."  232 Cal. App. 2d at 506, 510.  There, as here,

5   other factors besides the defendant's statements contributed to the harms.  Because the plaintiff's

6   expert was unable to prove that, but for the defendant's statements, "the plaintiff would have"

7   avoided the harm, the trial court denied even general ("assumed") damages.  *Id.* at 509-10.

8          Professor Milbourn repeatedly testified that the effect of Wisk's Statements cannot be

9   separated from the effect of the contemporaneous events that caused Atlas Crest and its investors

10  to independently take the actions that Archer is complaining about.  Nor can he isolate the effects

11  of reading Wisk's Statements from the effects of obtaining the same information from Wisk's

12  filings.  Indeed, he admitted that the Lawsuit Statements are a "digestible" version of Wisk's

13  Complaint and the discussion of the Criminal Investigation and the subpoenas issued to Archer

14  and its employees appeared in Wisk's PI Motion—public filings that are available to Atlas Crest

15  and others.  Ex. A (Milbourn Tr.) 88:9-24; 109:2-110:16.  Because Archer cannot recover any

16  form of compensatory damages, the counterclaims cannot proceed.  *See Agard v. Hill*, 2010 WL

17  4365543, at *6-7 (E.D. Cal. Oct. 27, 2010) (granting summary judgment and awarding $1 in

18  damages where the defendant's statements that are defamatory on their face could not have caused

19  the decline in business); *Prendeville v. Singer*, 155 F. App'x 303, 305 (9th Cir. 2005) (affirming

20  grant of new trial where the jury verdict on presumed damages was "wholly unsupported by the

21  evidence presented").  Further, as explained below, Professor Milbourn testified that Archer's

22  alleged reputational harm resulted from Wisk's non-actionable conduct: media contacts about the

23  blog post and the press release.  That too bars Archer's recovery under any theory.  *See Coastal*

24  *Abstract Serv. Inc. v. First Am. Title Ins. Co.*, 173 F.3d 725, 732-33 (9th Cir. 1999) (reversal

25  where general damages for defamation claim was based on non-actionable statements).

26  **II.     ARCHER SEEKS DAMAGES FOR WISK'S PRIVILEGED CONDUCT**

27         Archer's defamation theory is based on Wisk conduct that is absolutely privileged against

28  liability.  Professor Milbourn stated that, to the extent Wisk's Statements caused Archer to suffer

economic and reputational harm, it was not because a meaningful number of persons read them, but because Wisk "amplified" the statements by disseminating them to reporters who republished them. Ex. R ¶¶ 37, 40, 73; Ex. A (Milbourn Tr.) 229:2-229:17; Exs. Y, AX-BH. He states that Wisk's putting a press release or blog post on its website, standing alone, would have garnered little attention unless and until Wisk followed up, as he believes Wisk did. Ex. R ¶ 40.[3]

Archer neglected to tell its expert that the Court has already ruled that Archer "cannot impose liability for transmitting the press release to a wire service or the damages that resulted from that transmission." Dkt. 146 at 17; *see also* Dkt. 124 at 25 (Court relies on Archer's representation that its "claims are not based on [] Wisk's 'transmittal' of Wisk's blog posts and press release to 'news outlets,' but rather on Wisk's *own* publication of those false statements on its blog and its press release"). The Court's holding, that Wisk's dissemination of Wisk's Statements to reporters is not actionable, is compelled by California's "fair and true reporting" privilege, Civil Code section 47(d). That privilege is absolute for "those who communicate information to the media." *Healthsmart Pac., Inc. v. Kabateck*, 7 Cal. App. 5th 416, 431 (2016); *see also Argentieri v. Zuckerberg*, 8 Cal. App. 5th 768, 794 (2017) (general counsel emails to reporters accusing plaintiff of forgery were covered by fair and true reporting privilege).

Archer must provide a "link between the injury suffered and the illegal practices of the defendant." *Wyatt Tech. Corp. v. Malvern Instr. Inc.*, 2010 WL 11505684, at *3 (C.D. Cal. Jan. 25, 2010). But it has, through its expert, based its claims on acts that were legal. That ends its counterclaims. *City of Vernon v. S. Cal. Edison Co.*, 955 F.2d 1361, 1372-73 (9th Cir. 1992).

## III.   THE FIRST AMENDMENT PRECLUDES ARCHER'S INTERFERENCE AND DEFAMATION CLAIMS

### A.   Wisk's Statements Are Protected Opinion.

Wisk's Statements are "statements of *opinion* rather than fact" that "cannot form the basis for a libel action." *Campanelli v. Regents of the Univ. of Cal.*, 44 Cal. App. 4th 572, 577-78 (1996). The court "look[s] at the statement in its broad context," "analyz[es] the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that

---

[3] Milbourn likewise cannot separate out the "amplification" from Wisk's emails to reporters from stories written from court filings or other stories. Ex. A (Milbourn Tr.) 222:6-223:19.

particular situation," and asks "whether the statement … is sufficiently factual to be susceptible of being proved true or false." *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995). In denying Wisk's pleading motion, the Court stated that Wisk's Statements are not "mere opinions or puffery," noting that Archer had "adequately pleaded" its claims. Dkt. 146 at 21. But Wisk had not sought to dismiss the counterclaims on the grounds that Wisk's Statements were opinion, which is often a summary judgment question, so the Court had no reason to conduct the required multi-factor analysis. On this record, Wisk's Statements are non-actionable opinions.

*The Lawsuit Statements*: Archer is not the first defendant to countersue for defamation over the plaintiff's public statements about the case; courts have repeatedly granted summary judgment, holding that the First Amendment bars such claims. The statements at issue—that Archer "infringed" Wisk's patents and "stole" Wisk's technology to create an aircraft that is remarkably similar to Wisk's—were in a litigation adversary's website. They are "protected by the First Amendment, and [are] not subject to a defamation suit," because "[t]he public would see that the two companies were involved in a lawsuit," and "expect a vigorous debate between both sides in the press." *Mattel, Inc. v. MCA Records, Inc.*, 28 F. Supp. 2d 1120, 1159, 1161-62 (C.D. Cal. 1998) (granting summary judgment on defamation counterclaim based on statement that the alleged infringer was committed a "crime" and "theft" of Mattel's Barbie doll trademarks).

Wisk's Lawsuit Statements were "made … on its own blog to 'explain the reasons behind the steps [the plaintiff] has taken,'" and are non-actionable. *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, 2013 WL 3460707, at *4 (N.D. Cal. July 9, 2013). *Amaretto* granted summary judgment on a defamation counterclaim over statements a copyright owner made in its blog post about the litigation that are materially indistinguishable from those at issue here: the defendant's product "was a 'near complete clone'" of the plaintiff's product, "would be infringing on the copyrights that [the plaintiff] held," and the "[Plaintiff's] works are protected by copyright." *Compare id.* at *3 *with* Dkt. 154 (SACC) ¶¶ 80-86. And in *Information Control Corp. v. Genesis One Comput. Corp.*, 611 F.2d 781, 783, 784 (9th Cir. 1980), the Ninth Circuit likewise affirmed summary judgment on a defamation claim based on a press release about a lawsuit "made in the early weeks of a commercial litigation which promised to be hard fought."

1   Further, because Wisk "outline[d] the facts available to [it], thus making it clear that the

2   challenged statements represents his own interpretation of those facts and leaving the reader free

3   to draw his own conclusions, those statements are generally protected by the First Amendment."

4   *Partington v. Bugliosi*, 56 F.3d 1147, 1156-57 (9th Cir. 1995).  In addition to providing a

5   summary of Wisk's forensic investigation and other reasons why Wisk believed Archer had based

6   its aircraft design on Wisk's design, "by linking to the [Complaint] and [the case caption to the

7   public docket], [Wisk] gave its blog readers additional context to decide whether to accept or

8   reject [Wisk's] opinions based on their own independent evaluations."  *Amaretto*, 2013 WL

9   3460707, at *4; *see Franklin*, 116 Cal. App. 4th at 378 (affirming summary judgment on

10  defamation claim and holding that emails to potential customers stating that the plaintiffs "stole

11  copyrighted material, plagiarized data" are "opinions because [the authors] purported to apply

12  copyright … law to facts" and "disclosed the facts upon which the opinions were based by

13  directing the reader to the FCC Web site and … to another company's Web site").

14  **The Criminal Investigation Statement**: the Criminal Investigation Statement also appears

15  in Wisk's blog post about the lawsuit and along with the basis for making the statement, namely

16  Archer's public statements to the *New York Times* and Atlas Crest's 8-K filing.  The statement is

17  non-actionable.  *See Franklin*, 116 Cal. App. 4th at 387-88 ("Accusations of criminal activity, like

18  other statements, are not actionable [opinion] if the underlying facts are disclosed.").

19      **B.      The Criminal Investigation Statement Was True.**

20      Truth is an absolute defense for a defamation claim.  *Innovative Business P'ships, Inc. v.*

21  *Inland Counties Reg'l Ctr, Inc.*, 194 Cal. App. 4th 623, 632 (2011).[4]  A court focuses not on the

22  statement's literal truth, but instead on whether the "***substance*** of the charge, irrespective of slight

23  inaccuracy in the details" is true.  *Smith v. Maldonado*, 72 Cal. App. 4th 637, 646-47 (1999).

24  Hence, if the statement is "substantially true as to justify the 'gist' or 'sting' of the remark," the

25  defamation claim is foreclosed.  *Hughes v. Hughes*, 122 Cal. App. 4th 931, 936 (2004); *see*

26  ───────────────
    [4] Archer is a limited purpose public figure, *see infra* III.C; thus, Archer has the burden of proving
27  that the statements are false.  *Integrated Healthcare Holdings, Inc. v. Fitzgibbons*, 140 Cal. App.
    4th 515, 528-29 (2006).  Regardless of who has the burden, the question is whether the statement
28  is "substantially true."  *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 508, 516-17 (1991).

1   *Innovative Business P'ships*, 194 Cal. App. 4th at 632 ("Every detail of the statement need not be

2   literally true so long as the imputation is substantially true." (quotation omitted)).

3        The Criminal Investigation statement was true: There was a criminal investigation "into

4   Archer relating to the theft and use of Wisk's intellectual property."  Archer has characterized the

5   criminal investigation as applying to its employees but not itself.  The undisputed facts show

6   otherwise.  The grand jury subpoena to Archer was not focused solely on Archer's employees.  It

7   required Archer to produce a broad range of documents that are germane to determining whether

8   Wisk's technology made its way to Archer, such as those concerning ***Archer's*** "financing,

9   funding, investors, mergers," as well as documents about ***Archer's*** business and hiring practices,

10  including records about "[a]ny Wisk technology, products or business plans, … [including]

11  confidential business information or data belonging to Wisk … or [Archer's] use of any such

12  information."  Ex. M at -738.  The prosecutors had no reason to put blinders on and look only at

13  those who stole valuable information from their prior employer, but not the current employer who

14  would stand to benefit from that information.  That would contravene the purpose of the Economic

15  Espionage Act—to prosecute not just those who took intellectual property, but also anyone who

16  would benefit from that illicit activity.  Ex. O-B (Freeh Reb. Rep.) ¶¶ 16, 20.

17       As Wisk's expert, Former FBI Director Louis J. Freeh, explained in his report—which

18  Archer declined to rebut—it was accurate for Wisk to have said that the investigation was "into

19  Archer" because Archer met the definition of a "subject" of a federal criminal investigation.

20  Ex. O-A (Freeh Rep.) ¶ 36.  A "subject" is a person or company whose conduct is "within the

21  scope of the investigation."  *Id.*  As Director Freeh explained, and the subpoena to Archer shows,

22  Archer necessarily was a subject; the government "sought in its investigation to determine whether

23  evidence existed that Archer was complicit in the downloading, was aware of it or had encouraged

24  it, or had used or benefitted from the downloaded trade secret information," evidence of which

25  could lead to charges against Archer.  *Id.* ¶¶ 17, 36-37.  Archer provided no expert testimony—or

26  any other reliable evidence—that it was not a subject of the Criminal Investigation.  Archer failed

27  to do so even though it knew, when it asserted its counterclaims, that Wisk meant that Archer was

28  a subject: "Archer engaged in unlawful conduct and/or is the ***subject*** of a criminal investigation."

1    Dkt. 154 SACC ¶ 90; *see also* Ex. U 57:22-24.  Archer's expert still avoided opining on that.

2         Archer's merger partner Atlas Crest was more candid.  In its June 4, 2021 SEC filing, it

3    characterized the Criminal Investigation using the same "investigation into Archer" phrase that

4    Wisk had: "On March 30, 2021, one of Archer's employees, who is a former employee of [Wisk]

5    was the subject of a search warrant executed at his home in connection with a federal ***investigation***

6    ***into Archer's*** aircraft design and hiring practices."  Ex. B at -952.  After realizing the significance

7    of that admission, Atlas Crest filed an amended Form S-4 that omitted it.  Ex. Z at -600.  ███████

8    █████████████████████████████████ Ex. U (Spellacy Tr.) 147:15-22, 154:3-155:11.  But Atlas

9    Crest's team of lawyers reviewed its SEC filings carefully to ensure that their considered

10   description of the DOJ investigation as being "into Archer" was accurate.  And when Atlas Crest

11   filed the amended version, it did not say that its prior use of "investigation into Archer" was

12   inaccurate or misleading.  Ex. Z at -600.

13        **C.**     **Archer Cannot Show That Wisk Spoke With Actual Malice.**

14             **1.**     **Archer is a limited purpose public figure.**

15        The First Amendment protects statements about public figures, requiring the plaintiff to

16   show knowledge of falsity or reckless disregard for the truth.  *E.g.*, *Mattel*, 27 F. Supp. 2d at 1162.

17   Archer's public figure status is a question of law.  *Reader's Digest Assn. v. Superior Court,* 37

18   Cal. 3d 244, 255 (1984).  Archer is at least a limited purpose public figure because "the alleged

19   defamation is related to [Archer's] participation in the [public] controversy" and because Archer

20   "voluntarily injected [it]self into the controversy for the purpose of influencing the controversy's

21   ultimate resolution."  *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 266 (9th Cir. 2013).

22        Long before Wisk made its statements, a public controversy existed over the development

23   of eVTOL vehicles for general public use, and how that development would be funded, which has

24   "foreseeable and substantial ramifications for nonparticipants."  *Annette F. v. Sharon S.*, 119 Cal.

25   App. 4th 1146, 1164 (2004) (quotation omitted); *Ampex Corp. v. Cargle*, 128 Cal. App. 4th 1569,

26   1578 (2005) (public company's decision to discontinue its business is "a public controversy").

27        As the Court observed, the "many news articles in well-trafficked publications" indicates

28   that the parties are "in an industry that is a 'topic of widespread, public interest' to a 'substantial

number of people.'"  Dkt. 146 at 8; *see id.* n.3-4.  Archer's expert agrees.  Ex. R (Milbourn Rep.) ¶ 36.  This includes Archer's decision to fund its eVTOL through a SPAC.  *E.g.*, Ex. AP, Sindreu, *Next Stop for Electric-Vehicle SPAC Mania: the Jetsons*, The Wall Street Journal (Feb. 11, 2021).

Moreover, since "exit[ing] stealth mode and publicly post[ing] in May 2020 a rendering of *Maker*" and claiming that it was the product of its own engineering, Dkt. 154 ¶ 14, Archer "engaged in promoting itself and its products" and sent "statements to numerous press outlets," thus injecting itself into the public debate.  *Mattel*, 28 F. Supp. 2d at 1162-63.  It publicly touted its alleged innovation and plans to exploit it.  *See, e.g.*, Dkt. 154 ¶¶ 14-15; Ex. P; Ex. AT.  Archer made the public case that it—not Wisk or anyone else—would lead the way in eVTOL travel.  *See* Ex. AA.  Archer also attributed its capabilities to its hiring practices, and news coverage in May 2020 reported that Archer had "assembled a team of 44 engineers … coaxed from other major eVTOL players, including Joby, the Airbus' Vahana team, Wisk, and Kitty Hawk."  Ex. AU.

These statements invited Wisk and others to comment.  Wisk's statements about Archer's hiring practices and technology are germane to that controversy.  *See Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 589 (D.C. Cir. 2016).  The First Amendment thus requires Archer to prove that Wisk made its statements with actual malice.

### 2.   Archer cannot show that Wisk made its statements with actual malice.

Archer must show by clear and convincing evidence that Wisk "entertained serious doubts as to the truth of [its statements] or acted with a high degree of awareness of probable falsity"—*i.e.*, actual malice.  *Underwager*, 39 F.3d at 368 (quotation omitted).  To survive summary judgment, Archer must show "sufficient evidence to permit the conclusion that [Wisk] in fact entertained serious doubts as to the truth of his publication."  *Reader's Digest*, 37 Cal. 3d at 256-57.  But Archer has no evidence of actual malice.  To the contrary, the evidence shows that Wisk's Statements were the product of significant due diligence and information from reliable sources.

***The Lawsuit Statements***:  Archer lacks any evidence that Wisk thought its Lawsuit Statements—which summarized the substance of Wisk's claims, the forensic investigation that preceded filing them, and the stunning similarities between Wisk's aircraft design and Archer's—were false or recklessly disregarded the truth.  *See id.* at 259, 266 (no actual malice where

1   publishers relied on articles, writing, and conversations with two professors).  This Court too

2   observed that Wisk's allegations—drawn from its pre-litigation investigation—"reasonably imply

3   misappropriation by Archer."  Dkt. 133 at 24 ("the allegedly implausible development timeline

4   concurrent with the influx of former Wisk employees reasonably implies that Archer 'had reason

5   to know' that the Maker was improperly derived in part from Wisk's trade secrets").  Wisk did not

6   draw unreasonable or far-fetched conclusions, so Archer cannot establish constitutional malice.

7            ***The Criminal Investigation Statement***:  Archer also has no evidence that Wisk had serious

8   doubts about the truth of this statement.  Wisk had identified Archer's public disclosures and Atlas

9   Crest's Form 8-K as the sources.  Wisk's General Counsel and Rule 30(b)(6) witness testified that

10  the facts for the Criminal Investigation Statement also came from Wisk's discussions with the FBI

11  and U.S. Attorney's Office.  Ex. N (Bibbes Tr.) 77:22-78:03; 78:17-79:2; 80:14-82:8; 95:13-25.

12        **D.        The Same First Amendment Principles Also Bar the Interference Claims.**

13           Claims for interference with prospective economic advantage "may not be based on speech

14  that is entitled to constitutional protection."  *See Copp v. Paxton*, 45 Cal. App. 4th 829, 845-46

15  (1996).  "First Amendment limitations are applicable to all claims, of whatever label, whose

16  gravamen is the alleged injurious falsehood of a statement."  *Isuzu Motors Ltd. v. Consumers*

17  *Union, Inc.*, 12 F. Supp. 2d 1035, 1045 (C.D. Cal. 1998) (citation omitted).  Archer's interference

18  claims are "based on precisely the same communications which we have found to be statutorily

19  and constitutionally protected" and it is "barred on the same grounds."  *Copp*, 45 Cal. App. at 848.

20           The prospective economic advantage claim also fails because without the defamation

21  claim, Archer cannot meet its "burden of pleading and proving that the defendant's interference

22  was wrongful by some reason beyond the fact of the interference itself."  *Della Penna v. Toyota*

23  *Motor Sales, U.S.A., Inc.*, 11 Cal. 4th 376, 392-93 (1995) (quotation omitted).

24  **IV.    ARCHER'S UCL CLAIM ALSO FAILS**

25           Because Archer cannot identify damages attributable to Wisk's Statements (*see* Sections I-

26  II), Archer does not even have standing to assert a UCL claim, which requires Archer to have

27  "suffered an injury in fact and lost money or property as a result of the unfair competition,"

28  *Kennedy v. Jackson Nat. Life Ins. Co.*, 2010 WL 4123994, at *14 (N.D. Cal. Oct. 6, 2010)

1   (quotation omitted); *Johnstech Int'l Corp. v. JF Microtechnology SDN*, 2016 WL 4182402, at *5

2   (N.D. Cal. Aug. 8, 2016).  Nor can Archer establish any of the three UCL prongs.

3   Archer cannot meet the ***unlawful*** prong, which requires "a violation of another law."

4   *Berryman v. Merit Prop. Mgmt.*, 152 Cal. App. 4th 1544, 1554 (2007).  Where "all of the alleged

5   predicate offenses (defamation …, and intentional [claim]) are deficient as a matter of law," as

6   here, the unlawful prong of the UCL is not satisfied.  *Johnstech Int'l Corp.* 2016 WL 4182402, at

7   *5; *Franklin*, 116 Cal. App. 4th at 443-44 (similar); *Amaretto*, 2013 WL 3460707, at *8 (similar).

8   Because this is a case between competitors, "a business practice is '***unfair***' only if it

9   'threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those

10  laws because its effects are comparable to or the same as a violation of the law, or otherwise

11  significantly threatens or harms competition.'"  *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal.

12  App. 4th 247,  254 (2010).  Archer complains about harms to itself and not to competition.  Dkt.

13  154 ¶ 95.  The unfair prong is thus off limits.  *See Johnstech Int'l Corp.*, 2016 WL 4182402, at *5.

14  The ***fraudulent*** prong is "wholly unsupportable" because Archer provided no evidence that

15  members of the public were, or were likely to be, deceived by Wisk's Statements.  *Id.*; *Amaretto*,

16  2013 WL 3460707, at *8 ("the Blog Entry itself contained mere statements of opinion that the

17  public was likely to view as such, and so the statements were not likely to deceive").

18  **V.     WISK IS ENTITLED TO PREVAIL ON ITS '036 PATENT CLAIM**

19  The '036 Patent is directed to Wisk's multicopter aircraft design with booms oriented at

20  "cant angles."  Ex. AB ('036 Patent) 4:59-65.  This allows the rotors to generate a horizontal force

21  component and thus rotational moments about one or more axes of the aircraft.  *Id.* 5:51-55.  This

22  enhances stability and control.  *Id.* 1:6-8, 6:28-56.  The Court should grant summary judgment that

23  Archer has infringed claim 2 of the '036 Patent, and that claim 2 is not invalid.

24  Archer's ███████████ Maker aircraft met every claim limitation.  Claim 2 covers

25  a 6-boom, 12-rotor aircraft, with three booms mounted on each of two wings and rotors mounted

26  on the front and aft ends of each boom.  *Id.* cls. 1, 2.  The rotors must each produce "an amount of

27  vertical thrust independent of levels of vertical thrust produced by the other rotors."  *Id.* cl. 1.  Of

28  the six booms mounted on both wings, at least one subset of booms must be canted "inboard"

1   (towards the fuselage) and at least one subset of booms must be canted "outboard" (away from the

2   fuselage)—*i.e.*, "differential canting" or "alternating canting scheme."  *Id.* cl. 1, Fig. 2B.

3   　　　Archer's ████ Maker design was a substantial copy of Wisk's patented configuration.

4   *Compare id.* Fig. 2B *and* Ex. AC at -6049, *with* Ex. AD at -1250. ████████████████

5   ████████████████████████████████████████████████

6   ████████████████████████████████████████████████

7   ████████████████████████████████████████████████

8   ████████████████████████████████████████████████

9   ████████████████████████████████████████████████

10  ████████████████████████████████████

11  　　　Wisk has not accused ████████████████████████████

12  ████████████████████████████████ Thus, to streamline the

13  case, while still ensuring the exclusivity of Wisk's patented design, ████████████

14  ████████████████████████████████████████████

15  ████████████████████████████████████

16  　　**A.**　　**The Accused Archer Aircraft Infringed Claim 2 of the '036 Patent.**

17  　　　There is no genuine issue of disputed fact that Archer's aircraft, ████████████

18  ████████████████████████████ infringed claim 2.  Wisk's expert,

19  Dr. Gandhi has opined that all limitations of claim 2 are met by the relevant accused aircraft.  *See*

20  Ex. AK-A (Gandhi Rep.) ¶¶ 348-373 (subscale "Betty"), ¶¶ 374-398 (full-scale "Maker").

21  　　　For example, Dr. Gandhi demonstrates (and it is undisputed) that the Maker aircraft has all

22  of the following: a "fuselage," *id.* ¶ 375; a "port side wing," *id.* ¶ 377; a "starboard side wing,"

23  ¶ 379; three booms mounted beneath each wing, *id.* ¶ 381; a first plurality of lift rotors (*i.e.*, 6

24  total) mounted on the forward end of each of the booms, *id.* ¶¶ 383, 397 (the Court construed "lift

25  rotors" to mean "rotors configured to provide lift," Dkt. 258 at 16); a second plurality of lift rotors

26  (*i.e.*, 6 total) mounted on the after end of each of the booms, *id.* ¶¶ 385, 397; ████████████

27  ████████████████████████████████████████████

28  ████████████████████████████████████████████

1  ████████████████████████████████████████████████

2  ████████████████████████████████████████████

3  ████████████████████████████████████████████

4  ████████████  Thus, ████████████████ was a direct (and likely willful) infringement of the '036

5  Patent.  *See* 35 U.S.C. § 271(a).  ████████████████████████████

6  ████████████████████████████████

7  ████████████████████████████████████████████  Thus,

8  there is no genuine issue of material fact that Archer's ██████ Maker ████ infringed claim 2 of

9  the '036 Patent.

10    ██████████████████████████████████████████

11  ██████████████████████████████████████████

12  ████████████████████████████████████████████  It is

13  undisputed that this subscale aircraft had a "fuselage," Ex. AK-A (Gandhi Rep.) ¶ 350; a "port

14  side wing," *id.* ¶ 351; a "starboard side wing," *id.* ¶ 353; three booms mounted beneath each wing,

15  *id.* ¶ 355; a first plurality of lift rotors (*i.e.*, 6 total) mounted on the forward end of each of the

16  booms, *id.* ¶¶ 357, 372; and a second plurality of lift rotors (*i.e.*, 6 total) mounted on the after end

17  of each of the booms, *id.* ¶¶ 359, 372. ████████████████████████

18  ████████████████████████████████████████████

19  ████████████████████████████████████████████

20  ██████████████████████████████████

21    The *only* dispute regarding infringement by the subscale aircraft raised by Dr. Smith is that

22  there is insufficient evidence to determine whether ██████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████  But Dr.

25  Smith's investigation of the ████████ aircraft was deficient.  Ex. AN (Smith Tr.) 331:17-333:5.

26  ████████████████████████████████████████████

27  ████████████████████████████████████████████

28  ████████████████████████████████████████████

1 ███████████████████████████████████████████████

2 ████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████

4 ██████████████████████████████████████████████████

5 ███████████████████████████████████████████████

6 █████████████████████████████████████████████

7 █████████████████████████████████████████████ Thus,

8 Dr. Smith's conclusory opinion does not raise a genuine issue of material fact ███████████

9 ██████████████████████████████ *See Invitrogen Corp. v. Clontech Lab's, Inc.*,

10 429 F.3d 1052, 1079-80 (Fed. Cir. 2005) (rejecting accused infringer's argument that the expert

11 testimony it presented raised a genuine issue of material fact where that testimony was merely

12 based on a "speculative difference of opinion"); *see also McGinley v. Franklin Sports, Inc.*, 262

13 F.3d 1339, 1349 (Fed. Cir. 2001) (affirming partial summary judgment on infringement because

14 the infringer "did not present any nonconclusory evidence" of non-infringement).

15     **B.**    <u>Claim 2 of the '036 Patent is Not Invalid Over the Alleged Prior Art.</u>

16     There is likewise no genuine issue of disputed fact that Archer cannot meet its burden of

17 showing that claim 2 of the '036 Patent is invalid by clear and convincing evidence. ████████

18 ████████████████████████████████████████████████

19 ██████████████████████████████ Archer therefore relies entirely on a theory

20 of obviousness, involving combinations of multiple disparate references. ████████████████

21 ██████████████████████████

22     None of Dr. Smith's purported combinations raises a genuine issue of material fact

23 regarding the presumed validity of claim 2.  For instance, claim 2 requires three booms per wing,

24 with at least one boom canted inwards and one boom canted outwards.  Yet, as Dr. Gandhi

25 explains, three of Archer's five prior art references (Sada-Salinas, Shaw, and Hesselbarth) do not

26 teach the key concept of canting whatsoever.  Ex. AK-B (Gandhi Reb. Rep.) ¶ 14.  A fourth

27 reference, Kroo, teaches a single boom per side comprising multiple canted *rotors*, *id.* ¶ 15, but

28 this is substantially different from canting the *booms* themselves, ██████████████████

1  ████████████████ *id.* ¶ 123.  The fifth reference, Austen-Brown, teaches, at most, the

2  outward canting of a single boom per wing of the aircraft, which serves a different purpose than

3  the multiple, differentially canted booms of the '036 Patent.  *Id.* ¶ 167.  ***None*** of Archer's

4  references teach multiple, differentially canted booms per wing.  Thus, Archer's theory of

5  obviousness relies on reconstructing the key feature of the '036 Patent through impermissible

6  hindsight.  *See Cheese Sys., Inc. v. Tetra Pak Cheese and Powder Sys., Inc.*, 725 F.3d 1341, 1353-

7  54 (Fed. Cir. 2013) (affirming summary judgment of non-obviousness where accused infringer

8  relied upon "after-the-fact" expert testimony to reconstruct a key feature of the asserted patent).

9       Substantial secondary considerations also weigh against any finding of obviousness,

10  including Archer's direct copying of the differential canting feature from Wisk's Cora aircraft for

11  its ████ Maker design, which ███████████████████████████████████

12  ████████████████████████████████████████████

13  ██████████ Dr. Smith fails to meaningfully rebut these facts.  ████████████

14  ████████████████████████████████████████████████

15  ██████████████████████████████████

16                                   **<u>CONCLUSION</u>**

17       For the foregoing reasons, the Court should grant summary judgment in favor of Wisk.

18  DATED:  March 19, 2023                Respectfully submitted,

19                                    QUINN EMANUEL URQUHART
                                       & SULLIVAN, LLP

20
                                      By:   */s/ Yury Kapgan*
21                                         Yury Kapgan
22                                         Robert M. Schwartz
                                          Diane Cafferata
23                                         Patrick Schmidt
                                          Michael F. LaFond
24
25                                         *Attorneys for Plaintiff Wisk Aero LLC*
26
27
28