1    GIBSON, DUNN & CRUTCHER LLP
     Josh A. Krevitt, SBN 208552
2      jkrevitt@gibsondunn.com
     1881 Page Mill Road
3    Palo Alto, CA  94304-1211
     Telephone: 650.849.5300
4    Facsimile: 650.849.5333

5    Daniel J. Thomasch, admitted *pro hac vice*
       dthomasch@gibsondunn.com
6    Paul Torchia, admitted *pro hac vice*
       ptorchia@gibsondunn.com
7    200 Park Avenue
     New York, NY  10166-0193
8    Telephone: 212.351.4000
     Facsimile: 212.351.4035
9
     Wayne Barsky, SBN 116731
10     wbarsky@gibsondunn.com
     Michael H. Dore, SBN 227442
11     mdore@gibsondunn.com
     Diana M. Feinstein, admitted *pro hac vice*
12     dfeinstein@gibsondunn.com
     2029 Century Park East, Suite 4000
13   Los Angeles, CA  90067-3026
     Telephone: 310.552.8500
14   Facsimile: 310.551.8741

15   Attorneys for Defendant and Counterclaimant
     Archer Aviation Inc.

16

17                    **UNITED STATES DISTRICT COURT**

18                  **NORTHERN DISTRICT OF CALIFORNIA**

19                     **SAN FRANCISCO DIVISION**

20

21   WISK AERO LLC,                          CASE NO. 3:21-CV-02450-WHO

                      Plaintiff,             **MOTION FOR SUMMARY JUDGMENT**
22
                                             **Hearing Date:** May 12, 2023
23        v.                                 **Hearing Time:** 3:00 PM

24   ARCHER AVIATION INC.,                    Hon. William H. Orrick III

25                    Defendant.

26

27        <span style="color:red">REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED</span>

28

1  **TO PLAINTIFF WISK AERO LLC AND ITS COUNSEL OF RECORD**:

2          **PLEASE TAKE NOTICE** that on May 12, 2023 at 3:00 PM, or as soon thereafter as the matter

3  may be heard, in the courtroom of the Honorable William H. Orrick at the United States District Court

4  for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, Defendant

5  Archer Aviation Inc. ("Archer") will and hereby does move the Court for summary judgment pursuant

6  to Federal Rule of Civil Procedure 56 on the First, Second, Fourth, and Fifth Causes of Action in Wisk's

7  Second Amended Complaint, which allege misappropriation of trade secrets under federal and

8  California law, and infringement of U.S. Patent No. 10,110,033 ("the '033 Patent") and U.S. Patent

9  No. 9,764,833 ("the '833 Patent").

10         Archer's Motion seeks the following relief, as set forth in the Proposed Order submitted with

11 this Motion:  An order granting summary judgment for Archer on the First and Second Causes of

12 Action of Wisk's Second Amended Complaint on the grounds that, for each trade secret, Archer did

13 not misappropriate that trade secret or, in the alternative, that each trade secret does not qualify for

14 trade secret protection; and an order granting summary judgment for Archer on the Fourth and Fifth

15 Causes of Action of Wisk's Second Amended Complaint on the ground that Archer does not infringe

16 any asserted claim of the '033 Patent (with respect to the Midnight production aircraft) or the '833

17 Patent.

18         Archer's Motion is based upon this Motion, the below supporting memorandum of points and

19 authorities, the concurrently filed exhibits, affidavits, and declarations, Archer's forthcoming reply

20 brief in support of this motion, and any other written oral argument or submission that Archer may

21 submit to the Court.

22

23 DATED:  March 19, 2023                    GIBSON, DUNN & CRUTCHER LLP

24

25                                           By:  _____/s/ Josh A. Krevitt_____
                                                              Josh A. Krevitt

26                                           *Attorneys for Defendant Archer Aviation Inc.*

27

28

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND.................................................. 3

    I.    Archer's Business and eVTOL Development................................................. 3

    II.    Wisk's Complaint and Motion for Preliminary Injunction ..................................... 4

    III.    Wisk's Trade Secret Disclosure and Archer's Motion to Strike............................. 5

    IV.    Fact Discovery Produced to Wisk ........................................................... 5

    V.    Forensic Evidence Relating to Archer and Personal Devices................................ 5

    VI.    Wisk's Changing Trade Secret Descriptions ................................................ 6

LEGAL STANDARDS............................................................................... 8

ARGUMENT ...................................................................................... 10

    I.    No Trade Secret Liability................................................................... 10

        A.    Trade Secret 1: *Aerodynamic Models Based On High Quality Simulation Data* ............................................................ 11

        B.    Trade Secret 3: *Aerodynamic Studies Regarding Lift Fan Locking And Stowing* ...................................................... 16

        C.    Trade Secret 15: *Studies Regarding Advantages Of A Tiltable Rotor Design* ............................................................ 17

        D.    Trade Secret 12: *Motor Optimization Model* ........................................... 21

        E.    Trade Secret 17: *Motor Control Algorithms and Architecture* ................ 25

        F.    Trade Secret 29: *Energy Storage System Architecture* ............................ 27

        G.    Trade Secret 30: *Lithium-Ion Battery Cell Design Studies* ...................... 30

        H.    Trade Secret 31: *Performance Studies for Typical Mission Profile* ........ 33

        I.    Trade Secret 39: *High Voltage Connection System Design* ...................... 35

        J.    Trade Secret 44: *Avionics Architecture and Systems* ................................ 39

II.   No Patent Infringement Liability .......................................................................... 43

    A.   '033 Patent: *No Evidence of Infringement by Midnight Production Aircraft* ................................................................................................ 43

    B.   '833 Patent: *Noninfringement by All Accused Archer Aircraft* ................ 44

CONCLUSION ................................................................................................................ 45

DEFENDANT ARCHER AVIATION INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:21-CV-02450-WHO

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

**CASES**

4

*Aerotec Int'l v. Honeywell Int'l,*
  836 F.3d 1171 (9th Cir. 2016)...............................................................................10

5

*Am. Airlines v. KLM Royal Dutch Airlines,*
  114 F. 3d 108 (8th Cir 1997)....................................................................................9

6

7

*ATS Prod., Inc. v. Champion Fiberglass, Inc.,*
  No. 13-CV-2403, 2013 WL 6086924 (N.D. Cal. Nov. 19, 2013)............................29

8

*BladeRoom Grp. Ltd. v. Facebook, Inc.,*
  No. 15-CV-1370-EJD, 2018 WL 514923 (N.D. Cal. Jan. 23, 2018)........................29

9

10

*Calendar Rsch. LLC v. StubHub, Inc.,*
  2020 WL 4390391 (C.D. Cal. May 13, 2020) ....................................................9, 15

11

*ChromaDex, Inc. v. Elysium Health, Inc.,*
  301 F. Supp. 3d 963 (C.D. Cal. 2017) ......................................................................8

12

13

*Clare v. Chrysler Grp. LLC,*
  819 F.3d 1323 (Fed. Cir. 2016)...............................................................................45

14

*Danjaq LLC v. Sony Corp.,*
  1999 WL 317629 (C.D. Cal. Mar. 11, 1999) ..........................................................10

15

16

*Excelligence Learning Corp. v. Oriental Trading Co.,*
  No. 03-CV-4947-JF, 2004 WL 2944048 (N.D. Cal. Dec. 20, 2004)...................9, 10

17

18

*Freeman Inv. Mgmt. Co., LLC v. Frank Russell Co.,*
  2016 WL 5719819 (S.D. Cal. Sept. 30, 2016), *aff'd*, 729 F. App'x 590 (9th Cir. 2018) .....9, 39

19

*GSI Tech., Inc. v. United Memories, Inc.,*
  No. 5:13-CV-1081-PSG, 2016 WL 3035699 (N.D. Cal. May 26, 2016) ..................9

20

21

*Imax Corp. v. Cinema Techs., Inc.,*
  152 F.3d 1161 (9th Cir. 1998)...................................................................................9

22

23

*Jobscience, Inc. v. CVPartners, Inc.,*
  No. 13-CV-4519-WHA, 2014 WL 852477 (N.D. Cal. Feb. 28, 2014)......................8

24

*Les Concierges, Inc. v. Robeson,*
  No. 09-CV-1510-MMC, 2009 WL 1138561 (N.D. Cal. Apr. 27, 2009) ............10, 39

25

26

*M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur,*
  400 F. Supp. 3d 867 (N.D. Cal. 2019)  ..............................................................8, 10

27

28

*Medgraph, Inc. v. Medtronic, Inc.*,
    843 F.3d 942 (Fed. Cir. 2016).............................................................................10, 11

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
    420 F. Supp. 2d 1070 (N.D. Cal. 2006), *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007).............9, 10

*Parallel Networks, LLC v. Abercrombie & Fitch Co.*,
    704 F.3d 958 (Fed. Cir. 2013)...........................................................................15, 18

*PMC, Inc. v. Kadisha*,
    78 Cal. App. 4th 1368 (2000) ..................................................................................10

*Proofpoint Inc. v. Vade Secure, Inc.*,
    No. 19-CV-4238-MMC (RMI), 2021 WL 2197954 (N.D. Cal. June 1, 2021).................24, 28

*Quintara Biosciences, Inc. v. Ruifeng Biztech Inc.*,
    No. 20-CV-4808-WHA, 2021 WL 2166880 (N.D. Cal. May 27, 2021) ..................................8

*Sun Distrib. Co., LLC v. Corbett*,
    2018 WL 4951966 (S.D. Cal. Oct. 12, 2018) ...........................................................10

*Swarmify, Inc. v. Cloudflare, Inc.*,
    No. 17-CV-6957-WHA, 2018 WL 2445515 (N.D. Cal. May 31, 2018) .................................9

*Treehouse Avatar LLC v. Valve Corp.*,
    54 F.4th 709 (Fed. Cir. 2022)....................................................................................45

*VR Optics, LLC v. Peloton Interactive, Inc.*,
    No. 2021-1900, 2023 WL 2031213 (Fed. Cir. Feb. 16, 2023) ................................................45

*Vt. Microsystems, Inc. v. Autodesk, Inc.*,
    88 F.3d 142 (2d Cir. 1996)..........................................................................................9

*Whyte v. Schlage Lock Co.*,
    101 Cal. App. 4th 1443 (2002) ................................................................................10

**STATUTES**

18 U.S.C. § 1839(5) ................................................................................................8

Cal. Civ. Code § 3426.1(b) ...................................................................................8

Cal. Civ. Proc. Code § 2019.210.............................................................................8

California Uniform Trade Secrets Act ..........................................................................8

Federal Defend Trade Secrets Act ..............................................................................8

1  **TREATISES**

2  Restatement (Third) of Unfair Competition § 40 cmt. d (1995) ..................................................... 10

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANT ARCHER AVIATION INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:21-CV-02450-WHO

**INTRODUCTION**

Wisk brought this case alleging that Archer had engaged in a "brazen theft" designed to "harvest as much confidential information as possible" from Wisk, and then "built" its business "on Wisk's intellectual property." None of that was true. And now, after nearly two years of extraordinary discovery, Wisk still has no evidence that anyone at Archer ever used—let alone stole—any one of its trade secrets. Summary judgment is warranted.

Everything Archer has done to design and develop its aircraft is documented; every system, subsystem, and component part is identified in detailed drawings. Discovery has rendered Archer's business an open book—Wisk knows exactly how Archer's aircraft are configured, how they were designed and developed, and by whom. Although Wisk asserted that "Archer engineering documentation is stunning in its reliance on Wisk's trade secrets," and that "the sheer volume of theft" was so great that Wisk could not address it all, Wisk cannot now point to any aspect of Archer's aircraft and trace it to any Wisk trade secret. Indeed, forensic examinations prove that Archer has never had even a single Wisk document reflecting a single Wisk trade secret, and not a single confidential Wisk document has ever been accessed by anyone at Archer.

That is why the specific allegations of *what Archer supposedly stole* have vanished, replaced by vague accusations about individuals who used to work at Wisk in certain areas (*e.g.*, aerodynamics, avionics, batteries) and now do so at Archer and, thus, *must have* used some Wisk information. But intentional theft is a serious charge, requiring real evidence, and Wisk has none. Instead, to create the impression of a claim, Wisk relies entirely on innuendo, speculation, and allegations of widespread perjury—none of which is, or can substitute for, *actual* evidence, or create a genuine dispute for a jury.

Wisk's own experts all but concede there was no use of any Wisk trade secret. While Wisk accuses Archer of misappropriating certain "studies" and "models" (TS 1, 3, 15, 30, 31), Wisk's experts *do not identify a single Wisk trade secret study or model* ever at Archer, let alone used by Archer. While Wisk accuses Archer of misappropriating certain "architectures" (TS 29, 39, 44), Wisk's experts *admit* that Archer does not use any one of those architectures. While Wisk accuses Archer of misappropriating Wisk "algorithms" (TS 17), Wisk's expert *admits* that Archer purchased equipment that uses that third party's proprietary algorithms. And, while Wisk accuses Archer of misappropriating

1  its motor "simulation tool" (TS 12), Wisk's expert *admits* he has never even seen Wisk's tool, let alone

2  compared it to Archer's, and *admits* that Wisk's tool was never used at Archer.

3  Wisk waves away these fatal deficiencies in its case with empty conjecture that its former

4  employees "had in mind" Wisk information and must have "leveraged" it as a "starting place" for their

5  work at Archer—no matter what they actually did at Archer or how different it is from what Wisk has

6  done. But evidence that former Wisk employees *knew* Wisk confidential information is not evidence

7  that they *used* such information, as a "starting place" or otherwise. To get to a jury, Wisk needs

8  affirmative, admissible evidence of misappropriation—proof that Archer's employees knowingly used

9  Wisk's trade secrets at Archer. That is what Wisk is missing; conjecture does not suffice.

10  And so, with full access to Archer's confidential files, Wisk has tried to rewrite its trade secrets.

11  Its new descriptions of the trade secrets—*on which it bases its claims*—bear no resemblance to the

12  trade secrets it told the Court it had "meticulously defined" in the 2019.210 Disclosure. Thus, a trade

13  secret on Wisk's "mission profile" performance studies (TS 31) becomes one on ████████████

14  ███████████████████████████████ a trade secret on Wisk's "battery cell design studies" (TS

15  30) becomes one on a ████████████████████ trade secrets on "overall" architectures

16  (TS 29, 39, 44) really cover isolated components; and a trade secret on specific aerodynamic models

17  (TS 1) becomes one that covers, literally, █████████████████████████████████

18  ████████████████████████████████████████████████

19  Wisk's "shifting sands" approach to its trade secrets is not only legally improper, it is exactly

20  what Wisk repeatedly told Archer and this Court it would not do. Wisk's attempted transformation of

21  its trade secrets is tantamount to an admission that it has no evidence of misappropriation—and reveals

22  that Wisk's case, from the start, has been nothing more than an accusation in search of evidence. It

23  also strips the trade secrets of any discernible scope, rendering them not sufficiently particular, which

24  is an independent basis for summary judgment. And, finally, there is no misappropriation in any event

25  because the baseless innuendo and speculation on which Wisk entirely relies does not show theft of

26  anything by anybody, no matter how Wisk's trade secrets are defined.

27  Wisk also asserts three patents, but only seeks damages as to two: the '833 and '033. Archer

28  does not infringe either, as Wisk's expert opinions demonstrate. Summary judgment should be granted.

**FACTUAL AND PROCEDURAL BACKGROUND**

I. **Archer's Business and eVTOL Development**

Archer was founded in October 2018. Its initial work, including the design of several eVTOL configurations, was performed through sponsored research at the University of Florida. Dkt. 58-13 (Adcock Decl.) ¶¶ 16–19. Beginning in mid-2019, Archer substantially increased its design capabilities by retaining third-party consultants to evaluate potential aircraft configurations. *Id.* ¶ 22. In September 2019, Archer hired FlightHouse Engineering ("FHE") which presented numerous tilting aircraft, including the "12-tilt-6" aircraft configuration ultimately chosen for Archer's demonstrator aircraft, the Maker. *Id.* ¶¶ 23, 29–32, 36–38; Dkt. 58-25 (Hughes Decl.) ¶¶ 16–26.

Starting in late 2019, Archer moved rapidly to increase its engineering team, including by hiring from several other companies, such as Joby, Wisk, and Airbus Vahana. Dkt. 58-13 ¶¶ 44–51. Those hires were put through a robust on-boarding process (including the provision of independent legal counsel to the on-boarded employees) intended to prevent any competitor proprietary information from reaching (or being used at) Archer. *Id.* ¶¶ 52–60.

Archer immediately put its newly enhanced team to work to select and build a demonstrator aircraft. On February 27, 2020, Archer's Chief Engineer Dr. Geoff Bower led Archer's conceptual design review for the Maker, which resulted in the selection of a 12-tilt-6 aircraft configuration. Dkt. 58-20 (Bower Decl.) ¶¶ 18–25. To minimize development time, Archer opted to purchase many of the Maker's key systems from third parties, including the energy storage system (ESS), high voltage batteries, motors, and motor controllers. *Id.* ¶¶ 30–39.[1] The Maker is an unmanned demonstrator aircraft not intended for FAA certification. Ex. 4 (Goldstein Tr.) at 17:22–18:17.[2] In contrast, the Midnight is Archer's production aircraft intended to be certified with the FAA. Ex. 5 (Archer Midnight Press Release). The Midnight and the Maker do not share the same systems, and Archer is developing in-house the Midnight's systems, including in relevant part the ESS, high voltage batteries, motors and motor controller. Ex. 1 (Bower Tr.) at 18:16–19:13; Ex. 6 (Marius Tr.) at 310:7–10, 409:10–12.

---

[1] Nevertheless, it took Archer until December 2021 to complete Maker's first hover flight, and until November 2022 to complete its first full-transition (hover to forward cruise) flight. Ex. 1 (Bower Tr.) at 503:15–17; Ex. 2 (Dec. 20, 2021 Archer press release); Ex. 3 (Dec. 1, 2022 Archer Press Release).
[2] All references to "Ex." are to exhibits appended to the Declaration of Kory Hines.

1    Development for the Midnight kicked off in early 2021, with the bulk of conceptual and preliminary

2    design performed after this lawsuit was brought.  Ex. 7 (Archer-NDCA-00078461); Ex. 1 (Bower Tr.)

3    at 87:5–18.  The design, development, and production of the Midnight remains ongoing to this day.

4    Bower Decl. ¶ 8.  For example, Archer is still selecting, and has not chosen, a battery charging system

5    for the Midnight*.  Id.* ¶ 7.

6    **II.**      **Wisk's Complaint and Motion for Preliminary Injunction**

7         Wisk filed this lawsuit on April 6, 2021, claiming Archer engaged in "a brazen theft" of Wisk's

8    intellectual property, and that the "striking resemblance" between a depiction of Maker and a drawing

9    of an aircraft that Wisk claimed to have developed "could not have been a coincidence."  Dkt. 1 ¶¶

10   1, 6.  Wisk pointed to the actions of one former Wisk engineer, alleging that Jing Xue "surreptitiously

11   downloaded thousands of files near midnight, shortly before he announced his resignation and

12   immediately departed to Archer," which, according to Wisk, Archer then used "to build its business in

13   brazen disregard of Wisk's intellectual property rights."  *Id.* ¶¶ 63–70.

14        Six weeks after filing the Complaint, Wisk filed a motion for preliminary injunction.  Dkt. 16.

15   In opposition to Wisk's motion, Archer refuted each of Wisk's stated claims.  Dkt. 58.  Thereafter, as

16   the Court later noted, Wisk's misappropriation theory "in its Reply changed dramatically from its

17   Motion."  Dkt. 134 at 27.  Wisk's Reply focused on Archer's conceptual development of the Maker

18   aircraft during "seven weeks" from Dr. Bower's hiring in January 2020 to the Maker conceptual design

19   review on February 27, 2020, and claimed Archer's engineering documentation from the same period

20   was "stunning in its reliance on Wisk's trade secrets."  Dkt. 92 at 1, 5–6.  Although Wisk continued to

21   describe Jing Xue as the "poster child for the covert theft of Wisk's trade secrets," Wisk also claimed

22   that former Wisk employees Diederik Marius, Johnny Melack, and Tom Muniz had stolen Wisk

23   documents "to harvest as much confidential information as possible" before joining Archer.  *Id.* at 1–

24   2, 3–4.  The Court denied Wisk's preliminary injunction motion, finding that "[d]espite getting robust

25   early discovery, including access to engineering documents, Wisk was not able to demonstrate that any

26   of its particular asserted trade secrets was misappropriated."  Dkt. 134 at 45.

27

28

### III.    Wisk's Trade Secret Disclosure and Archer's Motion to Strike

Wisk provided a Disclosure of Trade Secrets pursuant to Section 2019.210 of the California Code of Civil Procedure (the "Disclosure") identifying 52 purported trade secrets.  Dkt. 16-08.  Archer moved to strike based on the lack of particularity of the trade secret descriptions.  Dkt. 50.  Wisk argued that its trade secrets were "meticulously defined," and that it had "identified the precise stolen files reflecting each one."  Dkt. 63 at 3.  Wisk also claimed that the Disclosure "described the trade secret information," "where it could be found," and "how it could be used."  Dkt. 64 at 12.

The Court denied Archer's motion to strike, finding that Wisk's Disclosure, "though not ideal, is sufficient at this early stage."  Dkt. 134 at 18.  The Court noted that documents in the Disclosure "are examples of embodiments of the trade secret; they are always preceded by the *substantive description of each trade secret.*"  *Id.* at 20 (emphasis added).  The Court also noted, "Wisk has pleaded that the misappropriated trade secrets *are the ones in the Disclosure*, a factual and legal assertion," and "[t]o avoid doubt, the trade secrets in the Disclosure in its current form are the only ones that Wisk has alleged."  *Id.* at 23 (emphasis added).

### IV.    Fact Discovery Produced to Wisk

Archer has produced to Wisk nearly two million pages of documents from over 50 custodians and dozens of other sources.  Hines Decl. ¶ 2.  Eight of Archer's outside suppliers and technical consultants also produced large volumes of documents to Wisk.  *Id.*  Archer also made available for Wisk's review vast quantities of source code, which Wisk spent 300 hours reviewing.  *Id.* ¶ 3.  Wisk also physically inspected Archer's aircraft and related components, including battery chargers, flight termination system, motor controller boards, battery cells, and energy storage system.  *Id.*  Archer further provided Wisk with hundreds of pages of responses to 30 interrogatories, spanning topics from recruiting communications to detailed technical issues.  *Id.* ¶ 4.  Wisk also deposed 15 of Archer's key engineers (some multiple times), its co-founders, a board member, and its head of certification.  *Id.* ¶ 5.

### V.    Forensic Evidence Relating to Archer and Personal Devices

Wisk also obtained vast amounts of forensic evidence related to dozens of Archer devices and systems, as well as personal devices used by former Wisk employees at Archer.  *Id*. ¶¶ 6–10.  Among the devices inspected by Wisk via forensic neutral were 38 personal devices the federal government

seized from Jing Xue's home and returned to Dr. Xue's counsel after completing its own forensic analysis and electing not to move forward with criminal charges.  Dkt. 273.  The forensic evidence reflects no instances of Wisk confidential information at Archer at any time.  Ex. 8 (Crain Tr.) at 184:20 –185:2; Dkt. 58-24 (Harrison Decl.) ¶¶ 1, 2, 5; Ex. 9 (Harrison Rpt.) ¶¶ 40–45, 49.[3]  The forensic evidence also reflects that during his employment at Archer Dr. Xue did not personally retain any of the files he downloaded while at Wisk, with the exception of 10 files that neither Wisk nor its experts have ever cited for any purpose in this case.  Ex. 11 (Crain Rpt.) at Ex. M; Ex. 9 (Harrison Rpt.) ¶¶ 19– 22.  Finally, the forensic evidence reflects that none of the other former Wisk employees accused of stealing Wisk files—Diederik Marius, Johnny Melack, and Scott Furman—ever accessed any Wisk files that had been inadvertently retained on their personal devices since starting at Archer.  Ex. 9 (Harrison Rpt.) ¶¶ 51–67.  The forensic evidence is consistent with each of those former employees' unrebutted testimony unequivocally denying any intention to retain Wisk documents and any use of Wisk confidential and proprietary information at Archer.[4]  Wisk's forensic expert does not dispute any of these findings.  Ex. 8 (Crain Tr.) at 164:6–14, 176:18–177:17, 179:2–18.

## VI.    Wisk's Changing Trade Secret Descriptions

After receiving voluminous discovery from Archer, Wisk began to drastically change the scope of its trade secrets.  Spread over numerous responses to Archer's interrogatories, Wisk removed elements Archer does not use, and added elements to distinguish claimed secrets from public references.  Archer was left to sift through hundreds of pages of Wisk's discovery responses trying to divine how Wisk altered its trade secrets.

Archer raised concerns about the shifting scope of Wisk's trade secrets in multiple letters,

---

[3] As Archer showed in opposition to Wisk's motion for sanctions, Mr. Furman used his Archer laptop for access to personal email and online accounts, and as a result, thousands of documents auto-synced to his laptop, including several hundred Wisk-related emails, photos and text messages that remained in those accounts.  Ex. 9 (Harrison Rpt.) ¶¶ 82, 84.  Wisk cites only one of those documents in support of its misappropriation allegations as to TS 44 (the only one relevant to Mr. Furman), and the forensic evidence shows that it was not opened by Mr. Furman while he was an Archer employee.  *Id.*  ¶¶ 67, 75, 82; Dkt. 412 (Harrison Sur-Reply Decl.) ¶¶ 14–16; Ex. 10 (Lighthouse FileFolderActivities analysis).

[4] *E.g.*, Ex. 12 (Furman Tr.) at 207:19–24, 236:22–24; Dkt. 260-19 (Melack Decl.) ¶¶ 9(a)–(c), 11; Ex. 13 (Melack Tr. (7/6/2021)) at 278:18–23; Ex. 14 (Melack Tr.) at 398:1–400:4, 418:23–419:5; Dkt. 260-18 (Marius Decl.) ¶¶ 3, 5, 10; Ex. 15 (Marius Tr. (7/6/2021)) at 141:16–143:14, 154:12–157:5; Dkt. 58-22 (Muniz Decl.) ¶¶ 5, 15–17; Ex. 16 (Muniz Tr. (6/25/21)) at 192:5, 314:14–24.

including in May and June 2022.  Exs. 17–18.  Archer explained that if Wisk wished to alter the scope of its trade secrets, it was required to move to amend and show good cause.  *Id.*  Wisk never responded to Archer's letters; nor did it move to amend.  Hines Decl. ¶ 11.

Archer also raised its concerns with the Court.  Archer explained that "in its discovery responses, Wisk makes clear that it is seeking to alter the scope of its trade secrets," which is improper "especially after having open access to Archer's confidential information."  Dkt. 356 at 2–3 (Fourth CMC Statement).  At the October 25, 2022, CMC, Archer noted that "if Wisk had wanted to modify or alter the scope of trade secrets, it was required to seek leave and show good cause."  Dkt. 376 (Oct. 25, 2022 CMC Tr.) at 6:13–15.  Wisk did not disagree, but assured the Court that, "we haven't changed the scope of our trade secrets."  Dkt. 376 at 6:23–7:1; *see also* Dkt. 356 at 2–4.  The Court noted that this issue seemed to be "summary judgment-related."  Dkt. 376 at 5:12–16.

Given Archer's concerns, following the October 25 CMC, Archer sought Rule 30(b)(6) testimony regarding: "A precise description of each [Asserted] Trade Secret."  Ex. 19 (30(b)(6) Notice).  Wisk initially refused to designate any witness for this topic, claiming that its trade secrets were already "defined precisely in Wisk's trade-secret disclosure."  Ex. 20 (Wisk Responses & Objections to 30(b)(6) Topics) at 2.  Archer said it would consider withdrawing this topic if Wisk agreed that the "text of Wisk's Section 2019.210 statement defines Wisk's asserted trade secrets" and that documents referenced in the Disclosure and Wisk's interrogatory responses "do not alter the definition of Wisk's asserted trade secrets."  Ex. 21 (Aug. 30, 2022 Letter).  Wisk refused.  Hines Decl. ¶ 12.  Only when Archer was about to move to compel did Wisk relent and put forward two designees.  *Id.*

At their depositions, however, Wisk's two corporate representatives—without access to Archer's documents—refused to provide *any* definition or description of any Wisk trade secret.  They refused to address the Disclosure, which they said "was written by lawyers and not engineers," so they were "not sure what the intent is of these words."  Ex. 22 (Long Tr.) at 277:17–19; *see also* Ex. 23 (Tighe Tr.) at 59:7–10 (dismissing the Disclosure as a document ███████████████ ████████████████████████████████  They disavowed knowledge of the parameters of Wisk's trade secrets, or even what Wisk claims them to be, with respect to fundamental questions about the trade secrets.  Ex. 23 (Tighe Tr.) at 307:22–308:10 (refusing to say whether Wisk contends a physical

1   ████████████ because "that's a legal distinction"); *id.* at 89:24–90:15 (refusing to say whether

2   TS 1 covers ████████). They also made clear that "████████████████████████████

3   ████████████████████████████████████████████████████████████████████████

4   ████████████████████████████████████████████████████████████████████  *Id.*

5   at 24:1–7, 28:11–13 (emphasis added).  And, they testified that Wisk's trade secrets had not yet been

6   defined, and would only be defined later by Wisk's experts (who had the benefit of already having

7   reviewed Archer's discovery).  *E.g.*, Ex. 22 (Long Tr.) at 409:8–12 ███ ████████████████

8   ████████████████████████████████████████████████████████████████████████

9   ████████████████████████████████████.  Thus, fact discovery concluded with Wisk as an entity

10  refusing to discuss, let alone define, its own trade secrets.

11          After fact discovery, Wisk served reports from three technical experts addressing Wisk's trade

12  secrets, their purported secrecy and value, and Wisk's bases for alleging misappropriation.  In all three

13  reports, Wisk's experts provided—and then based their opinions on—descriptions of the trade secrets

14  that are dramatically different from the descriptions in the Disclosure.

15                                      **LEGAL STANDARDS**

16          To show misappropriation under the California Uniform Trade Secrets Act ("CUTSA"), Wisk

17  must show that (i) it owned a trade secret, (ii) Archer acquired, disclosed, or used that trade secret

18  through improper means, and (iii) those actions damaged Wisk.  *M.A. Mobile Ltd. v. Indian Inst. of*

19  *Tech. Kharagpur*, 400 F. Supp. 3d 867, 892 (N.D. Cal. 2019) (Orrick, J.); Cal. Civ. Code § 3426.1(b).

20  The federal Defend Trade Secrets Act ("DTSA") has a "substantially similar" definition.  *ChromaDex,*

21  *Inc. v. Elysium Health, Inc.*, 301 F. Supp. 3d 963, 971 (C.D. Cal. 2017); 18 U.S.C. § 1839(5).

22          "[T]rade secret cases are especially susceptible to pleading chicanery."  *Quintara Biosciences,*

23  *Inc. v. Ruifeng Biztech Inc.*, No. 20-CV-4808-WHA, 2021 WL 2166880, at *1 (N.D. Cal. May 27,

24  2021).  Under California law, Wisk was required to identify its alleged trade secrets with "reasonable

25  particularity" early in the case.  Cal. Civ. Proc. Code § 2019.210.  This "particularity" requirement is

26  critical because Wisk is not permitted to take a "shifting sands" approach, wherein it "allege[s] trade

27  secrets with calculated vagueness, then use[s] discovery to redefine the trade secrets to be whatever is

28  found in [Archer's] files."  *Quintara*, 2021 WL 2166880, at *1; *see also Jobscience, Inc. v. CVPartners,*

*Inc.*, No. 13-CV-4519-WHA, 2014 WL 852477, at *5 (N.D. Cal. Feb. 28, 2014); *Swarmify, Inc. v. Cloudflare, Inc.*, No. 17-CV-6957-WHA, 2018 WL 2445515, at *3 (N.D. Cal. May 31, 2018).

Now that Wisk has taken full discovery, summary judgment is appropriate if the Court holds that Wisk has taken a "shifting sands" approach, or otherwise has failed to show that its trade secrets *as pled* are sufficiently particular to separate them from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade. *See, e.g.*, *Freeman Inv. Mgmt. Co., LLC v. Frank Russell Co.*, 2016 WL 5719819, at *9–12 n.4 (S.D. Cal. Sept. 30, 2016) (granting summary judgment for lack of particularity where plaintiff's Rule 30(b)(6) witness could not "put the trade secret in a box" or provide a definite statement of its scope—even though court had previously denied motion to strike 2019.210 disclosure), *aff'd*, 729 F. App'x 590 (9th Cir. 2018); *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1164–67 (9th Cir. 1998); *Calendar Rsch. LLC v. StubHub, Inc.*, 2020 WL 4390391, at *7 (C.D. Cal. May 13, 2020).

To prove misappropriation, it is not enough for Wisk merely to show that "any substantial portion" of the alleged trade secret is present in Archer's products. *GSI Tech., Inc. v. United Memories, Inc.*, No. 5:13-CV-1081-PSG, 2016 WL 3035699, at *6 (N.D. Cal. May 26, 2016) (rejecting plaintiff's proposed jury instruction that "[u]se of any substantial portion of a trade secret constitutes misappropriation").[5] Instead, the onus is on Wisk to show that Archer used *the trade secret* itself—for example, for Wisk's trade secrets directed to "architectures" (TS 29, 39, 44), Wisk must show use of the "architectures" themselves, not merely some components. *Vt. Microsystems, Inc. v. Autodesk, Inc.*, 88 F.3d 142, 147 (2d Cir. 1996) (applying California law) (misappropriation affirmed where accused technology was "virtually the same" as the trade secret and the "overall architecture" was "in some cases identical"); *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1089–90 (N.D. Cal. 2006), *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007).

---

[5] *See also Am. Airlines v. KLM Royal Dutch Airlines*, 114 F. 3d 108, 109–112 (8th Cir 1997) (affirming summary judgment of no misappropriation where trade secret was the combination of five elements and plaintiff showed only four of those elements in defendant's possession); *Excelligence Learning Corp. v. Oriental Trading Co*., No. 03-CV-4947-JF, 2004 WL 2944048, at *7 (N.D. Cal. Dec. 20, 2004) (granting summary judgment of no misappropriation where "approximately 90% of the 200–300 products in [defendants' product] catalog are the same or conceptually similar to one of the 2,700 products in the [plaintiff's] catalog").

1      Because misappropriation is an intentional tort, "[u]se of a trade secret without knowledge it

2   was acquired by improper means does not subject a person to liability unless the person receives notice

3   that its use of the information is wrong," or "knew or had reason to know" that the knowledge of the

4   trade secrets was acquired improperly. *O2 Micro Int'l*, 420 F. Supp. 2d at 1091 (quoting *PMC, Inc. v.*

5   *Kadisha*, 78 Cal. App. 4th 1368, 1382 (2000)); Restatement (Third) of Unfair Competition § 40 cmt. d

6   (1995) (liability requires "actual or constructive knowledge that the use or disclosure is wrongful" *and*

7   that "the information in its possession is a secret"); *Sun Distrib. Co., LLC v. Corbett*, 2018 WL

8   4951966, at *6 (S.D. Cal. Oct. 12, 2018).

9      Wisk also cannot rely on speculation and innuendo to meet any element of its claims, and cannot

10  reach trial without actual evidence of misappropriation. *M.A. Mobile*, 400 F. Supp. 3d at 893; *Aerotec*

11  *Int'l v. Honeywell Int'l*, 836 F.3d 1171, 1182 (9th Cir. 2016) ("The speculation and innuendo offered

12  by [plaintiff] cannot substitute for evidence."). Wisk cannot reach trial by suggesting that its former

13  employees *must have* used Wisk trade secrets in their later work for Archer, as this would effectively

14  nullify California's rejection of the "inevitable disclosure" doctrine. *Whyte v. Schlage Lock Co.*, 101

15  Cal. App. 4th 1443, 1463 (2002); *Les Concierges, Inc. v. Robeson*, No. 09-CV-1510-MMC, 2009 WL

16  1138561, at *2 (N.D. Cal. Apr. 27, 2009); *Excelligence Learning*, 2004 WL 2944048, at *6; *Danjaq*

17  *LLC v. Sony Corp.*, 1999 WL 317629, at *1 (C.D. Cal. Mar. 11, 1999) (granting summary judgment

18  "[b]ecause the Plaintiffs cannot create a factual dispute through their mere speculation about what [their

19  former employee] might have disclosed to" defendants).

20     For Wisk's patent infringement claims, Wisk bears the burden to come forward with evidence

21  from which a reasonable factfinder could find that the accused products meet each and every claim

22  limitation as construed. *Medgraph, Inc. v. Medtronic, Inc.*, 843 F.3d 942, 949 (Fed. Cir. 2016).

23                                **ARGUMENT**

24  **I.    No Trade Secret Liability**

25     Summary judgment is appropriate because there is no evidence that Archer misappropriated

26  any Wisk trade secret. Wisk also has impermissibly broadened its trade secrets in a manner that, if

27

28



permitted, would render them not sufficiently particular, warranting summary judgment on that basis.[6]

**A.     Trade Secret 1:** *Aerodynamic Models Based On High Quality Simulation Data*

TS 1 is ███████████████████████████████████████████

███████████████████████████████████████ Disclosure at 5.  The Disclosure identifies

a single document, from 2017, as reflecting the trade secret.  That document, ███████████

███████████████████████████ contains ███████████████████████████████

█████████████████████████████████████████████████ *Id.* ████████

████████████████████████████████████████████████████████████████

██████████████████████████ (WISK00011285).

*No Evidence of Misappropriation of Trade Secret 1.*  Wisk sought a preliminary injunction

regarding TS 1, but had no evidence that anyone at Archer ever had—let alone used—any TS 1 study

or data.[7]  Now, after almost two years of litigation, Wisk still has no evidence of misappropriation of

TS 1.  Despite accusing Archer of stealing ██████████████████████████████████

█████████████████████████████████ Wisk does not identify a single study or any data

(CFD or otherwise) that Archer is even alleged to have used.

Wisk no longer even *alleges* that █████████████, or any data in it, was disclosed to Archer or

used at Archer; Dr. Gandhi admitted that he has no evidence of that.  Ex. 25 (Gandhi Tr.) at 248:9–11.[8]

Nor is there evidence that any other Wisk aerodynamic studies or data *of any kind* were ever used at

Archer.  Even if TS 1 could include *every* aerodynamic study *ever* performed at Wisk regarding *any*

---

[6] By this motion, Archer does not address a number of grounds on which summary judgment would be warranted in regard to some or all of Wisk's alleged trade secrets, including Wisk's failure to take reasonable measures to maintain the secrecy of its alleged trade secrets, and its failure to establish that those secrets derive independent economic value from not being generally known to the public. Additionally, in light of the Court's prior ruling on Archer's motion to strike, Archer does not now challenge the sufficiency of Wisk's Disclosure, as written, in regard to particularity. Should summary judgment not be entered in Archer's favor on any of Wisk's trade secrets, Archer reserves its defenses on these and other currently unasserted grounds for trial.

[7] Wisk originally based its claim—and crafted TS 1—on Dr. Xue's download of the Mutt Study.  Dkt. 16 at 8–9, 14–15; *see also* Dkt. 16-04 (Gandhi Decl.) ¶¶ 35–44.  That proved to be a dead-end, as there was (and is) no evidence that Dr. Xue retained ███████████████ after leaving Wisk, let alone that he shared it with anyone at Archer.  Ex. 11 (Crain Rpt.) at Ex. M; Ex. 9 (Harrison Rpt.) ¶¶ 40–45.  Despite being the centerpiece of Wisk's TS 1 claim (and Complaint generally), Dr. Xue's name does not appear in Wisk's expert report on TS 1.

[8] Given the extensive citation throughout this motion to Wisk's technical experts' reports and deposition transcripts, we have not repeated the applicable exhibit numbers after initial citation.

1    Wisk aircraft (and all data from such studies), there would still be no evidence of disclosure to, or use

2    by, Archer.  While Dr. Gandhi identifies over fifty new documents in his "description" of TS 1, he does

3    not contend any such document was misappropriated.  Ex. 26 (Gandhi Rpt.) ¶ 89.

4         In fact, Dr. Gandhi's entire misappropriation analysis does not cite any Wisk aerodynamic study

5    or data at all.  And, at his deposition, Dr. Gandhi admitted that he could not identify a single Wisk

6    document, or any Wisk data, ever used at Archer—let alone any TS 1 information.  Gandhi Tr. at

7    248:9–11.  He *explicitly and unequivocally* admitted that he was ███████████████

8    ████████████████████████████████████████████████████████

9    ████████████████████████████████████  Gandhi Tr. at 248:22–

10   249:2.  Thus, summary judgment is warranted, as Wisk has no evidence that TS 1 was misappropriated.

11        Having no evidence of misappropriation of TS 1, Dr. Gandhi tries to expand TS 1 far beyond

12   aerodynamic studies and data, claiming that it really covers any ████████████████

13   ████████████████████████████████████████████████████████

14   ████████████████  Gandhi Tr. at 189:8–13; *id.* at 164:11–17 (TS 1 ████████

15   ████████████████████████████████████████████████████████

16   ████████████████)  *id.* at 248:16–18.  Wisk's attempted transformation of TS 1 from ████████

17   ████████████████████████████████████████████████████████ is

18   obviously improper, and would frustrate Archer's ability to defend itself by making TS 1 an elusive,

19   moving target.  It also shows Wisk's awareness that it lacks evidence that TS 1 was misappropriated.

20        Even if Wisk were allowed to radically transform the scope of TS 1 (after promising the Court

21   it had no intention of doing so), there would still be no evidence of misappropriation.  Indeed, Wisk's

22   TS 1 claim is striking because Wisk never identifies precisely what information Archer is supposed to

23   have taken, or why it is within TS 1.  Instead, just as it did at the preliminary injunction stage, Wisk

24   contends that Archer *must have* used some unspecified Wisk information because, having hired Wisk

25   employees, Archer selected its configuration quickly.  Gandhi Rpt. ¶¶ 133, 152, 175–178, 191.  Dr.

26   Gandhi speculates that Archer ██████████████████████████████████

27   ████████████████████████████████████████████████  *Id.* ¶ 133.

28   Dr. Gandhi never says what "results" Archer supposedly used, what "resource intensive efforts" he is

referring to, or how either falls within TS 1.  And, in any event, Wisk has *zero* evidence for this rank speculation on which Wisk bases its TS 1 claim.

Dr. Gandhi tries to create the impression of a claim based on Archer's consideration and selection of the 12-tilt-6 design, but he does so using only the barest innuendo and *ipse dixit*.  For example, it is undisputed that FlightHouse presented the 12-tilt-6 design to Archer *before any Wisk employee* joined Archer.  Dkt. 58-25 (Hughes Decl.) ¶ 21.  But Dr. Gandhi—the advocate, not the expert—insinuates that maybe FlightHouse *really* got the idea from Tom Muniz, *solely* because while still at Wisk, Mr. Muniz had a conversation with Archer's then-CEO Brett Adcock on December 3, 2019, and FlightHouse documented an analysis of the 12-tilt-6 design the next day.  Gandhi Tr. at 191:16–19, 207:7–11; Gandhi Rpt. ¶ 167.  Dr. Gandhi never says what Mr. Muniz may have communicated, or how that information could be within TS 1.  He just lobs out innuendo, without facts, that directly contradicts the testimony of every person involved—Mr. Muniz, Mr. Adcock, and the two founders at FlightHouse (Calder Hughes and Zach Hazen)—testimony Dr. Gandhi never mentions let alone grapples with.[9]  Wisk's wild speculation about a phone call, which would require everyone (including third parties) to have committed perjury, captures the extent to which Wisk must, and is willing to, stretch beyond any evidence to manufacture the impression of a claim.

Wisk also vaguely suggests that Archer may have used some Wisk information to *select* the 12-tilt-6 design at the Maker conceptual design review, but there is no evidence of that either.  Gandhi Rpt. ¶¶ 167–177, 290–302.  TS 1 is about *Wisk's* aerodynamic studies and models, which Dr. Gandhi admitted are ███████████████████████████  *Id.* ¶ 106.  As the Court found, TS 1 studies, such as the ████████, are configuration-specific "aerodynamic simulation results tested in various conditions for different aircraft configurations," and "there is no evidence that these [TS 1] models were used to simulate an aircraft with the material elements of the" 12-tilt-6 design.  Dkt. 134 at 36, 38.  It is undisputed, in fact, that ██████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[9] Dkt. 98-19 (Muniz Suppl. Decl.) ¶ 3; Ex. 27 (Muniz Tr.) at 197:4–11, 193:13–23, 197:7–23; Ex. 16 (Muniz Tr. (6/25/21)) at 71:16–18, 112:14–113:2, 121:3–5; Ex. 28 (Adcock Tr. (6/28/21)) at 155:3–17; Ex. 29 (Hughes Tr. (8/31/22)) at 51:25–52:22; Ex. 30 (Hughes Tr. (6/30/21)) at 121:3–24, 170:25–172:2; Ex. 31 (Hazen Tr.) at 20:6–12, 78:5–79:7, 120:7–21; Dkt. 58-25 (Hughes Decl.) ¶ 20–23.

1   That is why, despite Dr. Gandhi's innuendo, Wisk does not allege that Archer used any Wisk study on

2   a 12-tilt-6 configuration—████████████████████████[10]

3       It also is undisputed that Archer's Chief Engineer Geoff Bower—a Stanford Ph.D. in Aerospace

4   Engineering and former Chief Engineer for the Airbus Vahana (a tilting-wing eVTOL) project—

5   personally selected the 12-tilt-6 design for Archer, and he testified extensively about precisely how he

6   did so, all without Wisk information. Dkt. 58-20 (Bower Decl.) ¶¶ 9–27; Ex. 32 (Bower Tr. (6/30/21))

7   at 49:18–21, 103:23–104:2, 176:7–177:19. Dr. Gandhi wholly ignores the inconvenient facts of Dr.

8   Bower's extensive testimony—and also his *own* statement that ████████████████████████

9   ████████████████████—and blithely suggests that Dr. Bower *may have* used some Wisk

10  information (and thus committed perjury), because ████████████████████████████

11  ███████████████ Gandhi Rpt. ¶¶ 106, 152, 176–177, 190. There is literally no evidence

12  for that claim, which is pure *ipse dixit* by Dr. Gandhi, who ████████████████████████

13  ████████████████████████████████████████████████████████ Gandhi

14  Tr. at 10:7–10:19.

15      As the Court recognized, Archer's selection of its 12-tilt-6 configuration does not show

16  misappropriation of TS 1 (or anything else). Dkt. 134 at 40. Wisk needs actual *evidence* that Archer

17  used TS 1, but it has *none*: no evidence that Dr. Bower used any TS 1 study or data, or any other Wisk

18  confidential information,[11] to select the Maker design; no evidence that simulation studies or data (let

19  alone CFD) are necessary, or even routinely used, at the conceptual design stage;[12] and no evidence

---

[10] Dr. Gandhi cites a few Wisk documents reflecting aerodynamic analysis regarding a 12-tilt-6 configuration.
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

[11] Dr. Gandhi points to a few numeric values in an Archer sizing spreadsheet created by Dr. Bower—
████████████████████████████ Gandhi Rpt. ¶¶ 140–150. But Dr. Gandhi never *actually* traces
*Archer's* values back to *anything in Wisk's Disclosure for TS 1* or the one document cited in it (the
████████ Nor does he show that Archer's values come from *any Wisk source*, as opposed to
Archer's own work or public sources, such as a public document sent to Archer by FlightHouse listing
the exact "figure of merit" value that Archer used. Ex. 33 (Archer-NDCA-00488372) at -383.

[12] ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

1   that Dr. Bower, a leading aerospace engineer, could not do what he indisputably did do—*i.e.*, select

2   the 12-tilt-6 configuration for the Maker demonstrator—without high-quality simulation data and CFD

3   analyses, let alone without Wisk's TS 1 studies (none of which even related to a 12-tilt-6 configuration).

4   Dr. Gandhi's naked *ipse dixit*, on which Wisk entirely relies, is "not sufficient to avoid summary

5   judgment." *Parallel Networks, LLC v. Abercrombie & Fitch Co.*, 704 F.3d 958, 970 (Fed. Cir. 2013).

6        ***Trade Secret 1 Lacks the Requisite Particularity.***   Because Wisk has no evidence of

7   misappropriation, it has tried to broaden the scope of TS 1 in a manner that strips it of any discernible

8   scope and meaning.  During discovery, Wisk refused to discuss the contours of TS 1, let alone provide

9   a precise definition of its scope.  Ex. 23 (Tighe Tr.) at 59:22–60:6.

10        Dr. Gandhi asserts that TS 1 encompasses ███████████████████████████

11   ████████████████████████████████████████████████████████████████████

12   ████████████████████████████████████████████████████████████████████

13   Gandhi Rpt. ¶¶ 89, 121; Gandhi Tr. at 189:8–13, 164:11–17.  Dr. Gandhi never identifies what in those

14   documents may be covered by TS 1; nor does he identify any ████████████████████

15   ███████████████████████████ (or otherwise protectable as a trade secret).  At his

16   deposition, as discussed above, Dr. Gandhi went further, asserting that TS 1 covers ████████

17   ████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████  Gandhi Tr. at 189:8–13, 164:11–17.

19        Transforming TS 1 from ██████████████████████████████████████

20   ███████████████████████████████—whatever those  may  be—is  not  only

21   irreconcilable with TS 1, it renders TS 1 meaningless.  Indeed, it is hard to imagine a less particular

22   trade secret than one directed to █████████████████████████████████████

23   ██████████████████████████████████████████████

24        Wisk's departure from the scope of TS 1 is improper.  If allowed, TS 1 would have no

25   reasonably discernible scope, warranting summary judgment for lack of reasonable particularity.  *See,*

26   *e.g.*, *Calendar Rsch. LLC*, 2020 WL 4390391, at *7 (granting summary judgment for lack of

27   particularity where plaintiff's expert "uses vague and over-inclusive phrases to encompass as much

28   information as possible" within the alleged trade secret).

**B.**     **Trade Secret 3:** *Aerodynamic Studies Regarding Lift Fan Locking And Stowing*

TS 3 is directed to ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

█████████████████ (the same document cited for TS 1).

*No Evidence of Misappropriation of Trade Secret 3.*   There is no evidence that Archer ever used TS 3.  Wisk does not allege that Archer possessed the ███████ or any data *from* the ██████

And even if TS 3 were broadened to ███████████████████████████████████████

███████ as Wisk would like, Wisk would still have no evidence of misappropriation.  Dr. Gandhi does not identify a single Wisk study that Archer ever had or used.  While he opines that in ███████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

██████████████████████████████ Archer is supposed to have used, let alone how they are within TS 3.  Gandhi Rpt. ¶ 223.

It also is undisputed that Archer *purchased motors with the lock and stow feature* from a third-party vendor, MAGicALL, which included that feature as part of its standard, advertised offering and implements it differently from Wisk in any event.  Ex. 35 (Wacknov Tr.) at 36:8–23 (MAGicALL's president identifying "position hold feature" as "standard in our product"); Dkt. 58-35 (Wacknov Decl.) ¶¶ 1, 4–11. ████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████.  Gandhi Rpt. ¶¶ 230, 238, 241.  Archer's purchase of off-the-shelf motors with locking and stowing capability precludes Wisk from proving misappropriation of TS 3.

*Trade Secret 3 Lacks the Requisite Particularity.*   Dr. Gandhi seeks to define TS 3 to include ██████████████████████████████████████████████████████████████████ Gandhi Rpt. ¶ 223.  If Wisk were permitted to broaden TS 3 to rope in all such unidentified ███████████

███████████ TS 3 cannot possibly be a particularized trade secret, and the Court should grant summary judgment on that basis as well.

C.     **Trade Secret 15: *Studies Regarding Advantages Of A Tiltable Rotor Design***

TS 15 is studies regarding █████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████  Disclosure at 15.  As to Wisk's

████████████████████  the Disclosure identifies only one document, from 2016, titled████

████████████  which contains a single slide referring to ██████████████████████

████████████████████████████████████████████████████████████████████

*Id.*  That one slide, in one document, is the sum total of information cited to identify Wisk's ████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████  *Id.*

***No Evidence of Misappropriation of Trade Secret 15.***  There is no evidence that Archer ever

had or used any Wisk study regarding tilting rotors, or anything else that could possibly fall within TS

15.  Wisk has no evidence—and its expert does not even assert—that Archer had or used the one

document identified in the Disclosure.  Wisk has not identified *any* Wisk document (or data) about

tilting rotors that anyone at Archer ever used, or even had access to at Archer.████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████  Gandhi Rpt. ¶ 247.  In the entire section titled

"Archer Misappropriated Trade Secret No. 15," Dr. Gandhi *does not even identify a single Wisk study*,

let alone show that Archer used one.  Nor is there any evidence that Archer used the "determinations"

identified in the Disclosure; Dr. Gandhi does not even address them in his analysis of misappropriation.

Given the lack of evidence of misappropriation, for TS 15, Wisk again relies on baseless

innuendo and *ipse dixit*.  ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████  *Id.* ¶¶ 290–298.  Dr. Gandhi never identifies

what Mr. Muniz may have said or how it falls within TS 15.  Even if admissible, his insinuation about

1  the call, which is directly refuted by the sworn testimony of everyone involved (testimony Dr. Gandhi,

2  ever the advocate, does not even mention let alone grapple with), is insufficient to create a genuine

3  issue of fact.

4       Dr. Gandhi also speculates, as he did during the preliminary injunction phase, that Archer may

5  have used TS 15 because it ███████████████████████████████████████████████████████

6  ███████████████████████████████████████████████████████████████████████████████

7  ████████████████████████ *Id.* ¶ 298. As noted above, Wisk had no studies on a 12-tilt-6 configuration

8  for Archer to use even if it wanted to do so. And, Dr. Gandhi does not provide any basis for the

9  assertion—*on which his opinion and Wisk's TS 15 claim depends*—that ███████████████████████

10  ███████████████████ for Archer to select the 12-tilt-6 configuration when it did. *Id.* He just says so. Nor

11  does he identify a *single* study that Archer supposedly needed (and did not perform)—much less any

12  *Wisk* study. Just as with TS 1, Dr. Gandhi's conclusory claim that some unidentified studies were

13  somehow necessary for Dr. Bower to do what he actually did (*i.e.*, select the 12-tilt-6 design) is rank

14  *ipse dixit* and "not sufficient to avoid summary judgment." *Parallel Networks*, 704 F.3d at 970.

15       Dr. Gandhi also speculates that Archer's ██████████████████████████████████

16  ████████████████████████████ Gandhi Rpt. ¶ 302.  ████████████████████████████████

17  ███████████████████████████████████████████████████████████████████████████████

18  ██████████████████████████████████████████████ based on information from Wisk; to the contrary,

19  ██████████████████████████████████████████████████████████ Ex. 36

20  (Archer-NDCA-00006990) at "Summary" sheet, row 7.  █████████████████████████████████

21  ███████████████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████ Gandhi Rpt. ¶ 275.[13]

23       ***Trade Secret 15 Does Not Constitute a Trade Secret.*** TS 15 does not constitute a trade secret,

24

---

25  [13] Dr. Gandhi notes that ██████████████████████

26  Gandhi Rpt. ¶¶ 300–302. ████████████████████████████████████████████████████████████

27  ██████████████—and the very testimony cited by Dr. Gandhi shows that it did not, as Mr. Muniz

28  ████████████████████ Ex. 14 (Muniz Tr.) at 449:18–450:14. ███████████████████████████████████████████. Gandhi Rpt. ¶¶ 300–301.

and summary judgment should be granted for this independent reason.  That is because neither of the

two "determinations" Wisk describes as TS 15 was in fact secret.  Disclosure at 15.

First, Wisk claims to have █████████████████████████████████████████████████

██████████████████████████████████████████ *Id.* (emphasis added).  ████████████

████████████████████████████████████████████████████████████████████████████████

████████████████     ████████████████████████████████████ For example, a 2016 public paper

by Uber Elevate discussed this exact possibility.████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

> *So far the vehicle concepts publicly disclosed by Zee utilize a lift plus cruise configuration*, where the vertical lift and forward thrust are provided by separate, non-articulating propulsors. *This type of concept approach results in extra motor weight and aircraft drag since the vertical lift propulsors are ineffective in forward flight.  However, the design complexity is low.*
>
> *Joby Aviation has a different concept approach* with their S2 and S4 concepts *using a distributed set of tilting prop-rotors* (six to twelve depending on the size/capacity of the vehicle) which rotate with the direction of flight so that the propulsors provide both vertical lift and thrust throughout the flight . . . . *This approach has lower motor weight and aircraft drag, but has much higher complexity due to the articulating motor and propulsors.*

Ex. 37 (Archer-NDCA-01641950) at -964–65 (emphases added) (footnotes omitted).  There is *nothing*

in Wisk's first so-called determination that is not set forth in the 2016 Uber Elevate white paper, a

seminal paper in the eVTOL industry.████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████ *Id.*  That was not a secret.

Moreover, by late 2019, it was public knowledge that the ████████████████████████

██████████████████████████████████████  For example, Mark Moore, who was then the

Engineering Director of Aviation of Uber Elevate, presented publicly on that topic in June 2019.  In

the slide below,████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[14] Dr. Gandhi admitted that that determination also means ██████████████████████████
████████████████████  Gandhi Tr. 307:6–12.

1

2

3

4

5

6

7

8



9  Archer-NDCA-01881596 at 10:39.[15]  Thus, Wisk's determination that ███████████████

10 ████████████████████████████████████████████████████████  simply was not a

11 secret.  Disclosure at 15.

12        Second, Wisk claims to have ████████████████████████████████████████████

13 ████████████████████████████████████████████████████████████████████████████

14 ██████████████  This determination also is not a secret.  It was well-known that ██████████

15 ██████████████████████  Wisk has not claimed otherwise.  And, as Wisk's own expert explained:

16 ████████████████████████████████████████████████████████████████████████████

17 ███████████████████████████████████████████  Ex. 39 (Collins Tr. (6/14/21)) at 88:12–20.

18        Thus, both of the "determinations" Wisk claims as the substance of TS 15 were publicly known,

19 and the Court should grant summary judgment that TS 15 is not a trade secret.

20        ***Trade Secret 15 Lacks the Requisite Particularity.***  Wisk has attempted to broaden TS 15 far

21 beyond the Disclosure.  ████████████████████████████████████████████████████████

22 ████████████████████████████████████████████████████████████████████████████

23 ███████████████████████████████████████████████  Gandhi Rpt. ¶¶ 245–249.  Even

24 worse, Dr. Gandhi claims that TS 15 also includes any Wisk ██████████████████████████

25 ██████████████████████████  but he identifies no such insights.  *Id.* ¶ 266.  If Wisk is not held to its

26 ――――――――――――――――――

27 [15] In fact, this 2019 presentation—given at a conference attended by Archer's co-founders before any
   alleged misappropriation—was instrumental in Archer's move from its initial preference for simplicity

28 to its acceptance of the complexity of tilting rotors to gain the performance benefits depicted on this
   slide.  Dkt. 58-13 (Adcock Decl.) ¶ 21; Ex. 4 (Goldstein Tr.) at 75:24–82:11.

1   Disclosure—which disclosed a single document and the two "determinations" discussed above—and

2   instead is permitted to expand TS 15 in the way Dr. Gandhi attempts, TS 15 would lack any discernible

3   scope, warranting summary judgment for lack of reasonable particularity.

4        **D.      Trade Secret 12: *Motor Optimization Model***

5        Wisk's TS 12 motor model is ████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████

7   ████████████████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████   *Id.* at 12–13.

9        ***No Evidence of Misappropriation of Trade Secret 12.***   At the preliminary injunction stage,

10  Wisk claimed that Archer asked Diederik Marius "to recreate the same models and tools" Wisk used.

11  Dkt. 134 at 34.  That was not true, and the Court found that Wisk "mischaracterizes—really, invents—

12  the evidence." *Id.*  The Court ruled that, while Archer has a motor simulation tool, "Wisk has no

13  evidence that the tool [Archer] used is *its* [*Wisk's*] tool or its output, and Archer employees have said

14  the contrary." *Id.* (emphasis in original).

15       Wisk still has no evidence that Archer ever used Wisk's TS 12 simulation tool.  █████████

16  ███████████████████████████████████████████████   Ex. 40 (Collins Tr.) at

17  176:2–177:4.  ██████████████████████████████████████████████████████

18  ██████████████████████████████████████████████████████████

19  ███████    *Id.* at 175:20–177:4.  Nor does Wisk any longer claim that Archer asked Mr. Marius to

20  "recreate" anything from Wisk, or that Mr. Marius did so.

21       Incredibly, while Wisk accuses Archer of misappropriating its motor tool, ███████████

22  ██████████████████████████████████████████████████████████████████

23  ██████████    *Id.* at 164:18–165:25.

24  ████████████████████████████████████████████   *Id.* at 165:16–25.

25       ██████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████████████████████████████

27  Ex. 41 (Collins Rpt.) ¶ 206.  ██████████████████████████████████

28  ███████████████████    *Id.* ¶¶ 208–272.  Dr. Collins started with—and confined his analysis to—



1

2 . *Id.*

3      Yet Dr. Collins never once grapples with the undisputed deposition testimony of Mr. Marius

4 that

5 Ex. 6 (Marius Tr.) at 525:20–527:23, 538:22–539:5.  That evidence is

6 undisputed, and while it wholly refutes Wisk's latest argument, it has been completely ignored by Wisk

7 and its advocate-expert.

8      Moreover, Dr. Collins is provably wrong in his supposition that

9 indeed, even *Wisk's* own forensic expert agrees he did *not* do so.

10

11

12

13

14

15 Collins Tr. at 219:25–220:21,

16 229:11–22.  But, that is incorrect, as the forensic evidence establishes.

17

18

19

20

21

22

23

24

25 _____

26 [16] The only document accessed by Mr. Marius after he arrived at Archer is a redacted PowerPoint file he personally prepared for a job interview at Apple shortly before leaving Wisk.  Ex. 42 (Crain Rpt.) ¶ 48(a); Ex. 9 (Harrison Rpt.) ¶ 61.  Mr. Marius confirmed that there is no confidential Wisk information

27 in this document.  Ex. 15 (Marius Tr. (7/6/21)) at 107:4–108:17. Collins Tr. at

28 278:19–280:4.

1   *instruction*—gathered Wisk information onto a hard drive *that Mr. Marius personally returned to Wisk*

2   on January 16. Dkt. 260-18 (Marius Decl.) ¶¶ 3–5.[17] And the January 16 "last access date" reflects

3   when *Wisk* attempted to remove all Wisk material from Mr. Marius's drive before returning it to Mr.

4   Marius, but *failed to do so*. *Id*. ¶ 5; Ex. 9 (Harrison Rpt.) ¶ 57. Wisk's forensic expert—on whom Dr.

5   Collins relies and who was initially *silent* on this pivotal (for Wisk) issue in his expert report—*does*

6   *not dispute this evidence*. Ex. 8 (Crain Tr.) at 176:19–177:17, 179:2–5. Thus, the factual foundation

7   on which Dr. Collins bases his misappropriation opinion—*i.e.*, that Mr. Marius actually *viewed* Wisk

8   documents at Archer—is flatly incorrect, and Wisk knows it.

9       Not only does the forensic evidence show that Mr. Marius never used any Wisk material after

10  leaving Wisk, let alone at Archer, but Mr. Marius's uncontradicted testimony confirms that he did not.

11  Mr. Marius explained in a sworn declaration twenty months ago how he developed the motor tool at

12  Archer from the ground up, using publicly available references and his motor modeling expertise, and

13  without any reliance on any Wisk information. Dkt. 98-17 (Marius Decl.) ¶¶ 4–9. Mr. Marius testified

14  that ████████████████████████████████████████████████████████████████████████

15  ██████████████████████ and he identified specific references he used. *Id.* ¶ 8. Mr. Marius's testimony

16  stands *uncontradicted*. During his multiple depositions, Wisk *never even asked* Mr. Marius how he

17  developed the tool at Archer; the only questions he was asked about the references he identified were

18  to *confirm* that he relied upon ██████████████████████████████ 6 (Marius Tr.) at

19  336:9–13. ██████████████████████████

20  ████████████████████████████████████████████████████████████████████████

21  ██████████████████████████████████████ Collins Tr. at 222:20–225:3; 226:12–20;

22  228:16–24; 273:4–274:23.

23  ██████████████████████████████████████████████████████████████████

24

25  ─────────────────────────

26  [17] ████████████████████████████████████████████████████████████████████████

27  ███████████████████████ Ex. 9 (Harrison Rpt.) ¶ 59; Dkt. 260-17 (Merlino Decl.) ¶ 35;
    Dkt. 260-18 (Marius Decl.) ¶¶ 9(a), 10; Ex. 15 (Marius Tr. (7/6/2021)) at 140:17–143:14; Ex. 6 (Marius

28  Tr.) at 286:10–287:14, 295:20–297:1.



1

2

3        *Id.* at 235:19–241:20.

4

5

6       More fundamentally,

7       —*i.e.*, the TS 12 motor tool program—at

8 Archer

9       *Not one of them appears* in Wisk's Disclosure or in any one of the documents

10 Wisk identified as "reflecting this trade secret." Disclosure at 12–13. To the contrary, as set forth in

11 the Disclosure and confirmed by Dr. Collins, Wisk's TS 12 is an

12       *Id.* at 12; Collins Tr. at 163:14–18.

13       Collins Tr. at

14 175:20–177:4. But misappropriation of TS 12 requires exactly that: misappropriation of the trade

15 secret itself—*i.e.*, improper acquisition, disclosure, or use of the TS 12 tool at Archer.

16       ***Trade Secret 12 Lacks the Requisite Particularity.*** Wisk designated its Chief Engineer and

17 creator of its "Motor Optimization Tool," Geoff Long, to testify regarding "a precise definition" of the

18 scope of TS 12. Mr. Long refused to do so, claiming not even to know the meaning of the term "Motor

19 Optimization Model" and that it is

20       Ex. 22 (Long Tr.) at 284:19–285:2, 289:17–

21 21. Instead, Mr. Long asserted that

22 ───────────
[18]       were identified for the very first time in Dr. Collins's opening report, and

23 should therefore be disregarded on that basis alone. *Proofpoint Inc. v. Vade Secure, Inc.*, No. 19-CV-4238-MMC (RMI), 2021 WL 2197954, at *7 (N.D. Cal. June 1, 2021) (striking new material in expert

24 report because late disclosure "impeded Plaintiffs' ability to conduct fact discovery on the undisclosed theories, allegations, and evidence").

25 [19]

26

27

28

1   █████████████████████████████████████████████████████

2   ████████████████████████████████████████ *Id.* at 277:25–279:18, 287:19–

3   289:21. If TS 12 is understood consistent with Wisk's corporate testimony, ██████████

4   ███████████████████████████████████ putting it beyond dispute that TS

5   12 is not defined with the requisite particularity.

6        **E.    Trade Secret 17: *Motor Control Algorithms and Architecture***

7        In its Disclosure for TS 17, Wisk states that it ████████████████████████

8   ██████████████████████ Disclosure at 18–19. Wisk's Disclosure identifies five documents

9   "reflecting" TS 17. *Id.* at 19. As the Court explained in its preliminary injunction order, ████

10  █████████████████████████████████████████████████████

11  ████████████ 134 at 35.

12       Wisk's misappropriation theory today is the same as it was at the preliminary injunction stage,

13  where it contended that Archer misappropriated its "motor control algorithms" ███████████

14  ████████████████ Dkt. 16 at 20–21. And it remains true that Archer purchased its motors and motor

15  controllers (collectively, electric propulsion units or "EPUs") for the Maker aircraft from a third-party

16  vendor, MAGicALL. Dkt. 58-20 (Bower Decl.) ¶ 31. Archer did not provide any code or algorithms

17  to MAGicALL for any purpose, let alone Wisk's TS 17 algorithms, and Archer does not know what

18  algorithms or code MAGicALL uses in its EPUs (nor does Wisk).

19       In fact, it is undisputed that MAGicALL has its *own* proprietary and confidential algorithms for

20  implementing locking and stowing, a feature MAGicALL's CEO testified is "standard on a [] eVTOL

21  aircraft." Ex. 35 (Wacknov Tr.) at 147:8–19. MAGicALL's CEO also testified that "[t]he way we

22  accomplish ████████████ with our motor is *proprietary* and maintained as confidential." Dkt.

23  58-35 (Wacknov Decl.) ¶ 10 (emphasis added).

24       To support its claim, Wisk relies upon ██████████████████████████

25  ████████████████████████████████ Collins Rpt. ¶¶ 420–424. On September 28,

26  2020, MAGicALL provided Archer with a slide deck outlining the high-level functionality of

27  MAGicALL's EPUs. Ex. 43 (Archer-NDCA-00403287). On a slide depicting various operating

28  █████████████████████████████████████████████████████



1

2   *Id.* at -299.

3

4

5   *Id.* at 153:3–25; 159:16–

6   160:19

7   Archer cannot possibly be liable for

8   misappropriating a functionality that is not part of TS 17 and that Wisk does not have.

9   Moreover, even if Wisk could overcome that fatal flaw in its argument,

10

11

12

13   Dkt. 58-35 (Wacknov Decl.) ¶ 10 (emphasis added).

14

15

16   Dkt. 134 at 35–36 ("the evidence [Wisk] cites just shows that Archer asked for the

17   *capability*, not that it provided the algorithm" (emphasis in original)).  Here, it is undisputed that Mr.

18   Marius only ever inquired about the

19

20

21   Ex. 35 (Wacknov Tr.) at 142:25–143:13, and Wisk has no evidence to the contrary.

22   Collins Tr. at 116:24–117:23.

23   Having no evidence that Archer provided any algorithm, as required, Dr. Collins says that TS

24

25   [20] Wisk's expert, Dr. Collins, also relies

26

27

28

DEFENDANT ARCHER AVIATION INC.'S MOTION FOR SUMMARY JUDGMENT
CASE NO. 3:21-CV-02450-WHO

1   17 really █████████████████████████████████ *Id.* at 280:7–19.  But that

2   contention is irreconcilable with the Court's ruling that it covers "particular algorithms and systems,"

3   ██████████████████ (Dkt. 134 at 35), as well as Wisk's own admission during discovery

4   that TS 17 is ██████████████████████████████████████████ of

5   doing so.  Ex. 44 (Wisk Resp. to Sixth Set of Interrogs.) at 19.

6       **F.    Trade Secret 29: *Energy Storage System Architecture***

7       TS 29 is a ████████████████████████████████████████

8   ████████████████████ Disclosure at 38–40.  Wisk's TS 29 ESS architecture uses a

9   ████████████████████████████████████████████████

10  ████████████████████████████████████████████████

11  ████████████████████ *Id.*  Wisk's Disclosure includes a ████████████

12  ████████████████████ *Id.*

13      ***No Evidence of Misappropriation of Trade Secret 29.***  Wisk concedes that no Archer aircraft

14  has ever used the TS 29 ████████ architecture.  As the Court ruled:  "There is no dispute between

15  the parties that Wisk's trade secret requires ████████ and Archer has not made use of it."  Dkt.

16  134 at 33.

17      Rather, Archer uses ████████ architectures.  Ex. 45 (Dix Rpt.) ¶ 921.  In a ████████

18  ████████████████████████████████████████████████

19  ████████████████████ Ex. 46 (Dix Tr.) 113:24–114:6.  By

20  contrast, ████████████████████████████████████████

21  ████████████████████ *Id.*  Archer has never used TS 29 because that architecture

22  requires a ████████, which no Archer aircraft has ever used.

23      Archer's selection of a ████████ architecture means that it is missing other aspects of the

24  TS 29 ████████ architecture beyond just the ████████.  As Wisk's expert admitted, the "decision

25  of whether to use ████████████████████████████████████████

26  ████████████████████ *Id.* at 114:7–12.  For instance, TS 29 includes ████

27  ████████████████████████████████████████████████

28  ████████████ Disclosure at 39.  But in the ████████ architecture of Archer's Maker aircraft,

-27-

there is no ██████████████████████. Ex. 47 (Archer-NDCA-00000404) at -454

█████████████ More generally, if one battery fails in Wisk's TS 29 architecture, the ████████

█████████████████████████████████████████ Disclosure at

39 (TS 29 architecture is ████████████████████████████████

████████████. By contrast, Archer's ██████ architecture for Maker ████████████

████████████████████████████████████████████████

████████████████████████████████████████ Ex. 47 (Archer-NDCA-00000404)

at -454; Ex. 48 (Archer-NDCA-00000980) at -998.

While Wisk concedes that Archer does not use its TS 29 ████████ architecture, it identifies

certain "similarities" with Archer's ████████ architectures, but none create a fact dispute. Wisk must

show that Archer *used* Wisk's trade secret—*i.e.*, the TS 29 ESS architecture—but Archer indisputably

never has. And, virtually *none* of the "similarities" Wisk identifies are even in Wisk's TS 29

architecture. Instead, the "similarities" are drawn from a lengthy recitation in Mr. Dix's report of

aspects of ██ *other ESS architectures developed over the history of Wisk and not captured by TS 29.*

Dix Rpt. ¶¶ 806–828 (describing "years of engineering across several generations of [Wisk] aircraft").

The *only* "similarity" Wisk identifies that actually appears in TS 29 is Archer's use of ████████

which the Court already determined is "presumably not protectible on its own" and "not enough to

show that Archer has ripped off Wisk's trade secret." Dkt. 134 at 33.

Because Wisk knows—and the Court has already ruled—that Archer has never used the TS 29

████████ architecture, Wisk's expert claims that Archer's use of its ████████ architecture

somehow shows "derivation of Trade Secret 29." Dix Rpt. ¶¶ 921–22. As an initial matter, the

argument Wisk's expert makes about derivation appeared for the first time in his report; it was never

disclosed to Archer at any time prior in any form in this case. That argument, therefore, is untimely

and should be stricken. *Proofpoint Inc. v. Vade Secure, Inc.*, No. 19-CV-4238-MMC (RMI), 2021 WL

2197954, at *7 (N.D. Cal. June 1, 2021).[21]

---

[21] Wisk also claims, for the very first time in its expert's report, that "███████████████████████
██████████████████████," which Wisk claims Archer used "to evaluate different
variations for the Maker." Dix Rpt. ¶ 923. This brand new theory is reflected nowhere in the

-28-

1    And, in any event, Wisk's new "derivation" argument disproves Wisk's claim, and shows why

2    summary judgment is warranted.  Wisk does *not* claim that Archer derived its ▮▮▮▮▮ architecture

3    from Wisk's TS 29 ▮▮▮▮▮ architecture; nor is there any evidence for such a claim.  Wisk claims

4    *only* (and without evidence) that Archer derived its ▮▮▮▮▮ architecture from *earlier Wisk*

5    *architectures that are not TS 29*, and based on a Wisk ▮▮▮▮▮ architecture Wisk was "considering"

6    at the time it developed the TS 29 architecture.  Dix Rpt. ¶¶ 919–921.  That cannot show derivation

7    from TS 29 (even if true, which it is not).  *See BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 15-CV-

8    1370-EJD, 2018 WL 514923, at *8 (N.D. Cal. Jan. 23, 2018) (derivation requires accused product be

9    "substantially derived from the trade secret" itself); *ATS Prod., Inc. v. Champion Fiberglass, Inc.*, No.

10   13-CV-2403, 2013 WL 6086924, at *3 (N.D. Cal. Nov. 19, 2013) (dismissing misappropriation claim

11   where plaintiff "only alleged that [defendant] used [another product]—not the trade secret formulas—

12   to create the [accused product]").

13   Moreover, it is not sufficient for Wisk to point to random similarities between two architectures

14   and conclude without more that one was derived from the other.  Wisk's new claim of derivation

15   requires *evidence* that Archer *started* with Wisk's trade secret architecture and *modified* it in some way

16   to come up with Archer's design, or that Archer somehow *used* Wisk's trade secret design as a

17   springboard to achieve its own design.  There is no such evidence for any such claim, and Wisk cannot

18   avoid summary judgment with a naked assertion of derivation.

19   ***Trade Secret 29 Lacks the Requisite Particularity.***  Wisk's expert acknowledges that TS 29 is

20   directed to "the energy storage system of Wisk's ▮▮▮▮▮▮▮▮▮▮ but then spends ten

21   pages of his report describing ▮▮ other energy storage systems developed for ▮▮▮▮▮▮▮

22   ▮▮▮ over the course of a decade.  Dix Rpt. ¶¶ 806–828.  As Mr. Dix's report demonstrates, these

23   various architectures differ from both each other and TS 29 in ▮▮▮▮▮▮▮▮▮▮

24   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*  If the different

25   aspects of all these different energy storage systems developed over the entire history of Wisk are

26

27   —————————————
     Disclosure, and Wisk provides no explanation of what this supposed element even means.  The only
28   document its expert cites in support does not discuss ▮▮▮▮▮▮▮▮▮▮ *at all.*  *Id.* ¶ 923
     (citing WISK00524366 at -376).

1    included within the scope of TS 29, as Mr. Dix suggests, Wisk has not identified TS 29 with

2    particularity.  Summary judgment would be appropriate on that additional basis.

3        **G.      Trade Secret 30: *Lithium-Ion Battery Cell Design Studies***

4        TS 30 is Wisk's ███████████████████████████████████████████

5    ████████████████████████████████████████████████████████████████

6    Disclosure at 40–42.  Wisk identifies two graphs of "exemplary" design studies it used ████████

7    ████████████████████████████████████ and seven documents "reflecting" TS 30.  *Id.*

8        ***No Evidence of Misappropriation of Trade Secret 30.***  It is undisputed that Archer has never

9    had or used Wisk's TS 30 "Lithium-Ion Battery Cell Design Studies," let alone any of those referenced

10   in the Disclosure as "reflecting" TS 30.  Nor is there any evidence that Archer ever had or used *any*

11   *other* Wisk battery cell design studies.  Despite accusing Archer of misappropriating Wisk's TS 30 cell

12   design studies, Wisk's expert did not identify *any* Wisk battery cell design study ever in Archer's

13   possession or used by Archer in his misappropriation analysis.[22]  And at his deposition Mr. Dix

14   admitted:  "I don't have information about who or if or when a document was actually accessed at

15   Archer."  Dix Tr. at 120:5–16.  There is a complete lack of evidence of misappropriation regarding TS

16   30, and summary judgment should be granted accordingly.

17       Indeed, Archer did not ███████████████████████████████ft—the stated purpose of TS

18   30 design studies.  It is undisputed that Archer *purchased* battery cells (or battery modules that included

19   battery cells) from third-party vendors.  For Maker, Archer *purchased* battery modules from its supplier

20   EP-S, which identified and procured battery cells from *its* battery cell supplier, ██████.  For

21   Midnight, Archer *purchased* battery cells directly from multiple cell vendors (including ███████

22

23

---

24   [22] Wisk's expert cites two Wisk documents inadvertently retained by former Wisk employee Johnny
     Melack to support his misappropriation opinion. Dix. Rpt. ¶ 230 (citing JM-000084 & JM-000081).
25   It is undisputed that Mr. Melack never accessed these documents while at Archer (Ex. 8 (Crain Tr.) at
     179:6–18; Ex. 9 (Harrison Rpt.) ¶¶ 62–64), and he testified multiple times that he did not know he had
26   these documents despite spending days attempting to clear his personal devices and accounts of Wisk
     materials prior to starting at Archer.  Ex. 13 (Melack Tr. (7/6/21)) at 278:18–23; Ex. 14 (Melack Tr.
27   (8/24/22)) at 398:1–400:4, 418:23–419:5; Dkt. 260-19 (Melack Decl.) ¶¶ 9(b), 11.  Neither document
     constitutes a battery cell design study.  JM-000081 is ████████████████████ and JM-000084
28   is a snapshot from the ██████████████.

1   ███████████████).[23]  Thus, after nearly two years of discovery, Wisk cannot identify a single Wisk

2   battery cell design study—within TS 30 or otherwise—that Archer ever had or used.

3       Faced with no supporting evidence for its claim, Wisk has tried to concoct a claim, which is

4   totally disconnected from TS 30, and explicitly tries to rewrite TS 30 to cover it.  Wisk now contends

5   that  Archer's  ████████████████████████████████████████████████████████

6   ████████████████████████████████████████████████████████████████████

7   Dix Rpt. ¶¶ 55–56, 173–76, 216.  Specifically, Wisk claims that Archer purchased battery modules

8   from supplier EP-S, knowing that EP-S would procure cells (to include in those modules) from *its*

9   vendor ████████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████  *Id.*  Wisk contends that "██████████████████

12  ████████████████████████████████████████████████████████████████████

13  ████████████████████████████████████████████████████████████████████

14  ████████████████████  *Id.*  ¶¶ 55, 190, 216.

15      After two years of exhaustive discovery, this is now Wisk's actual claim under TS 30, but it

16  has nothing to do with TS 30 *cell design studies*, and everything to do with ██████████████████

17  ██████████  TS 30 covers battery cell design studies, not ██████████████████████████████

18  ████████████████████████████████  and Wisk's new allegations cannot raise any genuine

19  issue of fact regarding TS 30.  That is why Wisk tries to rewrite TS 30.  While TS 30 covers battery

20  cell design studies, Wisk claims that TS 30 ████████████████████████████████  and that the

21  actual ██████████████  also is "included within this trade secret."  *Id.* ¶ 50.  That description of TS

22  30 is irreconcilable with TS 30 itself, which is battery cell design studies, not an ██████████████

23  ████████████████████████████—neither of which is mentioned in TS 30 or any of the documents

24  identified as "reflecting" TS 30, nor is either otherwise fairly within the scope of TS 30.

25

26  ───────────────
    [23] *See, e.g.*, Dix Rpt. ¶ 186 ("cells being offered to Archer by … EPS"), ¶ 262 (Archer's purchase of
    cells to evaluate for Midnight); Ex. 49 (Millecam (EP-S CEO) Tr.) at 190:15–25 (EP-S selected

27  ██████; Ex. 50 (Archer-NDCA-00335877) (EP-S recommended the cell supplier); Dkt. 58-20
    (Bower Decl.) ¶¶ 35–36 (Archer/EP-S relationship); Dkt. 58-33 (Millecam Decl.) ¶ 6 (Archer/EP-S

28  relationship).

1    Wisk's allegations do not show misappropriation by Archer from Wisk in any event.  For

2 Maker, Archer *bought* batteries from its vendor (EP-S), and EP-S bought cells for its batteries from *its*

3 vendor ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4 ▮▮▮▮▮▮▮▮      to EP-S (which then sold them to Archer), that is ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

5 ▮▮▮.[24]  It certainly is not a basis for a claim that Archer misappropriated anything from Wisk—

6 let alone TS 30 design studies Archer did not have or need.

7    Likewise, for Midnight, Wisk asserts that former Wisk employees at Archer had exposure to

8 information about ▮▮▮▮▮▮ cells and used that to evaluate and "prioritize" ▮▮▮▮▮▮ cells during

9 Midnight cell selection.  Dix Rpt. ¶ 188.  Even if true (it is not), that would not amount to

10 misappropriation of TS 30, which requires use of Wisk's "battery cell design studies," which Archer

11 did not have and did not use.  Indeed, Archer never even used ▮▮▮▮▮▮ cells in Midnight, as it decided

12 to select ▮▮▮▮ as its vendor instead.[25]  And, again, if ▮▮▮▮▮ violated some commitment to Wisk

13 by providing its cells to Archer, that is a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

14    ***Trade Secret 30 Lacks the Requisite Particularity.***  While TS 30 covers battery cell design

15 studies, Wisk's expert claims that TS 30 "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ also is "included within this trade secret."  Dix Rpt. ¶ 50.  If such items

17 could possibly fall within the scope of TS 30, even though the Disclosure makes absolutely no reference

18 to them, TS 30 is not defined with reasonable particularity.

19    Wisk goes further, claiming that TS 30 includes the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21 even though the Disclosure makes no mention of such ▮▮▮▮▮▮▮▮▮▮▮▮     Dix Tr.

22

---

23 [24] Wisk's expert devotes much of his effort speculating that current or former Archer employees should
have known that the ▮▮▮▮▮▮ cells Archer received when it procured battery modules from EP-S were
24 ▮▮▮▮▮▮▮▮▮▮▮▮ and that some of these individuals made efforts to obtain such cells from ▮▮▮▮▮▮.
Wisk's speculation is irrelevant, however, because it remains undisputed that the cells Archer procured
25 were commercially sold by ▮▮▮▮ to EP-S and others.
[25] *See* Ex. 51 (Archer-NDCA-01870223); Ex. 52 (Greek Tr.) at 181:7–10; Ex. 14 (Melack Tr.) at
26 549:22–550:10; Ex. 53 (Zhang Tr.) at 111:23–113:5, 227:17–228:9.  Wisk also implies (again without
evidence) that Archer pursued ▮▮▮▮▮ but it is undisputed that ▮▮▮▮▮ initiated contact with
27 Archer about supplying cells for Midnight, not the other way around.  Ex. 54 (Archer-NDCA-
01817919) (meeting notes); Ex. 55 (Archer-NDCA-01656071) (Mar. 18, 2021 email from ▮▮▮▮▮
28 to Archer); Ex. 53 (Zhang Tr.) at 204:20–205:21.

at 145:2–7.  Mr. Dix testified that he "would define the scope of Trade Secret 30 with, you know, the ██████████████████████████████████████████████████████████████████ *Id.*  And in his expert report, Mr. Dix included a 28-page "Description of Trade Secret 30" that characterizes events that occurred over the course of several years and refers to topics such as the ████████████████ ███████████████████████████████████ that appear nowhere in the Disclosure's description of TS 30.  *See, e.g.*, Dix Rpt. ¶¶ 50–54.  If Wisk's TS 30 can be stretched this far, it cannot be fairly said to be sufficiently particular.

**H.      Trade Secret 31:** *Performance Studies for Typical Mission Profile*

TS 31 is performance studies for mission profiles, used ███████████████████ ██████████████████████████████████████ Disclosure at 42–43. The studies ████████████████████████████████████████████████████ ████████████████████████████ *Id.* ██████████████████ ████████████████████████████████████████ ████████████████████ *Id.*  Wisk's Disclosure includes an image that ████████████ ████████████████████████████████████████████████████ ██████████ and identifies eight documents "reflecting" TS 31.  *Id.*

*No Evidence of Misappropriation of Trade Secret 31.*  It is undisputed that Archer has never had or used any Wisk mission profile performance studies of any kind, let alone those identified in TS 31.  Wisk does *not even allege* that Archer ever had or used the one identified study, or any of the eight documents "reflecting" TS 31.  Nor does Wisk allege that Archer ever had or used *any other* Wisk mission profile performance studies.  In fact, in the 119 paragraphs Wisk's expert, Mr. Dix, devotes to alleged misappropriation of TS 31, he does not cite even one of the studies identified in the Disclosure "reflecting" TS 31, *nor any other Wisk mission profile performance study at all*.

Wisk's expert also does not even mention Archer's *own* mission profile studies, which Archer produced in this case, let alone compare them in any way to Wisk's mission profile studies.  Thus, Wisk accuses Archer of having misappropriated its TS 31 mission profile studies even though it cannot identify a single such study that Archer ever had or ever used, at any time, or for any purpose.

1    Instead, having had full access to Archer's confidential development documents, Wisk *now*

2    points to something entirely different than TS 31 mission profile performance studies: █████████

3    ████████████████████████████████████████████████████████████████████████████

4    ████████████████████████████████ Dix Rpt. ¶¶ 468–475.  Even if Wisk were correct that Archer

5    engineer Nansi Xue estimated the █████████████████████████████ l by relying on Wisk

6    information (he did not), that estimate is not a "performance study" and would not raise any genuine

7    issue of TS 31 misappropriation.  The same is true as to the ████████████; even if the only way

8    Archer's battery engineers knew about that public domain █████ was from Wisk (they did not), this

9    would also not raise any genuine issue precluding summary judgment because the use of *any*█████

10   is not TS 31's "performance study."   Moreover, Wisk has no evidence that this information was

11   somehow plucked out of a confidential document, or that Wisk has some proprietary right to █████

12   ████████████████████████████████████████████████████

13      Consequently, although repeatedly promising this Court it would not do so, Wisk tries to rewrite

14   TS 31.  Specifically, Wisk attempts to transform TS 31 from the Disclosure's ████████ performance

15   study for typical mission profile studies to ████████████████████████████████████

16   █████  *See, e.g., id.* ¶¶ 468–475.  And Wisk is not subtle about it.  In fact, the overview of the section

17   entitled "Description of Trade Secret 31" in its expert report *bears no resemblance at all* to TS 31 as

18   described in the Disclosure.  *Compare id.* ¶¶ 358–60 *with* Disclosure at 42.  It does not even mention

19   performance studies for mission profiles.

20      Instead, Mr. Dix proclaims:  "Trade Secret 31 comprises Wisk's ███████████████████

21   ██████████████████████████████████████████████████████."[26]

22   Dix. Rpt. ¶¶ 358–359.  That description of TS 31 is irreconcilable with what is described in the

23   Disclosure.  This effort to morph TS 31 from mission profile studies into "iterative" ███████████

24   ████████ now that it has enjoyed full access to all of Archer's development documents and proprietary

25

---

26   [26] Wisk's expert bases his assertion that Archer employees misappropriated TS 31 material on this
     radical rewrite, not on any alleged performance studies for a mission profile.  Further, Mr. Dix does
27   not identify a single document accessed or retained by Archer employees for *any* TS 31
     misappropriation theory.   At bottom, Mr. Dix's assertions amount to little more than baseless
28   speculation and innuendo.

1   information, is not only improper, it is directly contrary to Wisk's repeated representations to Archer

2   and this Court.

3          To be clear, ██████████████████ may well *impact* a mission profile performance

4   study, and may well *impact* how ██████████████████. But Wisk does not get

5   to sweep into TS 31 everything it thinks it has found in Archer documents that might impact a ████

6   ████████████████████████████████████████

7   ████████████████████████████████████. All of

8   those things may well *impact* a ██████████████ in a mission profile study, but they are not

9   "studies" and they are not within the scope of TS 31 under even the most generous of interpretations.

10         And while all this information relating to ██████████████████ may be

11  *related* to a performance study for a mission profile, Disclosure at 42 ██████████████

12  ███████), it is not such a study itself, which Wisk says is used ██████████████

13  ████████████████████████████████████ *Id.* And here, it is only

14  performance studies for mission profiles that Archer is accused of misappropriating (but indisputably

15  never had). Indeed, Wisk does not even *try* to argue that ██████████████████

16  actually constitutes TS 31 performance studies for mission profiles, nor could it defensibly do so.

17         Because Archer never had or used any Wisk performance study for mission profiles, and

18  because Wisk identifies no evidence to the contrary, summary judgment should be granted accordingly.

19         ***Trade Secret 31 Lacks the Requisite Particularity.*** As explained above, although TS 31 covers

20  performance studies for a typical mission profile, Wisk claims that it covers ██████████████

21  ███████ If such ██████ could possibly fall within the scope of TS 31, even though the Disclosure does

22  not mention them, TS 31 is not defined with reasonable particularity. Wisk's expert goes further,

23  relying on an unbounded concept of "iterative" ██████████████. His 15-page "Description of

24  Trade Secret 31" characterizes events that occurred over the course of years and refers to material

25  ██████████████████ that appear nowhere in the Disclosure's description of TS 31. If Wisk's

26  TS 31 can be stretched this far, it cannot be fairly said to be sufficiently particular.

27     **I.     Trade Secret 39: *High Voltage Connection System Design***

28         TS 39 is the ██████████████ of Wisk's High Voltage Connection System ("HVCS"),

-35-

1   which is used ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

2   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Disclosure at 53–54.  An HVCS ▮▮▮▮▮

3   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

4   ▮▮▮▮▮▮▮▮▮▮  *Id*.  An HVCS ensures that ▮▮▮▮▮▮▮▮▮▮▮

5   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  *Id*.

6   Wisk's Disclosure includes a block diagram of the TS 39 HVCS architecture:



14  *Id*. at 53.  TS 39 is not directed to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Wisk's expert confirmed that TS 39 is ▮▮

16  ▮▮▮▮▮▮▮▮  That is the trade secret."  Dix Tr. at 206:18–23.[27]

17      ***No Evidence of Misappropriation of Trade Secret 39.***  Wisk does not even assert, let alone

18  show, that Archer has ever used Wisk's TS 39 architecture for any Archer aircraft.  To the contrary,

19  Wisk's expert acknowledges that Archer itself "*designed*" its own HVCS (Dix Rpt. ¶ 685) (emphasis

20  added), and that Archer's ▮▮▮▮▮▮ is *different* from TS 39, including in ways that go to what he

21  described as the "heart" of TS 39.  *Id*. ¶¶ 670, 685.

22      According to Wisk's expert, the "heart of this trade secret" is the way in which Wisk's

23  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24  [27] Dix Tr. at 213:18–22 ▮▮▮▮▮

25  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  The TS 39 ▮▮▮▮▮▮" includes the HVCS ▮▮▮

26  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

27  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id*. at 204:2–19 ▮▮▮▮; 224:12–
    226:22 ▮▮▮▮▮▮▮▮▮▮  Wisk's expert even claims that TS 39 is the ▮▮▮

28  in the Disclosure.  *Id*. at 220:12–25.

1   ███████ *Id.* ¶¶ 670, 675. ████████████████████████████████

2   ████████████████████████ *Id.* ¶¶ 622–623. ████████████████████

3   ██████████████████████████████████████████████████████████████

4   ██████████████████████████████████████████████████████████████

5   ██████████████████████████████████████████████████████████████

6   ████████████████████████████ *Id.* ¶ 622–640. ████████████████

7   ████████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████████████

9   ██████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████. *Id.* ¶¶ 703–707.  That is a wholly

11  distinct approach for ███████████████, and uses a wholly distinct architecture to accomplish it.[28]

12       Because Archer's architecture is undisputedly different from TS 39, Wisk claims only that

13  Archer "incorporated key *components*" used in TS 39 into its different HVCS, and speculates that the

14  alleged use of those components suggests Archer employees may have *consulted* Wisk's architecture

15  when designing Archer's own architecture. *Id.* ¶ 690 (emphasis added); Dix Tr. at 214:4–17.  But Wisk

16  has no evidence to support its speculation on which its misappropriation claim is entirely based.  There

17  is no evidence that Wisk's TS 39 architecture was ever present at Archer, let alone that it was ever

18  consulted or used by anyone at Archer to select the particular components Wisk identifies—none of

19  which are themselves TS 39, as Wisk's expert admits.  *See, e.g.*, Dix Tr. at 206:18–23; 213:18–22.

20  Wisk simply has no evidence that TS 39 (as opposed to some non-protected element that may also be

21  in TS 39) was ever used in the development of Archer's HVCS architecture.  Nor is there any evidence

22  that Archer started its HVCS design with Wisk's design in-hand or in-mind, or that it otherwise used

23  ────────────────────

24  [28] There are other fundamental differences as well. ████████████████████████████

25  ██████████████████████████████████████████████████████████████████████████

26  ████████████████████████████████████████████  Yet Wisk *does not assert, let alone show*, that
    Archer misappropriated these aspects of its claimed architecture.  Nor does Wisk assert or show that

27  Archer's overall architecture includes any of the following aspects of Wisk's overall architecture:

28  ██████████████████████████████████████████████████████████████████████████

1   Wisk's design to come up with its own.

2   Wisk also has no evidence—or even allegation—that the allegedly "key" components it has

3   identified are themselves secret to Wisk, as opposed to generic aspects of HVCS design, let alone

4   evidence that Archer or its employees intended to misappropriate those elements from Wisk. The first

5   "key component[]" Wisk identifies, for example, █████████████████████████████████████

6   █████████████████████████████████████ Dix Rpt. ¶ 690. But Wisk's expert

7   admitted that he has *no evidence* that this generic idea is secret to Wisk. Dix Tr. at 229:8–230:2 ██

8   █████████████████████████████████████████████████████████████████████

9   ███████████████████████████████████████████ The same is true for all

10  other "key components" Wisk identified, ██████████████████████████████████

11  ████████████████████████████████████████. Dix Rpt. ¶¶ 690–

12  701. Wisk has no evidence—or even a contention—that these (or any other individual components of

13  a HVCS) were secret to Wisk. Thus, there is no basis for a jury to find that Archer's alleged use of

14  *components* could prove use of the TS 39 *architecture*, let alone prove intentional misappropriation of

15  it. And it simply isn't sufficient for Wisk to say, in effect, you have a red wire and we have a red wire,

16  QED, you stole our architecture.

17  Instead of actual evidence, Wisk and its expert again indulge in baseless speculation and

18  innuendo. Wisk's expert speculates, for example, that Archer may have used TS 39 because "Jing Xue

19  retained confidential and proprietary documents from Wisk, describing Wisk's HVCS designs and

20  development efforts." *Id.* ¶ 702. But Wisk has no evidence that Dr. Xue (or anyone else) ever used or

21  consulted—or even accessed—any Wisk document regarding TS 39 at Archer; Dr. Xue has testified

22  *three times* that he never did, *and his testimony is confirmed by forensic evidence*.[29]

23  Likewise, Wisk's expert spends paragraph after paragraph discussing Scott Furman and Johnny

24  Melack, but never identifies any evidence they used any source disclosing Wisk's HVCS architecture

25

26

27  [29] Ex. 11 (Crain Rpt.) Ex. M; Ex. 9 (Harrison Rpt.) ¶¶ 20–21, 27–30, 40, & Ex. 3 to Harrison Rpt.; Ex.
    56 (J. Xue Tr. (7/6/21)) at 74:20–75:21; Ex. 57 (J. Xue Tr.) at 219:4–8, 242:2–8, 243:25–244:6; Dkt.
28  58-26 (Xue Decl.) ¶ 7.

1    to accomplish their Archer work.[30]  He just notes they worked *at Wisk* and then *at Archer* on different

2    HVCS architectures that allegedly have some components in common.  *Id.* ¶¶ 703–756.  That is not a

3    permissible basis for *allegations* of misappropriation, let alone to justify a trial.  *Les Concierges*, 2009

4    WL 1138561, at *2.  As the Court recognized, Wisk's innuendo (on which its case is fundamentally

5    built) is not evidence, and certainly cannot substitute for actual proof.  Dkt. 422 at 9 ("while Wisk

6    points to a single document in that capture that 'concerns' one of Wisk's trade secrets, Wisk pointedly

7    does not say that Furman opened, used, or implemented that document in his work at Archer").[31]

8         ***Trade Secret 39 Lacks Sufficient Particularity.***  Further, if Wisk is permitted to redefine TS

9    39 to cover ████████████████████████████████████████

10   ████████████████████████—which Archer undisputedly has not used—TS 39 would lack reasonable

11   particularity.  For example, in an egregious departure from TS 39 as defined in the Disclosure, and in

12   violation of the Court's narrowing order, Wisk has attempted to sneak in allegations regarding ████

13   ████████████████████████████████████████████████████

14   ██████████████████████████████—under the guise of TS

15   39 in Mr. Dix's report.  *Compare, e.g.*, Dix Rpt. ¶¶ 708–716 ███████████████████

16   ██████████████████████████████ *with* Disclosure at 69–70

17   ███████████████████████ If Wisk is permitted to employ

18   this "shifting sands" tactic, then TS 39 will lose any reasonable particularity.  *Freeman*, 2016 WL

19   5719819, at *10 n.4.

20        **J.    Trade Secret 44: *Avionics Architecture and Systems***

21        Trade Secret 44 is Wisk's "Avionics Architecture and Systems."  Disclosure at 62.  ████████

22

23   ───────────────
     [30] Wisk's expert does cite a single document Mr. Furman inadvertently retained as reflecting an image
     of Wisk's HVCS architecture (Dix Rpt. ¶ 604), but that document was saved to a backup storage device

24   called a "Time Capsule" that indisputably had not been used since March 2017 (nearly three years prior
     to Mr. Furman leaving Wisk).  Ex. 9 (Harrison Rpt.) ¶ 66.

25   [31] Indeed, because Wisk has no actual evidence, Wisk's expert Mr. Dix tries to excuse that failing by
     contending (with the exact same language used by Wisk's two other experts) that "many of [Scott

26   Furman's] files are unrecoverable" such that "I am unable to determine whether any of the deleted
     content provides further corroboration of my opinion that Archer misappropriated Wisk trade secrets."

27   Dix Rpt. ¶ 608 n.42.  That claim is false.  Mr. Dix could have reviewed the documents deleted by Mr.
     Furman, because Archer preserved and produced all but one of them.  Dkt. 422 at 9–10.  None of those

28   documents support Mr. Dix's opinions—as shown by the fact that none are cited by Mr. Dix.

1 ███████████████████████████████████████████████████

2 ████████████████████████ *Id.* at 63. ████████████████

3 ███████████████████████████████████████████████████

4 ██████████████ *Id.*██ ████████████████████████████████

5 ███████████████████████████████████████ *Id.* ████████

6 ███████████████████████████████ *Id.* at 64.

7       ***No Evidence of Misappropriation of Trade Secret 44.***  Archer does not use Wisk's TS 44

8 architecture in either of its aircraft—and Wisk does not even contend otherwise.  Indeed, Wisk's own

9 expert, Dr. Collins, concedes that there are "***some differences*** between Wisk's [TS 44] avionics

10 architecture and the system actually implemented for Maker."  Collins Rpt. ¶ 529 (emphasis added).

11 And as to the Midnight aircraft, Wisk contends only that Midnight "implemented ***similar*** concepts for

12 its avionics architecture."  *Id.* (emphasis added)  These are understatements, as *both* the Maker and

13 Midnight avionics architectures lack nearly *every* element of Wisk's TS 44.

14       For example, Archer does not use ██████████████████████—which Wisk states

15 █████████████████████████████ Rather, both Maker and Midnight indisputably

16 ████████████████████ Nor does Archer ██████████████████████

17 ██████ Disclosure at 63.[32]  Unlike TS 44, █████████████████████

18 ███████████████████████████████████████████████████

19 ███████████████████████████████████████████████████

20 ███████████████████████████████████████████████████

21 ███████████████████████████████████████████████████

22 ███████████████████████████████████████████████████

23 Ex. 12 (Furman Tr.) at 308:1–21; Ex. 58 (Archer-NDCA-00000022) at -035, -044–045. ████████

24 ███████████████████████████████████████████████████

25

26 [32] ██████████████████████████████████████████████████

27 ███████████████████████████████████████████████████

28 Disclosure at 61–62 (emphasis added).

1 ██████████████████████████████████████████████████  Ex. 59

2 (Archer-NDCA-01878596) at -955–957.  These fundamental differences in TS 44 and Archer's aircraft

3 are all undisputed, and indeed it would be hard to image how Archer's aircraft architecture could be

4 more different than the TS 44 architecture.[33]

5      Wisk nevertheless contends that, because Archer supposedly developed its different

6 architecture "rapid[ly]" after hiring former Wisk employee Scott Furman, this fact somehow "shows

7 Archer was able to use Wisk's trade secret as a starting point to develop its avionics architecture."

8 Collins Rpt. ¶¶ 528–529.  That is rank speculation, and in fact there is no evidence whatsoever that

9 Archer's fundamentally different avionics design was in any way derived from or otherwise benefitted

10 from Wisk's design.

11      The best that Wisk can come up with is the fact that, █████████████████████████

12 ██████████████████████████████████████████.  Collins Tr. at 80:20–

13 86:15; Ex. 60 (Archer-NDCA-00443032) at -053–070 █████████████████████████

14 ████████████████████████████████████████████████████

15 █████████████████████████████████████████████████████.  In

16 short, not one was the design of TS 44.

17      ████████████████████████████████████████████

18 ████████████████████ and thus, Wisk claims it "resembles" TS 44,  Collins Rpt. ¶ 529,

19 █████████████████████████████████████████████████████

20 ██████████  Regardless, even if it were *identical* to TS 44 it would not matter, because ████

21 █████████████████████████████████████████████████████

22 ████████████████  Collins Tr. at 88:5–92:24; Ex. 12 (Furman Tr.) at 296:15–300:17.  And

23 Archer selected the fundamentally different avionics architecture discussed above, which is nothing

24 like D3, just as it is nothing like TS 44.

25      Looking for anything on which to hang a claim, Wisk identifies an element of Archer's avionics

26 _____

[33] The foregoing is not even an exhaustive list of the differences. ████████████████████

27 ████████████████████████████████████████████████

28 █████████████████████ Disclosure at 63 (emphasis added), and Wisk does not contend

otherwise.

architectures to which Mr. Furman allegedly contributed: ███████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████ both of which were dropped by Wisk

pursuant to this Court's order limiting the number of trade secrets that could be asserted.  Dkt. 257.

Nor would it have helped Wisk even if TS 44 *had* included ███████████████, as Wisk's

own expert admitted that ████████████████████████████████████████████████████

██████.  Collins Tr. at 12:3–15:13.  Moreover, Dr. Collins conceded that an avionics engineer would

be familiar with ████████████████████████ in an avionics architecture.  *Id.* at 41:17–25.  And

Archer's implementation of ████████████████ is indisputably different than TS 44; ███████████

██████████████████████████████ (Disclosure at 61–62, 64–65), ████████████████

██████████████████████████████████████████████████████████

████████████████████████████████

Wisk attempts to excuse its lack of any supporting evidence by pointing to Mr. Furman's

deletion of documents, claiming the documents "related to his prior work at Wisk" and that "most" of

those documents "are unrecoverable so we will never learn the precise contents" of them.  Collins Rpt.

¶ 534.  But, as the Court is well aware from Wisk's spoliation motion, and with the exception of a

*single* document irrelevant to TS 44, no documents were lost and no documents are "unrecoverable."

All documents but one were preserved and produced to Wisk, who knows their "precise contents," and

the fact is that *none* of those documents, or any others, support Wisk's misappropriation claim.[34]

***Trade Secret 44 Lacks Sufficient Particularity.***  Further, if Wisk is permitted to redefine TS

44 to cover the fundamentally different Maker and Midnight avionics architectures, rather than being

limited to Wisk's overall avionics architecture expressly recited in its Disclosure—which Archer

---

[34] Wisk's expert cites one of those preserved and produced documents, but *solely* to support the uncontested fact that Mr. Furman worked on Wisk's avionics architecture.  Collins Rpt. ¶ 526 (citing Archer-NDCA-00920235).  Moreover, the forensic evidence reflects that Mr. Furman never accessed that document since starting at Archer.  Dkt. 422 at 9 ("Wisk has no evidence that any of the documents from Furman's computer were used before May 2021.").  Wisk's expert also contends that Dr. Xue downloaded a document (WISK00002214) "right before he left Wisk for Archer, copied this document to his personal computer, and accessed it on January 11, 2020."  Collins Rpt. ¶ 535.  But, that contention is also unsupported (Ex. 11 (Crain Rpt.) at Ex. M; Ex. 9 (Harrison Rpt.) ¶ 27 & Ex. 3 to Harrison Rpt.) and irrelevant—there is no allegation that Dr. Xue was even involved in Archer's avionics architecture development efforts.

1   undisputedly has not used—TS 44 would lack reasonable particularity.

2   **II.     No Patent Infringement Liability**

3        **A.     '033 Patent:** *No Evidence of Infringement by Midnight Production Aircraft*

4        Wisk asserts claims 1 and 19 of Patent No. 10,110,033 ("the '033 Patent"), entitled "Multi-

5   battery charging station which selectively connects battery sub-modules to a common power bus for

6   charging." Ex. 61 ('033 Patent). Claim 1 recites a "system" that contains a memory with "instructions"

7   relating to battery charging, such as instructions to "select" which "battery sub-modules to electrically

8   connect to a common power bus" and instructions to "charge the selected battery sub-modules" in a

9   specified way. *Id.* at 14:47–15:17. Claim 19 recites a "computer program product" with the same

10  "computer instructions" as claim 1. *Id.* at 20:19–53.

11       The Court should grant summary judgment of non-infringement by the accused Midnight

12  production aircraft, because Wisk has no evidence that ███████████████████████

13  ████████████████████████████████—let alone one that meets the specific limitations

14  of the claims. As Archer's witnesses explain in unrebutted sworn testimony, ████████████

15  ████████████████████████████████████████████████████████

16  █████   Ex. 52 (Greek Tr.) at 38:2–39:25; 41:16–23; 44:1–10; Ex. 1 (Bower Tr.) at 336:7–10; Bower

17  Decl. ¶¶ 6–8.

18       Indeed, Wisk's own expert Dr. Collins does not attempt to show—or even assert—that there is

19  ████████████████████████████████████████████████, let alone

20  attempt to conduct an *infringement analysis* of one. Instead, Dr. Collins analyzes a charging system

21  for Archer's ████████████████████, and he labels that charging system the "Midnight

22  Charging System" in his report—even though he has no evidence that it will be used with the Midnight

23  *production* aircraft, *i.e.*, the *different* aircraft that Archer plans to seek certification of and then operate

24  commercially if certified. Collins Rpt. ¶ 792; Collins Tr. at 198:10–14. In fact, as Dr. Collins himself

25  admits, ████████████████████████████████████████████████████

26  █████   Collins Rpt. ¶ 783; Ex. 1 (Bower Tr.) at 334:17–335:12 (same). The charging system that

27  Dr. Collins calls the "Midnight Charging System" in his infringement report simply *is not the charging*

28  *system for the Midnight production aircraft.* Bower Decl. ¶¶ 5–8. Because Wisk has no evidence of

-43-

1    infringement regarding the Midnight production aircraft, summary judgment is warranted.

2             **B.**    **'833 Patent:** *Noninfringement by All Accused Archer Aircraft*

3         Wisk asserts claims 1, 2, 6, 8, and 16 of Patent No. 9,764,833 ("the '833 Patent"), entitled

4    "Ventilated rotor mounting boom for personal aircraft." Ex. 62 ('833 Patent).  Claim 1, from which

5    all other asserted claims depend, recites a "rotor mounting boom assembly for a personal aircraft." *Id.*

6    at 12:61–13:10.  The assembly must include, among other things, "a *boom* capable of being coupled to

7    the wing of the personal aircraft," with "an air inlet *positioned on the boom*." *Id.* (emphasis added).

8    The parties stipulated to a claim construction of the term "boom" in their joint filing, agreeing that it

9    means "elongated support structure." Dkt. 183 at 1.

10       The Court should grant summary judgment of noninfringement because Wisk has no evidence

11    that any Archer aircraft (or aircraft design) includes "an air inlet positioned on the boom" under the

12    stipulated construction of "boom" meaning "elongated support structure."  Wisk's expert does not

13    *mention*, let alone apply, that claim construction anywhere in his infringement report, and thus Wisk

14    has no evidence of infringement of the claims as construed.

15       Specifically, Wisk's expert Dr. Collins bases his infringement opinions for this limitation on

16    air inlets that are positioned on *covers* or *fairings* in Archer's aircraft and aircraft designs.  Collins Rpt.

17    ¶¶ 590, 632.  As Dr. Collins himself explains, "covers or fairings may be removable and *may not be*

18    *structural*." *Id.* ¶ 632 (emphasis added).  Thus, while the construed claims require an air inlet

19    positioned on an "elongated support structure," Dr. Collins admits the accused air inlets are instead

20    positioned on covers and fairings that "may be removable and *may not be structural*." *Id.* (emphasis

21    added).

22       Dr. Collins does not show—and does not even opine—that any accused covers and fairings in

23    this case is in fact an "elongated support structure" as required by the governing claim construction.

24    He never *mentions* the phrase "elongated support structure" in his infringement report, let alone in his

25    opinions regarding infringement of the limitation "an air inlet positioned on the boom."  And he does

26    not even *cite* to the parties' agreed construction, or even list the parties' joint filing (where the parties

27    documented the agreed construction) anywhere on his list of materials considered.  Collins Rpt. at Ex.

28    2.  Because Dr. Collins does not apply the governing construction in his infringement report (either for

1  literal infringement or the Doctrine of Equivalents), Wisk cannot show infringement. *See, e.g.*,

2  *Treehouse Avatar LLC v. Valve Corp.*, 54 F.4th 709, 712, 715–16 (Fed. Cir. 2022) (affirming summary

3  judgment of noninfringement where plaintiff's expert did not apply "the agreed-upon construction").

4       Moreover, Dr. Collins' report reveals that his opinions are based on an understanding of "boom"

5  that *contradicts* the governing claim construction.  In the very sections of his report where he opines

6  that the accused air inlets infringe even though they are positioned on non-structural covers or fairings,

7  he explains that his opinions are based on his view that "[t]he patent does not concern the number of

8  components used to form the outer surface of the boom assembly *or whether those components are*

9  *structural* or removable."  Collins Rpt. ¶¶ 591, 633 (emphasis added).  Thus, Dr. Collins bases his

10  infringement opinions on the legally incorrect view that it *does not matter* whether the air inlet is

11  positioned on a structural component.  Because his opinions contradict the governing claim

12  construction, they cannot create a genuine issue of fact, and the Court should grant summary judgment

13  of noninfringement. *See, e.g.*, *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 2021-1900, 2023 WL

14  2031213, at *6 n.4 (Fed. Cir. Feb. 16, 2023) (expert testimony that is "based on an incorrect claim

15  construction" "cannot create a genuine dispute of fact to preclude summary judgment"); *Clare v.*

16  *Chrysler Grp. LLC*, 819 F.3d 1323, 1332–33 (Fed. Cir. 2016) (same).[35]

17  **CONCLUSION**

18       For the foregoing reasons, Archer's motion for summary judgment should be granted regarding

19  all of Wisk's trade secret claims and Wisk's patent infringement claims for the '833 patent and '033

20  patent (with respect to the Midnight production aircraft).

21

22

23

24

25  [35]  Archer does not infringe the '833 Patent for the additional reason that the rotor controller enclosure
26  on each accused aircraft is not "in fluid communication with the air inlet and an air outlet for allowing
   air to flow through the controller enclosure."  Ex. 62 ('833 Patent) at 13:7–10.  Because of briefing
27  space constraints, Archer is not moving for summary judgment on that basis.  Likewise, Archer does
   not infringe the third asserted patent, the '036 Patent, but does not address that patent here because of
28  space constraints and because Wisk is not seeking any damages on that patent in any event (and has no
   basis for seeking an injunction).

1
2
3    DATED:  March 19, 2023

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Respectfully submitted,

GIBSON, DUNN & CRUTCHER LLP

By: _____ */s/ Josh A. Krevitt* _____
             Josh A. Krevitt

Attorneys for Defendant Archer Aviation Inc.