GIBSON, DUNN & CRUTCHER LLP
Josh A. Krevitt, SBN 208552
  jkrevitt@gibsondunn.com
Stuart Rosenberg, SBN 239926
  srosenberg@gibsondunn.com
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: 650.849.5300
Facsimile: 650.849.5333

Daniel J. Thomasch, admitted *pro hac vice*
  dthomasch@gibsondunn.com
Paul Torchia, admitted *pro hac vice*
  ptorchia@gibsondunn.com
200 Park Avenue
New York, NY  10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

Wayne Barsky, SBN 116731
  wbarsky@gibsondunn.com
Michael H. Dore, SBN 227442
  mdore@gibsondunn.com
Diana M. Feinstein, admitted *pro hac vice*
  dfeinstein@gibsondunn.com
2029 Century Park East, Suite 4000
Los Angeles, CA  90067-3026
Telephone: 310.552.8500
Facsimile: 310.551.8741

Attorneys for Defendant and Counterclaimant
Archer Aviation Inc.

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| WISK AERO LLC, | CASE NO. 3:21-CV-02450-WHO |
| Plaintiff, | **COUNTERCLAIMANT ARCHER'S OPPOSITION TO WISK'S MOTION TO EXCLUDE THE TESTIMONY OF TODD MILBOURN** |
| v. | |
| ARCHER AVIATION INC., | Date:    May 12, 2023 |
| Defendant. | Time:    3:00 p.m. |
| | Judge:   William H. Orrick III |

REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION ............................................................................................................... 1

II.   BACKGROUND ................................................................................................................ 2

    A.    Archer's Counterclaims Regarding Wisk's Allegedly Defamatory Statements ........... 2

    B.    Archer's Merger with Atlas Crest ................................................................................. 5

    C.    Professor Milbourn's Opinions ..................................................................................... 6

III.  ARGUMENT ..................................................................................................................... 8

    A.    Professor Milbourn's Opinion That The Alleged Defamatory Statements
        Caused Harm To Archer Is Consistent With California Law ....................................... 8

    B.    Professor Milbourn's Opinions Are Not Excludable Because He Did Not
        Quantify Damages That Are Separately Attributable To Each Defamatory
        Statement ..................................................................................................................... 12

        1.    Professor Milbourn Attributes Harm to Wisk's Defamatory Statements ....... 12

        2.    There Is No Requirement That Professor Milbourn Must Quantify
             Harm Associated with Each Statement Separately ......................................... 15

    C.    Professor Milbourn's Opinions Are Based on Substantial Evidence, Not *Ipse
        Dixit* ........................................................................................................................... 16

    D.    Professor Milbourn's Opinions Are Not Contradicted By The Factual Record ......... 17

    E.    Professor Milbourn's Media-Amplification Opinions Are Proper ............................. 19

        1.    The Fair and True Reporting Privileged Does Not Apply and Wisk
             Misstates Archer's Position About its Damages and The Court's Ruling
             That Denied Wisk's Anti-SLAPP Motion ...................................................... 19

        2.    Wisk's Argument Against Professor Milbourn's Qualifications Is
             Based On A Misstatement Of Professor Milbourn's Testimony ................... 22

IV.   CONCLUSION ................................................................................................................ 23

Gibson, Dunn &
Crutcher LLP

i

# TABLE OF AUTHORITIES

Page(s)

CASES

*Alioto v. Cowles Comms. Inc.*,
430 F. Supp. 1363 (N.D. Cal. 1977) ....................................................................14

*Am. Dental Ass'n v. Khorrami*,
2004 WL 3486525 (C.D. Cal. Jan. 26, 2004) .......................................................20

*Bank of N.Y. v. Fremont Gen. Corp.*,
523 F.3d 902 (9th Cir. 2008)...........................................................................8, 10

*Behrendt v. Times–Mirror Co.*,
30 Cal. App. 2d 77 (1938)...................................................................................14

*Bockrath v. Aldrich Chem. Co.*,
21 Cal. 4th 71 (1999) ............................................................................................9

*Burlington N. & Santa Fe Ry. Co. v. United States*,
556 U.S. 599 (2009) ............................................................................................13

*Colbourn v. Crane Co.*,
728 F. App'x 679 (9th Cir. 2018) ..........................................................................9

*Comdyne I, Inc. v. Corbin*,
908 F.2d 1142 (3d Cir. 1990) .........................................................................13, 14

*Contento v. Mitchell*,
28 Cal. App. 3d 356 (1972).............................................................................15, 17

*Douglass v. Daisley*,
114 F. 628 (1st Cir. 1902) ....................................................................................16

*DSPT Intern., Inc. v. Nahum*,
624 F.3d 1213 (9th Cir. 2010).............................................................................16

*Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*,
273 U.S. 359 (1927).............................................................................................16

*Edward v. Ellis*,
72 Cal. App. 5th 780 (2021) ................................................................................16

*Espinosa v. Little Co. of Mary Hosp.*,
31 Cal. App. 4th 1304 (1995) ......................................................................1, 11, 13

*Fibreboard Paper Prods. Corp. v. E. Bay Union of Machinists, Local 1304*,
227 Cal. App. 2d 675 (1964) .......................................................................1, 14, 15

*Galarneau v. Merrill Lynch*,
504 F.3d 189 (1st Cir. 2007) ................................................................................17

Gibson, Dunn & Crutcher LLP

ii

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

*Grouse River Outfitters Ltd. v. Oracle Corp.*,
2019 WL 8918902 (N.D. Cal. June 21, 2019) ...............................................................10

*Haft v. Lone Palm Hotel*,
3 Cal. 3d 756 (1970) ......................................................................................................14

*Hardeman v. Monsanto Co.*,
997 F.3d 941 (9th Cir. 2021).........................................................................................12

*Healthsmart Pac., Inc. v. Kabateck*,
7 Cal. App. 5th 416 (2016) ......................................................................................20, 21

*In re Korean Ramen Antitrust Litig.*,
No. 13-CV-04115-WHO, 2017 WL 235052 (Jan. 19, 2017)........................................18

*Maggio v. United Farm Workers*,
227 Cal. App. 3d 847 (1991).........................................................................................14

*Major v. R.J. Reynolds Tobacco Co.*,
14 Cal. App. 5th 1179 (2017) .........................................................................................9

*McGlinchy v. Shell Chemical Co.*,
845 F.2d 802 (9th Cir. 1988).........................................................................................14

*MicroStrategy Inc. v. Business Objects, S.A.*,
429 F.3d 1344 (Fed. Cir. 2005).....................................................................................14

*Mitchell v. Gonzales*,
54 Cal. 3d 1041 (1991)....................................................................................................9

*Moore v. Apple Inc.*,
No. 14-CV-2269-LHK, 2015 WL 7351464 (N.D. Cal. Nov. 20, 2015) ........................10

*Niebur v. Town of Cicero*,
212 F. Supp. 2d 790 (N.D. Ill. 2002) ............................................................................15

*O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*,
399 F. Supp. 2d 1064 (N.D. Cal. 2005) ........................................................................15

*Oculu LLC v. Oculus VR, Inc.*,
2015 WL 3619204 (C.D. Cal. June 8, 2015) .................................................................10

*Pakootas v. Teck Cominco Metals, Ltd.*,
905 F.3d 565 (9th Cir. 2018)....................................................................................13, 15

*Pentair Thermal Mgmt., LLC v. Rowe Indus., Inc.*,
No. 06-CV-7164-NC, 2013 WL 1320422 (N.D. Cal. Mar. 31, 2013)...........................13

*Rozark Farms Inc. v. Ozark Border Elec. Co-op*,
849 F.2d 306 ..................................................................................................................13

Gibson, Dunn &
Crutcher LLP

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1

2

**TABLE OF AUTHORITIES**
(*continued*)

Page(s)

3

*Rutherford v. Owens-Illinois, Inc.*,
    16 Cal. 4th 953 (1997) ...................................................................................................9

4

*Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*,
    2007 WL 935703 (S.D. Cal. Mar. 7, 2007) .................................................................21

5

6

*Tesla, Inc. v. Tripp*,
    No. 18-CV-296-LRH (D. Nev. Aug. 28, 2019) ..........................................................12

7

*Uriell v. Regents of Univ. of Cal.*,
    234 Cal. App. 4th 735 (2015) .................................................................................9, 12

8

9

*Venegas v. Southwest Airlines Co.*,
    2007 WL 3196479 (C.D. Cal. Oct. 23, 2007) ..........................................................9, 10

10

*Viner v. Sweet*,
    30 Cal. 4th 1232 (2003) ...............................................................................................10

11

12

**OTHER AUTHORITIES**

13

CACI 430 ...............................................................................................................9, 10, 12

14

CACI 431 ......................................................................................................................9, 12

15

CACI 1700 ........................................................................................................................9

16

CACI 1702 ........................................................................................................................9

17

Charles J. Fobrun, *Reputation: Realizing Value from the Corporate Image*, First Edition, (Boston,
    MA: Harvard Business School Press, 2018 ...................................................................22

18

Ebbers, Joris J. and Nachoem M. Wijnberg, 2012, "Nascent Ventures Competing for Start-Up
    Capital: Matching Reputations and Investors," *Journal of Business Venturizing*, 27(3)................22

19

20

**TREATISES**

21

Restatement (Second) of Torts § 432(1) .........................................................................9

22

Restatement (Second) of Torts § 432(2) .........................................................................10

23

Restatement (Second) of Torts § 433A ....................................................................13, 14

24

Restatement (Second) of Torts § 433B cmt. d .............................................................13

25

26

27

28

Gibson, Dunn &
Crutcher LLP

iv

# I.    INTRODUCTION

Wisk's motion seeks to exclude in its entirety the testimony of Todd Milbourn, Archer's counterclaims damages expert.  Professor Milbourn is an expert on, and will testify about, de-SPAC transactions and the economic impact of reputational injury to the targets of such transactions, including Archer.  Wisk seeks to avoid that testimony through a two-pronged attack that repeatedly combines misstatements of California law with distortions of Professor Milbourn's testimony.

Wisk's principal argument is that Professor Milbourn's testimony would not be helpful to a jury because he has admitted that he cannot state *what Wisk says* is required—"that Wisk's Statements were *the* cause of Archer's claimed economic harm, especially to the exclusion of [] contemporaneous, independent events."  Mot. at 6.  However, Wisk's "*but for*" causation argument (Mot. at 12) is not consistent with California law.  California follows the "substantial factor" test, under which Archer's burden is to prove that Wisk's defamatory statements were *a* cause of harm.  And that showing is satisfied by any nontrivial contribution to the complained-of harm.  That is accepted law in California, recognized in case after case, and incorporated into model jury instructions, all of which Wisk ignores. Instead, Wisk makes up a purported legal requirement directly at odds with California law and then asks the Court to exclude the witness for not satisfying its made-up requirement.

Wisk's damages-related argument is a virtual clone of its inapt causation argument.  Arguing that there were multiple other potential causes of Archer's financial harms, including "the lawsuit, the criminal investigation, [and] the downturn of the SPAC market" (*id*. at 6), Wisk argues that Professor Milbourn's testimony is excludable because he testified that he could not "do a damages analysis *of just the alleged defamatory statements.*"  *Id*. at 7.  But, again, California law does not require such an analysis by plaintiff in the face of concurrent, independent causes.  Under California law, "[w]here it is clear that a defendant has been at fault and that he has caused some part of the plaintiff's damages, the burden of proof should rest on him to show the extent of his contribution, and that if he cannot sustain it he should be liable for the entire loss."  *Fibreboard Paper Prods. Corp. v. E. Bay Union of Machinists, Local 1304*, 227 Cal. App. 2d 675, 705 (1964).  To the extent that damages can be allocated between harm caused by defendant and any other source of harm, California law places the burden of proving that allocation on *defendant*, here Wisk.  *See Espinosa v. Little Co. of Mary Hosp.*, 31 Cal.

App. 4th 1304, 1321 (1995) ("A plaintiff does not have the burden of apportioning damages.").

Wisk tries to avoid the issue of allocation (on which it bears the burden) by arguing that Professor Milbourn "makes clear that *no* 'dollar amounts' can be identified as damages Archer had suffered as a result of Wisk's Statements." Mot. at 11 (emphasis in original). But that is a complete distortion of Professor Milbourn's testimony, which was that he could not identify damages "uniquely" associated with the defamatory statements. *See id.* at 6. Such testimony has not "*torpedoed*" Archer's claims, as Wisk claims. *Id.* To the contrary, Professor Milbourn's testimony follows California law, in contrast to Wisk's motion. Wisk's damages position is particularly untenable here given that Archer has a defamation *per se* claim and thus damages are presumed.

Wisk further contends that Professor Milbourn's opinions are inadmissible because they are "foreclosed" by California's "fair and true reporting" privilege. Mot. at 16–17. But Wisk misstates both the California fair report privilege and this Court's order denying Wisk's anti-SLAPP motion (Dkt. 146). The privilege does not apply to Wisk's statements *on its own website*, and neither Archer nor the Court limited the scope of available damages arising from Wisk sending links to its website to third parties.

Finally, Wisk's argument concerning Professor Milbourn's testimony on the harm to Archer done by Wisk's amplification of its website is based on another mischaracterization of his testimony. Mot. at 17. Professor Milbourn did not testify that "but for Wisk's outreach to the media, Wisk's Statements would have gone unnoticed," as Wisk claims. *Id*. And Wisk's related attack on Professor Milbourn's qualifications to testify on amplification is baseless. *Id*. Professor Milbourn has studied and evaluated the effects of reputational harm on start-up companies such as Archer; Wisk is free to try to attack his qualifications through cross-examination, but has shown no basis for exclusion. Professor Milbourn's opinions are methodologically sound and consistent with the applicable law.

## II.    BACKGROUND

### A.    Archer's Counterclaims Regarding Wisk's Allegedly Defamatory Statements

Archer's counterclaims for Interference with Contractual Relations, Interference with Prospective Economic Advantage, Defamation, and Unfair Competition are all founded upon Wisk's statements in an April 6, 2021 press release, an April 6, 2021 blog post, and a May 19, 2021 update to

that blog post that "falsely and recklessly accus[e] Archer of unlawful conduct." Dkt. 153-4 ¶ 45.[1]
Wisk filed its complaint on April 6, 2021, the same day it issued the press release and posted a blog
entry entitled "*Why We're Taking Legal Action Against Archer Aviation*," which purported to describe
"Archer's Actions." Mot., Ex. C. The blog post claimed, among other things, that a "striking
similarity" between Wisk and Archer "designs could not have been a coincidence" and that "[t]he
similarity in overall aircraft design further indicates Archer's use of more detailed design features,
including features related to aircraft propulsion, power management, avionics, flight control, and
manufacturing methodology." *Id.* According to Wisk, there was "significant and troubling evidence"
that Archer had used and was still "using Wisk's proprietary intellectual property." *Id.*

Wisk filed its preliminary injunction motion on May 19, 2021, the same day it posted an
"update" to the April 6 blog post, that stated:

> After Wisk filed its Complaint on April 6, Archer publicly disclosed a criminal
> investigation relating to some of the claims Wisk brought, and Archer's SPAC sponsor
> Atlas Crest Investment Corp filed an 8-K noting that it was reviewing these matters.
> *Wisk is fully cooperating with the FBI and Department of Justice in their criminal
> investigation into Archer relating to the theft and use of Wisk's intellectual property.*

*Id.* Professor Milbourn refers to Wisk's statements in the press release and both blog posts collectively
as the "Alleged Defamatory Statements." Ex. 1 (Milbourn Rpt.) ¶ 11.

As Professor Milbourn discusses at length in his Report, Wisk, aided by its public relations firm
Sard Verbinnen, engaged in an extensive effort to increase media exposure of its blog posts. *See id.*
¶¶ 40–41 & nn.62–65 (citing Wisk's emails to various news outlets); Ex. 2 (Sard-0019); *see generally*
Ex. 1 (Milbourn Rpt.) §§ VI.A.1–2.

The day *before* Wisk filed its complaint, it told executives ███████████████
████████████████████████████████████████████████████
██████████████████████ Ex. 3 (WISK00398504). The next morning, April 6, a *Times*
reporter sent an email to Archer's PR firm that linked to Wisk's blog post and requested comment
about the lawsuit that Wisk had just filed. Ex. 4 (Archer-NDCA-00194012). The *Times* then published
an article linking to Wisk's blog post that same day. *See* Ex. 5 (Archer-NDCA-00235571). Wisk

---

[1] All references herein to Dkt. 153-4 are to Archer's Second Amended Counterclaims, beginning on
page 60 of that docket entry.

Gibson, Dunn &
Crutcher LLP

reached out to numerous other media outlets, with links to the Wisk blog, pushing for a story about Archer.  *See* Ex. 1 (Milbourn Rpt.) ¶ 40 & n.62 (citing sources).  Many were published.  *Id.* at ¶¶ 42–43 & nn.66–73

Wisk followed a similar playbook in advance of filing its motion for a preliminary injunction on May 19, 2021.  ████████████████████████████████████████████████████████████████████████████████ Ex. 6 (WISK00398530).  This time, before its filing, ████████████████████████████████████.  *See* Ex. 7 (Sard-0075); Ex. 8 (WISK00486696).  ████████████████████████████████████████████████████████████████████████████.  Ex. 7 (Sard-0075); Ex. 9 (Reevemark-0002154).  Wisk also circulated links to its blog posts to other media outlets, several of which published their own articles linking to and quoting Wisk's blog posts.  *See, e.g.*, Ex. 1 (Milbourn Rpt.) ¶¶ 51 & nn.84–87 (citing Wisk's emails to news outlets); *id.* ¶¶ 52–53 & nn.88–90 (citing published articles containing links to and quotes from Wisk's blog posts).  In some of those ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Wisk asserted on its blog post that there was a criminal investigation "into Archer."  Mot., Ex. C.  Internally however, and in communications with several media outlets, Wisk conceded the ████████████████████████████████████████ Ex. 11 (WISK00398564); *see also* Ex. 12 (WISK00398566); Ex. 13 (WISK00477601); Ex. 14 (WISK00486740).

To combat Wisk's defamatory statements, Archer engaged the PR firm Reevemark—at substantial cost—to try to get media outlets to correct the false statements derived from Wisk's blog post, including that Archer was under criminal investigation.  *See* Ex. 15 (Burns Tr.) at 69:12–70:12, 86:16–25, 87:12–20, 110:13–113:1; Ex. 16 (Goldstein Tr.) at 457:6–14; *see also, e.g.*, Ex. 17 (Reevemark-0003140); Ex. 18 (Reevemark-0003135).  Despite these efforts, articles with wide circulation remain posted and available online that quote and summarize Wisk's blog posts.  *See* Ex. 1 (Milbourn Rpt.) ¶ 44 (discussing a still-available article on Yahoo! Finance—a site with over 57 million monthly visitors—that quotes Wisk's blog post); *see also, e.g.*, Ex. 19, Christopher Yasiejko, *Flying-Taxi SPAC Faces Criminal Probe Over Rival's Trade Secrets*, BNN Bloomberg (May 19, 2021), https://tinyurl.com/4u2fpvmc; Ex. 20, *Chris Stonor*, *YIKES! Wisk Asks Court to Halt Archer's*

4

"*Alleged Use of Its Trade Secrets*", *Co-operating with U.S. Criminal Probe*, Urban Air Mobility (May 21, 2021), https://tinyurl.com/bddkersy.

## B.    Archer's Merger with Atlas Crest

Wisk's actions and defamatory statements came after Archer announced its merger agreement with the Atlas Crest SPAC.  That announcement was made on February 10, 2021, when the SPAC market was hot and interest in Archer was high.  Archer stated that it planned to close its merger with Atlas Crest in June 2021.  Due to spiking demand, private investment in Archer increased from $350 million to $500 million, and then from $500 million to $600 million, all in approximately three weeks.[2] Ex. 1 (Milbourn Rpt.) ¶¶ 26, 28; Ex. 25 (Archer-NDCA-01577261) at -388 to -389.  Atlas Crest's public investors—who, unlike the PIPE investors, could choose to opt out of the transaction by redeeming their shares when the merger closed—were the source of another $500 million in potential capital to Archer.  *See* Ex. 1 (Milbourn Rpt.) ¶¶ 20, 24.  Thus, Archer anticipated raising a total of $1.1 billion via the merger.  Ex. 25 (Archer-NDCA-01577261) at -312; Ex. 21 (Spellacy Tr.) at 174:23–175:10.

After Wisk filed its lawsuit and made its false claims in its blog posts and press release, potential investors raised significant concerns.  Ex. 1 (Milbourn Rpt.) ¶¶ 66, 71–73 & n.113; Ex. 16 (Goldstein Tr.) at 357:23–358:8; Ex. 21 (Spellacy Tr.) at 184:2–185:15; *see also, e.g.*, Ex. 22 (IRIDIAN_00022407).   Several investors explicitly cited Wisk's blog post in expressing those concerns.  *E.g.*, Ex. 22 (IRIDIAN_00022407); Ex. 23 (IRIDIAN_00066212); Ex. 21 (Spellacy Tr.) at 190:7–196:12. The Archer-Atlas Crest merger transaction was delayed while Atlas Crest conducted additional diligence into Wisk's allegations. Ex. 1 (Milbourn Rpt.) ¶¶ 25, 81, 84.  Additional diligence to investigate Wisk's misleading characterization of the "criminal investigation" further extended the delay.  *See id.* ¶¶ 75, 79–89; *compare* Dkt. 58-24 (describing the investigation into Wisk's allegations completed by June 24, 2021) *with* Ex. 24 (Archer-NDCA-00578096) (reflecting Archer's counsel's continued investigation into "the specter of a criminal investigation" in late July 2021).

---

[2] Institutional investors who contractually commit to fund a de-SPAC transaction are collectively called "PIPEs" (**p**rivate **i**nvestment in **p**ublic **e**quity).   Those investors are contractually obligated to go through with the de-SPAC transaction.

1       During the pendency of the delay, Archer took on necessary short-term financing, incurring

2 $7.5 million in fees. Ex. 1 (Milbourn Rpt.) ¶¶ 121–22  On July 29, 2021, Archer also agreed with Atlas

3 Crest to a one-time strategic reset of the merger transaction, which included reducing Archer's pre-

4 merger value by $1 billion.  *Id.* ¶ 98.  Considerations leading to the strategic reset included "the

5 potential benefits of ensuring long-term commitment of Archer's largest investors" and "the

6 importance of New Archer to maintain the relationship with Atlas public stockholders and PIPE

7 Investors as long-term investors"—*i.e.*, some of the same investors who had cited Wisk's blog post in

8 expressing concerns to Archer. Ex. 25 (Archer-NDCA-01577261) at -391.

9       The transaction finally closed on September 16, 2021 after the completion of the additional

10 diligence and finalization of the new terms following the strategic reset.  Ex. 26 (Archer-NDCA-

11 00178512) at -512 to -513.  But, rather than raising the anticipated $1.1 billion, Archer only raised

12 $857.6 million—$242.4 million less than its anticipated $1.1 billion—because 48.5% of the public

13 investors redeemed their shares.  *Id.*; Ex. 1 (Milbourn Report) ¶ 132.

14 **C.**    **Professor Milbourn's Opinions**

15       Archer retained Professor Milbourn "to evaluate the economic impact to Archer as a result of

16 the Alleged Defamatory Statements." Ex. 1 (Milbourn Report) ¶ 12.  Professor Milbourn has served

17 on the board of two SPACs and was the Chair the Audit Committee for both prior to their de-SPAC

18 transactions in 2021. *Id.* ¶ 4.  To reach his conclusions, he "applied fundamentals of corporate finance,

19 [his] background and experience with SPAC transactions, and [his] evaluation of the market conditions

20 during the period at-issue to the facts and circumstances of this matter." *Id.*  Professor Milbourn was

21 not asked—because it would be beyond the scope of his expertise—to evaluate whether the Alleged

22 Defamatory Statements were actually "defamatory." Ex. 27 (Milbourn Tr.) at 87:16–88:8.

23       Professor Milbourn highlights that, as an early stage company, Archer was vulnerable to

24 reputational risks. Ex. 1 (Milbourn Rpt.) ¶¶ 31–35, 54–64; *see id.* ¶ 33 (discussing how, "as has been

25 documented in academic literature, reputation often has an outsized role in an early-stage company's

26 value").  Against this backdrop, he opines that the Alleged Defamatory Statements harmed Archer in

27 multiple ways.

28       First, the Alleged Defamatory Statements harmed Archer's reputation.  *Id.* ¶¶ 15, 64–74.

Professor Milbourn notes that ████████████████████████████████████
██████████████████████████████████. *Id.* ¶ 66; *see also* Ex. 22 (IRIDIAN_00022407). Professor Milbourn further relies upon those investors' continued "serious concerns" after the merger's delay, noting that one investor linked to Wisk's May 19 blog post in an email to Archer CEO Adam Goldstein. Ex. 1 (Milbourn Rpt.) ¶¶ 71–73 & n.113. He points to the transcript of Mr. Goldstein's deposition testimony—something that Wisk's rebuttal expert on causation never read (*see* Ex. 28 (Klausner Tr.) 50:4–12; Ex. 29 (Kinrich Dep.) 50:19–21)—discussing multiple other investors' concerns expressed to Mr. Goldstein directly. Ex. 1 (Milbourn Rpt.) ¶ 66.[3] He also cites testimony from Atlas Crest CEO Michael Spellacy, who explained that the "compounding effect" of investors' "perceptions of the lawsuit," the "delay to the transaction," and "[s]ubsequent blog posts exacerbate[d] . . . [by] subsequent negative press . . . led to pretty significant" negative impressions of Archer to its potential investors. Ex. 21 (Spellacy Tr.) 185:16–186:5.

Second, the Alleged Defamatory Statements led to the delay in Archer's merger with Atlas Crest, which had a cascading impact upon Archer. Ex. 1 (Milbourn Rpt.) ¶¶ 16, 75, 81, 82, 85; *see also* Ex. 27 (Milbourn Tr.) at 114:7–22 (opining that the Alleged Defamatory statements would "unequivocally . . . increase due diligence and potentially could lead to a delay" and "a strategic reset"); *accord* Ex. 28 (Klausner Tr.) at 111:15-113:2. Professor Milbourn cites Mr. Goldstein's sworn deposition testimony that Archer "would have closed right through" the lawsuit but for the Alleged Defamatory Statements. Ex. 1 (Milbourn Rpt.) ¶ 81. Professor Milbourn concludes that the harm Wisk dealt to Archer's reputation via the Alleged Defamatory Statements manifested in "a one-time approximately $1 billion (or approximately 38.8%) absolute reduction to Archer's enterprise value" as agreed to as part of a strategic reset of the Archer-Atlas Crest merger. *Id.* ¶ 68.

Professor Milbourn does not opine that the Alleged Defamatory Statements were the lone cause of Archer's harms. Ex. 27 (Milbourn Tr.) at 86:21–87:6, 91:2–4 ("I am not opining that the ADS

---

[3] Mr. Goldstein testified, for example, that Wisk's defamatory statements have made Archer "toxic" and "radioactive" in the investment community, and that "a very large percentage of the delay [in closing Archer's merger transaction] was caused from the investors getting extremely upset that they were going to lose a lot of money in the deal because of all the negative lies that were spread." Ex. 1 (Milbourn Rpt.) ¶¶ 73, 81, 94.

1  [Alleged Defamatory Statements] is the sole cause of the economic harm . . . ."); *see* Ex. 1 (Milbourn

2  Rpt.) ¶ 136.  Rather, he opines that the Alleged Defamatory Statements were one of the causes of

3  Archer's harm (Ex. 27 (Milbourn Tr.) at 72:20–25, 85:21–23, 91:4–8, 307:10–16), that were sufficient

4  "on their own" to harm Archer (*id.* at 87:1–4, 114:3–6, 129:18–23, 165:10–17).

5      In sum, Professor Milbourn opines that the Alleged Defamatory Statements were a cause of

6  delay, which in turn caused the $1.03 billion drop in Archer's pre-merger value, the higher redemption

7  rate that left Archer $242.4 million short of its anticipated cash funding, and Archer to incur $7.5

8  million in short-term financing costs, among other harms.[4]

9                              **III.    ARGUMENT**

10 **A.   Professor Milbourn's Opinion That The Alleged Defamatory Statements Caused Harm
       To Archer Is Consistent With California Law**

11

12     Wisk initially attacks Professor Milbourn's opinions as unhelpful to the jury because he

13 supposedly failed to consider all potential causes of harm to Archer, and failed to link specific Wisk

14 statements to specific damages.  Mot. at 8.  By "fail[ing] to consider whether the harm on which [he

15 is] opining could have been the result of alternative causes," Wisk argues that Professor Milbourn's

16 opinions are not the product of an accepted methodology.   *Id.* at 11.  According to Wisk, unless

17 Professor Milbourn evaluated "what the world would have looked like *but for* Wisk's statements," he

18 is incapable of attributing harm to the Alleged Defamatory Statements.  *Id.* at 12 (emphasis in original).

19 Wisk advances that proposition without citation.   *Id.*   In so arguing, Wisk misstates Professor

20 Milbourn's opinions and misconstrues the applicable law of causation.   Professor Milbourn

21 appropriately relied on substantial evidence to show that Wisk's defamatory statements were *a* cause

22 of Archer's harm.  Under California law, that is sufficient to establish causation here.  Wisk attempts

23 to present its argument as one founded on "proper scientific methods."  *Id.* at 12.  But Wisk does not

24 explain why it is methodologically improper for a damages expert to use a damages framework that is

25 entirely consistent with governing state law.  It is not.

26 ───────────────
27 [4] This is a "non-exhaustive" list of Archer's harms attributable to the Alleged Defamatory Statements.
   Ex. 1 (Milbourn Rpt.) ¶ 136; *see also* Ex. 16 (Goldstein Tr.) at 453:12–455:6, 456:23–459:7 ("Very
   specifically, I think we paid Re[eve]Mark almost $500,000 total for time working on [responding to
28 Wisk's May 19 blog update].")); Ex. 15 (Burns Tr.) at 110:13–113:1 (same); Ex. 30 (Archer's Resp. to
   Interrog. 18) at 24; Ex. 31 (Archer's Second Am. Initial Disclosures) at 28–29.

To determine causation, California applies a "substantial factor" test.  *See Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008) (substantial factor test applies for determining causation in intentional torts); CACI Nos. 1700, 1702 (requiring plaintiff to show that defamatory statements were "a substantial factor in causing" actual damages).  Under that test, "[a] substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm."  CACI 430.

The substantial factor standard "is a relatively broad one," and "a very minor force that does cause harm is a substantial factor."  *Bockrath v. Aldrich Chem. Co.*, 21 Cal. 4th 71, 79 (1999).  The tortious conduct "*does not have to be the only cause of the harm*."  *Major v. R.J. Reynolds Tobacco Co.*, 14 Cal. App. 5th 1179, 1196 (2017) (quoting CACI 430).  Rather, "it is sufficient that defendant's negligence [or intentional act] is *a* legal cause of injury, even though it operated in combination with other causes, whether tortious or nontortious."  *Uriell v. Regents of Univ. of Cal.*, 234 Cal. App. 4th 735, 746-47 (2015) (emphasis in original); *see* CACI 431 (applying "Multiple Causes" instruction to intentional torts).

The substantial factor test thus subsumes the but-for test "while reaching beyond it to satisfactorily address other situations, such as those involving independent or concurrent causes in fact."  *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 969 (1997).  California law is clear that there can be multiple, independent substantial factors causing a single injury, and "provides one cannot escape responsibility for his [conduct] on the ground that identical harm would have occurred without it."  *Mitchell v. Gonzales*, 54 Cal. 3d 1041, 1049 (1991).  Instead, "[t]he proper rule for such situations is that the defendant's conduct is a cause of the event because it is a material element and a substantial factor in bringing it about."  *Id.*; *see also* CACI 431 (A defendant "cannot avoid responsibility just because some other person, condition, or event was also a substantial factor in causing [plaintiff's] harm."); *Colbourn v. Crane Co.*, 728 F. App'x 679, 681 (9th Cir. 2018) ("An independently sufficient cause is a substantial factor even if it is not a but for cause because there were other independently sufficient causes.").  Thus, it is true that "[o]rdinarily, 'the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.'"  *Venegas v. Southwest Airlines Co.*, 2007 WL 3196479, at *1 (C.D. Cal. Oct. 23,

2007) (quoting Restatement (Second) of Torts § 432(1)).  "However, '[i]f two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.'"  *Id.* (quoting Restatement (Second) of Torts § 432(2)); *see Viner v. Sweet*, 30 Cal. 4th 1232, 1240 (2003) ("Restatement section 432, subsection (1) adopts the 'but for' test of causation, while subsection (2) provides for an exception to that test."); *see generally Moore v. Apple Inc.*, No. 14-CV-2269-LHK, 2015 WL 7351464, at *3 (N.D. Cal. Nov. 20, 2015) (citing Restatement (Second) of Torts § 432(2) in case involving intentional tort).  As the "Directions for Use" in California's pattern jury instruction on Causation makes clear, "[t]he 'but for' test . . . does not apply to concurrent independent causes . . . ."  CACI 430.[5]

Wisk cites to *Oculu LLC v. Oculus VR, Inc.*, 2015 WL 3619204, at *21 (C.D. Cal. June 8, 2015), and *Grouse River Outfitters Ltd. v. Oracle Corp.*, 2019 WL 8918902, at *10 (N.D. Cal. June 21, 2019), to suggest that California law requires a causation expert to consider alternative causes (Mot. at 11), but in those two cases the respective experts both opined that the defendant's actions were the sole cause of the alleged harm.  Professor Milbourn has not and will not offer any such opinion.

To the contrary, at his deposition, Professor Milbourn made clear that multiple factors, including the defamatory statements, the litigation, and headwinds in the SPAC market contributed to Archer's financial harm, equating those factors to "three legs of [a] stool that are all taking place contemporaneously."  Ex. 27 (Milbourn Tr.) at 79:21–80:8; *see id.* 82:9–21,114:7–115:13.  Critically, he cites ample record evidence to conclude that the defamatory statements were *a cause* of Archer's harm, including, among other things, communications from investors and the deposition testimony of Atlas Crest and Archer's CEOs.  *See, e.g.*, Ex. 1 (Milbourn Rpt.) ¶¶ 65–66, 71–73 & nn.102–104, ¶¶ 87, 90, 92, 94, 113–120, 122, 131, 132 & n.140; *see also* Ex. 22 (IRIDIAN_00022407); Ex. 16 (Goldstein Tr.) at 357:23–358:8, 459:11–15, 463:14–16, 465:14–22; Ex. 21 (Spellacy Tr.) at 50:7–15,

---

[5] *See Bank of N.Y.*, 523 F.3d at 909–10 ("The critical question as to causation in intentional torts is whether the actor's conduct is a substantial factor in bringing about the type of harm which he intended from his original act.  No consideration is given to the fact that after the event it appears highly extraordinary that it should have brought about such harm or that the actor's conduct has created a situation harmless unless acted upon by other forces for which the actor is not responsible.")

ARCHER'S OPPOSITION TO WISK'S MOTION TO EXCLUDE THE TESTIMONY OF TODD MILBOURN
CASE NO. 3:21-CV-02450-WHO

68:1–18, 137:19-139:12, 175:5–14, 185:10–186:5.

Wisk barely addresses *any* of the record evidence and other bases (*e.g.*, academic literature and his personal SPAC experience) for Professor Milbourn's conclusions.  Wisk's brief cites only one sentence from Mr. Goldstein's deposition cited by Professor Milbourn (that Archer's merger transaction would have closed on time if there only were the Wisk litigation and no defamatory statements). Mot. at 16.  Even then, Wisk does not address the substance of Mr. Goldstein's testimony as a reliable basis for Professor Milbourn's conclusions.  Nor does Wisk's motion address other testimony on which Professor Milbourn relies, including that (as one of Wisk's own experts has concluded ) Archer and Atlas Crest were the ones who made the decision to lower Archer's enterprise valuation—making Mr. Goldstein's testimony on the causes of Archer's delayed transaction and its corresponding lowered valuation especially relevant.  *See* Ex. 32 (Kinrich Rpt.) ¶ 36.

Professor Milbourn's detailed report makes clear both that he has considered alternative causes and concluded that Wisk's defamatory statements, standing on their own, would harm Archer.  *See, e.g.*, Ex. 1 (Milbourn Rpt.) ¶¶ 64, 71, 89, 134; *see also* Ex. 27 (Milbourn Tr.) at 85:21–23 (the alleged defamatory statements "on their own would also be, as I say here, [] a cause of economic harm as well."), 65:8–23, 86:21–87:6, 114:12–22.[6]  Wisk's argument seeks to equate not assigning a dollar value to an alternative cause with not considering an alternate cause.  That is simply wrong.

Contrary to Wisk's argument, the but-for test of causation does not apply in this case. Wisk acknowledges that its litigation statements, the criminal investigation (that Wisk prompted) and the downturn in the SPAC market were "contemporaneous" with Wisk's defamatory statements and "independent" of them.  Mot. at 3, 6; *see id.* at 11 (noting that Professor Milbourn "identified the contemporaneous events that could have caused the harms identified in his report").  That acknowledgment establishes that this case presents a situation involving independent concurrent causes in fact.  Archer agrees.  But, in such a situation, California law requires only that Archer show that

---

[6] Even apart from the direct evidence of harm to Archer's reputation, under California law a reasonable juror could conclude "as a matter of ordinary experience" that Wisk's posting of its public statements about Archer and its use of a public relations firm to expose an even broader audience to those statements would have the expected result of members of the public seeing and believing those statements. *Espinosa*, 31 Cal. App. 4th at 1314.

1    Wisk's defamatory statements "contributed" to Archer's harm, notwithstanding whether other causes

2    also contributed to the total harm. *See* CACI 430, 431. Relying on ample evidence, academic

3    literature, and his experience on the board of multiple SPACs in the relevant timeframe, Professor

4    Milbourn provides a proper opinion under California law, concluding that Wisk's defamatory

5    statements were *a* cause of Archer's harm (*e.g.*, Ex. 1 (Milbourn Report) ¶ 136). *See Hardeman v.*

6    *Monsanto Co.*, 997 F.3d 941, 969 (9th Cir. 2021); *Uriell*, 234 Cal. App. 4th at 746-47.

7    **B.    Professor Milbourn's Opinions Are Not Excludable Because He Did Not Quantify
          Damages That Are Separately Attributable To Each Defamatory Statement**

8

9            Wisk argues that Professor Milbourn's opinions are deficient because he "considered their

10   effect as a group" (Mot. at 9), and he failed to quantify the harm attributable solely to Wisk's

11   defamatory statements, as opposed to other causes. *Id.* at 1–2, 6–11. Wisk has it backwards.

12   Apportionment is Wisk's burden if it chooses to argue that its tortious conduct is not responsible for

13   all harm to Archer. Specifically, allocation it is an affirmative defense *that Wisk has not pleaded*.

14   Professor Milbourn's opinion are appropriate and helpful to the jury to establish the total harm that

15   Wisk has made no effort to apportion.

16           **1.    Professor Milbourn Attributes Harm to Wisk's Defamatory Statements**

17           Professor Milbourn quantifies several measures of damages attributable at least in part to

18   Wisk's defamatory statements that provide sufficient evidentiary bases upon which a jury can premise

19   its damages award. For example, Professor Milbourn identifies the $1 billion drop in Archer's

20   enterprise value. Ex. 1 (Milbourn Rpt.) ¶¶ 60–64, 65–66, 71, 73, 74, 80, 83, 84–85, 89, 113, 117, 132;

21   *see also* Ex. 27 (Milbourn Tr.) at 114:12–22.[7] This and the other measures of damages may support a

22   jury's damages award, and Professor Milbourn's testimony will help the jury understand the causal

23

24   _____

25   [7] Wisk implies that the billion dollar drop in value is not "damage[]" because it "does not represent a
     'loss' reflected on Archer's financial statements." Mot. at 5. But, as Mr. Spellacy testified, Archer's

26   dropped value affected all shareholders. Ex. 21 (Spellacy Tr.) at 135:16–136:2 ("The company to all
     shareholders was worth $1 billion less."). Wisk's own expert Jeff Kinrich reached a similar conclusion

27   in an expert report he wrote for Tesla. *See Tesla, Inc. v. Tripp*, No. 18-CV-296-LRH (D. Nev. Aug.
     28, 2019), Dkt. 90-1 ¶ 19 (opining that changes in Tesla's stock price following the disclosure of its

28   confidential information to a business news website was "one way of measuring [Tesla's] harm").

1    relationship between Wisk's statements and each of those measures.[8]

2          Wisk claims that because Professor Milbourn cannot quantify the unique harm caused by

3    Wisk's defamatory statements, "[a]ll he can do is wish the jury good luck."  Mot. at 11.  Wisk's

4    mockery is intended to suggest there is some deficiency or gap in Professor Milbourn's opinions.  There

5    is not.  Wisk is misstating the legal requirement and then seeking to exclude Professor Milbourn's

6    opinion because it does not meet that incorrect standard.

7          The burden on apportionment of damages is not susceptible to dispute:  "*A plaintiff does not*

8    *have the burden of apportioning damages*."  *Espinosa*, 31 Cal. App. 4th at 1321; *see Pakootas v. Teck*

9    *Cominco Metals, Ltd.*, 905 F.3d 565, 589 (9th Cir. 2018) ("[T]he defendant asserting the divisibility

10   defense bears the burden of proof."); *see Rozark Farms Inc. v. Ozark Border Elec. Co-op*, 849 F.2d

11   306, 311 ("[T]he burden of proof on the issue of apportionment is on the party seeking to limit its

12   liability . . . .").[9]  Moreover, "[a]pportionment is improper where either cause would have been

13   sufficient in itself to bring about the result, as in the case of merging fires which burn a building."

14   *Pentair Thermal Mgmt., LLC v. Rowe Indus., Inc.*, No. 06-CV-7164-NC, 2013 WL 1320422, at *21

15   (N.D. Cal. Mar. 31, 2013); *see* Restatement (Second) of Torts § 433A; *see also Pakootas*, 905 F.3d at

16   590 ("The Restatement makes clear . . . that '[a]s between the proved tortfeasor who has clearly caused

17   some harm, and the entirely innocent plaintiff, any hardship due to lack of evidence as to the extent of

18   the harm should fall upon the former.'" (quoting Restatement (Second) of Torts § 433B cmt. d)).

19

20

---

21   [8] Wisk wrongly asserts that Professor Milbourn "makes clear that *no* 'dollar amounts' can be identified
22   as damages Archer had suffered as a result of Wisk's statements."  Mot. at 11 (emphasis in original).
     *Wisk quotes its own counsel's question* for its assertion that "[t]o [Professor Milbourn], the 'damages
23   from the alleged defamatory statements could be ten dollars, zero dollars, or 100 million dollars.'"  *Id.*
     (quoting Ex. 27 (Milbourn Tr.) at 141:2–11).  In fact, Professor Milbourn testified that he could not
24   "*uniquely* identify" the dollar amount of harm associated with only the defamatory statements.  *Id*.  In
     California, particularly in a defamation case, he is not required to do so.
25
     [9] *Pakootas* was a CERCLA case, but the Ninth Circuit's statement of the law on divisibility in *Pakootas*
26   is equally applicable here.  The *Pakootas* court noted that "the Supreme Court confirmed that 'the
     universal starting point for divisibility of harm analyses in CERCLA cases is § 433A of the Restatement
27   (Second) of Torts.'"  905 F.3d at 588 (quoting *Burlington N. & Santa Fe Ry. Co. v. United States*, 556
     U.S. 599, 614 (2009)).  And "Congress intended the scope of liability [under CERCLA] to be
28   determined from traditional and evolving principles of common law."  *Burlington*, 556 U.S. at 613.

Gibson, Dunn &
Crutcher LLP

*Comdyne I, Inc. v. Corbin*, 908 F.2d 1142 (3d Cir. 1990), is instructive.  In that case, the plaintiff's harm was caused both by defamatory statements and a statement the trial court had held to be not actionable. *Id.* at 1151–52.  The Third Circuit found there was evidence from which the district court could have concluded that the defamatory statements (other than the non-actionable statement) were "*a* substantial cause" of the harm. *Id.* at 1151.  It thus identified the statements as concurrent causes of the harm, holding that "[i]n such instances, the burden shifts to the defendant to demonstrate how the damages should be apportioned among the concurrent causes." *Id.*, *see id.* ("Where the harm . . . is indivisible, there is no apportionment of damages among the concurrent causes." (citing Restatement (Second) of Torts § 433A)).

Accordingly, well-established tort-law principles put the burden on Wisk to prove that Archer's overall harm can be apportioned and, if so, how.  *See Fibreboard*, 227 Cal. App. 2d at 704–05 ("Where it is clear that a defendant has been at fault and that he has caused some part of the plaintiff's damages, the burden of proof should rest on him to show the extent of his contribution. . . ."); *see Maggio v. United Farm Workers*, 227 Cal. App. 3d 847, 866 (1991) (same); *accord Haft v. Lone Palm Hotel*, 3 Cal. 3d 756, 774 (1970) ("[W]hen a plaintiff's injuries result from a combination of a tortfeasor's negligence and an innocent cause but the injuries are not readily susceptible to allocation between the two, our courts have required the negligent party to bear the burden of proving the extent of the damages resulting from his conduct.").[10]

Wisk's motion does not address this burden shifting requirement should Wisk seek to be held liable for less than the full harm resulting from the concurrent forces it unleashed.  Wisk's citations to *MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344 (Fed. Cir. 2005) and *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802 (9th Cir. 1988) (Mot. at 9), thus are inapt.  Neither case involved a defamation claim and neither involved an expert who—like Professor Milbourn—relied on evidence to support the conclusion that the allegedly tortious acts were a cause of the plaintiff's harm.  In

---

[10] This burden shifting is particularly appropriate in a case based on a defamation claim. *See Alioto v. Cowles Comms. Inc.*, 430 F. Supp. 1363, 1371 (N.D. Cal. 1977) ("In actions for libel or slander, the amount of damages recoverable is peculiarly within the discretion of the trier of fact, for there can be no fixed or mathematical rule on the subject.") (quoting *Behrendt v. Times–Mirror Co.*, 30 Cal. App. 2d 77, 90 (1938)).

1  *MicroStrategy*, the Federal Circuit court held that "the record suggests that other market factors caused

2  most, *if not all*, of the damage to MicroStrategy." *MicroStrategy*, 429 F.3d at 1355.  And in *McGlinchy*,

3  the expert asserted that the cause of the plaintiff's decline in sales "could have been *anything*."

4  *McGlinchy*, 845 F.2d at 806.  Unlike here, the expert in *McGlinchy* thus could not conclude the

5  actionable conduct was a cause of the harm.

6      By contrast, here Professor Milbourn has concluded that Wisk's defamatory statements

7  damaged Archer.  That conclusion is consistent with well-established principles of defamation law.

8  *See, e.g., Contento v. Mitchell*, 28 Cal. App. 3d 356, 358 (1972) (reputational harm is presumed where

9  statement is defamatory on its face); *Niebur v. Town of Cicero*, 212 F. Supp. 2d 790, 822 (N.D. Ill.

10  2002) ("[N]egative publicity alone can support an award for reputational damages.").  If Wisk believes

11  it is not responsible for a portion of Archer's harm, then Wisk would bear the burden of showing that,

12  not Archer and not Professor Milbourn.  *Fibreboard*, 227 Cal. App. 2d at 705.  However, Wisk has not

13  pled apportionment as an affirmative defense, making apportionment a non-issue.  *See Pakootas*, 905

14  F.3d at 589 n.14 ("[D]ivisibility is only a partial defense to liability[, b]ut for the purposes of Federal

15  Rule of Civil Procedure 8(c)(1), even a partial defense that introduces new matter into a case must be

16  pleaded affirmatively.").

17      **2.  There Is No Requirement That Professor Milbourn Must Quantify Harm Associated with Each Statement Separately**

18      Wisk claims that if a jury finds just one of Wisk's statements to be not defamatory, then

19  Professor Milbourn's testimony would be "unhelpful, confusing, and prejudicial" because Professor

20  Milbourn's damages opinion treat the defamatory statements collectively.  Mot. at 9–10.  Wisk cites

21  no defamation case to support its proposition that Archer is under an obligation to parse through Wisk's

22  blog posts and assign damages on a statement-by-statement basis.  Wisk is simply manufacturing a

23  purported requirement that is not recognized under California defamation law.  There is no justification

24  to exclude Professor Milbourn's testimony because he did not quantify harm among the similar

25  individual statements, which a jury will have to consider in their full context.

26      Wisk cites to *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 399 F. Supp. 2d 1064 (N.D.

27  Cal. 2005) as supposed support for its argument, but that case is entirely distinguishable.  The *O2 Micro*

28

1   case considered damages for trade secret misappropriation, not defamation.  The two could not be more

2   different as pertains to Wisk's argument.  A trade secret plaintiff must identify each trade secret at issue

3   with particularity, and each trade secret is distinct from the others.  But here every allegedly defamatory

4   statement relates to the same general topic: Wisk's assertion that Archer engaged in unlawful conduct

5   by stealing Wisk's intellectual property.  Indeed, with the exception of the follow-up post (which Wisk

6   labeled an "update" to the earlier post), Wisk itself put each of its allegedly defamatory statements

7   together in a single narrative, complete with pictures, in which each accusation was intended to

8   reinforce the others.  Under those circumstances, Wisk's purported requirement of allocating harm

9   separately to each statement is non-sensical.  It is also at odds with California law, under which the

10   jury's analysis of Wisk's defamatory statements will be a holistic exercise.  *See Edward v. Ellis*, 72

11   Cal. App. 5th 780, 790 (2021) ("In determining whether the disputed statement communicates or

12   implies a provably false assertion of fact, we look at the totality of the circumstances, looking first to

13   the language of the statement and whether it was understood in a defamatory sense, and then

14   considering the context in which the statement was made.").

15          Wisk offers no case showing that Professor Milbourn must try to put a specific dollar amount

16   on each aspect of Wisk's false claim that Archer stole Wisk's intellectual property and that Wisk was

17   cooperating with an FBI and DOJ investigation "into Archer" regarding that supposed theft.  *See*

18   *generally DSPT Intern., Inc. v. Nahum*, 624 F.3d 1213, 1223 (9th Cir. 2010) ("[A] defendant whose

19   wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the

20   plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision

21   as would otherwise be possible.") (quoting *Eastman Kodak Co. of N.Y. v. S. Photo Materials Co.*, 273

22   U.S. 359, 379 (1927)).  This is particularly true in defamation cases, where courts have long recognized

23   the uniquely insidious harm that defamation causes.  *See, e.g.*, *Douglass v. Daisley*, 114 F. 628, 638

24   (1st Cir. 1902) (libel "travels and does damage in the dark, meandering in ways whereof it is difficult

25   for man to find out").  Wisk's wholly unsupported claim that Professor Milbourn must quantify the

26   harm associated with each defamatory statement should be rejected.

27   **C.     Professor Milbourn's Opinions Are Based on Substantial Evidence, Not *Ipse Dixit***

28          Wisk unfairly and incorrectly characterizes Professor Milbourn's opinions as *ipse dixit*.

1    *See* Mot. at 11, 13–14.  Wisk further claims Professor Milbourn's testimony is predicated on factual

2    errors.  *Id.* at 15.  These arguments are baseless.

3         As discussed, *supra*, Professor Milbourn's report details the substantial evidence, experience

4    and academic literature on which he relies.  Wisk argues that Professor Milbourn "assumed that, solely

5    because Wisk's Statements were made before the alleged harm, they caused the harm," and thus "[h]e

6    has confused correlation with causation." *Id.* at 14.  Wisk cites no paragraph of Professor Milbourn's

7    expert report to show any such assumption.  It cites to no deposition testimony.  Like so much of Wisk's

8    argument, the asserted factual predicate for the requested relief is made up out of whole cloth.  Professor

9    Milbourn relied on no such assumption.

10        Although Professor Milbourn's damages opinions are supported by substantial evidence, it is

11   also worth noting that Wisk ignores the consequences of a liability finding on a defamation *per se*

12   claim.  *See Contento*, 28 Cal. App. 3d at 358 ("[I]n an action for damages based on language defamatory

13   per se, damage to plaintiff's reputation is conclusively presumed and he need not introduce any

14   evidence of actual damages in order to obtain or sustain an award of damages."); *see, e.g., Galarneau

15   v. Merrill Lynch*, 504 F.3d 189, 203 (1st Cir. 2007) (defamation per se entitled plaintiff "to recover

16   general damages without having to prove causation").  Wisk's silence as to presumed damages betrays

17   the insufficiency of its *Daubert* arguments.

18   **D.    Professor Milbourn's Opinions Are Not Contradicted By The Factual Record**

19        Wisk argues that Professor Milbourn's opinions should be excluded because they are premised

20   on "factual errors."  Mot. at 15.  Wisk premises this argument on only two bases:  (i) one answer to a

21   deposition question by Atlas Crest CEO Michael Spellacy; and (ii) the absence of any explicit reference

22   to Wisk's defamatory statements in Atlas Crest's SEC filings.  Mot. at 15–16.  Neither can carry the

23   weight that Wisk puts on it.

24        Wisk's treatment of the deposition testimony of former Atlas Crest CEO Michael Spellacy (*see

25   Id.* at 15) is a quintessential case of cherry-picking.  Wisk claims that Mr. Spellacy testified that the

26   only causes for Archer's decision to delay its merger with Atlas Crest was Wisk's filing of its lawsuit,

27   its filing of a motion for a preliminary injunction, and 'the allegations that were made in both those

28   filings.' " *Id*. at 15 (quoting Ex. 21 (Spellacy Tr.) at 68:19–70:3).  Through that mischaracterization of

Gibson, Dunn &
Crutcher LLP

17

his testimony, Wisk argues that Archer has effectively admitted that Wisk's blog posts did not contribute to the delay of the Archer/Atlas Crest merger.  But, Wisk omits that Mr. Spellacy made clear he understood the impact of the "litigation" to encompass the impact of Wisk's public statements related to that litigation.  *See* Ex. 1 (Milbourn Report) ¶ 92 n.140; *see also* Ex. 21 (Spellacy Tr.) at 50:2–51:17.  Those public statements were made in the blog posts.

Indeed, Mr. Spellacy's deposition testimony is replete with specific testimony of how Wisk's blog posts harmed Archer's reputation, including with specific references to investors who cited Wisk's blog posts in expressing their concerns. Ex. 21 (Spellacy Tr.) at 188:6–196:12.  He made clear that the "litigation" and investors' perception of that litigation are intertwined.  *See, e.g.*, *id.* at 50:2–51:17, 63:7–65:12, 137:19–139:23.   Professor Milbourn references that testimony in his report (Ex. 1 (Milbourn Report) ¶ 92 & n.140), and quoted it at his deposition (Ex. 27 (Milbourn Tr.) at 94:20–96:13).   But Wisk says nothing about it here.   Nor does Wisk refer to the testimony by Archer's co-founders showing that they considered Wisk's defamatory statements to be encompassed by a reference to the litigation.  *See* Ex. 34 (Adcock (2022.11.21) Tr.) at 223:13–24, 224:20–225:23; *see also* Ex. 16 (Goldstein Tr.) at 452:11–465:22.

Wisk likewise claims that Professor Milbourn "ignored" that Atlas Crest's SEC disclosures said "nothing about Wisk's statements."  Mot. at 15.  In reality, the Atlas Crest Form S-4 referenced Archer's counterclaims and Archer's June 1, 2021 press release "in response to Wisk's allegations." Ex. 25 (Archer-NDCA-01577261) at -314.  It also noted, among other things, the risk to Archer caused by harm to its reputation (Ex. 35 (Archer-NDCA-00007541) at -601), that Archer had been informed it was "not a target of the federal investigation," (Ex. 25 (Archer-NDCA-01577261) at -390), and discussions concerning the "market and media reaction to the disclosures relating to the civil and the federal government investigation" (*id.*).  Wisk offers neither authority nor a rationale to show why Atlas Crest would be obligated to explicitly repeat or otherwise draw more attention to Wisk's harmful, defamatory statements about Archer.

Wisk's claim that Professor Milbourn failed to give sufficient weight to a given piece of factual evidence (or the alleged absence of evidence) is not a basis for exclusion of his opinions—it is a matter for cross-examination.  *See In re Korean Ramen Antitrust Litig.*, No. 13-CV-04115-WHO, 2017 WL

235052, at *9 (Jan. 19, 2017) (Orrick, J.) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.").  Professor Milbourn can be cross-examined on the purported "factual errors" Wisk relies on—they are not a basis upon which to exclude Professor Milbourn's opinions.

**E.      Professor Milbourn's Media-Amplification Opinions Are Proper**

Wisk seeks to preclude Professor Milbourn from testifying as to his opinion that Wisk's efforts to augment the audience of its defamatory statements by contacting media outlets amplified Archer's harms caused by those Wisk statements.  Mot. at 16–17 (citing Ex. 1 (Milbourn Rpt.) ¶¶ 37, 40 & n.62, ¶¶ 41–53, 73, 90) and Ex. 27 (Milbourn Tr.) at 229:2–16).  Wisk seeks to exclude those opinions on two baseless grounds.

First, Wisk asserts that California's fair report privilege bars his opinions because (a) Professor Milbourn purportedly opined that Wisk's statements harmed Archer only because Wisk disseminated them to reporters, (b) Archer purportedly claimed it is not seeking damages for those statements, and (c) the Court held that Archer cannot seek to impose liability on Wisk for those statements.  Mot. at Section IV.E.  Second, Wisk argues that Professor Milbourn is not qualified to offer such opinions.  *Id.* at Section IV.F.  Both arguments fail.

**1.      The Fair and True Reporting Privileged Does Not Apply and Wisk Misstates Archer's Position About its Damages and The Court's Ruling That Denied Wisk's Anti-SLAPP Motion**

Wisk falsely claims that Professor Milbourn opined that Wisk's statements harmed Archer "not because any meaningful number of persons read" the Alleged Defamatory Statements, but because Wisk "disseminat[ed] them to reporters who republished them."  Mot. at 16.  Professor Milbourn never says that—not in his report, not at his deposition, and nowhere else.  To the contrary, Professor Milbourn repeatedly says that *both* Wisk's Alleged Defamatory Statements and the amplification of those statements through the media's citing of and linking to those same statements (on Wisk's website, at Wisk's prompting) harmed Archer.  *See, e.g.*, Ex. 1 (Milbourn Rpt.) ¶¶ 36, 40–53; *see id.* ¶ 71 ("The Alleged Defamatory Statements, and their exposure in the public domain, thus diminished the value of Archer by increasing perceptions of risk around Archer's ability to successfully execute its

1   business plan."), ¶ 72 (quoting statement by Archer investor that "I was . . . concerned about the blog

2   post when I saw it on the Wisk blog and continue to be concerned about it today.").

3      Wisk also cites paragraphs 36 and 37 of Professor Milbourn's report for the proposition that

4   "Professor Milbourn says that if Wisk had done no more than place Wisk's Statements on its website,

5   the statements would have garnered little attention unless and until Wisk disseminated them further

6   through its contact with reporters."  Mot. at 16.  Those paragraphs (and the rest of his report) say

7   nothing of the sort.  Professor Milbourn instead opines—citing academic literature—that "it may take

8   longer for investors to become aware of the majority of corporate litigation due to the lack of media

9   coverage."  Ex. 1 (Milbourn Rpt.) ¶ 36.  He is clear that Wisk harmed Archer "by posting *and*

10  amplifying the media reach of the Alleged Defamatory Statements."  *Id.* ¶ 134.  The media coverage

11  *amplified* an existing harm; it did not create one.  *See, e.g.*, *id.* ¶ 73 ("The Alleged Defamatory

12  Statements *and* the disruptive effect that media coverage had on potential investors had a lasting impact

13  on the reputation and value of Archer.").

14     In any event, the fair and true report privilege does not protect statements *on Wisk's own website*

15  just because Wisk succeeded in drawing more readers to its website by drumming up media coverage

16  of Wisk's accusations against Archer.  California's fair report privilege covers statements in or

17  transmitted to "public journals" like newspapers and television broadcast companies.  *See Healthsmart

18  Pac., Inc. v. Kabateck*, 7 Cal. App. 5th 416, 432 (2016).  Wisk's website, to which its hyperlinks

19  directed readers, is not a "public journal."  *See Am. Dental Ass'n v. Khorrami*, 2004 WL 3486525, at

20  *3 (C.D. Cal. Jan. 26, 2004).

21     Wisk then claims that "Archer has conceded that it can challenge Wisk's Statements only to the

22  extent that they were 'published on [Wisk's] website.'"  Mot. at 16 (quoting Dkt. 146 at 17, and then

23  citing Dkt. 124 at 18).  Archer has made no such concession.  Archer *did* confirm that its counterclaims

24  were based on Wisk's own publication of the false statements on its blog and in its press release.

25  Dkt. 124 at 18 (citing Dkt. 90 ¶ 45).  But Archer *never* conceded that Archer could not seek damages

26  related to its efforts to drive the public to read its blog post on its website.

27     Having misstated Archer's position on Wisk's earlier motion, Wisk then falsely claims that the

28  Court "relied" on that misstated position in the Court's order denying Wisk's anti-SLAPP motion.

Mot. at 17.  But what was at issue in the anti-SLAPP motion was exceedingly narrow.  Specifically, the Court noted in its anti-SLAPP order that Wisk's motion initially focused on Archer's tort claims in regard to "the transmittal of Wisk's blog posts and press release to news outlets," *but that Wisk had narrowed its fair report privilege argument* from its original scope.  Dkt. 146 at 17.  By that narrowing, Wisk dropped its claim of privilege regarding the transmittal of blog posts, and left the claim to be decided limited to the applicability of the fair reporting privilege "to the press release, and only to the extent that it was transmitted via a wire service (not, apparently, posted . . . on its website)."  *Id*.  As to that issue, the Court held that Archer could "not impose liability for transmitting the press release to a wire service or the damages that resulted from that transmission."  *Id.*  Professor Milbourn offers no opinion based on any such transmission of Wisk's press release.  Critically, neither Archer nor the Court said that the fair report privilege applies to hyperlinks to Wisk's website.  Indeed, the Court's order said nothing about the fair report privilege and Wisk's blog posts at all (other than as a subject of Wisk's narrowing).  Contrary to Wisk's argument (*see* Mot. at 17), Wisk's media amplification efforts—drawing additional viewers to Wisk's website—remain "at issue" and "relevant" in this case.

Wisk concludes by claiming the fair report privilege "is absolute for 'those who communicate information *to the media*.'"  Mot. at 17 (quoting *Healthsmart*, 7 Cal. App. 5th at 431).  Wisk takes that quote out of context.  The *Healthsmart* court was emphasizing that California's privilege no longer is limited to statements made *by* the media.  *Healthsmart*, 7 Cal. App. 5th at 431.  The privilege does *not* apply to all "information" communicated to the media, as Wisk contends.  Mot. at 17.  The statement must be a fair and true report of a judicial proceeding.  By contrast, Wisk's statements purport to describe "Archer's Actions."  Mot., Ex. C.  The fair report privilege does not allow someone to "make defamatory allegations in a complaint and then report the same alleged facts, *as facts* . . . with impunity."  *Healthsmart*, 7 Cal. App. 5th at 435; *see* Dkt. 146 at 21.

Moreover, Wisk cannot transform statements on its website into statements to the media just by sending the media a hyperlink to Wisk's website.[11]  *See, e.g.*, *Sundance Image Tech., Inc. v. Cone*

---

[11] In any event, the fair report privilege could only apply to disclosures of the existence of the lawsuit or what the complaint says—it would not apply to Wisk's statements of purported fact about *why* Wisk is taking legal action against Archer.  *See* Mot., Ex. C.

Gibson, Dunn &
Crutcher LLP

*Editions Press, Ltd.*, 2007 WL 935703, at *7 (S.D. Cal. Mar. 7, 2007) (linking to statements already published on the Web "is more reasonably akin to the publication of additional copies of the same edition of a book" and not a separate statement).

### 2. Wisk's Argument Against Professor Milbourn's Qualifications Is Based On A Misstatement Of Professor Milbourn's Testimony

Wisk argues that Professor Milbourn "purports to offer the opinion that, but for Wisk's outreach to the media, Wisk's Statements would have gone unnoticed," but that Professor Milbourn does not have the credentials to speak on that topic. Mot. at 17 (citing Ex. 1 (Milbourn Rpt.) ¶¶ 36–37 and Ex. 27 (Milbourn Tr.) at 223:7–225:9). Once again, the Court need not consider Wisk's argument because it is addressed to purported testimony that Professor Milbourn has not given and will not give at trial. Professor Milbourn noted that "it may take longer for investors to become aware of the majority of corporate litigation due to the lack of media coverage." Ex. 1 (Milbourn Rpt.) ¶ 36. He absolutely does not say that Wisk's defamatory statements on its website somehow would have "gone unnoticed" or even more generally that lawsuits go wholly "unnoticed" absent media coverage. Such statements are wholly unnecessary to Professor Milbourn's opinion, which is that Wisk's actions to increase press coverage about Wisk's defamatory statements increased or amplified the existing adverse effect of those statements. *See id.* ¶ 37; *see also id.* ¶¶ 71–75. That opinion is both unsurprising and supported by facts. Professor Milbourn cites factual evidence upon which he concludes that Wisk's efforts to spread its false statements about Archer in fact impacted Archer's reputation with investors, who voiced concerns about Archer while at the same time referencing (and sometimes actually linking to) Wisk's blog posts. *Id.* ¶¶ 65–66, 71–72, 74 & n.113, ¶ 124; *see also* Ex. 22 (IRIDIAN_00022407); Ex. 36 (Archer-NDCA-00699214). Wisk does not mention, let alone challenge, this evidence.

Wisk takes issue with Professor Milbourn's qualifications to testify about "media amplification" of the Allegedly Defamatory Statements, arguing that he does not have a degree or training "in communications," or experience "in mass media or marketing." (Mot. at 17). But the subject matter of Professor Milbourn's opinion concerns corporate reputations, not Neilson ratings. Reputation is a necessary component of a company's value, and something about which Professor Milbourn is well-qualified to address. *See, e.g.*, Ex. 1 (Milbourn Rpt.) ¶ 33 & n.50 (citing Charles J.

Fobrun, *Reputation: Realizing Value from the Corporate Image*, First Edition, (Boston, MA: Harvard Business School Press, 2018)); *id.* ¶ 34 & n.51 (citing Ebbers, Joris J. and Nachoem M. Wijnberg, 2012, "Nascent Ventures Competing for Start-Up Capital: Matching Reputations and Investors," *Journal of Business Venturizing*, 27(3), pp. 372–384). Professor Milbourn's report cites his experience on the board of two SPACs, academic literature, and evidence including deposition transcripts and Atlas Crest's securities filings to support his understanding of the importance of reputation to early-stage startups in general and to Archer in particular. Ex. 1 (Milbourn Rpt.) ¶¶ 4, 15, 31–35, 60–64; *see also* Ex. 27 (Milbourn Tr.) at 113:22–114:6, 120:19–121:23.

Wisk also offers nothing to show why Professor Milbourn's expertise in corporate finance, valuation, financial performance measurement and financial markets (Ex. 1 (Milbourn Rpt.) ¶ 3), and his practical experience serving on the board of two SPACs, do not qualify him to address the effect of an adverse reputation on the valuation of a company involved in a de-SPAC transaction, and its performance in the financial market. Archer's CEO and Atlas Crest's CEO are not experts in "media studies," but they testified as to the importance of Archer's reputation and the harm that Wisk's defamatory statements did to that reputation. *See, e.g.*, Ex. 21 (Spellacy Tr.) at 139:20–23 ("The prevailing perception of that press release or blog post was largely negative . . . so the sentiment matters, perception matters."); Ex. 16 (Goldstein Tr.) at 530:14–18 ("I believe that Wisk's statements about criminal investigations into Archer along with many other statements in the blog post damaged Archer's reputation so badly and made us radioactive that nobody wanted to touch us.").

Professor Milbourn is well-qualified to give the opinions he actually offers in this case.

## IV.   CONCLUSION

For the foregoing reasons, Wisk's Motion to Exclude the Opinions and Testimony of Todd Milbourn should be denied in all respects.

DATED: April 6, 2023                                    GIBSON, DUNN & CRUTCHER LLP

By: */s/ Josh Krevitt*
    Josh Krevitt

*Attorneys for Defendant Archer Aviation Inc.*