QUINN EMANUEL URQUHART & SULLIVAN, LLP
  Yury Kapgan (Bar No. 218366)
    yurykapgan@quinnemanuel.com
  Robert M. Schwartz (Bar No. 117166)
    robertschwartz@quinnemanuel.com
  Diane Cafferata (Bar No. 190081)
    dianecafferata@quinnemanuel.com
  Patrick Schmidt (Bar No. 274777)
    patrickschmidt@quinnemanuel.com
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
Facsimile: (213) 443-3100

  Michael F. LaFond (Bar No. 303131)
    michaellafond@quinnemanuel.com
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
Telephone: (650) 801-5000
Facsimile: (650) 801-5100

*Attorneys for Plaintiff Wisk Aero LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WISK AERO LLC,<br><br>                 Plaintiff,<br><br>          vs.<br><br>ARCHER AVIATION INC.,<br><br>                 Defendant. | Case No. 3:21-cv-02450-WHO<br><br>**WISK'S REPLY IN SUPPORT OF ITS *DAUBERT* MOTION TO EXCLUDE THE OPINION AND TESTIMONY OF HEATH HOFMANN**<br><br>Hon. William H. Orrick<br>Date: May 12, 2023<br>Time: 3:00 p.m. |

1

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

2

3    INTRODUCTION ...................................................................................................... 1

4    ARGUMENT ............................................................................................................ 2

5    I.     Dr. Hofmann Is Not Qualified to Opine on Trade Secrets 30 or 31 ..................................... 2

6    II.    Opinions Regarding Trade Secret Identification ........................................................ 4

7    III.   Opinions Regarding Non-Misappropriation Of Trade Secret 30 On The Basis Of
            Archer Purchasing From A Third Party .................................................................. 7

8    IV.    Opinion Regarding Alternative To Trade Secret 17 ..................................................... 10

9    V.     Opinion Regarding Head Start For Trade Secret 39 .................................................... 12

10   CONCLUSION ......................................................................................................... 14

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## TABLE OF AUTHORITIES

**Page**

### CASES

*Alza Corp.* v. *Impax Lab'ys, Inc.*,
        No. C-03-4032 VRW, 2005 WL 6220093 (N.D. Cal. Mar. 10, 2005) ................................. 6

*Ancho* v. *Pentek Corp.*,
        157 F.3d 512 (7th Cir. 1998) ....................................................................................... 2

*Area 55, Inc.* v. *Amazon.com, Inc.*,
        2012 WL 12846975 (S.D. Cal. July 24, 2012) ..................................................... 12

*Guidroz-Brault* v. *Missouri Pac. R. Co.*,
        254 F.3d 825 (9th Cir. 2001) ................................................................................ 11, 14

*Maldonado* v. *Apple, Inc.*,
        2021 WL 1947512 (N.D. Cal. May 14, 2021) ......................................................... 2

*Nationwide Transp. Fin.* v. *Cass Info. Sys., Inc.*,
        523 F.3d 1051 (9th Cir. 2008) ................................................................................ 10

*Optronic Techs., Inc.* v. *Ningbo Sunny Elec. Co.*,
        2019 WL 4780183 (N.D. Cal. Sept. 30, 2019) ................................................. 11, 12

*Pecover* v. *Elec. Arts Inc.*,
        2010 WL 8742757 (N.D. Cal. Dec. 21, 2010) ......................................................... 2

*Pelican Int'l, Inc.* v. *Hobie Cat Co.*,
        No. 320CV02390RSHMSB, 2023 WL 2130379 (S.D. Cal. Feb. 10, 2023) ...................... 9

*Raytheon Co.* v. *Indigo Sys. Corp.*,
        598 F. Supp. 2d 817 (E.D. Tex. 2009) ..................................................................... 4

*Scentsational Techs., LLC* v. *Pepsi, Inc.*,
        No. 13-CV-8645(KBF), 2018 WL 1889763 (S.D.N.Y. Apr. 18, 2018) .............................. 5

*United States* v. *Valencia-Lopez*,
        971 F.3d 891 (9th Cir. 2020) ............................................................................. 3, 4

### RULES AND REGULATIONS

Fed. R. Evid. 704 ............................................................................................................. 5

1

## **INTRODUCTION**

In its Opposition, Archer concedes the key factual issues and fails to rebut the bases to exclude the challenged portions of Dr. Hofmann's testimony.  First, Archer all but admits that Dr. Hofmann is not qualified to rebut Mr. Dix's opinions regarding the cell design and modeling issues related to TS 30 and TS 31.  Indeed, Dr. Hofmann—by his own admission—has zero experience in cell design and modeling.  Instead, Archer claims that Dr. Hofmann is qualified to opine on those trade secrets *as described in the 2019.210 statement*.  That argument is of no help, because Wisk's theories are consistent with the 2019.210 statement, and under any interpretation, TS 30 and 31 require experience in cell design and related modeling.

Second, Dr. Hofmann improperly opines that the 2019.210 statement fails to adequately describe "the boundaries" of Trade Secrets 12, 17, 29, 30, 31, and 39.  These are improper opinions as to a "***matter of law***," Opp. at 6, and directly contradict this Court's finding that Wisk's 2019.210 statement *is* sufficient.  In opposition, Archer does not contest that Dr. Hofmann's deposition testimony is improper, rather it claims that his report comprises "more circumscribed" opinions.  Not so.  Dr. Hofmann opines that all trade secrets described in the 2019.210 statement are insufficiently identified due to the generality of their description.

Third, Dr. Hofmann's opinions on TS 30 depend on a misunderstanding and misapplication of the law on indirect misappropriation.  In opposition, Archer switched positions and now concedes that misappropriation may be shown by Archer's intentional procurement of Wisk's trade secret through a third party.  Dr. Hofmann's contrary opinions must be excluded.

Fourth, Dr. Hofmann opines that an admittedly hypothetical alternative for TS 17 would have a trivial effect on Maker performance in a but-for world.  But that opinion is based solely on a single conversation with Mr. Marius regarding previously undisclosed facts that Dr. Hofmann could not even recall at his deposition.  Archer does not dispute that the conversation is the sole basis for Dr. Hofmann's opinion and does not dispute that Dr. Hofmann did not validate or check Mr. Marius's claims.  Nor does Archer deny that the facts of this hypothetical design change were never disclosed in fact discovery.  Exclusion is warranted.

Finally, Dr. Hofmann's rebuttal to Wisk's head-start theory for Trade Secret 39 is

without factual support and contradicts the record, as evidenced by the actual timeline for Archer's vendor to make requested technical changes.  In opposition, Archer does not contest the facts.  Therefore, Dr. Hofmann's non-responsive, counterfactual rebuttal should be excluded.

## ARGUMENT

### I.   Dr. Hofmann Is Not Qualified to Opine on Trade Secrets 30 or 31

Dr. Hofmann has no experience, and insufficient expertise, in cell design or related modeling, and his opinions on those matters should be excluded.  Archer first argues that Wisk's challenge is merely to Dr. Hofmann's lack of "particularized expertise," which goes to weight rather than admissibility.  Opp. at 2.  But Dr. Hofmann lacks more than mere "particularized expertise"; Dr. Hofmann's expertise is in a different discipline entirely.

Battery cell design and modeling, as described in TS 30 and 31, concern chemical engineering.  Dkt. 439-5 (Dix Dep. Tr.) at 48:13-50:2.  Dr. Hofmann has no experience in chemical engineering. He is an "electrical engineer" with experience in "electromechanical systems."  Dkt. 439-2 (Hofmann Reb. TS. Rep.) ¶ 7.   The difference between a chemical and electrical engineer is not "particularized expertise."  *See Ancho v. Pentek Corp.*, 157 F.3d 512, 519 (7th Cir. 1998) ("[A] mechanical engineer . . . lacks qualifications to give expert testimony about plant reconfiguration . . . . Ancho should have retained a qualified plant engineer to testify at trial and his failure to do so was a mistake in judgment for which he has no one to blame but himself.") (collecting cases).  Chemical engineering is not a "corner" of, or a particularized variant of, electrical engineering.  They are two entirely distinct fields.  As a result, Archer cannot simply "slap[] the label 'engineering' on an expert or opinion" and claim that Dr. Hofmann is an expert in all engineering matters.  *See*, *e.g.*, *Maldonado v. Apple, Inc*., 2021 WL 1947512, at *17 (N.D. Cal. May 14, 2021); *Pecover v. Elec. Arts Inc.*, 2010 WL 8742757, at *3-6 (N.D. Cal. Dec. 21, 2010).

Notwithstanding that incongruity between his experience and his opinions, Archer argues that Dr. Hofmann is qualified to opine on TS 30 and 31 "as those trade secrets are described in Wisk's Disclosure." Opp. at 3 (emphasis omitted).  With respect to TS 30, however, Archer recognizes that the 2019.210 statement describes battery "***cell*** design studies."  Opp. at 2-3

1  (emphasis added).  Dr. Hofmann does not have any experience in and has not "worked on

2  battery cell design."  Dkt. 439-3 (Hofmann Dep. Tr.) at 26:16-27:11.  Nor does Archer contend

3  otherwise; it concedes Dr. Hofmann has no experience in the "specific chemistry and design of

4  cells."  Opp. at 3-4.  That is exactly what TS 30 requires.  Titled "Lithium-Ion Battery Cell

5  Design Studies," TS 30 comprises the actual cell chemistry, composition, physical properties,

6  and manufacturing techniques.  Indeed, Dr. Hofmann admits that ███████████████████

7  ████████████████████████████ were provided in Wisk's 2019.210 statement,

8  Dkt. 439-2 (Hofmann Reb. TS. Rep.) ¶ 626 n.12, and the exemplary documents cited in the

9  statement include discussion of cell manufacturing techniques in order to ensure a safe and

10  reliable design.  Thus, Archer's argument that Wisk has redefined TS 30 is unfounded.  Dr.

11  Hofmann's opinions on TS 30 should be excluded for lack of sufficient experience in the

12  disclosed field of lithium-ion battery design.  *See United States v. Valencia-Lopez*, 971 F.3d 891,

13  901 (9th Cir. 2020) ("There cannot be 'too great an analytical gap between [an expert's]

14  experience and his conclusion.'") (citation omitted).

15      Archer mischaracterizes TS 31 "████████████████████████████████

16  ████████████████████████████████████████████████████████

17  ██████████████████████████████████.'"  Opp. at 3.  This chopped up

18  quotation from the 2019.210 statement omits a key aspect of the disclosure, which goes on to

19  describe the claimed "████████████████████████████████████████

20  ████████████████████████████████."  Dkt. 45-5 at 42 (2019.210 statement) (emphasis

21  added).  Archer accuses Wisk of redefining TS 31 to cover the use of ████████████, but that is

22  exactly what the 2019.210 statement describes as Dr. Hofmann testified.  Dkt. 439-2 (Hofmann

23  Reb. TS Rpt.) ¶ 843 ("[t]he 2019.210 Statement provides a summary ███████████████

24  ████████"), ¶ 852 ("In sum, the 2019.210 Statement states that Wisk '██████████

25  ████████████████████████████████████████████████████████

26  ████████████████████████'").

27      Archer asserts that Dr. Hofmann was involved in "publish[ing] dozens of peer reviewed

28  papers on topics on analysis of battery cells, estimation and detection of battery cell

characteristics, and determination of faults."  Opp. at 4-5.  But while the three articles cited by Archer make reference to battery cells, they merely address performance issues with the larger, system-level components within which the cells are a part.[1]  That difference is significant.  Cell modeling as described in TS 31 concerns simulating a particular cell design based on its composition.  Dkt. 439-5 (Dix Dep. Tr.) at 50:3-24.  Archer fails to demonstrate how any of the three articles it cites relate to modeling individual cell performance based on chemical composition, nor do they implicate considerations of the design and performance modeling of the cells *themselves*.  This, of course, is consistent with Dr. Hofmann's deposition testimony, that his academic research has not focused on such matters.  *Compare* Opp. at 5 *with* Dkt. 439-3 (Hofmann Dep. Tr.) at 26:18-27:11.  *See also* Dkt. 439-3 (Hofmann Dep. Tr.) at 159:19-160:5.  Therefore Dr. Hofmann's opinions on TS 31 should be excluded.  *See Valencia-Lopez*, 971 F.3d at 901.

## II.       Opinions Regarding Trade Secret Identification

The question of whether Wisk's 2019.210  statement provides sufficient disclosure of the boundaries within which Wisk's trade secrets lie is an inherently legal exercise that Dr. Hofmann should not be permitted to wade into in front of the jury.

Archer first seeks to reframe Dr. Hofmann's opinions as permissible technical opinions. Opp. at 5-6, *citing Raytheon Co. v. Indigo Sys. Corp.*, 598 F. Supp. 2d 817, 821–22 (E.D. Tex. 2009).  But there is a glaring disconnect between the "valid opinions" identified in *Raytheon*, and Dr. Hofmann's opinions in this case.  In *Raytheon*, the court contrasted "valid opinions" "that the[] trade secrets, as described, do not meaningfully differ from information that is widely known in the industry," with *impermissible* opinions that "trade secrets 20, 22 and 25 are not actually trade secrets because of the *generality of their description*." *Id.* (emphasis added).  Dr. Hofmann's opinion are, at best, of the latter, impermissible type.  Opp. at 5 (Archer

---

[1]    Specifically, the three articles cited by Archer address: battery string failure rates and degradation; battery string monitoring with "only one voltage and one current sensor"; and the use of a "neural network" to characterize short circuits in parallel battery strings without independent current sensors (for individual cells in a parallel string).

characterizing opinions as "whether Wisk's Disclosure 'meaningfully convey[s] to the reader what Wisk contends to be the boundaries' of each trade secret.").

Wisk carefully identified only those opinions in Dr. Hofmann's report that strayed into the issue of trade secret identification for the 2019.210 Statement, Dkt. 439-2 (Hofmann Reb. TS Rpt.) ¶¶ 62, 65, 66-77, 311, 314, 315-347, 478, 481-501, 615, 617-622, 839, 842-852, 876, 954, 956-966, 982, and 987, and specifically did *not* seek to exclude Dr. Hofmann's technical opinions regarding whether the trade secrets were distinct from what was identified in the public domain, *id.* ¶¶ 623-628, 752-764, 853-872, 913-925, 983-986; Ex. G (Hofmann Reb. TS Rpt.) ¶¶ 78-101, 242-267, 348-361, 418-450, 502-520, 967-981, 988-990, and 1132-1143.  Indeed, many of the objected-to opinions involve absolutely no comparison of the trade secrets to any public domain material, but are instead discrete, stand-alone opinions regarding Dr. Hofmann's interpretation of the 2019.210 statement in isolation,[2] against his own subjective view of what would constitute a sufficient "boundary."  While an expert may opine to an ultimate issue of fact pursuant to Federal Rule of Evidence 704, it is well-established that an expert may not offer an opinion representing an ultimate issue of law, *i.e.*, regarding the particularity of trade secret identification.  *See Scentsational Techs., LLC v. Pepsi, Inc*., No. 13-CV-8645 (KBF), 2018 WL 1889763, at *3, 6 (S.D.N.Y. Apr. 18, 2018), *aff'd sub nom* 773 F. App'x 607 (Fed. Cir. 2019) ("[w]hile an expert 'may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts'"; excluding opinions, noting that "[n]othing in her resume or report supports a particular level of expertise in legal

---

[2]    *Compare* Dkt. 439-2 (Hofmann Reb. TS Rpt.) ¶¶ 618-622 (Section IX.A.1 opining that  to "2019.210 Statement … does not meaningfully convey what Wisk contends to be the trade secret's boundaries.") *with id.* ¶¶ 623-638 (Section IX.A.2 opining the same with respect to "the Dix Report"); *compare* Dkt. 439-2 ¶¶ 66-77 (Section VI.B.1 "2019.210 Disclosure Statement" for TS 12) *with* Ex. G ¶¶ 81-101 (Section VI.B.3 "The Collins Report's Definition of Trade Secret 12"); *compare* Dkt. 439-2 ¶¶ 315-347 (Section VII.B.1 "2019.210 Disclosure Statement" for TS 17) *with* Ex. G ¶¶ 351-361 (Section VII.B.3 "The Collins Report's Definition of Trade Secret 17"); *compare* Dkt. 439-2 ¶¶ 482-502 (Section VIII.B.1 "2019.210 Disclosure Statement" for TS 29) *with* Ex. G ¶¶ 504-520 (Section VIII.B.3 "The Dix Report's Definition of Trade Secret 29"); *compare* Dkt. 439-2 ¶¶ 843-852 (Section X.A.1 "2019.210 Disclosure Statement" for TS 31) *with id.* ¶¶ 857-872 (Section X.A.3 "The Dix Report's Definition of Trade Secret 31"); *compare* Dkt. 439-2 ¶¶ 957-965 (Section XI.A.1 "2019.210 Disclosure Statement" for TS 39) *with* Ex. G ¶¶ 967-990 (Section XI.A.1 "The Dix Report's Definition of Trade Secret 39").

1  determinations as to trade secret status (and, of course, even if she were, expert witnesses should

2  generally not offer legal conclusions)").

3        The Court need look no further than Dr. Hofmann's own deposition testimony to confirm

4  that his opinions cross the line from permissible technical opinions to impermissible legal

5  conclusions.  Dkt. 439-3 (Hofmann Dep. Tr.) at 50:25-51:8.  Archer does not even contest that

6  Dr. Hofmann's characterization of his own opinions was objectionable, Opp. at 7, but instead

7  argues that this testimony "has no relevance," because the opinions in his report are "more

8  circumscribed."  Opp. at 7.  But Wisk should be entitled to rely upon the expert's own, sworn

9  characterization of what he understands his opinions to be.  Moreover, a careful reading of Dr.

10  Hofmann's report makes clear that the report is *not* more circumscribed as Archer contends.  For

11  example, Dr. Hofmann opines that: "It is my opinion that the **metes and bounds of Trade Secret**

12  **39 are not decipherable and lack any particularity at all.**"  Ex. G (Hofmann Reb. TS Rpt.)

13  ¶ 977.  As another example, Dr. Hofmann opines that "the 2019.210 Statement does not, in my

14  opinion, meaningfully convey the scope or content of Trade Secret 29 to a reader, let alone why

15  Wisk contends that many of the standard components therein are somehow proprietary."  Dkt.

16  439-2 (Hofmann Reb. TS Rpt.) ¶ 501.  For each of Trade Secrets 12, 17, 29, 30, 31, and 39,

17  Dr. Hofmann includes the same, cut-and-paste opinion that it has **always** been his opinion that

18  the 2019.210 statement lacks a sufficiently particularized disclosure: "It was my opinion in the

19  first instance, and it remains my opinion today, that the 2019.210 Statement does not

20  meaningfully convey to the reader what Wisk contends to be the boundaries of Trade Secret [fill

21  in the blank]."  Dkt. 439-2 (Hofmann Reb. TS Rpt.) ¶¶ 62, 311, 478, 615, 839, 954.

22        Next, Archer complains that Wisk's expert at the PI stage had similar opinions.  Opp. at

23  7-8.  But the two circumstances are not comparable.  Wisk's expert opinions at the PI stage were

24  offered in the context of Archer's Motion to Strike and were made for the appropriate purpose of

25  assisting the Court in determining, *at that particular procedural setting*, whether a person skilled

26  in the art could discern the subject-matter being disclosed in the 2019.210 statement.  Those

27  opinions were analogous to expert opinions sometimes offered to the Court in support of a claim

28  construction dispute, which nevertheless is a legal question for the Court.  *See Alza Corp. v.*

*Impax Lab'ys, Inc.*, No. C-03-4032 VRW, 2005 WL 6220093, at *1 (N.D. Cal. Mar. 10, 2005) ("claim construction issues [are] a question of law for the court, even though it is a question on which evidence from experts may be relevant") (citation omitted).   Unlike Dr. Hofmann's opinions now, Wisk's prior expert opinions did not purport to usurp the Court's role in making the ultimate *legal* determination regarding the particularity of the disclosure.   Nor did Wisk propose having its expert present these opinions to the jury.

Archer also argues that "Dr. Hofmann's opinion does not . . . 'contradict' the Court's order on Archer's early motion to strike" because the "Court ruled only that 'the trade secrets are adequately identified *at this stage*.'" Opp. at 8.   As an initial matter, this argument merely reinforces the legal nature of the inquiry.   To the extent the 2019.210 statement is now subject to a different analysis, through the lens of a different procedural posture, that is an inquiry that Dr. Hofmann is ill-equipped to opine on, particularly in front of the jury.[3]   In any event, Dr. Hofmann's opinions, on their face, *do* contradict the Court's prior ruling because they are not limited to merely an interpretation of the disclosure at this particular stage of litigation.   Dkt. 439-2   (Hofmann Reb. TS Rpt.) ¶¶ 62, 311, 478, 615, 839, 954 (opining the 2019.210 lacked clear boundaries "***in the first instance***, and it remains my opinion today") (emphasis added).

## III.   Opinions Regarding Non-Misappropriation Of Trade Secret 30 On The Basis Of Archer Purchasing From A Third Party

Archer now admits that misappropriation may be proven here upon a showing that "Archer knew that the ███████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████)."   Opp. at 10-11.   That is a dramatic departure from Archer's position in its March 19,

---

[3] Further, Dr. Hofmann made clear that his opinions are not in any way based on any new "discovery" that took place since the initial determination regarding the 2019.210 statement by admitting that his trade secret opinions were not "really influenced in any significant way" by Wisk's "interrogatory responses."   Dkt. M (Hofmann Tr.) at 38:11-39:7 (the interrogatory responses "did not have a significant impact on [his] thinking" "in forming [his] opinions on trade secrets in this case").   Dr. Hofmann considered his role as a rebuttal expert as "really just supposed to be kind of responding to [] the original 2019.210 statement."   Dkt. M (Hofmann Tr.) at 57:17-25.

1  2023 Summary Judgment Motion, where Archer argued "███ ██████ ██████ ████

2  ████████████████████████████████████████████████████████████████████████████

3  ████████████████████████████████████████████████████████████████████████████

4  ████████████████████████████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████████████████████████████

6  ███████████████████████████."  Dkt. 456 at 32,  n. 24.

7       The objected-to portions of Dr. Hofmann's expert opinions are in-line with Archer's

8  summary judgment argument that what Archer employees "knew" or "should have known"

9  about ██████ Archer was procuring is not "relevant," *e.g.*, Dkt. 439-2 (Hofmann TS Reb. Rpt.)

10  ¶ 668 n.14 ("████████████████████████████████████████████████████████████████

11  ████████████████████████████████████████████████████████████████████████████

12  ████████████████████████████████████████████████████████████████████████████

13  ████████████████████████████").  Dr. Hofmann further suggests that the mere fact of

14  a "commercial purchase" somehow demonstrates that Archer did "nothing wrong," *E.g.*, Dkt.

15  439-2 (Hofmann TS Reb. Rpt.) ¶ 670 ("████████████████████████████████████████

16  ██████ ██ ████ ███ ███ ██ ████ ██████ ██████ ████ ████████ ████ ████

17  ██████████████████"), ¶ 707 ("████████████████████████████████████████████████

18  ████████████████████████████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████████████████████████████

20  ████████████████████████████████") (emphases added).  Wisk and Archer

21  both now agree, however, that under the law of indirect misappropriation, what Archer

22  employees knew or should have known about those ████ *is* indeed relevant, and Archer is not

23  absolved of liability simply because of a third-party commercial purchase.  Opp. at 11.  The

24  Court should therefore exclude any opinion by Dr. Hofmann that suggests otherwise.

25       Archer's  Opposition  seeks  to  rewrite  Dr.  Hofmann's  opinion.  It  argues  that  Dr.

26  Hofmann opined "████████████████████████████████████████████████████████████

27  ████████████████████████████████████████████████."  Opp. at 10.  That is

28  plainly wrong.  Dr. Hofmann did not even consider those circumstances material.  As he wrote,

1  "█████████████████████████████████████████████████████████

2  ████████████████████████," Dkt. 439-2 (Hofmann Reb. TS. Rpt.) ¶ 707 (emphasis

3  added).  Instead, Dr. Hofmann suggests that Archer is not liable because it "███████████

4  ██████████████████████████████████████████████." *Id.* ¶ 678. *See*

5  *also* Dkt. 456 at 32, n. 24.

6        Dr. Hofmann's entire non-misappropriation opinion is premised on him expressly

7  avoiding consideration of the circumstances under which Archer purchased Wisk's proprietary

8  ████████████.[4]  By way of example, Dr. Hofmann opines, ████████████████████

9  ████████████████████████████████████████████████████████████

10  ████████████████████████████████████████████."   Dkt. 439-2

11  (Hofmann TS Reb. Rpt.) ¶ 681.   Dr. Hofmann opined that there was "no evidence" of

12  misappropriation because it was irrelevant whether Archer knew it was getting Wisk's trade

13  secret, as there is no liability for "the commercial purchase of ████ *known to be produced using*

14  *trade secret information*."   These sorts of opinions, premised on a foundational legal error, are

15  not reliable and will undoubtedly confuse the jury.  *See Pelican Int'l, Inc. v. Hobie Cat Co.*, No.

16  320CV02390RSHMSB, 2023 WL 2130379, at *5 (S.D. Cal. Feb. 10, 2023) (excluding

17  testimony because defendant's expert "failed to apply the proper legal test in rendering her

18  invalidity opinions . . . those opinions are irrelevant, unreliable, and would mislead the jury.").

19        In an effort to muddy the water, Archer proclaims, the "██████████████

20  ████████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████████████

22  █████"  Opp. at 11. That allegation is highly misleading, and unsupported by the record, for

23  reasons that are beyond the scope of this Motion.  Nonetheless, if *those* technical circumstances

24  were actually the basis for Dr. Hofmann's opinions (and assuming *arguendo* that they are true[5]),

25  _____

26  [4]  Nor did he consider the circumstances to determine if Archer knew it was getting Wisk's
trade secret when it ████████████████████████.  Again, he did not consider the

27  identical composition between TS 30 and ████████████ important, nor did he analyze the
composition. Dkt. 439-3 at 178:4-179:10.

28  [5]  They are not.  For example, ████████████████████████████████████
████████  ████  ████████  ████████████.   Ex. H (WISK00052553) at 617, Ex. I

1  then Wisk would not have moved for exclusion.  The problem with Dr. Hofmann's opinions,

2  however, is they are not tied to the purported prevalence of the ▌▌▌ in the marketplace.  Given

3  the scant support for any such allegation, Dr. Hofmann instead suggests that the mere

4  commercial purchase from a third-party is sufficient to conclude that Archer did "nothing

5  wrong."  That sort of suggestion is what should be excluded.

6      At bottom, the determinative issue is whether Archer knew, or should have known, it

7  was improperly getting access to ▌▌▌▌▌▌ embodying Wisk's trade secret.  To Dr. Hofmann,

8  that issue is not even relevant.  Such a disconnect between the law and proffered expert opinion

9  warrants exclusion.  *See Nationwide Transp. Fin. v. Cass Info. Sys., Inc*., 523 F.3d 1051, 1058-

10  59 (9th Cir. 2008).

11  **IV.   Opinion Regarding Alternative To Trade Secret 17**

12      In response to Wisk's damages theory regarding TS 17, Dr. Hoffman identified a

13  previously undisclosed, *hypothetical* modification to the functionality offered by third-party

14  ▌▌▌▌▌▌   Archer now seeks to downplay the hypothetical nature of the design-around,

15  arguing that "▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

16  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌."  Opp. at

17

18  (BOEING_WISK_0014029) at 207. ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌. Ex. J

19  (WISK00051257).   Boeing is the majority equity owner of Wisk, and Aurora is Boeing's
subsidiary.

20      Relatedly, while Archer cites to testimony from ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

21  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌, that testimony is inconsequential. The issue is
Dr. Hofmann's application of the law of indirect misappropriation. Even if pertinent here, Mr.
Millecam, by his own admission "▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

22  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌. Ex. K

23  (Millecam Tr.) at 139:14-143:1. His testimony was clear: ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

24  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌" *Id.* at 143:2-145:24.   Indeed, the documents tell a markedly different story,
specifically that ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌

25  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌."

26  Ex. L (▌▌▌▌▌▌▌▌) at 089; Ex. K (Millecam Tr.) at 139:14-142:1; 152:5-19 ("▌▌▌▌▌▌▌▌▌▌▌▌▌
▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌."). Such evidence

27  was irrelevant to Hofmann yet is directly relevant to misappropriation and evidences "▌▌▌▌▌▌▌

28  ▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌▌
▌▌▌▌▌▌."  Opp. at 11.

13.  That is **not** Dr. Hofmann's opinion.  Paragraph 459 of Dr. Hofmann's rebuttal report is the proposed, purported alternative involves "███████████████████████████████████████████████ ████████████████████████████████████."  There is no doubt that Dr. Hofmann was considering a hypothetical design change—he admitted as much at his deposition.  Ex. (Hofmann Tr.) at 217:4-7 ("████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ██████").

Archer does not deny that the entire basis for Dr. Hofmann's hypothetical design change is a conversation with Mr. Marius.  Opp. at 13.  Archer also does not deny that the facts of this hypothetical design change were never disclosed in fact discovery.  And, other than the scant description in Dr. Hofmann's report ████████████████████████████████████████ ███████████"), there are no other technical details regarding this purported design-around in the record.  Based on this belated, insufficient disclosure, it is impossible to tell whether this purported design-around avoids misappropriation of TS 17, whether it is commercially feasible, and the economic impact that would result to Archer as a result of implementing this design-around.

Instead of identifying an adequate basis in fact for Dr. Hofmann's opinion, Archer argues that Wisk had ample opportunity to ask questions about this opinion at deposition.  But Wisk **did** ask Dr. Hofmann about this opinion, and all he could testify was that he had forgotten about the conversation, and that he did not "███████████████████████████████████" of this alternative.  Dkt. 439-3 (Hofmann Dep. Tr.) at 216:4-217:7.  Moreover, and determinatively, it is Archer's burden to ensure Dr. Hofmann "back[s] up his opinion with specific facts" and provides the "factual basis for the expert's opinion . . . in the expert's [report]."  *Guidroz-Brault v. Missouri Pac. R. Co.*, 254 F.3d 825, 831–32 (9th Cir. 2001).  It did not do so.  Furthermore, Wisk could not have asked Mr. Marius about this purported design-around because it was first disclosed by Archer in expert discovery, long after Mr. Marius had been deposed.

Dr. Hofmann's purported design-around opinion is therefore nothing more than parroting the unsworn and self-serving statements of Archer's fact witness.  Archer's citation to *Optronic*

1  *Techs., Inc. v. Ningbo Sunny Elec. Co.*, 2019 WL 4780183, at *5 (N.D. Cal. Sept. 30, 2019) is

2  inapt.   Unlike the expert in *Optronic*, Dr. Hofmann did not "validate[] and check[]" the

3  information provided by Mr. Marius.   Rather, Dr. Hofmann admitted that he did not "████

4  ████████████████████████████████" of what the proposed alternative entailed, and he

5  could not remember any details about it.   Dkt. 439-3 (Hofmann Dep. Tr.) at 216:4-217:7.

6  Similarly, Dr. Hofmann did not independently review corroborating documentary evidence like

7  the expert in *Area 55, Inc. v. Amazon.com, Inc.*, 2012 WL 12846975, at *4 (S.D. Cal. July 24,

8  2012). Dkt. 439-3 (Hofmann Dep. Tr.) at 216:22-217:3.

9        In sum, Dr. Hofmann's opinion on a purported hypothetical alternative to TS 17 is based

10  only on a "forgotten" "discussion with Mr. Marius," on which he did not conduct any

11  independent research, validation or checking.   His testimony should be excluded.

12  **V.      Opinion Regarding Head Start For Trade Secret 39**

13        Wisk's Motion is targeted to Dr. Hofmann's "head start" opinions in paragraphs 1151

14  through 1171 of Dr. Hofmann's rebuttal expert report.   These are opinions that purport to

15  assume, for the sake of argument, that TS 39 has been misappropriated, and respond to Mr.

16  Dix's opinion about what impact that misappropriation would have on Archer's overall

17  development timeline.   These opinions are flawed, unsupported, and therefore unreliable, and

18  Archer fails to demonstrate otherwise.

19        First, Archer takes issue with Wisk's request to exclude the opinions in paragraphs 1167-

20  1170, where Dr. Hofmann seeks to rebut Wisk's theory that absent knowledge of TS 39, ████

21  ████████████████████████████████████████████████████████████████

22  ████████████████████████.   Archer claims that Dr. Hofmann "relies on objective

23  evidence" such as a set of "████████████████████████████████████████████

24  ████.   Opp. at 15-16.   But this is not proper evidence for a "head start" analysis—this is merely

25  a recasting of Archer's theory that it did not misappropriate in the first place.   The ████████

26  Archer comments cited by Dr. Hofmann were made *with the benefit* of TS 39, and therefore do

27  not provide a reasoned basis for Dr. Hofmann to opine that the same comments could be made

28  without the benefit of TS 39.   Archer also vaguely cites to other portions of Dr. Hofmann's

1   report, which it claims reflects the "█████████████████████████." Opp. at 16.

2   But this evidence fares no better.  It is undisputed that the original system ████████████,

3   without Archer's input, did not include the TS 39 features, and thus ███████████████

4   is irrelevant to a head start opinion.  In short, Archer is not able to identify any proper support

5   for Dr. Hofmann's opinion that it could have identified the need for the TS 39 features prior to

6   beginning ████████████████████.  Paragraphs 1167-1170 should be excluded.

7           Second, Archer objects to Wisk's request to exclude the timeline on which Dr. Hofmann

8   hypothesizes Archer and its vendor ████ could have independently developed TS 39.  Dr.

9   Hofmann's purported timeline is counterfactual and devoid of support, and risks confusing the

10  jury.  That timeline is premised on the assumption that after the necessary changes █████████

11  ████████████████████████████████████████████████████████████████████

12  ███████████████████████" Dkt. 439-2 (Hofmann TS Reb. Rpt.) ¶ 1157.  But

13  in the *real* world, with Archer having the benefit of TS 39, those very same changes actually

14  took ████████████████████.  Dkt. 439-4 (Dix Op. Rpt.) ¶¶ 757-770.  Specifically, on

15  ████████████████████████████████████████████████████████████████████

16  ███████████████████████████████████." *Id.* ¶ 741-747.  ██████████████

17  ████████████████████████████████████████████████████. *Id.* ██████

18  did not understand those requirements, and struggled with their implementation—so much so

19  that by ████████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████████████████

21  ███████████████████████████████████████████████████" *Id.* ¶ 763 (quoting

22  EPS009209 at 213-14). ████████████████████████████████████. *Id.* ¶ 768.

23          Dr. Hofmann does not address any of these facts in his rebuttal expert report.  And

24  Archer does not even mention them in its Opposition brief.  Instead, Archer cites to an entirely

25  different section of Dr. Hofmann's expert report in an effort to cobble together a story about

26  ████████████████████████████████████.  Opp. at 16-17.  That testing is

27  irrelevant.  Archer concedes as much, stating that the ████████████████████████████

28  ████████████████████████████████████████████████████████████████████

1   ████████        Opp. at 17 (emphasis in original).  Therefore there is no dispute that the ████████

2   ████████ does not bear on the TS 39 head-start issues, or the functionality that Dr. Hofmann

3   opines that ██████████████████████████████"  Indeed Dr. Hofmann's report

4   draws no connection between his ████████ opinion in paragraph 1167, and the ████████

5   ████ that Archer raises in its Opposition.  The Court should reject this effort to rehabilitate Dr.

6   Hofmann's opinions.

7          In sum, there is no dispute that ████ was *not* able to implement the desired features for

8   more than a year.  Dr. Hofmann's opinion that ████████████████████████████

9   ██████████████████████████" is thus not "'a fair and accurate reconstruction of

10  the 'but for' [world,]'" *DSU*, 296 F. Supp. 2d at 1157-59, and warrants exclusion as unreliable

11  opinions based on "unsupported speculation and subjective beliefs," *Guidroz-Brault,* 254 F.3d at

12  829.

13                                          **<u>CONCLUSION</u>**

14         For the foregoing reasons, Wisk respectfully requests that this Court exclude portions of

15  Heath Hofmann's report and testimony.

16

17  Dated:  April 20, 2023                   QUINN EMANUEL URQUHART &
                                            SULLIVAN, LLP
18

19                                   By:    */s/ Patrick Schmidt*
                                            Patrick Schmidt
20                                          Yury Kapgan
                                            Robert M. Schwartz
21                                          Diane Cafferata
                                            Michael F. LaFond
22
                                            *Attorneys  for  Plaintiff  Wisk  Aero*
23                                          *LLC*

24

25

26

27

28