# EXHIBIT M

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1                UNITED STATES DISTRICT COURT

2              NORTHERN DISTRICT OF CALIFORNIA

3                  SAN FRANCISCO DIVISION

4

5    WISK AERO, LLC,

6                   Plaintiff,

7       vs.                        CASE NO. 5:21-CV-02450

8    ARCHER AVIATION, INC.,

9                   Defendant.

     _____

10

11

12      **HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY**

13        VIDEOTAPED DEPOSITION OF HEATH HOFMANN

14              Redwood Shores, California

15              Monday, February 20, 2023

16

17

18

19

20

21

22

23   Stenographically Reported by:  Ashley Soevyn,

     CSR No. 12019

24   Job No. 5772525

25   Pages 1 - 324

                                              Page 1

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

| | |
|---|---|
| 1 UNITED STATES DISTRICT COURT | 1 APPEARANCES: |
| 2 NORTHERN DISTRICT OF CALIFORNIA | 2 |
| 3 SAN FRANCISCO DIVISION | 3 For the Defendant Archer Aviation, Inc. |
| 4 | 4 GIBSON DUNN & CRUTCHER |
| 5 WISK AERO, LLC, | 5 BY: FRANK COTE |
| 6 Plaintiff, | 6 Attorney at Law |
| 7 vs. CASE NO. 5:21-CV-02450 | 7 333 South Grand Avenue, Suite 4600 |
| 8 ARCHER AVIATION, INC., | 8 Los Angeles, California 90071 |
| 9 Defendant. | 9 fcote@gibsondunn.com |
| 10 | 10 (213) 229-7652 |
| 11 | 11 -AND- |
| 12 | 12 |
| 13 ***HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY*** | 13 For the Defendant Archer Aviation, Inc. |
| 14 | 14 GIBSON DUNN & CRUTCHER |
| 15 Videotaped Deposition of | 15 BY: KIM DO |
| 16 HEATH HOFMANN taken on behalf of plaintiff Wisk Aero | 16 Attorney at Law |
| 17 taken at the offices of Quinn Emanuel, 555 Twin | 17 1881 Page Mill Rd. |
| 18 Dolphin Drive, Redwood Shores, California beginning | 18 Palo Alto, California 94304 |
| 19 at 9:15 a.m. and ending at 7:54 p.m. on Monday, | 19 kdo@gibsondunn.com |
| 20 February 20, 2023, before ASHLEY SOEVYN, Certified | 20 (650) 849-5330 |
| 21 Shorthand Reporter No. 12019. | 21 |
| 22 | 22 |
| 23 | 23 |
| 24 | 24 |
| 25 | 25 ALSO PRESENT: Shawna Hynes, Videographer |
| Page 2 | Page 4 |

| | |
|---|---|
| 1 APPEARANCES: | 1 INDEX TO EXAMINATION |
| 2 | 2 DEPOSITION OF HEATH HOFMANN |
| 3 For the Plaintiff Wisk Aero LLC | 3 EXAMINATION BY: PAGE |
| 4 QUINN EMANUEL URQUHART & SULLIVAN, LLP | 4 MR. SCHMIDT 9, 300 |
| 5 BY: PATRICK SCHMIDT | 5 MR. HEFAZI 217, 308 |
| 6 BY: NIMA HEFAZI | 6 MR. COTE 285 |
| 7 Attorneys at Law | 7 |
| 8 865 South Figueroa Street, 10th Floor | 8 |
| 9 Los Angeles, California 90017 | 9 |
| 10 patrickschmidt@quinnemanuel.com | 10 |
| 11 nimahefazi@quinnemanuel.com | 11 |
| 12 (213) 443-3222 | 12 |
| 13 -AND- | 13 |
| 14 For the Plaintiff Wisk Aero LLC | 14 |
| 15 QUINN EMANUEL URQUHART & SULLIVAN, LLP | 15 |
| 16 BY: GREG MIRAGLIA (REMOTE APPEARANCE) | 16 |
| 17 BY: JUN ZHENG (REMOTE APPEARANCE) | 17 |
| 18 Attorneys at Law | 18 |
| 19 300 West 6th Street | 19 |
| 20 Suite 2010 | 20 |
| 21 Austin, Texas 78701 | 21 |
| 22 gregmiraglia@quinnemanuel.com | 22 |
| 23 junzheng@quinnemanuel.com | 23 |
| 24 (737) 667-6100 | 24 |
| 25 | 25 |
| Page 3 | Page 5 |

2 (Pages 2 - 5)

1          INDEX TO EXHIBITS
2              HEATH HOFMANN
3      WISK AERO V. ARCHER AVIATION
4          Monday, February 20, 2023
5          Ashley Soevyn, CSR No. 12019
6   EXHIBIT NO.       DESCRIPTION       PAGE
         (Provided electronically to the reporter)
7   Exhibit 1    Expert Report of Heath Hofmann    11
             Regarding Invalidity ('033
8            patent)
9   Exhibit 2    Rebuttal Expert Report of Dr.     11
             Heath Hofmann Regarding Trade
10           Secrets
11  Exhibit 3    Rebuttal Expert Report of Dr.     12
             Heath Hofmann Regarding the '033
12           patent
13  Exhibit 4    Curriculum Vitae of Dr. Heath     19
             Hofmann
14
    Exhibit 5    Document entitled HV Charger      266
15           Design Review 12/04/2020; Bates
             No. ARCHER-NDCA-00000794 through
16           ARCHER-NDCA-00000823
17  Exhibit 6    Email dated March 15, 2022 from   272
             Joshua Portlock to Bobby Ng;
18           Bates No. EA0032499
19  Exhibit 7    Meeting 4/3/21; Bates No.         278
             EA0000057 through EA0000058
20
    Exhibit 8    Email dated 10/8/2021 from Brett  305
21           Adcock to Nathan Millecam; Bates
             No. ARCHER-NDCA01884048 through
22           ARCHER-NDCA-01884049
23  Exhibit 9    SAE International document;       309
             Bates No. EA0002060 through
24           EA0002132
25
                                              Page 6

1              ---oOo---
2          THE VIDEOGRAPHER:  Good morning.
3          We are going on the record at 9:15 a.m.
4    on February 20th, 2023.
5          Please note that this deposition --
6    excuse me.
7          Please note that the microphones are
8    sensitive and may pick up whispering and private
9    conversations.  Please mute your phones.  Audio and
10   video recording will continue to take place unless
11   all parties agree to go off the record.
12         This is Media Unit 1 of the
13   video-recorded deposition of Dr. Heath Hoffman,
14   taken by counsel for plaintiff in the matter of
15   Wisk Aero, LLC vs. Archer Aviation, Inc.
16   filed in the United States District Court,
17   Case Number 3:21-cv-02450.
18         The location of the deposition is
19   555 Twin Dolphin Drive, 5th Floor, Redwood Shores,
20   California 94065.
21         My name is Shawna Hynes representing
22   Veritext Legal Solutions, and I'm the videographer.
23         The court reporter is Ashley Soevyn from
24   the firm Veritext Legal Solutions.
25         I am not related to any party in this
                                              Page 7

1    action, nor am I financially interested in the
2    outcome.
3          If there are any objections to
4    proceeding, please state them at the time of your
5    appearance.
6          Counsel and all present, including
7    remotely, will now state their appearances and
8    affiliations for the record beginning with the
9    noticing attorney.
10         MR. SCHMIDT:  Good morning.
11         Patrick Schmidt from Quinn Emanuel
12   Urquhart & Sullivan on behalf of plaintiff
13   Wisk Aero.
14         MR. HEFAZI:  Nima Hefazi also on behalf
15   of plaintiff Wisk Aero.
16         MR. COTE:  Good morning.
17         Frank Cote of Gibson, Dunn & Crutcher on
18   behalf of Archer Aviation, and with me is my
19   colleague, Kim Do, and also the witness, Dr.
20   Hoffman.
21         THE VIDEOGRAPHER:  Thank you.
22         Will the court reporter please swear in
23   the witness, and then Counsel may proceed?
24         THE REPORTER:  Dr. Hoffman, can I please
25   have you raise your right hand?
                                              Page 8

1          Do you solemnly state that the testimony
2    that you're about to give in this deposition will be
3    the truth, the whole truth, and nothing but the
4    truth?
5          THE WITNESS:  I do.
6          THE REPORTER:  Great.  Thank you.
7              EXAMINATION
8    BY MR. SCHMIDT:
9      Q   Good morning, Dr. Hoffman.
10     A   Good morning.
11     Q   Nice to meet you.
12     A   Same here.
13     Q   Is there any reason why you can't testify
14   truthfully and accurately today?
15     A   No.
16     Q   You're not under any medication or
17   anything else that would influence your ability to
18   testify?
19     A   I'm not under any medication that would
20   impact my ability to testify.
21     Q   Thank you.
22         Throughout the deposition, I'm going to
23   be asking you a series of questions.  If, at any
24   time, one of my questions is unclear, I invite you
25   to ask me to clarify.  But if you don't ask me to
                                              Page 9

3 (Pages 6 - 9)

1 BY MR. SCHMIDT:
2     Q   Okay.  Was the second patent you looked
3 at the '833 patent?
4     A   That's probably maybe what it was.
5     Q   The ventilated boom patent?
6     A   I can't -- no.  I -- I -- I -- I guess
7 what I am going to say is, I don't remember.
8         MR. COTE:  I think it's the 328 case.
9         THE WITNESS:  I think there was -- there
10 was a second patent that I was originally looking at
11 and I thought I remembered the number, but,
12 obviously, I did not.
13 BY MR. SCHMIDT:
14     Q   I think we're clear.  Okay.
15         So you did a literature review on the
16 fast charging patents that were at issue in this
17 case, correct?
18     A   The -- yeah, the '033 patent, that's
19 the -- I guess the one that's pertinent in -- yes, I
20 did.
21     Q   You also did a literature review for
22 certain of the trade secrets asserted in this case;
23 is that right?
24     A   That -- yes, I did.
25     Q   Is it fair to say that you did the

Page 34

1 literature review for each of the six trade secrets
2 that you've opined on in this case?
3     A   I did do a literature review for the
4 trade secret, or what we're calling trade secrets.
5 I guess that's -- I want to clarify that at least
6 for the particular topics we are discussing today, I
7 don't believe that any of them are trade secrets
8 per se, and I'll try to refer them as TS, TSs maybe,
9 but -- but I don't want to explicitly state that I
10 believe those are trade secrets.
11     Q   That's fine.  I'm not asking you to
12 endorse the idea that they're trade secrets, but
13 just for the --
14     A   Yeah.  Yeah.  Yeah.  We have to use
15 something to talk about them.
16     Q   You could -- you could use the term,
17 "asserted trade secrets," if you -- if you want to.
18     A   Oh, that's a good one.  I'll try that.
19     Q   So you did the literature search for each
20 of the six asserted trade secrets that you opined on
21 in your reports, correct?
22     A   I did a literature search, yes.
23     Q   Are you the one that turned up all of the
24 publicly available sources that are cited in
25 connection with each of the six trade secrets in

Page 35

1 your report?
2         MR. COTE:  Objection, foundation, calls
3 for speculation.
4         THE WITNESS:  Okay.  So I -- I went
5 through and -- and because sort of the fact that I
6 am an academic, I went through and looked a lot at,
7 you know, the journal publications and -- and
8 whatnot.  And so I -- but -- but I -- but I did not
9 necessarily -- I would not necessarily say that
10 everything, you know, in terms of the references was
11 something that I discovered, but I -- you know,
12 sometimes things are brought to my attention but, by
13 and large, you know, I did conduct a literature
14 review and found a lot of pertinent references that
15 were included.  Not all of them, I guess, but --
16     Q   Okay.  Was the other source of
17 information for public literature the -- the lawyers
18 in this case?
19     A   I did receive information about patents
20 that might be pertinent, and then I reviewed them.
21     Q   Other than publicly available information
22 that you yourself identified and things provided by
23 the lawyers, was there any other source of publicly
24 available literature that you received information
25 from?

Page 36

1     A   I am sorry.  I don't quite understand the
2 question.
3     Q   Well, we -- we know that you did your own
4 public search, correct?
5     A   Uh-huh.
6     Q   And you received some public references
7 from the lawyers, right?
8         Was there anybody else that you received
9 publicly available references from?
10     A   No.  I can't think of anything.
11     Q   When you were looking for public
12 references in connection with trade secrets, what
13 specifically were you looking for?
14     A   Okay.  Sure.  So basically, going through
15 each of the asserted trade secrets, specifically
16 with respect to the 2019.210 Statement, my process
17 was I would go through, kind of look at every
18 sentence in those, you know, there -- within each
19 assert- -- trade secret, they were relatively short,
20 maybe a paragraph or two.  Go through each sentence
21 and say, Okay, you know, find something that shows
22 that, you know, this -- what is mentioned in this
23 particular sentence is out there already and is well
24 known.  Right?  So that was basically the -- the
25 process that I went through when doing that review.

Page 37

10 (Pages 34 - 37)

1   Q   And you felt qualified to undertake that
2  process?
3    A   Oh, yeah.
4    Q   You didn't have any problems with that
5  process?
6    A   No. No. I mean, like I said, these --
7  the trade secrets I'm doing, I -- I have either, you
8  know, extensive direct experience or have
9  significant exposure due to the very related work I
10  do.
11   Q   In -- in forming your opinions on trade
12  secrets in this case, did you consider the
13  interrogatory responses that Wisk served?
14    A   So I did look at interrogatory responses
15  to -- I don't -- can't state to the extent that they
16  affected my opinions, and I don't know that I looked
17  at every single interrogatory response, but I do
18  know that I did see some of them and -- but I
19  don't -- my recollection is that those did not have
20  a significant impact on my thinking.
21   Q   Were the interrogatory responses helpful
22  in understanding more context around the trade
23  secrets?
24    MR. COTE:  Objection, vague.
25    THE WITNESS:  I mean, I feel like -- so
                                          Page 38

1  there any other private conversations you had with
2  Archer employees?
3    A   No.
4    Q   How many times did you speak with
5  Mr. Marius?
6    A   Just one time, I think.
7    Q   Is that a telephone call?
8    A   Yeah, or maybe Zoom, but yeah.
9    Q   About how long did you speak with him
10  for?
11    A   I'd put in on the order of an hour.  I
12  didn't time it, but we had a few things to talk
13  about.
14    Q   What was the general topics that you
15  discussed with Mr. Marius?
16    A   So we talked about the motor modeling
17  issues that have come up here.  You know, sort of
18  his motor modeling experience.  We also sort of
19  talked about, you know, when he's -- specific
20  instances where he's -- he modeled motors and he --
21  you know, we talked about the models that he used
22  and he kind of, you know, just answered questions
23  that I had about assumptions made and this sort of
24  thing.
25    Q   Other than speaking with Mr. Marius about
                                          Page 40

1  once again, I -- the topics that the asserted trade
2  secrets are on, I feel that I have a good
3  understanding of those areas.  And so I -- so yeah,
4  I -- I -- I feel like I -- I -- I kind of used my
5  own experience and background, by and large, and I
6  don't believe I was really influenced in any
7  significant way.
8  BY MR. SCHMIDT:
9    Q   As one of the sources of information you
10  relied on in this case, you had some discussions
11  with Archer employees; is that right?
12    A   I did have a few conversations with
13  Archer employees.
14    Q   Which employees did you speak to?
15    A   Diederik Marius.  The other guy's name is
16  escaping me right now.
17    Q   Ben Greek?
18    A   Thank you.
19    THE REPORTER:  I'm sorry.  Who?
20    MR. SCHMIDT:  Ben Greek.
21    THE WITNESS:  Ben Greek.
22    THE REPORTER:  Greek?
23    THE WITNESS:  Yeah.  Yeah.
24  BY MR. SCHMIDT:
25    Q   Other than Mr. Marius and Mr. Greek, were
                                          Page 39

1  the motor modeling issues, was there anything else
2  you spoke with him about?
3    A   Like I said, it was sort of the
4  application of the models that was also very much
5  under discussion.  I'm trying to think if there was
6  another -- yeah.
7    Do you mind if I look at my report to
8  reflect -- recollect?
9    Q   No.  That's fine.
10    A   Okay.  Do you happen to know where that's
11  located?
12    Q   It's -- your discussions with Mr. Marius
13  are kind of spread throughout, so I don't have a
14  comprehensive list at my fingertips right now.
15    A   Okay.
16    Q   I know -- I know you do discuss your
17  discussions with him.
18    A   Pretty sure it would be in TS12.
19    Q   Yeah.
20    A   And -- okay.  It comes up a lot, so
21  exactly where the conversation that we had is, is --
22  I'll see if I can find it.
23    Q   We'll discuss the Trade Secret 12 stuff
24  in more detail when we get deeper into the
25  deposition, but other than the issues surrounding
                                          Page 41

11 (Pages 38 - 41)

Veritext Legal Solutions
866 299-5127

1  specific, but -- but I -- I think -- and as the
2  subsequent reports show up, it's like, Okay, now,
3  here's all these details about that model, all
4  right, all these equations that come up, for
5  example, in the Collins report that weren't in the
6  2019.210 Statement.  Okay?  So if those are the
7  actual trade secrets, those equations, they weren't
8  in the 2019.210 Statement.  So in that sense, there
9  was no particular ability because they weren't
10 there.
11        So like I said, you know, I think it's --
12 and of course, I'm -- I am not a legal expert, so I
13 don't know how these decisions regarding particular
14 ability but, I mean, that's -- that's the way that I
15 looked at it.
16 BY MR. SCHMIDT:
17    Q   You've rendered the opinion that Dr. Dix
18 and Dr. Collins departed from the trade secret
19 statements, correct?
20    A   I -- they -- so there was sort of new
21 information within their reports that was not within
22 the text provided in the 2019.210 Statement, yes.
23    Q   So the issue is, is that they provided
24 more specificity to what was stated in the --
25 regarding subject matter of the trade secret in the

Page 54

1  2019.210 Statement?
2        MR. COTE:  Misstates testimony.
3        THE WITNESS:  Yeah, I wouldn't say that
4  exactly.  I would say that there is sort of a --
5  a -- a back and forth going on here.  If these
6  equations were the trade secret, then they should
7  have been in the 2019.210 Statement.  Okay?  It's
8  not -- and that -- if -- if -- if those -- if those
9  equations were, which I don't think they are, and I
10 go in great detail in my report about that, right?
11 If those equations were trade secrets, then they
12 should have been in the 2019.210 Statement.  So when
13 you say going into specifics, I -- like I said,
14 there's this really kind of back and forth where,
15 you know, what's the trade secret?  Is it this very
16 broad thing or is it the specific things?  Well, the
17 specific things weren't in the original statement.
18 So can they -- yeah.  I -- I think it's -- you know,
19 once again, it's -- these are things that people
20 can, I guess, have different opinions on, and I can
21 only provide mine.
22 BY MR. SCHMIDT:
23    Q   Okay.  But generally, the issue in your
24 mind with what Dr. Collins and Dr. Dix did, is that
25 they added specificity that was absent from the

Page 55

1  2019.210 Statement, fair?
2        MR. COTE:  Misstates testimony.
3        THE WITNESS:  Yeah.  I don't --
4        MR. COTE:  Asked and answered.
5        THE WITNESS:  Yeah.  And I don't think
6  that that really captures what I'm saying because
7  I'm not trying to make any broad statements about
8  the reports.  I'm just commenting on -- really, I'm
9  just trying to address your original question of
10 particularity.
11 BY MR. SCHMIDT:
12    Q   I'm -- I'm just trying to understand,
13 is -- is your problem with what Dr. Collins and
14 Dr. -- strike that.
15        Is your problem with what Dr. Collins and
16 Dr. Dix analyzed that they brought in the trade
17 secrets, or is it that they got more specific with
18 trade secrets?
19        MR. COTE:  Object -- objection.
20        THE WITNESS:  Well, so --
21        MR. COTE:  Vague.
22        THE WITNESS:  So once again, I -- I -- I
23 think that -- you know, so -- well, okay.  Let me --
24 let me try to talk about it this way.  And this
25 is -- was -- is a bit of a source of frust- --

Page 56

1  frustration on my part.
2        The original 2019.210 Statements were
3  very broad.  And when I say that they lack
4  particularity, I mean in the sense that there would
5  have had to have been something more specific in
6  them for there to have been a trade secret.  Okay?
7  So we were given these very generic things about a
8  motor modeling tool that has certain inputs and
9  outputs, for example, asserted Trade Secret 12.  And
10 then at that point, I told you, I said, Okay, well,
11 I'm going to go through and I'm going to show that,
12 you know, motor modeling tools exist.  They have
13 these inputs and outputs.  They do these things.
14 And -- and then, okay, you can argue because I did
15 that, okay, that there must have been some
16 particulars there.  Okay.  Fine.
17        But now, there's these new equations that
18 are -- have come up and because we -- you know, the
19 process is such that my original reviews were --
20 were done for the first part, and the second part is
21 really just supposed to be kind of responding to
22 those original -- the original 2019.210 Statement,
23 information in that statement, but now there's all
24 this new stuff that has to be addressed now or
25 doesn't, I don't know.  I mean, potentially, I could

Page 57

15 (Pages 54 - 57)

1 just say, Well, you know, it wasn't in the 2019.210
2 Statement so I shouldn't say anything, but I don't
3 know that that's the right thing to do. So you want
4 to be safe, so you have to kind of cover all your
5 bases.
6        And so we talk -- you know, we talk about
7 why these aren't, but it -- you know, this -- this
8 is not the time to have these discussions. This
9 should have happened -- this information should have
10 been provided in the original 2019.210, and then we
11 just go back and forth on what's that statement and
12 not -- so -- yeah.
13 BY MR. SCHMIDT:
14    Q    But as a technical expert in this case,
15 you were able to cover all your bases, as you put
16 it, with respect to everything that was said about
17 the trade secrets; is that fair?
18        MR. COTE: Misstates testimony.
19        THE WITNESS: Yeah. Can you rephrase
20 what -- what you're asking?
21 BY MR. SCHMIDT:
22    Q    Sure.
23        You said you had to cover all your bases.
24        Do you remember giving that testimony?
25    A    Well, I -- I -- I said that, you know,

Page 58

when I went through the 2019, you -- we -- we have
2 to make sure that we can respond to any argument.
3 And like I said, one -- one argument would have just
4 been to say, Well, I refuse to comment on this stuff
5 because it wasn't in the original 2019.210. I
6 didn't do that, but that would have been one
7 argument that I could have made. And, but, you
8 know, once again, you want to kind of err on the
9 side of making sure you fully address everything,
10 provide all the information possible so that the
11 appropriate decisions can be made.
12    Q    Do you feel like you fully addressed
13 everything and provided all the information possible
14 in your expert reports?
15    A    Well, that's another issue. The -- part
16 of it's a matter of timing. Right? We're only
17 given so much time to write these reports. And in
18 these -- you know, when you're starting to introduce
19 all this brand new stuff that hasn't been mentioned
20 before, it -- it kind of messes up the process a
21 little bit. Everything should have been in the
22 original statement.
23    Q    Okay. When you were rendering your
24 misappropriation opinions, you were looking to
25 distinguish what Dr. Dix and Dr. Collins said about

Page 59

1 the trade secrets from Archer's technology; is that
2 fair?
3    A    So we're -- we're changing topics now.
4 Right? We're talking about misappropriation. I'm
5 sorry.
6        Can you -- can you repeat --
7    Q    Well, I --
8    A    -- that?
9    Q    I'm talking about methodology --
10    A    Okay.
11    Q    -- and I'm asking a general question.
12        When you undertook your misappropriation
13 analysis --
14    A    Yeah.
15    Q    -- you were looking to distinguish what
16 Dr. Collins and Dr. Dix said about the trade secrets
17 from what you saw in Archer's technological
18 development, correct?
19    A    That -- yeah. That is the basic approach
20 that I took, yes.
21    Q    Okay. And that's a process that you felt
22 qualified to perform?
23    A    I mean, it's really -- you know, it's
24 less technical, right, and it's really more about
25 what -- who did what, what happened and -- but

Page 60

1 that's really kind of just a matter of, you know,
2 there's the record, there's reports by, you know,
3 various people such as Brett Harrison as to what
4 happened. And I -- I mean, basically, that -- those
5 parts of the report are just me saying, Okay, here's
6 what the record says. So it's not necessarily
7 something that really relies too much on my
8 technical expertise and -- but, yeah, like I said,
9 it's -- it's not any -- it's not rocket science, in
10 and of itself. I mean, maybe -- I don't want to
11 offend anyone who's an expert in misappropriation,
12 but I think it's just a matter of looking at what
13 happened and trying to clarify what happened.
14        MR. SCHMIDT: Okay. Why don't we take
15 our first break?
16        MR. COTE: Yeah.
17        THE VIDEOGRAPHER: This marks the end of
18 Media Number 1.
19        Off the record at 10:22.
20        (Recess.)
21        THE VIDEOGRAPHER: This marks the
22 beginning of Media Number 2 in the deposition of
23 Heath Hof- -- Dr. Heath Hofmann.
24        We're back on the record. The time is
25 10:47.

Page 61

16 (Pages 58 - 61)

HIGHLY CONFIDENTIAL ATTORNEYS' EYES ONLY

1     I, HEATH HOFMANN, do hereby declare under
2  penalty of perjury that I have read the foregoing
3  transcript; that I have made any corrections as
4  appear noted, in ink, initialed by me, or attached
5  hereto; that my testimony as contained herein, as
6  corrected, is true and correct.
7     EXECUTED this_____ day
8  of_____,
9  20____, at_____, _____.
        (City)      (State)
10
11
12

_____
13  HEATH HOFMANN
14
15
16
17
18
19
20
21
22
23
24
25

Page 322

1     I, the undersigned, a Certified Shorthand
2  Reporter of the State of California, do hereby
3  certify:
4     That the foregoing proceedings were taken
5  before me at the time and place herein set forth;
6  that any witnesses in the foregoing proceedings,
7  prior to testifying, were duly sworn; that a record
8  of the proceedings was made by me using machine
9  shorthand, which was thereafter transcribed under my
10  direction; further, that the foregoing is a true
11  record of the testimony given.
12     I further certify I am neither financially
13  interested in the action nor a relative or employee
14  of any attorney or party to this action.
15     IN WITNESS WHEREOF, I have this February
16  23, 2023 subscribed my name.
17
18
19
20
21
22     ASHLEY SOEVYN
23     CSR No. 12019
24
25

Page 323

1  PATRICK SCHMIDT, ESQ.
2  patrickschmidt@quinnemanuel.com
3          February 23, 2023
4  RE: WISK AERO, LLC   vs.  ARCHER AVIATION, INC.
5  February 20, 2023-HEATH HOFMANN-5772525
6  The above-referenced transcript has been
7  completed by Veritext Legal Solutions and
8  review of the transcript is being handled as follows:
9  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Contact Veritext
10    to schedule a time to review the original transcript at
11    a Veritext office.
12  __ Per CA State Code (CCP 2025.520 (a)-(e)) – Locked .PDF
13    Transcript - The witness should review the transcript and
14    make any necessary corrections on the errata pages included
15    below, notating the page and line number of the corrections.
16    The witness should then sign and date the errata and penalty
17    of perjury pages and return the completed pages to all
18    appearing counsel within the period of time determined at
19    the deposition or provided by the Code of Civil Procedure.
20  __ Waiving the CA Code of Civil Procedure per Stipulation of
21    Counsel - Original transcript to be released for signature
22    as determined at the deposition.
23  __ Signature Waived – Reading & Signature was waived at the
24    time of the deposition.
25

Page 324

1  __ Federal R&S Requested (FRCP 30(e)(1)(B)) – Locked .PDF
2    Transcript - The witness should review the transcript and
3    make any necessary corrections on the errata pages included
4    below, notating the page and line number of the corrections.
5    The witness should then sign and date the errata and penalty
6    of perjury pages and return the completed pages to all
7    appearing counsel within the period of time determined at
8    the deposition or provided by the Federal Rules.
9  _X_ Federal R&S Not Requested - Reading & Signature was not
10    requested before the completion of the deposition.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 325

82 (Pages 322 - 325)