1
2
3
4                         UNITED STATES DISTRICT COURT
5                        NORTHERN DISTRICT OF CALIFORNIA
6
7    WISK AERO LLC,                          Case No. 3:21-cv-02450-WHO
                  Plaintiff,
8
9          v.                               [REDACTED] ORDER ON MOTIONS
                                            FOR SUMMARY JUDGMENT,
10   ARCHER AVIATION INC.,                   MOTION TO STRIKE, MOTIONS TO
                                            EXCLUDE, AND DAUBERT MOTIONS
                  Defendant.                Re: Dkt. Nos. 435, 437, 439, 441, 442, 443,
11                                           445, 451, 453, 456, 459, 474
12

        This Order concerns the dispositive motions filed by plaintiff Wisk Aero and defendant

13   Archer Aviation in this patent and trademark case.  For the following reasons, Wisk's motion for

14   summary judgment is DENIED, Archer's motion for summary judgment is GRANTED in part

15   and DENIED in part, Wisk's motion to strike is GRANTED in part and DENIED in part, and the

16   motions to exclude and *Daubert* motions are GRANTED in part and DENIED in part.

17                                     **BACKGROUND**

18   **I.    FACTUAL BACKGROUND**

19        Wisk sued Archer in April 2021 for alleged patent infringement and theft of trade secrets

20   related to Wisk's Electrical Vertical Takeoff and Landing (eVTOL) aircraft technology.  [Dkt. No.

21   1].  Many of the relevant facts are outlined in my prior order denying a preliminary injunction,

22   [Dkt. No. 133], and this order assumes familiarity with those facts.  Additional relevant

23   uncontested background facts are provided below, and much of the submitted evidence as well as

24   disputed facts are discussed throughout the order.

25        Wisk was formed in 2010, and by 2019 it had undergone several name changes and

26   acquired new corporate partners and investors, including Kitty Hawk and the Boeing Company.

27   Declaration of Geoff Long ("Long Decl.") [Dkt. No. 16-27] ¶¶ 2-4.  Wisk was focused on building

28

United States District Court
Northern District of California

United States District Court
Northern District of California

electric, passenger-carrying aircraft, powered by batteries rather than chemical fuel. *Id.* ¶ 5. Wisk previously built five generations of aircraft and by 2019, Wisk began work on a sixth generation called Cora X. *Id.* ¶¶ 6-10; Supplemental Declaration of Geoff Long ("Long Supp. Decl.") [Dkt. No. 92-4] ¶ 9. The Cora X aircraft used 12 rotors and considered the incorporation of six tilting fans, for a "12-tilt-6" configuration. *See* Long Supp. Decl. ¶¶ 9-11.

Archer was formed in 2018 by Brett Adcock and Adam Goldstein. Declaration of Brett Adcock ("Adcock Decl.") [Dkt. No. 58-13] ¶¶ 1, 13-17. By June 2019, Archer had a prototype eVTOL aircraft, *id.* ¶ 19, but soon learned its design was unlikely to succeed commercially, *id.* ¶ 20. In September 2019 Archer began working with third party FlightHouse Engineering ("FHE") to help with designs. *Id.* ¶¶ 23-26. By October 2019, Archer had started recruiting engineers and employees from Wisk. *Id.* ¶¶ 33, 36, 48-49; Long Decl. ¶¶ 11-12. By December 2019, at least one engineer from Wisk (Tom Muniz) began working at Archer, and others soon followed. Adcock Decl. ¶¶ 39, 49. At the same time, Archer was recruiting engineers from other aircraft companies with experience in the eVTOL industry. *Id.* ¶¶ 50-51. By February 2020, Archer had selected a new "12-tilt-6" aircraft configuration for its demonstrator aircraft, Maker. Declaration of Geoff Bower ("Bower Decl.") [Dkt. No. 58-20] ¶¶ 18-25.

On January 31, 2020, Wisk submitted a provisional patent application, apparently in response to learning about plans for Archer's design for its Maker aircraft. [Dkt. No. 17-19]. The application contained the following depiction:

 

*Id.*

In February 2021, Archer presented a visual depiction of the Maker aircraft to investors, including the following illustration:

 

[Dkt. No. 16-3].

On April 6, 2021, Wisk filed this lawsuit, arising out of concerns that the Maker aircraft infringed several of Wisk's patents and that former Wisk engineers stole and used at Archer trade secrets developed during their time at Wisk.  [Dkt. No. 1].  The same day, Wisk posted to its website a blog about the lawsuit, entitled "Why We're Taking Legal Action Against Archer Aviation."  [Dkt 451-11] ("Blog Post").  On May 19, 2021, the day Wisk filed for a preliminary injunction, it "update[d]" the blog post with two additional sentences about a related "criminal investigation into Archer relating to the theft and use of Wisk's intellectual property."  *Id.*

## II.    PROCEDURAL BACKGROUND

As noted above, Wisk filed this suit in April 2021 [Dkt. No. 1] and moved for a preliminary injunction the following month.  [Dkt. No. 16].  Wisk also filed a 2019.10 Disclosure. ("Disclosure") [Dkt. No. 45-5] (Kapgan Ex. E).  After permitting the parties to engage in extensive initial discovery, I denied Wisk's motion for a preliminary injunction.  ("Order Denying PI") [Dkt. No. 133].  That order also denied Archer's motion to dismiss as well as Archer's motion to strike Wisk's trade secrets for lack of particularity.  *Id.*  Wisk subsequently filed its operative second amended complaint.  ("SAC") [Dkt. No. 148].

Archer filed counterclaims and amended counterclaims asserting state law causes of action, including defamation, and for declaratory judgment of noninfringement of the '036 Patent.  I subsequently denied Wisk's motion to dismiss and its anti-SLAPP motion to strike.  ("Order on Counterclaims") [Dkt. No. 146].  Archer then filed its operative second amended counterclaims. ("SACC") [Dkt. No. 154].

I also held a Markman hearing and construed certain claims.  ("Claim Construction") [Dkt. No. 258].  I later granted Wisk leave to serve amended infringement contentions.  [Dkt. No. 348].

1   Throughout the litigation, the parties have filed at least 23 letters regarding discovery

2   disputes, which have mostly been addressed by the Honorable Donna Ryu.  [Dkt. Nos. 36, 69, 86,

3   151, 164-65, 167, 186, 191, 235, 241, 246, 260, 271, 278, 281, 282, 284, 329, 346, 371-73, 377,

4   396, 411].  I also denied Wisk's motion for sanctions arising from allegations that Archer's

5   employee, Scott Furman, intentionally hid and deleted files that he took when he left Wisk.  [Dkt.

6   No. 423].

7   Now, Wisk moves for summary judgment on Archer's state law counterclaims and for

8   declaratory judgment of infringement of the '036 patent.  ("P. Mot.") [Dkt. No. 451].  Archer

9   opposed.  ("D. Oppo.") [Dkt. No. 497].  Wisk replied.  ("P. Repl.") [Dkt. No. 529].  Archer also

10  moves for summary judgment on ten trade secrets and two patents.  ("D. Mot.") [Dkt. No. 474[1]].

11  Wisk opposed.  ("P. Oppo.") [Dkt. No. 498].  Archer replied.  ("D. Repl.") [Dkt. No. 528].  Wisk

12  also moves to strike Archer's Undisclosed Non-Infringing Alternatives.  ("Mot. Strike") [Dkt. No.

13  441].  Archer opposed.  ("Oppo. Strike") [Dkt. No. 484].  Wisk replied.  ("Repl. Strike") [Dkt. No.

14  511].  Additionally, the parties filed nine *Daubert* motions and motions to exclude certain expert

15  testimony.  Together, the parties' briefing alone consisted of over 800 pages, with thousands and

16  thousands of pages of exhibits.

17  I held a hearing on these motions on May 12, 2023, at which counsel for both parties

18  appeared.

19  **LEGAL STANDARD**

20  Summary judgment on a claim or defense is appropriate "if the movant shows that there is

21  no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

22  law."  Fed. R. Civ. Proc. 56(a).  In order to prevail, a party moving for summary judgment must

23  show the absence of a genuine issue of material fact with respect to an essential element of the

24  non-moving party's claim, or to a defense on which the non-moving party will bear the burden of

25  persuasion at trial.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once the movant has

26  made this showing, the burden then shifts to the party opposing summary judgment to identify

27

28  [1] Archer filed multiple corrections of the docket with respect to its motion.  [Dkt. Nos. 459, 456].
Its operative motion is found at Dkt. No. 474.

United States District Court
Northern District of California

"specific facts showing there is a genuine issue for trial." *Id.* The party opposing summary judgment must then present affirmative evidence from which a jury could return a verdict in that party's favor. *Anderson v. Liberty Lobby*, 477 U.S. 242, 257 (1986).

On summary judgment, the Court draws all reasonable factual inferences in favor of the non-movant. *Id.* at 255. In deciding a motion for summary judgment, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* However, conclusory and speculative testimony does not raise genuine issues of fact and is insufficient to defeat summary judgment. *See Thornhill Publ'g Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## DISCUSSION

## I.  WISK'S MOTION FOR SUMMARY JUDGMENT

### A.  Archer's State Law Counterclaims

Archer filed several counterclaims against Wisk, asserting interference with contractual relations, SACC ¶¶ 65-71, interference with prospective economic advantage, *id.* ¶¶ 72-78, defamation, *id.* ¶¶ 79-91, and unfair business practices under California's Unfair Competition Law ("UCL"), *id.* ¶¶ 92-98. Archer also sought declaratory judgment of noninfringement and invalidity of the '036 Patent. *Id.* ¶¶ 99-106. Wisk now moves for summary judgment on the four state law claims, as well on the claim seeking declaratory judgment of noninfringement and invalidity of the '036 patent.

The state law counterclaims arise from Wisk's publication of: a blog post on its website on April 6, 2021, made the same day it filed this lawsuit; a press release that day consisting of a paragraph explaining that Wisk filed suit, two bullet points about the allegations, and a hyperlink to the blogpost; and an "update" to that post it made on May 19, 2021 that added a paragraph stating—as relevant here—that there was an FBI and DOJ "criminal investigation into Archer relating to the theft and use of Wisk's intellectual property." Order on Counterclaims 2:6-4:11; *see also* [Dkt 451-11] ("Blog Post"). My prior Order dismissing Wisk's anti-SLAPP motion to strike and its motion to dismiss the counterclaims reproduces the relevant sections of the blogpost. Order on Counterclaims 2:11-4:2. That Order also provided:

There appears . . . to be no real dispute between the parties.  The press release apparently was put out both in Wisk's website and via wire service.  Wisk does not defend the post on its website on the basis of [the Fair Report] privilege (nor, presumably, could it).  Archer's Opposition admits that it only challenges the statement to the extent it was published on its website.  [citing Dkt. No. 123 at 18].  **Both parties will be bound by those representations going forward: Archer cannot impose liability for transmitting the press release to a wire service or the damages that results from that transmission; Wisk cannot argue that the posts on its own website are shielded by the fair reporting privilege.**

*Id.* 17:15-22 (emphasis added).

Wisk makes four arguments in support of summary judgment for the state law claims and two in support of summary judgment for the '036 patent claim.  I address each in turn.

### 1.      Elements of the Claim: Damages and Causation

Wisk argues that Archer failed to present any evidence of causation or damages for the defamation and interference claims.  In a nutshell, Wisk says that Archer's only source of evidence for its counterclaims is the expert report from and testimony of Professor Todd Milburn, but that Milburn failed to identify harm or damages, and failed to quantify damages caused "just" by Wisk's statements in the blog post.  P. Mot. 9:3-13:25; *see* Expert Report of Todd Milburn ("Milburn Rep.") [Dkt. 497-30].[2]  Archer counters that it is not required to show but-for causation or to quantify damages, and that its expert sufficiently showed that the statements harmed and economically damaged Archer to create a material dispute of fact for the jury.  D. Oppo. 10:19-14:5.

Damages are a required element of each of Wisk's state law claims.  *See* Cal. Civ. Code §§ 44-46 (defamation)[3]; *United Nat'l Maint., Inc. v. San Diego Convention Ctr., Inc.*, 766 F.3d 1002, 1006 (9th Cir. 2014) (citing *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 791 P.3d 587, 589-90 (1990)) (intentional interference with contractual relations); *Pac. Gas &*

---

[2] Wisk's motion to exclude the Milburn Report is denied.  *Infra* Part IV.D.

[3] Archer argues that it does not have to show actual damages for Wisk's statements that it alleges were "defamatory on their face," D. Oppo. 13:22-14:5, but Archer still must establish damages—or a genuine dispute of material fact as to damages—for all other statements as well as the other causes of action.

*Elec. Co.*, 791 P.2d at 590 n.2 (noting intentional interference with prospective economic advantage requires showing "economic harm"); *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 246 P.3d 877, 881 (2011) (noting UCL claim requires that a plaintiff "lost money or property").

Both of Archer's intentional interference claims also require it "to prove causation." *Franklin v. Dynamic Details, Inc.,* 116 Cal. App. 4th 375, 391 (2004) (citations omitted). California uses the "substantial factor" test to determine causation for these torts. *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008) (citing *Franklin*, 116 Cal. App. 4th at 391).[4] While "[t]he substantial factor standard generally produces the same results as does the 'but for' rule of causation . . . the substantial factor test is a 'broader rule of causality than the "but for" test.'" *Id.* at 909 (citations omitted); *see also Viner v. Sweet*, 30 Cal. 4th 1232, 1240, 70 P.3d 1046, 1051 (2003) ("[T]he 'substantial factor' test subsumes the traditional 'but for' test of causation."). Indeed, the Supreme Court of California has said that the substantial factor standard "reach[es] beyond" the but-for test "to satisfactorily address other situations, such as those involving independent or concurrent causes in fact." *Rutherford v. Owens-Ill., Inc.*, 16 Cal. 4th 953, 969, 941 P.2d 1203, 1214 (1997) (citations omitted). Proving that a defendant's action was "a concurrent independent cause of the harm" is sufficient for a plaintiff to establish causation. *Viner*, 30 Cal. 4th at 1241, 70 P.3d at 1051; *see also Venegas v. Se. Airlines Co.*, No. CV 06-7195-VBF(EX), 2007 WL 3196479, at *1 (C.D. Cal. Oct. 23, 2007) (applying California law and noting that "if two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about" (quoting Rest. 2d Torts, § 432(2)).

Archer presents sufficient evidence that it suffered economic harm and damages from Wisk's statements on its blog post, and that the blog post was a substantial factor in causing the

---

[4] *See also* Cal. Civil Jury Instructions (2022) No. 430 – Causation: Substantial Factor ("A substantial factor in causing harm is a factor that a reasonable person would consider to have contributed to the harm.  It must be more than a remote or trivial factor.  It does not have to be the only cause of the harm.").

United States District Court
Northern District of California

harm and damages.  The Milbourn report found that the closing of the merger was delayed by

three months, Milbourn Rep. ¶¶ 15-16, in part to maintain investor confidence, *id.* ¶ 83, which had

been affected by the investors' awareness of the blog post, *id.* ¶¶ 65-66.  For example, some

investors insisted that additional due diligence be performed before closing.  *Id.* ¶¶ 80-84.  One

investor specifically referenced the blog post in an email to his investment firm's general counsel

and to Archer's co-founder.[5]  *Id.* ¶¶ 71-72.  Together, this presents evidence that investors knew

specifically of the *post* and that the closing was delayed to assuage concerns related to that

knowledge.  That evidence, depending on its veracity, could show that the blog post independently

caused the delay and was, regardless of other then-existing factors, a "concurrent independent

cause" of the harm.  *See Viner*, 30 Cal. 4th at 1241, 70 P.3d at 1051.  Though Wisk points to

evidence suggesting that it was Atlas Crest's decision to delay the merger and that neither Atlas

Crest nor other investors relied on the blog post in making that decision, *see* P. Mot. 10:17-11:8;

P. Repl. 4:13-18, this merely creates disputes of fact, given Archer's evidence to the contrary.

Accordingly, Archer meets its burden at this stage to produce evidence showing a material dispute

of fact.  The question will go to the jury.

　　　　Milbourn further found that Archer was economically harmed by the delay.  In addition to

being forced to decrease its valuation by over $1 billion, Milbourn Rep. ¶¶ 16, 69, 77, and

obtaining over $240 million less in funding than expected, *id.* ¶ 16, Archer lost $7.5 million

through efforts to secure interim funding to cover the delay, *id.*  Taken together, this is enough

evidence to establish that the blog posts—not the statements to the press or the market

conditions—were a substantial factor and an independent force in causing economic harm to

Archer, *at least* to the tune of $7.5 million.  I am not persuaded by Wisk's argument that the

decreases in valuation and funding did not constitute economic harm, but even if that were true,

Archer still shows it was economically damaged by the delay.

　　　　Wisk's other arguments are unconvincing.  Wisk focuses on Milbourn's "admission" that

---

[5] Wisk contests whether this investor was concerned about the blog post or the lawsuit more
generally, *see* P. Repl. 4:21-25, but that merely creates a disputed fact for resolution at trial.

any harms to Archer "were the result of many factors" and that Milbourn could not identify harms caused "just" by Wisk's blog posts or quantify damages specifically caused by the blog post. But Wisk concedes in its reply that the substantial factor standard applies to intentional tort claims, including where there are multiple concurrent causes,[6] *see* P. Repl. 2:13-3:3 & n.1; *see also Venegas*, 2007 WL 3196479, at *1; *Viner*, 30 Cal. 4th at 1241, 70 P.3d at 1051, and its argument to the contrary fails.

And Wisk's insistence that Milbourn had to "separate out" "the effects of the other contemporaneous events" and had to "quantif[y]" the specific damages that the blog post caused is untethered to the law. *See* P. Mot. 11:19-12:2; P. Repl. 3:24-25. True, Milbourn did not distinguish the economic harm caused by the blog posts from that caused by the lawsuits, Deposition of Todd Milbourn ("Milbourn Depo.") [Dkt. No. 452] Ex. A at 111:8-10, and he said that the economic harm to Archer "cannot be uniquely identified . . . to the litigation itself, to the alleged defamatory statements, or to the [market changes]," *id.* at 113:9-16; *see also id.* at 119:23-120:3. But Wisk cites no law, and I could find none, showing that Archer must prove how much in damages were caused by the blog posts as opposed to the litigation or the market, so long as it proves the posts were a "substantial factor" in the damage.[7] Milbourn's testimony supports his report by reiterating his findings that the blog posts specifically contributed to investor uncertainty, *id.* at 112:3-10, that the posts caused the need to increase due diligence, *id.* at 114:12-22, and that they delayed the merger, *id.* 120:24-121:3. By asserting that the posts did not cause

_____

[6] Wisk then cites Hawaii law to show that but for causation applies when there are multiple concurrent causes. P. Mot. 3:13-16. These claims were brought under California law.

[7] Wisk's citations are unconvincing. Citing antitrust law about protecting the jury from the need to engage in "'speculation or guesswork' in determining the amount of damages," the court in *Toscano v. PGA Tour, Inc.*, 201 F. Supp. 2d 1106, 1124 (E.D. Cal. 2002), granted summary judgment because the expert failed to "provide any evidence on damages." In *McGlinchy v. Shell Chemical Co.*, 845 F.2d 802, 807-08 (9th Cir. 1988), the Ninth Circuit affirmed that summary judgment was proper where the district court excluded expert testimony related to damages and then held that without the testimony, there was "no showing at all about causation or fact of damages." Here, unlike both of those cases, the expert report is admissible and provides evidence of damages—Milbourn simply did not separate damages caused by the statements from damages caused by the litigation or market, which is not a requirement found in either case. And *MicroStrategy Inc. v. Business Objects, S.A.*, 429 F.3d 1344, 1353-54 (Fed. Cir. 2005), applied Virginia law, not California law, and was also a case where the district court excluded any evidence of damages or causation, and so is similarly inapplicable.

1    the delay, Wisk merely creates a disputed issue of material fact that can be resolved by the jury.

2        In short, Archer submitted sufficient evidence to show causation and damages for its

3    intentional tort claims.  Wisk's motion is DENIED as to this argument.

4                    **2.        Fair Reporting Privilege**

5        Archer alleges and provides evidence of economic harm caused by the blog statements

6    themselves and also from the "amplification" of the statements to the public and investors through

7    the media.  Wisk asserts that basing damages on the transmission of the post to the media is

8    impermissible under California's fair reporting doctrine.  Wisk does not argue that the blog itself

9    is protected by the fair reporting privilege and Archer does not argue that the press release

10   transmitted to the media can form the basis of any of its damages.[8]

11       California Civil Code section 47(d), known as the "fair report privilege[,] confers an

12   absolute privilege on any fair and true report in, or a communication to, a public journal of a

13   judicial proceeding, or anything said in the course thereof."  *Gallagher v. Philipps*, 563 F. Supp.

14   3d 1048, 1082 (S.D. Cal. 2021) (citations omitted); *see also Healthsmart Pac., Inc. v. Kabateck*, 7

15   Cal. App. 5th 416, 431 (2016), *as modified* (Jan. 10, 2017) (same).  Though the question of

16   whether the report is fair and true is one for the jury, "whether a privileged occasion exists within

17   the meaning of [section 47(d)] is for the court to decide."  *Healthsmart Pac.*, 7 Cal. App. 5th at

18   431 (citation omitted); *see also Gallagher*, 563 F. Supp. 3d at 1082 (same).

19       First, I note the differences between the content of the blog statements and the press

20   release.  The former consists of many paragraphs about Wisk's history and status in the industry,

21   its discovery of "significant and troubling evidence" including "thousands of highly confidential

22   files" that indicate Archer is "using . . . stolen Wisk technology," Wisk's assertions that Archer's

23   development timeline is "virtually impossible," as well as side by side photos of the patent

24   application and one of Archer's designs, ending with a hyperlink to the complaint and press

25   release.  [Dkt. No. 141-1].  In contrast, the press release contains one paragraph stating that Wisk

26

27   _____

[8] This aligns with my prior order denying Wisk's anti-SLAPP motion to strike, where I explained
     that "Archer cannot impose liability for transmitting the press release to a wire service or the
28   damages that results from that transmission; Wisk cannot argue that the posts on its own website
     are shielded by the fair reporting privilege."  Order on Counterclaims 17:15-22.

United States District Court
Northern District of California

"filed a lawsuit" and quoting from the lawsuit, a line saying "[a]s detailed in the filing in federal court" followed by two bullet points about the litigation with tentative words like "discovery of suspicious files" and the "design appears to be a copy," ending with a direct quote from the complaint and a paragraph about Wisk, with hyperlinks to the blog post and to Wisk's website. [Dkt. No. 141-2]. The statements, content, and format of the blog and press release are not the same.

And it is important to emphasize that while the press release is clearly protected by the doctrine, the statements on the blog are not because they are not statements and reports made "to" the media in a "public journal." *Cf. Am. Dental Ass'n v. Khorrami*, No. CV 02-3853 DT(RZX), 2004 WL 3486525, at *3 (C.D. Cal. Jan. 26, 2004) (finding, where defendant posted allegedly defamatory statements on his website, the statements were not made to media because the website "d[id] not serve to inform the public in general" and so was not a "'public journal' as intended by Section 47(d)"). The parties point to no cases that find posting on a blog or on social media automatically brings a statement under the protection of the privilege; such a finding would likely be contrary to the purpose of California law, which is to "provide[] . . . breathing room for newspapers to explain the basis of a judicial proceeding without at the same time opening themselves up to exposure for defamation liability." *Id.* (quoting *Dorsey v. Nat'l Enquirer, Inc.*, 973 F.2d 1431, 1437 (9th Cir. 1992)). Privileging every blog and social media post would likely exceed the scope and purpose of the statute.

Sharing the blog posts with the media does not transform the post and statements into protected communications under the privilege either. The nature of the underlying statements are still merely posts on a blog: they are not reports or communications made to the news media. *Cf. id.* Wisk seems to argue that the privilege protects *all* communications made to the media, but that is contrary to the plain language of the statute and is not what California case law provides. *See Healthsmart Pac.* 7 Cal. App. 5th at 431-32 (clarifying that while the privilege protects those who communicate information to the media, it specifically protects third parties who "communicate[] . . . *already privileged material* to the press" (emphasis added)).

Wisk also seems to argue that because it included a hyperlink to the blog post and

United States District Court
Northern District of California

United States District Court
Northern District of California

1  complaint in its communications transmitted to the media, that means the content found by

2  clicking on the hyperlink is incorporated into the privilege that applies to the transmission itself.

3  *See, e.g.*, [Dkt. No. 451-52] (P. Mot. Ex. AY) (press communication).  For support it cites *Adelson*

4  *v. Harris*, 973 F. Supp. 2d 467, 482 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017), in which

5  the district court in New York reasoned that statements were protected by the Nevada fair

6  reporting doctrine where they quoted from and hyperlinked to a news report that "accurately

7  describe[d] and quote[d] from" a judicial document.  *Id.* at 483.  The *Adelson* court was addressing

8  a distinct question arising under *Nevada* fair reporting law—whether the statements had been

9  properly attributed to the litigation, *see id.*—which is not the issue in this motion.  More

10  importantly, *Adelson* does not stand for the proposition that including *unprotected* statements on a

11  website and then sending the link to the media transforms the underlying statements into protected

12  communications, because there the plaintiff conceded that the underlying statements were

13  protected—they were quotes from judicial proceedings.  *See id.*  Here, as explained, the

14  underlying statements are not protected.  *See also* Order on Counterclaims 17:15-22.

15      Accordingly, the fair report doctrine does not foreclose Archer's assertion of damages

16  based on the "amplification" of the blog post by the media.  The post and transmission do not fall

17  under the purview of the doctrine.  *See Healthsmart Pac.*, 7 Cal. App. 5th at 431 (explaining that

18  the question of whether the statements fall under the doctrine is a question of law, and the question

19  of whether they are protected as fair and true is a subsequent question for the jury).

20      Wisk's motion is DENIED as to this argument.

21          **3.   First Amendment**

22      Wisk argues that the statements in its blog posts are nonactionable under the First

23  Amendment because they are protected opinions, because the criminal investigation statement was

24  true, and because Archer is a limited public figure and must but cannot show actual malice.  P.

25  Mot. 14:23-20:11.

26          **a.   Protected Opinions**

27      "The sine qua non of recovery for defamation . . . is the existence of falsehood."  *ZL*

28  *Techs., Inc. v. Does 1-7*, 13 Cal. App. 5th 603, 624 (2017) (citations omitted).  "Because the

statement must contain a provable falsehood, courts distinguish between statements of fact and statements of opinion for purposes of defamation liability.  Although statements of fact may be actionable as libel, statements of opinion are constitutionally protected." *Id.* (citations omitted).  "[W]here an expression of opinion implies a false assertion of fact, the opinion can constitute actionable defamation." *Id.* (citations omitted).

"Although defamation is primarily governed by state law, the First Amendment safeguards for freedom of speech and press limit state law." *Underwager v. Channel 9 Australia*, 69 F.3d 361, 366 (9th Cir. 1995) (citing *N.Y. Times v. Sullivan,* 376 U.S. 254, 264 (1964)).  "Pure opinions—'those that do not imply facts capable of being proved true or false'—are protected by the First Amendment." *Amaretto Ranch Breedables, LLC v. Ozimals, Inc.*, No. CV 10-5696 CRB, 2013 WL 3460707, at \*3 (N.D. Cal. July 9, 2013) (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1153 n.10 (9th Cir. 1995)).  "Assertions of fact and statements that 'may imply a false assertion of fact, however, are not protected.'" *Id.* (quoting *Partington*, 56 F.3d at 1153 n.10).

Whether a statement is an assertion of fact or opinion is a question of law for the court to decide.  *Dworkin v. Hustler Mag., Inc.*, 867 F.2d 1188, 1193 (9th Cir. 1989).  "[B]ut if the challenged statement or statements are 'reasonably susceptible of an interpretation which implies a provably false assertion of fact,' then they may be considered by the jury 'to determine whether such an interpretation was in fact conveyed.'" *Manufactured Home Cmty. Inc. v. Cnty. of San Diego*, 544 F.3d 959, 963 (9th Cir. 2008) (quoting *Kahn v. Bower*, 232 Cal. App. 3d 1599, 1608 (1991)).

The Ninth Circuit "examine[s] the totality of the circumstances" to determine whether a statement implies a factual assertion, with three main inquiries:

> First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work.  Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation.  Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Underwager*, 69 F.3d at 366 (citations omitted); *see also Amaretto*, 2013 WL 3460707, at \*3

United States District Court
Northern District of California

1    (same); *see also Manufactured Home*, 544 F.3d at 963-65 (addressing the three inquiries in the

2    same analysis).

3    　　　The broad context would favor finding that these statements were opinions.  Similar to

4    *Amaretto*, 2013 WL 3460707, at *4, where the plaintiff made statements on its blog to "explain

5    the reasons behind" the legal steps it had taken, here too Wisk put these statements on its blogs to

6    explain "why [it was] taking legal action against Archer."  And with this context, "readers are less

7    likely to view statements as assertions of fact" because they were clearly provided in a context—

8    on the speaker's own blog—where statements would be more likely viewed as part of a debate

9    than as purely factual.  *See id.*  Archer argues that unlike *Amaretto*, here Wisk's blog did not

10   provide a chat or other forum to debate the statements, but I am more persuaded by the reasoning

11   in *Amaretto* that even absent that debate, a reader of Wisk's own blog—which appears on its own

12   website, where the company is understandably promoting its own business—"would realize" that

13   Wisk "wrote it from its own perspective to paint itself in a better light."  *Id.*; *see also Underwager*,

14   69 F.3d at 366 (looking to the "setting" and "format" in which the statements were made).

15   　　　But the specific context favors finding these statements were facts.  I look to the "content

16   of the statements," including the use "of figurative or hyperbolic language . . . and the reasonable

17   expectations of the audience in that particular situation."  *Underwager*, 69 F.3d at 366.  There is

18   essentially no "figurative or hyperbolic language" used in the blog.  *See id.*  Rather, the statements

19   contain extremely specific factual assertions, including diagrams understandable by a layperson,

20   with significant context about the industry and development of Wisk's own business and products

21   as well as its position as a leader in the field.  *See* Blog Post.  Wisk unambiguously states that it

22   has "significant and troubling evidence" of Archer's theft and misappropriation, including

23   "thousands of highly confidential files" showing "stolen Wisk technology."  *Id.*  The "reasonable

24   expectations" of the relevant audience—readers of Wisk's blog or recipients of the hyperlink, *see*

25   *Underwager*, 69 F.3d at 366—would understand that Wisk was a leader in the field with the

26   knowledge and basis to make these findings, especially the ones concerning whether it would be

27   "virtually impossible" for Archer to make so much technological progress so quickly without

28

14

stealing. *See Info. Control Corp. v. Genesis One Comp. Corp.*, 611 F.2d 781, 784 (9th Cir. 1980)[9] (noting the importance that the statements were made in a "trade publication" to an audience "who would be expected to be aware of the nature of the litigation . . . and the responses that might be evoked").

Wisk's inclusion of the link to the complaint and press release also does not transform its statements into opinions, given the specific context. *Cf. Amaretto*, 2013 WL 3460707, at *4. True, statements are generally nonactionable under the First Amendment "when an author outlines the facts available to him [sic], thus making it clear that the challenged statements represent his [sic] own interpretation of those facts and leaving the reader free to draw his [sic] own conclusions." *Partington*, 56 F.3d at 1156-57. But in *Partington*, the author provided the facts to the reader and *then* provided its opinion, giving the reader clear opportunity to draw her own conclusions; the complaint here was seemingly included as an afterthought at the end of the blog and provided much less of such opportunity. Also unlike *Partington*, Wisk failed to provide *all* of the relevant facts from which the reader could draw its own conclusions. For example, as Archer points out, Wisk said that it would be nearly impossible to make the progress Archer made on its timeline but left out that it could very well be possible by implementing an industry method of employing third-party consultants. *See also Manufactured Home*, 544 F.3d at 965 (holding that "a reasonable listener could conclude" that the defendant's statements implied there were other, unstated facts supporting her comments). Without that context, it is more likely the reader would view this as a fact and not an opinion. Finally, *Partington* emphasizes the importance of the specific language used in the statements, including the use of "in my opinion," question marks, and hyperbolic language. 56 F.3d at 1156-57. While I "give weight to cautionary terms used" by the publisher of the statement, there is no "cautiously phrased" language used in the blog post that would indicate the statements are mere opinions. *Info. Control Corp. v. Genesis One Comp. Corp.*, 611 F.2d 781, 784 (9th Cir. 1980) (citation omitted). Accordingly, given the specific

---

[9] This case, cited by Wisk, came before California's anti-SLAPP statute was established in 1992. Although it is still relevant to the analysis of the First Amendment issues, it does not discuss the issues in the same context as more recent cases.

United States District Court
Northern District of California

context of the statements, a reasonable reader would view these as opinions.

Further, the statements themselves are sufficiently factual to be proved true or false.  *See Underwager*, 69 F.3d at 366.  Each statement underlies the basis of this litigation, the very point of which is to prove the statements true or false and determine whether Archer infringed on Wisk's patents or stole its trade secrets.  This favors finding that the statements are facts, not opinions.

Given the totality of the circumstances, "[a] reasonable juror could conclude" that these statements are facts or that they are opinions; consequently, the question must go to the jury.  *See Manufactured Home*, 544 F.3d at 965.[10]  Summary judgment is denied on this basis.

### b.      Truth

As stated in Archer's Second Amended Counterclaims, the contested phrase comes from Wisk's update to its blog post, where it wrote that the FBI and DOJ were conducting a "criminal investigation into Archer relating to the theft and use of Wisk's intellectual property."  SACC ¶ 57.  Wisk argues that the quoted portion is true and so cannot serve as the basis for a defamation

---

[10] In *Manufactured Home*, the plaintiff investment group sued the defendant, a local government representative, for making allegedly false and defamatory statements to the media about the plaintiff's imposition of a rent increase.  544 F.3d at 961-62.  The statements included that the plaintiff was "a greedy, profit-driven company," that she would be "interested" to see if the actions were fraudulent and if civil or criminal actions were filed, that the rent increases were "rent gouging at its worst" and "well above" the legal limit, and that the plaintiff was a "bad" and "predatory" company that had "lied."  *Id.*  The Ninth Circuit reasoned that "a reasonable factfinder could disagree" whether the statements were opinions or facts and so rejected the district court's findings that the statements were nonactionable opinions.  *Id.* at 964.  The majority rejected the dissent's contrary finding by reasoning that "a reasonable listener could conclude that [the defendant's] statements were founded in part on an objective, factual basis, especially in light of [her] role as a public servant and her having made some of the relevant statements in response to a news reporter's questions."  *Id.* at 965.  The context here is different because Wisk is not a public official and its statements were made on its blog rather than to a reporter.  But if a reasonable listener could conclude that the public official's comments in *Manufactured Homes* were facts—including that the company "lied" and was "predatory," that she was "interested" to see whether criminal charges would be filed, and that the company was engaging in "rent gouging at its worst"—then surely a reasonable juror here could conclude that Wisk's statements—including that Archer is using "stolen Wisk technology" and "infringing [Wisk's] patents," that the similarities between designs "could not have been a coincidence," that it was "virtually impossible" for Archer to make so much progress in such little time, and that there was "a criminal investigation into Archer"—were facts, rather than opinions.

1   claim.  The parties each submitted expert reports on the truth of this statement, which both include

2   supporting documents purportedly showing that there was or was not an investigation "into"

3   Archer.  *See* Expert Report of Louis Freeh ("Freeh Rep.") [Dkt. No. 442-2]; Expert Report of

4   Miranda Kane ("Kane Rep.") [Dkt. No. 435-3].

5       "Substantial truth is a defense to defamation and trade libel claims."  *Glob. Plasma Sols.,*

6   *Inc. v. IEE Indoor Env't Eng'g*, 600 F. Supp. 3d 1082, 1097 (N.D. Cal. 2021) (citing *Karimi v.*

7   *Golden Gate Sch. of L.*, 361 F. Supp. 3d 956, 977 (N.D. Cal. 2019), *aff'd*, 796 F. App'x 462 (9th

8   Cir. 2020)).  Whether a statement is substantially true is "[g]enerally . . . a question of fact for the

9   jury" so long as "substantial truth is not evident to the court."  *Id.* at 1097-98 (first citing *Maheu v.*

10  *Hughes Tool Co.*, 569 F.2d 459, 465-66 (9th Cir. 1977); and then quoting *D.A.R.E. Am. v. Rolling*

11  *Stone Mag.*, 101 F. Supp. 2d 1270, 1288 (C.D. Cal. 2000)).

12      The crux of the parties' disagreement is this: Wisk's expert, a former director of the

13  Federal Bureau of Investigation ("FBI"), uses the Department of Justice ("DOJ") definition for

14  "subject" to determine that Archer was the subject of the DOJ and FBI investigation, and so there

15  was an investigation "into" Archer.  Freeh Rep. ¶¶ 31-39.  But Archer's expert, a former Assistant

16  United States Attorney, uses the DOJ definition for "target" to determine that Archer was not the

17  target of the DOJ and FBI investigation, and so there was not an investigation "into" Archer.

18  Kane Rep. ¶¶ 37-47.  Archer's counterclaims assert that the statement was defamatory in part

19  because it untruthfully suggests "that Archer engaged in unlawful conduct and/or is the subject of

20  a criminal investigation."  SACC ¶ 88-90.

21      Both parties present strong evidence that the investigation was or was not "into" Archer,

22  including the expert reports, letters from the investigation, and other contemporaneous documents.

23  Under one definition of the sentence, the statement it is true.  Under another, it is false.  The

24  question turns on which definition applies here, which likely depends in part on how Wisk

25  understood the situation and its own words.  With conflicting evidence from both sides, I cannot

26  resolve this dispute on summary judgment.  This is a question of fact that the jury must resolve in

27

28

United States District Court
Northern District of California

17

order to determine the "substantial truth" of the statement.[11]  *See Global Plasma*, 600 F. Supp. 3d at 1097-98.  Wisk's motion is DENIED as to this argument.

### c.     Public Figure and Actual Malice

Finally, Wisk argues that Archer is a limited purpose public figure and so must show actual malice to succeed on its defamation claims.

To succeed on a defamation claim, limited public figures must demonstrate that a speaker acted with actual malice.  *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 258 (9th Cir. 2013).  To determine whether an entity is a limited purpose public figure in the context of a defamation claim, courts "consider whether (i) a public controversy existed when the statements were made, (ii) whether the alleged defamation is related to the plaintiff's participation in the controversy, and (iii) whether the plaintiff voluntarily injected itself into the controversy for the purpose of influencing the controversy's ultimate resolution."  *Id.* at 266 (citing *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 24 (2007)).

"A public controversy 'must be a real dispute, the outcome of which affects the general public or some segment of it.'"  *Id.* (citation omitted); *see also Gilbert*, 147 Cal. App. 4th at 24 ("[A] public controversy . . . means the issue was debated publicly and had foreseeable and substantial ramifications for nonparticipants." (citation omitted)); *Carver v. Bonds*, 135 Cal. App. 4th 328, 353 (2005) ("[For defamation claims,] [t]he public interest test was expressly rejected [by the California Supreme Court] in favor of the public controversy test.").  The Ninth Circuit in *Makaeff* distinguished between "general interest" in a topic and "an actual dispute" over a controversy.  *Makaeff*, 715 F.3d at 267.  There, what began as general interest into the university due to its famous founder "ripened into an actual dispute" concerning the university's business and educational practices, and eventually the "specific question" of the university's legitimacy "bec[a]me a public controversy."  *Id.* (citations omitted).  Additionally, the California appellate

---

[11] At the hearing, Wisk pointed to *Gilbert v. Sykes*, 147 Cal. App. 4th 13 (2007), to argue that the proper test is whether a "reasonable reader" would understand the statement as true.  Because that case appears to discuss the protected opinion and truth defenses in the same analysis, it is not clear how the reasonable reader applies.  *See id.* at 32-33.  More importantly, though, the court found the defendant failed to carry his burden that the statement was false because he presented "no evidence" of falsity.  *Id.* at 33.  Here, Archer's presents evidence that the statement was false.

United States District Court
Northern District of California

court in *Annette F. v. Sharon S.*, 119 Cal. App. 4th 1146, 1154-55, 1164 (2004), found that "the validity of second-parent adoption was clearly a matter of public controversy" where the evidence showed the parties published a website and book about second parent adoption, appeared on national television to discuss the topic, and were discussed in the national media including the New York Times.  And in *Gilbert*, the California appellate court found an individual defendant was a limited purpose public figure where he "thrust himself into" the public debate about the relative merits of plastic surgery by appearing on news shows, advertising his services as a plastic surgeon, writing articles for medical journals and beauty magazine, and generally "touting the virtues" of plastic surgery.  147 Cal. App. 4th at 25.

There was no public controversy here.  Wisk defines the public controversy as "the development of eVTOL vehicles for general public use, and how that development would be funded," P. Mot. 18-22:23, but does not show that there was "an actual dispute" over development or funding.  My prior order, which Wisk cites as evidentiary support, found only that the industry in general was a "'topic of widespread, public interest' to a 'substantial number of people,'" Order on Counterclaims 7:10-9:6, which is different from finding there was *any* dispute, *see Carver*, 135 Cal. App. 4th at 353, let alone a dispute concerning eVTOL development or funding.  Wisk next cites a paragraph of the Milbourn report, which states that the eVTOL market could be worth billions of dollars in the future, that litigation between early-stage competitors is not uncommon, and that press coverage is minimal, Milbourn Rep. ¶ 36: again that does not show anything more than "general interest."  *See Makaeff*, 715 F.3d at 267.  Finally, Wisk points to news releases and other communications made by Archer as evidence that Archer injected itself into a public controversy, but that also does not establish there *was* a public controversy to enter.  *Cf. Gilbert*, 147 Cal. App. 4th at 25 (considering ads for plastic surgery services as evidence that the defendant injected himself into the public controversy, where there was national conversation about plastic surgery, including by defendant on news shows and in medical journals and magazines).  It seems that Wisk's broad theory would deem any topic reported in the media as a public "controversy"— but that is not the law.  *See Carver*, 135 Cal. App. 4th at 353.  Here, the public is "interested" in eVTOL—though not necessarily its funding and development—but that interest had not clearly

"ripened" into an actual dispute (at least until Wisk filed suit). *Cf. Makaeff*, 715 F.3d at 267; *see also Annette F.*, 119 Cal. App. 4th at 1164 (noting the public controversy must have existed "at the time . . . [that the] allegedly defamatory statements" were made).

And even if there was an "actual dispute" concerning the funding for development of eVTOL vehicles for the public, there is no evidence that Archer "voluntarily injected itself into the controversy." *Makaeff*, 715 F.3d at 266. First, Wisk points to Archer's statements about its "hiring practices and technology," P. Mot. 19:4-16, which are different from the alleged controversy of how to fund the development of the vehicles for the public. Second, Wisk points to Archer's advertisements and other self-promotion, but as discussed, these facts differ from those in *Gilbert*, and there is no law that says merely participating in a business or market renders that participant into a public figure. *Cf. Makaeff*, 715 F.3d at 267 (finding that the university developed into a limited purpose public figure but not stating that it always was one); *see also Carver*, 135 Cal. App. 4th at 353 ("Criticism of commercial conduct does not deserve the special protection of the actual malice test."). There is no evidence that Archer "injected itself" into the controversy surrounding funding of these vehicles for public use.

Wisk has not shown that Archer was a limited purpose public figure, or that Archer needed to establish actual malice. The motion is DENIED as to this argument.

### 4.    UCL

Wisk's arguments about the unlawful and fraudulent prongs of the UCL claims rise or fall on its other arguments. *See* P. Mot. 21:3-7, 21:14-17. Summary judgment is DENIED as to those prongs for the same reasons as above.

Wisk's argument about the unfair prong is that a business practice is only "unfair" in the context of competitors where it "threatens an incipient violation of an antitrust law, or violates the policy or spirit of one of those laws because its effects are comparable to or the same as a violation of the law, or otherwise significantly threatens or harms competition." P. Mot. 21:8-13 (quoting *Drum v. San Fernando Valley Bar Ass'n*, 182 Cal. App. 4th 247, 254 (2010)). In opposition, Archer points to other disputed issues of fact and says that the evidence "shows Wisk has defamed Archer, stifled competition by baselessly smearing departing employees as criminals, and

United States District Court
Northern District of California

1   misstated what 'fair competition' in the eVTOL space entails." D. Oppo. 22:16-21.

2          Wisk's argument focuses on Archer's failure to allege any antitrust violations. But Archer

3   also alleges—and provides evidence establishing—that Wisk engaged in "conduct that . . .

4   significantly threatens or harms competition." *Id.* In *Allergan, Inc. v. Athena Cosmetics, Inc.*, 640

5   F.3d 1377, 1383 (Fed. Cir. 2011), the Federal Circuit found that "lost sales, revenue, market share,

6   and asset value" are sufficient to show unfair competition between competitors under the UCL.

7   *See also L. Offs. of Mathew Higbee v. Expungement Assistance Servs.*, 214 Cal. App. 4th 544, 557

8   (2013) (citing *Allergan*'s finding with approval). Archer's evidence of economic damages, *supra*

9   Part I.A.1, fall into these categories. Accordingly, there is a genuine dispute of material fact as to

10  whether Wisk engaged in unfair competition. Its motion is DENIED as to this argument.

11                          *        *        *

12         For all of those reasons, Wisk's motion for summary judgment on the state law claims is

13  DENIED.

14      **B.      Wisk's '036 Patent Claims**

15         The '036 Patent is directed at a "multicopter aircraft with boom-mounted rotors." Expert

16  Report of Dr. Marilyn Smith ("Smith Rep.") [Dkt. No. 529-10][12] ¶ 46. Wisk makes two

17  arguments for summary judgment: that Claim 2 is not obvious and invalid over the alleged prior

18  art and that there is no genuine dispute of fact that Archer's aircraft infringed Claim 2 of the

19  patent.

20         First, it is clear that a genuine dispute of fact over the obviousness of the patent precludes

21  summary judgment. Archer's expert conducts an obviousness analysis finding that Claim 2 is

22  rendered obvious by prior art. *See* Smith Rep. ¶¶ 610-687. Wisk contends that none of the

23  references specifically teach "multiple, differentially canted booms per wing" and so Archer

24  impermissibly reconstructs the patent through hindsight. P. Mot. 24:16-25:8. But "[a] claimed

25  invention may be obvious even when the prior art does not teach each claim limitation, so long as

26

27  ───────────────────

28  [12] I cite Wisk's exhibit with Archer's expert report because Archer failed to include a full copy of its report, and indeed the partial copy it provided did not even have all of the paragraphs it cited. [Dkt. No. 497-72] (showing only paragraphs 64-66, 576-678, and 723).

United States District Court
Northern District of California

1   the record contains some reason why one of skill in the art would modify the prior art to obtain the

2   claimed invention." *Nike, Inc. v. Adidas AG*, 812 F.3d 1326, 1335 (Fed. Cir. 2016), *overruled on*

3   *other grounds by Aqua Prod., Inc. v. Matal*, 872 F.3d 1290 (Fed. Cir. 2017) (citation omitted).

4   And Archer's expert provides this reason by opining that a person of skill in the art would be

5   motivated to combine the asserted teachings to "increase the redundancy of the rotors and provide

6   additional lift" and to "address other design issues of noise and potentially motor-rotor efficiency."

7   Smith Rep. ¶¶ 613, 619.  Wisk contests these findings, but that merely creates a dispute of fact for

8   the jury.  *See Nike*, 812 F.3d at 1335 ("Whether a person of ordinary skill in the art would have

9   had such a reason to combine the teachings of prior art references is . . . a question of fact."

10  (citation omitted)).  Summary judgment is DENIED as to obviousness.

11          Second, later in this Order I strike Wisk's expert report concerning infringement

12  allegations against Betty.  *Infra* Part IV.A.1.  Accordingly, Wisk's motion for summary judgment

13  on the Betty aircraft is DENIED for lack of evidence.

14          Third, the evidence shows that genuine issues of material fact preclude summary judgment

15  on whether Archer's Maker aircraft infringed Claim 2.  As relevant here, Claim 1 provides for

16  booms mounted to the side of the wings at nonzero angles, referred to by the parties as

17  "differentially canted booms."  Opening Report of Farhan Gandhi ("Gandhi Rep.") [Dkt. No. 498-

18  3] ¶¶ 391-96.  Claim 2 starts with the aircraft of claim 1, and then provides "the port side wing and

19  the starboard side wing each has three booms mounted thereto and wherein the first plurality of lift

20  rotors is 6 and the second plurality of lift rotors is 6."  *Id.* at 147(j), ¶ 397.  "Lift rotors" was

21  construed to mean "rotors configured to provide lift."  Claim Construction at 16.  Because Claim 2

22  contemplates "[t]he aircraft of claim 1," to meet the limitations of Claim 2 the product must have

23  rotors constructed to provide lift as well as differentially canted booms.  *See id.*

24          Wisk says that the undisputed evidence shows that the Maker aircraft meets each claim

25  limitation.  P. Mot. 22:21-24:14.  Archer responds that Wisk's motion is directed at a design for a

26  product, not at an actual product.  D. Oppo. 23:2-27; *see also* Gandhi Rep. ¶¶ 345-46 (finding that

27  Maker had differentially canted booms at the "design stage").  Archer does not dispute that Maker

28  itself met both contested limitations but says that it removed one limitation before adding the

United States District Court
Northern District of California

22

second, so no version of Maker ever met both claim limitations simultaneously as required by Claim 2. *Id.*

Whether Maker infringed the patent is disputed. Archer's evidence suggests that Maker never met both limitations. *See* [Dkt. No. 497-72] (Bower Tr.) 359:5-360:3 (explaining that when Maker had differentially canted booms, it did not have any "avionics," sensors, wiring, battery packs, or engines). Even if the rotors were part of the aircraft at the same time, Archer's evidence at least creates a dispute of fact whether the rotors could be used to "provide lift" as required by the claim construction. Claim Construction at 16. Wisk seems to argue that just having rotors on the aircraft at the same time as the differentially canted boom is enough to meet Claim 2 because having rotors "configured to" provide lift does not require that the rotors actually performed the lift, so long as the vehicle could perform the limitations when used in its "intended environment." *See* P. Repl. 14:4-12 (citing *Rothschild Connected Devices Innovations, LLC v. Coca-Cola Co.*, 813 F. App'x 557, 564 (Fed. Cir. 2020)). But that question too is disputed—without an engine, it is not clear that the rotors could provide lift when used in *any* environment.

Accordingly, genuine disputes of material fact remain. Wisk's motion is DENIED.

## II.   ARCHER'S MOTION FOR SUMMARY JUDGMENT

Archer moves for summary judgment of the claims related to Wisk's ten remaining trade secrets and two patents not discussed in Wisk's motion. I grant the motion in part.

### A.   Trade Secrets

For each trade secret, Archer argues that there is no evidence of misappropriation and that the secret lacks the requisite particularity. Archer reserves its defenses on Wisk's failure to maintain the secrecy of its trade secrets, Wisk's failure to establish independent economic value due to not being generally known, and other arguments. *See* D. Mot. 11 n.6. Wisk responds that there are genuine disputes of material facts regarding the appropriation of each secret and that each secret is defined particularly. *See generally* P. Oppo. I address each secret in the order discussed in the papers.

To succeed on a claim for misappropriation of trade secrets[13] under the California Uniform Trade Secrets Act ("CUTSA") and the federal Defend Trade Secrets Act ("DTSA"), a plaintiff "must show that (i) it owned a trade secret, (ii) [the defendant] 'acquired, disclosed, or used [the plaintiff's] trade secret through improper means,' and (iii) those actions damaged [the plaintiff]." *M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur*, 400 F. Supp. 3d 867, 892 (N.D. Cal. 2019) (quoting *BladeRoom Grp. Ltd. v. Facebook, Inc.*, No. 5:15-CV-01370-EJD, 2018 WL 514923, at *2 (N.D. Cal. Jan. 23, 2018)); *see also* Cal. Civ. Code § 3426.1(b); 18 U.S.C. § 1839(5); *Veronica Foods Co. v. Ecklin*, No. 16-CV-07223-JCS, 2017 WL 2806706, at *12-13 (N.D. Cal. June 29, 2017) (explaining that courts analyze claims under the CUTSA and DTSA together because of the substantial similarity between the statutes). "Because direct evidence of misappropriation and misuse is not always available, plaintiffs can rely on circumstantial evidence to prove their case." *M.A. Mobile*, 400 F. Supp. 3d at 893. "In most cases plaintiffs must construct a web of perhaps ambiguous circumstantial evidence from which the trier of fact may draw inferences which convince him that it is more probable than not that what plaintiffs allege happened did in fact take

---

[13] A trade secret is defined as the following under federal law:
> [A]ll forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information

18 U.S.C. § 1839(3). Under California law it is defined as:
> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1.

place." *Id.* (citations omitted).

"[T]rade secret misappropriation through use can occur under CUTSA in a wide variety of ways, including '[e]mploying the confidential information in manufacturing, production, research or development, marketing goods that embody the trade secret, or soliciting customers through the use of trade secret information.'" *BladeRoom Grp.*, 2018 WL 514923, at *9 (quoting *PMC, Inc. v. Kashida*, 78 Cal. App. 4th 1368, 1383 (2000)). "[M]inor variations in a product do not negate a claim for misappropriation of trade secrets." *Verigy US, Inc. v. Mayder*, No. C-07-04330 RMW, 2008 WL 564634, at *7 (N.D. Cal. Feb. 29, 2008) (citations omitted); *see also Think Vill.-Kiwi, LLC v. Adobe Sys., Inc.*, No. C 08-04166 SI, 2009 WL 3837270, at *3 (N.D. Cal. Nov. 16, 2009) (reasoning that a secret need not be the "sole influence" on an allegedly misappropriating product if the trade secret plaintiff shows the secret "had a substantial influence" on the product). But trade secrets plaintiffs must show "more than speculation" of misappropriation; simply pointing out that products are "the same or conceptually similar" is insufficient to survive summary judgment. *Excelligence Learning Corp. v. Oriental Trading Co.*, No. C 03-4947 JF, 2004 WL 2944048, at *7-8 (N.D. Cal. Dec. 20, 2004) (emphasis omitted); *see also M.A. Mobile*, 400 F. Supp. 3d at 893 ("The fact that [the relevant companies] developed similar technology does not raise [the plaintiff's] theories above the speculative level.").

Additionally, "information may be improperly 'used' in that it is unlawfully acquired and then built upon or modified before being disclosed or benefit derived." *BladeRoom Grp.*, 2018 WL 514923, at *9 (quoting *SkinMedica, Inc. v. Histogen Inc.*, 869 F. Supp. 2d 1176, 1197 (S.D. Cal. 2012)). Knowledge about a company's "proprietary processes . . . may be considered a trade secret" even if the information is not in writing but rather only "in the employee's memory." *Mattel, Inc. v. MGA Ent., Inc.*, 782 F. Supp. 2d 911, 967 (C.D. Cal. 2011) (collecting cases and quoting *Greenly v. Cooper*, 77 Cal. App. 3d 382, 392 (1978)). But to prove misappropriation, even based on employees' memories of proprietary information, a trade secret plaintiff must define their secrets with requisite particularity. *See id.*; *see also Swarmify, Inc. v. Cloudflare, Inc.*, No. C 17-06957 WHA, 2018 WL 2445515, at *2 (N.D. Cal. May 31, 2018) (noting summary judgment may be granted if a trade secret plaintiff failed to identify specifics of its trade secret

25

United States District Court
Northern District of California

with particularity (citing *Imax Corp. v. Cinema Techs., Inc.*, 152 F.3d 1161, 1167 (9th Cir. 1998))).

**1.    TS 1: Aerodynamic Models Based On High Quality Simulation Data**

Wisk defines Trade Secret 1 as the "detailed aerodynamic data" that were derived from analyses and tests carried out using simulation data.   Disclosure 5:2-19.  The derived data can predict "various aerodynamic properties over a range of potential operating conditions, for different aircraft configurations."  *Id.*  With its Disclosure, Wisk provided exemplary models like the "Mutt Stage 3" document, showing various properties plotted as a function of operating conditions, for different aircraft configurations.  *Id.*  Wisk says that the plots provide information about aerodynamic forces and predicted movements which can be used "to select and validate the design and configuration of the aircraft."  *Id.*  In essence, the trade secret is the data that helps choose aircraft configuration.  Based on this "database" of information from simulation tests, Wisk selected its 12 rotor configuration that uses 6 booms.  Gandhi Rep. ¶¶ 87, 89.  It argues that Archer misappropriated this trade secret by using "the aerodynamic understandings regarding . . . performance and viability" to select the 12 by 6 design for its Maker aircraft.  P. Oppo. 15:20-22; *see also* Gandhi Rep. ¶¶ 114-16.[14]

Archer asserts that Wisk improperly expanded its secret from the data and plots to "understandings" and "insights."  *See* D. Repl. 2:1-3:3.  But the Disclosure as well as subsequent explanations in its expert reports and depositions make clear that the purpose of the tests and analyses that yielded the data was to derive insight into the best aerodynamic formation for its vehicles, based on a variety of inputs.  *See* Disclosure 5:2-19.  Wisk explains the hours and manpower it took to run those simulations and conduct those analyses, offering an exemplary plot as a model of the results from just a few tests.  *See id.*  Together the tests yielded information that ultimately led to Wisk's selection of its design.  Gandhi Rep. ¶¶ 87, 89.  Wisk also concedes that the trade secret is not the design itself but rather the data (and relevant knowledge and insight) from its simulations and analyses that ultimately led to its choice of the design.[15]  The secret is

_____

[14] Archer's motion to exclude certain portions of the Gandhi Report is addressed below.

[15] Some of Wisk's arguments are essentially that Archer used the 12 tilt 6 design and so inherently

1    sufficiently particular and not expanded from the original definition.

2         Next, Wisk argues that there is a genuine dispute of material fact whether Dr. George

3    Bower—the former Wisk employee who indisputably chose the 12 by 6 design for Archer's

4    Maker aircraft—misappropriated TS 1 in making that choice. Wisk says that Archer's choice of a

5    12 tilt 6 design "demonstrates that Archer misappropriated" TS 1 in part because the design was

6    not used by any other eVTOL manufacturer, Gandhi Rep. ¶ 176, though that speculation alone is

7    insufficient to establish misappropriation, *see Excelligence Learning*, 2004 WL 2944048, at \*7-8.

8    Wisk also contends that Archer's timeline for choosing the 12 tilt 6 design (which *Wisk* chose

9    based on the knowledge and insight from its secret data and analyses) was too fast for Archer to

10   have figured out the design and conducted the requisite analyses on its own, Gandhi Rep. ¶ 177,

11   but without any grounding evidence tying the design to Wisk's secret, this too is just speculation.

12        Wisk's other evidence similarly fails to create a genuine dispute of fact over

13   misappropriation. Wisk points to specific calls and data requests that Muniz made around the time

14   of his move to Archer, but they relate to the battery design, recruiting Wisk engineers, and the

15   Cora budget, *id.* ¶¶ 134-36—they do not relate to knowledge or data tied to TS 1, and so are

16   irrelevant even circumstantially to show that Muniz somehow knew of or used Wisk's secrets.

17   *See Think Vill.-Kiwi*, 2009 WL 3837270, at \*3 (permitting circumstantial evidence to show

18   misappropriation so long as the necessary inferences are not "derived from speculation,

19   conjecture, imagination, or guesswork" (citation omitted)). It also says that Muniz had a phone

20   call with Archer employee Moses Divakar and the following day Divakar created a 3D

21   visualization of a 12 tilt 6 configuration, which at the time was being considered by Wisk for its

22   sixth-generation aircraft. *See* Gandhi Rep. ¶¶ 168-72. But Wisk does not point to evidence of the

23   content of that phone call, so again the reason for the resulting choice is purely speculative. *See*

24   *id.* (speculating that the design elements "were likely conveyed to Dr. Divakar by Mr. Muniz"; the

25   timing and similarity between designs "strongly supports an inference of misappropriation"); *see*

26   *also Excelligence Learning*, 2004 WL 2944048, at \*7-8 (finding trade secret plaintiffs must show

27   _____

28   had to use Wisk's underlying data and analyses, but Wisk can't have it both ways: it must show
     that Archer used the data or had knowledge of the data, not just that it used the design.

United States District Court
Northern District of California

1   more than mere speculation).  True, Muniz testified that he had calls with *Bower* about Archer's

2   aircraft configuration, Gandhi Rep. ¶ 133, but without any further evidence of those calls or of

3   Muniz using Wisk's data and knowledge from TS 1, the existence of calls—even in combination

4   with the development timeline—is too speculative to establish misappropriation.

5          Also insufficient is Wisk's evidence that Archer's third-party consultant FHE had been

6   looking into a particular aircraft configuration, but the day following a call with Muniz, FHE

7   changed to a 12-tilt-6 design.  Wisk does show that Muniz accessed the "Cora X Project List"

8   from his personal device before that call.  *See* P. Oppo. 15:24-16:11 (citing [Dkt. Nos. 502-71,

9   502-72]).  But the Project List shows a 50-row spreadsheet of planned projects for the

10   development of (apparently) Cora X.  [Dkt. No. 502-72.]  The projects are listed at a "High Level"

11   including intended 2020 deliverables and activities.  *Id.*  Besides the fact that the spreadsheet

12   relates to project management for Cora, the sixth version of which used the 12 tilt 6 configuration,

13   nothing on the spreadsheet shows data, knowledge, or insight related to TS 1.  *See id.*  In other

14   words, that Muniz was looking at this spreadsheet before talking to FHE does not support a

15   finding—even circumstantially—that he shared TS 1 information during the call.  Accordingly,

16   there is no evidence connecting FHE's choice to change configurations to the trade secret.

17          Wisk's more convincing arguments are that certain data on a spreadsheet used by Bower

18   are identical or nearly identical to Wisk data and that there are gaps in analyses and data that

19   should exist if Archer truly developed and researched the design sufficiently to choose it—but

20   even these assertions do not provide evidence of misappropriation.  For example, Wisk points to a

21   few lines in a spreadsheet used by Bower for "vehicle sizing" that contained assumptions and

22   parameters used by Archer.  Gandhi Rep. ¶ 138.  "Many" assumptions in that spreadsheet came

23   from Muniz, including "Furnishings Weight," "Environmental Control System Weight," and

24   "[Low Voltage] Power & Comms Weight," which Wisk's expert calls "foundational in the design

25   process." *Id.* ¶¶ 138-39, 149.  But Wisk does not say that these "foundational" assumptions are

26   connected to TS 1, *see id.*; indeed, the following paragraph in the expert report clarifies that

27   "[o]ther parameters . . . not explicitly linked to Muniz" were the ones that "can be traced back to"

28   TS 1, *id.* ¶ 140.  And while one of the datapoints that "trace[s] back to" TS 1 is a specific value

used by Wisk and Archer in their calculations, the expert simply says that the use of that value by Archer "suggests Archer misappropriated" TS 1—which again, is mere speculation. *Id.* Merely showing that the companies use one of the same values does not show the information was "substantially derived" from Wisk's secret. *See Think Vill.-Kiwi*, 2009 WL 3837270, at *3 (citation omitted).

Wisk's expert also points to studies that Wisk conducted concerning ███████████ ████████████████████████████████████████████ as well as to a "key" insight from Wisk's Mutt Stage 3 document about a "non-intuitive assumption" about drag, saying these same factors, insights, and assumptions appeared in Archer's spreadsheet. Gandhi Rep. ¶¶ 142-47, 150. But Wisk does not say that any Archer employees knew or had access to these analyses or assumptions, does not point to documents that any employees might have had showing these key figures, and does not otherwise provide any evidence at all showing those figures somehow transferred to Archer.[16] In other words, Wisk points out several pieces of data and analysis used by Archer that are similar or identical to those used by Wisk and says that Archer's use of that data means it must have stolen the data and knowledge from Wisk. But despite extensive discovery, including deposing Archer employees and scouring their computers and devices, Wisk does not point to anything showing that any of this information came from Wisk. *See M.A. Mobile*, 400 F. Supp. 3d at 893 ("The fact that [the companies] developed similar technology does not raise [Wisk's] theories above the speculative level.").

Accordingly, Archer is correct that Wisk has not provided evidence that Archer used its data from TS 1 or even the knowledge and insights derived from that data. To be sure, Archer uses some of the same values and insights that Wisk uses. But there must be *some* connection between the data, knowledge, and insight used at Wisk with that by Archer, even circumstantially—and the evidence does not show them. While Wisk could have provided evidence showing Muniz knew or should have known the specific values and insights that showed

---

[16] Wisk points out the longitudinal distribution insight used by Archer was "directly contrary" to what Archer's third party consultant had previously told Archer, but that is *still* not evidence connecting the insight to Wisk. *See* P. Oppo. 16:16-17 (citing Gandhi Rep. ¶ 155).

United States District Court
Northern District of California

1  up in Archer's design choices, from which Wisk could have supported its contention that Muniz's

2  "memor[ies]" led to trade secret infringement, *see Mattel*, 782 F. Supp. 2d at 967, it did not.  Wisk

3  could have provided evidence showing that Muniz's contributions to the spreadsheets came from

4  his knowledge stemming from TS 1, thus connecting TS 1 to Archer, but it did not.  Wisk could

5  have provided evidence showing that any other former Wisk employees at Archer knew the

6  relevant values and insights from Wisk and were somehow connected to the configuration choice

7  at Archer, but again, it did not.

8       Consequently, with only speculation that Archer misappropriated TS 1, there is no dispute

9  of fact for a jury to evaluate.  Summary judgment is GRANTED.

10       **2.     TS 3: Aerodynamic Studies Regarding Lift Fan Locking and Stowing**

11       As described in Wisk's Disclosure, TS 3 is similar to TS 1 in that it concerns simulation

12  data and testing results that yielded "insight into design considerations for the locking and stowing

13  of lift fans."  Disclosure 6:1-14.  The Disclosure specifies Wisk's "detailed analyses" regarding

14  locking and stowing the lift mechanisms ██████████████████████████████████████████

15  ████████████████████████████████  *Id.*  Wisk says TS 3 also covers insight about the

16  ██████████████████████████████████████████████████████████████████████

17  ██████████  *Id.*; *see also* Gandhi Rep. ¶¶ 198-200.  It clarifies that while TS 3 consists of

18  documents and "physical objects," Gandhi Rep. ¶ 209, like TS 1, the trade secret is not the locking

19  and stowing mechanism itself but rather ██████████████████████████████████████

20  ██████████  Gandhi Rep. ¶ 216; *see also* P. Oppo. 18:4-6 (citing Gandhi Rep. ¶ 213), ██████

21  ██████████████████████  Gandhi Rep. ¶¶ 199, 202, 223.

22       Archer argues that Wisk's definition of TS 3 lacks particularity because it includes all

23  "results and information" from Wisk's testing and simulation data.  D. Mot. 16:24-28.  As for TS

24  1, though, Wisk says that the secret is not the mechanism itself but rather ████████████████

25  ██████████████████████████████████████████████████████████████████████████

26       *See* Gandhi Rep. ¶¶ 199, 202, 223; P. Oppo. 18:3-14.  Wisk's secret, then, is

27  specifically the analyses and insights about ██████████████████████████████████████

28  ██████████████████████████████████  Thus, TS 3 is sufficiently particular.

United States District Court
Northern District of California

1    Archer contends that it purchased its locking and stowing fans "off-the-shelf" from a third

2    party, MAGicALL, and so could not have used the trade secret in implementing the fans.  D. Mot.

3    16:7-23.  But there is evidence to preclude summary judgment based on this argument: Wisk

4    shows that Archer gave MAGicALL many specifications that Archer wanted for the fan

5    mechanisms, *see* Gandhi Depo. ¶¶ 238, 241, so there is at least a dispute of fact regarding Archer's

6    role in the development of the mechanisms and the underlying choices of technology.  That

7    disputed fact is material because at least one of those specifications was a figure for torque, which

8    Wisk says was the same as the figure it determined from its extensive studies and analyses that are

9    the basis for TS 3.  *See id.* ¶¶ 237-38.

10    Archer also says that Wisk fails to identify any study of Wisk's that Archer used, but

11    Wisk's evidence is enough for a jury to find that Archer "used" TS 3 even though Wisk does not

12    point to a *specific* study within T3 that Archer allegedly misappropriated.  Wisk shows that Archer

13    employees Jing Xue and Diedrik Marius worked on the lock and stow mechanism at Wisk,

14    including specifically on determinations related to the torque factor.  Gandhi Rep. ¶¶ 225-27, 238.

15    Very shortly after Marius joined Archer, he instructed MAGicALL to use the same torque factor

16    (████) that *he* had previously used at Wisk, saying the number was based on a "guess," and

17    there is no indication or evidence that Archer had conducted the relevant studies that Wisk's

18    expert said would be expected to make that torque determination.  *Id.* ¶ 238.  Subsequently, Xue,

19    who had also worked on torque at Wisk and who retained documents related to the torque

20    analysis, *id.* ¶ 223, changed the torque value[17] that MAGicALL was to use (to ████), *id.* ¶ 237,

21    which is the same as one of the torque factors that appears in Wisk's exemplary Disclosure

22    documents, [Dkt. No. 502-57] at pdf 37.  Considering that Marius and Xue both worked on torque

23    analyses at Wisk, both implemented figures at Archer that were used by Wisk, Xue retained

24    documents related to torque and TS 3, and Marius used a value identical to the one he personally

25    used at Archer but said its use at Archer was based on a "guess," coupled with the rapid timeline

---

[17] Though the expert report only says Xue changed the value, Wisk's opposition says that Marius and Xue together changed the value, and for support it cites a document Wisk says was "managed" by Marius and Xue that shows the change to ████—but the document itself does not show either name.  [Dkt. No. 502-81].

development and the lack of argument from Archer that this is not a disputed material fact, *see* D. Repl. at 5 n.6—this "web of perhaps ambiguous circumstantial evidence" is sufficient for a jury to infer that it is more probable than not that Archer used Wisk's TS 3. *M.A. Mobile*, 400 F. Supp. 3d at 893 (citation omitted). It is also sufficient to create a question of fact for the jury whether Marius or Xue relied on their memories of TS 3 from their time at Wisk to use that knowledge at Archer. *See Mattel*, 782 F. Supp. 2d at 967.

Summary judgment is DENIED on this misappropriation claim.

### 3.     TS 15: Studies Regarding Advantages of a Tiltable Rotor Design

TS 15 is the determination that with respect to tiltable aircraft rotors—which means the rotors can operate vertically to move the aircraft up and then tilt to move the aircraft forward—

████████████████████████████████████████████████████

██████████████████████████ Disclosure 15:1-27; Gandhi Rep. ¶ 248; *see also* Gandhi Rep. ¶ 266 ("[TS 15] comprises insight regarding ██████████████████

██████████████ as a result of years or research, experimentation, and development by Wisk."). Additionally, TS 15 includes the determination that the tiltable design ████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

██████████ Disclosure 15:1-27; Gandhi Rep. ¶ 249. Wisk's Disclosure names two documents that "reflect[] this trade secret." *Id.*

Archer makes three arguments for summary judgment: that the TS 15 is not secret because it is generally known, that it is not sufficiently particular, and that there is no evidence of misappropriation. D. Mot. 17:1-21:3. To start, there is a genuine dispute of fact whether TS 15 is generally known: though Archer persuasively points to public documents and presentations that suggest general knowledge, *see id.* 19:3-26 (citing documents), Wisk's expert addresses those examples and opines that they do not show the specifics of TS 15 were known publicly, *see* Gandhi Rep. ¶¶ 265-75. That factual question cannot be resolved on summary judgment.

But with respect to particularity, Wisk may not broaden its definition of TS 15 from what it provided in the Disclosure. Wisk's Disclosure specifically discusses two determinations from its

studies: ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████   *See* Disclosure 15:1-27.  Wisk's expert's explanation that TS 15

"comprises insight regarding ██████████████████████████" threatens to broaden the

secret to *all* ████████████████ from Wisk's studies, rather than the two specified insights.  If

the secret were so identified, it would be overbroad because Wisk would have failed to identify

specifics of its trade secret with particularity.  *See Imax Corp.*, 152 F.3d at 1167 (holding

summary judgment is appropriate where the trade secret plaintiff fails to identify specifics of its

trade secret with particularity).  This order relies on Wisk's definition in its Disclosure, which is

limited to the two insights it initially outlined, and the studies that led to those insights.

Wisk's arguments about misappropriation are nearly identical to its arguments for TS 1,

and for the same reasons do not present genuine disputes of material fact.  Wisk asserts that

Archer rejected tilting rotors until "after Archer began recruiting Wisk employees"; that Archer's

third-party consultant FHE suggested a tiltable design for the first time the day after speaking with

Muniz; that Muniz "accessed 'Cora X' documents" and "analyses comparing the relative weight

breakdown" of two Wisk aircrafts before leaving Wisk; and that FHE's inputs into Bower's

spreadsheet shifted to reflect █████████████████ (the same as TS 15 determines)

after Muniz joined Archer.  P. Oppo. 20:8-21:21.

As discussed above, the fact and timing of Archer's choice to shift focus to a tiltable

design is not evidence that Archer used any of Wisk's knowledge or secrets from TS 15.  *Supra*

Part II.A.1; *see also Excelligence Learning*, 2004 WL 2944048, at *7-8 (speculation insufficient to

defeat summary judgment).  The timing could support an inference of misappropriation, *see M.A.

Mobile*, 400 F. Supp. 3d at 893, if combined with other non-speculative evidence.  But as

explained further below, Wisk's other evidence is also insufficient.

As it did for TS 1, Wisk again points out that Muniz contributed inputs to Bower's sizing

spreadsheet that related to weight and that Muniz accessed Cora documents before he left Archer,

United States District Court
Northern District of California

including a document title "Cora Weight Reduction Summary."[18]  But Wisk's own expert does not assert that the weight values that Muniz added to the spreadsheet related to TS 15—the expert very carefully states that Muniz contributed to Bower's sizing spreadsheet, and that the spreadsheet's weight assumptions "reflect ███████████████ that [TS 15] provides" without saying that *Muniz's* contributions to the spreadsheet reflect TS 15.  Gandhi Rep. ¶ 294.  While analyzing TS 1, the expert report explains that Muniz's inputs were for "Furnishings Weight," "Environmental Control System Weight," and "[Low Voltage] Power & Comms Weight" and it does not say these are related to the tiltable rotors or TS 15.  *Id.* ¶¶ 138-39, 149.  Archer's uncontradicted evidence shows that these inputs are unrelated to the tilting configuration, and so are unrelated to TS 15, *see* [Dkt. No. 456-29] (Muniz. Tr.) 449:18-450:7,[19] which is not disputed by Wisk, *see* D. Repl. 6:20-27.  Accordingly, there is no genuine dispute over whether Muniz "used" TS 15 when he inputted values into the spreadsheet or even that TS 15 was a "substantial influence," *see Think Vill.-Kiwi*, 2009 WL 3837270, at *3, on those values because there is no evidence connecting the values to the secret.

Wisk's arguments that Muniz accessed Cora documents are also not persuasive.  First, Wisk does not actually state that the "Cora Weight Reduction Summary" document concerns TS 15—it was not included in the Disclosure as a document "reflecting this trade secret," Disclosure at 15, and again this order is limited to what was disclosed—and its relationship is not obvious by reviewing the document.  *See* [Dkt. No. 502-87].  This is exacerbated by the fact that Wisk's expert does not opine on the document.  More importantly, Wisk does not present evidence that any information from the Cora Weight Reduction Summary was used at Archer.  Rather, its

---

[18] Wisk cites "Ex. 64 at rows 1175-79" for support but the relevant exhibit did not include row numbers.  It is unclear if Wisk expected me to *count to one thousand one hundred seventy-five* to confirm this evidence, but in the future Wisk must provide usable exhibit citations.  I was able to find a row that indicates Muniz accessed the Cora Weight Reduction Summary by using the "control + F" find function.

[19] Archer, too, must take care with its citations.  It cited "Ex. 14" to direct me to the Muniz Transcript.  D. Mot. 18 n.13.  Exhibit 14 of its motion is the Melack transcript.  Attachment 14 [Dkt. No. 456-14] is the Furman transcript.  Exhibit 16 [Dkt. Nos. 455-11, 456-18] is part of the Muniz transcript, but does not contain the correct cited content.  Rather, Archer should have cited—as I did—Dkt. Nos. 455-21, 456-29, rather than having me look through its 62 redacted exhibits and 42 unredacted exhibits to find the correct evidence.

opposition again tries to link the timelines—Muniz viewed the document on November 14 (when he was an employee at Wisk), he talked to FHE on December 3, and FHE added a "Cora + tilt" configuration into its models on December 4, *see* P. Oppo. 20:20-21:2—but any inferences from the timelines are wholly speculative, if not irrelevant, because *even if* Muniz looked at the Cora Weight Reduction Summary during the call, there is no evidence that anything from the document influenced developments at Archer. *Cf. Think Vill.-Kiwi*, 2009 WL 3837270, at *3 (noting summary judgment would be inappropriate where disputed facts remained as to whether information in the plaintiff's secret document "had a substantial influence on [the defendant's] design"). And as noted above, the other documents Muniz accessed in his final weeks at Wisk were unrelated to the tilting rotors. *Supra* Part II.A.1 (explaining they concerned recruitment, budget, and project management).

Finally, Muniz's discussions with coworkers at Wisk about the tiltable rotors, *see* Gandhi Rep. ¶ 258, do not preclude summary judgment. Wisk's expert emphasizes that the trade secret is *not* the tiltable rotors, which are generally known, but rather the █████████████████ ████████████████████████████████████████████████████████████ ███████████████ Gandhi Rep. ¶ 278. Not only does Wisk fail to provide even circumstantial evidence that Muniz used that underlying knowledge and information at Archer, Wisk also does not provide evidence of what Muniz actually knew—besides the general existence of the tiltable rotors. Accordingly, there is no disputed fact precluding summary judgment.

Archer's motion is GRANTED.

### 4. TS 12: Motor Optimization Tool

TS 12 is a "simulation tool for evaluating all-electric motors" that considers and calculates different properties and parameters in order to "evaluate, configure, and compare motors" for use in eVTOLs. Disclosure 12:20-13:22. Wisk cites four documents that "reflect[] this trade secret." *Id.* The model is ██████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████ Opening Expert Report E. Randolph Collins, Jr., Ph.D., PE ("Collins Rep.") [Dkt. No.

498-4] ¶¶ 85-92.

Archer offers several arguments in support of summary judgment: that TS 12 lacks the requisite particularity, that Wisk offers no evidence that Archer actually used the model, that the documents Wisk says Marius "accessed" were timestamped before he started at Archer and were only "accessed" because they were returned to Wisk on that date, and that the eight equations in Archer's code neither were secret nor form the basis for trade secret.  D. Mot. 21:5-25:5.

With respect to particularity, the Disclosure is sufficiently clear and particular that the secret is the simulation tool itself, which can involve and provide different properties and parameters for building motors.  *See* Disclosure 12:20-13:22; *cf. Mattel*, 782 F. Supp. 2d at 968 (finding lack of particularity based on failure to "identify the specific systems misappropriated" by defendant and the lack of "*any* basis on which to conclude" value from or efforts to maintain secrecy).  Archer's argument is really that Wisk tries to expand this definition in its assertion of misappropriation, *see* D. Repl. 10:5-6, which is true.  For example, Wisk's expert says that using an ███████████████████████████████████████" and not generally known or ascertainable, Collins Rep. ¶ 153, which implies the ████████████████ is the secret, rather than the model itself.  He also seems to say that the secret is "the unique design [and] selection of mathematical models, equations, [and] source code implementations related to [the] tool," *id.* ¶ 159, which could be interpreted as the secret is the tool itself, but also opens the doorway to a bigger leap—and the subject of Archer's concerns—that every underlying equation or model is also covered by the secret.  That is not the case, because despite having the opportunity to identify particular equations or even general categories, that is not how Wisk described its secret in its Disclosure or even in its initial expert report supporting TS 12.[20]  *See also Bladeroom Grp.*, 2018 WL 514923, at *3 (noting the degree of reasonable particularity depends on the specific secret alleged).  Accordingly, though I find TS 12 is sufficiently particular, I caution Wisk that *it*

---

[20] *See* [Dkt. 17-1] 12:3-5 (describing TS 12 as "relat[ing] to Wisk's models and studies for optimizing the parameters of the motor design, including thermal, magnetic, and dimensional parameters," but not specifying the underlying equations, calculations or studies, and opining that "given the similarity in overall aircraft configuration, and apparent design choice for motor selection, it is . . . reasonably likely that Archer leveraged Wisk's trade secrets for optimizing the motor design parameters (*i.e.*, Trade Secret No. 12)").

United States District Court
Northern District of California

defined TS 12 as "the tool," not as every underlying calculation and analysis that went into creating the tool.

That said, Wisk can show that Archer "used" TS 12 by showing that Archer used the tool's source code to develop Wisk's tool—in other words, if Archer copied and pasted "confidential information" from Wisk's tool's source code, that would constitute "use" (and misappropriation) of TS 12. *See id.* at *9 (employing confidential information in development constitutes misappropriation, and secret information is "used" where "it is unlawfully acquired and then built upon or modified before being disclosed or benefit derived" (citation omitted)). That is what Wisk argues: that there are eight equations in Archer's model that are identical or nearly identical to the equations in Wisk's model, and because Marius developed the Wisk model and then the Archer model, a jury could infer that Marius "used" (read: copied) the equations from Wisk's model in Archer's. *See* Collins Rep. ¶¶ 215-36. This is further supported by the evidence that suggests Marius included a "useless" typo line of code in Archer's model that was also present in Wisk's. *Id.* ¶¶ 245-46.

Archer argues that Wisk cannot show use of TS 12 by pointing to use of eight equations that are—as I have found—*not* the trade secret. With respect to the assertion that the equations are publicly known and that Marius relied only on public information to make the model, this is persuasive but ultimately does not support summary judgment. *See* D. Mot. 22:3-7; 22:17-23:8 (collecting citations), 23:23-24:5; D. Repl. 8:9-15; *see also BladeRoom Grp.*, 2018 WL 514923, at *2 (explaining that "[r]everse engineering or independent derivation alone" is insufficient to show misappropriation of a trade secret (quoting Cal. Civ. Code § 3426.1(a)). Wisk provides contradictory evidence that the equations were not publicly known, *see* Collins Rep. ¶¶ 95-132, and that the source code documents were accessed by Marius (which Archer disputes),[21] *see* Collins Rep. ¶¶ 190-95, 198-99. That creates a genuine dispute of fact for the factfinder to decide.

Second, trade secrets are unlike patents, for which the law "protects a publicly-disclosed

---

[21] It is undisputed that while at Archer, Marius downloaded and opened a document he had created at Wisk for an interview he had with Apple. D. Mot. 22 n.16; P. Oppo. 24:14:16; Collins Rep. ¶¶ 198-99. Archer argues that the document was never used at Archer, *see* D. Mot. 22 n. 16; it may present that argument to the jury.

idea from appropriation by others" and defendants can disclaim infringement by pointing to the patent's elements and limitations and assert their products' claims and limitations are different. *BladeRoom Grp.*, 2018 WL 514923, at \*8-9.  Trade secrets defendants cannot merely argue that their products have some different elements from the secret product because "that type of defense does not exclude the possibility that a reasonable jury could still find that [the defendant's product] was substantially derived from [the plaintiff's] secrets." *Id.* (citations omitted).  Here, given the contradictory evidence about Marius's reliance on Wisk's model versus public information, and the undisputed evidence that eight similar or identical equations appear in both models, a reasonable jury could find that Archer's model was substantially derived from Wisk's model.  *See id.*  Archer argues that Wisk points only to eight equations out of "hundreds" but it does not assert, for example, that the eight equations are not fundamental or they do not indicate substantial derivation.  That question will go to the factfinder.

Further, while "the developer of a formula can't claim that the numbers and variables that compose the formula are trade secrets," *Mattel*, 782 F. Supp. 3d at 962, a trade secret can be comprised entirely of "separate elements [that are] known in the industry . . . so long as the combination of all such information is not generally known," *O2 Micro Int'l Ltd. v. Monolithic Power Sys., Inc.*, 420 F. Supp. 2d 1070, 1089-90 (N.D. Cal. 2006), *aff'd*, 221 F. App'x 996 (Fed. Cir. 2007) (citations omitted).  I have already found that the eight equations are not the trade secret and so Wisk cannot argue that to the jury.  But it is possible for Wisk to prove to a jury that the combination of the equations is not generally known, *see id.*, and that Archer's use of that combination of equations show its model was "substantially derived from" Wisk's tool, *see BladeRoom Grp.*, 2018 WL 514923, at \*8.  Archer does not appear to argue otherwise, and the evidence presented on the point is contradictory, so the question must go to the jury.

Accordingly, genuine issues of material fact remain and summary judgment is DENIED.

### 5.    TS 17: Motor Control Algorithms and Architecture

TS 17 covers the "systems and algorithms for operating the torque and speed of [a] motor over a wide range of values."  Disclosure 18:1-19:21; *see also* Collins Rep. ¶¶ 335-37, 347-49, 360, 366-67 (describing the secret as the algorithms and implementing system).  The Disclosure

United States District Court
Northern District of California

explains the importance of ████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Disclosure

18:1-19:21.  The Disclosure provides an exemplary illustration and cites five documents that

reflect TS 17.  *Id.*

Archer argues that Wisk's trade secret definition is limited to the algorithms and motor

control systems derived from its ███████████████████ and if TS 17 included

"functionalities" more generally, it would be overbroad.  I agree.  I previously explained that TS

17 "is its particular algorithms and systems; other algorithms *performing the same basic function*

are not covered."  Order Denying PI 35:14-16 (emphasis added).  Wisk asserts that its Disclosure

"describes TS 17 in functional terms," notes the Disclosure describes the control system's

capabilities, design, and other aspects, and says the Disclosure cited a document that includes a

specific capability.  P. Oppo. 27: 14-26.  All of that is accurate—but the secret itself is still *defined*

as the algorithms and the systems, not as the capabilities or functionalities.  *See, e.g.*, Collins Rep.

¶¶ 335-37, 347-49, ¶ 370 (describing the "motor controller software" as "implement[ing] Wisk's

motor controller algorithms"), ¶ 372 (explaining that the "*algorithms* cannot be disclosed by

videos" showing propellers are locked and stowed), ¶ 373 (noting the lack of evidence that the

"*algorithms* were known to" any third party), ¶ 392 ("The motor controller *algorithms* covered by

Trade Secret 17 . . .") (emphases added).  Accordingly and as defined by the Disclosure, the secret

consists of Wisk's algorithms and motor control systems but does not extend to other algorithms

or systems that perform the same functions.  This definition is not overbroad.

Given this definition, Wisk fails to show a genuine dispute of material fact concerning

misappropriation.  First, it is undisputed that Archer's motors and motors controllers were built

and provided by third party MAGicALL.  D. Mot. 24:14-16; P. Oppo. 28:7-8.  Wisk's theory of

misappropriation is that Archer—through Marius, who worked on the algorithms and systems

covered by TS 17 while at Wisk—told MAGicALL to include several "requirements" and

"functionalities" in the controllers it provided to Archer, and that those "correspond[]" with TS

and its functionalities.  *See* Collins Rep. ¶¶ 412-32, 435-36, 439-48; *see also* P. Oppo. 28:15-16

United States District Court
Northern District of California

(Marius asked for a ███████████████), 29:1-11 (Marius asked for ███████████

██████████).  But as I previously found, asking for a specific functionality is not the same as

using a trade secret that is defined as the algorithms and systems, *not* as the functionality.  *See*

Order Denying PI 35:14-16.  Wisk points to no evidence that Marius used TS 17 in his requests—

it does not show the same algorithms were used at both companies, that Marius gave MAGicALL

any Wisk documents, or that the requests were anything more than that: requests.  Rather, Wisk

asserts that Marius "described in detail" to Archer how to implement the desired elements and

functionalities, P. Oppo. 28:14-20, but Wisk's cited documents include six "open questions"

Marius had for MAGiCALL, [Dkt. No. 498-97] at -79, and several comments on a figure, [Dkt.

No. 498-99] at -19, -20, none of which include algorithms or any other information encompassed

by TS 17.  Indeed, Wisk's own evidence shows that it took MAGicALL months of work to create

the ultimate algorithm, *see* Collins Rep. ¶¶ 249-34, which does not support Wisk's theory that its

secret information was used to quickly give Archer an advantage.

Wisk's other evidence also fails to support this theory of misappropriation.  Even if Marius

and former Wisk employee Johnny Melack "accessed" documents containing TS 17 information

after leaving Wisk, *see* Collins Rep. ¶¶ 403-05, a fact that Archer disputes, Wisk does not show

that anything from those documents was used at Archer.  And despite Marius' use of the name

████████—the acronym for Wisk's motor controller system—in a chat message with another

former Wisk employee while at Archer, *id.* ¶¶ 398-402, use of an acronym does not equate to use

of any secret information.  Finally, Wisk's assertion that MAGicALL's machine did not have

certain functionalities until Marius asked for them, *see* P. Oppo. 28:7-29:12, is not evidence that

Archer used secret algorithms, even though the ultimate functionality was similar to Wisk's

functionality.  Again, showing that the companies' algorithms and systems have similar features,

without more, is not enough for a jury to reasonably infer that Archer misappropriated Wisk's

secrets.  *See M.A. Mobile*, 400 F. Supp. 3d at 893 ("The fact that [the relevant companies]

developed similar technology does not raise [the plaintiff's] theories above the speculative

level."); *Excelligence Learning*, 2004 WL 2944048, at *7-8 (same).

Despite voluminous discovery, including thousands of documents, multiple expert report,

1  two depositions of Marius, and many discovery disputes, Wisk has not produced any evidence that

2  Archer misappropriated TS 17.  Summary judgment is GRANTED.

3        **6.**    **TS 29: Energy Storage System Architecture**

4        TS 29 consists of the Energy Storage System ("ESS") for Wisk's fifth-generation aircraft,

5  including ████████████████████████████████████████████████

6  ████████████  Disclosure 38:25-40:17.  The batteries are connected ██████████

7  ████████████████████████████████████████████████████████████

8  ████████████████████████████  *Id.*  The Disclosure contains an exemplary

9  illustration and names four documents that reflect TS 29.  *See id.*  Wisk's expert report describes

10  the development of the ESS technology from 2013 onward.[22]  *See* Expert Declaration of Eric Dix

11  ("Dix Rep.") [Dkt. No. 498-4].  ¶¶ 806-28.

12        Wisk's key assertion is not that Archer uses TS 29—Wisk has effectively conceded it

13  cannot provide evidence of this, in large part because it is undisputed Archer's ESS uses a

14  "distributed" power bus rather than a ████████████████—but rather that "Archer derived its

15  distributed bus architecture from Wisk's ██████████████."  P. Oppo. 30:23-31:1

16  (emphasis omitted).  To show derivation, Wisk must be able to show a dispute of fact sufficient

17  for "a reasonable jury [to] find" that Archer's ESS "was substantially derived from" Wisk's ESS.

18  *BladeRoom Grp.*, 2018 WL 514923, at *8-9.

19        Wisk's evidence shows that the ESS systems are similar, but it does not show even

20  circumstantial evidence of unlawful derivation.  Conceding that neither Archer's original ESS

21  designs from 2019 nor the ESS designs from its third party provider EPS were comparable to TS

22  29, *see* Dix Rep. ¶¶ 871-86, Wisk instead asserts that Melack and Jing Xue used their knowledge

23  and experience with TS 29 from Wisk to develop Archer's ESS.  For example, Wisk says Melack

24  sought a design proposal from EPS that used ████████████████████████████, which

25  Wisk says is "consistent with" TS 29.  *Id.* ¶ 904.  Opting to not use ESS's proposal, *see id.* ¶¶ 895-

26

27      [22] Contrary to Archer's argument, I do not read these paragraphs as Wisk's expert attempting to

28  expand the scope of TS 29 to include other energy storage systems.  *See* D. Mot. 29:19-30:2.  The
   secret is sufficiently particular.

United States District Court
Northern District of California

908, Archer designed an ESS for EPS to build, and Wisk says that the included elements were "attributable to Archer's derivation of" TS 29 and were "[c]onsistent with" TS 29. *See id.* ¶¶ 909-11. Wisk contends that other modifications "directly mirror[ed]" TS 29. *Id.* ¶ 913. The expert report also summarily concludes that a trade study conducted in late 2020 "describes a series of complex, different designs for its certifiable eVTOL. This work, done days after Xue and Johnny Melack joined Archer, based on all available evidence, is derived from Xue and Johnny Melack's knowledge of Trade Secret 29." *Id.* ¶¶ 888-89. The expert ends by listing similarities between Wisk's ESS and Archer's ESS and declaring, "Thus, Archer developed the Maker ESS as a result of derivation of Trade Secret 29." *Id.* ¶¶ 919-20. But Wisk's expert never explains the analytical or logical connection between those similarities and derivation or misappropriation and does not analyze how or why those similarities were derived from TS 29. Pointing to similarities in products, without more, is insufficient to survive summary judgment. *Cf. BladeRoom Grp.*, 2018 WL 514923, at *8-9.

Wisk's attempts to show that Xue and Melack somehow used Wisk's documents concerning TS 29 also fail. Xue's "contribut[ion] to a design leveraging ███████████" is titled "████████████████████," which suggests it would be related to TS 29, but all that Wisk's expert says is that the document's "level of complexity and sophistication . . . is strong evidence of misappropriation via derivation of" TS 29. Dix Rep. ¶ 891. The same is true of the following paragraph, which explains Xue considered particular "architecture[s]" during his first few days at Archer but says nothing more about how this indicates derivation from TS 29. *Id.* ¶ 892. And while Wisk asserts that Xue "downloaded multiple elements reflecting TS 29," P. Oppo. 31 n. 20 (citing Dkt. No. 498-44), neither Wisk nor its expert explain how Xue's work at Archer used those elements to derive the ESS. And Wisk does not even say that Melack retained any TS 29 documents but rather that he proposed an idea that had been in a presentation retained by Xue. Dix Rep. ¶ 881. None of these are evidence that Xue or Melack used TS 29 as a basis for designing Archer's ESS. Accordingly, it does not matter whether the similarities Wisk identifies were proposed by Archer or were part of its third-party producer's "off-the-shelf" system, *see* D. Repl. 12:12-23, because either way Wisk does not show that those similarities were derived from

United States District Court
Northern District of California

1    TS 29.

2          Finally, in denying the PI, I noted that it was undisputed "that Wisk's trade secret requires

3    a ███████████" and that while there was evidence showing Archer "was consider[ing]" a

4    ███████████ to use in the future, there was no evidence that it derived its independent

5    power bus from Wisk's trade secret.  Order Denying PI 33:4-22.  Wisk now argues that Archer hid

6    evidence at that stage because it did not disclose to Wisk or to me that it was working on a

7    ███████ design called Meru.  *See* P. Oppo. 30:10-21.  But as Archer points out in reply, Wisk

8    apparently knew that Archer was working on Meru when it filed its initial complaint.  [Dkt. No. 1]

9    ¶¶ 183-90.  Its accusation that "Archer hid Meru from the Court and Wisk" is therefore somewhat

10   misleading.  P. Oppo. 30:19-20.  And the Meru documents do not show anything substantively

11   different from what Wisk argued and I considered at the PI stage: that Archer was "considering" a

12   ███████████, but not that it "used" one in development.  *See* [Dkt. No. 498-104] at -746-47

13   (discussing "Design Goals" for Meru and noting that a "███████" would be a "[m]ajor

14   change from a prior model); [Dkt. No. 498-105] at -458-59 (comparing "detailed architecture"

15   between the independent and ███████ and specifying that "Independent Bus is the plan of

16   record for demonstrator").  Wisk's line of argument is not convincing and does not create a

17   genuine dispute of material fact.[23]

18         Because Wisk presented no evidence that Archer used TS 29 or derived its ESS from TS

19   29, summary judgment is GRANTED.

20              **7.    TS 30: Lithium-Ion Battery Cell Design Studies**

21         The parties dispute the definition and scope of this trade secret.  Though the name of this

22   secret is "Cell Design *Studies*," the Disclosure begins with, "Wisk has custom designed *the*

23   *batteries* within its [ESS]" and says the batteries' designs are based on "several factors," for which

24   the Disclosure provides examples.  Disclosure 40:18-42:8 (emphases added).  It then says that

25   Wisk has conducted various studies "to design the characteristics of *its battery cells*" and "to

26

27   _____
     [23] Wisk's expert report includes detail on Archer's development of Meru, including finding that it
28   is "nearly a carbon-copy of Trade Secret 29."  Dix Rep. ¶¶ 925-40.  But Wisk does not cite these
     findings in its opposition to summary judgment, presumably because Archer *does not use Meru*—
     which includes a ███████████—in its vehicles.

                                              43

United States District Court
Northern District of California

1  optimize the battery cell design." *Id.* (emphasis added).  The Disclosure includes exemplary

2  illustrations and seven documents that "reflect[]" TS 30.  *Id.*  It is undisputed that the studies

3  themselves are covered by the secret.

4       Wisk's expert asserts that this description also covers the "characterization, modeling, and

5  design" of the cells themselves as well as the "automated production line that Wisk developed

6  ████████████████████████" in order to produce the cells needed to meet the

7  specifications determined by its studies.  Dix Rep. ¶ 50.  It is clear from the Disclosure that TS 30

8  does not cover the production line, which mentions nothing about manufacturing let alone the

9  physical machines Wisk ████████████.  But it is also clear that the secret covers the

10  characterization of the cells, which Wisk's expert says includes the ████████████████

11  *id.*, because that is simply another way of referring to the studies and findings.  Archer adamantly

12  asserts that Wisk argues the secret covers the cells themselves, but I do not see that argument in

13  the briefs, and it does not seem to be made so directly in the expert report.  Rather, the secret is

14  defined with sufficient particularity to cover the studies, but not the production line.

15       Wisk's (contested) evidence shows the following: Wisk used its cell design studies in

16  ████████████████████████ a "pouch cell," and Wisk owned the cells,

17  manufacturing processes and line, and related intellectual property.  Dix Rep. ¶¶ 55-56.  Melack,

18  Muniz, and Nansi Xue were "included" in the development of the cells and formula.  *Id.* ¶ 59.

19  Melack, Xue, Muniz, and Ke Cocoa Zhang had varying knowledge that Wisk was ████████

20  ████████████████████.  *Id.* ¶¶ 61, 78, 82, 111.  In particular, Melack, Xue, and

21  Muniz were told that Wisk ████████ agreed to build a "dedicated" cell manufacturing line for

22  Wisk ████████████, and Melack and Zhang understood that the machines belonged to

23  Wisk and were for Wisk's use alone.  *Id.* ¶¶ 117-18, 176.  It is undisputed that each of these

24  individuals eventually left Wisk for Archer.

25       Wisk provides enough evidence for a reasonable jury to determine that, once Melack

26  arrived at Archer, he undertook a concerted effort to figure out the identity of the manufacturer

27  providing batteries to Archer's supplier, EPS.  *See id.* ¶¶ 186-87, 192-94, 197-209, 219, 221-24.

28  Though this is admittedly not the only interpretation of the evidence, which includes Melack

asking repeated questions about the manufacturing facilities, it is a reasonable one.  Wisk's

evidence suggests that once Archer had enough information to show that the manufacturer was

likely ███████, it asked more and detailed questions about the production equipment, *see id.*

¶¶ 200-07, which Wisk's evidence suggests Melack knew was the same dedicated line that

belonged to Wisk, *see id.* ¶¶ 117-18; *see also id.* ¶ 176 (Zhang's knowledge).  Melack was told by

EPS that an unnamed customer had the "sole right" to use this line, *id.* ¶ 206, but he still requested

Archer's cells be produced from that line and included the requirement in the statement of work,

*id.* ¶¶ 207, 210.  And Archer received at least some cells from that line.  *Id.* ¶¶ 211, 214, 216.

 Wisk's theory of misappropriation is indirect misappropriation, which "occurs when a

defendant obtains a trade secret 'from someone other than plaintiff'" and requires that the

defendant

> (a) knew or had reason to know before the use or disclosure that the information
> was a trade secret and knew or had reason to know that the disclosing party had
> acquired it through improper means or was breaching a duty of confidentiality by
> disclosing it; or (b) knew or had reason to know it was a trade secret and that the
> disclosure was a mistake.

*Wisk Aero LLC v. Archer Aviation Inc.*, No. 3:21-CV-02450-WHO, 2021 WL 8820180, at *10

(N.D. Cal. Aug. 24, 2021) (quoting *Navigation Holdings, LLC v. Molavi*, 445 F. Supp. 3d 69, 78-

79 (N.D. Cal. 2020)); *see also Cal. Police Activities League v. Cal. Police Youth Charities, Inc.*,

No. C 08-1991 PJH, 2009 WL 537091, at *3 (N.D. Cal. Mar. 3, 2009) (same).

 The theory of indirect misappropriation that is supported by the evidence is somewhat

unique here, particularly given my holding that the secret does not include the production line

itself.  Instead of asserting that Archer ████████████ to give Archer the secret studies, Wisk

says that Archer asked ████████ to use the secret studies to create the cells.  In other words, Wisk

seems to argue that Melack knew ████████ would have to use Wisk's trade secrets to create the

specific cells that Archer requested using the equipment Archer requested, and Melack improperly

████████████ into misusing the trade secret to do so.  Archer argues that under California law,

"using a product does not constitute a 'use' of trade secrets employed in its manufacture."  *Silvaco*

*Data Sys. v. Intel Corp.*, 184 Cal. App. 4th 210, 224 (2010), *disapproved of on other grounds by*

*Kwikset*, 246 P.3d at 894-95.  But the theory of indirect misappropriation is *not* that by acquiring

45

United States District Court
Northern District of California

the cells, Archer "used" Wisk's secret studies.  Rather, the theory is that Archer indirectly "used"

the studies by ▮▮▮▮▮▮▮▮▮▮ to improperly use the studies to make Archer the cells.

Wisk provides evidence to establish each element of indirect misappropriation under this

theory.  *See Wisk Aero*, 2021 WL 8820180, at *10.  It shows that Melack knew or had reason to

know that the studies were secret and that those studies were inherent to ▮▮▮▮▮▮ process of

making the cells requested by Archer, meaning that Melack knew ▮▮▮▮▮ would have to

improperly use Wisk's secrets to make the cells.  In other words, Melack knew that by demanding

certain requirements, he was ▮▮▮▮▮▮ to use Wisk's trade secrets (or so Wisk's evidence

suggests).  And Wisk shows that Melack was on notice that ▮▮▮▮▮ was only supposed to

provide these cells to Wisk, which is enough to show either that ▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ or that providing the cells was a mistake.  Together, this is enough evidence to

create a dispute of fact over whether Archer indirectly misappropriated the studies.

For those reasons, summary judgment is DENIED.

### 8.   TS 31: Performance Studies for Typical Mission Profile

TS 31 consists of "performance studies" that Wisk conducts to make determinations about

the battery's power requirements during different flight stages and ensure the battery provides

enough energy throughout a flight.  Disclosure 42:9-43:15.  The studies "use a model" to simulate

the "battery dynamics over a desired mission profile."  *Id.*  Wisk's Disclosure includes an

exemplary illustration graph and cites eight documents that reflect TS 31.  *Id.*

Wisk's argument boils down to the following: Archer's own model to predict and simulate

battery performance uses a value and a function that are also parts of Wisk's own model and that

were part of Wisk's iterative process in developing a model to predict and simulate battery

performance, and so Archer used TS 31 by using those same factors.  *See* P. Oppo. 36:11-37:16.

The underlying factors are a ▮▮▮▮▮▮▮▮▮ and an ▮▮▮▮▮▮▮

▮▮▮▮▮▮▮.  Dix Rep. ¶¶ 378-79, 383, 386.  Wisk's evidence shows how

this value and function were chosen and developed over time.  *See id.* ¶¶ 368, 378, 380-85, 388-

91.  It provides evidence that Zhang "leverag[ed]" ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ll

46

United States District Court
Northern District of California

1    ███████████████████████████████████ *Id.* ¶ 378. The ███████████

2    ████████████████████████████████████, *id.* ¶¶ 384-85, and

3    Nansi Xue "was working on using ██████████████████████████," *id.*

4    ¶ 381. Xue and Zhang both went to Archer, where its first model "████████

5    ███████████████████████, *id.* ¶¶ 484-88, the ██████████ serving as part of

6    the "basis" for Archer's models, *id.* ¶¶ 506-07. Xue chose ██████████ and said it was

7    based on "estimates," *id.* ¶ 492 (quoting Xue Tr.), but Wisk's expert says ██████████

8    "originate[d] from . . . Xue's knowledge of" TS 31 and was implemented by Archer before it

9    conducted any tests. *Id.* ¶¶ 495, 503. The expert also opines that "Archer's modeling strategy" is

10   the same as Wisk's, that Archer "███████████████" in the "source code" for its model,

11   and that the ██████████████████████████████ are part of

12   TS 31. *Id.* ¶¶ 494, 515, 519, 528-29.

13         Wisk's evidence shows that Xue and Zhang chose to use the ████████████

14   ██████ at Archer based on the work they did at Wisk. Archer disputes the evidence and also

15   argues that it is insufficient to show misappropriation because the secret is the "performance

16   studies," not the specific values.[24] But as clarified at the hearing, Wisk's expert report shows that

17   these ████████████████████████████████████████████

18   ██████████████████████████ *See, e.g.*, Dix Rep. ¶¶ 379-90. Archer argues that

19   the evidence shows only that ████████ and the ████████████████████, not

20   the resulting studies providing insight into battery power requirements or even the model itself,

21   but Wisk presents evidence to the contrary. And while evidence that the companies used similar

22   model inputs is not evidence that Archer used the secret *studies*, Wisk's point is that the only

23   reason *it* used ██████████████████████████████████, so if Archer

24   implemented them in the same way, Archer necessarily used the studies to make that

25   implementation decision. If true, that could show that the secret information was used in the

---

[24] This is true—the secret is the studies, not necessarily every input into the studies. Because TS 31 is sufficiently particular with this definition from the Disclosure, summary judgment is denied as to this argument. *See* D. Mot. 35:19-26.

1   "research or development" of Archer's model, *see BladeRoom Grp.*, 2018 WL 514923, at *9,

2   which creates a dispute of fact for the jury to decide.

3       Accordingly, because of this genuine dispute of material fact, summary judgment is

4   DENIED.

5           **9.**    **TS 39: High Voltage Connection System ("HVCS") Design**

6       TS 39 is "compris[ed]" of the "components, control, measurement, and communication

7   systems" that connect the vehicle's batteries to the "high-voltage system and the charging system,"

8   as well as the "monitoring" of these systems.  Disclosure 53:1-55:7.  The Disclosure outlines other

9   "[f]eatures" of the HVCS system, including ████████████████████████

10  ███████████████████████████████████████████████████

11  ██████████████ *Id.*  It also provides an "exemplary block diagram" showing the HVCS

12  functionality and lists 17 documents relating to the secret.  *Id.*

13      Archer argues that Wisk's secret would be insufficiently particular if it included each

14  underlying component that goes into the system, and I agree.  Wisk's Disclosure clearly refers to

15  the "system," including how it is put together and what it does, but each underlying element is not

16  itself the trade secret.  Defining TS 39 as the "system," though, is sufficiently particular to

17  preclude summary judgment on that basis.

18      Wisk does not provide evidence that Archer "used" its HVCS design or system.  Instead,

19  Wisk points to various elements of Archer's system and design that are similar to Wisk's, an

20  argument it repeated at the hearing.  It is undisputed that several elements are similar, that former

21  Wisk employees worked on the HVCS system at Wisk and then at Archer, and that Archer

22  developed aspects of its system on a quick timeline, *see* Dix Rep. ¶¶ 690-707—but that is not

23  enough, even circumstantially, to show that Archer misappropriated Wisk's secrets.

24      In Wisk's expert's hundreds of paragraphs on this trade secret, there is only one piece of

25  evidence at all connecting Wisk's TS 39 information to use at Archer.  Wisk shows that Jing Xue,

26  who undisputedly downloaded and retained Wisk documents when he left Wisk, retained a

27  document that ███████████████████████████████ *Id.* ¶ 702.  Wisk then shows that

28  Xue added a requirement to Archer's HVCS plan related to "███████████" which was "just as

United States District Court
Northern District of California

Wisk ███████████████████.”  *Id.* ¶ 700.  But this does not create a genuine dispute of fact in

part because Wisk's expert does not actually connect the retained document to the requirement

implemented at Archer; and they do not appear to be the same,[25] though even if they were, Wisk

still fails to provide evidence establishing a connection, so there is no evidence that that document

was "used" at Archer.  More critically, even if Xue copied this element from Archer, it does not

show that he "used" TS 39, which is the connection *system*.  *See* Disclosure 53:1-55:7.  Wisk

could establish that Archer misappropriated TS 39 by showing that Archer used some or all of the

underlying systems and designs "combined in" the same "novel way" that Wisk uses.  *See O2

Micro Int'l*, 420 F. Supp. 2d at 1089-90.  But Wisk does not do that by merely pointing to a single

"requirement" that came from Wisk, even combined with the evidence about Xue downloading

files and the quick development timeline.  Taking all of this together, a jury could only speculate

as to misappropriation of the system itself.

Wisk's other evidence also fails to establish genuine disputes of fact regarding

misappropriation.  Its expert lists other documents Xue retained that are apparently related to

HVCS, but it is not clear from the report, or from other evidence presented, how those documents

show information related to TS 39 or how Wisk thinks they were used at Archer.  *See* Dix Rep.

¶ 702.  The report also says that a "truth table" used by Archer to create its HVCS "was designed

by" Melack and Furman "thus the reasonable inference is that they relied on their knowledge of"

TS 39, *id.* ¶ 756, but this inference is obviously conclusory.  Wisk's expert also discusses the

Flight Termination System, *see id.* ¶¶ 708-16, but this is not part of TS 39.  *See* Disclosure 53:1-

55:7.  Finally, the expert report recounts in great detail the back-and-forth process between

Archer's engineers and Archer's supplier, EPS, showing that Archer asked for many requirements

and specifications that were similar to some of the features in TS 39.  *See id.* ¶¶ 717-771.  But

despite these dozens of paragraphs, Wisk fails to connect the requested specifications with its

---

[25] The Wisk document provided, ████████████████████████████████████████████
████████████████████████████████ Dix Rep. ¶ 702.  The Archer requirement
was ██████████████████████████████████████████████████████████████████████
██████████████████████████████ *Id.* ¶ 700.

United States District Court
Northern District of California

United States District Court
Northern District of California

secrets—nothing shows any employees used documents with those secrets at Archer, or that the requesting employee specifically worked on those specifications at Wisk, and nothing else connects the requests in a way that could create a genuine dispute as to misappropriation.  Without supporting evidence, Wisk's theories are mere speculation.  *See Excelligence Learning*, 2004 WL 2944048, at *7-8.

Wisk's misappropriation arguments and evidence for Midnight and Midnight Zero rely on its arguments and evidence for Maker, *see* Dix Rep. ¶ 772, and fail for the same reasons.  To the extent that the arguments include offer new assertions, *see id.* ¶¶ 773-91, the comparisons merely show similar technology at each company without providing a connection between Archer's implementation and its use of Wisk's trade secret.

Accordingly, summary judgment is GRANTED.

### 10.    TS 44: Avionics Architecture and Systems

TS 44 is comprised of the avionics systems, which are interconnected systems required to operate an aircraft that include "low voltage electronic equipment" such as for navigation, communication, flight controls, radar, and more.  Disclosure 62:22-64:18.  The avionics architecture is also part of TS 44, the ████████████████████████████████ ████████████████, which uses sensors and other data to send commands to the aircraft's motor controllers and "control surfaces," like rudders.  *Id.*  The architecture includes multiple redundancies to minimize risk and avoid single points of failure.  *Id.*  Wisk includes an exemplary illustration and six documents reflecting the trade secret.  *Id.*  This definition is sufficiently particular.

Wisk's expert report lays out the avionics architecture used at Wisk as well as its history and timeline for development.  Collins Rep. ¶¶ 465-519, 536-45.  Then the report compares Wisk's avionics architecture and systems to those considered by and implemented at Archer.  Archer does not dispute that there are some similarities between the architectures and systems, though it disputes many of the particular similarities found by Wisk's expert.  *See* D. Mot. 40:7-42:19.  Archer's key point, though, and what is ultimately fatal to Wisk's claim, is that there is no evidence establishing anything more than a speculative connection between Wisk's secret and its

alleged use at Archer.  *See Excelligence Learning*, 2004 WL 2944048, at *7-8.

Wisk's architecture was developed through extensive testing across prototypes over several years.  Collins Rep. ¶ 467.  Wisk's expert says that Archer incorporated a "drastic and rapid" change to its architecture system that "coincide[d]" with the arrival of former Wisk employee Scott Furman, who had the "same role" at both companies developing the avionics architecture.  Collins Rep. ¶¶ 526-27.  Furman "made substantial edits" to an Archer document that incorporated a system "like Wisk's."  *Id.* ¶ 528; *see also id.* ¶ 522 (Archer's new architecture "resemble[d]" Wisk's architecture.).  The report provides an example diagram and explains that there are "some differences" between the architectures but they "closely resemble[]" each other, so—the report surmises—Furman used TS 44.  *Id.* ¶¶ 528-29.  It also says that Furman considered only considered ██████████████ for Archer and provides side-by-side lists of similar considerations at each company regarding ████████████████████████ *id.* ¶ 530, though it is not clear from the exhibits who made these lists.  Wisk also asserts that Archer "considered" ██████████████████████ and compares those to Wisk's process.  *Id.* ¶ 532.  And it says that Archer's choices for its sensors were "relatively uncommon," like Wisk's, so Archer must have derived its "starting point" from Wisk's TS.  *Id.* ¶ 543.  Finally, the report explains that Furman retained and then deleted Wisk documents, so the expert was unable to review them, and that Xue downloaded a document related to TS 44.  *Id.* ¶¶ 534-35.

While the report shows that the systems are similar—facts disputed by Archer—Wisk's evidence does not establish that anyone *used* TS 44 at Archer.  *See M.A. Mobile*, 400 F. Supp. 3d at 893 ("The fact that [the relevant companies] developed similar technology does not raise [the plaintiff's] theories above the speculative level.").  Noting that the systems are similar or resemble each other is insufficient to show use of a trade secret.  *See id.*  And while it is not clear that the ██████████████ "considered" by Furman even fall within the scope of TS 44 since they do not appear in the Disclosure, even if they do, pointing to these elements "considered" by Archer without providing evidence that Archer "employ[ed]" the secret in "manufacturing, production, research or development, [or] marketing," *BladeRoom Grp.*, 2018 WL 514923, at *9, is insufficient to show use of the secret.

United States District Court
Northern District of California

1   Despite the extensive document discovery disputes, as well as dozens of depositions and

2   expert reports, Wisk does not point to documents, conversations, emails, or anything else showing

3   TS 44 was "used" in the development of Archer's avionics systems.  Referring to its inability to

4   review the documents retained by Furman is somewhat misleading; I previously found that all but

5   one of those documents was available and had been provided to Wisk.  [Dkt. No. 423].  And

6   though Wisk says that Xue downloaded a document showing at least some aspects of TS 44, it

7   does not claim that Xue worked on the avionics systems at Archer or that Xue shared this

8   document—or other relevant information—with Furman or other members of the avionics

9   architecture team.

10   Wisk fails to provide evidence that Archer misappropriated TS 44.  There is no genuine

11   dispute of fact precluding summary judgment.  Archer's motion is GRANTED.

12   **B.    Patents**

13   Archer moves for summary judgment that its Midnight production aircraft does not

14   infringe Wisk's U.S. Patent no. 10,110,033 ("the '033 patent"), concerning the battery charging

15   system, and for summary judgment that none of its aircrafts infringe Wisk's U.S. Patent no.

16   9,764,833 ("the '833 patent"), concerning the ventilated rotor mounted on the aircraft boom.  I

17   previously permitted Wisk to amend its infringement contentions for these patents to add

18   allegations against the Midnight production aircraft.  [Dkt. No. 348].

19   **1.   '033 Patent: Multi-Battery Charging Station Which Selectively Connects**

20   **Battery Sub-Modules to a Common Power Bus for Charging**

21   The '033 Patent is "directed at methods and systems" for charging a battery system that

22   has "a plurality" of sub-modules connected to a common power bus.  Collins Rep. ¶ 769.  Archer

23   argues for summary judgment of noninfringement of the '033 Patent by its Midnight production

24   aircraft because it says that the charging system for that aircraft does not exist and so there can be

25   no dispute of fact as to whether the aircraft infringes the patent.  D. Mot. 43:3-44:1.  In opposition,

26   Wisk points to evidence that Archer imported an infringing charging system (called a charging

27   management unit, or "CMU") into the U.S. "for its Maker aircraft" and its "prototype 'Midnight

28   Zero.'"  P. Oppo. 43: 15-20.  Wisk disputes whether the Midnight production aircraft will use the

same charging system as Maker and Midnight Zero and asserts that Archer has not proved it will *not* use the same system, and then says it "is irrelevant to liability" whether Archer has used the system in Midnight.  *Id.* 43:18-20, 44:2-14.

Wisk presents sufficient evidence to create a dispute of fact whether the accused charging systems infringe its patent.  Archer purchased two allegedly infringing charging systems from a third party, Electro Aero, *id.* ¶¶ 781-92, 832: the ███ system for Maker and the ███ system, which "is to be used for at least Archer's Midnight Zero aircraft," *id.* ¶ 792.  Wisk's expert report describes the charging systems and methods of the patent as well as the prosecution history and claims, Collins Rep. ¶¶ 769-78, and notes that the expert inspected at least Maker and Midnight Zero with respect to the '033 Patent allegations, *id.* ¶ 965.  Wisk's expert reviewed the source code for the ███ charger, finding it "materially the same" as the ███ charger, and determined both chargers infringe the '033 Patent.  *Id.* ¶¶ 810-939.

But as Archer points out in its papers, at no point in the report, or in any other evidence that Wisk points to, is there evidence that Archer has used or does use the ███ charger in its Midnight production aircraft.  *See id.* ¶¶ 782, 784 (referring to evidence of designs "currently under consideration for Midnight" as well as the "current plan of record" for Midnight (quoting Bower Tr. 336:7-17)); ¶ 802 (describing the "current plan for the Midnight aircraft"); ¶ 947 (Midnight "is currently set to use" the system).  There is disputed evidence whether Midnight will *eventually* use the allegedly infringing system and whether any alternatives to the charger being consider by Archer are viable.  *See id.* ¶¶ 947-62, 965-68, 970-75.  But Archer's evidence shows that Midnight does not use the ███ system (or the ███ either).  [Dkt. No. 456-52] (Deposition of Benjamin Greek) 39:20-25, 41:22-43:10 (explaining there have been neither design reviews of nor any development work on Midnight's charging system); [Dkt. No. 456-1] (Declaration of Geoff Bower) ¶¶ 3-8 (differentiating between Midnight and Midnight Zero aircrafts and declaring Archer decided against the ███ battery for Midnight and will not purchase a battery from Electro.Aero by otherwise has yet to select a vendor).  Wisk points to a recently released press statement that it says shows production on the first Midnight aircraft is complete.  [Dkt. No. 558].  I take judicial notice of that document and also acknowledge Archer's rebuttal that the article

United States District Court
Northern District of California

1  concerns Midnight Zero, not the Midnight production aircraft.  [Dkt. No. 559].  Wisk provides no

2  evidence that Archer has chosen a charging system for the Midnight *production* aircraft.

3       To infringe a patent, there must be an accused product.  *See* 35 U.S.C. § 271(a)

4  (contemplating the make, use, offer to sell, or sale of a patented *invention*); *see also BladeRoom*

5  *Grp.*, 2018 WL 514923 at *8-9 (describing the differences between patents and trade secrets,

6  including that patent cases analyze "the *presence or absence*" of the patent in the accused *device*,

7  while trade secrets protect the "*dissemination of information*" (first emphasis added)).  Abstract

8  ideas cannot infringe a patent in part because abstract ideas are not patentable.  *See Alice Corp.*

9  *Pty. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014).  Wisk seems to assert that because Archer has

10  contemplated using the ███ charger in Midnight, it infringes the patent.  But the undisputed

11  evidence shows that Midnight does not use the ███ system (or the ███ either).  It is

12  undisputed that Midnight does not use the allegedly infringing system, so there is no dispute of

13  fact concerning Midnight's infringement of the '033 Patent.

14       Further, with respect to Wisk's argument that it "is irrelevant to liability" whether

15  Midnight uses the allegedly infringing technology given its evidence that Maker and Midnight

16  Zero infringe, I note that *Wisk* moved to amend its infringement contentions of the '033 Patent to

17  assert them against Midnight.  [Dkt. No. 312].  I permitted it to amend its infringement allegations

18  to assert that Archer's Midnight aircraft infringed the ███ system because it pointed to evidence

19  that it said showed Archer would be imminently incorporating the system into its aircrafts.  [Dkt.

20  No. 348] 2:9-12, 6:22-26.  But because Wisk does not now show that the system was ever

21  incorporated in the Midnight production aircraft, its infringement contention does not survive.

22  Wisk's unpublished and nonbinding cited case does not support denial of summary judgment

23  because there it was "undisputed" that products were sold with infringing software, whereas here

24  there is no evidence that the Midnight uses the allegedly infringing CMU.  *See VirnetX Inc. v.*

25  *Apple, Inc.*, 792 F. App'x 796, 808 (Fed. Cir. 2019); *cf. Apple Inc. v. Samsung Elecs. Co.*, No. CV

26  12-00630 LHK, 2012 WL 5632618, at *2 (N.D. Cal. Nov. 15, 2012) (amending infringement

27  allegations where new product had been *released*).

28       There is no genuine dispute of material fact for the jury.  Summary judgment is

54

GRANTED regarding the Midnight production aircraft's infringement of the '033 Patent.

## 2.   '833 Patent: Ventilated Rotor Mounting Boom for Personal Aircraft

The '833 Patent is directed at a "rotor mounting boom assembly" that addresses "cooling challenges" faced by the electric rotor controllers on eVTOL aircraft and it uses "a novel rotor mounting boom assembly" to do so.  Collins Rep. ¶¶ 557-60.  The rotors can generate airflow through the boom assembly to cool the rotor controllers.  *Id.* ¶ 560.  The rotor control assembly consists of a rotor controller and its enclosure, which "may be in 'fluid communication' with an air inlet and air outlet on the boom."  *Id.* ¶ 561.  Claim 1 recites, at issue here, a "rotor mounting *boom* assembly" which includes "an air inlet positioned on the *boom*."  *Id.* ¶¶ 567 (emphases added); *see* D. Mot. 44:10-14.  Under Patent Local Rule 4-3, the parties agreed to, and this court adopted, the construction of "boom" as "elongated support structure."  [Dkt. No. 183].

Archer's sole argument for summary judgment is that Wisk's expert fails to include the proper definition of "boom" in his infringement analysis, so his finding that Claim 1 was met should be struck, and that all other asserted claims depend on that one.  *See* D. Mot. 44:2-45:16. Archer also moves to strike these portions of the expert report for the same reason.  [Dkt. No. 443 No. 7:20-9:11].  Wisk contends that its expert applied the correct definition in his analysis and that even if he did not, the infringement claim survives under the doctrine of equivalents.  *See* P. Oppo. 44:16-45:22.

Wisk's expert states in his report that he was told "the Court has not construed any of the claim terms in the '833 Patent" and so he "applied the plain meaning" to all claim terms in the '833 Patent.  Collins Rep. ¶ 34.  His rebuttal report, though, includes a line acknowledging that the parties' agreed that "boom" means "elongated support structure" and stating he applied that definition in his rebuttal and his opening reports.  ("Collins Reb. Rep.") [Dkt. No. 498-4] ¶ 25.  In his initial analysis, he says that he inspected Maker as well as the design plans for Midnight, Collins Rep. ¶¶ 570, 574, and explains his findings that Maker's architecture infringes Claim 1, *id.* ¶¶ 577-91, and that Midnight's architectural design infringes, *id.* ¶¶ 618-33.  In particular, he found that a "boom comprises multiple different components, including the fairing" and that

"what Archer calls a 'fairing' is clearly a part of the boom in this context."[26]  *Id.* ¶ 590; *see also id.* ¶ 632 (applying the same reasoning to "covers").  He says that a fairing "may be removable and may not be structural" but that fact does not mean a fairing is not part of a boom.  *Id.* ¶¶ 590, 632. Wisk's expert determined that even if the air inlet is on the fairing or the cover as Archer asserts, it is still on the *boom* as required by Claim 1 because the fairing and cover are simply parts of the boom.  *See id.* ¶¶ 577-91, 629-33.

Archer cites *Treehouse Avatar LLC v. Valve Corporation*, 54 F.4th 709 (Fed. Cir. 2022) in support of its motion.  That case is similar in many ways: the Federal Circuit affirmed the district court's decision to strike an expert report and grant summary judgment for lack of evidence of infringement where the expert report specifically stated he applied the ordinary meaning of a term instead of the construction agreed upon and adopted by the court, the report did not acknowledge or recite the court's construction, and the expert submitted a supplemental report stating it applied the proper construction in the initial report.  *Id.* at 712-14.  The court held that testimony should be struck where it was based on "a claim construction that is materially different from the construction adopted by the parties and the court," *id.* at 715 (collecting cases) and affirmed the district court's finding that the meaning used was "inconsistent with" the agreed construction, *id.* at 714-15; *see also VR Optics, LLC v. Peloton Interactive, Inc.*, No. 2021-1900, 2023 WL 2031213, at *6 (Fed. Cir. Feb. 16, 2023) (finding an expert's testimony failed to demonstrate a genuine issue of material fact where it was "based on an unduly narrow reading of the district court's claim construction" (citations and footnote omitted)).  And here, as in *Treehouse*, the expert's report failed to acknowledge or recite the construction of "boom" agreed on by the parties and adopted in this case, and later submitted a rebuttal report stating that he previously applied the proper agreed construction.  *See* Collins Reb. Rep. ¶ 25.

But Archer does not show that the expert's definition of boom was inconsistent with—let alone materially different from—the agreed upon construction.  *Cf. Treehouse*, 54 F.4th at 714-15.

---

[26] For support he cites the Hughes Deposition, which only confirms that the fairing is "part of the boom *module*," and a statement from Archer's boom vendor, *see id.* (emphasis added), neither of which provide evidence that the fairing is "part" of an "elongated support structure" such that an air inlet "on" the fairing would be "on" the support structure.

United States District Court
Northern District of California

He says that a boom "comprises multiple different components, including the fairing [and cover]." Collins Rep. ¶¶ 590, 632.  Archer argues that because its air vents are mounted on its fairings (and covers), and because the expert says fairings (and covers) "may not be structural," it is impossible for its architecture to meet Claim 1, which requires air vents mounted on "support *structures*." But Archer's argument is misguided.  The expert does not say that the *booms* are nonstructural, but that the fairings and covers, which he finds are *components* of the booms, "may" be nonstructural.  *See also id.* ¶ 633.  Finding that something is comprised of certain nonstructural components does not show that the thing itself is nonstructural—and Archer points to no evidence or law that says otherwise.  Accordingly, the expert's construction of "boom" is consistent with the agreed construction.

That construction also supports his infringement findings, at least to create a genuine dispute of fact.  Even assuming the air inlets are on the fairings and covers, the expert's finding that the fairings and covers are "on" the booms is sufficient to show that the air inlets are "on" the booms are required by Claim 1.  Archer contests these findings, but they are something for the jury to address.  I note too that there are disputed facts regarding the expert's infringement theory of the doctrine of equivalents, which also survives based on his acceptable construction of "boom."  *See* Collins Rep. ¶¶ 591, 633.

Because disputed facts remain, summary judgment is DENIED.[27]

### III. WISK'S MOTION TO STRIKE

In its motion to strike, Wisk asserts that Archer's experts improperly provided three previously undisclosed non-infringing alternatives ("NIA") in their rebuttal reports and seeks to strike all three NIAs for failure to previously disclose and for prejudice to Wisk.  *See* Mot. Strike; *see also* Rebuttal Report of Heath Hofmann ("Hofmann Reb. Rep.") [Dkt. No. 440-2]; Rebuttal Report of Marilyn Smith on Patents ("Smith Reb. Rep.") [Dkt. No. 440-3].  In opposition, Archer asserts that each "NIA" is actually rebuttal testimony to address arguments and NIAs that Wisk's

---

[27] Archer raises an additional argument in a footnote but specifically says it "is not moving for summary judgment on that basis" due to space constraints.  D. Mot. 45 n.35.  Accordingly, I do not address the argument.

United States District Court
Northern District of California

experts discussed in their reports, and regardless, at least two of the NIAs` were explicitly disclosed.  *See* Oppo. Strike.

In this district, "given the purpose" of the Local Rules requiring disclosure of infringement contentions, "a party may not use an expert report to introduce new infringement theories, new infringing instrumentalities, new invalidity theories, or new prior art references not disclosed in the parties' infringement contentions or invalidity contentions." *Huawei Techs., Co., Ltd. v. Samsung Elecs. Co., Ltd.*, 340 F. Supp. 3d 934, 946 (N.D. Cal. 2018) (quoting *Verinata Health, Inc. v. Sequenom, Inc.*, No. 12-cv-00865-SI, 2014 WL 4100638, at *3 (N.D. Cal. Aug. 20, 2014)). "In deciding whether to strike an expert report, the 'threshold question . . . is whether the expert has permissibly specified the application of a disclosed theory or impermissibly substituted a new theory altogether." *Droplets, Inc. v. Yahoo! Inc.*, No. 12-CV-03733-JST, 2021 WL 9038509, at *2 (N.D. Cal. Apr. 27, 2021) (citation omitted).  If the latter, courts in this district then ask, "[W]ill striking the report result in not just a trial, but an overall litigation, that is more fair, or less?" *Huawei Techs.*, 340 F. Supp. 3d at 946 (quoting *Apple Inc. v. Samsung Electronics Co.*, No. 11-cv-01846-PSG, 2012 WL 2499929, at *1 (N.D. Cal. June 27, 2012)).  "[A] party need not 'prove its case' or even 'disclose specific evidence' in its contentions." *Droplets*, 2021 WL 9038509, at *2 (quoting *Verinata Health*, 2014 WL 4100638, at *3).  "Courts distinguish between 'the required identification of the precise element' that meets a claim limitation and 'every evidentiary *item of proof* showing that the . . . element did in fact practice the limitation.'" *Id.* (quoting *Genetech, Inc. v. Tr. of Univ. of Penn.*, No. C 10-2037 LHK (PSG), 2012 WL 424985, at *1 (N.D. Cal. Feb. 9, 2012)).

Where a party did not sufficiently disclose, FRCP 37(c)(1) "provides for 'automatic and mandatory' exclusion unless the non-disclosure was 'justified or harmless,'" though "courts have discretion to permit a lesser sanction." *Id.* at *9 (citations omitted).  Courts consider the following in deciding whether to strike evidence: (1) "the surprise to the party against whom the evidence would be offered"; (2) "the ability of that party to cure the surprise"; (3) "the extent to which allowing the evidence would disrupt trial"; (4) "the importance of the evidence"; and (5) "the nondisclosing party's explanation for its failure to disclose the evidence." *Id.* (quoting *Blair v.*

1    *CBE Grp., Inc.*, 309 F.R.D. 621, 626 (S.D. Cal. 2015)).

2        **A.    NIA 1**

3        Wisk labels as NIA 1 Hofmann's opinion in paragraphs 186 to 188 of his report.  Mot.

4    Strike 3:8-11.  Collins' report says that Maker satisfies the claim limitation "obtaining a global

5    maximum cell voltage, wherein the global maximum cell voltage is determined by selecting a

6    maximum from a plurality of maximum cell voltages in the plurality of metrics" using particular

7    source code he calls the "███████████████████."  Collins Rep. [Dkt. No. 484-2]

8    ¶¶ 897-900.  Hofmann's rebuttal opines that the source code could be changed to remove that

9    function, thereby not "obtaining a global maximum cell voltage" and instead taking another

10   approach, which would require relatively little time (40 hours) and expense ($10,000).  Hofmann

11   Reb. Rep. ¶¶ 186-88.  Archer says that this opinion merely responded to Collins' opinions that the

12   particular source code satisfied the particular claim limitation and did not offer a new alternative.

13       The problem with Archer's argument is that it was specifically asked about this claim in

14   the interrogatories and it directed Wisk to its much more general answer that the batteries could be

15   charged separately and independently.  [Dkt. 440-5] at 40:21-25 (Archer's interrogatory

16   responses).  The allegedly infringing source code is the "precise element" that Archer was

17   required to identify but it did not discuss the source code as an alternative to this limitation.  *See*

18   *Droplets*, 2021 WL 9038509, at *2 (citation omitted).  Consequently, this response in Hofmann's

19   rebuttal report constitutes a new theory of noninfringement.  *See id.*

20       Archer next argues that it could not have previously disclosed this alternative because it

21   did not have access to the source code from Electro.Aero to identify this issue before the rebuttal

22   report.  Wisk points out that both parties had access to the source code at the same time (and Wisk

23   was able to timely analyze this portion), and further notes that it specifically identified the

24   "██████████████████████" in its '033 Patent Infringement Chart.  [Dkt. No. 312-2] at pdf

25   74-75.  Archer could have addressed this at least in its opening report.  Its explanation for failing

26   to do because it lacked access to the source code—one of the considerations when determining

27   whether to strike the opinions—is shaky at best and thus favors Wisk.  *See Droplets*, 2021 WL

28   9038509, at *9.  For the same reasons, the "surprise" element favors Wisk.  *See id.*

United States District Court
Northern District of California

Whether Wisk had the ability to cure the surprise and whether allowing the evidence would disrupt trial also favor Wisk. *See id.* Archer points out that Wisk filed supplemental reports for other issues and could have done so for this limitation, which would cure any surprise. Wisk notes it did so only for "a separate discovery violation" that could be addressed without further fact discovery. *See* Repl. Strike 8:24-9:5. It is persuasive that responding to Hofmann's contentions about deleting this portion of the source code and replacing it with another method would require additional fact discovery, including to determine the viability of such a method along with its projected time and cost. Archer cites a district court case from Nevada where the court determined that the failure to disclose a non-infringing alternative until service of an expert report was "harmless" in part because the affected plaintiff had subsequently submitted a supplemental expert report that "could have addressed" the new NIAs. *See Silver State Intell. Techs., Inc. v. Garmin Int'l, Inc.*, No. 2:11-CV-01578-GMN, 2015 WL 2152658, at *7 (D. Nev. May 7, 2015). But in that case there was an eleven-month turnaround between the initial expert report and the supplemental reports, and the plaintiff did not move to strike for fifteen months after the initial report was filed. *See id.* Here, Hofmann provided the new NIA fewer than four months before *summary judgment*—obviously different timelines. Unlike in *Silver State*, even if Wisk had brought this to my attention on the day Hofmann filed his report—January 27, 2023—I could not "have reopened discovery to allow [Wisk] the opportunity to take additional fact discovery and its experts to address th[is] theor[y]" without significantly affecting the litigation schedule for this case. *See id.* Accordingly, the second and third factors favor Wisk.

Finally, the "importance of the evidence" factor is neutral. The evidence itself is important for Archer to demonstrate that it did not infringe this limitation of the '033 Patent. But it is not dispositive of the infringement claim, and perhaps not even dispositive of this limitation given Archer's other substantial evidence to these points.

Based on the above analysis, I find that striking these paragraphs of Hofmann's rebuttal report will result in "more fair" litigation "overall." *Huawei Techs.*, 340 F. Supp. 3d at 946. Wisk's motion is GRANTED.

**B.    NIA 2**

Wisk labels as NIA 2 Hofmann's opinion in paragraphs 177, 181, and 184.  Wisk's argument is essentially that Archer disclosed individual and separate charging ports for each battery would be on the wings, but now Hofmann opines that the charging ports can be closer to the ground and thus save charging time.  *See* Mot. Strike 4:3-28; *see also* Hofmann Reb. Rep. ¶¶ 174, 177, 181, 184.  In opposition, Archer contends that Hofmann's opinion that the charging ports did not have to be on the wings and could be closer to the ground is not a new theory and was merely a response to Collins' calculation of how long it would take to charge the plane.  *See* Strike Oppo. 10:4-19.

I agree with Archer that Hofmann's report did not contain a new opinion on this topic.  It is true that Archer included an exemplary diagram of charging ports on the wings, [Dkt. 440-5] at 39:6-41:2 (Archer's interrogatory responses), and that Archer's charging vendor said the ports would be on the wings, [Dkt. No. 441-8].  But Archer did not affirmatively state in its interrogatory responses that its NIA charging each battery independently required the ports to be on the wings—Collins assumed this.  Accordingly, it was proper rebuttal testimony for Hofmann to explain that the chargers did not have to be on the wings.  This was not impermissible substitution of a new theory altogether, but rather permissible specification of the application of the disclosed charging port theory.  *See Droplets*, 2021 WL 9038509, at *2.  Accordingly, these paragraphs need not be struck.  Wisk's motion is DENIED.

**C.    NIA 3**

Smith's rebuttal report analyzes Collins' opinion that to avoid infringing the '833 Patent, Archer would have to move the motor controller to a different position outside of the boom assembly, which would create drag and require Archer to provide additional power to fly its vehicles.  *See* Collins Rep. ¶ 665, 668.  Collins asked Gandhi to calculate and quantify this drag and power analysis.  *Id.* ¶¶ 670-71; *see also* Smith Reb. Rep. ¶¶ 173, 175-77.  Smith pokes holes in Gandhi's analysis and points out flaws, reasoning that even if she uses Gandhi's methodology, the calculations would yield different outcomes if he had instead used the correct inputs.  *See* Smith Reb. Rep. ¶¶ 178-96.  In particular, Smith says that a "basic premise" of aerodynamics is to

1    avoid protrusions, and it is not "standard industry practice to perch a cylindrical shape on top of a

2    boom without" other considerations, so the proposed alternative is wholly nonviable and would

3    not be adopted without significant alterations. *Id.* ¶ 184. She then outlines those standard industry

4    practices, *id.* ¶¶ 185-86, and explains how including them would yield more accurate calculations,

5    *id.* ¶¶ 187-96. It is those final paragraphs applying the new practices to Gandhi's methodology

6    that Wisk moves to strike, labeling these at NIA 3. *See* Mot. Strike 5:15-8:23.

7         I do not read Smith's report as providing a new alternative theory. Her response applies

8    methods to decrease the aircraft's drag, including putting a streamlined fairing on the back of the

9    vehicle instead of the top, both of which Smith says are industry practice though Wisk labels these

10    as a new undisclosed alternative. *See* Smith Reb. Rep. ¶¶ 190, 196. But it is clear from her report

11    and from the analysis in the Collins and Gandhi reports that Smith properly responds to the

12    alternative proposed by Wisk's experts and properly calls out apparent mistakes they made or

13    factors they overlooked, asserting that any person with skill in the art of aerodynamics would

14    know to not make these choices. *See id.* ¶¶ 184-85, 190. And it is permissible that Smith

15    consulted with Archer engineers to craft this analysis—that alone does not show this is a new

16    theory. *See* [Dkt. No. 441-12]. Wisk is free to cross-examine Smith on this analysis and question

17    her assertions that these choices were standard industry practice or dissect her calculations that

18    yield different results, but Wisk does not show these opinions should be struck. Party experts are

19    permitted to poke holes in the analyses provided by opposing experts; pointing out that the

20    opposing experts failed to apply standard industry practices in their analysis is not the same as

21    providing new non-infringing alternatives.

22         Accordingly, this section of Smith's report permissibly specifies the application of *Wisk's*

23    noninfringement theory and does not itself provide a new theory. *See Droplets*, 2021 WL

24    9038509, at *2. Wisk's motion is DENIED.

25                                    *      *      *

26         For those reasons, Wisk's motion to strike is GRANTED in part and DENIED in part.

27    **IV. DAUBERT MOTIONS / MOTIONS TO EXCLUDE**

28         Federal Rule of Evidence 702 provides, "A witness who is qualified as an expert by

62

1   knowledge, skill, experience, training, or education may testify in the form of an opinion or

2   otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier

3   of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on

4   sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d)

5   the expert has reliably applied the principles and methods to the facts of the case."

6        Under *Daubert*, I "must assure that the expert testimony 'both rests on a reliable

7   foundation and is relevant to the task at hand." *City of Pomona v. SQM N. Am. Corp.*, 750 F.3d

8   1036, 1043 (9th Cir. 2014) (quoting *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)).  The

9   testimony is "relevant if the knowledge underlying it has a valid connection to the pertinent

10  inquiry." *Id.* at 1044 (quoting *Primiano*, 598 F.3d at 565).  It is "reliable if the knowledge

11  underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Id.*

12  (quoting *Primiano*, 598 F.3d at 565).  Though I exclude "unreliable nonsense opinions," I do not

13  exclude evidence for being shaky or opinions for being impeachable or even wrong.  *See id.*

14  (citing *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013)).

15       For reliability, the test looks at the "soundness of [the expert's] methodology" rather than

16  the correctness of the opinions.  *Id.* (citation omitted); *see also* Fed. R. Evid. 702.  I "must act as a

17  'gatekeeper' to exclude 'junk science' that does not meet Rule 702's reliability standards by

18  making a preliminary determination that the expert's testimony is reliable." *Cooper v. Brown,* 510

19  F.3d 870, 943 (9th Cir. 2007).  "Rule 702 demands that expert testimony relate to scientific,

20  technical or other specialized knowledge, which does not include unsubstantiated speculation and

21  subjective beliefs." *Id.*

22       Together the parties filed nine *Daubert* motions and motions to exclude a total of eleven

23  experts' testimonies and reports.  I address them in turn.[28]

---

[28] The Motion to Exclude Expert Testimony of Patrick Kennedy, [Dkt. No. 447], and the Motion to Exclude Opinion and Testimony of Eric Wright, [Dkt. No. 449], will be addressed in a subsequent order.

United States District Court
Northern District of California

A.    **Archer's Motion to Exclude Wisk's Technical Experts**

    1.    **Gandhi**

Much of Archer's motion with respect to Gandhi's report shows that Archer is moving to strike new theories of infringement.  Archer argues that the section that reviews the Betty aircraft and finds it infringes Claim 2 of the '036 Patent should be struck because Wisk did not accuse Betty in its infringement contentions.  Motion to Exclude Certain Testimony of Wisk's Technical Experts ("Tech. Mot.") [Dkt. No. 443] 6:22-7:19.  Wisk responds that Betty is a "scaled-down version" of Maker and that there is no prejudice to Archer from including Betty even if Betty were a new theory.  ("Tech. Oppo.") [Dkt. No. 481] 11:19-12:19.

Whether Betty is a scaled-down version of Maker is a disputed fact, as Wisk's own motion asserts.  *See id.* 11:16-12:4 (showing an expert dispute whether Betty is "unrelated" to Maker or merely a "scaled-down version" (first quoting Smith Rep.; and then quoting Gandhi Rep.)).  Wisk's reference to Betty as "an infringing product," *id.* 12:6, though, is telling: it seems to view Betty as a new accused instrumentality.  Regardless of that, Wisk largely concedes that including Betty in its infringement analysis constituted a new *theory* of infringement.  *See id.* 11:23-27 (citing *ROY-G-BIV Corp. v. ABB, Ltd.*, 63 F. Supp. 3d 690 (E.D. Tex. 2014), for the contention that new theories of infringement may be included for the first time in expert reports in certain cases[29]).  Accordingly, the same test discussed above from *Droplets*, 2021 WL 9038509, at *2, and *Huawei Technologies*, 340 F. Supp. 3d at 946, applies.

Here, the infringement contentions and analysis against Betty in Wisk's expert report constituted the disclosure of new theories or instrumentalities, impermissibly substituting a new

---

[29] In addition to being out of district and therefore not applying our Local Patent Rules, this case does not provide enough factual description of the contested products to fully support Wisk's argument that Betty is within the scope of its infringement contentions because it is a merely a scaled-down version of Maker.  The district court in Texas reasoned that an expert report did not improperly extend the bounds of the plaintiff's infringement contentions where the plaintiff seemed to analyze new software systems in the expert report, but the court found each system was "integrated with" the accused system, and the theories in the expert report were supported by the initial contentions.  *ROY-G-BIV*, 63 F. Supp. 3d at 699-700.  Because it is not clear from that case what the specific systems were or how they were "integrated with" the accused system, it is not possible to draw a comparison to this case, where Wisk argues Betty is a "scaled-down version" of Maker—not "integrated with" Maker in any way.

United States District Court
Northern District of California

instrumentality in violation of the local rules.  *See Huawei Techs.*, 340 F. Supp. 3d at 946.
Striking this portion of the report will result in more fair litigation overall: Wisk knew of Betty's
existence when it filed the complaint in this case.  *See* Tech. Oppo. 12:6-11 (noting Wisk
"identified Betty as an infringing product early in this litigation by including a photo of Betty in its
pleadings" (citing [Dkt. No. 1] ¶¶ 121, 148; [Dkt. No. 45] ¶¶ 121, 148; [Dkt. No. 148] ¶¶ 134,
165)).  Yet it did not include Betty in its infringement contentions despite an opportunity to
amend, [Dkt No. 348].  At the hearing on its motion to amend its infringement contentions, "Wisk
conceded on the record . . . that is had made no changes to its contentions concerning" the '036
Patent.  *Id.* 9 n.4.  It would be unjust and unfair to now permit Wisk to expand the scope of its
contentions to include a new infringing theory or instrumentality.  And though Archer had an
opportunity to respond to the contentions with its own expert report, in the context of this "overall
litigation" where Wisk was granted requests for expedited discovery, leave to amend its
contentions long into the lawsuit, and several discovery disputes in its favor, it would be
exceedingly unfair to Archer to give Wisk this eleventh hour opportunity of which it could have
taken advantage earlier.

Accordingly, Archer's motion is GRANTED for this contention and the requested
paragraphs are struck.  The remainder of Archer's motion to exclude Gandhi concerns his opinions
about Trade Secrets 1 and 5.  Because summary judgment was granted concerning each of these
secrets, these arguments are now moot.

## 2. Collins

Archer moves to exclude Collins' expert report and testimony concerning the '833 Patent
in part because, Archer says, Collins failed to apply the proper governing claim construction for
"boom."  Tech Mot. 7:20-8:13.  I rejected that argument above, *supra* Part II.B.2, because Archer
failed to show Collins' definition was inconsistent with or materially different from the governing
construction, *cf. Treehouse*, 54 F.4th at 714-15, and do so again here.

Archer also says that the portions of the report where Collins opines that ███████
████████████████████████████████████████████ should be excluded
because Collins merely parrots the determinations of Wisk's engineer Geoff Long concerning a

future product.  Tech. Mot. 10:14-11:11.  But Wisk points out that Collins' report analyzes the

progression of its previous generation aircraft and couples the determinations about those—for

which he inspected the aircraft and designs—with the factual assertions from Long about the same

or similar technology ███████████████████████████████████████████████████████

██████████   Collins is entitled to rely on the facts provided by Wisk's employee in their

conversations.  *See Oracle Am., Inc. v. Google Inc.*, No. C 10-03561 WHA, 2011 WL 5914033, at

*1 (N.D. Cal. Nov. 28, 2011) (denying a motion to strike expert testimony because "[e]xpert

reliance on foundational facts supplied by [the company's] engineers can be proper so long as they

testify to the foundation facts with firsthand knowledge"[30] (citation omitted)).  Archer is free to

argue at trial that Collins and Wisk do not have evidence ███████████████

Accordingly, the motion to exclude the Collins report and testimony is DENIED.

### 3.   Dix

Archer argues that Dix may not offer contract interpretation testimony and so moves to

exclude portions of Dix's expert report that state Wisk "owned" the cells, manufacturing

processes, and intellectual property developed ████████████, a finding related to TS 30.  Tech.

Mot. 9:17-10:22.  The disputed contract language, which Dix cites, is that Wisk ██████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████ [Dkt. No. 481-

20] at -450.

Dix's statement that Wisk "owned" the cells, while perfunctory, is a finding that Wisk

developed, conceived, or created the cells with the specified technical requirements—a technical

finding, not a legal contract interpretation.  This differs from *Fujifilm Corp. v. Motorola Mobility

LLC*, No. 12-CV-03587-WHO, 2015 WL 1737951, at *16 (N.D. Cal. Apr. 8, 2015), where I struck

---

[30] *Oracle* noted that in Google's opposition papers that it would offer factual testimony from fact
witnesses before its damages experts would testify based on those facts.  2011 WL 5914033, at *1.
Wisk is expected to do the same, or Archer may renew this objection at trial.

an expert's testimony regarding the "scope" of a patent and copyright agreement because he was not a contract interpretation expert and he gained his understanding of the contract language from conversations with counsel. Here, not only is Dix not interpreting the contract, he clarified he did not gain any understanding from counsel. *See* [Dkt. No. 443-6] (Dix Transcript) 152:17-154:4. His statements may be factually incorrect, and Archer is free to argue that at trial. But the statements will not be excluded.

Archer also moves to exclude portions of Dix's report that it says impermissibly opine on the mental states of Archer and its employees. Tech. Mot. 10:25-11:14. It moves to strike the following paragraphs: ¶¶ 189, 190, 194, 198, 208, 217, 218, 223, 226, 251, 252, 255, 259. Paragraphs 190, 194, 208, 217-18, 223, 251, 252, 255, and 259 have nothing to do with mental state and will not be struck.

In ¶ 189, finding Melack sought information "in order to mandate production" is improper testimony on mental state because Dix has no way of knowing Melack's intentions and so the finding is not grounded in Dix's "scientific, technical, or other specialized knowledge." Fed. R. Evid. 702. It also does not go to factual issues concerning what Archer's engineers "should have known" and none goes to "the ultimate issue." *See* Tech. Oppo. 22:11-28. Those words shall be struck. However, stating Melack "intentionally sought information" is not speculative; it is a finding based on Melack's conscious actions and communications, which provides context for Dix's opinions, and so is not improper.

Upon review of ¶ 198, the sentence, "Those inquiries appear to be triggered by Archer's initial review of EPS cell discharge data" and the words "That information prompted" are background information based on the Dix's expert findings and so are grounded in his expertise. *See* Fed. R. Evid. 702. Nothing else in the paragraph could be interpreted as speculation on mental state. It will not be struck.

Finally, ¶ 226 says "Archer sought to ensure the use of Wisk's proprietary and confidential research," and then offers a specific example and quotes a statement from Melack. This is a classic expert finding and is not improper.

Accordingly, the motion to exclude Dix's report is GRANTED as to the specific phrase

1      above and otherwise DENIED.

2          **B.      Freeh and Kane**

3              The Freeh and Kane reports were submitted to address the veracity of the phrase "criminal

4      investigation into Archer."  *See* Freeh Rep.; Kane Rep.; *supra* Part I.A.3.b.  Both parties move to

5      exclude the other's expert report.  Motion to Exclude Expert Testimony of Louis J. Freeh ("Freeh

6      Mot.") [Dkt. No. 442]; Motion to Exclude the Opinions and Testimony of Miranda Kane ("Kane

7      Mot.") [DKt. No. 435].

8              Both experts are qualified, and their specialized knowledge "will help the trier of fact to

9      understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a): they were asked to

10     opine on whether the FBI and DOJ were conducting a criminal investigation into Archer, and each

11     has experience conducting investigations with those agencies.

12             Both reports use nearly identical methods: the reports look at the contested statement and

13     the available contextual evidence, select that which each expert views as the relevant definition,

14     and apply the definition to evidence.  That each report selects a different definition—one using

15     "subject" and one using "target"—and gives different weight to evidence certain evidence, does

16     not mean that the method itself was unreliable, even if it may mean one of the conclusions is

17     incorrect.  *See City of Pomona*, 750 F.3d at 1043.  Though Wisk moves to exclude Kane's report

18     as ipse dixit and not based in sound reasoning or methods, again she employs essentially the

19     same—permissible—methods used by Freeh.  This argument is meritless.

20             Neither report is unreliable or irrelevant for failing to address the chosen definition used in

21     the other expert's report.  Archer argues that Freeh's report is irrelevant for failing to account for

22     the context of the phrase, applying only the definition of "subject," and therefore

23     mischaracterizing Archer's claim, which parallels Wisk's argument that Kane's report is irrelevant

24     and unhelpful for only addressing whether Archer was the "target" of an investigation.  These

25     arguments essentially assert that each party has "contrary evidence" about the definition of target

26     versus subject that was unaddressed by the other party's expert, which is not a reason to exclude

27     either report.  *See City of Pomona*, 750 F.3d at 1043.

28             Archer also argues that Freeh is too qualified to interpret the report and cannot offer an

United States District Court
Northern District of California

1  opinion on how an average reader would interpret the wording, but Freeh's opinion goes to how

2  the federal agencies define the existence of a criminal investigation, which is relevant to the truth

3  of the statement, properly based on Freeh's experience, and helpful to a layperson who would not

4  have the same knowledge of federal agencies.  *See* Fed. R. Civ. Proc. 702(a)-(d).  Archer also fails

5  to explain why the testimony of a former FBI director would be unduly prejudicial; his experience

6  is directly relevant to determining how the FBI might define a term and so is highly probative to

7  the issue.  *See* Fed. R. Evid. 403.  It does not usurp the factfinder's role because Freeh does not

8  say the statement was not defamatory—a legal conclusion—but rather that based on his

9  experience, he opines that there was an investigation into Archer—not a legal conclusion.  *See*

10  *United States v. Diaz*, 876 F.3d 1194, 1197 (9th Cir. 2017) ("[A]n expert witness cannot give an

11  opinion as to her *legal conclusion*, i.e., an opinion on an ultimate issue of law." (citations

12  omitted)).  Finally, despite Freeh's omission of a case in which he previously testified, as Wisk

13  shows, there is no prejudice to Archer, and indeed Archer seems to have omitted similar

14  information from its own expert.  [Dkt. No. 479] 12 n.6.

15      Accordingly, both motions are DENIED.

16  **C.    Hofmann**

17      Wisk moves to exclude the expert testimony and report of Heath Hofmann for various

18  reasons.  ("Hofmann Mot.") [Dkt. No. 439]; *see also* [Dkt. Nos. 439-2, 487-2] ("Hofmann Rep.").

19  Archer opposed.  ("Hofmann Oppo.") [Dkt. No. 487].  I granted summary judgment to Archer on

20  Wisk's misappropriation claims for trade secrets 17 and 39 without relying on Hofmann's

21  testimony, so I need not address Wisk's argument going to the substance of or expertise related to

22  that testimony.  I also rejected all of Archer's arguments that Wisk's trade secrets were not

23  sufficiently particular, so I need not address those arguments in Wisk's motion.

24      Hofmann is qualified to opine on TS 30, which covers the cell design studies but does not

25  cover the manufacturing equipment.  *Supra* Part II.A.7.  The studies are used to design the cells

26  that go into the batteries.  Disclosure 40:19-41:5.  The crux of Wisk's argument is that Hofmann

27  does not have cell design or chemical engineering experience and so cannot opine on studies

28  related to cell design, which Wisk says require both.  *See* Hofmann Mot. 3:11-5:11.

As an initial matter, the language of Disclosure does not cover "cell chemistry" though it seems reasonable that the studies themselves involve chemistry, as Wisk asserts. But if Wisk wanted to assert that an opposing expert needed to be a chemistry expert to assess its secrets, it should have ensured that its secret explicitly covered chemistry. *See Maldonado v. Apple, Inc*, No. 3:16-CV-04067-WHO, 2021 WL 1947512, at *17 (N.D. Cal. May 14, 2021) ("[T]he labels given to fields and subfields do not absolutely govern who may testify about them."). As is, it is not clear that a chemical engineering background specifically is required. The point of the studies is to inform cell and battery design, and Hofmann has extensive experience in battery design and energy storage design, Hofmann Rep. ¶¶ 7-13, electric vehicles, *id.* ¶¶ 19-26, and battery cell development, *see* Hofmann Oppo. 4:17-5:4 (collecting citations and listing examples). His opinions accordingly relate to his expertise; this is not the same as "slapping the label 'engineering' on an expert or opinion," *Maldonado*, 2021 WL 1947512, at *17, because his expertise is directly tied to his opinions. Hofmann is sufficiently qualified. *See Cooper*, 510 F.3d at 943.

Hofmann is also qualified to opine on TS 31, which covers performance studies related to the battery throughout a flight mission. *Supra* Part II.A.8. Wisk repeats the arguments it makes for TS 30 and adds that "Hofmann lacks experience modeling individual cell performance." Hofmann Mot. 5:12-17. But TS 31 concerns battery dynamics and battery performance, *see* Disclosure 42:10-17, and again, Wisk does not contest that Hofmann has extensive experience in battery design and battery cell development, to which his opinions relate. Wisk seems to try to use its reply to its motion to exclude in order to add detail to its Disclosure definition about particular cell composition. *See* Hofmann Repl. 4:3-5. But it did not define the secret in that way and it does not sufficiently explain why Hofmann would be unqualified to opine on its secret as currently defined.

Wisk argues that Hofmann's report should be excluded for incorrectly opining on the legal rules for misappropriation by derivations. *See* Hofmann Mot. 8:12-11:26. As relevant, Hofmann discussed how he thinks it is important to see if any contract between Wisk ▮▮▮▮▮▮▮▮▮ was violated, but does not discuss whether Archer knew EPS ▮▮▮▮▮▮▮▮▮▮▮▮.

70

1   Hofmann Rep. ¶ 707.  Archer conceded that it knew EPS ████████████████ in its

2   Motion for Summary Judgment.  And Hofmann's discussion is not an incorrect statement of law

3   as Wisk asserts; indeed, it is not a statement of the law at all.  *Cf. Herbert v. Lisle Corp.*, 99 F.3d

4   1109, 1115-17 (Fed. Cir. 1996) (excluding various statements by the expert as "incorrect

5   statement[s] of the law").  Hofmann simply says what he thinks is important.  To the extent that

6   Hofmann's opinion can be discredited for failing to analyze the facts under a derivation theory of

7   misappropriation analysis, that can be challenged on cross examination at trial.  The motion is

8   DENIED.

9       **D.    Milbourn**

10      Wisk's arguments and *Daubert* motion to exclude Milbourn's report and testimony are

11  nearly identical to its arguments about causation and damages for Archer's counterclaims.

12  *Compare* Motion to Exclude Milbourn ("Milbourn Mot.") [Dkt. No. 454] *with supra* Part I.A.1.

13  For mostly the same reasons, it too is denied.

14      First, Milbourn's testimony does not fail to link economic harm to Wisk's statements.  *See*

15  Milbourn Mot. 8:19-11:8.  Milbourn and Archer were not required to determine or present

16  evidence of the specific economic damage caused by each statement or to separate out the specific

17  harm caused by the blog as opposed to the litigation or the market, and the report sufficiently

18  shows that the statements caused Archer economic damage.  *Supra* Part I.A.1

19      Second, Wisk does not show that Milbourn's analysis falls below the accepted standards

20  and methodology in the field.  *See* Milbourn Mot. 11:11-13:24.  Wisk's only argument is

21  essentially the same as its other arguments related to causation and damages: that the report

22  "fail[ed] to consider whether the harm on which [Milbourn] w[as] opining could have been the

23  result of alternative causes."  *Id.*  In fact, Milbourn says that the other factors—litigation and the

24  market—likely caused economic harm but that he could not (and was not required to) separate out

25  which factor caused any particular *amount* of damages.  As explained, he was not required to do

26  so under the law, so his methodology did not need to account for this.  *Supra*, Part I.A.1.

27      Third, Milbourn's opinions are not inadmissible ipse dixit conclusions but rather properly

28  rely on facts, law, and his professional expertise.  *See* Milbourn Mot. 13:25-14:25.  Milbourn

United States District Court
Northern District of California

applied his expertise—as a finance and investment professor as well as a board member of two

SPACs and a hedge fund, *see* Milbourn Rep. ¶¶ 1-7—and "fundamentals of corporate finance" to

evaluate market positions, *see id.* ¶ 12, using relevant facts like the investors' comments about the

blog posts and the evidence showing the delay was implemented to assuage investor concerns.  He

compared Archer's experiences to those of other "early-stage startups" to assess the impact of the

statements on Archer's reputation, using his experience constructing financial models.  *Id.* ¶¶ 54-

59, 74.  This is sufficient for an expert report.

Fourth, Archer may present contradictory evidence at trial regarding whether the delay in

the merger resulted from the litigation, market, *and* blog, or just the litigation and market, *see*

Milbourn Mot. 15:3-16:11, but as discussed, this is not a reason to exclude Milbourn's report.

And contrary to Wisk's assertion, Milbourn's report does not rely "only" on the testimony of

Archer's CEO, but rather on other evidence, data, and analyses.

Fifth, the report is not "contrary to the law."  *See* Milbourn Mot. 16:14-17:10.  Wisk's

arguments about the Fair Reporting Doctrine are addressed and rejected above.  *Supra* Part I.A.2.

Finally, Milbourn is qualified to opine on the "amplification" argument.  *See* Milbourn

Mot. 17:11-24.  His report found that Wisk's sending of the blog to the media made it more likely

that investors would see the allegedly defamatory statements more quickly.  *See, e.g.*, Milbourn

Rep. ¶¶ 36-37.  Though Wisk says that Milbourn's finance background does not qualify him to

opine on the "effect Wisk's alleged 'amplification' had on the media," Reply to Milbourn Mot.

[Dkt. No. 526] 13:13-14, Milbourn's report concerns how Wisk's actions affected *investors*—

undisputedly an area in which Milbourn is qualified.  And as Archer points out, [Dkt. No. 501]

22:22-23:8, the opinions relate to Archer's reputation and valuation, for which he cites supporting

evidence and is qualified to opine.

The motion is DENIED.

### E.    Paskiewicz

Archer moves to exclude certain opinions in the expert report of Frank Paskiewicz.

("Paskiewicz Mot.") [Dkt. No. 445]; *see also* Opening Expert Report of Frank Paskiewicz

("Paskiewicz Rep.") [Dkt. No. 445-2].  Wisk opposed.  ("Paskiewicz Oppo.") [Dkt. No. 485].

United States District Court
Northern District of California

Archer replied.  ("Paskiewicz Repl.") [Dkt. No. 525].  Paskiewicz is an expert on aircraft certification given his decades of experience, including at the FAA where he helped develop certification regulations and policies.  *See* Paskiewicz Resume [Dkt. No. 485-2].  He has also done work on unmanned systems and eVTOL aircraft.  *Id.*; *see also* Paskiewicz Oppo. 4:4-14 (collecting citations).  He is more than qualified, under FRE 702, to opine on the aircraft certification at issue here.

Archer challenges paragraph 18—finding that eVTOL certification can take 5 to 10 years—as not based on any facts or experience, and Archer argues Paskiewicz is not qualified to render this opinion.  But Wisk points to Paskiewicz's extensive aircraft certification experience coupled with his experience working with eVTOL aircraft, which together are sufficient to provide estimates.  Archer's cited case is not to the contrary.  *See In re Cessna 208 Series Aircraft Prod. Liab. Litig.*, No. 05-MD-1721-KHV, 2009 WL 3756980 (D. Kan. Nov. 9, 2009).  There the court excluded a helicopter expert from testifying about fixed wing aircraft for lack of experience relating to fixed wing aircraft.  *Id.* at *12.  Here, Paskiewicz has experience related to eVTOL *and* significant general certification experience.  While no passenger-carrying aircrafts have yet been certified by the FAA, that alone does not preclude Paskiewicz from opining on the timeline based on his extensive experience, though Archer may point to this fact on cross-examination.

The remainder of Archer's substantive argument is that Paskiewicz is not qualified to provide certain opinions that require technical engineering expertise.  *See* Paskiewicz Mot. 6:12-9:20.  It seeks to strike paragraph 18 of the report, which was addressed above, as well as paragraphs 55 to 86.  *See* Paskiewicz Repl. 1:1:2-3.  As detailed below, these paragraphs do not require technical expertise and so Paskiewicz's experience with certification is sufficient to render these opinions admissible.

Paragraphs 55-56 say that Archer developed and iterated its Midnight production aircraft based on the technology and testing done with Maker, which Paskiewicz says is "common practice" for certification.  Opining on what is a common practice for certification is certainly within his expertise in certification, so these are admissible.  Paskiewicz next addressed Archer's public and private statements and opined on how those affected certification timelines.

73

Paskiewicz Rep. ¶¶ 57-60. Paragraph 61 discusses the kinds of technologies for which Maker helped prove viability, but it makes that assessment from non-technical documents, and it uses those findings to reason that Maker gave Archer a head start on certification. Paragraph 62 simply states when Archer chose the 12-tilt-6 design as a factual basis for other findings. Paragraphs 63 to 65 discuss how long certification usually takes for aircrafts and how that is affected by internal testing and development, and that the timelines for Midnight's certification were affected by Maker's testing and development. All of these require certification expertise to interpret but do not require technical expertise. *See, e.g.*, ¶ 59 ("Archer planned to conduct the first flight test of Maker around the same date that it planned to freeze Midnight's 'Requirements and Aircraft Sizing.'"). They will not be struck.

Paskiewicz next discusses technology in terms of showing how Midnight's reliance on Maker's technology affected certification, but these paragraphs do not apply technical analyses and so do not require technical expertise. *Id.* ¶¶ 66-78. He then analyzes nontechnical statements and documents showing how Maker's timeline affected Midnight's development, which does not require technical expertise, and he used those findings to explain the effect on the certification timeline, for which he is qualified. *Id.* ¶ 79-84. The last two contested paragraphs merely provide conclusions from the above permissible paragraphs and so too are permissible. *Id.* ¶¶ 85-86.

It is also not clear that Paskiewicz "recanted" his head start opinion at his deposition. *See* Paskiewicz Mot. 9:21-10:27. If Archer wants to argue this, it may do so on cross examination, including to address credibility.

Accordingly, the motion is DENIED.

### F. Smith

Wisk moves to exclude the supplemental expert report of Dr. Marilyn Smith for various reasons. ("Smith Mot.") [Dkt. No. 437]; *see also* [Dkt. No. 437-3] ("Smith Supp. Rep."). Archer opposed, ("Smith Oppo.") [Dkt. No. 489], after which Wisk's reply clarified some of its positions, ("Smith Repl.") [Dkt. No. 513].

First, above I found that Wisk's trade secrets 1, 3, and 15 were defined with reasonable particularity; its arguments about Smith's testimony to these points are moot.

United States District Court
Northern District of California

United States District Court
Northern District of California

1

2

3

Next, Wisk challenges Smith's "head start" opinions concerning TS 1 and 15. *See* Smith Mot. 9:3 (citing [Dkt. 437-5] ¶¶ 582-83). Above I granted summary judgment to Archer for these trade secrets without relying on this contested testimony, so I need not address the argument.

4

5

6

7

8

9

10

11

12

The parties' final dispute concerns Smith's supplemental report opinion on the allowance of a patent application for Midnight related to Wisk's '833 Patent. Though the parties debate whether Smith's report concerns literal infringement or the doctrine of equivalents ("DOE") theory, it is clear that her contested statements supplement her DOE findings from her other reports, not findings of literal infringement. *See* Smith Supp. Rep. ¶¶ 5, 11, 13. And evidence of separate patentability can be "relevant as to the question of whether the accused devices infringe the patent-in-suit" under the DOE theory. *AngioScore, Inc. v. TriReme Med., Inc., et al.*, No. 12-CV-03393-YGR, 2015 WL 5258786, at *3 (N.D. Cal. Sept. 8, 2015) (citing *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1192 (Fed. Cir. 1996)).[31] Smith's DOE opinions are allowed.

13

14

15

16

17

18

19

20

21

Wisk argues that even Smith's DOE assertions are inadmissible because Smith's statements about the oil cooling approach are irrelevant to Wisk's DOE theory that Archer's aircraft has equivalent technology to the '833 Patent's motor control enclosure, and that the oil cooling approach is an "additional functionality" rather than a defense to infringement. Smith Repl. 2:22-3:6, 3:21-4:8. But Smith *does* analyze Archer's patent allowance for its effect on that enclosure; it seems Smith's whole point is that the technologies are different because Midnight uses oil in the enclosure instead of air. *See* Smith Supp. Rep. ¶¶ 8-9, 11-13. It is not clear that finding shows this is an additional functionality, as Wisk asserts, rather than an inherently different way of producing similar results. Whether that is factually true can be proved at trial.

22

23

Wisk's remaining arguments about Smith's supplemental report rely on its arguments concerning the literal infringement and DOE opinions, and so are similarly denied.

24

Accordingly, this motion is DENIED.

25

26

27

28

---

[31] Indeed, *AngioScore* and *National Presto* both seem to suggest that the allowance is relevant to literal *and* DOE theories of infringement. *See Nat'l Presto Indus.*, 76 F.3d at 1192 ("Whether a modified device is within the scope of the prior patent, literally or by equivalency, depends on the particular facts. The fact of separate patentability is relevant, and is entitled to due weight.").

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CONCLUSION**

For those reasons, Wisk's motion for summary judgment is DENIED.  Archer's motion for summary judgment is GRANTED in part and DENIED in part.  Wisk's motion to strike is GRANTED in part and DENIED in part.  The motions to exclude and *Daubert* motions are as follows: Gandhi: GRANT in part and DENY in part.  Collins: DENY.  Dix: GRANT in part and DENY in part.  Freeh: DENY.  Kane: DENY.  Hofmann: DENY.  Milbourn: DENY.  Paskiewicz: DENY.  Smith: DENY.

**IT IS SO ORDERED.**

Dated: May 30, 2023



William H. Orrick
United States District Judge