GIBSON, DUNN & CRUTCHER LLP
Josh A. Krevitt, SBN 208552
  jkrevitt@gibsondunn.com
Stuart M. Rosenberg, SBN 239926
  srosenberg@gibsondunn.com
1881 Page Mill Road
Palo Alto, CA  94304-1211
Telephone: 650.849.5300

Daniel J. Thomasch, admitted *pro hac vice*
  dthomasch@gibsondunn.com
Paul Torchia, admitted *pro hac vice*
  ptorchia@gibsondunn.com
200 Park Avenue
New York, NY  10166-0193
Telephone: 212.351.4000

Wayne Barsky, SBN 116731
  wbarsky@gibsondunn.com
Michael H. Dore, SBN 227442
  mdore@gibsondunn.com
Diana M. Feinstein, admitted *pro hac vice*
  dfeinstein@gibsondunn.com
2029 Century Park East, Suite 4000
Los Angeles, CA  90067-3026
Telephone: 310.552.8500

Attorneys for Defendant and Counterclaimant
Archer Aviation Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| WISK AERO LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>ARCHER AVIATION INC.,<br><br>                    Defendant. | CASE NO. 3:21-CV-02450-WHO (DMR)<br><br>**ARCHER'S OMNIBUS MOTIONS IN LIMINE**<br><br>Hon. William H. Orrick |

Gibson, Dunn &
Crutcher LLP

<u>**NOTICE OF MOTIONS AND MOTIONS**</u>

**TO PLAINTIFF WISK AERO LLC AND ITS COUNSEL OF RECORD**:

**PLEASE TAKE NOTICE** that on July 17, 2023, at 2:00 p.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable William H. Orrick at the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, Defendant Archer Aviation Inc. ("Archer") will and hereby does move the Court for an order granting the following motions in limine:

| | |
|---|---|
| Motion in Limine No. 1: | No expert witness shall offer any testimony or opinion not forth expressly in that expert's report. |
| Motion in Limine No. 2: | No party shall offer evidence or argument regarding a fact on which the party successfully resisted discovery on privilege grounds. |
| Motion in Limine No. 3: | Wisk shall not introduce evidence or argument regarding the alleged content of its oral communications with law enforcement officials concerning any FBI or DOJ investigation related to the alleged misappropriation of Wisk intellectual property. |
| Motion in Limine No. 4: | The following documents are admissible: Archer-NDCA-00578482, Archer-NDCA-00578250. |
| Motion in Limine No. 5: | Wisk is precluded from arguing that damages should be apportioned between defamatory statements and any other alleged or potential cause of harm to Archer. |
| Motion in Limine No. 6: | Wisk shall not mention, or offer evidence or argument regarding, Scott Furman's deletion of Wisk files. |
| Motion in Limine No. 7: | Dr. Kennedy shall not offer testimony regarding damages for the '033 patent. |
| Motion in Limine No. 8: | Wisk may not argue that Archer is a limited purpose public figure. |
| Motion in Limine No. 9: | No party shall introduce evidence or argument relating to the requested review of any personal devices that were subject to an order precluding discovery of those devices. |

Gibson, Dunn & Crutcher LLP

1    Archer's Motion is based upon this Motion, the below supporting memorandum of points and

2  authorities, the concurrently filed exhibits and declaration, and any other oral argument or submission

3  that Archer may submit to the Court.

4

5  DATED:  July 3, 2023                    GIBSON, DUNN & CRUTCHER LLP

6                                          By:  _____/s/ Josh A. Krevitt_____

7                                                  Josh A. Krevitt

8                                          *Attorneys for Defendant Archer Aviation Inc.*

**TABLE OF CONTENTS**

Page

I.     MOTION IN LIMINE NO. 1 TO PRECLUDE ANY EXPERT WITNESS FROM OFFERING ANY TESTIMONY OR OPINION NOT SET FORTH EXPRESSLY IN THAT EXPERT'S REPORT. ........................................................................... 1

II.    MOTION IN LIMINE NO. 2 TO BAR ANY PARTY FROM OFFERING EVIDENCE OR ARGUMENT REGARDING A FACT ON WHICH THE PARTY REFUSED DISCOVERY ON PRIVILEGE GROUNDS. ........................................ 1

III.   MOTION IN LIMINE NO. 3 TO PRECLUDE WISK FROM INTRODUCING EVIDENCE OR ARGUMENT REGARDING THE ALLEGED CONTENT OF ITS ORAL COMMUNICATIONS WITH LAW ENFORCEMENT OFFICIALS CONCERNING ANY FBI OR DOJ INVESTIGATION RELATED TO THE ALLEGED MISAPPROPRIATION OF WISK INTELLECTUAL PROPERTY. .................. 2

    A.    Wisk's Discovery Conduct ........................................................................ 3

    B.    Lack of Personal Knowledge ................................................................... 8

    C.    Hearsay........................................................................................................ 9

IV.   MOTION IN LIMINE NO. 4 TO ADMIT (1) ARCHER-NDCA-00578482, AND (2) ARCHER-NDCA-00578250. ................................................................................ 10

V.    MOTION IN LIMINE NO. 5 TO PREVENT WISK FROM ARGUING THAT DAMAGES SHOULD BE APPORTIONED BETWEEN DEFAMATORY STATEMENTS AND ANY OTHER ALLEGED OR POTENTIAL CAUSE OF HARM TO ARCHER. ............................................................................................... 13

VI.   MOTION IN LIMINE NO. 6 TO PRECLUDE WISK FROM MENTIONING, OR OFFERING EVIDENCE OR ARGUMENT REGARDING, SCOTT FURMAN'S DELETION OF WISK FILES. .......................................................................... 16

VII.  MOTION IN LIMINE NO. 7 TO BAR DR. KENNEDY FROM OFFERING TESTIMONY REGARDING DAMAGES FOR THE '033 PATENT. ................................. 18

VIII. MOTION IN LIMINE NO. 8 TO BAR WISK FROM ARGUING THAT ARCHER IS A LIMITED PURPOSE PUBLIC FIGURE. ................................................................ 20

IX.   MOTION IN LIMINE NO. 9 TO BAR WISK FROM INTRODUCING EVIDENCE OR ARGUMENT RELATING TO THE REQUESTED REVIEW OF ANY PERSONAL DEVICES THAT WERE SUBJECT TO AN ORDER PRECLUDING DISCOVERY OF THOSE DEVICES. ................................................................ 21

**TABLE OF AUTHORITIES**

**Page(s)**

CASES

*AngioScore, Inc. v. TriReme Med., Inc.*,
No. 12-cv-3393-YGR, 2015 WL 5258786 (N.D. Cal. Sept. 8, 2015) ...............................................1

*Beech Aircraft Corp. v. Rainey*,
488 U.S. 153 (1988) ........................................................................................................................12

*Bittaker v. Woodford*,
331 F.3d 715 (9th Cir. 2003)............................................................................................................1

*Brice v. Haynes Investments, LLC*,
No. 18-cv-1200-WHO, 2021 WL 9860718 (N.D. Cal. Aug. 10, 2021) ..........................................1

*Carlotto, Ltd. v. County of Ventura*,
47 Cal. App. 3d 931 (1975)............................................................................................................14

*Chevron Corp. v. Pennzoil Co.*,
974 F.2d 1156 (9th Cir. 1992)..........................................................................................................1

*Comdyne I, Inc. v. Corbin*,
908 F.2d 1142 (3d Cir. 1990)..........................................................................................................15

*Dawe v. Corrections USA*,
506 F. App'x 657 (9th Cir. 2013) ...................................................................................................20

*Enlow v. Salem-Keizer Yellow Cab Co.*,
389 F.3d 802 (9th Cir. 2004) (Ferguson, J., concurring in part)....................................................15

*Espinosa v. Little Co. of Mary Hosp.*,
31 Cal. App. 4th 1304 (1995)........................................................................................................14

*Jenson v. Eveleth Taconite Co.*,
130 F.3d 1287 (8th Cir. 1997)........................................................................................................14

*Johnson v. City of Pleasanton*,
982 F.2d 350 (9th Cir. 1992)..........................................................................................................12

*Larez v. City of Los Angeles*,
946 F.2d 630 (9th Cir. 1991)..........................................................................................................13

*M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur*,
400 F. Supp. 3d 867 (N.D. Cal. 2019) ...........................................................................................17

Gibson, Dunn &
Crutcher LLP

*Neelon v. Krueger*,
   2015 WL 13677813 (D. Mass. Sept. 8, 2015) ............................................................11

*Pakootas v. Teck Cominco Metals, Ltd.*,
   905 F.3d 565 (9th Cir. 2018)..................................................................................14

*Plantronics, Inc. v. Aliph, Inc.*,
   No. 09-cv-1714-WHA, 2014 WL 12641792 (N.D. Cal. Feb. 26, 2014) .........................2

*Plexxikon v. Novartis Pharm. Corp.*,
   No. 17-cv-4405-HSG, 2021 WL 2255885 (N.D. Cal. June 3, 2021) ...............................8

*Reader's Digest Ass'n v. Super. Ct.*,
   37 Cal.3d 244 (1984) .............................................................................................20

*Rozark Farms Inc. v. Ozark Border Elec. Co-op*,
   849 F.2d 306 (8th Cir. 1988)..................................................................................14

*Siqueiros v. Gen. Motors LLC*,
   No. 16-cv-7244-EMC, 2022 WL 3974752 (N.D. Cal. Aug. 31, 2022) .........................13

*Smith v. Davis*,
   No. 19-cv-8152-SI, 2020 WL 3488035 (N.D. Cal. June 26, 2020).............................12

*United States v. Fryberg*,
   854 F.3d 1126 (9th Cir. 2017)................................................................................11

*United States v. Loyola-Dominguez*,
   125 F.3d 1315 (9th Cir. 1997)................................................................................11

*Wilson v. Ritto*,
   105 Cal. App. 4th 361 (2003)..................................................................................14

**OTHER AUTHORITIES**

4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:87 (4th ed. July 2022
   Update).................................................................................................................11

*Dep't of Justice Manual* § 9-11.151, https://tinyurl.com/379u8brw....................................12

*The Role of the United States Attorney*, U.S. DEP'T OF JUST. (Dec. 12, 2022),
   https://tinyurl.com/3cm8n7bt................................................................................11

**RULES**

Fed. R. Civ. P. 26(a)(2)(B)....................................................................................................1

Fed. R. Evid. 402 ..........................................................................................16, 19, 20, 22

Fed. R. Evid. 403 ..........................................................................................17, 19, 20, 22

Gibson, Dunn &
Crutcher LLP

Fed. R. Evid. 602 ................................................................................................................8

Fed. R. Evid. 802 ................................................................................................................9

Fed. R. Evid. 803(8) ...........................................................................................10, 11, 12

Fed. R. Evid. 803(8)(A)(i) ................................................................................................11

Fed. R. Evid. 807 ..............................................................................................................12

**TREATISES**

Rest. (Second) Torts § 433A(1) ........................................................................................14

Rest. (Second) of Torts § 433B(2) cmt. *c* .......................................................................16

Gibson, Dunn &
Crutcher LLP

Defendant Archer Aviation Inc. ("Archer") respectfully requests that the Court grant the motions in limine set forth below.

## I.   MOTION IN LIMINE NO. 1 TO PRECLUDE ANY EXPERT WITNESS FROM OFFERING ANY TESTIMONY OR OPINION NOT SET FORTH EXPRESSLY IN THAT EXPERT'S REPORT.

Archer moves the Court for an order excluding any evidence, opinions, or testimony by expert witnesses not set forth explicitly in their written opinions in this matter.  *See* Fed. R. Civ. P. 26(a)(2)(B); *AngioScore, Inc. v. TriReme Med., Inc.*, No. 12-cv-3393-YGR, 2015 WL 5258786, at *1 n.1 (N.D. Cal. Sept. 8, 2015) ("All expert witnesses at trial must tether their testimony to the contents of their respective reports, and are precluded from exceeding the scope of their report."). Archer proposed that the parties stipulate to this routine arrangement, but Wisk refused, contending that its experts should be able to offer opinions based on the evidence introduced at trial.  If that were the case, Wisk's experts could say anything they wanted at trial, even if they could have said it earlier in their expert reports, thus making a mockery of this Court's disclosure requirements.  Should unanticipated, new material arise for the first time at trial, the parties should seek leave of Court (for good cause shown) in order to introduce any new opinions or testimony from experts.  That would address Wisk's concern, without vitiating the entire point of expert disclosures and reports.

## II.   MOTION IN LIMINE NO. 2 TO BAR ANY PARTY FROM OFFERING EVIDENCE OR ARGUMENT REGARDING A FACT ON WHICH THE PARTY REFUSED DISCOVERY ON PRIVILEGE GROUNDS.

The Court should preclude any party from presenting the jury with argument or evidence regarding a fact on which it refused discovery under the attorney-client privilege.  It is black-letter law that "[t]he privilege which protects attorney-client communications may not be used both as a sword and a shield."  *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (citation omitted).  This rule prevents a party from using privilege as both a sword and shield by unfairly "asserting claims the opposing party cannot adequately dispute unless it has access to the privileged materials."  *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003).  Courts routinely prohibit litigants from introducing matters at trial on which it resisted full discovery by invoking the attorney-client privilege.  *See, e.g.*, *Brice v. Haynes Invs., LLC*, No. 18-cv-1200-WHO, 2021 WL 9860718, at *4 (N.D. Cal. Aug. 10, 2021) ("It would be unfair to allow these defendants to use a good faith

defense that defendants admit ultimately rests on attorney client information provided by Think Finance attorneys as both a sword and shield given *their* invocation of the privilege to shield relevant information in this litigation."); *Plantronics, Inc. v. Aliph, Inc.*, No. 09-cv-1714-WHA, 2014 WL 12641792, at *1 (N.D. Cal. Feb. 26, 2014) ("At trial, Aliph will not be permitted to reference communications with counsel wherein privilege was asserted over the contents because privilege cannot be used as a sword and a shield.").  This Court should do the same.

### III. MOTION IN LIMINE NO. 3 TO PRECLUDE WISK FROM INTRODUCING EVIDENCE OR ARGUMENT REGARDING THE ALLEGED CONTENT OF ITS ORAL COMMUNICATIONS WITH LAW ENFORCEMENT OFFICIALS CONCERNING ANY FBI OR DOJ INVESTIGATION RELATED TO THE ALLEGED MISAPPROPRIATION OF WISK INTELLECTUAL PROPERTY.

Archer brings defamation and related counterclaims arising from Wisk's statement in a May 19, 2021 blog post that there was a "criminal investigation *into Archer* relating to the theft and use of Wisk's intellectual property."  Dkt. 452-1 at 16–18 (emphasis added).  In defending against these counterclaims, Wisk has taken the position that its statement was true.  *Id.*  It appears that Wisk intends to support this truth defense with out-of-court statements that federal law enforcement officers purportedly made to Wisk and its counsel at Quinn Emanuel—primarily Yury Kapgan, the only person from Wisk or Quinn Emanuel who was present for each of the 36 meetings that allegedly took place between Wisk and law enforcement about this issue.  *See* Dkt. 562-56 at 105–07.  But Wisk should be precluded from presenting evidence about any purported oral conversations between Wisk representatives and officials within the federal government for at least three reasons.  *First*, Wisk has thwarted Archer's attempts to take discovery about the alleged communications that Wisk claims the government made to its lead trial counsel in those conversations.  *Second*, it is clear from the Rule 30(b)(6) testimony of Greg Bibbes—Wisk's General Counsel, Rule 30(b)(6) witness regarding oral communications between Wisk and government officials, and Wisk's apparently intended witness to these communications—that he does not have personal knowledge of the conversations at issue, making his intended trial testimony inadmissible under Federal Rule of Evidence 602.  *Third*, Mr. Bibbes's (or any other Wisk witness's) trial testimony about those conversations would constitute inadmissible hearsay.

1  Each of these grounds is independently sufficient to bar Wisk from providing the jury with

2  evidence regarding federal officers' out-of-court statements regarding the purported scope of the

3  government's investigation.  Together, they demonstrate that Wisk has no basis upon which to

4  introduce alleged oral communications between Wisk's representatives and government officials.

5  The admission of such testimony would be immensely prejudicial to Archer, despite having no

6  probative value to the case.

7  **A.  Wisk's Discovery Conduct**

8  Wisk contends that it based the statement in its May 19, 2021 blog post on representations

9  made to it by officials at the FBI and the U.S. Attorney's Office for the Northern District of

10  California regarding their investigation into the alleged theft of Wisk intellectual property.  Wisk has

11  identified a total of 36 conversations in which it discussed that investigation with law enforcement.

12  *See* Dkt. 562-56 at 105–07.  But the only person who participated in each of those conversations on

13  behalf of Wisk was its lead counsel at Quinn Emanuel, Yury Kapgan.  *See id.*  And Wisk—and

14  Mr. Kapgan specifically—has consistently thwarted Archer's attempt to take discovery on those

15  critical conversations.  It would violate basic principles of fairness to allow Wisk to go to the jury

16  with argument or evidence regarding an issue on which it so completely refused to provide

17  meaningful discovery.

18  Wisk's resistance began during written discovery, when Archer propounded an interrogatory

19  directing Wisk to "[d]escribe in detail all oral communications . . . involving Wisk and/or Quinn

20  Emanuel Urquhart & Sullivan, LLP, on the one hand, and the Federal Bureau of Investigation, the

21  U.S. Attorney's Office for the Northern District of California, the Santa Clara County District

22  Attorney's Office, or any other federal or state law enforcement agency, on the other hand, related to

23  any alleged misappropriation of Wisk trade secrets by any former Wisk employee," including "***the***

24  ***substance of what each person said in the oral communication or discussion***."  *Id.* at 104 (emphasis

25  added).

26  Wisk refused to provide any substantive information regarding the communications.  Instead,

27  Wisk identified 36 communications between law enforcement officials and Wisk's officers or

28  agents—largely its outside counsel, Quinn Emanuel—but provided nothing about the individual

Gibson, Dunn &
Crutcher LLP

3

communications beyond a general statement that all 36 addressed "developments in the foregoing investigations and/or the misappropriation of Wisk's intellectual property." *See id.* at 105–07. Wisk's response merely contained such perfunctory statements as "August 19, 2020: Mr. Kapgan spoke with Mr. Kassabian," "October 30, 2020: Mr. Kapgan spoke with Mr. Mergen," and "March 29, 2021: Mr. Kapgan and Mr. LaFond spoke with Mr. Mergen." *Id.* Wisk's interrogatory responses do not identify any communications between Wisk and the government in which Wisk claims that any statement was made by anyone about any supposed criminal investigation "into Archer."

Wisk justified withholding the requested information on the ground that it was "overbroad and unduly burdensome, and not relevant or proportional to the needs of the case." *Id.* at 104–05. Wisk also asserted the attorney-client privilege and work-product doctrine to shield the specific substance of every conversation it or its lawyers had with the FBI and DOJ. *Id.* Wisk may not claim irrelevance and invoke privilege to prevent discovery of all oral communications with the government, only to selectively withdraw its objections at trial to allow only the precise testimony it deems helpful to its position. *See Brice*, 2021 WL 9860718, at *4 ("It would be unfair to allow these defendants to use a good faith defense that defendants admit ultimately rests on attorney client information provided by Think Finance attorneys as both a sword and shield given *their* invocation of the privilege to shield relevant information in this litigation."). But that is exactly what would occur if Wisk were permitted to present evidence about the substance of any one or more of the 36 communications at issue.

Nor was Wisk's stonewalling during written discovery its only tactic to deny Archer full and fair discovery about the alleged bases of its truth defense. Archer served a Rule 30(b)(6) notice seeking corporate testimony regarding, among other things, "[t]he basis for Wisk's statement in a May 19, 2021 blog post that there was a 'criminal investigation into Archer relating to the theft and use of Wisk's intellectual property' being conducted by the FBI and U.S. Department of Justice." Dkt. 496-43 ¶ 7. Wisk designated Mr. Bibbes to testify on this topic, "subject to [Wisk's] objection." Ex. 1 (Bibbes Tr.) at 10:11–16; *id.* at 76:13–23.[1]

---

[1] All exhibits are to the Declaration of Kory Hines, which is attached to this Motion.

Mr. Bibbes had been present for only three of the 36 conversations between Wisk and federal investigators, yet nobody in-house at Wisk had been present for more.  *See* Dkt. 562-56 at 105–07.[2] In response to the questions asked of him, Mr. Bibbes served as a conduit for information provided to him by Mr. Kapgan, who was defending the deposition, but effectively shielded himself from cross-examination through a combination of asserted memory lapses and multiple invocations of privilege. Mr. Bibbes readily volunteered that Wisk based its blog post statement "on discussions that we had with Special Agent Mergen and representatives from the U.S. Attorney's Office."  Ex. 1 (Bibbes Tr.) at 78:14–16; *see also id.* at 78:22–23 ("Special Agent Mergen said that they were looking into Archer.").  But when asked for supporting details, Mr. Bibbes could not provide anything of substance, including what was said, when it was said, or even whether he was present for the discussion.

Mr. Bibbes's response to questioning about his conversations with FBI Special Agent Mergen is illustrative:

**Q:**   In what interviews did Special Agent Mergen say that FBI and/or DOJ was, quote, 'looking into Archer'?

**A:**   I do not recall which of the several interviews and discussions that we had with Special Agent Mergen he said that.

**Q:**   Do you recall who was present for the discussion with Special Agent Mergen where Special Agent Mergen said that FBI and/or DOJ was looking into Archer?

**A:**   Yury Kapgan would have been part of that.

**Q:**   Do you recall anyone else who was present for a discussion [in] which Special Agent Mergen said that FBI and/or DOJ was looking into Archer?

**A:**   No.

**Q:**   Do you recall the dates of the communications in which Special Agent Mergen and the FBI and/or DOJ was looking into Archer?

**A:**   I don't recall.  It would have – I don't recall.

*Id.* at 79:10–80:4.  And when asked if he could provide "the context of the discussion in which Special Agent Mergen said that FBI and/or DOJ was looking into Archer," *id.* at 80:14–16,

---

[2]  Mr. Kapgan was present for all 36 communications, Michael LaFond was present for 20, and Steven Madison was present for six.  *See* Dkt. 562-56 at 105–07.  Each of these individuals is outside counsel for Wisk at Quinn Emanuel.

Gibson, Dunn &
Crutcher LLP

Mr. Bibbes responded, "I think just general discussions about – about the case.  I don't recall the specific – I don't recall the specific discussion in context.  But I do remember that he indicated that they were looking into Archer as an entity," *id.* at 80:20–25.

In light of the self-serving nature of Mr. Bibbes's testimony—professing to remember just one aspect of one purported discussion involving Special Agent Mergen as to which Mr. Bibbes did not recall if he was present—Archer's counsel sought to determine if there were other witnesses who could corroborate the alleged communication, and, if so, their identities.  Those efforts ran into a buzz saw of asserted privilege.  Specifically, when Mr. Bibbes was asked whether he informed anyone else of the statement he attributed to Special Agent Mergen, Mr. Kapgan interjected with a privilege objection to shut down that inquiry.  *See id.* at 82:9–17 ("Q: Did you inform anyone of the fact of Special Agent Mergen saying that FBI was looking into Archer?  MR. KAPGAN: Objection to the extent it calls for privileged communications.  If you have information outside of that, you can answer.  THE WITNESS: It would have been privileged."); *see also id.* at 83:21–23 ("Any discussions I would have had regarding our discussions with Special Agent Mergen would have been privileged.").

Having been blocked in his attempt to test the accuracy of Mr. Bibbes's testimony through another witness, Archer's counsel asked Mr. Bibbes if he knew "who wrote the words 'criminal investigation into Archer' in the May 19th, 2021 blog post by Wisk?"  *Id.* at 85:16–18.  Despite this question calling only for factual information, not communications, Mr. Kapgan again objected "to the extent it's calling for work product information," and Mr. Bibbes dutifully declined to answer other than to follow Mr. Kapgan's lead:  "I think it would be work product."  *Id.* at 85:19–25.  Archer's counsel then reframed the question, asking:  "Who wrote the words on the website that says that there's a criminal investigation into Archer?"  *Id.* at 86:3–4.  Again, Mr. Kapgan interjected that "[i]t's the same instruction about work product," prompting Mr. Bibbes to asserted his "belie[f] it's work product."  *Id.* at 86:7–10.  These objections to questions seeking factual information as to the basis for a Rule 30(b)(6) witness's testimony were patently improper, but served to deny Archer all information beyond the single alleged disclosure desired by Wisk to support its truth defense.

When Archer's counsel moved from Wisk's communications with FBI Special Agent Mergen to its communications with the U.S. Attorney's Office, Mr. Bibbes's and Mr. Kapgan's recalcitrance only intensified.  When asked simply, "What discussions with the U.S. Attorney's Office were the basis for Wisk saying that there was a criminal investigation into Archer," Mr. Bibbes requested a break soon after starting his answer so that he could consult about "a privileged question" with his counsel, Mr. Kapgan.  *Id.* at 87:2–6.  When he returned from speaking privately with counsel, Mr. Bibbes testified that Wisk (without identifying who) had conversations with the U.S. Attorney's Office in March 2021, "where they indicated that they ***would be*** taking action against Archer and its employees."  *Id.* at 88:2–6 (emphasis added).  But Mr. Bibbes caught himself mid-answer and sought to revise his testimony before he was asked another question, stating:  "Let me just take that back. They ***were*** taking action."  *Id.* at 88:7 (emphasis added).  Sensing that Mr. Bibbes had flubbed a planted line, Archer's counsel asked if Mr. Bibbes's response was "based in any way on the conversation [he] just had with [his] counsel[.]"  *Id.* at 88:13–15.  Despite the fact that Mr. Bibbes had conferred with counsel after starting—but before finishing—his answer, and although the source of purported facts testified to by a Rule 30(b)(6) witness is never privileged, Mr. Kapgan instructed his witness three times not to answer the question.  *See id.* at 88:18–19, 89:2, 91:8–9.  In doing so, Mr. Kapgan prevented Archer from uncovering details about those crucial meetings—meetings in which he participated on Wisk's behalf.

Subsequent questioning about the March 2021 conversation was equally fruitless:

**Q:**   Who was present at that conversation in March of 2021?

**A:**   I think there was more – Yury [Kapgan] was part of that conversation.  I can't remember if I was part of it or if it was relayed to me.

. . .

**Q:**   Who said the words from the U.S. Attorney's Office that the USAO would be taking action against Archer in March of 2021?

**A:**   I don't recall which attorney said it.

. . .

**Q:**   What prompted someone from the U.S. Attorney's Office to say that the U.S. Attorney's Office was looking in – I'm sorry – would be taking action against Archer?

Gibson, Dunn &
Crutcher LLP

. . .

**A:**   I think if I disclose that, I would be disclosing work product.

*Id.* at 92:21–94:23; *see also* Dkt. 562-56 at 106.

Wisk has never supplemented its responses to Archer's interrogatory, and it misused privilege to shield its Rule 30(b)(6) witness from proper questioning about the source of Wisk's supposed corporate knowledge.  To this day, Wisk has not provided answers to Archer's legitimate questions.  Fundamental principles of fairness (and Rule 403) counsel against permitting Wisk to present evidence or argument about its oral conversations with law enforcement—a key part of its defense against Archer's defamation counterclaim—after withholding critical information about that issue during discovery.

**B.      Lack of Personal Knowledge**

As noted, Mr. Bibbes was present for only three of the 36 conversations between Wisk and federal law enforcement, and he did not identify anyone else from Wisk at any specific meeting at which a government official supposedly made any comment about Archer.  *See supra* at 5 & n.2.  And because Wisk has not suggested that it will produce its outside counsel at Quinn Emanuel as witnesses at trial, Mr. Bibbes is the only plausible witness Wisk can present for the conversations between federal law enforcement and Wisk.  But any testimony Mr. Bibbes might attempt to present on this topic is inadmissible for lack of personal knowledge.

Although Mr. Bibbes, in his capacity as a Rule 30(b)(6) witness, was not required to possess personal knowledge as to the substance of his testimony, a party may not call one of its employees to testify in a Rule 30(b)(6) capacity at trial; rather, personal knowledge is required of trial witnesses.  *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced to support a finding that the witness has personal knowledge of the matter."); *Plexxikon v. Novartis Pharm. Corp.*, No. 17-cv-4405-HSG, 2021 WL 2255885 (N.D. Cal. June 3, 2021) ("[C]ourts have generally concluded that 'a corporate representative may not testify [at trial] to matters outside his own personal knowledge to the extent that information [is] hearsay not falling within one of the authorized exceptions.'") (citations and quotation marks omitted).  Mr. Bibbes's deposition testimony, however, makes clear that he lacks personal knowledge of Wisk's communications with Special Agent Mergen

Gibson, Dunn &
Crutcher LLP

and the U.S. Attorney's Office. *See, e.g.*, Ex. 1 (Bibbes Tr.) at 79:16–24 ("Q: Do you recall who was present for the discussion with Special Agent Mergen where Special Agent Mergen said that FBI and/or DOJ was looking into Archer?  A: Yury Kapgan would have been part of that.  Q: Do you recall anyone else who was present for a discussion [in] which Special Agent Mergen said that FBI and/or DOJ was looking into Archer?  A: No."); *id.* at 92:21–25 ("Q: Who was present at that conversation [with the U.S. Attorney's Office] in March of 2021?  A: I think there was more – Yury was part of that conversation.  ***I can't recall if I was part of it or if it was relayed to me***." (emphasis added)).

### C.   Hearsay

Even if Mr. Bibbes was present for one of the conversations with government officials about which he was questioned, his trial testimony regarding any such conversations would constitute inadmissible hearsay.  *See* Fed. R. Evid. 802.  And given that Mr. Bibbes was unable to confirm that even he was present for those conversations, *see* Ex. 1 (Bibbes Tr.) at 79:16–24, 92:23–25, it appears as though Wisk would like to have Mr. Bibbes inform the jury of a supposed statement that was relayed to him by Mr. Kapgan, who supposedly was told the information by Mr. Mergen or by an unidentified Assistant U.S. Attorney—*i.e.*, hearsay *within* hearsay.  And the reason for this testimony would be to support Wisk's assertion that its blog post's claim that there was a federal criminal investigation "into Archer" was true.  Such hearsay within hearsay testimony is inadmissible under Rules 802 and 805.

Rule 807 is of no utility to Wisk.  Not only does the testimony in question lack "circumstantial guarantees of trustworthiness" equivalent to the hearsay exceptions in Rules 803 or 804, the testimony is inherently and affirmatively ***untrustworthy***.  Mr. Bibbes represented that federal law enforcement informed Wisk that the FBI and/or DOJ *was* "looking into" Archer, but under Federal Rule of Criminal Procedure 6(e), "a company, such as Wisk, would not be entitled to a preview of the evidence developed through a grand jury investigation, nor would the U.S. Attorney's Office be allowed to share with Wisk the scope of its investigation, including what individuals or companies it had subpoenaed, or its characterization of particular individuals or entities related to the investigation as targets, subjects, or witnesses."  Dkt. 435-3 (Expert Report of Miranda Kane) ¶ 46.

The statements Mr. Bibbes attributes to Special Agent Mergen and unidentified officials in the U.S. Attorney's Office would plainly contravene that prohibition.  Indeed, even Wisk's expert witness on the May 19, 2021 blog post, former FBI Director Louis Freeh, does not base his opinion on alleged disclosures that neither an FBI Special Agent nor an AUSA would have been permitted to make.  *See* Dkt. 516-5 at 133:19–134:3.  These circumstances reflect the untrustworthiness of Mr. Bibbes's conclusory assertions about alleged oral statements—as does the fact that there is an extensive record of written communications between Wisk's outside counsel and the FBI/DOJ, none of which says anything whatsoever about a supposed criminal investigation "into Archer."

Under these circumstances, Mr. Bibbes's testimony also would not be admissible as a statement by a public office.  *See* Fed. R. Evid. 803(8) (public records are admissible only if "the opponent does not show that the source of the information or other circumstances indicate a lack of trustworthiness").  Wisk's attempt to have Mr. Bibbes serve as a mouthpiece to testify to alleged oral conversations that he did not witness, or does not remember, would be palpably improper.  Accordingly, the Court should bar Wisk from presenting evidence or argument regarding the content of any oral conversations with law enforcement about any investigation into the alleged theft of Wisk intellectual property.

## IV. MOTION IN LIMINE NO. 4 TO ADMIT (1) ARCHER-NDCA-00578482, AND (2) ARCHER-NDCA-00578250.

Archer seeks an order from the Court confirming the admissibility of two email chains, bearing Bates numbers Archer-NDCA-00578482 and Archer-NDCA-00578250, which reflect correspondence between Archer's counsel and two Assistant U.S. Attorneys who investigated the alleged theft of trade secrets from Wisk.  These email threads are directly relevant to Archer's defamation counterclaim, and they squarely rebut Wisk's defenses that "[t]he Criminal Investigation Statement was true" because "[t]here was a criminal investigation 'into Archer relating to the theft and use of Wisk's intellectual property,'" Dkt. 452-1 at 17, and that "the facts for the Criminal Investigation Statement . . . came from Wisk's discussions with the FBI and U.S. Attorney's Office," *id.* at 20—defenses Wisk continues to assert despite its own admission that "***no one disputes that Archer was not a 'target' of the investigation***."  Dkt. 435 at 13 (emphasis added).

Gibson, Dunn & Crutcher LLP

On April 23, 2021, Archer's counsel, Arturo Gonzalez, contacted Benjamin Kingsley and Helen Gilbert, two Assistant U.S. Attorneys in the Northern District of California, to confirm the accuracy of a proposed "statement to [Archer's] investors who have been inquiring about the status of the investigation." Ex. 2 (Archer-NDCA-00578482) at -483.  In response, AUSA Gilbert confirmed on April 23, 2021 that "Archer is not a target, and that we are not currently aware of evidence that members of senior management engaged in wrongdoing." *Id.*  AUSA Kingsley subsequently confirmed on May 17, 2021 and May 19, 2021 that Archer was not a target of the federal investigation and that the government was not aware of evidence that members of its senior management engaged in wrongdoing.  *See id.* at -482 ("We have no updates to the email exchange with Arturo below."); Ex. 3 (Archer-NDCA-00578250) at -250 ("We do not have anything to add to what we explained to Arturo previously regarding Archer's current status.").

These email chains are admissible under the public records exception to the hearsay rule, which permits the introduction of hearsay contained in "[a] record or statement of a public office if: (A) it sets out: (i) the office's activities . . . ; and (B) the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness." Fed. R. Evid. 803(8).  Archer, as the proponent of the evidence, bears the burden of establishing "that the record should be admitted under Rule 803(8)(A)." *United States v. Fryberg*, 854 F.3d 1126, 1133 (9th Cir. 2017).  It does not, however, need to provide foundational testimony because, as the Ninth Circuit has held, "the public records exception is one of the few hearsay exceptions that does not require a foundation." *United States v. Loyola-Dominguez*, 125 F.3d 1315, 1318 (9th Cir. 1997).  Once Archer has demonstrated that the evidence falls within Rule 803(8)(A), Wisk "then bears the burden of showing that the record is untrustworthy." *Fryberg*, 854 F.3d at 1133.  The two email chains at issue plainly fall within the scope of this hearsay exception.

First, the emails "set[] out . . . the office's activities." Fed. R. Evid. 803(8)(A)(i).  "The idea behind clause (A)(i) is to reach records that focus exclusively or at least primarily on the functions of a public agency," as distinct from "records focusing primarily on the behavior of citizens, or events or conditions outside the functioning of a public office or agency[.]"  4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:87 (4th ed. July 2022 Update).  As the Department of

Justice's website explains, "[t]he United States Attorney is responsible for coordinating multi-agency investigations which involve federal, state and local law enforcement agencies" and "is responsible for a wide variety of prosecutions consistent with the priorities set by the Attorney General of the United States." *The Role of the United States Attorney*, U.S. DEP'T OF JUST. (Dec. 12, 2022), https://tinyurl.com/3cm8n7bt.  The emails from AUSA Kingsley and AUSA Gilbert focus exclusively or primarily on the functions of the U.S. Attorney's Office because they describe the scope of a federal investigation, as well as the evidence gathered in the course of that investigation. *See Neelon v. Krueger*, 2015 WL 13677813, at *5 (D. Mass. Sept. 8, 2015) (admitting under Rule 803(8)(A)(i) emails from U.S. Embassy officials "stating that the embassy will draft a formal letter" and "is inquiring with the State Investigator's Office" about a certain issue).

Second, Wisk cannot carry its burden of demonstrating that these statements are untrustworthy.  Because the public records exception "is 'premised on the assumption that public officials perform their duties properly without motive or interest,'" *Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir. 1992) (citation and quotation marks omitted), "[p]ublic records have justifiably carried a presumption of reliability."  Fed. R. Evid. 803(8) advisory committee's note to 2014 amendment.  Relevant factors in determining if this presumption has been overcome include "(1) the timeliness of the investigation; (2) the investigator's skill or experience; (3) whether a hearing was held; and (4) possible bias when reports are prepared with a view to possible litigation." *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 167 n.11 (1988).

There is no basis for finding untrustworthy AUSA Kingsley's and AUSA Gilbert's statements regarding the focus and status of the investigation into the alleged theft of Wisk's trade secrets.  The statements were made while the investigation was still ongoing.  Neither official had any reason for misrepresenting to Archer whether it was a target of their investigation.  And both Wisk and its expert, Louis Freeh, concede the truth of these statements.  *See* Dkt. 493-12 (Freeh Tr.) at 127:10–14 ("Q: In your opinion, was Archer a target of the grand jury investigation?  A: No.  Because the prosecutors took that off the table in their statements and correspondence back to counsel."); Dkt. 435

at 13 ("[N]o one disputes that Archer was not a 'target' of the investigation.").[3]

Even if there were some credible doubt concerning the applicability of the public records exception, the Court should still admit these email threads under the residual exception to the hearsay rule. *See* Fed. R. Evid. 807. AUSA Kingsley's and AUSA Gilbert's statements are trustworthy for the same reasons outlined above with respect to the public records exception. *See Smith v. Davis*, No. 19-cv-8152-SI, 2020 WL 3488035, at *6 (N.D. Cal. June 26, 2020) (identifying "certain 'recurring factors' that are 'particularly significant' to consider when determining the trustworthiness of a statement potentially to be admitted under the residual hearsay exception," including "'[w]hether the declarant had a motivation to speak truthfully or otherwise,'" "'the time lapse between event and statement,'" and "'whether the declarant's firsthand knowledge is clearly demonstrated'" (citation omitted)). And the statements of the two officials responsible for overseeing the investigation is plainly more probative on the scope of the investigation than any other evidence that can be reasonably obtained. *See Siqueiros v. Gen. Motors LLC*, No. 16-cv-7244-EMC, 2022 WL 3974752, at *13 (N.D. Cal. Aug. 31, 2022) (noting that this requirement "'essentially creates a best evidence requirement'" (quoting *Larez v. City of Los Angeles*, 946 F.2d 630, 644 (9th Cir. 1991))).

For these reasons, the Court should rule that Archer-NDCA-00578482 and Archer-NDCA-00578250 are admissible under the public records exception to the hearsay rule or, in the alternative, under the residual exception to the hearsay rule.

## V.   MOTION IN LIMINE NO. 5 TO PREVENT WISK FROM ARGUING THAT DAMAGES SHOULD BE APPORTIONED BETWEEN DEFAMATORY STATEMENTS AND ANY OTHER ALLEGED OR POTENTIAL CAUSE OF HARM TO ARCHER.

Archer will present evidence at trial sufficient to establish that Wisk's defamatory blog post was a substantial factor in causing Archer's harm. Indeed, in denying Wisk's motion for summary judgment, this Court cited evidence that, irrespective of any other causes of Archer's harm, "the blog post was a substantial factor in causing [Archer's] harm and damages." Dkt. 572 at 8. The parties will no doubt contest the extent of the monetary and reputational harm suffered by Archer. But that

---

[3] In contrast to the situation presented by Motion in Limine No. 3, the U.S. Attorney's Office's notification of an entity as to *its own* status related to a grand jury investigation is expressly contemplated by the Department of Justice Manual. *See Dep't of Justice Manual* § 9-11.151, https://tinyurl.com/379u8brw.

is ultimately beside the point:  Once Archer proves that Wisk's statements were a substantial factor in causing the harm, then Wisk is responsible for it as a matter of California law.  *See id.* at 9 (rejecting Wisk's allocation of damages argument on summary judgment, stating that "Wisk cites no law, and I could find none, showing that Archer must prove how much in damages were caused by the blog posts as opposed to the litigation or the market, so long as it proves the posts were a 'substantial factor' in the damage").  And because Wisk has not attempted to show that Archer's damages should be allocated among Wisk's defamation and any other causes that Wisk might argue contributed to Archer's harm, as is its burden, the Court should preclude Wisk from offering evidence or argument on the issue at trial.

California follows Restatement (Second) of Torts § 433A, which provides that damages for harm may be apportioned among two or more causes only where "(a) there are distinct harms, or (b) there is a reasonable basis for determining the contribution of each cause to a single harm."  Rest. (Second) Torts § 433A(1); *see Carlotto, Ltd. v. County of Ventura*, 47 Cal. App. 3d 931, 937 (1975).  But "[d]amages for any other harm *cannot be apportioned among two or more causes*."  Rest. (Second) Torts § 433A(2) (emphasis added).  The question whether the harm at issue is divisible or indivisible is a matter for the Court to decide.  *See id.* § 434 ("It is the function of the court to determine . . . whether the harm to the plaintiff is capable of apportionment among two or more causes.").

The harm at issue here is the consequence of the renegotiation of the de-SPAC transaction; Wisk has not suggested otherwise.  Instead, Wisk argues only that there were multiple causes contributing to that harm.  But Wisk is not entitled to an allocation of damages among those causes for two reasons.

***First***, it is Wisk's burden to show that Archer's harm is capable of being apportioned among different causes.  *See Pakootas v. Teck Cominco Metals, Ltd.*, 905 F.3d 565, 589 (9th Cir. 2018) ("[T]he defendant asserting the divisibility defense bears the burden of proof."); *accord Rozark Farms Inc. v. Ozark Border Elec. Co-op*, 849 F.2d 306, 311 (8th Cir. 1988) ("[T]he burden of proof on the issue of apportionment is on the party seeking to limit its liability[.]").  California law follows the same approach as the Ninth Circuit, and could not be more clear:  "***A plaintiff does not have the***

1    ***burden of apportioning damages***."  *Espinosa v. Little Co. of Mary Hosp.*, 31 Cal. App. 4th 1304,

2    1321 (1995) (emphasis added).

3        Indeed, divisibility of harm is an affirmative defense that a defendant must plead.  *See*

4    *Pakootas*, 905 F.3d at 589 & n.14 (holding that divisibility is an affirmative defense that "must be

5    pleaded affirmatively" (citation omitted)); *Wilson v. Ritto*, 105 Cal. App. 4th 361, 369 (2003)

6    ("Apportionment of noneconomic damages" such as reputational harm is an "affirmative defense[]");

7    *accord Jenson v. Eveleth Taconite Co.*, 130 F.3d 1287, 1293 (8th Cir. 1997) ("Apportionment of

8    damages is akin to an affirmative defense.").  Archer cited this requirement in its opposition to

9    Wisk's motion for summary judgment.  *See* Dkt. 496-1 at 13.  Wisk ignored it.  Despite pleading ten

10   distinct defenses in its Answer to Archer's Second Amended Counterclaims, Wisk did not plead

11   divisibility (*i.e.*, apportionment) as an affirmative defense.  *See* Dkt. 163 ¶¶ 150–59.  It may not now

12   pursue that un-pleaded affirmative defense at trial because "[f]ailure to plead an affirmative defense

13   . . . results in waiver of that defense."  *Enlow v. Salem-Keizer Yellow Cab Co.*, 389 F.3d 802, 819

14   (9th Cir. 2004) (Ferguson, J., concurring in part).  Thus, Wisk does not have a live claim for

15   apportionment at trial.

16       ***Second***, Wisk's damages experts have offered no opinion that any percentage of Archer's

17   harm was attributable to some cause other than the blog post.  On the contrary, Wisk's experts on

18   counterclaim damages expressly disclaimed any attempt to show that Archer's damages are divisible

19   between Wisk's defamatory statements and other causes.  *See* Ex. 4 (Kinrich Tr.) at 75:21–76:1 ("Q:

20   Have you analyzed whether it's possible to isolate the effects of the allegedly actionable statements

21   by Wisk about Archer from the statements by Wisk about Archer that Archer does not allege to be

22   actionable in its second amended counterclaim?  A: I haven't attempted to do that."); Ex. 5 (Klausner

23   Tr.) at 229:2–8 ("Q: Did you make any effort to apportion the amount of harm caused by any

24   different factors with respect to the delay in the transaction?  And by that, I mean did you try to

25   quantify the extent to which something may have caused the delay as opposed to something else that

26   caused the delay?  A: No.").

27       Wisk damages expert Jeff Kinrich made Wisk's position plain.  When asked if Wisk expert

28   Professor Michael Klausner had analyzed how much of the delay in Archer's go-public transaction

"was attributable to which given causes," Mr. Kinrich responded in relevant part:  "It's not a question of dividing it up in proportions among—you don't give a percentage to each one.  That's not the right question."  Ex. 4 (Kinrich Tr.) at 100:2–12.  Having not even tried to answer the divisibility question itself, Wisk should not be permitted to mislead the jury by suggesting that *Archer* should have done so, or that Wisk is responsible for anything less than the full amount of harm to Archer in the event Archer proves that Wisk's blog post was a substantial factor in causing that harm.

Archer has presented evidence to satisfy the substantial factor test.  *See* Dkt. 572 at 71 (acknowledging that "Milbourn's report sufficiently shows that the statements caused Archer economic damages").  Wisk has not even attempted to establish that the resulting harm is divisible. Thus, there can be no apportionment of damages for whatever harm the jury finds to have resulted, at least in part, from Wisk's defamatory blog posts.  *See, e.g.*, *Comdyne I, Inc. v. Corbin*, 908 F.2d 1142, 1152 (3d Cir. 1990) ("Where the harm . . . is indivisible, there is no apportionment of damages among the concurrent causes." (citing Rest. (Second) of Torts § 433A)); Rest. (Second) of Torts § 433B(2) cmt. *c* (shifting burden to the defendant to apportion harm for concurrent liability arises only where the harm "is capable of apportionment").  Accordingly, the Court should bar Wisk from arguing that Archer's damages should be apportioned at trial.

## VI.   MOTION IN LIMINE NO. 6 TO PRECLUDE WISK FROM MENTIONING, OR OFFERING EVIDENCE OR ARGUMENT REGARDING, SCOTT FURMAN'S DELETION OF WISK FILES.

Wisk seeks to introduce at trial evidence that Scott Furman—Wisk's Chief Avionics Architect until January 2020, when he joined Archer (*see* Dkt. 422 at 2)—retained and then deleted Wisk files on his personal electronic devices.  But Wisk has only ever alleged that a single file retained (or deleted) by Mr. Furman concerned any of the trade secrets in this case—notably, *Trade Secret No. 44*, on which the Court has already granted Archer summary judgment.  *See* Dkt. 572 at 52.  As a result, the only possible reason for introducing this evidence at trial would be to mislead the jury and prejudice Archer by improperly suggesting to the jury that Archer was somehow responsible for Mr. Furman's deletions, in direct contravention of this Court's sanctions order.  Wisk should therefore be precluded from mentioning, offering evidence on, or presenting argument regarding, Scott Furman's deletion of Wisk files for at least two reasons.

**First**, Mr. Furman's deletion of Wisk-related files is not relevant to the issues before the jury. *See* Fed. R. Evid. 402.  Wisk does not assert that Mr. Furman even *possessed* documents relating to any trade secret after leaving Archer, with the sole exception of a single file purportedly related to Trade Secret No. 44.  *See* Dkt. 502-1 at 5 ("Scott Furman retained—and later intentionally deleted— Wisk-related documents, emails, iMessages, and photos.  One such document was an early Zee Aero (Wisk's predecessor) flight control system document discussing actuator electronics, fault tolerance and redundancy, and consensus voting, which are all features of TS 44." (citations and emphasis omitted)); Dkts. 502-3 ¶¶ 223–241, 502-4 ¶¶ 186–277, 502-5 ¶¶ 186–326, 468–586 (Wisk's experts making no mention of Mr. Furman in the misappropriation sections of their reports related to the four remaining alleged trade secrets (*i.e.*, Trade Secret Nos. 3, 12, 30, 31)).  But this Court granted summary judgment in favor of Archer on Trade Secret No. 44 because "Wisk fail[ed] to provide evidence that Archer misappropriated TS 44."  Dkt. 572 at 52.  Documents aside, Wisk does not allege that Mr. Furman ever worked on any of the technical areas implicated by the four remaining alleged trade secrets during his time at Wisk or Archer, much less that he misappropriated any of the remaining alleged trade secrets while at Archer.  Put simply, he is entirely irrelevant to Wisk's remaining claims, and the only conceivable reason Wisk would call Mr. Furman as a witness is to put before the jury highly prejudicial evidence of his deletion of Wisk files that the Court has already held did not result in spoliation and is not attributable to Archer.  *See* Dkt. 423 at 1, 7.

Nor does Mr. Furman's deletion of files reveal anything about Archer's general practices that might bear on this case.  For example, during a meet and confer regarding this motion in limine, Wisk indicated that it intends to challenge whether Archer's onboarding process was adequate to ensure that new hires do not bring files reflecting trade secrets from prior employers.  But Mr. Furman deleted the files in question in December 2021 and January 2022—nearly two years after he was onboarded at Archer.  Dkt. 422 at 3–4.  And because this Court has already determined that "there is no evidence that Archer was aware of [Mr. Furman's] conduct before it learned of the actions," *id.* at 1, Mr. Furman's conduct is not relevant to Archer's state of mind or whether Archer "'acquired, disclosed, or used [Wisk's] trade secret[s] through improper means.'"  *M.A. Mobile Ltd. v. Indian Inst. of Tech. Kharagpur*, 400 F. Supp. 3d 867, 892 (N.D. Cal. 2019) (citation omitted).

Gibson, Dunn &
Crutcher LLP

**Second**, even if Mr. Furman's deletion of files was somehow relevant, "its probative value is substantially outweighed by" the "unfair prejudice" it would have on Archer, and the "confusing" or "misleading" effect it would have on the jury. Fed. R. Evid. 403.

Wisk asserts its trade secret misappropriation claims against *Archer*, but as this Court has already acknowledged, Archer was not even aware of—much less responsible for—Mr. Furman's deletion of Wisk-related files. Indeed, in denying Wisk's motion for sanctions, the Court explained that Archer took reasonable steps to preserve Wisk-related data at every step of the way. *See, e.g.*, Dkt. 422 at 10 ("[T]he steps Archer took to preserve information were reasonable in light of the facts and allegations of the case[.]"); *id.* at 16 ("[I]t seems that Archer took all reasonable steps to preserve data."). Nevertheless allowing Wisk to introduce Mr. Furman's deletion of Wisk-related files during his employment at Archer, and as part of Wisk's broader case that Archer is responsible for misappropriating Wisk's purported trade secrets, could induce the jury to improperly attribute Mr. Furman's conduct to Archer—in direct contravention of this Court's sanctions order. And while Archer could explain to the jury why such an attribution would be improper, doing so would be needlessly time-consuming. Indeed, that undertaking could quickly devolve into a mini-trial addressing such issues as (1) what steps Archer took to inform employees like Mr. Furman of their obligation to retain potentially relevant documents, (2) why Mr. Furman believed he could delete the files, (3) Mr. Furman's fear of personal criminal liability should the inadvertently retained documents be discovered, (4) Archer's preservation efforts, and (5) forensic data and expert testimony demonstrating that all but one file deleted by Mr. Furman had been preserved by Archer. Rule 403 is designed to protect against precisely this sort of wasteful and confusing sideshow.

Because the risk of prejudice and confusion far outweighs the relevance (if any) of Mr. Furman's deletion of Wisk-related files, Wisk should be prohibited from mentioning, or offering evidence or argument regarding, that conduct.

## VII.    MOTION IN LIMINE NO. 7 TO BAR DR. KENNEDY FROM OFFERING TESTIMONY REGARDING DAMAGES FOR THE '033 PATENT.

The Court should preclude Wisk's damages expert, Dr. Patrick Kennedy, from testifying about damages for the '033 patent because he did not disclose any damages opinion for the acts of

alleged infringement remaining in the case for that patent.  Dr. Kennedy chose to base his damages

opinion on the assumption that the Midnight production aircraft infringes the '033 patent, despite

Wisk's counsel's awareness of Archer's position as to noninfringement.  *See* Dkt. 450-3 (Kennedy

Tr.) at 256:18–257:6.  But the Court has now granted Archer's motion for summary judgment of

noninfringement by the Midnight production aircraft, rendering Dr. Kennedy's entire '033 patent

damages analysis irrelevant.  *See* Dkt. 572 at 54–55.  Dr. Kennedy himself admitted at his deposition

that he has no other theory of damages, and that there are "no damages" for the acts of alleged

infringement that now remain in the case (concerning the Maker demonstrator and Midnight Zero

prototype aircraft).  *See* Dkt. 450-3 (Kennedy Tr.) at 257:7–16, 258:22–260:2.   Further, during meet-

and-confer discussions on this Motion, Wisk failed to identify any basis for Dr. Kennedy to testify

about damages for the '033 patent in light of the Court's summary judgment ruling.  And there is

none.  Thus, regardless of how the Court rules on Archer's pending *Daubert* motion to exclude

Dr. Kennedy, the Court should preclude Dr. Kennedy from offering testimony regarding '033 patent

damages.[4]

        In his expert report, Dr. Kennedy opined that Archer would have paid Wisk $68 million in a

hypothetical negotiation to license the '033 patent, a number which he based on Archer's alleged

future "incremental profits" from using the patented technology solely in the *Midnight* production

aircraft—not the Maker or Midnight Zero aircraft.  *See* Dkt. 450-2 (Kennedy Rpt.) at 287,

Schedule 6.1.  In fact, in response to questions asking him to "assume that Maker and Midnight Zero

infringed, but also ***assume that Midnight, the production vehicle, does not infringe***," Dr. Kennedy

acknowledged that "there [would be] ***no damages*** for the patent case."  Dkt. 450-3 (Kennedy Tr.) at

256:12–15, 257:15–16 (emphases added); *see also id.* at 257:1–4 ("[T]he damages that I've

calculated are based upon, as I mentioned, revenues generated from the production aircraft that's

actually going to be operated[.]"); *id.* at 259:3–10 (Q: "You don't have a damages theory that bases

value of a reasonable royalty solely on the acts of infringement associated with the Midnight Zero

---

[4]  Archer's *Daubert* motion is based on fatal flaws in Dr. Kennedy's *methodology* across all of his
reasonable royalty opinions.  *See* Dkt. 450-1.  This Motion, by contrast, is based on Dr. Kennedy's
*failure to disclose* any damages opinion regarding the alleged acts of infringement for the '033 patent
that remain in the case following the Court's summary judgment order.  Each motion should be
granted, but for independent reasons.

Gibson, Dunn &
Crutcher LLP

1    and Maker under the assumption that the production aircraft does not infringe; isn't that right?"  A: "I

2    think that hypothetical would require a different analysis[.]").

3        Because this Court granted summary judgment that Archer's Midnight production aircraft

4    does not infringe the '033 patent, *see* Dkt. 572 at 54, the only issue that remains for trial is whether

5    the Maker or Midnight Zero aircraft infringe the '033 patent.  And because Dr. Kennedy expressly

6    disclaimed having any opinion on damages related to that alleged infringement, Wisk has no basis for

7    presenting any opinion regarding '033 damages to the jury.  *See* Fed. R. Evid. 402; Fed. R. Evid. 403.

8    Thus, the Court should preclude Dr. Kennedy from testifying regarding damages for the '033 patent.

9    **VIII.   MOTION IN LIMINE NO. 8 TO BAR WISK FROM ARGUING THAT ARCHER IS A
         LIMITED PURPOSE PUBLIC FIGURE.**

10       Wisk has attempted to defend against Archer's defamation and other speech-related claims on

11   the ground that "Archer is at least a limited purpose public figure," such that it must "show [Wisk's]

12   knowledge of falsity or reckless disregard for the truth" in order to establish liability.  Dkt. 452-1 at

13   18–19 (citation omitted).  But this Court has already rejected that argument, concluding in its

14   summary judgment order that "Wisk has not shown that Archer was a limited purpose public figure,

15   or that Archer needed to establish actual malice."  Dkt. 572 at 20.  In light of that conclusion, any

16   argument Wisk may present regarding Archer's purported status as a limited purpose public figure

17   would be irrelevant, misleading, and prejudicial, and should therefore be barred.  *See* Fed. R. Evid.

18   402; Fed. R. Evid. 403.

19       While it is true that the Court only denied *Wisk's* motion for summary judgment, that does not

20   mean that there is a genuine issue of fact to present at trial.  On the contrary, because "[w]hether

21   someone is a limited purpose public figure is a question of law," *Dawe v. Corrs. USA*, 506 F. App'x

22   657, 659 (9th Cir. 2013) (citing *Reader's Digest Ass'n v. Super. Ct.*, 37 Cal.3d 244, 252 (1984)), the

23   Court—not the jury—is the ultimate arbiter of Archer's status, and it must resolve that question under

24   the same legal standard irrespective of the posture in which it is presented.  And because Wisk had

25   ample opportunity to present evidence to support its claim that Archer is a limited purpose public

26   figure, both in its motion for summary judgment and its reply, there is no reason to suppose that it

will come forward with new, previously undisclosed evidence in support of its claim at trial.  As a result, any argument on Archer's purported status as a limited purpose public figure should be barred.

## IX.   MOTION IN LIMINE NO. 9 TO BAR WISK FROM INTRODUCING EVIDENCE OR ARGUMENT RELATING TO THE REQUESTED REVIEW OF ANY PERSONAL DEVICES THAT WERE SUBJECT TO AN ORDER PRECLUDING DISCOVERY OF THOSE DEVICES.

Archer moves the Court for an order barring Wisk from introducing evidence or argument relating to Wisk's requested forensic review of personal devices belonging to non-parties Diederik Marius, Johnny Melack, and Tom Muniz, which were subject to multiple orders denying inspection of those devices by a forensic neutral.  Wisk moved twice to compel the inspection of Messrs. Marius's, Melack's, and Muniz's personal devices.  Dkts. 191, 263.  Judge Ryu denied Wisk's motions on the basis that Wisk had failed to meet the heightened showing of good cause to examine personal devices belonging to non-parties.  Dkt. 295.  This Court later affirmed Judge Ryu's ruling, and in doing so cited extensive caselaw recognizing that individuals justifiably have significant privacy interests in connection with personal devices.  Dkt. 310 at 3–4.  Separate and apart from these rulings, Judge Ryu recently issued an order compelling Archer to produce, among other things, all forensic artifact reports generated by Archer's independent forensic expert firm in the course of its investigation, irrespective of whether the reports were considered by Archer's testifying forensic expert.  Dkt. 582.  Such reports include forensic data associated with the same personal devices that were at the heart of Wisk's twice-unsuccessful motions to compel forensic inspection.

Evidence of the fact that Messrs. Marius, Melack, and Muniz opposed Wisk's efforts to compel forensic neutral inspection of the personal devices is not probative of anything, and is highly prejudicial to Archer.  Specifically, there is no probative value to Messrs. Marius, Melack, and Muniz having not voluntarily surrendered their privacy interests to Wisk when in fact Wisk is obtaining through Judge Ryu's most recent order effectively the same materials it sought through its prior unsuccessful motions to compel forensic inspection.  And even if there were probative value to this evidence—and there is not—it is outweighed by the prejudice that will undoubtedly result to Archer by virtue of Wisk arguing (as it has already previewed during meet and confers and depositions) that the jury should effectively adopt an adverse inference that Messrs. Marius, Melack, and Muniz had

1   something to hide on their personal devices by not voluntarily relinquishing their privacy rights and

2   opposing Wisk's motion to compel forensic inspection.  *See, e.g.*, Ex. 6 (Marius Tr.) at 299:23–300:1

3   ("Q: Do you have any explanation as to why you would not consent to a forensic inspection to clear

4   your name and confirm that these documents have not been used from your personal devices?").

5          Given both Judge Ryu and this Court held multiple times that Messrs. Marius, Melack, and

6   Muniz were justified in asserting their privacy rights in the face of Wisk's prior motions to compel, it

7   would unduly prejudicial to allow Wisk to capitalize on their loss as they have indicated they plan to

8   do at trial.

9

10

11                                          Respectfully submitted,

12

13   DATED:  July 3, 2023                   GIBSON, DUNN & CRUTCHER LLP

14                                          By:  _____*/s/ Josh A. Krevitt*_____

15                                                          Josh A. Krevitt

16                                          *Attorneys for Defendant Archer Aviation Inc.*

17

18

19

20

21

22

23

24

25

26

27

28