GIBSON, DUNN & CRUTCHER LLP
Josh A. Krevitt, SBN 208552
  jkrevitt@gibsondunn.com
Stuart Rosenberg, SBN 239926
  srosenberg@gibsondunn.com
1881 Page Mill Road
Palo Alto, CA 94304-1211
Telephone: 650.849.5300

Daniel J. Thomasch, admitted *pro hac vice*
  dthomasch@gibsondunn.com
Paul Torchia, admitted *pro hac vice*
  ptorchia@gibsondunn.com
200 Park Avenue
New York, NY 10166-0193
Telephone: 212.351.4000

Wayne Barsky, SBN 116731
  wbarsky@gibsondunn.com
Michael Dore, SBN 227442
  mdore@gibsondunn.com
Diana M. Feinstein, admitted *pro hac vice*
  dfeinstein@gibsondunn.com
2029 Century Park East, Suite 4000
Los Angeles, CA 90067-3026
Telephone: 310.552.8500

Attorneys for Defendant and Counterclaimant
Archer Aviation Inc.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| WISK AERO LLC,<br><br>                    Plaintiff,<br><br>          v.<br><br>ARCHER AVIATION INC.,<br><br>                    Defendant. | CASE NO. 3:21-CV-02450-WHO (DMR)<br><br>**ARCHER'S NOTICE OF MOTION AND MOTION TO COMPEL WISK TO PRODUCE SARD DOCUMENTS**<br><br>Hon. Donna M. Ryu |

## REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED

**TO THIS COURT, ALL PARTIES AND THEIR ATTORNEYS:**

Please take notice that, as soon as the matter may be heard, in the courtroom of the Honorable Donna M. Ryu at the United States District Court for the Northern District of California, 1301 Clay Street, Oakland, California, Defendant Archer Aviation Inc. ("Archer") will move the Court for an Order compelling Plaintiff Wisk Aero LLC ("Wisk") to produce certain documents Wisk's public relations firm, Sard Verbinnen & Co., provided to Wisk but never produced to Archer, including nine documents Wisk sent to Archer and subsequently clawed back claiming that they were privileged.  This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Daniel J. Thomasch and exhibits thereto, all cited authorities, and all pleadings and papers on file in this action.  All references to "Ex. _" are to the exhibits to the Thomasch Declaration filed in support of this Motion.

Respectfully submitted,


DATED:  July 21, 2023                    GIBSON, DUNN & CRUTCHER LLP

By:  _____ */s/ Daniel J. Thomasch* _____
                        Daniel J. Thomasch

*Attorneys for Defendant Archer Aviation Inc.*

# I.  INTRODUCTION

Archer's counterclaims arise from Wisk's false and misleading April 6, 2021 blog post and its equally defamatory May 19, 2021 "update."  Those blog posts were drafted, timed for release, and disseminated with the intention of derailing an announced "de-SPAC" transaction in which Archer would merge with Atlas Crest (the SPAC), resulting in a massive infusion of needed capital into Archer. Through an orchestrated media campaign directed by Wisk's litigation counsel and executed by Wisk and its public relations firm, Sard Verbinnen & Co. ("Sard"), Wisk sought to cause public and private (*i.e.*, "PIPE") investors in the de-SPAC transaction to lose confidence in Archer to the point of refusing to consummate the announced merger.  The plan ultimately failed, but not before Archer was forced to renegotiate the transaction using an enterprise valuation of Archer that was $1.03 billion less than the originally-agreed valuation.  Sard's role lies at the core of Archer's counterclaims.

Archer's counterclaims have withstood Wisk's repeated legal attacks (*see* Dkt. 146 (denying Wisk's anti-SLAPP motion); Dkt. 572 (denying Wisk's summary judgment motion)), and are now poised for trial.  But Archer's claims are fact-intensive, and many critical facts lay hidden under a blanket of privilege asserted by Wisk's counsel, Yury Kapgan of Quinn Emanuel, who is directly implicated in the anticompetitive scheme alleged in Archer's counterclaims.  *See* Dkt. 612 at 3 (Judge Orrick:  "[T]he evidence seems to show that Mr. Kapgan initiated the investigation with the government, had 36 conversations with the government, refused to testify as to those conversations, *refused to allow questions with respect to the authorship of the blogpost, and seems to have been the source of the 30(b)(6) testimony* [related to the blog post] *but refused to waive privilege* ...." (emphasis added)).  Compounding the fact that Mr. Kapgan is a direct actor in Wisk's scheme to defame (including having created the misleading side-by-side illustration that is a centerpiece of the April 6 blog post) and has used privilege to conceal his actions, Wisk now seeks to use Mr. Kapgan's role to conceal the PR activities of a PR firm.  Indeed, *as to every one of the 333 withheld documents at issue here* (including the nine clawed-back documents challenged by Archer), Wisk asserts on its newly-minted privileged log that the work product protection applies because Mr. Kapgan directed the actions of Sard employees, even though Mr. Kapgan was not a party to any of the withheld communications.

The 333 documents generated by Sard (the "Sard Documents") at issue here were wrongfully

withheld from production on the basis of Quinn Emanuel's assertions of work product protection. Quinn Emanuel represents Wisk, not Sard, and all 333 withheld documents are internal Sard documents exchanged exclusively between and among Sard public relations employees—not one is to, from, or copies Wisk's attorneys. Yet as reflected by Wisk's July 17, 2023 privilege log (the "Sard Document Log"), the only asserted bases for application of work product protection to the PR documents at issue are that: (i) the work reflected in the documents was created by a PR firm "retained by counsel"; and (ii) in all 333 instances, the PR firm's employees were allegedly "acting at the direction of attorney Yury Kapgan." Ex. 31 (Sard Document Log). That is wholly insufficient to transform the Sard PR documents into attorney work product. Critically, Wisk's just-prepared log does not assert that even a single one of the withheld documents at issue "contain[s] the mental impressions, conclusions, opinions, or legal theories of [Wisk's] attorney or other representative concerning the litigation." Fed. R. Civ. P. 26(b)(3)(B). As such, Wisk improperly withheld all of the Sard Documents at issue from production last year, and they should be produced immediately. *Anderson v. SeaWorld Parks & Ent., Inc.*, 329 F.R.D. 628, 639 (N.D. Cal. 2019). Wisk has abused the *attorney* work product privilege.

## II. BACKGROUND

On February 9, 2022, Archer subpoenaed Sard for documents related to Sard's work for Wisk. Ex. 1. Sard later sent responsive documents to Quinn Emanuel for a privilege review. Ex. 18. On August 1, 2022, Sard confirmed that Wisk's counsel had completed its review and returned the documents to Sard for production to Archer. Ex. 19. Sard then produced 66 documents (comprising 111 pages) to Archer on August 5, 2022. Thomasch Decl. ¶ 27. Sard also provided a privilege log with an entry for the one document that Sard withheld based on *Sard's* attorney-client privilege. *Id.* ¶ 26; Ex. 20. Sard explained that it "withheld and redacted [additional] documents to preserve the applicable privileges of Quinn Emanuel and Wisk," for which Wisk would "provide a separate privilege log." Ex. 20. Sard withheld the remaining 333 documents based on Quinn Emanuel's alleged work product, but Wisk did not serve a log reflecting its privilege claims until the Court ordered Wisk to do so in connection with this dispute. Dkt. 606.

In late June 2023, while the parties were communicating about their respective lists of trial exhibits, Wisk's counsel sent Archer nine documents with Sard Bates numbers that matched the Bates

numbers of the Sard documents on Archer's exhibit list, even though they were different documents. Thomasch Decl. ¶ 37; Ex. 25. Those nine documents included eight emails and one attachment—none included a Wisk attorney, none reflected any legal advice or request for legal advice, none mentioned any lawyers, and the only references to Wisk personnel were to Wisk's marketing personnel. Thomasch Decl. ¶ 38. Nothing in the documents revealed to the reader the mental impressions or opinions of counsel, nor did any of the documents disclose litigation strategy. *Id.*

Wisk's June 29 email also identified the Bates numbers of Sard-produced documents that appeared to match the descriptions on Archer's exhibit list, the highest of which was Sard-0556, (Ex. 25), far beyond the highest Bates number Sard had produced to Archer (Sard-0111). Thomasch Decl. ¶ 37. Realizing that Wisk had more documents stamped with Sard Bates numbers than Archer had received from Sard, Archer requested that Wisk immediately produce all Sard documents in Wisk's possession. *Id.* ¶ 39; Ex. 26. But Wisk refused, asserting for the first time that "certain documents were withheld as privileged … causing [Wisk's] internal control numbers to differ from the bates numbers on [Archer's] set of documents." Ex. 26. Archer reiterated its request, Ex. 27, but rather than produce the remainder of the unproduced Sard documents, Wisk clawed back the nine documents it had sent to Archer on June 29. Ex. 29. Archer sequestered the documents. Thomasch Decl. ¶ 44.

Wisk's belated clawback led to a joint letter brief, Dkt. 596, and the Court's order requiring the lodging of the clawed-back documents for *in camera* review. Dkt. 598. Just before lodging the documents, Wisk served on Archer and delivered to the Court an untimely privilege log with entries for only the nine clawed back documents. Thomasch Decl. ¶ 54. On July 13, 2023, the Court granted Archer leave to move to compel the production of the Sard Documents and ordered Wisk to "produce a privilege log for all withheld Sard documents by no later than 12:00 p.m. on July 17, 2023." Dkt. 606. Wisk served its log on July 17 at 7:15 p.m. PDT. Thomasch Decl. ¶ 56. The Sard Document Log contains 333 entries, including the nine clawed-back documents. Ex. 31 (Sard Document Log).

Although the clawed-back documents confirm, for the first time, ██████████████████ ████████████████████████ (*see* discussion of Sard-0051, *infra* at 7), Wisk's long-undisclosed privilege assertions have prevented Archer from uncovering the origins of the statements, including the extent of Sard's role in their creation and knowledge of their falsity. Specifically, Archer has not

1   yet discovered whether Sard was complicit in the statements' falsity or was duped by Wisk's counsel

2   into unwittingly aiding and abetting Wisk's defamation.  For instance, Archer is still unaware of who

3   wrote the words of the May 19, 2021 blog post update that the FBI and DOJ were conducting a criminal

4   investigation "into Archer" because Mr. Kapgan asserted work product protection to prevent disclosure

5   of the same by Wisk's Rule 30(b)(6) witness.  Ex. 32 (Bibbes Tr.) at 76:13–23, 85:8–86:10.  Similarly,

6   while Wisk has admitted that Mr. Kapgan created the side-by-side graphic (*id.* at 71:14–19), Archer

7   does not know whether Sard was aware of its false and misleading nature.

8        Sard's   fixation   on   Archer's   de-SPAC   transaction   in   internal   communications   and

9   communications with third parties—reflective of Wisk's and Quinn Emanuel's fixation on the same—

10  makes clear that Wisk's true purpose in disseminating the blog post was not to inform readers of why

11  Wisk sued Archer, as the title of the blog post claims.  It was to cripple or kill Archer by interfering

12  with Archer's de-SPAC transaction.  Wisk's complaint (Dkt. 1) says nothing about the de-SPAC

13  transaction, but within days of Archer's announcement of the de-SPAC transaction,

14  

15  

16      Ex. 33.  And,

17  

18  

19  

20  

21      Ex. 22 (Sard-0058 ).

22  

23  

24      Archer has alleged

25  that the $1 billion drop in valuation is a direct harm of the defamatory blog post.  Dkt. 496-1 at 12.

26      An order compelling production of all withheld Sard documents is essential to allow Archer to

27  show the jury not only how the scheme to disrupt Archer's de-SPAC transaction unfolded, but also to

28  detail what factual information Wisk and Mr. Kapgan disclosed to the Sard employees involved in

crafting the content of the blog posts, how the defamatory blog posts were understood by those Sard employees, and why Wisk and Sard targeted journalists who had an interest in SPACs to amplify the effect of the defamatory blog posts.

Below, Archer first addresses the nine clawed-back documents specifically, and then extends its reasoning to other documents identified on the Sard Document Log with descriptions materially identical to the descriptions given to the clawed-back documents. Archer then argues waiver as to all documents that pre-date April 6, 2021 based on Wisk's failure to timely log them in accordance with the parties' ESI Stipulation. Dkt. 129 at 5; Dkt. 167-1 ¶¶ 27–31.

### III.   GOVERNING LAW

Federal work product law governs this dispute. Dkt. 586 (applying federal work product law in this case); *see also* Fed. R. Civ. P. 26(b)(3). Wisk bears the burden of showing that the work product protection applies and has not been waived. *Hartford Fire Ins. Co. v. NBC Gen. Contractors Corp.*, No. 09-CV-5363-SBA (DMR), 2010 WL 2034770, at *3 (N.D. Cal. May 19, 2010).

Assertions of attorney work product over "dual purpose" documents (*i.e.*, those with both business and legal purposes) must be assessed under the Ninth Circuit's "because of" test, which "considers the totality of the circumstances and affords protection when it can fairly be said that the document was created because of anticipated litigation, and would not have been created in substantially similar form but for the prospect of that litigation." *In re Grand Jury Subpoena (Mark Torf/Torf Env't Mgmt.)*, 357 F.3d 900, 908 (9th Cir. 2004) ("*Torf*") (cleaned up).

Whether a party has waived work product protection by failing to timely serve a privilege log is determined by considering the Ninth Circuit's *Burlington* factors. *See Burlington N. & Santa Fe Ry. Co. v. U.S. Dist. Ct. for Dist. of Mont.*, 408 F.3d 1142, 1149 (9th Cir. 2005).

### IV.   ARGUMENT

**A.   The Clawed-Back Documents Do Not Constitute Attorney Work Product**

"Public relations work is generally treated as business strategy, rather than a legal one, and is not protected as work product." *Anderson*, 329 F.R.D. at 635 (cleaned up). As a result, "[w]ork product protection does not attach to an attorney's work directing a public relations campaign …." *Id.* at 637; *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, No. 17-CV-2824-JST-KAW, 2022 WL 885368, at *4

(N.D. Cal. Mar. 25, 2022) ("a media or public relations strategy … would constitute business strategy rather than legal strategy, and would not be protected by the work product privilege" "even if such documents are tangentially related to the litigation").  Instead, attorney work product can be properly invoked only where "the public relations firm needs to know the attorney's strategy in order to advise as to public relations, and the public relations impact bears, in turn, on the attorney's own strategizing as to whether or not to take a contemplated step in the litigation itself and, if so, in what form." *Anderson*, 329 F.R.D. at 636 (citation and quotation marks omitted).  And under those narrow circumstances, the protection "does ***not*** extend to public relations activities ***even if they bear on the litigation strategy*** because the purpose of the rule is to provide a zone of privacy for strategizing about the conduct of litigation itself, ***not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally***." *Id.* at 637 (emphases added) (cleaned up).  In the Sard Document Log, Wisk cites the *Stardock Systems, Inc. v. Reiche* case in all 333 entries as support for its privilege assertion.  No. 17-CV-7025-SBA (KAW), 2018 WL 6259536, at *6–7 (N.D. Cal. Nov. 30, 2018); Ex. 31.  But the *Stardock* court did not hold, as Wisk suggests, that a law firm's retention of a PR firm renders all work done by that PR firm at the law firm's direction protected attorney work product, *regardless of the content of the documents*.  And Wisk's log says nothing about the content of the 333 withheld Sard documents that would entitle Wisk to claim attorney work product protection.

Indeed, an earlier ruling in this case by Judge Orrick is dispositive:  Judge Orrick held that the defamatory blog posts and press release—the focus of all nine of the clawed-back documents—"were not a useful or necessary step in the litigation ***and were not for purposes of achieving its objects***." Dkt. 146 at 15 (emphasis added); *United States v. Phillips*, 367 F.3d 846, 856 (9th Cir. 2004) ("Issues that a district court determines during pretrial motions become law of the case.").  Judge Orrick also observed that the "only connection" that the blog posts and press release have "to the litigation is that the communication[s] discussed" the litigation, which does not suffice as a "litigation purpose" because "a public post on the internet … cannot be found to further the objects of the litigation."  *Id.* (citation and quotation marks omitted).  That holding precludes any finding that the PR documents at issue qualify as protected work product on the ground that "their litigation purpose so permeates any non-litigation purpose that the two purposes cannot be discretely separated from the factual nexus as a

whole." *Torf*, 357 F.3d at 908, 910. And, because the blog posts and press release themselves have *no* litigation purpose, it necessarily follows that drafts of those documents, emails discussing those documents, and similar "PR strategy" documents, also fail to qualify as work product.

The specific content of the nine clawed-back documents further confirms that none qualifies as work product. Thomasch Decl. ¶ 65 (identifying each clawed-back document by Bates number). Working from counsel's memory alone, *see id.* ¶ 45, among the nine purely internal Sard documents that Wisk clawed back from Archer after Archer demanded to know why Wisk withheld them is an email from Sard executive Megan Bouchier to other Sard employees in the month before Wisk published its blog post and filed its lawsuit on April 6, 2021. The document (clawed-back Sard-0051) confirms several core Archer arguments about the defamatory nature of Wisk's blog posts and Wisk's motive to derail Archer's de-SPAC transaction. ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████ Each of these points is highly relevant to Archer's counterclaims; put together, they are a roadmap of Wisk's deceit. Absolutely nothing about Ms. Bouchier's musings reflects any mental impressions *of counsel* or constitutes litigation-related work.

In fact, Archer submits that *none* of the clawed-back documents reflects *any* legal advice or mental impressions from Quinn Emanuel or any other Wisk counsel. In *Anderson*, the court overruled work product assertions over emails discussing an "infographic" because "[n]othing in the document … indicates whether the changes [to the infographic] were suggested by attorneys rather than the non-attorney executive, or that anyone involved in the decision was motivated by litigation strategy rather than mere public relations concerns." 329 F.R.D. at 636; *see also id.* at 637 (overruling work product assertion over PR firm email exchange, even though it involved the asserting party's in-house counsel,

because "[n]othing on the face of the exchange reveals legal strategy or impressions"). This perfectly describes the clawed-back documents: None reflects *any* direction to Sard from Quinn Emanuel. Thomasch Decl. ¶ 38. Similarly, Archer's counsel recalls that one or more of the emails discuss the preparation of talking points without identifying any attorney involvement or input. *Id.* ¶ 47; *Anderson*, 329 F.R.D. at 636 (overruling work product assertion over "draft script for focus group discussions prepared by a public relations consultant" even though a comment by the consultant "indicat[ed] that legal input might be appropriate on one issue"). Thus, as has occurred previously, Wisk has improperly clawed back documents based on a meritless privilege claim in an attempt to deprive Archer of evidence that directly support Archer's affirmative claims. *See* Dkt. 466.

## B. Other Documents Identified on the Sard Document Log Using the Same Descriptions as Those Used for Clawed-Back Documents Do Not Constitute Work Product

Wisk repetitively used nine descriptions for the "specific basis" for its work product claims over the 333 documents on the Sard Document Log, all of which pertain to (A) a "PR statement," "PR communication," or "public statement," (B) "PR strategy," or (C) *both* PR strategy and PR statements. Ex. 31. Since the Court has already conducted an *in camera* review of documents from Categories A and B, the Court has effectively already conducted a review of a random sampling of the challenged documents. *See, e.g.*, Sard-0051 (Category A), Sard-0018 (Category B). Thus, to the extent the Court determines that the clawed-back documents do not constitute work product, the Court should extend that finding to other, non-clawed-back documents that Wisk identified on the Sard Document Log using descriptions that are materially identical to those Wisk used for the clawed-back documents. *LD v. United Behav. Health*, No. 20-CV-2254-YGR-JCS, 2022 WL 17408010, at *2 (N.D. Cal. Dec. 2, 2022) (ordering production of documents withheld as claimed work product based on in camera sampling).

*Category A: "PR Statements."* Ample caselaw shows that Wisk's draft PR statements— including drafts of the defamatory blog posts and press release—do not constitute work product because the Sard Document Log "fail[s] to identif[y] any litigation or trial related purposes" for the PR statements. *Padgett v. City of Monte Sereno*, No. 04-CV-3946 JW, 2007 WL 4554322, at *2 (N.D. Cal. Dec. 20, 2007) (finding a "draft press release is not entitled to attorney-work product protection," even though it "concern[ed] this litigation"); *Stein v. U.S. SEC*, 266 F. Supp. 3d 326, 350 (D.D.C. 2017)

(finding that "draft press releases … generally are not privileged because they do not contain confidential information and are intended to be released to third parties").  Moreover, their "disclosure will not invade the thoughts or trial preparation of the attorney and will not lead to any stealing of trial preparation materials."  *UTStarcom, Inc. v. Starent Networks Corp.*, No. 04-CV-1122-PVT, 2005 WL 8177860, at *1, *3 (N.D. Cal. Mar. 17, 2005).  By the same token, Wisk's work product claims over emails discussing changes to the PR statements are equally baseless.  *U.S. ex rel. Baker v. Cmty. Health Sys., Inc.*, 2012 WL 12342816, at *7 (D.N.M. May 16, 2012) (overruling work product claim as to an "intra-office e-mail … confirming language in a press release" "because it does not disclose client confidential communications, legal advice, or [counsel's] mental impressions").  The "PR statement" documents are identified by Bates numbers in Paragraph 66 of the Thomasch Declaration.

**Category B: "PR Strategy."**  The purpose of the work product protection "is to provide a zone of privacy for strategizing about the conduct of litigation itself, not for strategizing about the effects of the litigation on the client's customers, the media, or on the public generally."  *Anderson*, 329 F.R.D. at 635 (cleaned up).  There is no indication that the "PR strategy" documents on the Sard Document Log are in any way "about the conduct of litigation itself;" instead, as with the clawed-back documents, Sard was mindful of the "effects of the litigation" against Archer on the investing public.  In other words, Sard "does not appear to have been performing functions materially different from those that any ordinary public relations firm would have performed if [it] had been hired directly by" Wisk, rather than Quinn Emanuel.  *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000).  That takes Sard's "PR strategy" documents and emails outside the scope of attorney work product.  The "PR strategy" documents are identified by Bates numbers in Paragraph 67 of the Thomasch Declaration.

**Category C: Both.**  If the Court finds that neither the "PR Statements" nor "PR Strategy" documents qualify as work product, it follows that Wisk's claim that both reasons underlie its assertion of work product over documents also fails.  Documents in the "both" category are identified by Bates numbers in Paragraph 68 of the Thomasch Declaration.

**C.   Wisk Waived Work Product Protection Over Pre-Suit Sard Documents**

Wisk has waived any argument that documents pre-dating April 6, 2021 (all of which are within

Gibson, Dunn & Crutcher LLP

one or more of the above-referenced categories) are protected by the attorney work product doctrine by failing to timely serve a privilege log. *See* Fed. R. Civ. P. 26(b)(5)(A); *see also* Thomasch Decl. ¶ 69 (identifying each document, by Bates number, that falls into this subset of the prior categories).

Each of the four *Burlington* factors cuts in favor of finding waiver. The first two *Burlington* factors focus on the challenging party's "ability to assess the applicability of the claimed privilege or protection and the timeliness of information about withheld documents." *Johnson v. Starbucks Corp.*, No. 65-CV-724-DMR, 2019 WL 402359, at *7 (N.D. Cal. Jan. 31, 2019). Archer had **no** such ability to challenge Wisk's belated assertion of work product over the Sard documents. Until Wisk served a privilege log last week (nine documents) and this week (333 documents), Archer "was literally unable to assess or challenge [Wisk's] claim" because neither Wisk nor Sard "identified any documents being withheld on that ground, and never served a privilege log." *Id.*; *see also McNamee v. Clemens*, 2013 WL 6572899, at *3 (E.D.N.Y. Sept. 18, 2013), *clarified*, 2014 WL 12775660 (E.D.N.Y. Jan. 30, 2014) (finding waiver for failure to serve a log because "it was not until this Court issued an Order to produce the withheld documents for *in camera* review that defendant finally produced a privilege log").

Under the third *Burlington* factor—"the magnitude of the document production," *Burlington*, 408 F.3d at 1149—the Court must consider whether "the volume of documents at issue was particularly burdensome in the context of producing a privilege log." *Loop AI Labs Inc. v. Gatti*, No. 15-CV-798-HSG (DMR), 2016 WL 2908415, at *3 (N.D. Cal. May 13, 2016). Here, Wisk failed to log 333 documents despite instructing Sard to withhold the same. Burden cannot be used as an excuse: After the Court entered its July 13, 2023 order (Dkt. 606), Wisk served the Sard Log just two business days later (July 17). *See* Dkt. 222 (rejecting Wisk's burden argument as to its demonstrably incorrect prediction of having to log 10,000 privileged documents within the custody of its General Counsel).

The fourth factor—"particular circumstances … that make responding to discovery unusually easy … or unusually hard," *Burlington*, 408 F.3d at 1149—also heavily favors waiver because Quinn Emanuel intentionally chose not to serve a privilege log despite having asserted work product protection over unprivileged documents to induce Sard to withhold the documents from Archer.

## V. CONCLUSION

Archer respectfully requests that the Court grant this Motion in all respects.

1

2 Respectfully submitted,

3 DATED:  July 21, 2023 GIBSON, DUNN & CRUTCHER LLP

4

By: */s/ Daniel J. Thomasch*
5    Daniel J. Thomasch

6 *Attorneys for Defendant Archer Aviation Inc.*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

ARCHER'S NOTICE OF MOTION AND MOTION TO COMPEL WISK TO PRODUCE SARD DOCUMENTS
CASE NO. 3:21-CV-02450-WHO (DMR)