UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| WISK AERO LLC,<br><br>   Plaintiff,<br><br>   v.<br><br>ARCHER AVIATION INC.,<br><br>   Defendant. | Case No. 3:21-cv-02450-WHO<br><br>**ORDER GRANTING MOTION TO ENFORCE SETTLEMENT AGREEMENT**<br><br>Re: Dkt. No. 648 |

Plaintiff Wisk Aero LLC and defendant Archer Aviation Inc. engaged in hard-fought litigation in this court for two years, culminating in a settlement agreement in August 2023. Wisk has now filed this Motion to Enforce the Parties' Settlement Agreement, seeking a court ruling that Archer breached the agreement and must make immediate cash payments to remedy the breach. The argument comes down to this: Archer paid Wisk a tranche of stock shares, which Wisk says should have been immediately exercisable—and indeed Wisk tried to exercise them—but Archer says were not exercisable until a Liquidation Event. But there is no contract language to support Archer's theory; Wisk is right. Wisk's motion is granted in part, though, because as explained below, Archer may remedy the breach by making the shares immediately exercisable *or* by paying Wisk in cash.

## BACKGROUND

Wisk filed this lawsuit in 2021, alleging theft of trade secrets and patent infringement. [Dkt. No. 1]. After two years of intense litigation, the parties settled in August 2023 with the financial and legal assistance of a third party, the Boeing Company, and they dismissed the case. [Dkt. No. 647]. I retained jurisdiction to enforce the terms of the settlement agreement. *Id.*

As relevant, the Settlement Agreement states that Archer will provide Wisk shares of

common stock in two tranches. ("Agreement") [Dkt. No. 649-5]. First, Boeing would invest a certain sum in Archer in exchange for payment of the first tranche of shares of common stock—the Initial Vested Share Tranche ("Tranche 1"), worth $ ███████ . *See id.* § 2.09. Six months later, Archer was required to pay Wisk the remaining amount, called the "Guaranteed Payment Amount," totaling about $ ███████ . *Id.* § 2.13. To pay the Guaranteed Payment Amount, Archer was permitted under the Agreement to pay in cash, shares of common stock, or a combination of both. *Id.* As relevant, if Archer chose to pay in stock—which it did—the stock came from the Initial Unvested Share Tranche ("Tranche 2"). *See id.* To pay shares from Tranche 2, Archer was required under the Agreement to provide Wisk a Guaranteed Payment Election Notice. *Id.*

Attached to the Agreement is the First Warrant to Purchase Shares, which is akin to a stock option. ("Warrant") [Dkt. No. 649-6]. The Warrant confirms that Archer could pay the Guaranteed Payment Amount in cash, shares, or a combination of both. *Id.* § 1. Any shares paid from Tranche 2 as part of the Guaranteed Payment Amount were both vested and exercisable; any shares left unpaid are never vested or exercisable. *Id.* §§ 1, 2.

The relevant contested sections of the Agreement and Warrant are reproduced in the Discussion section below.

On February 16, the date Archer was supposed to provide Wisk a payment of $ ███████ , Archer did not pay. Instead, on March 18, Archer delivered the Guaranteed Payment Election Notice and stated that Archer would pay $ ███████ by wire transfer and the remaining $ ███████ in the form of 8,664,259 shares from Tranche 2. ("Election Notice") [Dkt. No. 649-8]. On March 26, Archer wired Wisk $ ███████ . [Dkt. No. 649-10]. And while Archer confirmed that the 8.6 million shares from Tranche 2 were vested, when Wisk tried to exercise those shares, Archer said it could not do so unless a Liquidation Event occurred. [Dkt. No. 696-9]. That refusal is the basis for this suit.

Wisk filed a motion to enforce the settlement agreement. ("Mot.") [Dkt. No. 648]. Archer opposed. ("Oppo.") [Dkt. No. 657]. Wisk replied. ("Repl.") [Dkt. No. 658]. I held a hearing at which counsel for both parties appeared.

**LEGAL STANDARD**

"It is well settled that a district court has the equitable power to enforce summarily an agreement to settle a case pending before it." *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987). A district court has jurisdiction to enforce a settlement agreement where, like here, the parties' stipulation to dismiss the case expressly provides that the court retains jurisdiction over disputes relating to the enforcement of the agreement. *See Flanagan v. Arnaiz*, 143 F.3d 540, 544 (9th Cir. 1998) (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994)).

The moving party bears the burden of showing that the parties formed a legally enforceable settlement agreement. *Madani v. Cnty. of Santa Clara*, No. 16-CV-07026-LHK, 2019 WL 402362, at *6 (N.D. Cal. Jan. 31, 2019) (citation omitted). "In order to enforce the settlement agreement, the Court must determine it is complete, *i.e.* the parties agreed to all material terms." *BGC Inc. v. Robinson*, No. 22-CV-01582-JSW, 2023 WL 4769978, at *2 (N.D. Cal. July 3, 2023) (citation omitted). "In addition, the Court must conclude the parties actually agreed to the terms or authorized counsel to settle the matter." *Id.* (citing *Harrop v. Western Airlines, Inc.*, 550 F.2d 1143, 1144-45 (9th Cir. 1977)).

"The interpretation and enforcement of a settlement agreement is governed by the legal principles applicable to contracts." *Pringle v. Regan*, No. 19-CV-07432-WHO, 2022 WL 19336469, at *2 (N.D. Cal. Feb. 22, 2022) (citation omitted). "Courts administer state contract law principles when interpreting a settlement agreement, even when the underlying cause of action is federal." *Id.* (citing *Botefur v. City of Eagle Point*, 7 F.3d 152, 156 (9th Cir. 1993)).

**DISCUSSION**[1]

**I.    GOVERNING LAW**

As a preliminary matter, I note that California law applies to the Settlement Agreement and Delaware law governs the Warrant. This is provided in the explicit terms of the contracts, *see* Agreement § 3.04(a); Warrant § 20, and the parties seem to agree to this in their papers, *see* Oppo.

---

[1] The motion to seal filed at [Dkt. No. 666] is significantly narrower than the prior requests at [Dkt. Nos. 659, 656, 659], which are DENIED as moot. The narrower motion to seal is GRANTED for compelling reasons shown.

3

1  10 n.2 (agreeing California law governs the Agreement and Delaware law governs the Warrant);

2  Repl. 6:27–28 (noting Delaware law governs the Warrant).

3  Under California law, the "fundamental rule[] of contract interpretation" is that "the
4  interpretation of a contract must give effect to the 'mutual intention' of the parties." *MacKinnon*
5  *v. Truck Ins. Exch.*, 31 Cal. 4th 635, 647, 73 P.3d 1205 (2003) (citations omitted); *see also* Cal.
6  Civ. Code § 1636 ("A contract must be so interpreted as to give effect to the mutual intention of
7  the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.").
8  Where possible, courts determine the parties' mutual intent "solely from the written provisions" of
9  the contract, *L.A. Lakers, Inc. v. Fed. Ins. Co.*, 869 F.3d 795, 801 (9th Cir. 2017) (citation
10 omitted), to ascertain the "plain meaning" of the language, *Hartford Cas. Ins. Co. v. Swift Distrib.,*
11 *Inc.*, 59 Cal. 4th 277, 288, 326 P.3d 253, 259 (2014) (quoting *Waller v. Truck Ins. Exch., Inc.*, 11
12 Cal. 4th 1, 18, 900 P.2d 619 (1995), *as modified* (Oct. 26, 1995)).  The language is given its
13 "'clear and explicit' meaning" interpreted in its "'ordinary and popular sense,' unless 'used by the
14 parties in a technical sense or a special meaning is given to them by usage.'" *Hartford Cas. Ins.*
15 *Co.*, 326 P.3d at 259 (quoting *AIU Ins. Co. v. Superior Court*, 51 Cal. 3d 807, 822, 799 P.2d 1253,
16 1264 (1990)).

17 A contractual provision "will be considered ambiguous when it is capable of two or more
18 constructions, both of which are reasonable." *Liberty Surplus Ins. Corp. v. Samuels*, 562 F. Supp.
19 3d 431, 438 (N.D. Cal. 2021) (quoting *Waller*, 900 P.2d at 627).  Ambiguity is "resolved by
20 interpreting the ambiguous provisions in the sense the promisor . . . believed the promisee
21 understood them at the time of formation." *Id.* (quoting *AIU Ins. Co.*, 799 P.2d at 1264).  "If
22 application of this rule does not eliminate the ambiguity, ambiguous language is construed against
23 the party who caused the uncertainty to exist." *Id.* (quoting *AIU Ins. Co.*, 799 P.2d at 1264).
24 Extrinsic evidence may only be used in contract interpretation "when a material term is
25 ambiguous." *Brown v. Goldstein*, 34 Cal. App. 5th 418, 432 (2019) (citations omitted).  If there is
26 a conflict in the extrinsic evidence itself, that factual conflict must be resolved by a jury. *See id.*
27 (citations omitted).

28 Under Delaware law, "[t]he proper construction of any contract . . . is purely a question of

1    law." *Shilling v. PolyOne Corp.*, No. 14-CV-03562-BLF, 2016 WL 7325013, at *5 (N.D. Cal.

2    Dec. 16, 2016) (quoting *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d

3    1192, 1195 (1992)). "Clear and unambiguous language" is "given its ordinary and usual

4    meaning." *Id.* (quoting *Rhone-Poulenc*, 616 A.2d at 1195–96). "[A] contract is ambiguous only

5    when the provisions in controversy are reasonably or fairly susceptible of different interpretations

6    or may have two or more different meanings . . . . The true test is not what the parties to the

7    contract intended it to mean, but what a reasonable person in the position of the parties would have

8    thought it meant." *Id.* (quoting *Rhone-Poulenc*, 616 A.2d at 1196). Courts may consult extrinsic

9    evidence only if the contract is ambiguous. *See id.*; *see also Eagle Indus., Inc. v. DeVilbiss Health*

10   *Care, Inc.*, 702 A.2d 1228, 1232 (1997) (suggesting courts "must" consider extrinsic evidence in

11   the face of ambiguity).

12       In other words, California and Delaware contract interpretation principles are relatively

13   similar, though their treatment of extrinsic evidence is somewhat different. Here, I will apply

14   California law to interpret the Settlement Agreement and Delaware law to interpret the Warrant,

15   though the outcome would be the same under the laws of either state.

16   **II.   WHETHER ARCHER BREACHED THE AGREEMENT**

17       Wisk's main argument is that Archer breached the Settlement Agreement by providing

18   Wisk shares that are not exercisable but for a "Liquidation Event."[2] Archer, in turn, asserts that its

19   actions align with the Agreement and the Warrant, which only permit Wisk to exercise the shares

20   upon a Liquidation Event. Though the papers contain a smattering of other arguments,[3] the

---

[2] A Liquidation Event is defined in the Warrant as the occurrence of (1) "the consolidation of [Archer] with, or the merger of [Archer] with or into, another 'person' or 'group' . . . or the sale, lease, transfer, conveyance or other disposition . . . of all or substantially all of the assets of [Archer]. . . ", (2) "the adoption by [Archer] of a plan relating to the liquidation or dissolution of [Archer]", (3) "the consummation of any transaction . . . the result of which is that any 'person' becomes the 'beneficial owner' directly or indirectly, of more than 50% of the Voting Shares of the Company," among other things not wholly relevant to this motions. Warrant § 2.4.

[3] For example, Wisk's opening Motion asserts that Archer breached the Settlement Agreement because its second payment was delayed. Mot. 4:1–24. It does not seem to make this argument again in Reply, nor would this succeed for Wisk, as it clearly accepted the amended terms—a later payment—when it tried to exercise its shares in March. *See* Oppo. 8:6–20 & n.2. Wisk also focuses on the Agreement language that Wisk's obligation to pay is "absolute, irrevocable and unconditional" but the issue here is not that Archer is trying to avoid its obligations entirely; it is

dispositive question here is whether the Tranche 2 stocks must be immediately exercisable, as Wisk argues, or can only be exercised upon a Liquidation Event, as Archer contends. The relevant portions of the agreement are as follows.

The Settlement Agreement provides that Archer will pay to Wisk, within five business days of the agreed upon date—six months after the date the Agreement was signed—"an amount equal to the Guaranteed Payment Amount." Agreement § 2.13(a). The parties do not dispute the calculation of that amount, about $██████.

What is disputed is whether Archer properly followed the following: "Subject to Section 2.13(b), Archer may, at its election, satisfy the Guaranteed Payment Amount in cash . . . and/or by vesting and making immediately issuable to Wisk shares of common stock from the Initial Unvested Share Tranche [Tranche 2] pursuant to the Guaranteed Payment Election Notice and the First Warrant." *Id.* The Election Notice is a form attached to the Agreement, which Archer completed and provided to Wisk on March 18. *See* Election Notice. The First Warrant is a contract attached to the Agreement, and it allows Wisk to purchase a certain amount of Archer's shares. The Warrant governs the first and second tranche of shares. *See generally* Warrant.

The Settlement Agreement also provides,

> [T]o the extent that Archer elects to pay all or any portion of the Guaranteed Payment Amount by vesting and making immediately issuable shares of common stock that are subject to the Initial Unvested Share Tranche [Tranche 2] . . . [and] to the extent that all or any portion of such shares of common stock that are proposed to be vested and made immediately issuable . . . are vested but not made immediately issuable or are made immediately issuable but are not vested . . . Archer shall satisfy and pay to Wisk any remaining Guaranteed Payment Amount . . . in cash, by wire transfer of immediately available funds.

Agreement § 2.13(b). In other words, if Archer pays Wisk in shares, those shares must be immediately vested and immediately issuable, and any remaining payment must be made in cash. *See id.*

The Agreement uses the Warrant's definition for "Initial Unvested Share Tranche"—the second tranche. *Id.* § 1.01. The Warrant in turn defines this as the 8,664,259 shares of Common

---

that Archer paid its obligations incorrectly—so these arguments are not persuasive.

6

1  Stock that Wisk "is entitled to purchase . . . which shall remain unvested and unexercisable unless
2  and until [Wisk] delivers to [Archer] a Guaranteed Payment Election Notice . . . to satisfy all or
3  any portion of the Guaranteed Payment Amount." Warrant § 1. That means that the shares exist
4  but are unvested and unexercisable unless and until Archer gives Wisk the proper Election Notice.
5  *See id.*

6  The Warrant further says that this second tranche "shall become vested with respect to
7  such number of Shares equal in value to the Guaranteed Payment Amount less any cash paid in
8  settlement of the Guaranteed Payment Amount, duly contained in the Guaranteed Payment
9  Election Notice." *Id.* Again, this means Archer may pay in a combination of cash and shares so
10 long as they equal the Guaranteed Payment Amount.

11 "Any portion of the Initial Unvested Share Tranche [Tranche 2] that does not become
12 vested and exercisable upon the delivery to [Wisk] of the Guaranteed Payment Election Notice
13 shall never become exercisable and will be forfeited by the Holder without any further action." *Id.*
14 The next section confirms, "The Shares issuable under this Warrant will become vested and
15 exercisable as set forth in Section 1 hereof." *Id.* § 2.2. Then, with respect to the shares that were
16 vested and exercisable in accordance with § 1, the Warrant "shall be exercisable . . . at any time
17 and from time to time on or before the earliest of (i) immediately prior to the closing of . . . a
18 Liquidation Event or (ii) . . . the 5th anniversary of [the Expiration Date]." *Id.* § 2.3.

19 Together, these clauses plainly permit Archer to pay Wisk in stocks from Tranche 2, and
20 that stock is vested upon delivery of the Election Notice. The parties do not contest that Archer
21 paid Wisk in 8,664,259 stocks from Tranche 2 in addition to the $ cash payment and
22 they do not contest that these stocks were properly vested. *See* Election Notice. The Warrant
23 language also clearly provides that these stocks became "exercisable upon the delivery" of the
24 Election Notice; that is because if they did not become exercisable upon delivery, they would
25 "never become exercisable and will be forfeited." Warrant § 1. And Archer does not assert that
26 the vested 8.6 million stocks were forfeited—which means they were (and are) exercisable.
27 Accordingly, there is no ambiguity in the plain language of the Warrant: the Tranche 2 shares
28 were exercisable immediately upon delivery. *See Shilling*, 2016 WL 7325013, at *5 (under

United States District Court
Northern District of California

1  Delaware law, which applies to the Warrant, "[c]lear and unambiguous language" is "given its
2  ordinary and usual meaning"). This also accords with the plain, unambiguous language of the
3  Agreement, that the Tranche 2 stocks must be "made immediately issuable" upon delivery of the
4  Election Notice. *See* Agreement § 2.13(b); *see also Hartford Cas. Ins. Co.*, 326 P.3d at 259
5  (under California law, which applies to the Agreement, contract language is given its "clear and
6  explicit" meaning).

7  Archer makes several counterarguments. First, it asserts that the Tranche 2 shares were
8  immediately issuable and exercisable, but under the language of the Warrant, Wisk was not
9  permitted to actually *exercise* them unless there was a Liquidation Event. But if Wisk could not
10 exercise its shares, the shares were not exercisable. *See Shilling*, 2016 WL 7325013, at *5 ("Clear
11 and unambiguous language" is "given its ordinary and usual meaning."). Archer points to no law
12 to the contrary.

13 Second, Archer relies heavily on the third and fourth sections in the Warrant to assert that
14 the Warrant language itself permits exercise of the Tranche 2 shares only upon a Liquidation
15 Event. Section 3 of the Warrant contains the "Method of Exercise" and outlines the procedure
16 Wisk must follow to exercise its shares. *See* Warrant § 3 (explaining that Wisk may exercise its
17 shares through Cash Exercise, Net Issue Exercise, or Automatic Cashless Exercise). For example,
18 one of the possible methods is through "surrender of this Warrant (with the notice of exercise form
19 attached hereto as Exhibit B duly executed) at the principal office of [Archer], and by the payment
20 to [Archer], by certified, cashier's or other check acceptable to [Archer] or by wire transfer . . . ."
21 *Id.* § 3.1. Each clause of Section 3, however, plainly applies only to "the Initial Vested Share
22 Tranche"—Tranche 1. *See id.* §§ 3.1–3.3.

23 Section 4 provides:

> Treatment of Warrant Upon a Liquidation Event: In the event of a Liquidation
> Event, either (a) [Wisk] shall affirmatively exercise this Warrant in full with
> respect to all remaining Shares for which the Warrant is then exercisable and such
> exercise will be deemed effective immediately prior to the consummation of such
> Liquidation Event or (b) if [Wisk] affirmatively elects not to exercise the Warrant,
> this Warrant will expire upon the consummation of such Liquidation Event;
> *provided*, *however*, should [Wisk] not affirmatively elect option (a) or (b), then the
> Warrant will automatically convert in full with respect to all remaining Shares for

> which the Warrant is then exercisable and such conversion will be deemed effective immediately prior to the consummation of such Liquidation Event with payment owed on the full exercise price on a cashless basis pursuant to Section 3.2 hereof. [Archer] shall provide [Wisk] with written notice of the foregoing . . . which is to be delivered to [Wisk] not less than ten (10) days prior to the closing or occurrence, as applicable, of the proposed Liquidation Event.

Warrant § 4. In other words, this section explains what happens to Wisk's unexercised exercisable shares should a Liquidation Event occur. Nowhere in this section does it say that Wisk may *only* exercise shares if a Liquidation Event occurs. Reading that limit into this section would also run contrary to the language in Warrant § 2.3, which affirmatively permits Wisk to exercise its shares "on or before . . . a Liquidation Event" and does not limit exercise to stocks in Tranche 1. Archer's interpretation of § 4 is simply wrong. *See Shilling*, 2016 WL 7325013, at *5 (noting a contract is only ambiguous if the relevant provisions "are *reasonably* or *fairly susceptible*" to different interpretations or meanings (emphasis added)).

Indeed, Archer asserts that § 4 is the counterpart to § 3 because § 3 explains methods of exercise for Tranche 1, so § 4 explains methods of exercise for Tranche 2. Again, this is wrong because it is not what the Warrant says. And logically, it does not make sense. Section 3 explains, procedurally, how Wisk can exercise the Tranche 1 stocks. Section 4 does not contain similar procedural instruction. Instead, it lays out what happens if there is a Liquidation Event—it says that Wisk can affirmatively exercise its remaining unexercised shares, but it does not say *how* to do so, in the way that § 3 explains how to. Though § 4 points to a subclause of § 3 for procedure, the purpose of § 4 itself is clearly different. And while § 3 applies only to Tranche 1 stocks, § 4 does not have that same limiting language. Instead, it uses general language like "all remaining shares," which encompasses *all* unexercised exercisable stocks, including Tranche 1 and Tranche 2 stocks. Archer's interpretation is contrary to the Warrant's plain language.

That no language—or attached form—in the Warrant explains *how* to exercise the Tranche 2 shares does not mean that the Warrant is invalid, that its language is ambiguous, or that the contract requires a Liquidation Event before the shares can be exercised. Imagine, for example, that the Warrant had no "Method of Exercise" section at all or any language explaining how to exercise shares, and that it included no exercise forms to fill out and exercise the stocks. The

9

1    Warrant and the Agreement would still have all the same language discussed above that mandates
2    that the Tranche 2 shares are immediately exercisable.  The lack of "how to" language would not
3    invalidate the rest of the agreements or cancel the purpose of the transactions.  Nor would it make
4    ambiguous any of the other language about immediate issuability and exercisability.  And
5    importantly, even if the Liquidation Event section in § 4 were still part of the Warrant, it still
6    could not be read as a limiting clause on how the stocks could be exercised because there is plainly
7    no language in the contract to support that interpretation.  Archer's theory is incorrect.

8    Archer also points out that Wisk edited the exercise form to use it for Tranche 2 shares,
9    which it says is evidence for its interpretation that Tranche 2 stocks were not to be exercised in the
10   same way as Tranche 1 stocks.  Oppo. 8:6–9:17.  This lacks merit for the same reasons as above—
11   just because the Warrant did not contain the method of exercise does not mean that the shares
12   could not be exercised.  And again, not only is this theory contrary to the unambiguous language
13   of the Warrant, it does not make sense.  Taking Archer's argument to its logical end point, if an
14   exercise form attached to the Warrant was a necessary prerequisite to exercise the Tranche 2
15   stocks, then the lack of form means they could never be exercised.  That is clearly not what the
16   contracts provide.  And, of course, Archer does not argue this because that would be contrary to
17   the plain language and purpose of the whole Settlement Agreement.  This theory too fails.

18   Finally, I note that both parties submitted extrinsic evidence that they say shed light on the
19   correct interpretation of the Agreement and Warrant.  But I can only consider extrinsic evidence if
20   the language in the agreements is ambiguous.  *See Brown*, 34 Cal. App. 5th at 432 (California
21   law); *Shilling*, 2016 WL 7325013, at *5 (Delaware law).  There is no ambiguous language in
22   either agreement.  I therefore decline to consider this evidence.

23   At bottom, the Agreement and Warrant require Archer to provide cash, exercisable stocks
24   from Tranche 2, or a combination of both to Wisk on the agreed date.  Archer provided cash, and
25   it provided nonexercisable stocks.  Under the plain language of the Agreement and Warrant, the
26   stocks it provided were required to be exercisable.  Archer therefore breached the Settlement
27   Agreement.

### III. REMEDIES

To remedy the breach, Wisk asserts that Archer must immediately pay in cash the rest of the Guaranteed Payment Amount, minus the $▮▮▮▮▮ in cash it already paid alongside the Tranche 2 stocks, plus interest. Mot. 7:25–8:6, 10:1–22. Archer says that even if it breached the Agreement, it should be required to make the stocks immediately exercisable, rather than pay that amount in cash. Oppo. 15:9–22.

To support its requested remedy, Wisk points to § 2.13(b) of the Settlement Agreement, which provides that if any of the Tranche 2 shares provided as part of the Guaranteed Payment Amount are not immediately vested or issuable, then Archer shall pay "any remaining Guaranteed Payment Amount that has not been paid in shares of common stock" from Tranche 2 "in cash, by wire transfer of immediately available funds." In the context of the rest of the Agreement, the language reads as confirming that Archer may pay the Guaranteed Payment Amount in any combination of cash and shares, and that to the extent that the shares do not fully cover the amount due, it must pay the rest in cash. What this clause does *not* say is that if Archer provides the right amount of stock in the wrong form, it must then pay the difference in cash. Though part of the "Guarantee" section of the Agreement, this clause does not say that the *remedy* for *breach* of contract is cash payment instead of stock payment. And, such an interpretation would be contrary to the plain language of the Settlement, which permits Archer to choose whether to pay in cash, stocks, or some combination of the two. *See* Settlement § 2.13(b).

Instead, California law provides—which Wisk does not contest, *see* Repl. 13:13–14:16—that when a contract is breached, the injured party "should receive 'as nearly as possible the equivalent of the benefits of performance.'" *Twitch Interactive, Inc. v. CreatineOverdose*, No. 21-CV-07006-JST (SK), 2023 WL 5993053, at *6 (N.D. Cal. July 20, 2023), *report and recommendation adopted*, No. 21-CV-07006-JST, 2024 WL 420704 (N.D. Cal. Feb. 5, 2024) (quoting *Lisec v. United Airlines, Inc.*, 10 Cal. App. 4th 1500, 1503 (1992)). California law also provides for prejudgment interest where there is "no dispute or uncertainty over the amount of damages" owed in a breach of contract claim. *Cheema v. L.S. Trucking, Inc.*, 39 Cal. App. 5th 1142, 1151–52 (2019), *as modified on reh'g* (Oct. 7, 2019); *see also* Cal. Civ. Code § 3287(a)–(b).

11

1    Here, the "equivalent of the benefits of performance," *Twitch*, 2023 WL 5993053, at *6, is requiring Archer to provide Wisk with the Tranche 2 shares and permitting Wisk to exercise them immediately. That is what I now ORDER Archer to do now, within seven days of this Order.

I also agree that Wisk is entitled to prejudgment interest for the breach of contract claim, because the amount owed at the time of breach—$▮▮▮▮▮▮—was "certain." *See* Cal. Civ. Code § 3287(a). Archer does not dispute this. Under my equitable powers to enforce settlement agreements, I find that Wisk is entitled to prejudgment interest because the share price of stocks is constantly changing, so while providing Wisk with immediately exercisable shares now is the closest it can get to the equivalent of the contract's original benefits, it is most equitable to provide interest based on the value of those shares in March. Tellingly, Archer does not contest that it would owe interest if it were found in breach. *See* Oppo. 15:9–22.

Under California law, the amount of interest is calculated at 10 percent per annum after a breach. Cal. Civ. Code § 3289(b). The breach occurred on March 21, 2024, when Wisk tried to exercise the shares but was prohibited from doing so, in breach of the contract. Accordingly, Archer owes Wisk $▮▮▮▮ per day between the day of breach and the hearing on this motion, which occurred on August 14, 2024. This amount shall be paid within fourteen days of this Order.

**CONCLUSION**

For those reasons, Wisk's motion is GRANTED in part. Wisk shall calculate the amount owed, confer with Archer, and submit a proposed Order within seven days of this Order.

**IT IS SO ORDERED.**

Dated: September 6, 2024

William H. Orrick
United States District Judge